.

EXHIBIT 1

**United States District Court**
**Southern District Of New York**



Melinda Serin, Judson Russ, Long Soui Lim,
Peri Kettler, Gordon Redner, and Thomas J. Smith,

        Plaintiffs

    v.

Northern Leasing Systems, Inc., Jay Cohen,
Rich Hahn, and Sara Krieger

        Defendants

**06 CV 1625**

JURY TRIAL DEMANDED

JUDGE ROBINSON

RECEIVED
MAR 0 1 2006
U.S.D.C. S.D. N.Y.
CASHIERS

# Verified Complaint

## Nature of the Action

1. This action arises out of defendants' racketeering scheme to intimidate out-of-state individuals into paying unwarranted sums of money by commencing fraudulent lawsuits in New York City Civil Court. Claiming to be financiers under alleged equipment finance leases, defendants brought actions seeking to recover relatively small sums, typically under $3,000. However, defendants were aware well before bringing such actions that plaintiffs' signatures on such leases had been forged. Nevertheless, defendants commenced these small claims proceedings - and even obtained fraudulent default judgments - in order to harass, intimidate, and thereby extort money from plaintiffs and others through threats of expensive long-distance litigation, of damage to credit rating, and/or entry of default judgments. On these and related grounds, plaintiffs assert claims under the federal racketeering statute, 18 U.S.C. §1962, and New York's

Anti-Deceptive Trade Practices Act, N.Y.G.B.L., §349, and seek compensatory, treble and/or punitive damages, together with attorneys' fees and expenses.

## Jurisdiction

2.    Jurisdiction is proper under the federal racketeering statute, 18 U.S.C. §1964( c), and the principles of supplementary jurisdiction, 28 U.S.C. §1367.  Defendants conducted a racketeering scheme in interstate commerce, through the use of interstate communication facilities.

## Parties

3.    Ms. Melinda Serin is a resident of Washington, D.C.

4.    Mr. Judson Russ is a resident of Orlando, Florida.

5.    Mr. Long Soui Lim is a resident of Marietta, Georgia.

6.    Ms. Peri Kettler is a resident of Port Townsend, Washington.

7.    Mr. Gordon Redner is a resident of Duncanville, Texas.

8.    Mr. Thomas J. Smith is a resident of Waukesha, Wisconsin.

9.    Defendant Northern Leasing Systems, Inc., is a New York corporation with its registered offices at 333 Seventh Avenue, New York, New York  10001, and principal executive offices at 132 West 31 Street, 14th Floor, New York, NY 10001.  Northern Leasing  claims to specialize in financing credit card point of sale (POS) terminals and other business equipment.

10.   Defendant Jay Cohen is and has been at all relevant times the President of the defendant Northern Leasing.

11.  Defendant Rich Hahn is and has been at all relevant times the Vice President for Sales of the defendant Northern Leasing.

12.  Defendant Sara Krieger is and has been at all relevant times the Vice President for Operations of the defendant Northern Leasing.

### Factual Allegations

13.  Defendants claim to be in the business of financing equipment for small businesses through so called "equipment finance lease" contracts.  Defendants' fraudulent scheme to entrap small businesspersons into equipment leases and personal guarantees by concealing material facts is at issue in a class action currently pending in the New York Supreme Court, New York County, *Pludeman v. Northern Leasing*, Index No. 04/101059 (Hon. Heitler, J.S.C.).  By a decision of April 7, 2005, that Court held that forgery-based claims, such as those at bar, were not part of that action.

14.  As summarized above, this case involves the systematic and repeated manner in which defendants attempted to and did intimidate individuals located around the country in essentially an effort to "shake them down" to pay defendants monies to which defendants never were entitled.  Based on forged documents, which defendants knew were forged, defendants uniformly sought to intimidate plaintiffs with dunning letters and phone calls, telling them that it would be more expensive for them to litigate defendants's claims in New York than it would be to pay off defendants.

15.  Obviously, when defendants commenced  legal proceedings, plaintiffs faced significant hurdles to having their day in court, including excessive expenses of

long-distance litigation, and multiple trips to New York. The relatively small amounts at issue would, as defendants were necessarily aware, have prevented these plaintiffs from obtaining counsel or from otherwise developing their defense. Further, plaintiffs' potential witnesses were all in his/her local area, and quite far from the New York court. Obviously, defendants' entire scheme was to designed to ensure that plaintiffs had no real opportunity to raise defenses to the lawsuit, thereby facilitating the entry of a default judgment.

16.     Once a judgment is entered in the New York courts, it would be almost impossible for plaintiffs and others to challenge defendants in the subsequent judgment enforcement actions without incurring costs far in excess of the judgment itself. Had defendants filed the suits in plaintiffs' home location to enforce their claims, they might have been able to present a defense, either through an attorney or by themselves.

17.     As shown below through the facts of each plaintiff, the repeated nature of the manner in which defendants acted and their wrongful behavior set the pattern and practice of a scheme unlawful under both federal and state law.

Ms. Serin

18.     In early 2003, Ms. Serin started receiving phone calls and dunning letters from defendants demanding sums allegedly due under a lease with defendant Northern Leasing. Ms. Serin had never heard of any of the defendants, and never had any dealings with them. Perplexed at the demand, Ms. Serin informed defendants that she had never signed any such lease, and that any such signature was a forgery.

4

19. After some communication with defendants, Ms. Serin received a General Release from Northern Leasing, releasing her from any liabilities under the said lease. The General Release was duly notarized on June 24, 2003. "Ex. A," General Release.

