**Supreme Court of the State of New York**
**County Of New York**

| | |
|---|---|
| Kevin Pludeman, Chris Hanzsek d/b/a Hanzsek Audio, Sarah Jane Hush, Ozark Mountain Granite & Tile Co., and Dennis E. Lauchman, on behalf of themselves and all others similarly situated, } } } } } } | |
| Plaintiffs } } | Index No. 04/101059 (Hon. Sherry Klein Heitler, |
| v. } } | J.S.C.) |
| Northern Leasing Systems, Inc., Jay Cohen, Steve Bernardone, Rich Hahn, and Sara Krieger } } } } | |
| Defendants } } | |

# First Amended Complaint

## Nature of the Action

1.    In this class action, plaintiffs assert a racketeering scheme to entrap small businessmen fraudulently into equipment leases with undisclosed charges and onerous terms.  Defendants, through their own representatives or third party salesmen, deceptively sell these leases to small businessmen through what appears to be a standard-form one-page lease, complete with signatures, and a personal guaranty ("Lease and Personal Guaranty").  Thereafter, defendants (through the corporate defendant) routinely charge and collect much more than what is specified in the first page, and foist several other liabilities on the unsuspecting small businessmen.  When questioned, defendants finally reveal the existence of 3 additional pages which make the Lease and Personal Guaranty irrevocable, onerous, and virtually indefinite.  Routinely, these pages

and their contents are never disclosed to the small businessmen at the inception, and are not incorporated into the Lease and Personal Guaranty. Nevertheless, defendants saddle small businessmen with all these terms and enforce them strictly.

2. On these and related grounds, Class plaintiffs assert claims under the federal racketeering statute, 18 U.S.C. §1962, the Electronic Funds Transfer Act, 15 U.S.C. §1693, the Fair Debt Collection Practices Act, 15 U.S.C. §1692, Fraud, Negligent Misrepresentation, Breach of the Implied Covenant of Good Faith and Fair Dealing, Breach of Contract, Unjust Enrichment, and Money Had and Received, and seek equitable and injunctive relief, and compensatory, treble and/or punitive damages, together with attorneys' fees and expenses.

## Parties

3. Mr. Pludeman is a resident of Dallas, Texas. Mr. Hanzsek is a resident of Seattle, Washington. Ms. Sarah Jane Hush is a resident of Ozark, Missouri, and her company, Ozark Mountain Granite & Tile Co., is a Missouri corporation in good standing. Mr. Lauchman is a resident of Gilbertsville, New York.

4. Defendants Northern Leasing Systems, Inc., is a New York corporation with its registered offices at 333 Seventh Avenue, New York, New York 10001, and principal executive offices at 132 West 31 Street, 14th Floor, New York, NY 10001. Northern Leasing is a micro-ticket leasing company located in New York City that claims to specialize in financing credit card point of sale (POS) terminals and other business equipment.

2

5.     Defendant Jay Cohen is and has been at all relevant times the President of the defendant Northern Leasing.

6.     Defendant Steve Bernardone is and has been at all relevant times the Vice President and Chief Information Officer of the defendant Northern Leasing.

7.     Defendant Rich Hahn is and has been at all relevant times the Vice President for Sales of the defendant Northern Leasing.

8.     Defendant Sara Krieger is and has been at all relevant times the Vice President for Operations of the defendant Northern Leasing.

**Class Action Allegations**

9.     Plaintiffs bring this action pursuant to Article IX, CPLR, on behalf of a Class consisting of themselves and all other persons in the United States who are lessees or guarantors under leasing or financing contracts with the defendant Northern Leasing whereunder the defendant Northern Leasing (as lessor) purported to lease business equipment.  The Class excludes defendants, or any parent, subsidiary, affiliate, accountant, agent, attorney, employee, officer, representative, servant, and/or any person acting on behalf of defendants or any of them.

10.    Northern Leasing has been in business since 1991.  According to its own website, it "lead[s] the industry with innovative plans, high technology and outstanding service." www.northernleasing.com.  It does business throughout the United States, and enters into the Lease and Personal Guaranty by itself directly as well as through third party vendors.  Thus, it is clear that thousands of

3

persons have signed the Lease and Personal Guaranty with defendants and continue to do so.  Clearly, the Class is so numerous that joinder of all of the members is impracticable.

11.   Plaintiffs' claims are typical of the claims asserted on behalf of the Class.

12.   Plaintiffs do not have any interests that are adverse or antagonistic to those of the Class.

13.   Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and have retained counsel competent and experienced in this type of litigation.

14.   Northern Leasing's leasing and financing contracts, according to its own website, involve financing of items that sell for under $10,000.  Thus, individual compensatory damages of most Class members are likely to be relatively small and hence, the burden and expense of prosecuting litigation of this nature makes it unlikely that members of the Class would prosecute individual actions. And if they did, such individual prosecution would be impracticable as well as inefficient.

15.   Plaintiffs are not aware of any pending litigation concerning the claims herein.

16.   This Court is the most appropriate forum for adjudicating the claims at issue, which arise under federal statutes and common law.  The Lease and Personal Guaranty designates New York as a forum State (although Northern Leasing or its successor-in-title has the unilateral prerogative to change that).  Northern Leasing is a New York corporation.  The principal offices of all defendants are in

4

this judicial district, and hence, the State of New York has a paramount interest in supervising and monitoring their activities at issue.

17.   Plaintiffs do not anticipate any difficulty in the management of this action as a Class action.

18.   There are many questions of law and fact common to the Class which predominate over any questions which may affect individual members.  The predominant common questions of law and fact include, among others:

    a.   Whether defendants violated the federal racketeering statute, 18 U.S.C. §1962;

    b.   Whether defendants violated The Electronic Funds Transfer Act, 15 U.S.C. §1693;

    c.   Whether defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. §1692;

    d.   Whether defendants are liable for Fraud;

    e.   Whether defendants are liable for Negligent Misrepresentation;

    f.   Whether defendants are liable for Breach of the Implied Covenant of Good Faith and Fair Dealing;

    g.   Whether defendants are liable for Breach of Contract;

    h.   Whether defendants are liable for Unjust Enrichment;

    i.   Whether defendants are liable for Money Had and Received;

    j.   Whether plaintiffs are entitled to equitable and injunctive relief against defendants; and

k.  Whether plaintiffs are entitled to damages, and if so the measure of damages.

19.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

20.  Plaintiffs seek declaratory, equitable, and injunctive relief.  They also seek compensatory, treble and/or punitive damages, together with reasonable attorneys' fees and expenses as permitted by law, on behalf of themselves and the Class.  Plaintiffs do not seek any damages prohibited by any law.

