Naturalization Service, and even receipt of a cash withdrawal from an ATM in Odessa, Ukraine at that time.

37. As before, Defendants never bothered conducting any "investigation", let alone a reasonable one, or making any "findings." Nevertheless, Defendants insisted that the signatures on each of the leases as well as the guarantees were genuine, not forgeries.

38. Mr. Russ closed his corporation's bank accounts wherefrom Defendants had been making the unauthorized withdrawals. Thereupon, Defendants nonchalantly commenced debiting funds electronically from the account of another, completely separate corporation. Information for this account was not listed on even the forged documents, and Defendants appear to have obtained this information unauthorizedly and in violation of law.

39. Obviously, Defendants' electronic deductions from the said account were also unauthorized and illegal.

40. Mr. Russ was forced to close his corporate bank accounts because of Defendants' unauthorized withdrawals. Thereafter, Defendants commenced their dunning process, threatening their usual lawsuit in New York.

41. Defendants then brought, under the name of Defendant Northern Leasing, four lawsuits against Mr. Russ personally in the New York City Civil Court, in a bid to bully him into paying them totally, $8,366.28 with costs. In each of the Verified Complaints filed with the New York City Civil Court, Defendant Krieger falsely asserted, under penalties of perjury, that Mr. Russ had unconditionally and personally guaranteed the obligations under the leases.

42. Extremely significant, Defendants did not ever seek to sue Rapid Cash anywhere. Rapid Cash - an active and viable Florida corporation at all relevant times - was not a party to the above proceedings in the New York City Civil Court.

43. Mr. Russ got notices from the City Civil Court requiring his personal attendance in Court in New York, whereupon he had to retain attorneys in New York.[2]

44. In addition, Defendants made derogatory entries in Mr. Russ's personal credit report.

45. As a result, Mr. Russ suffered the consequences of such adverse reports.

46. Mr. Russ had to incur travel, boarding, lodging and legal expenses in New York. In addition, At the time Defendants made several adverse entries on his personal credit report, Mr. Russ was attempting to buy a house, and his loan application was denied by the bank due to these adverse entries; instead, he had to settle for another home at a less desirable location at a higher interest rate. Furthermore, Mr. Russ was denied leases for his businesses due to these

---

[2]As already seen, Mr. Russ had already submitted indisputable evidence of forgery to Defendants long before they even commenced these actions. Nevertheless, Defendants not only commenced these lawsuits, but insisted on proceeding with the litigation, expecting a default judgment and not anticipating that he would spend the time and resources to come personally. Defendants refused to consent to even an adjournment of the evidentiary hearing, whereupon Mr. Russ had to come all the way from Florida. Mr. Russ did so, and testified at the hearing in the New York City Civil Court, much to Defendants' shock and dismay. Defendants had no evidence whatsoever to dispute Mr. Russ's assertion of forgery, whereupon all four of Defendants' lawsuits were dismissed by Judge Barbara Jaffe by an order dated December 4, 2006. Northern Leasing Systems, Inc. V. Judson Russ, 47733 CV 2003, 47737CVN2003, 47754CVN2003, 47755CVN03 (N.Y. City Civ. Ct.).

10

adverse entries. Moreover, Defendants took about $10,000 from his corporate accounts before Mr. Russ closed those accounts.

Mr. Long Soui Lim

47. In May of 2001, Mr. Lim received a copy of a Summons and Verified Complaint filed by Defendants in the City Civil Court demanding $2,060.26 from him personally. That copy had been mailed to Mr. Lim's old address at 3251 Old Concord Road, Smyrna, Georgia 30082, and forwarded to him at his new address at 2105 Taylor Meadows Way, Marietta, Georgia 30008.

48. Immediately upon receipt of that Summons and Complaint, Mr. Lim called and informed Defendants that the signatures on the guarantee underlying that action were a forgery.

49. Defendants demanded that Mr. Lim send him a copy of identification documents to verify his signature and identity. Mr. Lim promptly sent a copy of his driver's license and other documents, which reflected the new address at Marietta, Georgia.

50. Defendants never bothered conducting any "investigation", let alone a reasonable one. Mr. Lim never heard back from Defendants.

51. On or about July 9, 2001, Mr. Lim sent two letters to Defendants, one addressed to Defendant Krieger, and the other to Ms. Erica Cohen, Esq., the attorney whose name appeared on the Summons and Complaint. He demanded the return of money wrongfully collected by Defendants, and an explanation for the forgery and Defendants' actions thereon.

52. Neither Defendant Krieger nor anyone else responded to Mr. Lim's letters.

11

53. More than two years thereafter, according to records of the New York City Civil Court, Defendants purported to serve Mr. Lim with another Summons and Complaint. According to the Affirmation of Service, a Summons and Complaint dated July 29, 2003, was delivered on or about October 20, 2003, once again to Mr. Lim's old address at 3251 Old Concord Road, Smyrna, Georgia 30082.

54. Mr. Lim never received a copy of this Summons and Complaint.

55. Indisputably, Defendants were well aware of Mr. Lim's current address at Marietta, Georgia from previous correspondence, and from his driver's license. However, Defendants purported to effect service of process at his old address.

56. Consequently, Mr. Lim was not even aware of Defendants' lawsuit against him in the City Civil Court in New York.

57. Defendants proceeded to enter a default judgment against Mr. Lim in the sum of $3,253.63 in May 2004.

58. Mr. Lim learned of the said entry of default judgment against him in the Civil Court of the City of New York, in August 2004, when he applied for a credit card with a financial institution. The financial institution denied him credit due to this judgment.

59. On or about August 31, 2004, Mr. Lim sent a letter to Defendant Krieger strongly objecting to the default judgment, noting his surprise and the wrongful nature of the suit. Further, he said:

> This is a very serious matter; therefore, your immediate attention and explanation is a must.

