# Smith Economics Group, Ltd.

### A Division of Corporate Financial Group

*Economics / Finance / Litigation Support*

*Stan V. Smith, Ph.D.*
*President*

August 5, 2010

Mr. Krishnan Chittur
Chittur & Associates
286 Madison Ave., Suite 1100
New York, NY  10017

     Re: Redner - DISCOUNTED

Dear Mr. Chittur:

You have asked me to calculate the value of certain losses
subsequent to the injury of Gordon Redner.  These losses are: (1)
the loss of time spent and payments made to Northern Leasing; (2)
the loss of credit expectancy; and (3) the reduction in value of
life ("RVL"), also known as loss of enjoyment of life.

Gordon Redner is a Caucasian, married male, who was born on
█████████████, and injured on February 1, 2004 at the age of
46.3 years.  Mr. Redner will be 52.9 years old at the estimated
trial or settlement date of October 1, 2010, with a remaining
life expectancy estimated at 26.6 years.  This data is from the
National Center for Health Statistics, United States Life Tables,
2006, Vol. 58, No. 21, National Vital Statistics Reports, 2010.

In order to perform this evaluation, I have reviewed the
following materials: (1) the Amended Complaint; (2) Mr. Redner's
credit report dated January 29, 2004; (3) numerous court
documents and communications between Mr. Redner and Northern
Leasing; (4) the interview with Gordon Redner on August 4, 2010;
and (5) the case information form.

My methodology for estimating the losses, which is explained
below, is generally based on past wage growth, interest rates,
and consumer prices, as well as studies regarding the value of
life.  The effective net discount rate using statistically
average wage growth rates and statistically average discount
rates is 0.40 percent.

My estimate of the nominal wage growth rate is 4.05 percent per
year.  This growth rate is based on Business Sector, Hourly
Compensation growth data from the Major Sector Productivity and
Costs Index found at the U.S. Bureau of Labor Statistics website
at www.bls.gov/data/home.htm, Series ID: PRS84006103, for the
real increase in wages primarily for the last 20 years.

My estimate of the nominal discount rate is 4.45 percent per
year.  This discount rate is based on the rate of return on 91-

SEG

day U.S. Treasury Bills published in the <u>Economic Report of the President</u> for the real return on T-Bills primarily for the last 20 years.  This rate is also consistent with historical rates published by Ibbotson Associates, Chicago, in its continuously updated series <u>Stocks, Bonds, Bills and Inflation</u> published by Morningstar, Inc.  This series, which acknowledges me as the Originator while a Principal and Managing Director at Ibbotson Associates, is generally regarded by academics in the field of finance as the most widely accepted source of statistics on the rates of return on investment securities.  It is relied upon almost exclusively by academic and business economists, insurance companies, banks, institutional investors, CPA's, actuaries, benefit analysts, and economists in courts of law.

My estimate of the inflation rate is 3.00 percent per year based on the Consumer Price Index (CPI-U) published in monthly issues of the U.S. Bureau of Labor Statistics, <u>CPI Detailed Report</u> (Washington, D.C.: U.S. Government Printing Office) and available at the U.S. Bureau of Labor Statistics website at www.bls.gov/data/home.htm, Series ID: CUUR0000SA0, for the increase in prices primarily for the last 20 years.

## I. LOSS OF TIME SPENT AND PAYMENTS MADE TO NORTHERN LEASING

In 2004, Gordon Redner ran a home-based company, Gifts R Us, where he made and sold what he describes as little knick-knacks and figurines.  He entered into an agreement, at the end of January 2004, with a company to provide him with credit card processing equipment.  Mr. Redner states he was never provided with working equipment, and he began to notice a lot of debits by Northern Leasing from his bank account.  Mr. Redner states he had never heard of Northern Leasing, and had never entered into any agreements with them.  He contacted them and was provided with copies of a lease with his signature, which Mr. Redner believes was forged.  In order to stop money from being debited from his bank account Mr. Redner closed the account, at which point he began to receive threatening letters and phone calls from Northern Leasing.  He did this in April 2004, by which point Northern Leasing had taken $230.24 from his account.

Northern Leasing threatened to sue Mr. Redner for breach of contract, and so he states he began the arduous process of communicating with them, obtaining documents and records, and consulting legal counsel all - in an attempt to clear his name. Mr. Redner estimates that his ordeal with Northern Leasing lasted until early 2005 when the company decided to stop pursuing claims against him.  Over that period of time he estimates he spent approximately 50 hours of time dealing with the situation.

The loss of time spent is illustrated at 50 hours of time spent in 2004, and is valued at $14.82 in year 2009 dollars based on

2

SEG
------------------------------------

the average hourly wages of Office Clerks and Payroll and
Timekeeping Clerks in Texas.  This data is from the Texas
Workforce Commission, wage data as of 2009, found at
www.tracer2.com.  Wages in 2004 through 2008 are reduced by
national average wage growth of 0.92 percent in 2009, 3.05
percent in 2008, 3.72 percent in 2007, 4.40 percent in 2006, and
3.42 percent in 2005.  In addition Mr. Redner's disputed bank
account debits totaling $230 are added to the loss.

Based on these assumptions, the loss of time spent and payments
made to Northern Leasing is $867.


II LOSS OF CREDIT EXPECTANCY

Tables 1D through 3D show the loss of credit expectancy.  Mr.
Redner had the ability to borrow considerable sums beyond his
current lines of credit.  I estimate this additional capacity to
be at least a benchmark of $10,000, and likely more.  This
standby expectancy has a value similar to the value of a safety
net for a trapeze artist, or the value of a term life policy for
a person who continues to live a healthy life - the value does
not depend upon the actual use.  The loss of expectancy is
estimated by the costs of using this credit under normal
circumstances, approximately 12 percent per year, and the costs
of using this credit, if available, at the highest rates charged
to those who are viewed as high credit risks, approximately 25
percent.  This difference is 13 percent per year and is an
estimate of the value of the expectancy loss.  I illustrate the
loss for 7 years - beginning in 2005, the approximate date that
Northern Leasing existed as a charge-off on Mr. Redner's credit
report and lasting through 2012.

Based on these assumptions, the loss of credit expectancy is
$9,732 ▸ Table 3D.


III. REDUCTION IN VALUE OF LIFE

Economists have long agreed that life is valued at more than the
lost earnings capacity.  My estimate of the value of life is
based on many economic studies on what we, as a contemporary
society, actually pay to preserve the ability to lead a normal
life.  The studies examine incremental pay for risky occupations
as well as a multitude of data regarding expenditure for life
savings by individuals, industry, and state and federal agencies.

My estimate of the value of life is consistent with estimates
published in other studies that examine and review the broad
spectrum of economic literature on the value of life.  Among
these is "The Plausible Range for the Value of Life," Journal of
Forensic Economics, Vol. 3, No. 3, Fall 1990, pp. 17-39, by T. R.