20. Nevertheless, Ms. Serin continued receiving dunning letters from defendants. Finally, on or about May 17, 2005, defendants sent Ms. Serin a lawyer's notice demanding $2,478 under the same lease, and threatening to sue her in New York. In their notice, they claimed that Ms. Serin was personally responsible for the lease obligations, and enclosed a Summons and Verified Complaint. Defendants offered to give her "one final opportunity" to pay them off within ten days.

21. Ms. Serin assumed that this was an oversight which would be rectified in due course.

22. However, by subsequent letter of June 15, 2005, defendants informed Ms. Serin that they had "obtained a summons/complaint against" Ms. Serin from the New York City Civil Court. Defendants now offered to settle for $743.

23. In response, Ms. Serin called up defendants and reminded them that the document was a forgery. Several weeks later, by an "Important Notice" dated September 2, 2005, defendants demanded a notarized affidavit of forgery from Ms. Serin, and at least 3 other pieces of evidence. In what appears to be a standard form letter, they stated:

> In order for Northern Leasing . . . to pursue this matter, we
> require three (3) different proofs of your signature to
> compare to the signature on our lease. These copies can

5

> include: a valid driver's license, a cancelled bank check, a copy of a passport, a social security card, an employee or school ID reflecting your signature, and the enclosed affidavit of forgery verifying your signature. Please ensure that the signature on your copy is legible.

These documents were to be sent to defendants' offices in New York.  When they received these documents, defendants represented, they would conduct an inquiry and inform Ms. Serin accordingly:

> Upon receipt of the documents, an investigation will be conducted and a determination will be made of the fraud claim.  You will be notified of our findings.

24.   On September 26, 2005, Ms. Serin sent the said affidavit of forgery, and other documents demanded by defendants.  These documents were duly received by defendants.

25.   However, Ms. Serin never received any "notification" from defendants about their "findings," assuming without conceding they conducted any "investigation" at all. Worse, in response to her phone inquiries, defendants demanded $750 to mark the account as "closed" and $1,250 for removing all adverse entries on her credit report.  Intriguingly, defendants' representatives refused to make this offer in writing.

26.   Defendants commenced an action against Ms. Serin here.  In the Verified Complaint filed with the New York City Civil Court, defendant Krieger falsely asserted, under penalties of perjury, that Ms. Serin had unconditionally and personally guaranteed the obligations under the said lease.  Without revealing

the General Release aforesaid, defendants demanded $2,478 with interest, and $495.60 towards attorneys' fees. "Ex. B," Summons and Verified Complaint.

27.   Ms. Serin once again attempted to reason with defendants. However, her repeated emails and telephone inquiries were simply met with a stonewalling response. All answers to her queries, she was told, were in the lease.

28.   Finally, Ms. Serin received a notice from the Clerk, Civil Court of the City of New York, that defendants' lawsuit against her was calendared for January 23, 2006. The official court notice stated that she had to appear in person in the Civil Court in New York (emphasis in original):

> THE CLERK CANNOT GRANT CHANGE IN THE SCHEDULED DATE OR TIME. YOU MUST APPEAR AND BRING THIS CARD WITH YOU.

29.   Ms. Serin had no choice but to come to New York to avoid an unwarranted default judgment against her. For this, she had to take time off from her work, spend time and resources on travel, boarding, and lodging expenses in New York.

30.   Ms. Serin did so, and came to New York to attend the City Civil Court as required on January 23, 2006. However, after making her wait for about an hour in Court, defendants' representative came to the City Civil Court, and voluntarily withdrew the bogus lawsuit against her with prejudice and without costs.

31.   Meanwhile, defendants made derogatory entries in Ms. Serin's credit report. As a result, she suffered the usual consequences of such adverse reports, apart

from having to retain attorneys and incurring legal expenses in New York.[1]  In addition, she was unable to secure a mortgage at affordable rates in order to purchase her first home.

## Mr. Judson Russ

32.    Mr. Russ is the principal of Rapid Cash Advances, Inc., a Florida corporation located in Orlando, Florida.

33.    In May 2002, Mr. Russ discovered that defendant Northern Leasing had been electronically debiting funds from four of his corporate accounts.  He contacted defendants demanding an explanation.  Defendants' representative told him that someone had signed four leases in his name.  Mr. Russ demanded a copy of the four alleged documents.

34.    Defendants send him the documents.  Upon review, the forgery was clear and undisputable:  Mr. Russ was in Ukraine at the time when these documents were signed.  He so informed defendants.

35.    Defendants thereupon sent him their standard form letter referred to above, demanding a notarized affidavit of forgery and 3 other pieces of evidence of signature.

36.    Mr. Russ filled out an Affidavit of Forgery as demanded by defendants.  He presented evidence of his absence from the United States at that time, including

---

[1]Such damages include, for example, increased interest rates on existing debts, loss of promotional opportunities, curtailment and even possible refusal of credit.  P. McGeehan, *The Plastic Trap: Soaring Interest Compounds Credit Card Pain for Millions*, N.Y. Times, Nov. 21, 2004, at A1.

copies of his passport stamped by the Immigration and Naturalization Service, and even receipt of an ATM withdrawal in Odessa, Ukraine at that time.

37. Defendants never sent Mr. Russ any "notification" of any "findings, assuming without conceding that defendants conducted any investigation. Nevertheless, defendants insisted that his signatures on each of the leases were genuine, not forgeries, and continued to debit his accounts.

38. Indeed, even after Mr. Russ closed Rapid Cash's corporate account, defendants started to debit funds electronically from another, completely separate corporation. Information for this account was not listed on even the forged contracts.