## Factual Allegations

21.  Defendants claim to be in the business of financing equipment for small businesses through so called "equipment finance lease" contracts, the Lease and Personal Guaranty.  Typically, these transactions involve equipment such as point-of-sale credit card swiping machines, Internet-based online payment systems ("virtual terminals"), and/or software for processing credit card payments over the phone.

22  Defendants designed and perpetrated, and continue to perpetrate, a fraudulent scheme to defraud small businessmen (Class members) by wilfully concealing, and/or orchestrating the concealment of, 3 of the 4 pages of the standard form Lease and Personal Guaranty which contain extremely material but highly onerous terms, and by charging and collecting significantly higher amounts than those represented to Class members.

23.   Defendants, through their own representatives or third party salesmen, approach Class members interested in leasing small business equipment.  After making a successful sales pitch, these representatives or salesmen obtain Class members' signatures, with personal guarantees, on the Lease and Personal Guaranty which has been drafted and prepared by defendants.

24.   To facilitate this fraudulent scheme, defendants drafted the Lease and Personal Guaranty such that Class members have to sign on the very **first** page of the Lease And Personal Guaranty.  Since the signature of parties to a document is always at the **end** of the document, Class members are led to believe that the Lease and Personal Guaranty is a one page document containing all terms of the lease.

25.   Moreover, the first page of defendants' Lease and Personal Guaranty appears to be a complete document.  It contains **all** the material information usually expected in a small business transaction (name, address, bank preauthorization, amount, equipment information, term, bank information) and signature blocks for both parties.

26.   The first page of defendants' Lease And Personal Guaranty contains **nothing** incorporating the remaining three pages, or even alerting Class members to the existence of additional pages that may be part of the lease terms.  It says expressly:

> Lessee has read and agrees to all terms and conditions contained in this Equipment Finance Lease.

7

This statement appears in a box under the caption "Lease Acceptance", which box also contains the space for Class members' signature.

27.   That "Lease Acceptance" box is followed by two other boxes in the same page. One provides for Class members' personal guaranty, and the other is for signature of acceptance by defendants.

28.   Thus, the first page effectively conveys that the Lease and Personal Guaranty is a one-page document.  Class members uniformly believe that all their Lease obligations were contained in that page.

29.   A fineprint – nay, microprint – at the bottom of that page, tucked away in the far left corner of the page reads "page 1 of 4".  Obviously, the placement and size of the print, which is difficult to read even if noticed, does nothing to enable Class members detect or inquire about additional terms.  This is obviously a part of defendants' fraudulent scheme: when Class members complained about not ever having been aware of the existence of the additional three pages, defendants routinely relied on this microprint, flatly disclaimed their representatives' or salesmen's representations, and self-righteously blamed Class members for allegedly not having read the microprint.

30.   Obviously, the microprint is legally inconsequential.  Nothing incorporates the terms contained in the undisclosed three pages into the Lease and Personal Guaranty.

31.   Consistent with this fraudulent scheme, defendants' representatives or salesmen selling defendants' Lease and Personal Guaranty never discuss, mention, or

8

even refer to the remaining three pages.  Irrespective of the time spent by defendants' representatives or salesmen selling defendants' Lease - whether it is four minutes or four hours - the Lease and Personal Guaranty is routinely presented for signature at the very last minute, just before the salesmen have "to run".  No copy of the Lease And Personal Guaranty is ever left with Class members at the time of signing; instead, they are simply told that Northern Leasing would mail them a copy.

32.     The Lease and Personal Guaranty document itself is purportedly a four page document in booklet form, printed on both sides of the paper.  Hence, to avoid inconvenient questions, defendants' representatives and third party salesmen routinely present the Lease And Personal Guaranty for signature, in a hurry at the last minute, while it is still clipped in a clip-board.  Thereby, they successfully keep the Class members completely unaware of even the existence of any printed material on the back of the signature page or on additional pages.  This is the consistent practice employed by defendants' representatives and/or third party salesmen all over the country.

33.     Defendants are well aware of this routine concealment of 3 of the 4 pages of the Lease And Personal Guaranty.  Defendants are also aware that their representatives and salesmen routinely do not give a copy of the Lease to Class members.

34.   In fact, defendants have a special hotline for Class members requesting copies

of the Lease.  Indeed, in Northern Leasing's own website, defendants expressly

advise Class members:

   2.   Q.   How can I obtain a copy of the lease
             agreement?
        A.   Just call the lease request hotline at 888-275-3247.

35.   Thus, the first page of the Lease is the only one seen by the plaintiffs[1] and Class

members.

36.   Accordingly, the terms contained in the remaining 3 pages cannot be said to

have been agreed to by the Class members.  They are not incorporated into the

Lease and Personal Guaranty, they appear after the signatures of Class

members, and hence, may not be enforced against them.

37.   In the aforesaid manner, defendants' representatives and salesmen fraudulently

sell Class members an alleged lease for extortionately overpriced items at

extremely onerous terms.  These items are typically available in the market for

outright purchase, free and clear, at a fraction of the price of defendants' "lease"

prices.  Worse, defendants routinely charge significantly higher prices than

---

[1]This was the uniform experience of the five plaintiffs, who are from New York, Missouri, Texas, and Washington.  In addition, plaintiffs' attorneys have been contacted and/or retained by other small businessmen from all over the country, including, for example, from Connecticut, California, Oklahoma, and Mississippi.  Obviously, none of these small businessmen and plaintiffs know each other; but every one of them had the same experience, abundantly proving defendants' intentional orchestration of the suppression of the 3 pages of its standard form Lease and Personal Guaranty and the terms contained therein.

those specified in the first page.  When challenged, they refer to provisions in the hitherto undisclosed 3 pages.

38.   By routinely concealing the additional pages of the Lease and Personal Guaranty, defendants has been wilfully causing, enabling, permitting, and encouraging its representatives/salesmen to misrepresent the terms and effects of the lease, and the obligations being personally guaranteed by the Class members.  Such representatives/salesmen routinely give an innocuous picture of the Lease And Personal Guaranty, pointing to the only page disclosed to the Class member and not saying one word about the grossly inequitable and oppressive terms therein.  Defendants routinely disclaim all such representations at lease inception, and point to the merger clause in the undisclosed pages; this enables defendants' representatives and salesmen to make misrepresentations with abandon – anything to clinch the sale.