Mr. Lim reiterated the above facts, confirming once again that he had "never seen the lease agreement nor [had he] sign[ed] it." Further, he recorded:

> It has been more than three years already, I have not hear [sic, heard] or get [sic, received] a reply from Mr. James, Ms. Erika Cohen or you. Not only has this matter has not been resolved, but it has been escalated. I will hold you responsible for this fraud.
> I will allow you ten days to clear my name and respond to my letter. . . . I promise you that I will bring justice to fix your corruption.

60. As before, Defendants never bothered responding to that letter either.

61. Mr. Lim then called Northern Leasing, and asked for a copy of the judgment. Defendants' representative refused to send such a copy unless Mr. Lim was willing to satisfy this judgment.

62. Thereafter, Mr. Lim wrote to the Court Clerk of the New York City Civil Court about this fraud. However, he was advised that he would need to hire an attorney in New York, and set aside this judgment which had been causing, and continued to cause, him serious damages by adversely affecting his credit rating.

63. From the Court files, it is clear that Defendants did not advise the City Civil Court that (a) Mr. Lim was not residing at Smyrna, Georgia; and (b) Mr. Lim had specifically asserted, with supporting documents, that Defendants' entire claim was predicated on a forged document. Instead, concealed these material facts and further, Defendants deliberately used Mr. Lim's old address for service of process and thereby secure a judgment on default.

13

64.  Mr. Lim had to retain a lawyer and incur legal expenses in New York to set aside the default judgment.[3]

65.  Meanwhile, Defendants made derogatory entries in his <u>personal</u> credit reports. As a result, he has suffered the usual consequences of such adverse reports, apart from having to retain attorneys and incurring legal expenses in New York. Defendants ruined his credit, sued him, and even obtained a default judgment based on documents which were clearly forged.

<u>Mr. Gordon Redner</u>

66.  In early 2004, Mr. Redner became aware of Defendants when Defendants commenced electronic withdrawals from his bank account and Defendant Northern Leasing's name appeared on his bank statement. He never had any transactions with Defendant Northern Leasing.

67.  Mr. Redner got Defendant Northern Leasing's telephone number from the internet, and called Defendants to inquire about the deduction. Thereupon, they claimed to be lessors, and sent him a copy of a lease with his alleged signature guarantee thereon.

---

[3] Even when the manifest errors were pointed out to Defendants, they refused to voluntarily vacate the default judgment against Mr. Lim, let alone dismiss the lawsuit. As a result, Mr. Lim's attorneys had to commence motion practice, whereupon Defendants had no choice but to acknowledge that the default judgment ought to be vacated. Even so, Defendants insisted on proceeding with the lawsuit against Mr. Lim, and even sought to compel Mr. Lim to come to New York for a deposition on their bogus claim for $3,253. Mr. Lim's attorneys had to commence motion practice once again seek dismissal for insufficient service and want of jurisdiction. The action was dismissed by Judge Arthur F. Engoron. <u>Northern Leasing Systems, Inc. V. Long Soui Lim</u>, 57937 CV 2003 (N.Y. City Civ. Ct.) (Order of April 20, 2006).

68. Mr. Redner had never even seen this lease before. Clearly, his signature was forged on this document.

69. Further, obviously, Mr. Redner never signed any pre-authorization for Defendant Northern Leasing for automatic electronic deduction from any bank account. Nevertheless, Defendants routinely deducted funds electronically, through the use of interstate wires, from his bank account at Duncanville, Texas.

70. Eventually, Mr. Redner had to close his bank account to prevent such unauthorized withdrawal.

71. Thereafter, Defendants commenced their dunning process, threatening their usual lawsuit in New York.

72. Meanwhile, Defendants made derogatory entries in Mr. Redner's <u>personal</u> credit reports. As a result, he has suffered the usual consequences of such adverse reports, apart from having to retain attorneys and incurring legal expenses in New York.

<u>Ms. Peri Kettler</u>

73. Ms. Kettler was the principal of Yodamo, Inc., a small business in Port Townsend, Washington. On or about January 9, 2002, Yodamo received a standard form one page lease agreement with Defendants through UPS Next Day Air Service. Yodamo signed and returned the original of this lease to the UPS driver (who was waiting) as advised by Northern Leasing's representative, and kept a copy of the said document.

74. Thereafter, Yodamo received equipment different from that specified in the lease, and worthless for Yodamo. Yodamo complained, whereupon Defendants claimed that the lease was noncancellable, and they would send a copy.

75. About three weeks later, on or about February 1, 2002, Yodamo received a four page lease from Defendants, which was clearly not the document that Yodamo had signed. Ms. Kettler's signature had been forged as guarantor on the lease.

76. On or about March 11, 2002, Yodamo returned the equipment to Defendant Northern Leasing with a notice of cancellation of the lease for fraudulent misrepresentation. Defendants refused the equipment, but continued their automatic deduction from Yodamo's bank account month after month. Eventually, in August 2003, Yodamo closed its bank account; meanwhile, Defendants had wrongfully collected about $900 cumulatively.

77. Thereafter, Defendants commenced their dunning process, threatening their usual lawsuit in New York. In response, Ms. Kettler reminded them of the above facts. But to no avail.

78. In the Verified Complaint filed with the New York City Civil Court, Defendant Krieger falsely asserted, under penalties of perjury, that Ms. Kettler had unconditionally and personally guaranteed the lease obligations, and demanded $1,390.26 with interest and costs[4].

79. Once again, this action was only against Ms. Kettler, and Defendants never ever sought to pursue their alleged claim against Yodamo anywhere.

---

[4] After the default judgment was vacated, proceedings in this case are currently stayed.