3

SEG

Miller. This study reviews 67 different estimates of the value
of life published by economists in peer-reviewed academic
journals. The Miller results, in most instances, show the value
of life to range from approximately $1.6 million to $2.9 million
dollars in year 1988 after-tax dollars, with a mean of
approximately $2.2 million dollars. In "The Value of Life:
Estimates with Risks by Occupation and Industry," Economic
Inquiry, Vol. 42, No. 1, May 2003, pp. 29-48, Professor W. K.
Viscusi estimates the value of life to be approximately $4.7
million dollars in year 2000 dollars. An early seminal paper on
the value of life was written by Richard Thaler and Sherwin
Rosen, "The Value of Saving a Life: Evidence from the Labor
Market." in N.E. Terlickyj (ed.), Household Production and
Consumption. New York: Columbia University Press, 1975, pp. 265-
300. The Meta-Analyses Appendix to this report reviews
additional literature suggesting a value of life of approximately
$5.4 million in year 2008 dollars.

Because it is generally accepted by economists, the methodology
used to estimate the value of life has been found to meet Daubert
standards, as well as Frye standards and the Rules of Evidence in
various states, by Federal Circuit and Appellate courts, as well
as state trial, supreme and appellate courts nationwide.
Testimony based on this peer-reviewed methodology has been
admitted in over half the states in over 175 trials nationwide.
Proof of general acceptance and other standards is found in a
discussion of the extensive references to the scientific economic
peer-reviewed literature on the value of life listed in the **Value
of Life Appendix** to this report.

The underlying, academic, peer-reviewed studies fall into two
general groups: (1) consumer behavior and purchases of safety
devices; (2) wage risk premiums to workers; in addition, there is
a third group of studies consisting of cost-benefit analyses of
regulations. For example, one consumer safety study analyzes the
costs of smoke detectors and the lifesaving reduction associated
with them. One wage premium study examines the differential
rates of pay for dangerous occupations with a risk of death on
the job. Just as workers receive shift premiums for undesirable
work hours, workers also receive a higher rate of pay to accept a
increased risk of death on the job. A study of government
regulation examines the lifesaving resulting from the
installation of smoke stack scrubbers at high-sulphur, coal-
burning power plants. As a hypothetical example of the
methodology, assume that a safety device such as a carbon
monoxide detector costs $46 and results in lowering a person's
risk of premature death by one chance in 100,000. The cost per
life saved is obtained by dividing $46 by the one in 100,000
probability, yielding $4,600,000.

4

SEG

---

Tables 4D through 9D are based on several factors:
  (1)  An assumed impairment rating by the trier-of-fact of
       between 33.33 percent and 50 percent in 2004 and
       between 5 percent and 10 percent thereafter through Mr.
       Redner's life expectancy in the reduction in the
       ability to lead a normal life.  The diminished capacity
       to lead a normal life reflects the impact on career,
       social and leisure activities, the activities of daily
       living, and the internal emotional state, as discussed
       in Berla, Edward P., Michael L. Brookshire and Stan V.
       Smith, "Hedonic Damages and Personal Injury:  A
       Conceptual Approach," Journal of Forensic Economics,
       Vol 3, No. 1, Winter 1990, pp. 1-8;
  (2)  The central tendency of the range of the economic
       studies cited above which I estimate to be
       approximately $4.2 million in year 2010 dollars; and
  (3)  A life expectancy of 79.5 years.

Tables 4D through 6D are based on the lower estimated impairment
rating; Tables 7D through 9D are based on the upper estimated
impairment rating.  Based on these values and life expectancy, my
opinion of the reduction in the value of life is estimated at
$212,878 ▶ Table 6D to $407,346 ▶ Table 9D, averaging $310,112.

------------------------------------------

A trier-of-fact may weigh other factors to determine if these
estimated losses for Gordon Redner should be adjusted because of
special qualities or circumstances that economists do not as yet
have a methodology for analysis.

In each set of tables, the estimated losses are calculated
through an assumed trial or settlement date of October 1, 2010,
and from that date thereafter.  The last table in each set
accumulates the past and future estimated losses.  These
estimates are provided as an aid, tool and guide for the trier-
of-fact.

All opinions expressed in this report are clearly labeled as
such.  They are rendered in accordance with generally accepted
standards within the field of economics and are expressed to a
reasonable degree of economic certainty.  Estimates, assumptions,
illustrations and the use of benchmarks, which are not opinions,
but which can be viewed as hypothetical in nature, are also
clearly disclosed and identified herein.

In my opinion, it is reasonable for experts in the field of
economics and finance to rely on the materials and information I
reviewed in this case for the formulation of my substantive
opinions herein.

SEG
_____

If additional information is provided to me, which could alter my
opinions, I may incorporate any such information into an update,
revision, addendum, or supplement of the opinions expressed in
this report.

If you have any questions, please do not hesitate to call me.

Sincerely,

Stan V. Smith, Ph.D.
President

SEG
_____

## APPENDIX: VALUE OF LIFE

The economic methodology for the valuation of life has been found to meet the Daubert and Frye standards by many courts, along with the Rules of Evidence in many states nationwide.  My testimony has been accepted in approximately 200 state and federal cases nationwide in approximately two-thirds of the states and two-thirds of the federal jurisdictions.  Testimony has been accepted by Federal circuit and Appellate courts as well as in state trial, supreme, and appellate Courts.  The Daubert standard sets forth four criteria:

1.    Testing of the theory and science

2.    Peer Review

3.    Known or potential rate of error

4.    Generally accepted.


**Testing of the theory and science** has been accomplished over the past four decades, since the 1960s.  Dozens of economists of high renown have published over a hundred articles in high quality, peer-reviewed economic journals measuring the value of life.  The value of life theories are perhaps among the most well-tested in the field of economics, as evidenced by the enormous body of economic scientific literature that has been published in the field and is discussed below.


**Peer Review** of the concepts and methodology have been extraordinarily extensive.  One excellent review of this extensive, peer-reviewed literature can be found in "The Value of Risks to Life and Health," W. K. Viscusi, Journal of Economic Literature, Vol. 31, December 1993, pp. 1912-1946.  A second is "The Value of a Statistical Life: A Critical Review of Market Estimates throughout the World." W. K. Viscusi and J. E. Aldy, Journal of Risk and Uncertainty, Vol. 27, No. 1, November 2002, pp. 5-76.  Additional theoretical and empirical work by Viscusi, a leading researcher in the field, can be found in: "The Value of Life", W. K. Viscusi, John M. Olin Center for Law, Economics, and Business, Harvard Law School, Discussion Paper No. 517, June 2005.  An additional peer-reviewed article discusses the application to forensic economics: "The Plausible Range for the Value of Life," T. R. Miller, Journal of Forensic Economics, Vol. 3, No. 3, Fall 1990, pp. 17-39, which discusses the many dozens of articles published in other peer-reviewed economic journals on this topic.  This concept is discussed in detail in "Willingness to Pay Comes of Age: Will the System Survive?" T. R. Miller, Northwestern University Law Review, Summer 1989, pp. 876-907, and "Hedonic Damages in Personal Injury and Wrongful Death

7

SEG

Litigation," by S. V. Smith in <u>Litigation Economics</u>, pp. 39-59. Kenneth Arrow, a Nobel Laureate in economics, discusses this method for valuing life in "Invaluable Goods," <u>Journal of Economic Literature</u>, Vol. 35, No. 2, 1997, pp. 759.  See the Meta-Analyses Appendix for an additional review of the literature.