39. Obviously, defendants' electronic deductions from the said account were unauthorized and illegal.

40. Mr. Russ was forced to close his business accounts because of defendants' unauthorized withdrawals. Thereafter, defendants commenced their dunning process, threatening their usual lawsuit in New York.

41. Defendant Northern Leasing then brought 4 actions against Mr. Russ in the New York City Civil Court, in a bid to bully him into paying them $2,124, with costs, in each action, or totally, $8,496 with costs.  In each of the Verified Complaints filed with the New York City Civil Court, defendant Krieger falsely asserted, under penalties of perjury, that Mr. Russ had unconditionally and personally guaranteed the obligations under the leases.

42.   Mr. Russ got notices from the City Civil Court requiring his personal attendance in Court in New York, whereupon he had to retain attorneys in New York.[2]

43.   In addition, defendants made derogatory entries in Mr. Russ's credit report. These entries have not be erased, and Mr. Russ has been informed by the credit reporting companies that only Northern Leasing could erase these reports.

44.   As a result, Mr. Russ suffered the consequences of such adverse reports, apart from having to retain attorneys and incurring legal expenses in New York.  In addition, he was also damaged in his business because he was unable to get a lease for his business due to such entries.  Defendants took over $4,000 from his corporate accounts, and ruined his credit, and sued him based on documents which were clearly forged.

Mr. Long Soui Lim

45.   In May of 2001, Mr. Lim received a copy of a Summons and Verified Complaint filed by defendants in the City Civil Court demanding $2,060.26 from him.  That copy had been mailed to Mr. Lim's old address at 3251 Old Concord Road, Smyrna, GA 30082, and forwarded to him at his new address at 2105 Taylor Meadows Way, Marietta, GA 30008.

46.   Immediately upon receipt of that Summons and Complaint, Mr. Lim called and informed defendants that the signatures on the lease underlying that action were a forgery.

_____

[2]Those lawsuits have been held in abeyance upon consent of the attorneys for the parties.

47.   Defendants demanded that Mr. Lim send him a copy of identification documents to verify his signature and identity.  Mr. Lim promptly sent a copy of his driver's license and other documents, which reflected the new address at Marietta, Georgia.

48.   Mr. Lim never heard back from defendants.

49.   On or about July 9, 2001, Mr. Lim sent two letters to defendants, one addressed to defendant Krieger, and the other to Ms. Erica Cohen, Esq., the attorney whose name appeared on the Summons and Complaint.

50.   Neither defendant Krieger nor anyone else responded to Mr. Lim's letters.

51.   More than two years thereafter, according to records of the New York City Civil Court, defendants purported to serve Mr. Lim with another Summons and Complaint. According to the Affirmation of Service, a Summons and Complaint dated July 29, 2003, was delivered on or about October 20, 2003, once again to Mr. Lim's old address at 3251 Old Concord Road, Smyrna, Georgia  30082.

52.   Mr. Lim never received a copy of this Summons and Complaint.

53.   Indisputably, defendants were well aware of Mr. Lim's current address at Marietta, Georgia from previous correspondence, and from his driver's license. However, defendants purported to effect service of process at his old address.

54.   Consequently, Mr. Lim was not even aware of defendants' lawsuit against him in the City Civil Court in New York.

55.   Defendants proceeded to enter a default judgment against Mr. Lim in the sum of $3,253.63 in May 2004.

11

56. Mr. Lim learned of the said entry of default judgment against him in the Civil Court of the City of New York, in August 2004, through a credit report.

57. On or about August 31, 2004, Mr. Lim sent a letter to defendant Krieger objecting to the default judgment, noting his surprise and the wrongful nature of the suit. Further, he said:

> This is a very serious matter; therefore, your immediate attention and explanation is a must.

Mr. Lim reiterated the above facts, confirming once again that he had "never seen the lease agreement nor [had he] sign[ed] it." Further, he recorded:

> It has been more than three years already, I have not hear [*sic*, heard] or get [*sic*, received] a reply from Mr. James, Ms. Erika Cohen or you. Not only has this matter has not been resolved, but it has been escalated. I will hold you responsible for this fraud.
> I will allow you ten days to clear my name and respond to my letter. . . . I promise you that I will bring justice to fix your corruption.

58. As before, defendants never bothered responding to that letter either.

59. Mr. Lim then called Northern Leasing, and asked for a copy of the judgment. Defendants' representative refused to send such a copy unless Mr. Lim was willing to satisfy this judgment.

60. Thereafter, Mr. Lim wrote to the Court Clerk of the New York City Civil Court about this fraud. However, he was advised that he would need to hire an attorney in New York, and set aside this judgment which has been causing, and continues to cause, him irreparable harm by adversely affecting his credit rating.

61. From the Court files, it is clear that defendants did not advise the City Civil Court that (a) Mr. Lim was not residing at Smyrna, Georgia; and (b) Mr. Lim had

12

specifically asserted, with supporting documents, that defendants' entire claim was predicated on a forged document. Instead, defendants deliberately used Mr. Lim's old address to secure a judgment on default.

62. Mr. Lim had to retain a lawyer and incur legal expenses in New York to set aside the default judgment.[3]

63. Meanwhile, defendants made derogatory entries in his credit reports. As a result, he has suffered the usual consequences of such adverse reports, apart from having to retain attorneys and incurring legal expenses in New York. Defendants ruined his credit, sued him, and even obtained a default judgment based on documents which were clearly forged.