39.   Defendants and their salesmen fail to disclose to Class members the harsh terms of the transaction contained in the 3 undisclosed pages.[2]  Thus, defendants conceal from Class members:

a.   That the Lease and Personal Guaranty entitled Northern Leasing to charge sums which were significantly higher than those specified in the first page;

_____

[2]Defendants' reasons for concealment of these terms is obvious: Class members would simply not agree to the transaction if they knew of these terms..  As Class plaintiff Hanzsek stated in a letter to defendants dated June 23, 2003, "I am not a reckless or stupid individual and would not, under any circumstances, ever consider agreeing to the harsh and prohibitive nature of this agreement."

b.  That the automatic electronic deductions from Class members' bank accounts, and Class members' other lease obligations, would continue indefinitely unless Class members gave a specific advance 60-day notice of cancellation, with a buyout balloon payment, at the end of the specified term;

c.  That the Lease and Personal Guaranty purport to immunize Northern Leasing from any warranties for the equipment;

d.  That although Northern Leasing retained title to the equipment leased, it was not answerable for failure or malfunction of the equipment;

e.  That the Class member's obligation to pay Northern Leasing was absolute and based solely on acceptance of the item leased;

f.  That the Class member had insurance obligations to Northern Leasing with respect to the equipment leased;

g.  That in case of an alleged default, Northern Leasing could "without demand or legal process enter into the premises where the equipment may be found and take possession of and remove the equipment without liability for such retaking;"

h.  That the charges for late payment of monthly dues were an extortionate 15%, with a minimum of five dollars;

i.  That in case of litigation, the Class member was obligated to pay Northern Leasing's attorneys' fees and expenses but Northern Leasing had no such obligation even if the Class member prevailed;

12

j.   That any litigation would be in a forum far away from Class members' homes and which forum was chosen and could be changed by Northern Leasing or its successor-in-title to the Lease and Personal Guaranty; and

k.   That Northern Leasing – but not the Class member – could effect service of process for a legal proceeding by certified mail, return receipt requested.

40.   Moreover, the Lease and Personal Guaranty does not require Northern Leasing to proceed against the business first in the event of default.  In fact, defendants **routinely** proceed against the guarantor personally, not against the business which is usually the primary lessee.

41.   Defendants' approach to collection is aggressive.  They use the undisclosed provisions described above to the fullest extent possible to obtain payment from Class members, including sending them phony "summons" and complaints, dunning them with collection letters, and obtaining judgments against those who refuse to pay.

42   Defendants' representatives uniformly intimidate Class members with endless phone calls, and expressly telling them that it would be more expensive for such Class members to litigate defendants' claims in New York than it would be to pay off defendants.

43.   And when defendants commence legal proceedings, Class members rarely have the opportunity to raise any defenses.  Defendants have hitherto been regularly filing their collection suits in New York, despite the fact that most of the Class

members reside in far away states.  Few if any can afford the expense of litigation in a distant forum, and obviously, most cases would end in default judgments.  Thus, Class members have no real opportunity to raise defenses to the lawsuit.

44.   Even Class members who do obtain counsel are hampered by the misleading Lease and Personal Guaranty.  Courts typically take individual contracts at face value unless there is evidence that the Lease is part of pattern and practice of fraud and deception.  Given the amounts and controversy, typically under $5,000, it would be extremely difficult for consumer protection lawyers to develop the requisite evidence.  Finally, the potential witnesses for Class members are likely to be in his/her local area, and quite far from the New York court.

45.   Obviously, once a judgment is entered in the New York courts, it is almost impossible for Class members to challenge defendants in the subsequent judgment enforcement actions.  Had defendants filed the suits in the Class members' home location to enforce its claims, they might have been able to present a defense, either through an attorney or by themselves.

46.   Defendants add to the injury by imposing outrageous fees for late payments, as well as for attorney's fees and expenses.  Upon information and belief, these fees provide significant profits to defendants.  In many cases, by the time defendants commence collection, these charges substantially increase the total payments due.

47.     Defendants are totally unconcerned and unresponsive to class members' complaints concerning fraudulent misrepresentations of their representatives or salesmen, undisclosed terms of the Lease and Personal Guaranty, nonfunctioning equipment, or anything else.  Instead, they rely heavily on the wording of the undisclosed 3 pages of the Lease and Personal Guaranty to slam complaining Class members that no defense exists to defendants' demand for payment.

## Mr. Pludeman's Transactions

48.     In October 1999, defendants' representative contacted Mr. Pludeman and his then-company, Challenger Deep Imports, Inc., in connection with their intent to accept credit cards from his vendees.

49.     Defendants' representative or salesman did not explain any terms of the lease to Mr. Pludeman.  The equipment leased was a credit card terminal, Verifone Tranz 330.

50.     On or about November 9, 1999, defendants' representative or salesman obtained Mr. Pludeman's signature on the first page of the Lease and Personal Guaranty on behalf of himself and his business, Challenger Deep Imports, Inc. Mr. Pludeman never received a copy of that document, and was unaware of the existence of the additional three pages.  The Lease and Personal Guaranty remained unsigned by or on behalf of Northern Leasing.

51.     This Lease and Personal Guaranty, purportedly with an Illinois resident at the time (Mr. Pludeman) and an Illinois entity (Challenger Deep Imports, Inc.) as

15

lessees, and entered into in Illinois for the conduct of business there, nevertheless contained a forum selection clause specifying New York and permitting defendants to change the forum unilaterally. It provided for a 48 month "lease" at $39.95 per month, or a total of $1,917.60. Unknown to Mr. Pludeman, this terminal was available for outright purchase in retail for about $200.

52. Defendants commenced automatic debits to Mr. Pludeman's bank account for $48.30 per month -- about 21% higher than the specified $39.95. Several months later, Mr. Pludeman realized defendants' scam. Thereupon, he promptly returned the equipment (June 2000) and sought to terminate the Lease and Personal Guaranty.

53. As usual, defendants demanded that Mr. Pludeman pay the entire sum due for the balance of the lease in a lump sum as premature cancellation penalty. When he refused, defendants repeatedly threatened him with deceptive notices, and even went to the extent of sending phony "summons", purporting to be from the Civil Court of the City of New York ordering Mr. Pludeman to appear in court.

54. Defendants repeatedly sent such phony summons and other official looking documents in a bid to intimidate Mr. Pludeman. They continued with their dunning letters and collection calls, demanding that Mr. Pludeman personally fulfil his guaranty and pay the entire sum demanded.

55. Mr. Pludeman refused to succumb to this extortion, and defendants have commenced a lawsuit against him personally in the New York City Civil Court,

County of New York, <u>Northern Leasing Systems Inc., v. Pludeman</u>, Index Number 067900/2003. Defendants seek to recover $1917.60 (including attorneys' fees) together with the costs of the proceeding from Mr. Pludeman. Defendants have not made his company, Challenger Deep Imports, Inc., even a party to the proceeding.

<u>Mr. Hanzsek's Transactions</u>

56.   Mr. Hanzsek and his business, Hanzsek Audio, had a substantially similar experience. In February 1999, defendants' representative or salesman contacted Mr. Hanzsek purportedly for enabling Mr. Hanzsek's business accept payments by credit card.