**The known or potential rate of error** is well researched.  All of these articles discuss the known or potential rate of error, well within the acceptable standard in the field of economics, generally using a 95% confidence rate for the statistical testing and acceptance of results.  There are few areas in the field of economics where the known or potential rate of error has been as well-accepted and subject to more extensive investigation.

**General Acceptance** of the concepts and methodology on the value of life in the field of economics is extensive.  This methodology is and has been generally accepted in the field of economics for many years.  Indeed, according to the prestigious and highly-regarded research institute, <u>The Rand Corporation</u>, by 1988, the peer-reviewed scientific methods for estimating the value of life were well-accepted: "Most economists would agree that the willingness-to-pay methodology is the most conceptually appropriate criterion for establishing the value of life," <u>Computing Economic loss in Cases of Wrongful Death</u>, King and Smith, Rand Institute for Civil Justice, R-3549-ICJ, 1988.

While first discussed in cutting edge, peer-reviewed economic journals, additional proof of general acceptance is now indicated by the fact that this methodology is now taught in standard economics courses at the undergraduate and graduate level throughout hundreds of colleges and universities nationwide as well as the fact that it is taught and discussed in widely-accepted textbooks in the field of law and economics: <u>Economics</u>, Sixth Edition, David C. Colander, McGraw-Hill Irwin, Boston, 2006, pp. 463-465; this introductory economics textbook is the third most widely used textbook in college courses nationwide. Hamermesh and Rees's <u>The Economics of Work and Pay</u>, Harper-Collins, 1993, Chapter 13, a standard advanced textbook in labor economics, also discusses the methodology for valuing life. Other textbooks discuss this topic as well.  Richard Posner, a Justice and former Chief Justice of the U.S. Court of Appeals for the highly regarded 7th Circuit and Senior Lecturer at the University of Chicago Law School, one of most prolific legal writers in America, details the Value of Life approach in his widely used textbooks: <u>Economic Analysis of Law</u>, 1986, Little Brown & Co., pp. 182-185 and <u>Tort Law</u>, 1982, Little Brown & Co., pp. 120-126.

As further evidence of general acceptance in the field, some surveys published in the field of forensic economics show that hundreds of economics nationwide are now familiar with this

SEG

methodology and are available to prepare (and critique) forensic
economic value of life estimates.  Indeed, some economists who
indicate they will prepare such analysis for plaintiffs also are
willing to critique such analysis for defendants, as I have often
done.  That an economist is willing to critique a report does not
indicate that he or she is opposed to the concept or the
methodology, but merely available to assure that the plaintiff
economist has employed proper techniques.  The fact that there
are economists who indicate they do not prepare estimates of
value of life is again no indication that they oppose the
methodology: many claim they are not familiar with the literature
and untrained in this area.  While some CPAs and others without a
degree in economics have opposed these methods, such
professionals do not have the requisite academic training and are
unqualified to make such judgements.  However, as in any field of
economics, this area is not without any dissent.  General
acceptance does not mean universal acceptance.

Additional evidence of general acceptance in the field is found
in the teaching of the concepts regarding the value of life.
Forensic Economics is now taught as a special field in a number
of institutions nationwide.  I taught what is believed to be the
first course ever presented in the field of Forensic Economics at
DePaul University in Spring, 1990.  My own book, Economic/Hedonic
Damages, Anderson, 1990, and supplemental updates thereto, co-
authored with Dr. Michael Brookshire, a Professor of Economics in
West Virginia, has been used as a textbook in at least 5 colleges
and universities nationwide in such courses in economics, and has
a thorough discussion of the methodology. Toppino et. al., in
"Forensic Economics in the Classroom," published in The Earnings
Analyst, Journal of the American Rehabilitation Economics
Association, Vol. 4, 2001, pp. 53-86, indicate that hedonic
damages is one of 15 major topic areas taught in such courses.

Lastly, general acceptance is found by examining publications in
the primary journal in the field of Forensic Economics, which is
the peer-reviewed Journal of Forensic Economics, where there have
been published many articles on the value of life.  Some are
cited above.  Others include: "The Econometric Basis for
Estimates of the Value of Life," W. K. Viscusi, Vol 3, No. 3,
Fall 1990, pp. 61-70; "Hedonic Damages in the Courtroom Setting."
S. V. Smith, Vol. 3, No. 3, Fall 1990, pp. 41-49; "Issues
Affecting the Calculated Value of Life," E. P. Berla, M. L.
Brookshire and S. V. Smith, Vol 3, No. 1, 1990, pp. 1-8; "Hedonic
Damages and Personal Injury:  A Conceptual Approach." G. R.
Albrecht, Vol. 5., No. 2, Spring/Summer 1992, pp. 97-104; "The
Application of the Hedonic Damages Concept to Wrongful and
Personal Injury Litigation." G. R. Albrecht, Vol. 7, No. 2,
Spring/Summer 1994, pp. 143-150; and also "A Review of the Monte
Carlo Evidence Concerning Hedonic Value of Life Estimates," R. F.
Gilbert, Vol. 8, No. 2, Spring/Summer 1995, pp. 125-130.

9

SEG
_____

It is important to note that this methodology is endorsed and
employed by the U. S. Government as the standard and recommended
approach for use by all U. S. Agencies in valuing life for policy
purposes, as mandated in current and past Presidential Executive
Orders in effect since 1972, and as discussed in "Report to
Congress on the Costs and Benefits of Federal Regulations,"
Office of Management and Budget, 1998, and "Economic Analysis of
Federal Regulations Under Executive Order 12866," Executive
Office of the President, Office of Management and Budget, pp. 1-
37, and "Report to the President on Executive Order No. 12866,"
Regulatory Planning and Review, May 1, 1994, Office of
Information and Regulatory Affairs, Office of Management and
Budget.  Prior presidents signed similar orders as discussed in
"Federal Agency Valuations of Human life," Administrative
Conference of the United States, Report for Recommendation 88-7,
December 1988, pp. 368-408.  926

Smith Economics Group, Ltd. ▪ 312-943-1551

SEG

_____

## APPENDIX: META-ANALYSES AND VALUE OF LIFE RESULTS SINCE 2000

Below I list the principal systematic reviews (meta-analyses), since the year 2000, of the value of life literature, and the values of a statistical life that they recommend. In statistics, a meta-analysis combines the results of several studies that address a set of related research hypotheses. Meta-analysis increase the statistical power of studies by analyzing a group of studies and provide a more powerful and accurate data analysis than would result from analyzing each study alone. Based on those reviews, the Summary Table suggests a best estimate. The following table summarizes the studies and their findings.