Mr. Gordon Redner

64. On or about January 27, 2004, Mr. Redner met with defendants' local sales representative in Texas for purposes of leasing a credit card terminal. During that meeting, he signed two applications. The first was for credit card check usage with Sterling Payment Technologies, and another, for the credit card machine, with the First American-Hurst.

65. Mr. Moore did not talk about or even mention Northern Leasing Systems, Inc., at that time. Mr. Redner never signed any document with defendants.

---

[3]Even when the manifest errors were pointed out to defendants, they refused to voluntarily vacate the default judgment against Mr. Lim, let alone dismiss the lawsuit. As a result, Mr. Lim's attorneys had to commence motion practice, whereupon defendants had no choice but to acknowledge that the default judgment ought to be vacated. Even so, defendants insisted on proceeding with the lawsuit against Mr. Lim, and even sought to compel Mr. Lim to come to New York for a deposition on their claim for $3,253. Mr. Lim's attorneys had to commence motion practice once again seek dismissal for insufficient service and want of jurisdiction, which motion is now pending.

13

66.    The first time Mr. Redner became aware of the existence of defendants was when they commenced electronic withdrawals from his bank account and defendant Northern Leasing's name appeared on his bank statement.  He never had any paperwork concerning NLS.  He got their telephone number from the internet.

67.    Mr. Redner called defendants to inquire about the deduction.  Thereupon, they claimed to be lessors, and sent him a copy of his alleged lease with them.

68.    Mr. Redner had never even seen this lease before.  Clearly, his signature was forged on this document, based on the contracts he signed with Sterling Payment Technologies and First American-Hurst.

69.    Obviously, Mr. Redner never signed any pre-authorization for NLS for automatic electronic deduction from any bank account.  Nevertheless, NLS routinely deducted funds electronically, through the use of interstate wires, from his bank account at Duncanville, Texas.

70.    Eventually, Mr. Redner had to close his bank account to prevent such unauthorized withdrawal.

71.    Thereafter, defendants commenced their dunning process, threatening their usual lawsuit in New York.

72.    Meanwhile, defendants made derogatory entries in his credit reports.  As a result, he has suffered the usual consequences of such adverse reports, apart from having to retain attorneys and incurring legal expenses in New York.

Ms. Peri Kettler

73.    Ms. Kettler is the principal of Yodamo, Inc., a small business in Port Townsend, Washington.

74.    Around December 2001 - January of 2002, Ms. Kettler received an unsolicited e-mail for lease of credit card payment terminal.  After further communication, she agreed to lease a specific equipment, a Tran 330 with a printer.  Since defendants' representative, an allegedly unaffiliated vendor called "First National Processing", was in Illinois, the lease was to be sent by mail.  Defendants' representative expressly advised Ms. Kettler that she should ask the UPS driver to wait while she opened the package, signed the lease, and gave it back to the driver for return overnight UPS service.

75.    Consistent with this, on or about January 9, 2002, Ms. Kettler received a standard form one page lease agreement with defendants by mail, through UPS Next Day Air Service.  She signed and returned the original of this lease to the UPS driver as advised by Northern Leasing's representative, and kept a copy of the said document for her records.

76.    Thereafter, Ms. Kettler received a credit card terminal different from that specified in the lease, and which terminal she could not use.  In response to her complaints and inquiries, defendants claimed that her lease was noncancellable, and they would send her a copy.

77.    About three weeks later, on or about February 1, 2002, Ms. Kettler received a four page lease, which was clearly *not* the lease that she had signed.  While the format of the first page appeared to be the same, the document she signed had

15

a footer saying "Page 1," while the document defendants sent her had a footer saying "Page 1 of 4." In addition, their document had different entries/markings under the boxes entitled "Payable at Signing of Lease", "Lease Acceptance," and "Personal Guaranty." Clearly, her signature had been forged on the lease.

78.   On or about March 11, 2002, Ms. Kettler returned the equipment to defendant Northern Leasing Systems with a notice of cancellation of the lease for fraudulent misrepresentation. Defendants refused the equipment, but continued their automatic deduction month after month. Eventually, in August 2003, Ms. Kettler closed the bank account; meanwhile, defendants had wrongfully collected about $900 cumulatively.

79.   Thereafter, defendants commenced their dunning process, threatening their usual lawsuit in New York. In response, Ms. Kettler reminded them of the above facts. But to no avail.

80.   In the Verified Complaint filed with the New York City Civil Court, defendant Krieger falsely asserted, under penalties of perjury, that Ms. Kettler had unconditionally and personally guaranteed the lease obligations, and demanded $1,390.26 with interest and costs.

Thomas J. Smith

81.   Mr. Smith is a resident of Waukesha, Wisconsin.

82.   In October 2002, Mr. Smith arranged for credit card processing facilities through a local supplier, Tarly Dall. Upon discovering that the rates being charged were significantly higher, Mr. Smith stopped using the processing facilities altogether.

83.   Thereafter, Mr. Smith started receiving dunning calls and letters from defendants, purportedly based on his signature on the lease.  Mr. Smith informed them that he never signed any such document, and had no agreement with defendants.

84.   Nevertheless, defendants have commenced an action against Mr. Smith in New York City Civil Court.  In the Verified Complaint filed with the New York City Civil Court, defendant Krieger falsely asserted, under penalties of perjury, that Mr. Smith had unconditionally and personally guaranteed the lease obligations, and demanded $1,764 with interest, and $352.80 towards attorneys' fees.