57.   As with Mr. Pludeman, defendants' representative or salesman did not explain the terms of the lease to Mr. Hanzsek, which were substantially the same as that with Mr. Pludeman's lease. A credit card swipe machine, Nurit 2085, constituted the "equipment" leased. Unknown to Mr. Hanzsek, this equipment could be purchased in retail for less than $200. But the lease was for 48 months at the rate of $42 per month, a total of $2016.

58.   On or about February 11, 1999, defendants' representative or salesman obtained Mr. Hanzsek's signature on the first page of the Lease and Personal Guaranty. As with Mr. Pludeman, Mr. Hanzsek also never received a copy of that document, which also remained unsigned by or on behalf of defendants.

59.   Defendants commenced automatic debits to Hanzsek's bank account immediately. As with Mr. Pludeman, these deductions were significantly in

17

excess of the amount specified in the Lease and Personal Guaranty: $50.65, or about 21% higher than the $42 specified in the Lease and Personal Guaranty

60.   As with Mr. Pludeman, Mr. Hanzsek was unaware of the very existence of the 3 additional pages of the Lease and Personal Guaranty.

61.   This Lease and Personal Guaranty, which was entered into in Seattle, Washington by a Seattle, Washington resident, for the conduct of business in Seattle, Washington, nevertheless contained a forum selection clause specifying New York County and permitting defendants to change the forum unilaterally.

62.   Defendants continued the automatic debit even after 48 months, the term of the Lease and Personal Guaranty.  When Mr. Hanzsek inquired of defendants about the reasons for continued withdrawal, defendants informed him for the first time of the hitherto undisclosed three additional pages of the Lease and Personal Guaranty.  According to defendants, Mr. Hanzsek's lease was to continue indefinitely unless he were to pay a buyout fee and give a 60 day written notice for termination.  And when Mr. Hanzsek inquired whether it was defendants' standard procedure not to provide a copy of the Lease and Personal Guaranty to Class members, defendants' representative categorically stated, "Yes, you have to call us and ask for one."

63.   Shocked at this revelation, Mr. Hanzsek closed the bank account to stop defendants' automatic debit.  Thereupon, defendants commenced its dunning letters and collection calls, demanding that Mr. Hanzsek pay the entire sum demanded.

18

64. Mr. Hanzsek refused to succumb to this extortion, and defendants have threatened their usual lawsuit in New York.

Ms. Hush's and Ozark Mountain's Transactions

65. Ms. Hush had the same experience in Ozark, Missouri. In October 2000, defendants' representative or salesman contacted Ms. Hush purportedly for enabling her business, Ozark Mountain, accept payments by credit card.

66. As with Mr. Pludeman, defendants' representative or salesman did not explain the salient terms of the lease to Ms. Hush. A credit card swipe machine, Talento, constituted the "equipment" leased. Unknown to Ms. Hush, this equipment could be purchased in retail for less than $350. But the lease was for 48 months at the rate of $99.90 per month, a total of $4,795.

67. On or about October 18, 2000, defendants' representative or salesman obtained Ms. Hush's signature on the first page of the Lease and Personal Guaranty. As with Mr. Pludeman, Ms. Hush also never received a copy of that document, which also remained unsigned by or on behalf of defendants.

68. As with Mr. Pludeman, Ms. Hush was also unaware of the very existence of the 3 additional pages of the Lease and Personal Guaranty.

69. This Lease and Personal Guaranty, which was entered into in Ozark, Missouri, by an Ozark, Missouri, resident, for the conduct of business in Ozark, Missouri, nevertheless contained a forum selection clause specifying New York County and permitting defendants to change the forum unilaterally.

70.  Defendants commenced automatic debits to Ozark Mountain's bank account. As with Mr. Pludeman, these deductions were significantly in excess of the amount specified in the Lease and Personal Guaranty: $112.07, or about 12% higher than the specified $99.90.

71.  Ms. Hush and Ozark Mountain faced repeated problems due to equipment malfunction, and the uncooperative and unreliable bank with which they were placed by the defendants. Finally, Ms. Hush stopped using the equipment and informed Northern Leasing.

72.  Subsequently, Ms. Hush received the defendants' usual demand for payment. When she called defendants in response to that demand, defendants informed her of the terms contained in the additional 3 pages of the Lease and Personal Guaranty.

73.  Ms. Hush rejected defendants' demand. Thereupon, defendants sent their usual deceptive notices, and phony "summons" and "Verified Complaint" to Ms. Hush, purporting to be from the Civil Court of the City of New York ordering Ms. Hush to appear in court.

74.  Ms. Hush refused to succumb to this extortion, and defendants have commenced a lawsuit against her personally in the New York City Civil Court, County of New York, Northern Leasing Systems Inc., v. Sarah Hush, Index Number 23212/2004. Defendants seeks to recover $4555.44 (including attorneys' fees) together with the costs of the proceeding from Ms. Hush. Once again, defendants have not made Ozark Mountain even a party to that proceeding.

Mr. Lauchman's Transactions

75.  Mr. Lauchman had the same experience in Gilbertsville, New York. In November

2003, defendants' representative or salesman contacted Mr. Lauchman

purportedly for enabling his business accept payments by credit card.

76.  As with Mr. Pludeman, defendants' representative or salesman did not explain

the salient terms of the lease to Mr. Lauchman. A credit card swipe machine,

Nurit 2080, constituted the "equipment" leased. Unknown to Mr. Lauchman this

equipment could be purchased in retail for less than $200. But the lease was for

48 months at the rate of $32 per month, a total of $1,536.

77.  On or about November 19, 2003, defendants' representative or salesman

obtained Mr. Lauchman's signature on the first page of the Lease and Personal

Guaranty. As with Mr. Pludeman, Mr. Lauchman also never received a copy of

that document, which also remained unsigned by or on behalf of defendants.

78.  As with Mr. Pludeman, Mr. Lauchman was also unaware of the very existence of

the 3 additional pages of the Lease and Personal Guaranty.

79.  This Lease and Personal Guaranty, which was entered into in Gilbertsville, New

York by a Gilbertsville, New York resident, for the conduct of business in

Gilbertsville, New York, nevertheless contained a forum selection clause

specifying New York County and permitting defendants to change the forum

unilaterally.

80.  Defendants commenced automatic debits to Mr. Lauchman's bank account. As

with Mr. Pludeman, these deductions were significantly in excess of the amount

specified in the Lease and Personal Guaranty: $39.19, or about 22% higher than the specified $32.

81.    When Mr. Lauchman inquired of defendants about the reasons for excessive withdrawal, defendants informed him for the first time of the hitherto undisclosed three additional pages of the Lease and Personal Guaranty.  According to defendants, these pages entitled them to charge in excess of the sum specified in the first page.