These statistically based studies place the value between $4.4 and $7.5 million, with $5.9 million representing a conservative yet credible estimate of the average (and range midpoint) of the values of a statistical life published in the studies in year 2005 dollars. Net of human capital, a credible net value of life based on all these literature reviews to be $4.8 million in year 2005 dollars, or $5.4 million in year 2008 dollars.

The actual value that I use, $4.1 million is approximately 24 percent lower than a conservative average estimate based on the credible meta-analyses. This value was originally based on a review conducted in the late 1980s, averaging the results published by that time. I have increased that late 1980s value only by inflation over time, despite the fact a review of literature over the years since that time has put obvious upward pressure on the figure that I use.

SEG
_____

Summary Table: Mean and range of value of statistical life
estimates (in 2005 dollars) from the best meta-analyses and
systematic reviews and characteristics of those reviews.

| Study | Formal Meta-Analysis? | Number of Values | Best Estimate (2005 Dollars) | Range | Context |
|-------|-----------------------|------------------|------------------------------|-------|---------|
| Miller 2000 | Yes | 68 estimates | $5.1M | $4.5-$6.2M | US estimate from all |
| Mrozek & Taylor 2002 | Yes | 203 estimates, from 33 studies | $4.4M | + or - 35% | Labor market |
| Viscusi & Aldy 2003 | Yes | 49 estimates (reviewed more than 60 studies, but some lacked desired variables) | $6.5M | $5.1-$9.6M | Labor market, US estimate from all |
| Kochi et al. 2006 | Yes | 234 estimates from 40 studies | $6.0M | + or - 44% | Labor market, survey |
| Bellavance 2006 | Yes | 37 estimates from 34 studies (rejected 15 others that lacked desired data or were flawed) | $7.0M | + or - 19% | Labor market |

Smith Economics Group, Ltd. ▪ 312-943-1551

SEG
_____

Miller (2000) started from the Miller 1989 JFE estimates and used statistical methods to adjust for differences between studies. It also added newer studies, primarily ones outside the United States. The authors specified the most appropriate study approach a priori, which allowed calculation of a best estimate from the statistical regression.

Mrozek and Taylor (2002) searched intensively for studies of the value of life implied by wages paid for risky jobs. They coded all values from each study rather than a most appropriate estimate. A statistical analysis identified what factors accounted for the differences in values between studies. The authors specified the most appropriate study approach a priori, which allowed calculation of a best estimate from the statistical regression.

Viscusi and Aldy (2003) focused on values from labor market studies that they considered of high quality and that provided data on risk levels and other important explanatory variables. They used statistical methods to account for variations between studies and derive a best estimate.

Kochi et al. (2006) searched intensively for studies of the value of life implied by wages and coded all values from each study rather than a most appropriate estimate. They did not filter study quality carefully. The best estimate was derived by statistical methods based on the distribution of the values within and across studies.

Bellavance et al. (2006) focused on values from labor market studies that they considered of high quality and that provided data on risk levels and other important explanatory variables. They used statistical methods to account for variations between studies and derive a best estimate.   926

13

SEG

---

**SUMMARY OF LOSSES FOR GORDON REDNER**

| TABLE | DESCRIPTION | ESTIMATE |
|-------|-------------|----------|
| ***** | ******************************** | *********** |
|  | **EARNINGS** |  |
|  | LOSS OF PAYMENTS AND TIME SPENT | $       867 |
| 3D | LOSS OF CREDIT EXPECTANCY | $     9,732 |
|  | - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - |  |
|  | **LOSS OF ENJOYMENT OF LIFE** |  |
|  | REDUCTION IN VALUE OF LIFE |  |
| 6D | Lower impairment rating | $   212,878 |
| 9D | Upper impairment rating | $   407,346 |

The information on this Summary of Losses is intended to summarize losses under certain given assumptions.  Please refer to the report and the tables for all the opinions.

14

LOSS OF PAST CREDIT EXPECTANCY
2005 - 2010

| YEAR | AGE | WAGES | CUMULATE |
|------|-----|--------|----------|
| 2005 | 48 | $1,300 | $1,300 |
| 2006 | 49 | 1,333 | 2,633 |
| 2007 | 50 | 1,387 | 4,020 |
| 2008 | 51 | 1,389 | 5,409 |
| 2009 | 52 | 1,426 | 6,835 |
| 2010 | 53 | 1,099 | $7,934 |

REDNER                    $7,934

PRESENT VALUE OF FUTURE CREDIT EXPECTANCY
2010 - 2011

| YEAR | AGE | WAGES | DISCOUNT FACTOR | PRESENT VALUE | CUMULATE |
|------|-----|-------|-----------------|---------------|----------|
| **** | *** | ***** | ******** | ******* | ******** |
| 2010 | 53 | $370 | 0.98891 | $366 | $366 |
| 2011 | 54 | 1,513 | 0.94678 | 1,432 | $1,798 |

GORDON REDNER                              $1,798

PRESENT VALUE OF NET LOSS OF CREDIT EXPECTANCY
2005 - 2011

| YEAR | AGE | WAGES | CUMULATE |
|------|-----|-------|----------|
| 2005 | 48 | $1,300 | $1,300 |
| 2006 | 49 | 1,333 | 2,633 |
| 2007 | 50 | 1,387 | 4,020 |
| 2008 | 51 | 1,389 | 5,409 |
| 2009 | 52 | 1,426 | 6,835 |
| 2010 | 53 | 1,465 | 8,300 |
| 2011 | 54 | 1,432 | $9,732 |

REDNER        $9,732

LOSS OF PAST RVL TO GORDON - LOWER
2004 - 2010

| YEAR | AGE | RVL | CUMULATE |
|------|-----|-----|----------|
| 2004 | 47 | $36,819 | $36,819 |
| 2005 | 48 | 5,712 | 42,531 |
| 2006 | 49 | 5,857 | 48,388 |
| 2007 | 50 | 6,096 | 54,484 |
| 2008 | 51 | 6,101 | 60,585 |
| 2009 | 52 | 6,267 | 66,852 |
| 2010 | 53 | 4,828 | $71,680 |