**Count I**

**(RICO, 18 U.S.C. §1962( c))**

85.   The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

86.   The association of defendants, certain attorneys retained by defendants, salesmen and others whose identities are known only to defendants at this time (cumulatively, the "Conspirators"), constituted an enterprise within the meaning of 18 U.S.C. §1961(c), which enterprise was engaged in, and whose activities affected, interstate and foreign commerce.  This enterprise was continuous in that it lasted for more than two years, had an ascertainable structure, and was distinct from the predicate offenses alleged here.

87.   Each defendant is a person within the meaning of 18 U.S.C. §1961(3) and separate from the enterprise.

17

88. Defendant Cohen, the President of the defendant Northern Leasing, was in charge of all its operations. As such, he set up, orchestrated, and supervised the entire racketeering scheme at issue.

89. Defendant Hahn, the Vice President for Sales of the defendant Northern Leasing, was the supervisor of its internal account managers and customer service. As such, he was in-charge of monitoring the racketeering scheme at issue.

90. Defendant Krieger, the Vice President for Operations of the defendant Northern Leasing, was responsible for several aspects of its day-to-day operations and sales. In addition, she routinely verified the fraudulent complaints filed in the New York City Civil Court under penalties of perjury.

91. Defendants participated, and conspired with others (including their attorneys and others whose identities are known only to defendants at this time) to participate, in the affairs of the aforementioned enterprise through a pattern of racketeering activity, as more fully set forth below, an all in violation of 18 U.S.C. §§ 1962(c).

Extortion Under The Hobbs Act, 18 U.S.C. §1951

92. Defendants had and implemented a practice and pattern of starting bogus legal proceedings based on false representations and solely for the purpose of injuring plaintiffs and recovering unwarranted sums through extortion.

93. For this purpose, defendants affirmatively misrepresented in filings with the City Civil Court in New York, under penalties of perjury, that

a. Ms. Serin "unconditionally guaranteed all of the merchant's obligations to" defendant Northern Leasing;

18

b.      Ms. Serin "personally guaranteed" a "non-cancelable equipment lease agreement" with defendant Northern Leasing;

c.      Ms. Serin "consented" to litigation in New York;

d.      There was "presently due and owing" from Ms. Serin to Northern Leasing the sum of $2,478 with interest thereon from March 1, 2002;

e.      There "is due and owing" from Ms. Serin to Northern Leasing attorneys' fees in the sum of $495.60;

94.   Defendants similarly affirmatively misrepresented in 4 different filings with the City Civil Court in New York, under penalties of perjury, that in each of those 4 cases,

a.      Mr. Russ "unconditionally guaranteed all of the merchant's obligations to" defendant Northern Leasing;

b.      Ms. Russ "personally guaranteed" a "non-cancelable equipment lease agreement" with defendant Northern Leasing;

c.      Ms. Russ "consented" to litigation in New York;

d.      There was "presently due and owing" from Ms. Russ to Northern Leasing the sum of $1,770 with interest thereon;

e.      There "is due and owing" from Ms. Russ to Northern Leasing attorneys' fees in the sum of $354;

95.   Defendants similarly affirmatively misrepresented in filings with the City Civil Court in New York, under penalties of perjury, that

a.      Mr. Lim "unconditionally guaranteed all of the merchant's obligations to" defendant Northern Leasing;

19

    b.      Mr. Lim "personally guaranteed" a "non-cancelable equipment lease agreement" with defendant Northern Leasing;

    c.      Mr. Lim "consented" to litigation in New York;

    d.      There was "presently due and owing" from Mr. Lim to Northern Leasing the sum of $2,060.26 with interest thereon;

    e.      There "is due and owing" from Mr. Lim to Northern Leasing attorneys' fees in the sum of $412.05;

    f.      That defendants were entitled to a default judgment in the amount of $3,253.63 against Mr. Lim.

96.   Defendants similarly affirmatively misrepresented in filings with the City Civil Court in New York, under penalties of perjury, that

    a.      Ms. Kettler "unconditionally guaranteed all of the merchant's obligations to" defendant Northern Leasing;

    b.      Ms. Kettler "personally guaranteed" a "non-cancelable equipment lease agreement" with defendant Northern Leasing;

    c.      Ms. Kettler "consented" to litigation in New York;

    d.      There was "presently due and owing" from Ms. Kettler to Northern Leasing the sum of $1,158.55 with interest thereon;

    e.      There "is due and owing" from Ms. Kettler to Northern Leasing attorneys' fees in the sum of $231.71;

97.   Defendants similarly affirmatively misrepresented in filings with the City Civil Court in New York, under penalties of perjury, that

a.   Mr. Smith "unconditionally guaranteed all of the merchant's obligations to" defendant Northern Leasing;

b.   Mr. Smith "personally guaranteed" a "non-cancelable equipment lease agreement" with defendant Northern Leasing;

c.   Mr. Smith "consented" to litigation in New York;

d.   There was "presently due and owing" from Mr. Smith to Northern Leasing the sum of $1,764 with interest thereon;

e.   There "is due and owing" from Mr. Smith to Northern Leasing attorneys' fees in the sum of $352.

98.   Defendants also threatened Mr. Redner with a similar lawsuit in New York City Civil Court. However, Mr. Redner retained attorneys in New York, and submitted an affidavit in the class action referred to above. Presumably as a result, defendants have not commenced their threatened lawsuit.

99.   Defendants knew, and should have known, that the above representations were false when made. Defendants' knowing fraud upon, and/or their intentional misrepresentations to, the Court deprived the litigation of its legitimacy.

100.   Nevertheless, defendants commenced at least 5 actions in The New York City Civil Court with the aforesaid false statements. Based upon such actions, they attempted to extort undeserved sums of money from plaintiffs.