82.    Shocked at this revelation, Mr. Hanzsek stopped using the machine and sought to cancel the Lease and Personal Guaranty.

83.    Thereupon, defendants commenced their usual collection calls demanding that Mr. Lauchman pay the entire sum demanded.  They have threatened the usual lawsuit in New York County.

Class Plaintiffs' and Class Members' Injuries

84.    Class plaintiffs and Class members were directly injured and damaged by defendants' debit of sums much higher than those specified in the Lease and Personal Guaranty.

85.    In addition, Class plaintiffs are saddled or threatened with liability and/or with legal proceedings for lease obligations that they were never aware of.  They have had to retain attorneys, and expend time and resources for responding to these threats and proceedings.

86.    Furthermore, Class plaintiffs' credit ratings have been adversely affected by the defendants' reports to the credit rating agencies for failure to pay defendants' unwarranted demands.

## Count I

## (RICO, 18 U.S.C. §1962( c))

87.    The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

88.    The association of defendants, certain attorneys retained by defendants, salesmen and others whose identities are known only to defendants at this time (cumulatively, the "Conspirators"), constituted an enterprise within the meaning of 18 U.S.C. §1961(c), which enterprise was engaged in, and whose activities affected, interstate and foreign commerce.  This enterprise was continuous in that it lasted for more than two years, had an ascertainable structure, and was distinct from the predicate offenses alleged here.

89.    Each defendant is a person within the meaning of 18 U.S.C. §1961(3) and separate from the enterprise.

90.    Defendants participated, and conspired with others (including their attorneys and others whose identities are known only to defendants at this time) to participate, in the affairs of the aforementioned enterprise through a pattern of racketeering activity, as more fully set forth below, an all in violation of 18 U.S.C. §§ 1962(c).

23

Mail Fraud, Violations of 18 U.S.C. §1341

91.     Defendants and the other members of the enterprise, having devised or intending to devise the scheme or artifice to defraud, and/or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing such scheme or artifice or attempting so to do, placed in post office(s) or authorized depository for mail matter, several letters and/or packages to be sent or delivered by the Postal Service, and/or took or received therefrom, letters and/or packages, or knowingly caused to be delivered by mail or such carrier according to the direction thereon, or at the place at which it was directed to be delivered by the addressee such letters and/or packages.  Specifically,

a.     On or about September 21, 2000, defendants in New York, through the use of interstate mail, mailed a letter to Mr. Pludeman in Texas;

b.     On or about January 4, 2001, defendants in New York, through the use of interstate mail, mailed a letter to Mr. Pludeman in Texas;

c.     On or about February 8, 2001, defendants in New York, through the use of interstate mail, mailed a letter to Mr. Pludeman in Texas;

d.     On or about October 31, 2003, defendants in New York, through the use of interstate mail, mailed a letter to Mr. Hanzsek in Washington;

e.     On or about October 16, 2003, defendants in New York, through the use of interstate mail, mailed a letter to Mr. Hanzsek in Washington;

    f.      On or about September 2, 2003, defendants in New York, through the use of interstate mail, mailed a letter to Mr. Hanzsek in Washington;

    g.      On or about February 18, 2004, defendants in New York, through the use of interstate mail, mailed a letter to Mr. Hanzsek in Washington.[3]

    h.      On or about January 22, 2004, defendants in New York, through the use of interstate mail, mailed a letter to Ms. Hush in Missouri.

92.    Each participant knew, expected, and intended that the facilities of interstate mail would be used in furtherance of the racketeering scheme, and that such use was an essential part of the scheme.

Wire Fraud, Violations of 18 U.S.C. §1343

93.    Defendants and other members of the enterprise, having devised or intending to devise the scheme or artifice to defraud, and/or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire communication in interstate commerce, sounds, phone calls and messages for the purpose of executing such scheme or artifice.  Specifically,

    a.      On January 10, 2001, at about 7:00 p.m., defendants in New York had a phone conversation with Mr. Pludeman in Texas in furtherance of their scheme; and

-------------------------------------

[3]Class plaintiffs have not detailed each such mailing to each Class plaintiff.

b.    On May 7, 2003, at about 11:00 a.m., defendants in New York had a phone conversation with Mr. Hanzsek in Washington in furtherance of their scheme;

c.    On or about January 9, 2004, defendants in New York had a phone conversation with Ms. Hush in Missouri.[4]

94.   Each participant knew, expected, and intended that the facilities of interstate telecommunication and phones would be used in furtherance of the racketeering scheme, and that such use was an essential part of the scheme.

95.   The Conspirators, wilfully and with intent to mislead Class plaintiffs and Class members, concealed the material facts from Class plaintiffs and Class members referred to above, including without limitation, the very existence of 3 additional pages of the Lease and Personal Guaranty and/or the terms contained therein.

96.   The material misrepresentations were made by Conspirators to Class plaintiffs Mr. Pludeman in Illinois and Texas, Ms. Hush in Missouri, Mr. Lauchman in New York, and Mr. Hanzsek in Washington.

97.   Class plaintiffs relied upon such information, and were unaware of the facts concealed by defendants.  Class plaintiffs' reliance was, under the circumstances, reasonable.

_____

[4]While defendants made scores of such calls, and foreseeably caused Class plaintiffs and Class members to make hundreds, if not thousands, of such interstate phone calls, we have refrained from detailing every such call.

Pattern of Racketeering Activity

98.     The aforesaid acts had the same or similar purposes, results, participants, victims, and/or methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events. The pattern of racketeering activity engaged in by defendants consisted of a scheme executed by the aforementioned conspirators from January 1998, and continuing to date, to mislead Class plaintiffs and others into entering and continuing to enter into onerous leases and/or to charge them sums significantly in excess of that specified in the lease, and/or to personally guaranty performance thereunder. That pattern included multiple predicate acts of mail fraud and wire fraud.

99.     The racketeering acts identified hereinabove were related to one another and formed a pattern of racketeering activity in that they: (a) were in furtherance of a common goal, including the goal of profiting illegally by improperly concealing material terms of the Lease and Personal Guaranty; (b) used similar methods (c) had similar participants; and (d) had similar or related victims.

100.    The acts of racketeering activity extended over a substantial period of time from January 1998, and continue to this day. They were sufficiently continuous to form a pattern of racketeering activity.

101.    Defendants participated in the scheme through themselves, and, in the case of Northern Leasing, its representatives, salesmen, employees and officers, and others whose identities are known only to defendants at this time. Defendants benefitted enormously by the profits they made, and the various fees derived

27

through defrauding, bullying, and intimidating Class members.  The Conspirators knew, enabled, and actively participated in the racketeering scheme.