REDNER        $71,680

PRESENT VALUE OF FUTURE RVL TO GORDON - LOWER
2010 - 2037

| YEAR | AGE | RVL | DISCOUNT FACTOR | PRESENT VALUE | CUMULATE |
|------|-----|-----|-----------------|---------------|----------|
| **** | *** | ****** | ******** | ******** | ******** |
| 2010 | 53 | $1,627 | 0.98891 | $1,609 | $1,609 |
| 2011 | 54 | 6,649 | 0.94678 | 6,295 | 7,904 |
| 2012 | 55 | 6,848 | 0.90644 | 6,207 | 14,111 |
| 2013 | 56 | 7,053 | 0.86782 | 6,121 | 20,232 |
| 2014 | 57 | 7,265 | 0.83085 | 6,036 | 26,268 |
| 2015 | 58 | 7,483 | 0.79545 | 5,952 | 32,220 |
| 2016 | 59 | 7,707 | 0.76156 | 5,869 | 38,089 |
| 2017 | 60 | 7,938 | 0.72912 | 5,788 | 43,877 |
| 2018 | 61 | 8,176 | 0.69805 | 5,707 | 49,584 |
| 2019 | 62 | 8,421 | 0.66831 | 5,628 | 55,212 |
| 2020 | 63 | 8,674 | 0.63984 | 5,550 | 60,762 |
| 2021 | 64 | 8,934 | 0.61258 | 5,473 | 66,235 |
| 2022 | 65 | 9,202 | 0.58648 | 5,397 | 71,632 |
| 2023 | 66 | 9,478 | 0.56150 | 5,322 | 76,954 |
| 2024 | 67 | 9,762 | 0.53757 | 5,248 | 82,202 |
| 2025 | 68 | 10,055 | 0.51467 | 5,175 | 87,377 |
| 2026 | 69 | 10,357 | 0.49274 | 5,103 | 92,480 |
| 2027 | 70 | 10,668 | 0.47175 | 5,033 | 97,513 |
| 2028 | 71 | 10,988 | 0.45165 | 4,963 | 102,476 |
| 2029 | 72 | 11,318 | 0.43241 | 4,894 | 107,370 |
| 2030 | 73 | 11,658 | 0.41399 | 4,826 | 112,196 |
| 2031 | 74 | 12,008 | 0.39635 | 4,759 | 116,955 |
| 2032 | 75 | 12,368 | 0.37946 | 4,693 | 121,648 |
| 2033 | 76 | 12,739 | 0.36330 | 4,628 | 126,276 |
| 2034 | 77 | 13,121 | 0.34782 | 4,564 | 130,840 |
| 2035 | 78 | 13,515 | 0.33300 | 4,500 | 135,340 |
| 2036 | 79 | 13,920 | 0.31881 | 4,438 | 139,778 |
| 2037 | 80 | 4,517 | 0.31441 | 1,420 | $141,198 |

GORDON REDNER                                    $141,198

PRESENT VALUE OF NET RVL TO GORDON - LOWER
2004 - 2037

| YEAR | AGE | RVL | CUMULATE |
|------|-----|-----|----------|
| **** | *** | ******** | ******** |
| 2004 | 47 | $36,819 | $36,819 |
| 2005 | 48 | 5,712 | 42,531 |
| 2006 | 49 | 5,857 | 48,388 |
| 2007 | 50 | 6,096 | 54,484 |
| 2008 | 51 | 6,101 | 60,585 |
| 2009 | 52 | 6,267 | 66,852 |
| 2010 | 53 | 6,437 | 73,289 |
| 2011 | 54 | 6,295 | 79,584 |
| 2012 | 55 | 6,207 | 85,791 |
| 2013 | 56 | 6,121 | 91,912 |
| 2014 | 57 | 6,036 | 97,948 |
| 2015 | 58 | 5,952 | 103,900 |
| 2016 | 59 | 5,869 | 109,769 |
| 2017 | 60 | 5,788 | 115,557 |
| 2018 | 61 | 5,707 | 121,264 |
| 2019 | 62 | 5,628 | 126,892 |
| 2020 | 63 | 5,550 | 132,442 |
| 2021 | 64 | 5,473 | 137,915 |
| 2022 | 65 | 5,397 | 143,312 |
| 2023 | 66 | 5,322 | 148,634 |
| 2024 | 67 | 5,248 | 153,882 |
| 2025 | 68 | 5,175 | 159,057 |
| 2026 | 69 | 5,103 | 164,160 |
| 2027 | 70 | 5,033 | 169,193 |
| 2028 | 71 | 4,963 | 174,156 |
| 2029 | 72 | 4,894 | 179,050 |
| 2030 | 73 | 4,826 | 183,876 |
| 2031 | 74 | 4,759 | 188,635 |
| 2032 | 75 | 4,693 | 193,328 |
| 2033 | 76 | 4,628 | 197,956 |
| 2034 | 77 | 4,564 | 202,520 |
| 2035 | 78 | 4,500 | 207,020 |
| 2036 | 79 | 4,438 | 211,458 |
| 2037 | 80 | 1,420 | $212,878 |

REDNER        $212,878

SMITH ECONOMICS GROUP, LTD.   312/943-1551

LOSS OF PAST RVL TO GORDON - UPPER
2004 - 2010

| YEAR | AGE | RVL | CUMULATE |
|------|-----|-----|----------|
| **** | *** | ******** | ******** |
| 2004 | 47 | $55,228 | $55,228 |
| 2005 | 48 | 11,423 | 66,651 |
| 2006 | 49 | 11,714 | 78,365 |
| 2007 | 50 | 12,192 | 90,557 |
| 2008 | 51 | 12,202 | 102,759 |
| 2009 | 52 | 12,534 | 115,293 |
| 2010 | 53 | 9,656 | $124,949 |

REDNER        $124,949

PRESENT VALUE OF FUTURE RVL TO GORDON - UPPER
2010 - 2037

| YEAR | AGE | RVL | DISCOUNT FACTOR | PRESENT VALUE | CUMULATE |
|------|-----|-----|-----------------|---------------|----------|
| **** | *** | ****** | ******** | ******** | ******** |
| 2010 | 53 | $3,254 | 0.98891 | $3,218 | $3,218 |
| 2011 | 54 | 13,297 | 0.94678 | 12,589 | 15,807 |
| 2012 | 55 | 13,696 | 0.90644 | 12,415 | 28,222 |
| 2013 | 56 | 14,107 | 0.86782 | 12,242 | 40,464 |
| 2014 | 57 | 14,530 | 0.83085 | 12,072 | 52,536 |
| 2015 | 58 | 14,966 | 0.79545 | 11,905 | 64,441 |
| 2016 | 59 | 15,415 | 0.76156 | 11,739 | 76,180 |
| 2017 | 60 | 15,877 | 0.72912 | 11,576 | 87,756 |
| 2018 | 61 | 16,353 | 0.69805 | 11,415 | 99,171 |
| 2019 | 62 | 16,844 | 0.66831 | 11,257 | 110,428 |
| 2020 | 63 | 17,349 | 0.63984 | 11,101 | 121,529 |
| 2021 | 64 | 17,869 | 0.61258 | 10,946 | 132,475 |
| 2022 | 65 | 18,405 | 0.58648 | 10,794 | 143,269 |
| 2023 | 66 | 18,957 | 0.56150 | 10,644 | 153,913 |
| 2024 | 67 | 19,526 | 0.53757 | 10,497 | 164,410 |
| 2025 | 68 | 20,112 | 0.51467 | 10,351 | 174,761 |
| 2026 | 69 | 20,715 | 0.49274 | 10,207 | 184,968 |
| 2027 | 70 | 21,336 | 0.47175 | 10,065 | 195,033 |
| 2028 | 71 | 21,976 | 0.45165 | 9,925 | 204,958 |
| 2029 | 72 | 22,635 | 0.43241 | 9,788 | 214,746 |
| 2030 | 73 | 23,314 | 0.41399 | 9,652 | 224,398 |
| 2031 | 74 | 24,013 | 0.39635 | 9,518 | 233,916 |
| 2032 | 75 | 24,733 | 0.37946 | 9,385 | 243,301 |
| 2033 | 76 | 25,475 | 0.36330 | 9,255 | 252,556 |
| 2034 | 77 | 26,239 | 0.34782 | 9,126 | 261,682 |
| 2035 | 78 | 27,026 | 0.33300 | 9,000 | 270,682 |
| 2036 | 79 | 27,837 | 0.31881 | 8,875 | 279,557 |
| 2037 | 80 | 9,034 | 0.31441 | 2,840 | $282,397 |