101.   Thereby, defendants used wrongful means for a wrongful objective, with an intent to obtain that which in justice and equity defendants were not entitled to, and knew that they were not entitled to, receive.

102.   Defendants affected interstate commerce by extortion and/or attempted or conspired so to do.

103.   Defendants attempted to extort property from each plaintiff, with each plaintiff's consent, induced by wrongful use of actual or threatened fear of economic loss and/or injury.  Such loss or injury included, without limitation, legal expenses in long-distance litigation, damage to credit rating, and/or entry of default judgments which could remain valid and enforceable for upto 20 years.

## Extortion Under New York Law

104.   Plaintiffs incorporate the aforesaid allegations herein by reference.

105.   Defendants intended to deprive plaintiffs and others of property or to appropriate the same to themselves.  They wrongfully took or obtained, or attempted to take or obtain, such property from each plaintiff.

106.   Defendants wrongfully attempted to take such property by compelling or inducing plaintiffs and other persons to deliver such property to defendants.  They did so by attempting to induce a fear that, if the property is not so delivered, defendants will cause damage to plaintiffs' property, or engage in other conduct constituting a crime, or testify or provide false information with respect to defendants' legal claim.

107.   Thereby, defendants committed the offense of extortion under New York's Extortion Act, N.Y. Penal Law, §155.05.

108.   Defendants' extortions are chargeable under New York law and punishable by imprisonment for more than one year.  As such, they constitute predicate racketeering acts under 18 U.S.C. §1961.

Pattern of Racketeering Activity

109.   The aforesaid acts had the same or similar purposes, results, participants,

victims, and/or methods of commission, and were otherwise interrelated by

distinguishing characteristics and were not isolated events.  The pattern of

racketeering activity engaged in by defendants consisted of a scheme executed

by the aforementioned conspirators from January 1998, and continuing to date,

to extort and collect unwarranted sums through litigation based on perjurious

averments or threats thereof.  That pattern included multiple predicate acts of

extortion.

110.   The racketeering acts identified hereinabove were related to one another and

formed a pattern of racketeering activity in that they: (a) were in furtherance of a

common goal, including the goal of profiting illegally by improperly commencing

or threatening fraudulent litigation; (b) used similar methods (c) had similar

participants; and (d) had similar victims.

111.   The acts of racketeering activity extended over a substantial period of time from

January 1998, and continue to this day.  They were sufficiently continuous to

form a pattern of racketeering activity.

112.   Defendants participated in the scheme through themselves, and, in the case of

Northern Leasing, its representatives, salesmen, employees and officers, and

others whose identities are known only to defendants at this time.  Defendants

benefitted enormously by the profits they made, and the various amounts

collected derived through bullying, and intimidating plaintiffs and others.  The

23

Conspirators knew, enabled, and actively participated in the racketeering scheme.

113. Defendants engaged in a pattern of racketeering activity consisting of extortion. The predicate acts occurred over a period of well over 6 years. Defendants received income from these patterns in the form of unwarranted payments. Defendants disbursed these funds amongst themselves in a manner known only to them.

114. Each defendants' participation was critical to the racketeering scheme. They enabled, conducted, maintained, aided, and abetted the racketeering scheme by:

   a.   Drafting and preparing letters, "Important Notices," Verified Complaints, and other documents;

   b.   Supervising, conducting, and monitoring the conduct of the fraudulent scheme;

   c.   Concealing the scheme or, alternatively, consciously avoiding discovery of the scheme;

   d.   encouraging third parties to participate in the racketeering scheme;

   e.   wilfully violating, or being recklessly indifferent to, mandatory requirements of federal law and procedure concerning racketeering, and the misuse of the judicial system;

   f.   Wilfully violating or being recklessly indifferent to their legal obligations to verify the legality of the alleged lease agreements to ensure that they were not fraudulently procured; and

g.     Wilfully violating or being recklessly indifferent to their legal obligations to

conduct "due diligence" with respect to the accounts at issue.

115.   The precise role played by each defendant is known only to defendants at this

time.  Such information, and evidence concerning their participation, is

exclusively within the possession and knowledge of defendants.

116.   Plaintiffs have been injured in their business or property by reason of

defendants' violation of 18 U.S.C. §1962(c).  As a direct and proximate result of

these violations, plaintiffs have been injured in that, inter alia, they had to waste

time and resources in responding to defendants's dunning calls, threats, lawsuit

in New York, retaining lawyers and incurring legal expenses therefor.  In addition,

plaintiffs' credit rating has also been adversely affected, and they have suffered

damages as a consequence as detailed above.

117.   By reason of this violation of 18 U.S.C. §1964(c), plaintiffs are entitled to recover

from defendants three times their damages plus pre- and post- judgment

interest, costs and attorneys' fees.

## COUNT II

### (Violation of 18 U.S.C. § 1962(d))

118.   The contents of the above paragraphs are incorporated herein by reference as if

fully set forth herein.

119.   In violation of 18 U.S.C. § 1962(d), defendants and others whose identities are

known only to defendants at this time conspired to violate the provisions of 18

U.S.C. §1962(c) in that, beginning no later than January 1998 and continuing

through today, they knowingly agreed and conspired to conduct or participate,

25

directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity described above. The volume and frequency of the transactions, and the continuance of the scheme at issue for over 6 years, could not have occurred without the consent and knowing connivance of defendants and other Conspirators.

120. As part of and in furtherance of their conspiracy, each defendant agreed to and conspired in the commission of the many predicate acts described above, with the knowledge that they were in furtherance of that pattern of racketeering activity. As part of and in furtherance of their conspiracy, each defendant agreed to and did commit at least two predicate acts of racketeering.