102.   Defendants engaged in a pattern of racketeering activity consisting of wire and mail fraud, aiding and abetting wire and mail fraud, and bank fraud.  The predicate acts occurred over a period of well over 6 years.  Defendants received income from these patterns in the form of extortionate lease rentals, transaction fees and service charges to the accounts, interest, and late fees, attorneys' fees and disbursements.  Defendants disbursed these funds amongst themselves in a manner known only to them.

103.   Defendants' participation was critical to the racketeering scheme. They enabled, conducted, maintained, aided, and abetted the racketeering scheme by:

a.   Drafting and preparing the Lease and Personal Guaranty document in a misleading manner to convey that the entire document was a one-page document, and misleading and/or orchestrating Class plaintiffs and Class members to believe that the one page contained all the lease obligations;

b.   Supervising, conducting, and monitoring the conduct of the fraudulent scheme;

c.   Concealing the scheme or, alternatively, consciously avoiding discovery of the scheme;

d.   Encouraging third parties to participate in the fraudulent scheme;

e.   Wilfully violating, or being recklessly indifferent to, mandatory requirements of federal law and procedure concerning racketeering, debt

collections, electronic debit of bank accounts, mail fraud, wire fraud, and the common law of fraud;

f.    Wilfully violating or being recklessly indifferent to their legal obligations to verify the legality of the alleged Lease and Personal Guaranty to ensure that they were not fraudulently procured; and

g.    Wilfully violating or being recklessly indifferent to its legal obligations to conduct "due diligence" with respect to the accounts at issue.

104.    The precise role played by each defendant is known only to defendants at this time. Such information, and evidence concerning their participation, is exclusively within the possession and knowledge of defendants.

105.    Class plaintiffs have been injured in their business or property by reason of defendants' violation of 18 U.S.C. §1962(c). As a direct and proximate result of these violations, Class plaintiffs have been injured in that, inter alia, they paid sums they should never had paid, have been saddled with unwarranted liabilities, and have had to expend time and resources in responding to defendants' dunning calls, threats, and/or lawsuit in New York. In addition, Class plaintiffs' credit rating has also been adversely affected.

106.    By reason of this violation of 18 U.S.C. § 1964(c), Class plaintiffs and the Class members are entitled to recover from defendants three times their damages plus pre- and post- judgment interest, costs and attorneys' fees. In addition, Class plaintiffs and the Class are also entitled to the equitable remedies of rescission, and injunctive and declaratory reliefs.

## Count II

### (Violation of 18 U.S.C. § 1962(d))

107.   The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

108.   In violation of 18 U.S.C. § 1962(d), defendants and others whose identities are known only to defendants at this time conspired to violate the provisions of 18 U.S.C. §1962(c) in that, beginning no later than January 1998 and continuing through today, they knowingly agreed and conspired to conduct or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity described above.  The volume and frequency of the transactions, and the continuance of the scheme at issue for over 6 years, could not have occurred without the consent and knowing connivance of defendants and other Conspirators.

109.   As part of and in furtherance of their conspiracy, each defendant agreed to and conspired in the commission of the many predicate acts described above, with the knowledge that they were in furtherance of that pattern of racketeering activity. As part of and in furtherance of their conspiracy, each defendant agreed to and did commit at least two predicate acts of racketeering.

110.   Class plaintiffs and Class members have been injured in business or property by reason of defendant's violations of 18 U.S.C. §1962(d).

111.   As a direct and proximate result of each defendant's violations, Class plaintiffs have been injured as aforesaid.

112.   By reason of defendants' violation of 18 U.S.C. §1964(d), Class plaintiffs are entitled to three times their damages plus interest, costs and attorneys' fees.  In addition, Class plaintiffs and the Class are also entitled to the equitable remedies of rescission, and injunctive and declaratory reliefs.

**Count III**

(Excess Deductions, Electronic Funds Transfer Act, 15 U.S.C. §1693)

113.   The contents of the paragraphs hereinabove are reiterated.

114.   Mr. Lauchman is a consumer under the Electronic Funds Transfer Act, 15 U.S.C. §1693a(5).

115.   Northern Leasing obtained preauthorization for a monthly electronic transfer of a specified amount, $32.00, from a specified bank account of Mr. Lauchman.

116.   Nevertheless, Northern Leasing electronically deducted $39.19, which was much more than the specified amount.

117.   Northern Leasing deducted sums in excess of its preauthorization.  The other defendants knowingly and willfully encouraged, aided, and abetted Northern Leasing's illegal acts.  Thereby, defendants violated The Electronic Funds Transfer Act, 15 U.S.C. §1693e, and regulations promulgated thereunder, for which violation defendants are liable to pay damages, including attorneys' fees and costs, to Class members.

118.   In addition, Class plaintiffs and the Class are also entitled to the equitable remedies of rescission, and injunctive and declaratory reliefs.

**Count IV**

(Failure to Provide Copy of Preauthorization,

The Electronic Funds Transfer Act, 15 U.S.C. §1693)

119.   Class plaintiffs reiterate the contents of the paragraphs hereinabove.

120.   Northern Leasing obtained preauthorization for a monthly electronic transfer

from a specified bank account of Mr. Lauchman.

121.   Northern Leasing was obligated to give a copy of the preauthorization to Mr.

Lauchman, 15 U.S.C. §1693e; Reg. E, 12 C.F.R. §205.10(b).

122.   Northern Leasing never gave a copy of Mr. Lauchman's preauthorization to him

at the time it was made.  The other defendants knowingly and willfully

encouraged, aided, and abetted Northern Leasing's illegal acts.  These actions

were in violation of The Electronic Funds Transfer Act, 15 U.S.C. §1693e, and

regulations promulgated thereunder, for which violation it is liable to pay

damages, including attorneys' fees and costs, to Class members.

123.   In addition, Class plaintiffs and the Class are also entitled to the equitable

remedies of rescission, and injunctive and declaratory reliefs.

**Count V**

(Illegal Omnibus preauthorization, Electronic Funds Transfer Act, 15 U.S.C. §1693)

124.   Class plaintiffs reiterate the contents of the paragraphs hereinabove.

125.   Northern Leasing obtained preauthorization for a monthly electronic transfer

from a specified bank account of Mr. Lauchman "to withdraw any amounts

including any and all sales and property taxes now due or hereinafter imposed

32

owed by [Mr. Lauchman] . . . by initiating debit entrees to [Mr. Lauchman's]

account at the financial institution . . . indicated above **or at such other bank**

**has [Mr. Lauchman] may from time to time use.**"[5]

126.   The Electronic Funds Transfer Act, 15 U.S.C. §1693e, requires that a

preauthorization may be only sought for a specific account from a specific

financial institution.

127.   Northern Leasing's omnibus preauthorization for any and all accounts that Mr.

Lauchman may use at any time is in violation of The Electronic Funds Transfer

Act, 15 U.S.C. §1693e, and regulations promulgated thereunder, for which

violation it is liable to pay damages, including attorneys' fees and costs, to Class

members.