GORDON REDNER                    $282,397

PRESENT VALUE OF NET RVL TO GORDON - UPPER
2004 - 2037

| YEAR | AGE | RVL | CUMULATE |
|------|-----|-----|----------|
| **** | *** | ******** | ******** |
| 2004 | 47 | $55,228 | $55,228 |
| 2005 | 48 | 11,423 | 66,651 |
| 2006 | 49 | 11,714 | 78,365 |
| 2007 | 50 | 12,192 | 90,557 |
| 2008 | 51 | 12,202 | 102,759 |
| 2009 | 52 | 12,534 | 115,293 |
| 2010 | 53 | 12,874 | 128,167 |
| 2011 | 54 | 12,589 | 140,756 |
| 2012 | 55 | 12,415 | 153,171 |
| 2013 | 56 | 12,242 | 165,413 |
| 2014 | 57 | 12,072 | 177,485 |
| 2015 | 58 | 11,905 | 189,390 |
| 2016 | 59 | 11,739 | 201,129 |
| 2017 | 60 | 11,576 | 212,705 |
| 2018 | 61 | 11,415 | 224,120 |
| 2019 | 62 | 11,257 | 235,377 |
| 2020 | 63 | 11,101 | 246,478 |
| 2021 | 64 | 10,946 | 257,424 |
| 2022 | 65 | 10,794 | 268,218 |
| 2023 | 66 | 10,644 | 278,862 |
| 2024 | 67 | 10,497 | 289,359 |
| 2025 | 68 | 10,351 | 299,710 |
| 2026 | 69 | 10,207 | 309,917 |
| 2027 | 70 | 10,065 | 319,982 |
| 2028 | 71 | 9,925 | 329,907 |
| 2029 | 72 | 9,788 | 339,695 |
| 2030 | 73 | 9,652 | 349,347 |
| 2031 | 74 | 9,518 | 358,865 |
| 2032 | 75 | 9,385 | 368,250 |
| 2033 | 76 | 9,255 | 377,505 |
| 2034 | 77 | 9,126 | 386,631 |
| 2035 | 78 | 9,000 | 395,631 |
| 2036 | 79 | 8,875 | 404,506 |
| 2037 | 80 | 2,840 | $407,346 |

REDNER            $407,346

August 5, 2010

**WORK NOTES** - DISCOUNTED (SRU/BAE)

BASIC FACTS: CREDIT DAMAGE CASE OF 46 YR-OLD MALE WHOSE SIGNATURE
WAS FORGED TO ENTER INTO FRAUDULENT CONTRACTS, RESULTING IN
CREDIT DAMAGE, LOSS OF TIME AND PAYMENTS, ETC.

CONTROL INFO
NAME: GORDON REDNER
GENDER: MALE
RACE: CAUCASIAN
DOB: ███████████████

DOI: FEBRUARY 1, 2004
DOL: SAME
DOT: OCTOBER 1, 2010

AGE AT DOI: 46.3
AGE AS OF DOT: 52.9
RLE AS OF DOT: 26.6
LE AS OF DOT: 79.5

GROWTH RATE: 4.05% NOMINAL
DISCOUNT RATE: 4.45% NOMINAL

FAMILY BACKGROUND
MARITAL STATUS: MARRIED
FAMILY MEMBERS: ███████████ REDNER-WIFE;

LOSS OF TIME SPENT AND PAYMENTS MADE TO NORTHERN LEASING
IN 2004, GORDON REDNER RAN A HOME-BASED COMPANY, GIFTS R US,
WHERE HE MADE AND SOLD WHAT HE DESCRIBES AS LITTLE KNICK-KNACKS
AND FIGURINES.  HE ENTERED INTO AN AGREEMENT, AT THE END OF
JANUARY 2004, WITH A COMPANY TO PROVIDE HIM WITH CREDIT CARD
PROCESSING EQUIPMENT.  MR. REDNER STATES HE WAS NEVER PROVIDED
WITH WORKING EQUIPMENT, AND HE BEGAN TO NOTICE A LOT OF DEBITS BY
NORTHERN LEASING FROM HIS BANK ACCOUNT.  MR. REDNER STATES HE HAD
NEVER HEARD OF NORTHERN LEASING, AND HAD NEVER ENTERED INTO ANY
AGREEMENTS WITH THEM.  HE CONTACTED THEM AND WAS PROVIDED WITH
COPIES OF A LEASE WITH HIS SIGNATURE, WHICH MR. REDNER BELIEVES
WAS FORGED.  IN ORDER TO STOP MONEY FROM BEING DEBITED FROM HIS
BANK ACCOUNT MR. REDNER CLOSED THE ACCOUNT, AT WHICH POINT HE
BEGAN TO RECEIVE THREATENING LETTERS AND PHONE CALLS FROM
NORTHERN LEASING.  HE DID THIS IN APRIL 2004, BY WHICH POINT
NORTHERN LEASING HAD TAKEN $230.24 FROM HIS ACCOUNT.

NORTHERN LEASING THREATENED TO SUE MR. REDNER FOR BREACH OF
CONTRACT, AND SO HE STATES HE BEGAN THE ARDUOUS PROCESS OF
COMMUNICATING WITH THEM, OBTAINING DOCUMENTS AND RECORDS, AND
CONSULTING LEGAL COUNSEL ALL - IN AN ATTEMPT TO CLEAR HIS NAME.
MR. REDNER ESTIMATES THAT HIS ORDEAL WITH NORTHERN LEASING LASTED

1

UNTIL EARLY 2005 WHEN THE COMPANY DECIDED TO STOP PURSUING CLAIMS
AGAINST HIM.  OVER THAT PERIOD OF TIME HE ESTIMATES HE SPENT
APPROXIMATELY 50 HOURS OF TIME DEALING WITH THE SITUATION.