121. Plaintiffs have been injured in business or property by reason of defendant's violations of 18 U.S.C. S 1962(d).

122. As a direct and proximate result of each defendant's violations, plaintiffs have been injured as aforesaid.

123. By reason of defendants's violation of 18 U.S.C. §1964(d), plaintiffs are entitled to three times their damages plus interest, costs and attorneys' fees.

## Count III

### (N.Y. General Business Law Article 22-A)

124. Plaintiffs incorporate the contents of the paragraphs hereinabove.

125. Defendants committed deceptive acts or practices in the conduct of business in New York. Their conduct was unlawful and of a recurring nature, and strongly affected the public interest. By its conduct aforesaid, defendants violated Article 22-A (Section 349) of New York's General Business Law.

126. Plaintiffs sustained damages due to the defendants' violation.  Accordingly, under Section 349(h) of New York's General Business Law, plaintiffs are entitled to recover compensatory and treble damages and reasonable attorneys' fees and expenses.

127. Plaintiffs demand a trial by jury.

      **WHEREFORE**, plaintiffs demand judgment against defendants on each Count aforesaid:

a.    awarding compensatory, punitive, and/or treble damages to plaintiffs in such amount, not less than $10 million, as may be determined after discovery and trial;

b.    awarding plaintiffs the costs of this action, including reasonable attorneys' fees and expenses, experts' fees and other disbursements; and

c.    for such further and other reliefs as may be just and proper.

Dated:    New York, New York
             February 24, 2006

**Chittur & Associates, P.C.**

By:  Krishnan Chittur, Esq. (KC9258)
The Lincoln Building 15th Floor
60 East 42nd Street 1501
New York, NY 10165
Tel: (212) 370-0447

Attorneys for Plaintiffs

27

<u>Verification</u>

Melinda Serin, being duly sworn, states that the factual contents of the Verified Complaint are true insofar as they concern her, and the remaining averments are based upon information and belief, which she believes to be true.

_District of Columbia:_

Solemnly Affirmed this _27th_

day of February, 2006

Notary Public

MY COMMISSION EXPIRES
SEPT. 30, 2006

Melinda Serin

<u>Verification</u>

Thomas J. Smith, being duly sworn, states that the factual contents of the
Verified Complaint are true insofar as they concern him, and the remaining averments
are based upon information and belief, which he believes to be true.

_____
Thomas J. Smith

Solemnly Affirmed this 25th

day of February, 2006

_____
Notary Public

State of Wisconsin
County of Waukesha

my commission expires 1-10-10.

## Verification

Judson Russ, being duly sworn, states that the factual contents of the Verified Complaint are true insofar as they concern him, and the remaining averments are based upon information and belief, which he believes to be true.


Judson Russ

Solemnly Affirmed this

day of February, 2006

_____
Notary Public

MARIA V. ROSA
Notary Public - State of Florida
My Commission Expires Sep 18, 2007
Commission # DD 250016

Verification

Long Soui Lim, being duly sworn, states that the factual contents of the Verified

Complaint are true insofar as they concern him, and the remaining averments are

based upon information and belief, which he believes to be true.

_____
Long Soui Lim

Solemnly Affirmed this 25

day of February, 2006

_____
Notary Public
Notary Public, Douglas County, GA
My Commission Expires
August 16, 2007

## Verification

Gordon Redner, being duly sworn, states that the factual contents of the Verified Complaint are true insofar as they concern him, and the remaining averments are based upon information and belief, which he believes to be true.

_Gordon S. Redner_
Gordon Redner

Solemnly Affirmed this

day of February, 2006

_Indria Elliott_ 2/27/06
Notary Public

INDRIA MICHELLE ELLIOTT
Notary Public
STATE OF TEXAS
My Comm. Expires 12-10-2006

Exhibit A

# GENERAL RELEASE

Northern Leasing Systems, Inc. and its predecessors and successors, respective heirs, administrators, executors, successors and assigns and any and all other persons, firms, and corporations who have acted or who might be claimed to have acted, in concert with, or on behalf of them or any of them (collectively, the "RELEASORS") do hereby remise, release and forever discharge **MELINDA J. SERIN** and **JIM CAMERON GARAGE DOORS** his/her predecessors and subsidiaries, divisions, parents, assigns and its respective subsidiaries and affiliates, the officers, directors, employees, attorneys and agents, past and present, for each of the foregoing, together with his respective heirs, administrators, executors, successors and assigns and any all other persons, firms and corporations who have acted or who might be claimed to have acted, in concert with, or on behalf of them or any of them (collectively, the "RELEASEES") of and from any and all manner of action and causes of action, suits, debts, claims and demands whatsoever, in law or in equity, in connection with all matters or contractual obligations, known or unknown, in any way relating to the lease agreement number **0228846** between Northern Leasing Systems, Inc. and **JIM CAMERON GARAGE DOORS** as lessee and **MELINDA SERIN** as guarantor. IN WITNESS WHEREOF, the undersigned have caused this RELEASE to be executed as of the 24th day of June 2003

NORTHERN LEASING SYSTEMS, INC.

_Bonita Burton_
Authorized Signature

_Bonita Burton_    _Legal Rep_
Print Name          Title

STATE OF NEW YORK   }
                    } s.s.:
COUNTY OF NEW YORK }

ARACELIS DIAZ
Notary Public, State Of New York
No. 01DI6043033
Qualified In New York County
Commission Expires 06/05/2006

On this 24 day of _June_ ,2003, before me personally came _Bonita Burton_, to me known and known to me by the individual described in and who executed the foregoing instrument, and duly acknowledged to me that he/she executed the same, and who further stated that he/she is a duly authorized representative of Northern Leasing Systems, Inc., and that this Release is, and shall be, binding on Northern Leasing Systems, Inc.