128.   In addition, Class plaintiffs and the Class are also entitled to the equitable

remedies of rescission, and injunctive and declaratory reliefs.

**Count VI**

(Illegal Condition, Electronic Funds Transfer Act, 15 U.S.C. §1693)

129.   Class plaintiffs reiterate the contents of the paragraphs hereinabove.

130.   Defendants conditioned the extension of credit to Mr. Lauchman upon his

repayment by means of preauthorized electronic transfers.

131.   Thereby, defendants violated The Electronic Funds Transfer Act, 15 U.S.C.

§1693k, and regulations promulgated thereunder, Reg. E, 12 C.F.R.

---

[5]All emphasis in quotations are supplied unless specified otherwise.

33

§205.10(e)(1), for which violation they are liable to pay damages, including

attorneys' fees and costs, to Class members.

132.   In addition, Class plaintiffs and the Class are also entitled to the equitable

remedies of rescission, and injunctive and declaratory reliefs.

### Count VII

(Failure to Notify Varying Deductions, Electronic Funds Transfer Act, 15 U.S.C. §1693)

133.   Class plaintiffs reiterate the contents of the paragraphs hereinabove.

134.   Northern Leasing obtained preauthorization for a monthly electronic transfer

from a specified bank account of Mr. Lauchman "to withdraw any amounts

including any and all sales and property taxes now due or hereinafter imposed

or owed by [Mr. Lauchman] . . . by initiating debit entrees to [Mr. Lauchman's]

account . . ."

135.   Thereunder, Northern Leasing enabled itself to, and did, deduct varying amounts

from Mr. Lauchman's account every month.

136.   The Electronic Funds Transfer Act, 15 U.S.C. §1693e, and the regulations

promulgated thereunder require defendants to "send [Mr. Lauchman] written

notice of the amount and date of the transfer at least 10 days before the

scheduled date of the transfer." Reg. E, 12 C.F.R. §205.10(d)(1).

137.   Northern Leasing routinely does not provide any such notice prior to deduction.

138.   Northern Leasing's conduct is in violation of The Electronic Funds Transfer Act,

15 U.S.C. §1693e, and regulations promulgated thereunder. The other

defendants knowingly and willfully encouraged, aided, and abetted Northern

Leasing's illegal acts.  Defendants are liable to pay damages, including attorneys' fees and costs, to Class members.

139.   In addition, Class plaintiffs and the Class are also entitled to the equitable remedies of rescission, and injunctive and declaratory reliefs.

**Count VIII**

(Illegal Waiver, Electronic Funds Transfer Act, 15 U.S.C. §1693)

140.   Class plaintiffs reiterate the contents of the paragraphs hereinabove.

141.   Defendants insisted and obtained from Mr. Lauchman a purported waiver of several rights including, without limitation, the right to jury trial, the right to sue at a forum of his choice, and the rights specified above.

142.   Thereby, defendants`violated The Electronic Funds Transfer Act, 15 U.S.C. §1693l, and regulations promulgated thereunder, for which violation it is liable to pay damages, including attorneys' fees and costs, to Class members.

143.   In addition, Class plaintiffs and the Class are also entitled to the equitable remedies of rescission, and injunctive and declaratory reliefs.

**Count IX**

(Deceptive Notice, Fair Debt Collection Practices Act, 15 U.S.C. §1692)

144.   Class plaintiffs reiterate the contents of the paragraphs hereinabove.

145.   Mr. Pludeman is a consumer under The Fair Debt Collection Practices Act, 15 U.S.C. §1692a(3).

146.   Defendants delivered to Mr. Pludeman an official looking document called "Summons", dated September 21, 2000, and an allegedly "Verified Complaint."

The Summons purported to require Mr. Pludeman to appear in the New York City Civil Court and file an answer within 30 days.  It threatened that if he didn't do so, a default judgment would be entered against him for the entire alleged debt as well as attorneys' fees and costs.

147.   In fact, the Summons and Verified Complaint were false.  Defendants had not commenced any proceeding in the New York City Civil Court, and had no intention of doing so when they sent the letter and phony court papers.[6]

148.   Mr. Pludeman was unaware of the above facts, and had to waste time, energy, and resources in investigating and determining the phony nature of the Summons and the fact that defendants had not commenced any proceeding at all.

149.   Defendants repeatedly threatened action that they did not intend to take.[7]

150.   Moreover, defendants used false representation or deceptive means to collect or attempt to collect the debt from Mr. Pludeman.

---

[6]While the New York City Civil Court Act permitted defendants, through attorneys, to serve a Summons before filing it with the clerk, N.Y. City Civ. Ct. Act § 401, it also required that proof of service be filed "within fourteen days after service outside the city of New York."  NY City Civ. Ct. Act § 409.  Defendants did not file any such proof of service concerning this Summons and Verified Complaint at any time, conclusively establishing that they never intended to commence those proceedings, and thereby, the intentional violation at issue.

[7]In fact, defendants actually commenced the proceeding only in December 2003 in the New York City Civil Court, with a Summons dated March 21, 2003.  Defendants did not effect service as required by the CPLR.  Mr. Pludeman filed an Answer and counterclaim therein, pro se, before retaining counsel and commencing this action.

151.   Thereby, defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. §1692e, for which violation they are liable to pay damages, including attorneys' fees and costs, to Class members.

152.   In addition, Class plaintiffs and the Class are also entitled to the equitable remedies of injunctive and declaratory reliefs.

## Count X

### (Fraud)

153.   Class plaintiffs incorporate the contents of the paragraphs hereinabove.

154.   Defendants conducted a fraudulent scheme to entrap Class members into highly overpriced leases with extremely onerous terms. They wilfully and knowingly made, or caused to be made, affirmative misrepresentations of material facts in furtherance of this scheme. They also wilfully and knowingly concealed material facts from Class plaintiffs and other Class members, and routinely failed to give them a copy of the lease or even reveal the existence of more than the first page of the lease. Defendants knew the falsity of the misrepresentations at the time these misrepresentations were made. Defendants also knew the material nature of the facts that they willfully concealed from Class members, and that defendants ought to have disclosed these facts at that time to the Class members. Defendants had superior knowledge not available to Class plaintiffs and other Class members; as such, they had the duty to disclose the facts. Class plaintiffs and other Class members relied upon defendants' representations, and were unaware of the falsity or misleading nature of the

representations.  Class plaintiffs and other Class members' reliance was reasonable under the circumstances.  As a result of such reliance, Class plaintiffs and other Class members sustained damages.

155.  By engaging in the conduct described above, defendants committed a fraud upon Class plaintiffs and other Class members.