**THE LOSS OF TIME SPENT IS ILLUSTRATED AT 50 HOURS OF TIME SPENT
IN 2004, AND IS VALUED AT $14.82 IN YEAR 2009 DOLLARS BASED ON
THE AVERAGE HOURLY WAGES OF OFFICE CLERKS AND PAYROLL AND
TIMEKEEPING CLERKS IN TEXAS.  THIS DATA IS FROM THE TEXAS
WORKFORCE COMMISSION, WAGE DATA AS OF 2009, FOUND AT
WWW.TRACER2.COM.  WAGES IN 2004 THROUGH 2008 ARE REDUCED BY
NATIONAL AVERAGE WAGE GROWTH OF 0.92 PERCENT IN 2009, 3.05
PERCENT IN 2008, 3.72 PERCENT IN 2007, 4.40 PERCENT IN 2006, AND
3.42 PERCENT IN 2005.  IN ADDITION MR. REDNER'S DISPUTED BANK
ACCOUNT DEBITS TOTALING $230 ARE ADDED TO THE LOSS.**

2004 = [12.94 (09 AVERAGE OFFICE CLERK) + 16.69 (09 MEDIAN
    PAYROLL CLERK)] / 2 = 14.82 / 0.92% (09 GRW) / 3.05% (08
    GRW) / 3.72% (07 GRW) / 4.40% (06 GRW) / 3.42% (05 GRW) =
    12.73 * 50HRS = 637 + 230 (PAYMENTS)= **867**

LOSS OF CREDIT EXPECTANCY
IN ADDITION TO WRITING THREATENING LETTERS AND MAKING HARASSING
PHONE CALLS, NORTHERN LEASING MADE DEROGATORY REMARKS ON MR.
REDNER'S CREDIT REPORT.  HE ADMITS TO HAVING CREDIT PROBLEMS IN
THE PAST, AND TO NOT REALLY USING CREDIT CARDS MUCH.  MR. REDNER
DOES RECALL NEEDING A COSIGNER TO OBTAIN A CAR LOAN IN THE RECENT
PAST.

MR. REDNER HAD THE ABILITY TO BORROW CONSIDERABLE SUMS BEYOND HIS
CURRENT LINES OF CREDIT.  I ESTIMATE THIS ADDITIONAL CAPACITY TO
BE AT LEAST A BENCHMARK OF $10,000, AND LIKELY MORE.  THIS
STANDBY EXPECTANCY HAS A VALUE SIMILAR TO THE VALUE OF A SAFETY
NET FOR A TRAPEZE ARTIST, OR THE VALUE OF A TERM LIFE POLICY FOR
A PERSON WHO CONTINUES TO LIVE A HEALTHY LIFE - THE VALUE DOES
NOT DEPEND UPON THE ACTUAL USE.  THE LOSS OF EXPECTANCY IS
ESTIMATED BY THE COSTS OF USING THIS CREDIT UNDER NORMAL
CIRCUMSTANCES, APPROXIMATELY 12 PERCENT PER YEAR, AND THE COSTS
OF USING THIS CREDIT, IF AVAILABLE, AT THE HIGHEST RATES CHARGED
TO THOSE WHO ARE VIEWED AS HIGH CREDIT RISKS, APPROXIMATELY 25
PERCENT.  THIS DIFFERENCE IS 13 PERCENT PER YEAR AND IS AN
ESTIMATE OF THE VALUE OF THE EXPECTANCY LOSS.  **I ILLUSTRATE THE
LOSS FOR 7 YEARS - BEGINNING IN 2005, THE APPROXIMATE DATE THAT
NORTHERN LEASING EXISTED AS A CHARGE-OFF ON MR. REDNER'S CREDIT
REPORT AND LASTING THROUGH 2011.**

```
LOSS OF CREDIT EXPECTANCY
2005 = 10000 * 13% = 1300
2006 = 1300 * 2.54% (06 INFL) = 1333
2007 = 1333 * 4.08% (07 INFL) = 1387
2008 = 1387 * 0.09% (08 INFL) = 1389
2009 = 1389 * 2.72% (09 INFL) = 1426
2010 = 1426 * 3.00E% (EST. 10 INFL) = 1469
2011 = 1469 * 3.00E% (EST 11 INFL) = 1513
```

REDUCTION IN VALUE OF LIFE ("RVL")
I ILLUSTRATE THE RANGE TO BE BETWEEN 33.33 PERCENT AND 50 PERCENT
IN 2004 AND BETWEEN 5 PERCENT AND 10 PERCENT THEREAFTER THROUGH
MR. REDNER'S LIFE EXPECTANCY.  SEE INTERVIEW NOTES FOR DETAILS.
LOSS CONFIRMED IN INTERVIEW.

LOWER
```
2004 = 114234 / 3.42% INFLATION = 110456 * 33.33% = 36819
2005 = 117135 / 2.54% INFLATION = 114234 * 5% = 5712
2006 = 121915 / 4.08% INFLATION = 117135 * 5% = 5857
2007 = 122024 / 0.09% INFLATION = 121915 * 5% = 6096
2008 = 125343 / 2.72% INFLATION = 122024 * 5% = 6101
2009 = 129104 (2010 EST BASE) / 3.00% EST. 09 INFL = 125343 *
       5% = 6267
2010 = 129104 (BASE) * 5% = 6455 THRU LE AT 3.00%
```

UPPER
```
2004 = 114234 / 3.42% INFLATION = 110456 * 50% = 55228
2005 = 117135 / 2.54% INFLATION = 114234 * 10% = 11423
2006 = 121915 / 4.08% INFLATION = 117135 * 10% = 11714
2007 = 122024 / 0.09% INFLATION = 121915 * 10% = 12192
2008 = 125343 / 2.72% INFLATION = 122024 * 10% = 12202
2009 = 129104 (2010 EST BASE) / 3.00% EST. 09 INFL = 125343 *
       10% = 12534
2010 = 129104 (BASE) * 10% = 12910 THRU LE AT 3.00%
```

3

**BAE TCW/GORDON REDNER (PL) ON 08-04-2010 AT C** ██████████

TIME LOSS / PAYMENT LOSS / CREDIT

IN 2004, GORDON REDNER RAN A HOME-BASED COMPANY, GIFTS R US, WHERE HE MADE AND SOLD WHAT HE DESCRIBES AS LITTLE KNICK-KNACKS AND FIGURINES. HE ENTERED INTO AN AGREEMENT, AT THE END OF JANUARY 2004, WITH A COMPANY TO PROVIDE HIM WITH CREDIT CARD PROCESSING EQUIPMENT. MR. REDNER WAS NEVER PROVIDED WITH WORKING EQUIPMENT, AND HE BEGAN TO NOTICE A LOT OF DEBITS BY NORTHERN LEASING FROM HIS BANK ACCOUNT. MR. REDNER HAD NEVER HEARD OF NORTHERN LEASING, AND HAD NEVER ENTERED INTO ANY AGREEMENTS WITH THEM. HE CONTACTED THEM AND WAS PROVIDED WITH COPIES OF A LEASE WITH HIS SIGNATURE, WHICH MR. REDNER BELIEVES WAS FORGED. IN ORDER TO STOP MONEY FROM BEING DEBITED FROM HIS BANK ACCOUNT MR. REDNER HAD TO CLOSE THE ACCOUNT, AT WHICH POINT HE BEGAN TO RECEIVE THREATENING LETTERS AND PHONE CALLS FROM NORTHERN LEASING. HE DID THIS IN APRIL 2004, BY WHICH POINT NORTHERN LEASING HAD TAKEN $230.24 FROM HIS ACCOUNT.