_Aracelis D_
Notary Public

Exhibit B

CIVIL COURT OF THE CITY OF NEW YORK        Index No.
COUNTY OF NEW YORK

| | |
|---|---|
| NORTHERN LEASING SYSTEMS, INC.        ) | |
|          ) | |
| Plaintiff,          ) | **VERIFIED COMPLAINT** |
|          ) | |
| -against-          ) | |
|          ) | |
| MELINDA J. SERIN A/K/A MELINDA SERIN    ) | |
|          ) | |
| Defendant(s).          ) | |
|          ) | |

PLAINTIFF, Northern Leasing Systems, Inc. ("Plaintiff"), by its attorney JOSEPH I. SUSSMAN, as and for its complaint against Defendant herein, alleges as follows:

## PARTIES

1.    Plaintiff was and is a corporation engaged in the lease finance business, is duly organized and existing under the laws of the State of New York, and maintains its principal office in New York City, at 132 West 31st. Street, New York, New York 10001.

2.    Upon information and belief, Defendant MELINDA J. SERIN ("defendant") was and is an individual residing in the State of DC.

## FACTUAL ALLEGATIONS

3.    In the course of its business, plaintiff leases credit card verification equipment ("equipment") to merchants who wish to utilize credit card transactions in their businesses.

4.    The equipment is chosen by the merchant and provided by an independent third party vendor.

5.    Pursuant to the business described above, on 9/7/2001, plaintiff entered into a non-cancelable equipment lease agreement ("agreement") with JIM CAMERON GARAGE DOORS ("the merchant"), payment on which was personally guaranteed by defendant. A copy of the agreement is annexed hereto as Exhibit A.

6.    Defendant unconditionally guaranteed all of the merchant's obligations to plaintiff under the agreement, including the basic monthly lease payment by the merchant to plaintiff of $59.00, plus applicable taxes, for a period of 48 months.

7.    Further, the agreement provides that in the event of a default, plaintiff may require immediate payment of all amounts then due plus the unpaid balance of amounts due for the original term of the agreement.

8.    In the event of a default in payment under the agreement, the agreement provides that the merchant will pay plaintiff's reasonable attorneys' fees.

9.    The merchant defaulted on the monthly payments under the agreement. The last payment under the agreement was made by the merchant on 2/1/2002, for a total amount paid of $354.00.

## JURISDICTION

10.     The agreement provides, and defendant consented thereto, that all actions, proceedings, or litigation with respect to the obligations under the agreement shall be instituted and prosecuted in the Courts of the State of New York, the jurisdiction in which plaintiff maintains its principal place of business.

## AS AND FOR A FIRST CAUSE OF ACTION

11.     Plaintiff repeats, reiterates and re-alleges the allegations contained in paragraphs "1" through "10" of the verified complaint with the same force and effect as if more fully set forth herein.

12.     As a result of merchant's failure to make the payment due on 3/1/2002 and each and every monthly lease payment due thereafter, there has been a default under the agreement.

13.     By reason of the foregoing, there is presently due and owing from the merchant to plaintiff the remaining unpaid lease balance of $2,478.00, with interest thereon from 3/1/2002.

14.     Accordingly, by reason of the defendant's personal guaranty, there is presently due and owing from defendant to plaintiff the sum of $2,478.00, with interest thereon from 3/1/2002.

## AS AND FOR A SECOND CAUSE OF ACTION

15.     Plaintiff repeats, reiterates and re-alleges the allegations contained in paragraphs "1" through "14" of the verified complaint with the same force and effect as if more fully set forth herein.

16.     The agreement provides for the merchant's payment of plaintiff's reasonable attorneys' fees in the event of a default under the agreement.

17.     In this action, plaintiff's reasonable attorneys' fees are in the sum of $495.60.

18.     Accordingly, by reason of the defendant's personal guaranty, there is due and owing from the defendant, to plaintiff, attorneys' fees in the sum of $495.60.

WHEREFORE, plaintiff demands judgment against defendant as follows:

A.     In the First Cause of Action against defendant, the sum of $2,478.00, with interest from 3/1/2002;

B.     In the Second Cause of Action against defendant, for reasonable attorneys' fees in the sum of $495.60;

C.     For such other and further relief as this Court may deem just and proper.

Dated New York County, NY: May 17, 2005

JOSEPH I. SUSSMAN
Attorney for Plaintiff
132 West 31ᵗ Street, 13th Floor
New York, NY 10001
Tel. (212) 502-6449

STATE OF NEW YORK          }                    VERIFICATION

COUNTY OF NEW YORK         }

SARA KRIEGER, affirms under penalties of perjury and says that she is the Vice President of Plaintiff,
Northern Leasing Systems, Inc., that she has read the Verified Complaint and knows the contents thereof, that
the same is true to her own knowledge, except as to those matters therein stated to be upon information and
belief, and as to those matters she believes them to be true.

Affirmed to be true before me this
17th Day of May 2005

_____                              Northern Leasing Systems, Inc.
NOTARY PUBLIC                                          By: SARA KRIEGER
                                                       Vice President

ARACELIS DIAZ
Notary Public, State Of New York
NO. 01DI6048639
Qualified In New York County
Commission Expires 03/05/2008