156.  Moreover, defendants' wanton conduct was systematic, in reckless disregard of their statutory and other duties, tantamount to criminal indifference to civil obligations, and unconscionable.

157.  Defendants are therefore liable to pay Class plaintiffs and other Class members compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.  In addition, Class plaintiffs and the Class are also entitled to the equitable remedies of rescission, and injunctive and declaratory reliefs.

## Count XI

### (Negligent Misrepresentation)

158.  Class plaintiffs incorporate the contents of the paragraphs hereinabove.

159.  Defendants conducted a fraudulent scheme to entrap Class plaintiffs and class members into highly overpriced leases with extremely onerous terms.  They made or caused to be made, affirmative misrepresentations of material facts in furtherance of this scheme.  They also concealed material facts from Class plaintiffs and other Class members, and routinely failed to give them a copy of the Lease and Personal Guaranty.  Defendants ought to have known the falsity

38

of the misrepresentations.  Defendants had superior knowledge not available to Class plaintiffs and other Class members; as such, they had the duty to disclose the facts.  Class plaintiffs and other Class members relied upon defendants' representations, and were unaware of the falsity or misleading nature of the representations.  Class plaintiffs and other Class members' reliance was reasonable under the circumstances.  As a result of such reliance, Class plaintiffs and other Class members sustained damages.

160. By engaging in the conduct described above, defendants committed the tort of negligent misrepresentation upon Class plaintiffs and other Class members.

161. Defendants are therefore liable to pay Class plaintiffs and other Class members damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.  In addition, Class plaintiffs and the Class are also entitled to the equitable remedies of rescission, and injunctive and declaratory reliefs.

## Count XII

(Breach of Implied Covenant of Good Faith and Fair Dealing)

162. Class plaintiffs incorporate the contents of the paragraphs hereinabove.

163. By its conduct aforesaid, Northern Leasing breached the implied covenant of good faith and fair dealing underlying the contracts at issue.  As a result of such breach, Class plaintiffs and the Class sustained damages.

164. Northern Leasing is therefore liable to pay Class plaintiffs and other Class members compensatory damages in such amount as may be proven at trial,

39

together with attorneys' fees and expenses and such other amounts as may be appropriate.  In addition, Class plaintiffs and the Class are also entitled to the equitable remedies of rescission, and injunctive and declaratory reliefs.

### Count XIII

### (Breach of Contract)

165.  Class plaintiffs incorporate the contents of the paragraphs hereinabove.

166.  By charging and collecting sums in excess of those specified in the first page of the Lease and Personal Guaranty, and by imposing undisclosed amounts towards alleged taxes and insurance coverage, Northern Leasing breached the contracts at issue.  As a result of such breach, Class plaintiffs and the Class sustained damages.

167.  Northern Leasing is therefore liable to pay Class plaintiffs and other Class members compensatory damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.  In addition, Class plaintiffs and the Class are also entitled to the equitable remedies of rescission, and injunctive and declaratory reliefs.

### Count XIV

### (Money Had and Received)

168.  Class plaintiffs reiterate the contents of the paragraphs hereinabove.

169.  By the aforesaid unlawful acts, Northern Leasing unlawfully billed and collected money that it was not entitled to.  It received money belonging to Class plaintiffs and class members.  Northern Leasing benefitted from the receipt of money, and

under principles of equity and good conscience, it should not be permitted to keep the money.

170.   Northern Leasing must not be permitted to take advantage of its own wrong and retain, collect, or continue collecting such money.

171.   Moreover, Northern Leasing is liable to pay Class plaintiffs and other Class members compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.

**Count XV**

(Unjust Enrichment)

172.   Class plaintiffs reiterate the contents of the paragraphs hereinabove.

173.   By collecting the excessive charges aforesaid, Northern Leasing benefitted at the expense of Class plaintiffs and other class members.  Equity and good conscience require that Northern Leasing be ordered to repay these sums to Class plaintiffs and other Class members towards restitution.

174.   Northern Leasing must not be permitted to take advantage of its own wrong and retain, collect, or continue collecting these illegal charges hereon.

175.   Moreover, Northern Leasing is liable to pay Class plaintiffs and other Class members compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.

41

**WHEREFORE,** Class plaintiffs demand judgment against defendants on each Count aforesaid:

a.   determining that the instant action be maintained as a Class action under Article IX, CPLR, and that Mr. Pludeman, Mr. Hanzsek, Ms. Hush, Ozark Mountain Granite & Tile Co., and Mr. Lauchman are adequate representatives of the Class;

b.   Declaring that every lease and financing agreement under Northern Leasing's standard form Lease and Personal Guaranty is voidable at the option of the individual lessees thereof (Class members herein) for fraud in the inducement;

c.   Declaring that pages 2-4 of all leases under Northern Leasing's standard form Lease and Personal Guaranty are unenforceable against Class plaintiffs and the Class members;

d.   Ordering defendants to refund to Class plaintiffs and to individual Class members all sums collected in excess of the amount specified in the first page of the Lease and Personal Guaranty;

e.   Ordering defendants to refund to individual Class members all sums collected on account of any judgment obtained by defendants in a New York court (or in a court other than that of the individual Class members' place of residence), based upon alleged breaches of the Lease and Personal Guaranty by such individual Class members, and forthwith enter

42

a satisfaction of all such judgments in the court wherein they were entered;

f.   awarding compensatory, punitive, and/or treble damages to Class plaintiffs and Class members in such amount, not less than $100 million, as may be determined after discovery and trial;

g.   awarding Class plaintiffs and Class members the costs of this action, including reasonable attorneys' fees and expenses, experts' fees and other disbursements;

h.   for such further and other reliefs as may be just and proper.

Dated:   New York, New York      **Chittur & Associates, P.C.**
         April 28, 2004

_____
By:  Krishnan Chittur, Esq.
The Lincoln Building 15th Floor
60 East 42nd Street 1501
New York, NY 10165
Tel: (212) 370-0447

Attorneys for Class plaintiffs and the Class[8]

_____

[8]Class plaintiffs will not accept service by fax or any electronic means.

43

# Supreme Court of the State of New York
# County of New York

### Index No: 04/101059

Kevin Pludeman, Chris Hanzsek d/b/a Hanzsek Audio,
Sarah Jane Hush, Ozark Mountain Granite & Tile Co., and
Dennis E. Lauchman on behalf of themselves and all others similarly situated,

Plaintiffs

v.

Northern Leasing Systems, Inc., Jay Cohen,}
Steve Bernardone, Rich Hahn, and Sara Krieger

Defendants

---

### First Amended Complaint

---

# Chittur & Associates, P.C.
The Lincoln Building
60 East 42nd Street, Suite 1501
New York, NY 10165
Tel: (212) 370-0447
Attorneys for Plaintiffs and the Class