NORTHERN LEASING THREATENED TO SUE MR. REDNER FOR BREACH OF CONTRACT, AND SO HE BEGAN THE ARDUOUS PROCESS OF COMMUNICATING WITH THEM, OBTAINING DOCUMENTS AND RECORDS, AND CONSULTING LEGAL COUNSEL ALL - IN AN ATTEMPT TO CLEAR HIS NAME. MR. REDNER ESTIMATES THAT HIS ORDEAL WITH NORTHERN LEASING LASTED UNTIL EARLY 2005 WHEN THE COMPANY DECIDED TO STOP PURSUING CLAIMS AGAINST HIM. OVER THAT PERIOD OF TIME HE ESTIMATES HE SPENT APPROXIMATELY 50 HOURS OF TIME DEALING WITH THE SITUATION.

IN ADDITION TO WRITING THREATENING LETTERS AND MAKING HARASSING PHONE CALLS, NORTHERN LEASING MADE DEROGATORY REMARKS ON MR. REDNER'S CREDIT REPORT. HE ADMITS TO HAVING CREDIT PROBLEMS IN THE PAST, AND TO NOT REALLY USING CREDIT CARDS MUCH. MR. REDNER DOES RECALL NEEDING A COSIGNER TO OBTAIN A CAR LOAN A COUPLE OF YEARS AGO.

MR. REDNER'S HOME BUSINESS HAD NOT BEEN SUCCESSFUL, BREAKING EVEN OVER THE APPROXIMATE TWO YEARS HE RAN IT, AND SO HE CLOSED IT DOWN IN 2005. HE HAS SINCE BEEN WORKING AS A SECURITY GUARD, EARNING APPROXIMATELY $23,000 PER YEAR.

RVL

DURING HIS BATTLE WITH NORTHERN LEASING, MR. REDNER EXPERIENCED A GREAT DEAL OF STRESS AND LOSS OF SLEEP. HE HAD NEVER DEALT WITH A COMPANY THREATENING TO SUE HIM, AND THOUGH HE WAS CONFIDENT THAT THEY WERE WRONG, THERE IS NO WAY TO TELL WHAT COULD HAPPEN IN COURT, AND SO THE ENTIRE SITUATION MADE MR. REDNER VERY NERVOUS. THERE WERE MANY NIGHTS WHERE HE STAYED AWAKE IN BED WORRYING ABOUT WHAT WOULD HAPPEN NEXT, AND HE WAS LARGELY A NERVOUS WRECK.

4

FOR THE YEAR OR SO THAT THIS WENT ON, MR. REDNER BELIEVES HIS
QUALITY OF LIFE WAS REDUCED BY APPROXIMATELY ONE THIRD OR MORE,
AND SINCE THEN HE HAS BEEN AT ABOUT 95%.

```
01 CN ** 00 GORDON REDNER
01 /* ** 00 LOSS OF CREDIT EXPECTANCY
01 CC ** 00 01-01-2005 10-01-2010 01-01-2004 10-26-1957 04-25-2037 12-31
01 CC ** 00 WM XXXX 7 XXB O N
01 PJ WA 00 01-01-2005 12-31-2005 1 1300 0 0.00 0.00
01 PJ WA 01 01-01-2006 12-31-2006 1 1333 0 0.00 0.00
01 PJ WA 02 01-01-2007 12-31-2007 1 1387 0 0.00 0.00
01 PJ WA 03 01-01-2008 12-31-2008 1 1389 0 0.00 0.00
01 PJ WA 04 01-01-2009 12-31-2009 1 1426 0 0.00 0.00
01 PJ WA 05 01-01-2010 12-31-2010 1 1469 0 0.00 0.00
01 PJ WA 06 01-01-2011 12-31-2011 1 1513 0 0.00 0.00
01 IN ** 00 1 10-01-2010 04-25-2037 1 4.45
01 FM ** 00 0 59 N N N X X X X X X X X X
01 TB WA P  01-01-2005 09-30-2010 0 0 1 1
01 TB WA F  10-01-2010 12-31-2011 0 1 2 1
01 TB SM B  01-01-2005 12-31-2011 0 1 3 1


02 CN ** 00 GORDON REDNER
02 /* ** 00 RVL - LOWER
02 CC ** 00 01-01-2004 10-01-2010 01-01-2004 10-26-1957 04-25-2037 12-31
02 CC ** 00 WM XXXX 7 XXB O N
02 PJ X1 00 01-01-2004 12-31-2004 1 36819 0 0.00 0.00
02 PJ X1 01 01-01-2005 12-31-2005 1 5712 0 0.00 0.00
02 PJ X1 02 01-01-2006 12-31-2006 1 5857 0 0.00 0.00
02 PJ X1 03 01-01-2007 12-31-2007 1 6096 0 0.00 0.00
02 PJ X1 04 01-01-2008 12-31-2008 1 6101 0 0.00 0.00
02 PJ X1 05 01-01-2009 12-31-2009 1 6267 0 0.00 0.00
02 PJ X1 06 01-01-2010 04-25-2037 1 6455 1 3.00 0.00
02 IN ** 00 1 10-01-2010 04-25-2037 1 4.45
02 FM ** 00 0 59 N N N X X X X X X X X X
02 TB X1 P  01-01-2004 09-30-2010 0 0 4 1
02 TB X1 F  10-01-2010 04-25-2037 0 1 5 1
02 TB SM B  01-01-2004 04-25-2037 0 1 6 1


03 CN ** 00 GORDON REDNER
03 /* ** 00 RVL - UPPER
03 CC ** 00 01-01-2004 10-01-2010 01-01-2004 10-26-1957 04-25-2037 12-31
03 CC ** 00 WM XXXX 7 XXB O N
03 PJ X1 00 01-01-2004 12-31-2004 1 55228 0 0.00 0.00
03 PJ X1 01 01-01-2005 12-31-2005 1 11423 0 0.00 0.00
03 PJ X1 02 01-01-2006 12-31-2006 1 11714 0 0.00 0.00
03 PJ X1 03 01-01-2007 12-31-2007 1 12192 0 0.00 0.00
03 PJ X1 04 01-01-2008 12-31-2008 1 12202 0 0.00 0.00
03 PJ X1 05 01-01-2009 12-31-2009 1 12534 0 0.00 0.00
03 PJ X1 06 01-01-2010 04-25-2037 1 12910 1 3.00 0.00
03 IN ** 00 1 10-01-2010 04-25-2037 1 4.45
03 FM ** 00 0 59 N N N X X X X X X X X X
03 TB X1 P  01-01-2004 09-30-2010 0 0 7 1
03 TB X1 F  10-01-2010 04-25-2037 0 1 8 1
03 TB SM B  01-01-2004 04-25-2037 0 1 9 1
```