1

DEPOSITION OF STAN SMITH, Ph.D.

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


MELINDA SERIN, JUDSON          )

RUSS, LONG SOUI LIM, PERI      )

KETTLER, GORDON REDNER         )

and THOMAS J. SMITH,,          )
                                         Case No.

          Plaintiffs,  )
                         06-CV-1625 (JSG)

     vs.                 )

NORTHERN LEASING SYSTEMS,      )

INC., JAY COHEN, RICH          )

HAHN and SARA KRIEGER,,        )

         Defendants.  )


VIDEOTAPED DEPOSITION OF STAN SMITH, Ph.D.

October 29, 2010

Chicago, Illinois


Reported by:
Sheri E. Liss
Job No.: 20179

**2**

DEPOSITION OF STAN SMITH, Ph.D.

1   DEPOSITION OF STAN SMITH, Ph.D.
2       The videotaped deposition of DR. STAN
3   SMITH, called by the Plaintiff for examination,
4   taken pursuant to the Code of Civil Procedure and
5   the Rules of the Supreme Court of the State of
6   Illinois pertaining to the taking of depositions for
7   the purposes of evidence, taken before Sheri E.
8   Liss, CSR NO. 084-002600, a Certified Shorthand
9   Reporter within and for the State of Illinois,
10  Registered Professional Reporter, Certified Realtime
11  Reporter, at the offices of Regus, Two Prudential
12  Plaza, Suite 3500, Chicago, Illinois, on October 29,
13  2010 at the hour 9:00 o'clock a.m.
14
15
16
17
18
19
20
21
22
23
24
25

**4**

DEPOSITION OF STAN SMITH, Ph.D.

1   DEPOSITION OF STAN SMITH, Ph.D.
2   APPEARANCES:
3       CHITTUR & ASSOCIATES, P.C.
4   By: ANDREY STRUTINSKIY, ESQ.
5       (Via Videoconference)
6       286 Madison Avenue, Suite 1100
7       New York, New York 10017
8       (212) 370-0447
9       astrutinskiy@chittur.com
10      -and-
11      FINKELSTEIN & PARTNERS, LLP
12  By: KEITH ALTMAN, ESQ.
13      (Via Videoconference)
14      1279 Route 300
15      Newburgh, New York 12551
16      (516) 795-6605
17      kaltman@lawampm.com
18          Appeared on behalf of the Plaintiffs;
19
20
21
22
23
24
25

**3**

DEPOSITION OF STAN SMITH, Ph.D.

1       DEPOSITION OF STAN SMITH, Ph.D.
2           I N D E X
3
    STAN SMITH, Ph.D
4
    EXAMINATION                    PAGE
5
    By Mr. Lillienstein              6
6
7
8           E X H I B I T S

    NO.            MARKED/REFERRED TO
9
    Exhibit D    .......................    11
10  Exhibit G    .......................    12
    Exhibit W    .......................    18
11  Exhibit E    .......................    35
    Exhibit B    .......................    40
12  Exhibit GG   .......................    50
    Exhibit V    .......................    55
13  Exhibit X    .......................    55
    Exhibit AA   .......................    55
14  Exhibit CC   .......................    55
    Exhibit DD   .......................    55
15  Exhibit EE   .......................    55
    Exhibit II   .......................    55
16  Exhibit KK   .......................    55
    Exhibit NN   .......................    55
17  Exhibit PP   .......................    55
    Exhibit AAA  .......................    142
18
19
20
21
22
23
24
25

**5**

DEPOSITION OF STAN SMITH, Ph.D.

1       DEPOSITION OF STAN SMITH, Ph.D.
2   APPEARANCES (continued):
3       MOSES & SINGER, LLP
4   By: ROBERT LILLIENSTEIN, ESQ.
5       (Via Videoconference)
6       The Chrysler Building
7       405 Lexington Avenue
8       New York, New York 10174
9       (212) 554-7807
10      rlillienstein@mosessinger.com
11      -and-
12      FRANK/GECKER, LLP
13  By: JEREMY C. KLEINMAN, ESQ.
14      325 North LaSalle Street
15      Suite 625
16      Chicago, Illinois 60654
17      (312) 276-1400
18      jkleinman@fgllp.com
19          Appeared on behalf of the Defendants.
20
21  ALSO PRESENT:
22      CHRISTOPHER ERATH, (Telephonically) Expert Witness
23      JOHN DOODY, Videographer
24  REPORTED BY:  SHERI E. LISS, CSR, RPR, CRR, CLR
25          CSR NO. 084-002600

2 (Pages 2 to 5)

6

1       DEPOSITION OF STAN SMITH, Ph.D.
2       THE VIDEOGRAPHER:  This is Tape No. 1 of
3   the videotaped deposition of Dr. Stan Smith taken by
4   the defense in the matter Serin et al., versus
5   Northern Leasing Systems, Inc., et al., filed in the
6   U.S. District Court, the Southern District of New
7   York, Case No. 06-CV-1625 (JSG).  This deposition is
8   being held it Regus offices at 180 North Stetson
9   Street, Suite 3500 in Chicago, Illinois on October
10  29, 2010 at approximately 9:00 a.m.
11       My name is John Doody from the firm
12  of David Feldman Worldwide, and I'm the certified
13  video specialist.  The court reporter is Sheri Liss
14  also in association with David Feldman Worldwide.
15       Will counsel please introduce
16  themselves.
17       MR. LILLIENSTEIN:  Robert Lillienstein
18  representing the defendants for Moses & Singer.
19       MR. STRUTINSKIY:  Andrey Strutinskiy from
20  Chittur & Associates representing the witness.
21       MR. LILLIENSTEIN:  Good morning, Dr. Smith.
22  Just to complete the introductions here, who else is
23  present with you in the room there?  Could whoever
24  is there identify themselves?
25       MR. KLEINMAN:  Jeremy Kleinman of the law

7

1       DEPOSITION OF STAN SMITH, Ph.D.
2   firm of Frank/Gecker LLP assistant counsel for the
3   defendants.
4       MR. LILLIENSTEIN:  And on the conference
5   call on my end here is Christopher Erath, who is the
6   defendants' expert witness, just so we have that
7   straight.
8       Dr. Smith, I previously introduced
9   myself to you but just for the record I'm
10  representing defendants here.  I'm going to ask you
11  some questions about the opinion and reports that
12  you've given in this case.  I understand that you've
13  been deposed many many times and that you've given
14  trial testimony many, many times so I probably don't
15  need to go through the instructions for you.  I just
16  ask that you wait for me to complete my answers
17  before you give your answers and that if you do
18  answer my question, that I will assume that you
19  understood the question.  Is that okay?
20       A.   Yes.
21       THE VIDEOGRAPHER:  Will the reporter please
22  swear in the witness?
23       (Whereupon, the witness was
24       sworn.)
25       DR. STAN SMITH,

8

1       DEPOSITION OF STAN SMITH, Ph.D.
2   having been first duly sworn, was examined and
3   testified as follows:
4       EXAMINATION
5       BY MR. LILLIENSTEIN:
6       Q.   Dr. Smith, how much money has your
7   company charged to date for services you rendered on
8   behalf of the plaintiffs in this case?
9       A.   I believe I have an invoice.  We charge
10  a set amount for each of the four reports.  My staff
11  gave me a series of documents today for various
12  different matters.
13       Q.   So without looking at those documents
14  you don't know how much money your firm has changed?
15       A.   The invoice I have here is for four
16  hours of deposition.  We charge a set fee for the
17  reports which is typically $3165 per report.
18       Q.   Okay.  And do you know whether that's
19  what you charged in this case?
20       A.   Yes.  And then we were told to bill you
21  four hours for deposition.  Did your colleague bring
22  a check today?
23       Q.   No, I don't believe he did.
24       A.   I thought it was a requirement by
25  Mr. Chittur.

9

1       DEPOSITION OF STAN SMITH, Ph.D.
2       Q.   No one has mentioned that to me.
3       A.   Okay.
4       THE WITNESS:  Andrey, do you know anything
5   about that?
6       MR. STRUTINSKIY:  I would have to check on
7   that.
8   BY THE WITNESS:
9       A.   That was my understanding from
10  Mr. Chittur.
11  BY MR. LILLIENSTEIN:
12       Q.   Is it your position that you're not
13  going to testify until you have a check?
14       A.   No.  I just thought we could get the
15  matter resolved perhaps by calling Mr. Chittur.
16       Q.   Mr. Chittur, I understand, is in India?
17       MR. STRUTINSKIY:  He is in India.
18  BY THE WITNESS:
19       A.   Okay.
20  BY MR. LILLIENSTEIN:
21       Q.   We will take care of that after the
22  deposition.
23       A.   Okay.
24       Q.   So what is the amount you charge for --
25  in total?

3 (Pages 6 to 9)

10

1          **DEPOSITION OF STAN SMITH, Ph.D.**
2     A.   3165 per report.
3     Q.   And it's your testimony that you
4 prepared four reports?
5     A.   We have five.
6     Q.   Okay.  Dr. Smith, before answering my
7 questions you tend to be looking at documents.  I
8 prefer to get your answers without looking through
9 the documents.  If you need to refer to a document,
10 tell me and we'll provide it for you or let you find
11 one.  But, please, in the first instance when I ask
12 a question, give me your answer without looking at
13 documents unless I've given you a document and asked
14 you to look at it.
15     A.   Mr. Lillienstein, I appreciate your
16 request.  I'm completely not bound by any requests
17 you make.  Unless there is some case law or a Court
18 order, I will simply do my normal practice in
19 deposition.  Thank you.
20     Q.   Well, I'm going to ask you not to follow
21 your normal practice.  I'm going to ask you to
22 answer the questions based on your recollection and
23 then if you need to refresh your recollection, then
24 you look at a document.
25     A.   Mr. Lillienstein, I simply cannot follow

11

1          DEPOSITION OF STAN SMITH, Ph.D.
2 your ad hoc direction.  I will just do as I always
3 do in deposition.
4     MR. LILLIENSTEIN:  Mr. Kleinman, can you
5 show the witness Exhibit D.
6     MR. KLEINMAN:  Certainly.
7          (Whereupon, the document was
8          tendered.)
9     MR. KLEINMAN:  Do you wish the court
10 reporter to mark the exhibits prior to their
11 submission to the witness?
12     MR. LILLIENSTEIN:  They should be
13 premarked.
14     MR. KLEINMAN:  They are.
15     MR. LILLIENSTEIN:  If the court reporter --
16 I don't think it's necessary.
17          (Whereupon, the document was
18          tendered.)
19     MR. KLEINMAN:  The witness has been
20 provided a copy of the document marked as Smith
21 Exhibit D.
22     MR. LILLIENSTEIN:  We can see it.
23 BY MR. LILLIENSTEIN:
24     Q.   Dr. Smith, can you identify Exhibit D?
25     A.   Sure.  It's a copy of my standard

12

1          DEPOSITION OF STAN SMITH, Ph.D.
2 engagement letter which has been provided to
3 Mr. Chittur.
4     Q.   Okay.  And is this the engagement letter
5 in this -- for your work in this case?
6     A.   Yes.
7     Q.   Is it your practice -- first of all, let
8 me ask, what is your position with the Smith
9 Economics Group?
10     A.   I am the founder, the president, the
11 chief bottle washer and the last guy to get paid.
12     Q.   Does the Smith Economics Group provide a
13 satisfaction guarantee to its clients?
14     A.   We do.  We promise them if we haven't
15 delivered what they contracted for, that they should
16 not pay a fee.
17     Q.   And has -- have you given that
18 satisfaction guarantee to Mr. Chittur in this case?
19     A.   We've given it to all our many hundreds
20 of clients over the years, including Mr. Chittur.
21     MR. LILLIENSTEIN:  Mr. Kleinman, can you
22 show Dr. Smith Exhibit G, please.
23          (Whereupon, the document was
24          tendered.)
25

13

1          DEPOSITION OF STAN SMITH, Ph.D.
2 BY MR. LILLIENSTEIN:
3     Q.   Dr. Smith, have you seen Exhibit G?
4     A.   Yes.
5     Q.   Can you identify that for me, please.
6     A.   It's a copy of a retainer request and a
7 copy of a check in payment for $2,500.
8     Q.   These are the only documents reflecting
9 any payments to your firm that we have received.
10          Are there any other documents --
11 excuse me.  Have there been any other payments to
12 your firm by Mr. Chittur's office?
13     A.   I don't know.  Not to my knowledge.
14     MR. LILLIENSTEIN:  I call for production of
15 any documents for payments made by Mr. Chittur to
16 your firm.  And that's directed at counsel here, not
17 to --
18     MR. STRUTINSKIY:  We'll take it under
19 advisement.
20 BY MR. LILLIENSTEIN:
21     Q.   Is any part of your compensation in this
22 matter contingent upon the outcome of the case?
23     A.   No.  I never do so.
24     Q.   Is it your understanding that you've
25 been paid thus far only $2500?

4 (Pages 10 to 13)

14

DEPOSITION OF STAN SMITH, Ph.D.

1  A.   I don't know.  I've been paid at least
2  that.  I don't know what else has been paid since
3  July 7, 2010, the date of this check.
4     Q.   And do you have any records there that
5  would refresh your recollection?
6     A.   No.  I don't maintain the financial
7  records in the same -- in the case file.
8     Q.   What documents did you bring with you
9  here today?
10     A.   All the documents related to my case.
11  To this case.
12     Q.   Except for the payments?
13     A.   Those are related to administrative
14  matters.
15     Q.   Okay.  Do you have such documents back
16  in the office?
17     A.   Yes.
18     Q.   I would call for production of all
19  documents reflecting invoices to and payments by
20  Mr. Chittur's office.  Is that okay?
21     A.   If there's anything in addition to this,
22  if Mr. Chittur requests, I certainly would give him
23  copies.
24     Q.   Other than the payment for your
25

15

DEPOSITION OF STAN SMITH, Ph.D.

1  testimony today, do you expect to charge anything
2  else for your services?
3     A.   Trial testimony.  If we go to trial.
4     Q.   And how much do you charge for trial
5  testimony?
6     A.   $315 per hour.
7     Q.   And do you charge for preparation time?
8     A.   Yes.
9     Q.   So that would be $315 per hour for
10  preparation and trial testimony?
11     A.   Yes.
12     Q.   Now, your retainer agreement and your
13  website says that for complex and commercial
14  litigation cases, that could result in a
15  substantially higher fee; is that correct?
16     A.   Yes.
17     Q.   Is it fair to say that you have not
18  treated this as a complex or commercial litigation
19  case by your billings?
20     A.   It's not a complex commercial litigation
21  case.  I -- we would categorize it as a
22  straightforward matter.  Complex litigation can
23  involve class action cases where I have three or
24  four economists working simultaneously.
25

16

DEPOSITION OF STAN SMITH, Ph.D.

1     Q.   Have you finished your answer?
2     A.   Yes.
3     Q.   Sir, you are billing this case the same
4  as if you had -- the same as if it were a personal
5  injury or wrongful death case?
6     A.   Or a simple commercial case.
7     Q.   Okay.
8     A.   And actually, while it is all under one
9  single litigation, I regard it as five cases that --
10  from my non-legal point of view are simply
11  consolidated.
12     Q.   So your billings in total for this case
13  would be in excess of $15,000 thus far?
14     A.   For each of the five cases they would be
15  about $3165 plus whatever today's deposition would
16  be for each of the five cases.
17     Q.   And is it your practice to receive that
18  payment, the $3165, before you issue your report?
19     A.   No.
20     Q.   What were you asked to do in this case?
21     A.   What I was asked to do is specified in
22  the first paragraph of each of the five individual
23  reports.  I can read that into the record but, for
24  example, for Mr. Russ, I was asked to analyze the
25

17

DEPOSITION OF STAN SMITH, Ph.D.

1  loss of payments -- the loss of the payments to
2  Northern Leasing, the loss of time and out-of-pocket
3  expense, the loss of business profits, the loss of
4  credit expectancy and the loss of the enjoyment of
5  life.
6     Q.   What are you referring to now?  What
7  document are you referring to?
8     A.   The July 16, 2010 report regarding
9  Mr. Russ.
10     Q.   And would that be the discounted or
11  undiscounted report?
12     A.   They both have the same first paragraph.
13     Q.   What is the difference -- you've given
14  basically 10 reports in this case, haven't you?
15     A.   Well, I would say five reports, each of
16  which has a modest variation.
17     Q.   And what is that variation?
18     A.   That we have not discounted on the --
19  the two variations are a discounted and an
20  undiscounted report.
21     Q.   And what did you mean by undiscounted
22  versus discounted?
23     A.   In the discounted report, the future
24  projected losses are brought to present value as of
25

5 (Pages 14 to 17)

18

DEPOSITION OF STAN SMITH, Ph.D.

1   October 1, 2010.

3      Q.   And in the undiscounted report, they are

4   not brought to present value?

5      A.   Yes.  It's just simply the undiscounted

6   projections.

7      Q.   And other than that difference, there is

8   no difference in it; is that true?

9      A.   Other than that extra mathematical step

10  in the discounted report, the reports are the same.

11     Q.   So as I'm going through these reports,

12  there's no reason for me to ask questions separately

13  about the discounted versus the undiscounted unless

14  I'm addressing the discounted?

15     A.   Right.  They should be, except for that,

16  identical.

17     Q.   I'm looking at the Lim report and so

18  make sure we're looking at the same document.  Can

19  you --

20     MR. LILLIENSTEIN:  Jeremy, can you please

21  show the witness Exhibit W, please.

22     MR. KLEINMAN:  Certainly.

23              (Whereupon, the document was

24              tendered.)

25

---

19

DEPOSITION OF STAN SMITH, Ph.D.

2   BY THE WITNESS:

3      A.   Okay.

4   BY MR. LILLIENSTEIN:

5      Q.   Can you identify that, please, for me?

6      A.   That's the August 12, 2010 discounted

7   report I prepared on behalf of Mr. Lim.

8      Q.   And that report gives your opinions as

9   to the losses incurred by Mr. Lim in this case?

10     A.   Yes.

11     Q.   Okay.  Now, if you look at the first

12  paragraph of that report, it says, "Dear

13  Mr. Chittur, you have asked me to calculate the

14  value of certain losses subsequent to the injuries

15  of Long Lim."

16          Do you see that?

17     A.   Yes.

18     Q.   What was the injury which you referred?

19     A.   The financial injury and the emotional

20  injury.

21     Q.   And then the second paragraph you say

22  that "Long Lim is an Asian married male who was born

23  on April 11, 1969 and injured on May 1, 2001."

24          Do you see that?

25     A.   Yes.

---

20

DEPOSITION OF STAN SMITH, Ph.D.

2      Q.   What is the injury that occurred on May

3   1, 2001?

4      A.   The sustaining of the credit damage and

5   the emotional injury.

6      Q.   Is it your testimony that the

7   calculations you've made assume that the injury to

8   his credit and any emotional damage took place on

9   May 1, 2001?

10     A.   It commenced then.  According to my

11  notes, as of May, 2001, Mr. Lim learned that

12  Northern Leasing was damaging him by pursuing a

13  claim against him.

14     Q.   And with respect all of the other

15  reports which refer to an injury, what injury are

16  you referring to?

17     A.   The very same type.

18     Q.   How did you determine the date of

19  Mr. Lim's injury?

20     A.   We were told that Mr. Lim learned of the

21  first suit and the damage to him in May.  We took it

22  to be May 1.  The truth is it could have been May 5

23  or 10, but our understanding was it was at the

24  beginning of May.

25     Q.   Who told you that?

---

21

DEPOSITION OF STAN SMITH, Ph.D.

2      A.   Mr. Lim in his interview testimony.

3      Q.   Okay.  Is it accurate to state that you

4   didn't speak directly with Mr. Lim?

5      A.   I had an interview with these plaintiffs

6   arranged and conducted at my direction.  I have not

7   yet spoken directly with the plaintiffs.

8      Q.   So all of the work notes that

9   accompanied the various reports were prepared by

10  staff in your firm?

11     A.   No.

12     Q.   Okay.  Who conducted the interview with

13  Mr. Lim?

14     A.   Mr. Ebling.

15     Q.   What's his first name?

16     A.   Brian.

17     Q.   And did Mr. Ebling conduct the interview

18  with all the other plaintiffs as well?

19     A.   I believe so, yes.

20     Q.   And you did not speak with any of the

21  other plaintiffs to this point?

22     A.   I have not spoken directly as yet.

23     Q.   Now, the work notes that I've seen

24  frequently refer to a DOL.  What does DOL refer to?

25     A.   The date at which we begin calculating

---

6 (Pages 18 to 21)

22

DEPOSITION OF STAN SMITH, Ph.D.

1    the loss.
2         **Q.    And how did you determine the date of**
3    **loss in each case?**
4         A.    I just answered that question, how we
5    determined it to be May of 2001 for Mr. Lim, and the
6    same would be true in each case.
7         **Q.    So your testimony is the date of loss**
8    **and the date of injury are the same?**
9         A.    We calculated -- yes.  We calculate the
10   loss typically from the date of injury, unless
11   there's some reason why they are not the same.
12        **Q.    And are you aware of any reasons in the**
13   **five reports that you prepared where those dates are**
14   **not the same?**
15        MR. STRUTINSKIY:  Objection.
16   BY THE WITNESS:
17        A.    Well, I can check each report, but my
18   recollection is they are all the same.
19   BY MR. LILLIENSTEIN:
20        **Q.    Okay.**
21        A.    If you give me a moment.
22             Well, for example, for Thomas
23   Smith, some of the losses begin November 1, '03, but
24   a -- we begin calculating another loss at a much

23

DEPOSITION OF STAN SMITH, Ph.D.

1    later time.  If we go through each report, we can
2    explain the details and the rationale.  That's for
3    example for Mr. Smith.
4             Did you want me to check all five
5    right now or go through them each as we proceed with
6    each of the five cases?
7         **Q.    Why don't we do the latter.**
8         A.    All right.
9         **Q.    Now, when you rendered your opinions in**
10   **this case as reflected in your report -- your**
11   **reports, would it be fair to assume that you assumed**
12   **that the defendants were all liable?**
13        A.    No.
14        **Q.    Okay.  Did you assume that they were not**
15   **liable?**
16        A.    I had no reason to make any assumption
17   about liability.
18        **Q.    Okay.  Isn't it true that if there was**
19   **no liability, that there would be no damage?**
20        MR. STRUTINSKIY:  Objection.
21   BY THE WITNESS:
22        A.    You're getting into legal issues.  I can
23   tell you what I did and how I did it from an
24   economic point of view.

24

DEPOSITION OF STAN SMITH, Ph.D.

1    BY MR. LILLIENSTEIN:
2         **Q.    Tell me.**
3         A.    Let's take it case by case.  Which case
4    do you want to start with?
5         **Q.    Dr. Lim -- Mr. Lim.**
6         A.    What would you like to know about this
7    case in particular aside from what's in my report?
8         **Q.    Did you assume that Northern Leasing**
9    **caused the loss?**
10        MR. STRUTINSKIY:  Objection.
11   BY THE WITNESS:
12        A.    I thought you asked that question about
13   all five and I answered it.
14   BY MR. LILLIENSTEIN:
15        **Q.    What's your answer to this question?**
16        A.    The same as it was before, I made no
17   assumption about liability.  It's not an economic
18   issue.
19        **Q.    Okay.  And did you attempt to**
20   **investigate or analyze whether there were any causes**
21   **of the loss other than the defendants in this case?**
22        A.    I've analyzed these claims for losses
23   and I'm not responsible for attributing them to
24   various defendants.  So the answer is I don't act as

25

DEPOSITION OF STAN SMITH, Ph.D.

1    an attorney or a private investigator or a fact
2    investigator and the answer is no.  I've
3    investigated the losses and valued the losses.  I am
4    not opining or attributing these losses to any
5    particular party or -- just assuming they came from
6    events that came around the time that the individual
7    claimants testified when they started.
8         **Q.    So you didn't assume that Northern**
9    **Leasing did anything to cause damage to these**
10   **people?**
11        MR. STRUTINSKIY:  Objection.  Asked and
12   answered.
13   BY THE WITNESS:
14        A.    I didn't assume anything one way or the
15   other.  Whatever is laid out in the complaint is all
16   I know.
17   BY MR. LILLIENSTEIN:
18        **Q.    And you assumed that to be true?**
19        A.    I just read the complaint.  I'll leave
20   it to a judge and a jury to determine the liability
21   issues.
22        **Q.    Well, what caused the loss to Mr. Lim?**
23        A.    The credit damage that he sustained and
24   the time that he spent seeking to reverse that along

7 (Pages 22 to 25)

26

DEPOSITION OF STAN SMITH, Ph.D.

1  with -- you need to -- along with payments that
2  these claims were not due to Northern Leasing, the
3  impact in his credit expectancy and the loss of his
4  enjoyment of life.
5      Q.    Did you assume that the credit damage
6  was caused by one of the defendants?
7      A.    You keep asking the same question in
8  minute variations.  And since you're an intelligent
9  man, you could probably think of one billion
10  variations and the answers will always be the same
11  on each of the variations.  I have not made an
12  assumption one way or the other about causality in
13  terms of which defendants or who caused it.
14      Q.    You were not asked to prepare a report
15  regarding Peri Kettler; is that correct?
16      A.    So far as I know, I have not.
17      Q.    Did you have any communications with
18  plaintiff's attorney regarding Peri Kettler?
19      A.    I don't recall as I sit here.
20      Q.    Do you have any document there that
21  might refresh your recollection?
22      A.    Each of these -- well, just not a name I
23  recognize.  I have -- okay.  I see a document here
24  regarding Peri Kettler, but this is a file of

27

DEPOSITION OF STAN SMITH, Ph.D.

1  documents that was not analyzed.
2      Q.    So to the best of your recollection you
3  were not asked to analyze any of Peri Kettler's
4  losses?
5      A.    Correct.
6      Q.    And the reason why we don't have your
7  report on that is not because you prepared one and
8  that it was not served but that you just never were
9  asked to do it?
10      A.    Correct.
11      Q.    How many expert reports have you
12  produced over the last year?
13      A.    Several hundred.
14      Q.    And over the last four years?
15      A.    Per year several hundred.
16      Q.    And can you estimate the percentage of
17  those that are for plaintiffs and for defendants?
18      A.    In commercial cases it's about 50-50.
19  In personal injury and wrongful death it's more for
20  plaintiffs, about three quarters.
21      Q.    And in the cases where you give expert
22  testimony on behalf of defendants in personal injury
23  cases, have you been asked to give testimony
24  questioning another expert's calculations of hedonic

28

DEPOSITION OF STAN SMITH, Ph.D.

1  damages?
2      A.    Well, I should say commenting on, yes.
3      Q.    And in those cases have you stated that
4  the expert on the other side had improperly
5  calculated those damages?
6      A.    I don't know if I use the word
7  "improper" but I may have a different point of view
8  from time to time, as does your expert in this case.
9      Q.    Have you -- do you recall any instance
10  where you've given testimony in which you argued on
11  behalf of a defendant that the calculation of
12  damages should be lower than that which the
13  plaintiff's expert said?
14      A.    Well, I can't recall about lower or
15  higher but different.
16      Q.    Have you ever given such testimony?
17      A.    Just what I said.
18      Q.    Have you ever given testimony -- maybe,
19  I didn't understand your answer.  Did you ever give
20  testimony where you gave an opinion that the
21  calculation of economic damages should be less than
22  that which the plaintiff's expert opined on?
23      MR. STRUTINSKIY:  Objection.  Asked and
24  answered.

29

DEPOSITION OF STAN SMITH, Ph.D.

1  BY THE WITNESS:
2      A.    What was the word before the word
3  "damages" in your question?
4      MR. LILLIENSTEIN:  Could the court reporter
5  read it back, please.
6           (Whereupon, the record was
7            read as requested.)
8  BY THE WITNESS:
9      A.    The word you used was "economic," is
10  that correct?  That's what we heard here and that's
11  what was transcribed.
12  BY MR. LILLIENSTEIN:
13      Q.    I'll rephrase the question.
14      A.    Did I hear it correctly the first time?
15  Was it transcribed correctly the first time or not?
16      Q.    I'm going to rephrase the question.
17      A.    I know you're going to rephrase it.  I'm
18  just curious, did you use the word "economic"?
19  Because that's what was transcribed.
20      Q.    I'm going to rephrase the question.
21      A.    Did the court reporter mistranscribe
22  your words?  I just need to know.
23      Q.    Then you'll have to ask her.
24      A.    Well, no.  Only you can tell us if she

30

DEPOSITION OF STAN SMITH, Ph.D.

1  has it right or wrong.
2      Q.   Doctor, since we have a limited amount
3  of time, please don't --
4      A.   You're not interested whether the
5  transcript reads correctly, am I correct?
6      Q.   Whether it did or doesn't, I'm
7  rephrasing the question.
8      A.   It probably doesn't if you won't answer
9  the question, but go ahead.
10      Q.   Okay.  Have you ever given testimony
11  where you've given an opinion that a plaintiff's
12  calculation of hedonic damages for reduction value
13  of life were too high?
14      A.   The first time the word was "economic"
15  and I guess this time the word is "hedonic."
16      Q.   The first time it was hedonic.
17      A.   I don't think she got what you just said
18  because I was talking.
19      Q.   The first time it was hedonic and she
20  probably understood it to be economic, but now we're
21  past that.
22      A.   Okay.  I don't specifically recall about
23  too high or too low, but I certainly would comment
24  if it was not done correctly.

31

DEPOSITION OF STAN SMITH, Ph.D.

1      Q.   Within the past month how many cases
2  have you been asked to provide an expert report
3  involving personal injury or death?
4      A.   Probably over a dozen.
5      Q.   And in the past year can you estimate
6  that?
7      A.   Just project that out.  I said a couple
8  hundred so somewhere over a hundred, possibly 200.
9      Q.   And how many within the past month have
10  you -- how many cases have you been asked in the
11  past month to provide an expert report involving a
12  claim other than personal injuries or death?
13      A.   Perhaps a half a dozen times or more.
14      Q.   So that would be about 18 total this
15  month?
16      A.   You're getting way too precise for me.
17      Q.   Okay.  Well, I'm asking you to give
18  answers and I am assuming that you're being precise
19  when you give the answers.
20      A.   I am, but you are switching words.  When
21  I say a half a dozen or so or a dozen or so, you
22  then convert that to a precise number as opposed to
23  the round -- the more imprecise that I used.
24      MR. STRUTINSKIY:  May I note for the

32

DEPOSITION OF STAN SMITH, Ph.D.

1  record, Mr. Lillienstein, you're trying to restate
2  what the witness says.
3      THE WITNESS:  I'll forgive him for that.
4  BY THE WITNESS:
5      A.   I'm just trying to clarify that what I
6  said I think is somewhat less precise.  We don't
7  have the precise figures.
8  BY MR. LILLIENSTEIN:
9      Q.   You don't have them -- you don't recall
10  them as you sit there today, your office has them?
11      A.   We can take some trouble and investigate
12  and add them up but we don't necessarily maintain
13  them like a stock market ticker.
14      Q.   Within the past month, how many cases
15  have you been asked to provide an expert report
16  involving the federal RICO claim?
17      A.   I testified a couple weeks ago, I
18  believe, in Boston on that, including the loss of
19  enjoyment of life, damages.
20      Q.   What was the name of that case?
21      A.   It was Smith and DeSilva.  They were two
22  consolidated cases versus a whole handfull of
23  plaintiffs, most of who were in the mortgage broker,
24  mortgage banking business.

33

DEPOSITION OF STAN SMITH, Ph.D.

1      Q.   And it's your testimony that was a RICO
2  case?
3      A.   That's my understanding.
4      Q.   And what was the nature of the loss in
5  those cases -- in that case?
6      A.   Some sort of a conspiracy to defraud the
7  plaintiffs, forgery of signatures.  Similar to this
8  case, actually.
9      Q.   And did you provide testimony in court
10  or at deposition?
11      A.   In court.
12      Q.   And was that before a jury?
13      A.   Yes.  The jury awarded substantial
14  damages, including enjoyment of life damages in
15  federal court.
16      Q.   When was that testimony given?
17      A.   Eight, 10 days ago, something like that.
18      Q.   And what court was that?
19      A.   Federal court, Boston.
20      Q.   Did you spend any time preparing for the
21  deposition today?
22      A.   Yes.
23      Q.   How much time did you spend?
24      A.   It was around a couple hours.  I have

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

34

DEPOSITION OF STAN SMITH, Ph.D.

1   some notes at the office about when I started and
2   stopped but I haven't computed it yet.
3
4       Q.    When was that done?
5       A.    Yesterday and this morning.
6       Q.    And did you review any documents for
7   preparation?
8       A.    The file.  I should say all five files.
9       Q.    If you could just generally describe the
10  procedure that your office follows in getting a
11  report prepared from the first call to the actual
12  submission of the report.
13      A.    Well, we get a call, we get an
14  assignment, we get some documents.  I hate to be too
15  general.  But we then review the documents, analyze
16  the damages.  I generally involve one or more staff
17  members to support me and produce the report, send
18  it off to the attorney.
19      Q.    Okay.  What is the case information form
20  that you use?
21      A.    That's one of the documents that
22  typically we ask our client to fill out to give us a
23  basic initial orientation on each case.  Often we
24  don't get it filled out but we try and informally
25  scratch one out on our own.  Sometimes it's -- since

35

DEPOSITION OF STAN SMITH, Ph.D.

1   I am trained or I'm used to looking for certain
2   information on a case intake form, if we don't have
3   one filled out by the client, we then try and fill
4   one out on our own for certain basic things.
5       Q.    All right.
6           MR. LILLIENSTEIN:  Jeremy, can you show the
7       witness Exhibit E, please.
8           MR. KLEINMAN:  Certainly.
9               (Whereupon, the document was
10              tendered.)
11  BY THE WITNESS:
12      A.    Okay, I have looked at this Exhibit E.
13  BY MR. LILLIENSTEIN:
14      Q.    Can you tell me what these documents
15  are?
16      A.    This is all of the five case intake
17  forms or case information forms stapled together.
18  Most of them have Brian's initial at the top.  He
19  assisted me in collecting information for this file
20  so that means that he scratched in the very limited
21  information that's on each one of these, which is
22  pretty much the name, date of birth, race and
23  gender.
24      Q.    Okay.  Is this the form that he used for

36

DEPOSITION OF STAN SMITH, Ph.D.

1   all clients?
2       A.    For complex cases it doesn't quite
3   apply, but when we're dealing with individuals and
4   damages to an individual, we typically use a form,
5   yes.
6       Q.    Is it important for you to know whether
7   there's a federal claim involved?
8       A.    Well, it's helpful -- look, you mean a
9   federal claim or whether a matter is in federal
10  court?  There's a slight difference.  Which did
11  you --
12      Q.    I was asking about a federal claim.
13      A.    You were asking about the federal claim.
14  That's what I thought.
15          It's helpful to know.  Sometimes
16  certain federal claims are guided, depending upon
17  the judicial circuit, have some case law that would
18  impact how damages are computed in that particular
19  circuit.  For example, Jones Act has certain
20  peculiarities, Section 1983 actions have certain
21  peculiarities.
22      Q.    Are you finished?
23      A.    Yes.
24      Q.    You were looking down.

37

DEPOSITION OF STAN SMITH, Ph.D.

1       A.    No, I'm just waiting for the next
2   question.
3       Q.    Okay.  Do the RICO claims have any
4   peculiarities?
5       A.    Nothing extra that I'm aware of, but
6   again, I don't pretend to know everything about the
7   law.  We just know some things about some claims,
8   not everything about all types of claims.
9       Q.    Now, I would like you to turn the page
10  to Page 606, the second page of the document.
11      A.    Okay.
12      Q.    And that section at the top says "Check
13  estimates you would like us to calculate."
14      A.    Yes.
15      Q.    What's the purpose of that section?
16      A.    To guide us, to give us an initial
17  understanding of the assignment.  It's just a
18  preliminary orientation.
19      Q.    And in this case, turning back to the
20  first page, you were basically told this is a credit
21  damage case?
22      A.    Yes.
23      Q.    And that would be the same for all of
24  these plaintiffs, correct?

10  (Pages 34 to 37)

38

DEPOSITION OF STAN SMITH, Ph.D.

1    A.    Certainly.
2    Q.    Now, in this -- looking again at Page
3  606, I guess it would be the second page of each
4  form, the third item in the box at the top says
5  "Value of life or loss of enjoyment to subject to
6  injury or death."
7           Do you see that?
8    A.    Yes.
9    Q.    And that's checked off in every form,
10  isn't it?
11    A.    Yes.
12    Q.    And --
13    A.    I haven't checked every form, but
14  probably. Given that we filled these out, it's
15  likely that -- because it was our understanding that
16  all the cases were to be analyzed in a similar
17  fashion so I think that -- I think I just checked,
18  and I think it's true on each of the five forms.
19    Q.    And injury in each of these cases is
20  what you testified to before?
21    A.    Yes. The credit damage and the
22  consequences.
23    Q.    Not a personal injury?
24    A.    Well, you know, I'm not a legal expert,

39

DEPOSITION OF STAN SMITH, Ph.D.

1  so if someone were to tell me that the emotional
2  damages constitute a personal injury also, then I
3  can't really tell you what the law is. Certainly
4  it's not a car crash. Nobody had a truck hit them,
5  that's true.
6    Q.    Are the emotional damages to which you
7  refer akin to pain and suffering?
8    A.    Well, you ask a very interesting legal
9  question. In the 50 states, that matter has been
10  resolved differently. Most states hold loss of
11  enjoyment of life as a separate compensable element
12  of damage. I'm not sure how the federal circuits
13  come out on the various different types of federal
14  claims, but many states, but not the majority,
15  include loss of enjoyment of life as a component of
16  a larger, broader definition of pain, suffering and
17  mental anguish.
18           But I believe the experts in my
19  field estimate and believe that the loss of
20  enjoyment of life as calculated by using this
21  standard methodology does not include pain,
22  suffering and mental anguish but can be calculated
23  independently of that, whether it's included in the
24  broad definition or whether its own category.

40

DEPOSITION OF STAN SMITH, Ph.D.

1    Q.    When you refer then to the emotional
2  damage, is that something other than loss of
3  enjoyment of life?
4    A.    With respect to my assessment, no.
5    Q.    Let me show you another document. Loss
6  of enjoyment of life.
7           Doctor, I'm looking for it. It
8  does not seem to have made it into the box?
9    A.    Well, I've got a couple hundred pages of
10  information. Maybe we can make one up here.
11    Q.    Would you agree that hedonic damages
12  have typically been applied in personal injury,
13  wrongful death and civil right cases?
14    A.    Often but not exclusively. Any
15  instance -- they're applied any time there is -- any
16  time someone sustains loss of enjoyment, it wouldn't
17  matter what the origin of the claim is.
18    Q.    Okay.
19        MR. LILLIENSTEIN: Jeremy, can you show the
20  witness Exhibit B, please.
21        MR. KLEINMAN: Certainly.
22           (Whereupon, the document was
23              tendered.)

41

DEPOSITION OF STAN SMITH, Ph.D.

1  BY MR. LILLIENSTEIN:
2    Q.    Can you identify that document,
3  Dr. Smith?
4    A.    Yes. It's a, I think, not the most
5  recent but a very recent staff list that we provide
6  to clients so they can -- I assume you want to know
7  why we have it or what it is. It's just a staff
8  list, if that suffices.
9    Q.    These are the people that work for you?
10    A.    Yeah. Not everybody.
11    Q.    But did anybody not on this list perform
12  any services in this case?
13    A.    No. Other than scheduling or taking
14  phone calls and things like that.
15    Q.    I believe that you mentioned Brian
16  Ebling before.
17    A.    Yes.
18    Q.    He conducted the interviews?
19    A.    At my direction, yes.
20    Q.    And do you know if anyone else conducted
21  those interviews with him?
22    A.    No one would have.
23    Q.    So if there are other people's initials
24  on the work notes, what does that refer to?

11  (Pages 38 to 41)

42

DEPOSITION OF STAN SMITH, Ph.D.

1    A.   Well, there would only be one other
2 person's initials and that's Stephanie Uhl, U-h-l,
3 and it just refers to the fact that she's the senior
4 economic analyst at the firm and in charge of all --
5 and in charge of the ultimate delivery of this
6 report.
7    Q.   Let's start with Brian Ebling, do you
8 know what his educational background is?
9    A.   Yes. He's a stellar graduate from the
10 University of Chicago and has been trained in my
11 firm for several years.
12    Q.   What degree does he have from the
13 University of Chicago?
14    A.   I don't specifically recall. Well, a
15 bachelor's degree but I'm not sure whether it was
16 science or arts.
17    Q.   You don't know whether it was in
18 economics?
19    A.   I'm not sure that it was.
20    Q.   Okay. Do you believe that it wasn't?
21    MR. STRUTINSKIY: Objection. Asked and
22 answered. He doesn't -- he's not sure.
23    MR. LILLIENSTEIN: I asked only if he
24 believed that it wasn't.

43

DEPOSITION OF STAN SMITH, Ph.D.

1 BY THE WITNESS:
2    A.   I'm not sure that it was.
3 BY MR. LILLIENSTEIN:
4    Q.   Okay. And do you know if he's had any
5 other -- any economic training other than with your
6 firm?
7    A.   He has not. We're a great training
8 ground so further training is not needed.
9    Q.   How long has he worked for you?
10    A.   Time flies. It could be in the
11 dimension of six years, plus or minus.
12    Q.   And what are his duties and
13 responsibilities?
14    A.   As it says here, I'll read from the
15 staff list page, he assists -- he does economic
16 research, he gathers case data, he tracks report
17 timetables, he assists me in preparation of reports.
18    Q.   You're going to have to fix that typo,
19 aren't you?
20    A.   I certainly am.
21    Q.   And has he been doing all of those
22 things for the entire six years?
23    A.   Brilliantly. He actually did some
24 administrative -- more administrative work in the

44

DEPOSITION OF STAN SMITH, Ph.D.

1 early years.
2    Q.   And by that what do you mean?
3    A.   Just all administrative stuff.
4    Q.   Scheduling, taking --
5    A.   No, not scheduling.
6    Q.   What do you mean by administrative work
7 then?
8    A.   Well, he does more intensive economic
9 research now because he's been trained. At the
10 beginning he was more administrative but still
11 administration in the production of reports and
12 opinions. That's independent of -- the other
13 administration is more generic such as bookkeeping,
14 billing, scheduling, reception, that have nothing
15 specific to do with a case.
16    Q.   And how long did he -- was he doing the
17 administrative work, as you say?
18    A.   We eased him into it probably over a
19 couple-year period. When somebody arrives day one
20 at the firm we first teach them how to correctly
21 answer the telephone and where the restroom key is,
22 and then over the course of a couple years we
23 increase their responsibilities in terms of economic
24 human capital.

45

DEPOSITION OF STAN SMITH, Ph.D.

1    Q.   So to the best of your knowledge, how
2 long has he been doing the more economic --
3 sophisticated economic work as opposed to the
4 administrative work?
5    A.   The great majority of his tenure.
6    Q.   He's been there six years and you said
7 that the first couple years he was doing
8 administrative work; is that fair to say?
9    A.   Mr. Lillienstein, is this how you choose
10 to spend your time today is to figure out Brian's
11 two-year transition? I didn't know it was such a
12 compelling matter. But if you want further detail
13 we can take a break, I'll call Brian, he'll brief me
14 on the matter and I can give you additional detail.
15 I am astonished at the amount of attention directed
16 to such an irrelevant matter.
17    Q.   Dr. Smith, I don't appreciate it.
18 You're wasting time. Please answer the question.
19    A.   I have a lot of opinions here, and
20 whether Brian spent three days answering phones or
21 three days learning how to read the Bureau of Labor
22 Statistics website, it baffles me that that would be
23 so compelling.
24    Q.   And if you just answer my question, we

12 (Pages 42 to 45)

46

**DEPOSITION OF STAN SMITH, Ph.D.**

1  can move on.
2      A.   I've offered, in fact, to take a break
3  and get further detail.  If you find that
4  compelling, I'd be happy to do so.
5      Q.   No, I decline that offer.  Can you just
6  answer the question?
7      A.   I did.
8          MR. STRUTINSKIY:  The witness answered the
9  question to the best of his knowledge.
10  BY MR. LILLIENSTEIN:
11      Q.   So you refuse to answer the question?
12          MR. STRUTINSKIY:  He answered the question.
13  BY THE WITNESS:
14      A.   Mr. Lillienstein, that's a belligerent
15  statement there.
16  BY MR. LILLIENSTEIN:
17      Q.   I've asked the question and I haven't
18  gotten an answer.  I am assuming you're refusing to
19  answer it.
20      A.   Could we get the question read because I
21  believe I did answer it, or could you ask it again
22  maybe to save time?
23      Q.   Was he doing administrative work for
24  your company for a couple of years?

47

**DEPOSITION OF STAN SMITH, Ph.D.**

1      A.   For the great majority of time.  I can't
2  tell you exactly how many months that was.
3      Q.   Okay.
4      A.   But he was not doing exclusively
5  administrative work for any but the initial short
6  time period.
7      Q.   Okay.  And what is Stephanie Uhl's
8  educational background?
9      A.   She is also a stellar graduate from the
10  University of Chicago and has in addition a masters
11  degree from the University of Chicago.
12      Q.   And what is her undergraduate degree in?
13      A.   Economics and mathematics, a dual major.
14      Q.   And her masters?
15      A.   From the University of Chicago Graduate
16  School of Business with a concentration in
17  economics.
18      Q.   Where did all of the factual information
19  that you relied on in forming your opinions come
20  from?
21      A.   Well, the great majority from
22  Mr. Chittur -- from the documents that Mr. Chittur
23  produced, some from the interviews and some economic
24  information we gathered on our own.  And as we go

48

**DEPOSITION OF STAN SMITH, Ph.D.**

1  through each report I will identify the sources of
2  that, but citations are provided in each report.
3      Q.   And was there one interview with each
4  plaintiff?
5      A.   Well, there was at least one.  I can
6  check each of the work notes and see if for some
7  reason, not often but sometimes, we call back if
8  something was left unclear.  Let's just -- if you'd
9  like me to check each of the five files I can do so.
10      Q.   If you can do that quickly, yes.
11      A.   Yes, I believe just a single interview
12  with each.
13      Q.   Do you know how long each of those
14  interviews lasted?
15      A.   Do I know?  No.  If you will next ask me
16  can I estimate I can have a general answer, if you
17  wish.
18          MR. STRUTINSKIY:  Don't guess.
19  BY MR. LILLIENSTEIN:
20      Q.   Can you take a look at the Lim report,
21  which was, I think it was Exhibit W?
22      A.   Yes.
23      Q.   I'm just using this as an example.  The
24  structure of all these reports is essentially that

49

**DEPOSITION OF STAN SMITH, Ph.D.**

1  the report is given and then there's an appendix and
2  then there's tables and then there's work notes and
3  then I believe that there's notes of a telephone
4  number given; is that correct?
5      A.   Yes.
6      Q.   And if you would turn to the first page
7  of the note reflecting the telephone interview?
8          MR. STRUTINSKIY:  You're referring to Lim's
9  report?
10          MR. LILLIENSTEIN:  Yes.
11  BY THE WITNESS:
12      A.   Yes.
13  BY MR. LILLIENSTEIN:
14      Q.   At the top of that page it says -- seems
15  to have two sets of initials.
16          MR. STRUTINSKIY:  Is that part of the
17  exhibit?  Just to clarify, is that the work notes?
18  At least I don't have them as part of the exhibit.
19  BY THE WITNESS:
20      A.   They are not part of the exhibit.
21          MR. STRUTINSKIY:  Do you have them as part
22  of the exhibit, Mr. Smith, as Exhibit W?
23          MR. LILLIENSTEIN:  My apologies.  They were
24  marked separately.

13 (Pages 46 to 49)

50

DEPOSITION OF STAN SMITH, Ph.D.

1    DEPOSITION OF STAN SMITH, Ph.D.
2    THE VIDEOGRAPHER:  Counsel, I have about
3  five minutes left on this tape.
4  BY MR. LILLIENSTEIN:
5    Q.   Can you give the witness Exhibit GG.
6         (Whereupon, the document was
7         tendered.)
8  BY MR. LILLIENSTEIN:
9    Q.   Do you have Exhibit GG in front of you?
10   A.   Yes.
11   Q.   Can you take a look at the first page of
12 the telephone interview notes?
13   A.   Yes.
14   Q.   Are those two different initials at the
15 top?
16   A.   Well, the first three letters is Brian
17 Ebling. I'm not sure of his middle name but his
18 initial is A.  Then what other initials --
19   Q.   "TCW" refers to telephone call with?
20   A.   Yes.
21   Q.   Now, you said that you reviewed the
22 amended complaint as well?
23   A.   Yes.
24   Q.   Mr. Chittur did not provide you with the
25 depositions of the plaintiffs, did he?

51

1    DEPOSITION OF STAN SMITH, Ph.D.
2    A.   I don't believe so.
3    Q.   And so you didn't review those
4  deposition transcripts?
5    A.   Correct.
6    Q.   And did you think it was important to
7  review those transcripts?
8    A.   I did not because I asked Mr. Chittur to
9  provide to me all the information he thought I
10 needed in order to -- and relevant to the
11 preparation of my report.  And we often find the
12 depositions, since they're conducted by the other
13 side, probably by you in this case, frequently don't
14 delve into matters that we need to know about in
15 order to conduct our analysis.  Usually depositions
16 have a lot to do with the circumstances surrounding
17 the liability and very little to do with the
18 analysis of damages.
19          And that victory sign you just
20 flashed means you're ahead two to nothing.
21   Q.   What are you talking about?
22   A.   Actually, it means there's two minutes
23 left on the tape.
24   Q.   Okay.  So this statement to the
25 plaintiffs under oath don't -- you don't find those

52

1    DEPOSITION OF STAN SMITH, Ph.D.
2  to be helpful?
3    A.   I answered your question to the best of
4  my ability.
5    MR. STRUTINSKIY:  You're mischaracterizing
6  the witness' testimony.  That's not what he says.
7  BY THE WITNESS:
8    A.   It is true you've mischaracterized my
9  answer.  I do not assume it was deliberate, but I
10 did answer your question to the best of my ability.
11 BY MR. LILLIENSTEIN:
12   Q.   Is a sworn statement something that you
13 feel would be helpful to you forming your opinion?
14   MR. STRUTINSKIY:  Objection.
15 BY THE WITNESS:
16   A.   I don't conduct my work by feeling.
17 BY MR. LILLIENSTEIN:
18   Q.   You believe that a sworn statement would
19 assist you in forming an opinion?
20   MR. STRUTINSKIY:  Objection.  What case?
21 BY THE WITNESS:
22   A.   You would have to give me a statement
23 and I will tell you whether it would assist me.
24 BY MR. LILLIENSTEIN:
25   Q.   As a general rule, is a sworn statement

53

1    DEPOSITION OF STAN SMITH, Ph.D.
2  of a plaintiff something that would help -- would be
3  helpful to you in forming your opinion?
4    A.   As a general rule, there is no general
5  rule.
6    THE VIDEOGRAPHER:  Counsel, I need to
7  change the tape.
8          This marks the end of Tape No. 1.
9  We're going off the record.  The time is 9:58 a.m.
10         (Whereupon, there was an
11         intermission.)
12   THE VIDEOGRAPHER:  We're back on the record
13 at the beginning of Tape No. 2.  The time is 10:12
14 a.m.
15   BY MR. LILLIENSTEIN:
16   Q.   Has Stephanie Uhl ever given expert
17 testimony to your knowledge?
18   A.   No.
19   Q.   Has she ever been qualified as an expert
20 in any case?
21   A.   She's never attempted to be qualified.
22   Q.   Were the telephone interviews that were
23 conducted by your staff tape recorded?
24   A.   No.
25   Q.   Is it your practice not to tape record

14  (Pages 50 to 53)

54

DEPOSITION OF STAN SMITH, Ph.D.

1  those interviews?
2
3      A.   It's our practice to transcribe the
4  notes that you see and nothing else.
5      Q.   And did you do anything to confirm the
6  accuracy of the notes that I see?
7      A.   Well --
8      MR. STRUTINSKIY:  Which notes are you
9  referring to?  Are you referring to any particular
10 notes, Mr. Lillienstein?
11     MR. LILLIENSTEIN:  I'm referring to all of
12 the work notes.
13 BY THE WITNESS:
14     A.   Yes.  Brian is trained, as are all
15 staff, to make sure we understand the information as
16 it's given to us.
17 BY MR. LILLIENSTEIN:
18     Q.   Does he have -- does he use a script --
19     A.   No.
20     Q.   -- in conducting those interviews?
21          No, he does not use a script?
22     A.   That's correct.
23     Q.   And is there any formal written document
24 that you use to instruct your people on how to
25 conduct an interview?

55

DEPOSITION OF STAN SMITH, Ph.D.

1
2      A.   No.
3      Q.   So what does the training consist of?
4      A.   Six years or so.
5      Q.   Who does the training?
6      A.   I do it, Stephanie does it, other staff
7  who are also trained do it.
8      Q.   Now, in, I believe, every case in
9  this -- every report -- well, let's go back.
10          Can you take a look at the
11 documents that I believe Jeremy has put before you?
12 It's Exhibit V, X, AA, CC, EE, DD, II, KK, and NN,
13 and PP.
14     THE WITNESS:  We keep losing
15 Mr. Lillienstein from the camera view.
16     MR. STRUTINSKIY:  He's getting the
17 exhibits.  He's right here.
18     THE WITNESS:  As long as he's not taking
19 lunch early, we're good.
20 BY MR. LILLIENSTEIN:
21     Q.   All right.  So those documents that
22 you've just been handed, can you identify them,
23 please?
24     A.   They are each of the five reports and
25 each of the five sets of work notes associated with

56

DEPOSITION OF STAN SMITH, Ph.D.

1
2  each report, although I seem to be missing one
3  thing.  Let's see.
4      Q.   What are you missing?
5      A.   I got Lim and work notes, Serin and work
6  notes, Smith and work notes, Russ and work notes,
7  Redner -- that's it.  I got it.  All 10.
8      Q.   And those are all the discounted reports
9  of these associated work notes?
10     A.   Sad to say, no.
11     Q.   No?
12     A.   The Lim report, Exhibit X, is the
13 undiscounted report.  All the rest are the
14 discounted reports.
15     Q.   So Lim -- you previously had W, the Lim
16 report you've previously had, the discounted
17 reports?
18     A.   So you would like me to swap that one
19 out for the moment?
20     Q.   Yes, please.
21     A.   Sure.  All right.
22     Q.   So those are the five discounted reports
23 and the associated work notes for all of the
24 plaintiffs that you've given an opinion on in this
25 case?

57

DEPOSITION OF STAN SMITH, Ph.D.

1
2      A.   Yes.
3      Q.   Now, I believe in all cases you've given
4  an opinion as to payments made to Northern Leasing
5  or out-of-pocket expenses; is that true?
6      A.   Well, on Lim, it doesn't appear that we
7  looked at out-of-pocket.  That is true of Serin and
8  Russ.
9      Q.   And I think I misspoke.  You did not
10 give an opinion on out-of-pocket or payments made to
11 Northern Leasing in the case of Smith?
12     A.   I just told you the ones we did.  So the
13 rest I did not.
14     Q.   All right.  In Lim, your report talks
15 about loss of payment made to Northern Leasing,
16 right?
17     A.   Yes.
18     Q.   And in Redner, it says "Loss of time
19 spent and payment made to Northern Leasing"?
20     A.   Yes.
21     Q.   In Russ it says, "Loss of time spent and
22 out-of-pocket expenses"?
23     A.   Yes.
24     Q.   Serin is the same as Russ?
25     A.   Right.

15 (Pages 54 to 57)

58

DEPOSITION OF STAN SMITH, Ph.D.

1    Q.   And Smith, you do not give an opinion
2    for out-of-pocket expenses or payments made to
3    Northern Leasing?
4    A.   Yes.
5    Q.   Where did you get the information with
6    regard to the payments made to Northern Leasing and
7    out-of-pocket expenses?
8    A.   Everything ultimately came from
9    Mr. Chittur and the interviews.
10   Q.   With respect to payments made to
11   Northern Leasing, did you do anything to corroborate
12   what you were told by the plaintiffs?
13   A.   Well, we don't act as document fraud
14   examiners or private investigators.  We accept the
15   information that's been provided to us because our
16   request is to base our losses on the information
17   provided.  So the answer is we take what we are
18   given.
19        If we have some reason to question
20   the plausibility of it, we may try and -- or if
21   there's some inconsistencies, we may try to seek
22   clarification, but that's it.
23   Q.   So you accept it as true, the events
24   told to you by the plaintiffs?

59

DEPOSITION OF STAN SMITH, Ph.D.

1    A.   No.
2    Q.   You base your opinion on those amounts
3    though?
4    A.   Yes.
5    Q.   Did you see any documents that
6    corroborate any of the plaintiffs' claims that they
7    made payments to Northern Leasing?
8    A.   I've got a thousand pages of information
9    here so I suppose we have to go through every file
10   one by one.  But let me just start with Lim.  So I
11   have certain sworn statements regarding payments
12   made for Lim, for example.
13   Q.   "Sworn statement" being what?
14   A.   I guess it's your client was suing Lim.
15   Am I right?  Mr. Sussman representing Northern
16   Leasing?
17   Q.   What document are you looking at?
18   A.   An attorney affirmation signed by
19   Mr. Sussman for the plaintiff Northern Leasing
20   asserting certain lease payments.
21   Q.   Okay.  Are there --
22   MR. STRUTINSKIY:  Are there any Bates
23   numbers on the documents you're looking at?
24   THE WITNESS:  Yes, I am -- I'm sorry.  Yes,

60

DEPOSITION OF STAN SMITH, Ph.D.

1    there are.
2    MR. STRUTINSKIY:  What are they?
3    THE WITNESS:  This says 000037.  And it
4    refers to lease No. 0086224.
5    BY MR. LILLIENSTEIN:
6    Q.   Did Mr. Lim or Mr. Chittur provide you
7    with copies of any bank statements showing payments
8    made to Northern Leasing?
9    A.   I don't know.  I have quite a few pages
10   of information here.  Do you want me to paginate
11   through each one?
12   Q.   Just briefly.
13   A.   Well, it can't be done briefly.
14   MR. STRUTINSKIY:  Mr. Lillienstein, do you
15   want him to look at every single -- it can't be done
16   briefly.  Do you want him to look at every single
17   document and answer your question before he answers
18   your question?
19   BY THE WITNESS:
20   A.   I will tell you in general, to speed
21   things up, I don't recall specifically seeing bank
22   statements.
23   BY MR. LILLIENSTEIN:
24   Q.   In any of the cases?

61

DEPOSITION OF STAN SMITH, Ph.D.

1    A.   Correct.  Now, there may be, but I think
2    your colleague here will verify I've got about a
3    thousand pages of documents here and --
4    Q.   We won't ask you to go through that
5    process.
6    A.   All right.
7    Q.   Would it be fair to say you took these
8    statements as to the amount of payments made by the
9    plaintiffs and repeated that in your report without
10   investigating whether they were accurate or not?
11   A.   Haven't you asked this question before?
12   Or if there's a new twist to it, let me know,
13   because I thought I answered it to the best of my
14   recollection.  If there's something -- if it is
15   different from the last time you asked it, help me
16   to discern the difference so I can address my answer
17   to the distinction.
18   Q.   I'm summarizing all of the plaintiffs in
19   this case.  I'm trying to save some time.
20   A.   What I answered before about what I did
21   for the question you asked about Lim was what I did
22   for all of them.
23   Q.   Okay.  Did you do anything other than
24   tally the amounts of payments that you were told

16  (Pages 58 to 61)

62

DEPOSITION OF STAN SMITH, Ph.D.

1 were made to Northern Leasing and list that as an
2 item of damage or an item of loss in your report?
3     A.   Well, I mean, we calculated what we
4 believe were the payments, yes.
5     Q.   So you took the numbers that you were
6 given, added them up and put them in your report?
7     MR. STRUTINSKIY:  Are you talking about the
8 payments?  What numbers are you talking to?
9     MR. LILLIENSTEIN:  I'm talking about
10 payments to Northern Leasing.
11 BY THE WITNESS:
12     A.   I believe I took the amount of money
13 that was told me.  For Ms. Lim (sic), for example, I
14 would have to say no to your question because I
15 believe we only have a record of one payment and so
16 there's nothing to add up.  But we would in effect,
17 one way or the other, through simple mathematics,
18 arrive at it.  Not always has to be tallied.
19 BY MR. LILLIENSTEIN:
20     Q.   You didn't add any economic analysis to
21 it, it was just a matter of math, correct?
22     A.   Correct.
23     Q.   And would that be the same answer with
24 respect to the out-of-pocket expenses, that you did

63

DEPOSITION OF STAN SMITH, Ph.D.

1 nothing to analyze them, you simply took the numbers
2 you were given and added them up and put them in
3 your report?
4     A.   We reviewed them to make sure they
5 appeared to be the information we asked for about
6 out-of-pocket.  If somebody submitted a list of
7 out-of-pocket expenses that included a honeymoon to
8 Hawaii, we would probably wonder whether some papers
9 were mis-shuffled or mis-Xeroxed.  So we look at the
10 information to make sure it appears to be reasonably
11 responsive to the information we asked for.
12     Q.   But if you didn't see a document and
13 they just told you a number, is it fair to say
14 you just took that number, added it up and put it in
15 your report?
16     A.   As long as the number appeared to be
17 within the dimension of the types of the numbers we
18 would expect to hear, somebody said their
19 out-of-pocket was 10 million -- I'm just saying that
20 as an absurd exaggeration -- we would ask about
21 whether the question was properly understood.  But
22 if somebody said, I spent $20 on a cab ride, that
23 certainly wouldn't cause us to raise our eyebrows.
24     Q.   And I'm just saying that if that's what

64

DEPOSITION OF STAN SMITH, Ph.D.

1 they told you and they said they also spent $75 on a
2 hotel and $100 on a train ticket, you just took
3 those numbers, added them up and represented that
4 was a loss in your report?
5     MR. STRUTINSKIY:  Objection.  You're
6 speculating.
7 BY THE WITNESS:
8     A.   What I did was ask for what information
9 would be testified to at trial and I was provided
10 this information.  So I took what Mr. Chittur and
11 the plaintiffs represent would be the information
12 they would give in sworn testimony at trial.  So
13 that was my assignment, yes.
14 BY MR. LILLIENSTEIN:
15     Q.   So you didn't add anything to do that,
16 you just took what they told you and put it in your
17 report?
18     A.   There's nothing to add if someone's
19 making the claim, say, for a $100 hotel bill, I have
20 nothing to add to that.
21     Q.   Precisely.  Now, with respect to the
22 amount of time spent, that's another item of loss
23 that you've calculated in some of the cases?
24     A.   I'm sorry.  One more time.

65

DEPOSITION OF STAN SMITH, Ph.D.

1     Q.   There is an item of loss reported in
2 your reports which is called "loss of time spent" in
3 certain cases; is that true?
4     A.   Correct.
5     Q.   And where did you get the information as
6 to the amount of time spent by the plaintiffs?
7     A.   The information comes also as a result
8 of my inquiry, which is essentially how much time
9 will you be testifying to as having been spent in
10 connection with seeking the remedy, the credit
11 damage situation.
12     Q.   First of all, you didn't ask, your staff
13 member asked, right?
14     A.   I asked the question to be asked by my
15 staff member, yes.
16     Q.   And you're essentially asking for the
17 plaintiffs to estimate the amount of time they spent
18 dealing with the problem?
19     A.   Yes.  Well, no.  I'm asking for the
20 plaintiffs to tell me what answer they will give in
21 sworn testimony at court when asked how much time
22 have you spent in seeking to address and remedy and
23 resolve the problem.
24     Q.   Now, none of the work notes or interview

17 (Pages 62 to 65)

66

DEPOSITION OF STAN SMITH, Ph.D.

1    notes indicates that that question was asked, do
2    they?
3        A.    We don't record the questions in the
4    interview.  We record the statements made by the
5    interviewees.
6        Q.    Okay.  Now, with respect to Mr. Lim, he
7    estimated between 200 and 250 hours; is that
8    correct?
9        A.    Yes.
10       Q.    But your report uses 240 hours; is that
11   correct?
12       A.    Yes.
13       Q.    And in the case of Serin, she estimated
14   between 100 and 200 hours; is that correct?
15       A.    You seem to keep going through these in
16   a different order, but just give me a moment.
17             Yes.
18       Q.    And your report uses 150 hours; is that
19   correct?
20       A.    Yes.
21       Q.    What was the basis for you to decide to
22   use 150 hours?
23       A.    It was within the range of what the
24   claimants told us.

67

DEPOSITION OF STAN SMITH, Ph.D.

1        Q.    And the same answer for Mr. Lim?
2        A.    Yes.
3        Q.    So why did you choose a number closer to
4    the high end of the range in the case of Mr. Lim and
5    a number right in the middle in the case of
6    Ms. Serin?
7        A.    Well, that's just one way of looking at
8    it.  I chose a number that was neither at the top
9    nor the bottom is the way I look at it.
10       Q.    Okay.  Does the --
11       A.    I'll tell you a little more practically
12   that we chose a number that was -- what I would call
13   a round annual figure that would fall within the
14   range when you add up all the years so that, for
15   example, if -- let me take the last one you
16   mentioned, Ms. Serin.
17             So she testified -- let me take the
18   first one because that's the one I think gave you a
19   little more -- probably causes you to have a little
20   more question.
21             So Mr. Lim said 100 to 150 hours.
22   We know that he spent this time over a five-year
23   period -- I'm sorry.  6-year period, 2001 to 2006.
24       Q.    Do you know that?

68

DEPOSITION OF STAN SMITH, Ph.D.

1        A.    Pardon me?
2        Q.    Do you know that or you're just assuming
3    that?
4        A.    That's what he told us.
5        Q.    Okay.
6        A.    And --
7        Q.    You assumed --
8        A.    Let me -- wait, wait.  It will go faster
9    if I finish my answer.
10             So we portray to the jury a model
11   of time loss based on 40 hours a year.  That does
12   result in a number within the range of what Mr. Lim
13   testified to.
14             But the reason we choose a round
15   number is to make things simple for a jury.  If they
16   think it was 35 hours a year, they could take off
17   one-eighth; if they think it's 45 hours a year, they
18   could add one-eighth; if they think it's 36 hours a
19   year, they could take off one-tenth.
20             So rather than give them some
21   number like, you know, 38.32 hours, which you would
22   get if you exactly divided the 225 hours by six
23   years, you would get some weird number, some odd
24   number, I try to make it easy for a jury to

69

DEPOSITION OF STAN SMITH, Ph.D.

1    comprehend the nature of the testimony, the
2    methodology, the manner of application and the
3    process for simple adjustment so long as my numbers
4    do faithfully represent the interview testimony of
5    the plaintiff.
6        Q.    Couldn't you have just taken the low
7    end, figure it out that way, and then taken the high
8    end and figure it out that way and let the jury
9    decide?
10       A.    Mr. Lillienstein, there's a billion
11   things I could have done.  I appreciate your
12   suggestion.  I did it the best way I see fit.  I'm
13   sure your economist can follow your directions and
14   appreciate your advice.
15       Q.    The result of what you did is relatively
16   arbitrary, isn't it?
17       A.    The result of what I did was to
18   absolutely faithfully represent and reflect the
19   value claimed by the claimants as stated in the
20   interview testimony.
21       Q.    But he never told you that he spent 240
22   hours?
23       A.    He absolutely did.
24       Q.    Okay.

18  (Pages 66 to 69)

70

DEPOSITION OF STAN SMITH, Ph.D.

1  A.   240 is absolutely in the range of 200 to
2  250.
3  Q.   Does the fact that Ms. Serin told you
4  that the amount of time spent was between 100 and
5  200 hours perhaps suggest to you that she was
6  guessing?
7      MR. STRUTINSKIY:  Objection.
8  BY THE WITNESS:
9  A.   I don't have a Ph.D. in psychology and
10 I'm not here to speculate.
11 BY MR. LILLIENSTEIN:
12 Q.   You did say if you got some information
13 that you thought was wildly out of the realm of
14 possibilities that you would question it, correct?
15 A.   Yes.  But for somebody to tell me that
16 they spent maybe 45 minutes a week on average on a
17 matter of deep concern to them does not sound to me
18 particularly unusual.  I've conducted dozens of such
19 interviews with similarly situated plaintiffs who
20 sustained credit damage over the course of years,
21 and the figures reported in this case are certainly
22 not unusual on an annual basis.  In fact, they seem
23 to me actually quite low.
24 Q.   My question is whether the range of the

71

DEPOSITION OF STAN SMITH, Ph.D.

1  hours that she gave you seems like she was guessing?
2      MR. STRUTINSKIY:  Objection.  He answered.
3  BY THE WITNESS:
4  A.   I know that's your question and I did
5  answer it.
6  BY MR. LILLIENSTEIN:
7  Q.   So that's your answer to my question as
8  to whether the range of 100 to 200 hours suggests
9  that she was guessing?
10     MR. STRUTINSKIY:  Objection again.  Asked
11 and answered.
12 BY THE WITNESS:
13 A.   Yes, that's my answer.
14 BY MR. LILLIENSTEIN:
15 Q.   Did your assistants ask each plaintiff
16 if they kept any records of the time they spent?
17 A.   They would -- they are trained to ask
18 for any records if they are kept.  Typically
19 records, time records or diaries are not kept.
20 Q.   Do you know whether that question was
21 asked in this case of any of the plaintiffs?
22 A.   We asked for all documentation to
23 support the statements made, if available.  So since
24 we received none, I assume that none was available.

72

DEPOSITION OF STAN SMITH, Ph.D.

1  Q.   Okay.  That was my next question.  So
2  you did not see any documentary evidence supporting
3  the numbers that each of the plaintiffs gave to you?
4  A.   I am not sure there's any documentation
5  that exists.
6  Q.   But you didn't see any whether it exists
7  or not?
8  A.   I was not provided any, correct.
9  Q.   Are you aware of any economic literature
10 which supports a procedure for estimating the amount
11 of time spent by someone by simply asking a person
12 to give an estimate?
13 A.   You know, Mr. Lillienstein, when someone
14 goes to a doctor complaining of pain and the doctor
15 pokes a finger into their ribs and says, on a scale
16 of one to 10, how do you feel?  And if they say 2,
17 they're sent home with an aspirin maybe and told to
18 take it easy for a day or two.  And if they say 10,
19 they may be rushed into a room where neurosurgery,
20 brain surgery is performed.
21     I've never seen a doctor or heard
22 of a doctor ask a patient what peer-reviewed
23 literature have they read, what academic training do
24 they have in being able to answer the question on a

73

DEPOSITION OF STAN SMITH, Ph.D.

1  scale of one to 10, how do you feel?
2      Economists are trained to gather
3  information, and when we ask someone how much time
4  have you spent, we don't ask them to first go get a
5  degree in statistics, either an undergraduate degree
6  or advanced degree, we don't send them a textbook in
7  statistics, we don't give them a course in
8  statistics.
9      My assignment, I'll repeat again,
10 from Mr. Chittur was to gather the information that
11 I understand will be the subject of sworn testimony
12 at trial and to portray to the jury the dollar
13 figures that represent the economic losses based on
14 the fact testimony that I am told will be given.
15 Q.   Are you done?
16 A.   Yes.
17 Q.   I move to strike that as nonresponsive.
18     Are you aware of any economic
19 literature that supports the methodology that you
20 use to determine the amount of time spent?
21 A.   There is no economic literature that
22 guides an economist on asking a simple question such
23 as what is your name, what is your race, what is
24 your gender, what is your date of birth, how many

19  (Pages 70 to 73)

74

1       DEPOSITION OF STAN SMITH, Ph.D.
2   hours did you spend last week in your opinion on the
3   phone, driving, sleeping.
4           And so those are all standard
5   processes that economists engage in, especially in
6   forensic economics, asking questions of plaintiffs
7   that are simple to understand and simple to answer
8   and ask the plaintiff to recall from memory how much
9   time did you spend cooking, approximately, or how
10  many hours did you spend studying or how many hours
11  did you spend addressing this particular situation?
12          I was vice president for a number
13  of years of a -- roughly a thousand-person
14  organization, the leading organization in the field
15  of national -- the National Association of Forensic
16  Economics and none of my colleagues or even
17  economists outside the field has ever seen fit to
18  write a peer-reviewed journal article or to attempt
19  to write a peer-reviewed journal article on how
20  economists can ask a question that consists of how
21  much time did you spend in this activity.  So that's
22  the best answer I can give you.
23      **Q.    So the answer is there is no such
24  economic literature and it's your testimony that
25  there's no need for economic literature?**

75

1       **DEPOSITION OF STAN SMITH, Ph.D.**
2       MR. STRUTINSKIY:  You're mischaracterizing
3   his testimony.  If you have any economic literature
4   you would like to present him to review, then do
5   that.
6       MR. LILLIENSTEIN:  You don't get to make
7   speaking objections in federal court.  Okay?
8   BY MR. LILLIENSTEIN:
9       **Q.    There is no such economic literature, is
10  that basically your testimony?**
11      A.    I can't imagine that there is any such
12  literature.  I never heard of it and nobody that I
13  know of, to my knowledge, has ever heard of it.
14      **Q.    Okay.  Is there any way for anybody to
15  test whether the estimates given by the plaintiffs
16  are accurate?**
17      A.    You misunderstand.  This is the
18  testimony that they told me they would give, and my
19  assignment is to base the loss on this testimony.
20  This has nothing to do with accuracy.  That has to
21  do with the plaintiff saying, here's what I will
22  testify to.
23          I believe these plaintiffs have the
24  Constitutional right to come into court and tell the
25  jury they felt cold, they felt warm, they felt

76

1       DEPOSITION OF STAN SMITH, Ph.D.
2   upset, they spent these many hours.  I believe
3   that's their Constitutional right.
4           I believe they have a further
5   Constitutional right to have an expert come in and
6   say if a plaintiff spent 10 hours doing something,
7   the market cost of those hours is X.  And that has
8   nothing to do with science, it has nothing to do
9   with Daubert, it has nothing to do with getting a
10  Ph.D. in economics.
11          All it has to do is having a
12  plaintiff say, my memory tells me this to the jury
13  and have an economist say, if you want to assume a
14  reasonable replacement cost of $20 an hour, then
15  this is how you simply multiply that out.
16          It is not the kind of thing that
17  would be subject to Daubert, because it's not
18  economic science.  It's simply economic
19  multiplication, looking up a figure from the Bureau
20  of Labor Statistics or the Bureau of Commerce as to
21  an appropriate hourly rate and multiplying it by the
22  number that the plaintiff has testified to.
23          So it's not something that could
24  ever be the subject of a Daubert motion, it's simply
25  outside the scope of a Daubert motion.

77

1       DEPOSITION OF STAN SMITH, Ph.D.
2       **Q.    I appreciate your desire to filibuster
3   here but I'm going to ask a question and hopefully
4   get a straight answer this time.**
5       A.    Mr. Lillienstein, I do not appreciate --
6   I'm not going to go on until you tell me you will
7   cease your sarcasm.  I am not going to continue with
8   sarcasm at the level you have raised it to.  If you
9   would like to have a side conversation with Mr. --
10  with Andrey or call a judge, but I will tell you
11  this, you do not have the right to cast sarcastic
12  remarks in my direction.  My belief is that a judge
13  would ask you to be respectful in this process.  My
14  understanding is these processes are to be conducted
15  as if they were in a court of law and I believe a
16  judge would require a minimum of decorum and
17  respect.  I will accord that to you and absolutely
18  request that you do the same.
19      **Q.    I will do that.**
20          **Is there any way for anyone to test
21  the -- whether the methodology of asking a question
22  of a plaintiff is accurate?**
23      A.    This is outside the realm of testing.
24  There is not a yes or no to that question.  This is
25  the testimony of the plaintiff.  You may inquire in

20  (Pages 74 to 77)

78

DEPOSITION OF STAN SMITH, Ph.D.

1 court as to whether the plaintiff -- how the
2 plaintiff knows what he's testifying to, but it's
3 not my testimony about the hours spent.  It is my
4 testimony about the value per hour and that is a
5 well -- based on a well-established credible set of
6 statistics, all universally accepted by economists
7 nationwide as to an appropriate hourly rate.
8 **Q.   And to come up with your opinion as to**
9 **the amount of the loss which you did, I believe you**
10 **just testified was take the figures that you got**
11 **from the plaintiff and multiplied it by that rate?**
12 A.   Correct.
13 **Q.   And in forming your opinion as to the**
14 **amount of time spent, I take it that you don't**
15 **believe that it makes any difference whether the**
16 **time they actually lost was income-producing time or**
17 **not-income-producing time?**
18 A.   I did not form an opinion as to the
19 amount of time spent.
20 **Q.   With respect to the value of the time**
21 **lost, is it fair to say that you don't believe that**
22 **it's important to consider whether the time lost was**
23 **spent doing income-producing activities or**
24 **non-income-producing activities?**

79

DEPOSITION OF STAN SMITH, Ph.D.

1 A.   I'll answer your question this way:  The
2 standard mechanism in forensic economics regarding
3 valuing time such as this is to look at the market
4 replacement cost, a method universally adopted -- I
5 shouldn't say all, but universally adopted in the
6 field of forensic economics and absolutely codified
7 and approved of by the U.S. Supreme Court.  And,
8 therefore, the actual hourly rate or opportunity
9 cost has not been the subject of a Supreme Court
10 opinion, U.S. Supreme Court opinion, to my
11 knowledge, and is generally not used by economists
12 because if we had a neurosurgeon spending one hour
13 or a cab driver spending one hour, the claims would
14 be vastly different.
15 And that, I think, would be
16 somewhat unfair against the defendant if there were
17 two cases where one neurosurgeon was claiming loss
18 of the hour and another case where a taxicab driver
19 were claiming loss of the hour, there could be a
20 difference in the claim in one case of maybe $25 and
21 the other case maybe $2500.
22 **Q.   And that to you -- it doesn't affect**
23 **your opinion as to the value of the lost time?**
24 A.   I need for you to specify the antecedent

80

DEPOSITION OF STAN SMITH, Ph.D.

1 of the pronoun "it."
2 **Q.   I'm going to ask you a different**
3 **question.**
4 **In forming your opinions as to the**
5 **value of time lost, does it matter to you whether**
6 **the lost time was leisure time or time spent**
7 **generating income in forming your opinion?  Not what**
8 **other economists say.**
9 A.   Under the methodology that I have used,
10 it does not.
11 **Q.   In your opinion, the value of an hour of**
12 **each plaintiff's time --**
13 MR. LILLIENSTEIN:  I believe Mr. Altman
14 might have just joined the conference.
15 MR. ALTMAN:  This is in fact Mr. Altman.
16 THE WITNESS:  Mr. Altman, you are welcome
17 to this proceeding.
18 MR. ALTMAN:  As per agreement of counsel, I
19 will be taking over the defense of this witness at
20 this time.
21 MR. LILLIENSTEIN:  I didn't realize we had
22 such an agreement, but that's fine.
23 BY THE WITNESS:  Mr. Altman, did you wish
24 to take a couple-minute break at this time?

81

DEPOSITION OF STAN SMITH, Ph.D.

1 MR. ALTMAN:  That would be good.  With the
2 agreement of counsel here, would this be a
3 convenient breaking point just so I could get the
4 lay of the land?
5 THE WITNESS:  How many minutes are we into
6 the second tape?
7 THE VIDEOGRAPHER:  We have 23 minutes left
8 on this tape.
9 MR. LILLIENSTEIN:  Why don't we go to the
10 end of this tape and you can talk.
11 THE WITNESS:  So we've got about 20 plus
12 minutes left.
13 MR. ALTMAN:  Okay.  Then I will consider
14 until then.
15 THE WITNESS:  So far, Keith, it's been
16 expeditious and cordial.
17 BY MR. LILLIENSTEIN:
18 **Q.   Your opinions calculate the value of an**
19 **hour of each plaintiff's time using the median wages**
20 **of office clerks and payroll and timekeeping clerks**
21 **for various locations; is that correct?**
22 A.   Correct.
23 **Q.   And what factors led you to select these**
24 **figures?**

21  (Pages 78 to 81)

82

DEPOSITION OF STAN SMITH, Ph.D.

1
2    A.    These are the folks that -- for example,
3  if Ms. Lim (sic) were to have had someone undertake
4  the activities that she undertook on her behalf, I
5  believe these are the rates that she would have paid
6  so that she herself would not have spent the time.
7  I do not include any time she would have had in
8  regard to supervision of these matters.
9        MR. STRUTINSKIY:   Just to clarify, are you
10  referring to Ms. Lim or Ms. Serin?  You're referring
11  to she and referring to Mr. Lim.
12  BY THE WITNESS:
13    A.    I'm sorry.  Mr. Lim.  I think -- was
14  your question to Mr. Lim?
15  BY MR. LILLIENSTEIN:
16    Q.    No, it wasn't.
17    A.    Was of it Ms. Serin?
18    Q.    It wasn't of either.
19    A.    For any of the plaintiffs my answer is
20  generic to any of the plaintiffs, what each of
21  them -- what it may have cost each of them, a
22  reasonable and a conservative estimate what it would
23  have cost each of them had they had these services
24  performed on their own behalf rather than conduct
25  them themselves, absent any supervision and other

83

1        DEPOSITION OF STAN SMITH, Ph.D.
2  costs associated with the retention and provision of
3  such services.
4    Q.    Did you make an attempt to find a wage
5  rate that was equivalent to the type of occupation
6  that each of the plaintiffs had?
7    A.    Yes.  They performed work in general
8  regarding matters that had to do with modest
9  accounting and administration such as that performed
10  by an office clerk or a payroll clerk.  This rate of
11  $14 an hour is, I think you will agree, it's very
12  hard to find anybody to work at $14 an hour doing
13  any kind of administration or payroll clerk on a
14  freelance basis.
15    Q.    Is it your testimony that you purposely
16  chose a low wage rate to be conservative or you
17  tried to match the wage rate applicable to each of
18  these plaintiffs?
19    A.    Well, it wasn't a wage --
20        MR. ALTMAN:  Objection.  Misstates the
21  testimony.
22        MR. LILLIENSTEIN:  Can you read back the
23  question, please.
24        (Whereupon, the record was
25        read as requested.)

84

1        DEPOSITION OF STAN SMITH, Ph.D.
2  BY THE WITNESS:
3    A.    I sought a wage rate appropriate to the
4  activity that was engaged in, and I believe my
5  approach is very conservative.  So actually neither
6  is the first answer to your question.
7  BY MR. LILLIENSTEIN:
8    Q.    Do you know what occupation Mr. Smith
9  had?
10    A.    Mr. Smith indicated he was president of
11  a company that supplies wholesale supplies to
12  restaurants and bars.  It appears to be a small
13  company, so he's an entrepreneur in a generic sense.
14    Q.    Do you know what occupation Ms. Serin
15  had?
16    A.    I will firstly say their occupation was
17  irrelevant to me but we often do learn --
18    Q.    Then we can stop.  Why do you believe it
19  was irrelevant?
20    A.    Well, I'm happy to tell you what I did
21  and what I based my losses on and then I can tell
22  you that there are 4 billion other things that are
23  irrelevant and that's just one of the 4 billion
24  things that are irrelevant, are their occupation.
25    Q.    So I'm confused.  Earlier I believe you

85

1        DEPOSITION OF STAN SMITH, Ph.D.
2  testified that you tried to match the wage rate to
3  their occupation?
4    A.    No.  You testified to that.  I did not.
5  I corrected you and said no.  I selected, and
6  apologize if there's been any misunderstanding based
7  on what I said.  But I selected a wage rate that I
8  believe was appropriate to the activity that they
9  undertook in seeking to remedy the credit damage
10  situation.
11        But whether -- but that would be
12  the same whether it was a neurosurgeon that had the
13  credit damage or a taxi driver who had the credit
14  damage, they would all, in my experience, be
15  undertaking a similar remedy which is to collect the
16  financial information, collect information about
17  dates, discuss matters with attorneys, make phone
18  calls, all matters of -- that can be undertaken by a
19  relatively modestly trained administrative clerk,
20  payroll clerk, that sort of thing.
21        So the wage rate I selected, which
22  is really the only -- the principal economic
23  determination here is a rate I believed appropriate
24  to the activity they engaged in which was unrelated
25  to their occupation.  In fact, we could have had

22 (Pages 82 to 85)

86

DEPOSITION OF STAN SMITH, Ph.D.

1              DEPOSITION OF STAN SMITH, Ph.D.
2   someone who was retired or somebody who works for a
3   charity at $1 a year and this would still be the
4   same.
5      **Q.   And what was the activity that they**
6   **engaged in?**
7      A.   I just gave it to you in my answer.
8      **Q.   Give it to me again.**
9      A.   Could I have my answer read back so I
10  can faithfully repeat the words?
11         (Whereupon, the record was
12         read as requested.)
13  BY THE WITNESS:
14     A.   So I really have nothing further to add
15  to those activities.  I believe each of the
16  plaintiffs will be in a position to testify on their
17  own behalf as to more detail about what specific
18  activities they undertook or what specific time was
19  lost as a result of the lawsuits that Northern filed
20  as a result of the credit damage, as a result of all
21  the things that are in the complaint.
22  BY MR. LILLIENSTEIN:
23     **Q.   Your opinion, then, attempts to**
24  **attribute a value to the time spent by the**
25  **plaintiffs seeking to undo the credit damage; is**

87

1              DEPOSITION OF STAN SMITH, Ph.D.
2  **that fair to say?**
3     A.   Again, mischaracterizes.  My answer was
4  much more full than that.
5        Your client sued these plaintiffs,
6  am I correct?
7     **Q.   Yes.**
8     A.   Well, that's --
9     **Q.   Not in all cases, no.  That's not**
10  **correct.**
11     A.   So it's not just credit damage.  There
12  are lawsuits that were responded to, there was, as I
13  say, all these matters on the complaint.  I don't
14  want to oversimplify it.  But the many issues that
15  these plaintiffs needed to deal with as a result of
16  all the allegations in the complaint, I have put a
17  conservative dollar value on the time spent that the
18  plaintiffs -- on the time that the plaintiffs
19  expended in seeking to extract themselves from the
20  circumstances and remedy the circumstances and
21  resolve the circumstances.
22     **Q.   Do you know how the Georgia Department**
23  **of Labor compiles wage rates that you used in your**
24  **report?**
25     A.   These are typically surveys of various

88

1              DEPOSITION OF STAN SMITH, Ph.D.
2  occupations.  I have not memorized how the survey
3  process is conducted, but it would be difficult for
4  me to imagine that there's an economist in the
5  country who would testify that the median rate --
6  that they have arrived at for that level of
7  occupation is not the best indicator available.  I
8  know of nobody who publishes alternative or
9  substitute or competitive data.  I've never seen a
10  single peer-reviewed journal article criticizing the
11  methodology.  I've never seen any peer-reviewed
12  statement that the -- that those rates are not
13  reliable and that's it.
14     **Q.   And how did you arrive at the estimate**
15  **of loss that you put in your report?**
16     A.   Well, the very simple process --
17     MR. ALTMAN:  Objection.  Form.
18  BY MR. LILLIENSTEIN:
19     **Q.   You can answer.**
20     A.   We're talking about time, right?
21     **Q.   Right.**
22     A.   Okay.  I took the testimony that the
23  plaintiffs gave during the interviews, put an annual
24  value to it, multiplied that by the appropriate rate
25  that we have just been speaking of, added -- where

89

1              DEPOSITION OF STAN SMITH, Ph.D.
2  necessary added an inflation factor to that because
3  the rate is -- the figures we got were 2009 figures
4  so I deflated them backwards in time.  So, for
5  example, if something was worth, say, $10 an hour in
6  2009, I valued it a couple percent less due to wage
7  inflation in 2008 and so on.
8     **Q.   I would like you to focus now on the**
9  **report on Russ and the associated work notes.**
10     A.   All right.
11     **Q.   Now, that report includes an item of**
12  **loss that you referred to as loss of business**
13  **profits?**
14     A.   Yes.
15     **Q.   In your opinion, did you assume that**
16  **Mr. Russ lost the opportunity to purchase three**
17  **check cashing locations from a competitor who was**
18  **looking to sell his business because the landlord**
19  **would not approve the transactions because of Russ's**
20  **credit issues?**
21     MR. ALTMAN:  Objection.  Form.
22  BY THE WITNESS:
23     A.   My opinion is based on Mr. Russ's
24  testimony that he -- while he was being sued by
25  Northern, he attempted to purchase three check

23  (Pages 86 to 89)

90

DEPOSITION OF STAN SMITH, Ph.D.

1  cashing stations from a competitor, yes, and failed
2  as a result of the issues that underlie the
3  allegations in this case.
4  BY MR. LILLIENSTEIN:
5      Q.   You said "testimony" but you didn't mean
6  testimony, did you?
7      A.   Why did I not mean it?
8      Q.   Did he -- did you review any of
9  Mr. Russ's testimony in this case?
10     A.   Yes, all the notes taken by Brian
11 Ebling, Mr. Russ's and the other plaintiffs'
12 testimony.
13     Q.   When you refer to testimony, you're
14 talking about what they said during the telephone
15 interviews?
16     A.   That's correct.
17     Q.   And if any of the facts told to your
18 staff were not in fact the case, that they were not
19 true or that they did not take place, would that
20 affect your opinion?
21     A.   Not at all because my opinion is based
22 on these statements, they're based on the failure to
23 get three check cashing stations.  Whether that
24 happened or not, this is the loss.  This is the loss

91

DEPOSITION OF STAN SMITH, Ph.D.

1  based on the statements.
2      Q.   Okay.  So you assumed the statements
3  were true --
4      A.   No.  Let me caution you.  We've covered
5  that earlier in this deposition when you asked
6  similar questions.  I did not assume they were true.
7  I assumed that this is what Mr. Russ will -- I was
8  told by Mr. Russ this is what he would say at
9  court in sworn testimony.
10         And again, I was asked by
11 Mr. Chittur, my assignment was to give the jury the
12 dollar value impact or assessment of the fact
13 testimony that I understand will be presented at
14 trial.  I leave it to the trier of fact to determine
15 issues of veracity.
16     Q.   And in forming your opinion, did you
17 assume that Mr. Russ's goods stores generate
18 approximately $12,000 a month?
19     A.   I based it on his statement that they
20 do.
21     Q.   And do you assume that they generate
22 approximately 12,000 per month while costing
23 approximately 6,000 per month to operate?
24     A.   Mr. Lillienstein, if I could rephrase

92

DEPOSITION OF STAN SMITH, Ph.D.

1  each of these questions because you always start
2  with "did you assume" and I keep meaning to correct
3  you.  So it would help if you say, did you base your
4  opinions on the statement that said, and then you
5  can include the subsequent facts.  Because as I said
6  before, these are not assumptions that I have made.
7      Q.   Did you base your opinion on the
8  statements that Mr. Russ allegedly made to your
9  staff that his goods stores generate approximately
10 $12,000 per month while costing approximately $6,000
11 per month to operate, thereby generating profit of
12 $72,000 a year?
13     A.   I have a little trouble with the word
14 "allegedly," but if I can side-step that because I
15 believe that those were made to the staff, but the
16 answer then would be yes.
17     Q.   And what is the phrase you want me to
18 use?
19     A.   Just -- well, these are not assumptions.
20 As I've said, I have based my opinions on the
21 statements of the testimony of the plaintiffs, so I
22 apologize if you think I'm overly directing you, but
23 I think it will be shortened if you ask it in the
24 manner where I don't have to object to the

93

DEPOSITION OF STAN SMITH, Ph.D.

1  assumption statement.
2      Q.   That's what I'm trying to do.
3         Is your opinion based on the
4  statement that Mr. Russ supposedly made to your
5  staff that two of the three stores that Mr. Russ had
6  the opportunity to purchase would have generated at
7  least $72,000 per year and that the third store
8  would have generated $25,000 per year in profit?
9      A.   Yes.
10        THE VIDEOGRAPHER:  Counsel, there's five
11 minutes left on this tape.
12 BY MR. LILLIENSTEIN:
13     Q.   And I believe your report states that it
14 was appropriate to calculate Mr. Russ's loss of
15 business opportunity from January 1, 2007 to allow
16 for a reasonable time for Mr. Russ to purchase the
17 three additional locations and have them produce at
18 the rate of his other stores; is that correct?
19     A.   Yes.
20     Q.   Now, in calculating Mr. Russ's loss of
21 business profit at -- first of all, did you
22 calculate them to be $4,470,906?
23     A.   Can you tell me where you are reading
24 that number?  I see something slightly different.  I

24 (Pages 90 to 93)

94

DEPOSITION OF STAN SMITH, Ph.D.

1      DEPOSITION OF STAN SMITH, Ph.D.
2  see.  Well, I still don't know where you --
3      **Q.   I see it at the bottom of Page 3.**
4      A.   Of exhibit --
5      **Q.   Of the Russ discounted report.**
6      A.   Okay.  I got the Russ discounted report.
7      **Q.   The last paragraph at the bottom on Page**
8  **3.**
9      A.   Well, that figure assumes losses to age
10  79, but I think it's more realistic that a trier of
11  fact may consider losses to an earlier date.  So on
12  Page 15 of that very same exhibit I make reference
13  at the bottom of Page 3 that any assumed date for
14  the cessation of damages may be read from Table 4
15  and that, for example, over a five-year loss -- over
16  a five-year period, the loss is 816,000,
17  approximately.  And to age 67, the loss is
18  3,031,000, approximately.
19      I'm reading now from the top of
20  Page 4 of the AA exhibit, which is also summarized
21  on Page 15 of that same exhibit in reference to
22  Table 4-D, standing for "discount," of that exhibit.
23      **Q.   Would you agree that if -- I believe**
24  **what you just said is -- I'm characterizing probably**
25  **but you'll tell me if I'm wrong -- that if Mr. Russ**

95

1      DEPOSITION OF STAN SMITH, Ph.D.
2  **is able to recover from the loss of opportunity at**
3  **an earlier date other than his -- the end of his**
4  **life expectancy, that the loss would cease as of**
5  **that date?**
6      A.   Correct.
7      The reporter is indicating we have
8  two minutes left.
9      **Q.   I saw the "V."  I saw the victory sign**
10  **that time.**
11      A.   Yes.  It does not mean your ahead two to
12  nothing.
13      **Q.   You've used that before.**
14      A.   I'll think of a new joke.
15      **Q.   Okay.  Now, if Mr. Russ succeeds in this**
16  **case would you expect he would be able to recover**
17  **from the loss of opportunity at an earlier date?**
18      A.   I don't know that I have come to an
19  opinion about that determination.  I would like to
20  think about it.
21      When you say "succeeds in this
22  case," what do you mean with regard to this
23  particular element of damage?
24      **Q.   If he's able to establish that Northern**
25  **Leasing had no right to impair his credit.**

96

1      **DEPOSITION OF STAN SMITH, Ph.D.**
2      THE VIDEOGRAPHER:  Counsel, I need to
3  switch the tape.
4      MR. LILLIENSTEIN:  I guess we'll have to
5  wait for the answer.
6      THE VIDEOGRAPHER:  We're going off the
7  record at the end of Tape No. 2.  The time is 11:11
8  a.m.
9      (Whereupon, there was an
10      intermission.)
11      (Mr. Strutinskiy left
12      proceedings.)
13      THE VIDEOGRAPHER:  We're back on the record
14  at the beginning of Tape No. 3.  The time is 11:25.
15  BY MR. LILLIENSTEIN:
16      **Q.   Mr. Smith, when we broke, you were about**
17  **to answer a question.**
18      MR. LILLIENSTEIN:  Can we have that
19  question read back.
20      (Whereupon, the record was
21      read as requested.)
22  BY THE WITNESS:
23      A.   I don't think I can answer the question.
24  I don't know really what would it take to achieve a
25  complete remedy for Mr. Russ.

97

1      DEPOSITION OF STAN SMITH, Ph.D.
2  BY MR. LILLIENSTEIN:
3      **Q.   When did the loss of business**
4  **opportunity begin as far as you're concerned?**
5      A.   In 2007, so we believe late '06 or
6  sometime in '06.  We effectively started the loss in
7  2007.
8      **Q.   January 1, '07; is that correct?**
9      A.   Well, for the year, yes, of the whole
10  year.
11      **Q.   Would the -- would you agree that if**
12  **Mr. Russ were able to have the derogatory credit**
13  **reference on his credit report expunged, that that**
14  **would allow him to recover from the loss?**
15      A.   Well, frankly, I doubt it, but I've not
16  been asked to arrive at an opinion regarding that.
17  I don't really see how.  If those business
18  opportunities are no longer available, then how can
19  he recapture this lost income stream?
20      **Q.   So are you assuming there will never be**
21  **any other business opportunities?**
22      A.   I am not assuming anything.  You asked
23  me about the loss.  I told you I have no opinion
24  about the cessation.  I told you I haven't really
25  been asked to give an opinion about what it would

25  (Pages 94 to 97)

98

DEPOSITION OF STAN SMITH, Ph.D.

1 take for him to completely recover from this loss of
2 business opportunity, and I gave you an example of
3 why. So it could be that if he does not have the
4 opportunity to buy three additional such businesses
5 generating this level of profit, that could be one
6 reason.
7     **Q.   The loss that you've calculated is based**
8 **on Mr. Russ's testimony, to use your word, that he**
9 **was unable to acquire these three business locations**
10 **because of the damage to his credit caused by**
11 **Northern Leasing; is that correct?**
12     A.   Yes.
13     **Q.   Is it true that Northern Leasing -- that**
14 **Mr. Russ also told you that Northern Leasing**
15 **delinquencies were expunged from his record**
16 **following the dismissal of their lawsuits,**
17 **approximately the beginning of 2007?**
18     MR. ALTMAN: Objection. Foundation.
19 BY THE WITNESS:
20     A.   Mr. Russ indicated that he believed that
21 the delinquencies were expunged approximately the
22 end of '07 subsequent to the dismissal of the
23 lawsuit, so yes. I didn't memorize all the facts in
24 your question but I think that was your question,
25

99

DEPOSITION OF STAN SMITH, Ph.D.

1 right?
2 BY MR. LILLIENSTEIN:
3     **Q.   Yes. So I want you to now assume that**
4 **Mr. Russ was able to recover from the loss of**
5 **opportunity in early 2007, assume that --**
6     MR. ALTMAN: Objection. Misstates
7 testimony.
8 BY MR. LILLIENSTEIN:
9     **Q.   What would be your opinion as to the**
10 **amount of business opportunity loss that Mr. Russ**
11 **sustained in that case?**
12     A.   You need to specify further the
13 hypothetical. How does he recover from the loss of
14 business opportunity?
15     **Q.   I don't want you to care. I want you to**
16 **assume he recovered fully.**
17     MR. ALTMAN: Objection. The witness will
18 answer a hypothetical question if he thinks he needs
19 to.
20 BY MR. LILLIENSTEIN:
21     **Q.   I want you to assume that he recovered.**
22     A.   I don't know what you mean by
23 "recovered."
24     **Q.   That there is no more loss of business**
25

100

**DEPOSITION OF STAN SMITH, Ph.D.**

1 opportunity.
2     MR. ALTMAN: Objection. Form.
3 BY THE WITNESS:
4     A.   If you mean that he has been able to
5 reestablish the income stream that I have assessed
6 that he claims he lost and that that income stream
7 has the same likelihood of being provided into the
8 future as it did had he been able to acquire the
9 stores as of the time he had made his initial
10 efforts, so that there would be an absolute complete
11 replacement of income with the same degree of
12 certainty at that time, yes.
13     So it's equivalent to saying if
14 somebody stole your 1999 Chevrolet and you didn't
15 have use of it for three years but then gave you
16 another 1999 Chevrolet after three years with the
17 exact same mileage and same quality and same color,
18 in as good a shape, then I would regard that as a
19 recovery at that time.
20 BY MR. LILLIENSTEIN:
21     **Q.   Your testimony -- your report provides**
22 **for the possibility of an earlier cessation of**
23 **damages other than the end of his life expectancy,**
24 **correct?**
25

101

**DEPOSITION OF STAN SMITH, Ph.D.**

1     A.   It provides for the jury, the trier of
2 fact, to use the table and arrive at an answer if
3 they made that determination, yes. It doesn't
4 provide for the circumstances, it only provides for
5 the ability to make such calculations.
6     **Q.   Okay. What would be the calculation if**
7 **the cessation of damages took place in early 2007?**
8     A.   It would be for that -- well, it would
9 be for that portion of 2007.
10     **Q.   And can you quantify that for me?**
11     A.   You have to give me more facts.
12     **Q.   What facts do you need?**
13     A.   Can you give me the hypothetical that it
14 took place, say, in -- by July 1 of '07, a half a
15 year?
16     **Q.   Yes.**
17     A.   Then we would take a half a year of the
18 '07 number.
19     **Q.   And likewise, if it happened in -- at**
20 **the end of three months, then you would take one**
21 **quarter?**
22     A.   Correct.
23     **Q.   Now, you didn't see any documentation**
24 **to -- withdrawn.**
25

26 (Pages 98 to 101)

102

DEPOSITION OF STAN SMITH, Ph.D.

1          Other than whatever Mr. Russ said
2  during his telephone interview with your staff,
3  isn't it true that you saw no documentary or other
4  evidence indicating that Mr. Russ had an opportunity
5  to purchase three check cashing locations from a
6  competitor?
7      MR. ALTMAN: Objection. Foundation.
8  BY THE WITNESS:
9      A.   We didn't seek any documentation, just
10  so you know, and I don't -- let me just take a look
11  at Mr. Russ's file.
12          I assume you mean in addition to
13  whatever may be in the complaint?
14  BY MR. LILLIENSTEIN:
15      Q.   I'm saying in addition to whatever he
16  said during his telephone interview.
17      A.   And whatever there may be in the
18  complaint.
19      Q.   Well, if there is something in the
20  complaint, I want you to tell me that.
21      A.   Let me just say the complaint will speak
22  for itself, so I won't look at the complaint just to
23  save time.  Because you have read it more thoroughly
24  than I so I won't dispute whether it's in or not.

103

DEPOSITION OF STAN SMITH, Ph.D.

1  I'll just say whatever about that issue, which may
2  include nothing, is in the complaint.  I'll let the
3  complaint alone.
4          I'm just reviewing this --
5      Q.   What are you looking at now?
6      A.   My entire file for Mr. Russ, which is
7  about a thousand pages.
8          I don't recall that there was
9  information in the file further to that issue.  So
10  I'm not quickly seeing anything so I'll say likely
11  not.
12      Q.   Based on Mr. Russ's telephone interview
13  with your staff, is it your understanding that the
14  three locations that he could have -- the business
15  locations that he wanted to acquire were going
16  concerns?
17      A.   I'm unaware of additional details about
18  those business opportunities other than Mr. Russ
19  characterized them as three check cashing locations
20  that were to be acquired from a competitor who was
21  looking to sell his business.  That would indicate
22  to me that they were going concerns, but I'm not
23  going to offer an opinion one way or the other about
24  that.  That's just what I have in my notes.

104

DEPOSITION OF STAN SMITH, Ph.D.

1      Q.   Do you know whether your staff asked
2  Mr. Russ if they were going concerns?
3      A.   I don't know.  But again, it wouldn't be
4  specifically something that would affect my
5  calculations because again, my task was to represent
6  what we understood to be his testimony at trial
7  about the income stream from these.
8      Q.   So you wouldn't base your opinion on
9  anything that Mr. Russ told you during the telephone
10  interview?
11      MR. ALTMAN: Objection. Misstates his
12  testimony.
13  BY MR. LILLIENSTEIN:
14      Q.   Would you have based your opinion on
15  anything that Mr. Russ had told you during the
16  telephone interviews?
17      A.   I base my opinion on what he did tell
18  us.  I can't tell you what I would base my opinion
19  on if he told us something different.
20      Q.   If he told you that he had the
21  opportunity to purchase four locations, would you
22  have given an opinion based on that?
23      A.   I can tell you what I did base my
24  opinion on.  I would have to think about that.  I'm

105

DEPOSITION OF STAN SMITH, Ph.D.

1  not certain.
2      Q.   I would like you to think about it and
3  give me an answer.
4      A.   I'll give an answer to Mr. Chittur next
5  week after I've had some time to digest it.
6      Q.   You're not going to answer my question?
7      A.   Yes, I will.  I just need some time to
8  think about it.
9      Q.   And would you have given your opinion --
10  would your opinion have been different if Mr. Russ
11  told you that each of the -- his existing stores was
12  generating $200,000 a year in profit?
13      A.   Same answer.  I can tell you that --
14  what I did do here.  I can't tell you what I would
15  have done if the answers were significantly
16  different, and you are now posing hypotheticals that
17  are significantly different.
18      Q.   Would your opinion have been different
19  if Mr. Russ told you that his existing locations
20  were generating $50,000 in profit?
21      A.   Are you talking about these three
22  locations?
23      Q.   No.  I'm talking about his existing
24  locations.  You based your estimate on what he would

27 (Pages 102 to 105)

106

DEPOSITION OF STAN SMITH, Ph.D.

1   earn purchasing these three locations on what
2   Mr. Russ told you his existing locations were
3   generating; isn't that true?
4       MR. ALTMAN: Objection. Misstates
5   testimony. Foundation.
6   BY THE WITNESS:
7       A.   He indicated that two of the stores
8   would have made at least 72,000 per year in profit
9   and as much as a hundred thousand or more, and the
10  third would have made 25,000 a year in profit.
11  BY MR. LILLIENSTEIN:
12      Q.   So you based your opinion on that
13  statement?
14      A.   On those statements, yes.
15      MR. ALTMAN: Objection. Misstates his
16  testimony. And form.
17  BY MR. LILLIENSTEIN:
18      Q.   Did Mr. Russ tell your staff whether he
19  investigated the profitability of the stores he
20  wanted to acquire?
21      MR. ALTMAN: Objection. Foundation.
22  BY THE WITNESS:
23      A.   Look, you have to understand again my
24  assignment was to take -- find out and take what we

107

DEPOSITION OF STAN SMITH, Ph.D.

1   understood to be the testimony that Mr. Russ would
2   be providing at trial and to put a dollar value on
3   it. We didn't act as a business broker in this
4   transaction or an investigator, nor did we evaluate
5   these businesses. And if he -- it didn't
6   specifically matter to me that these were check
7   cashing locations. It could have been a business of
8   a different nature that Mr. Russ indicated he had
9   sought to purchase and felt competent to manage. So
10  we took the information he gave us because the
11  assignment was to put dollars on the testimony.
12  BY MR. LILLIENSTEIN:
13      Q.   And he didn't tell you whether he
14  investigated the profitability of those stores
15  before acquiring them -- before trying to acquire
16  them?
17      A.   Well, we normally wouldn't inquire
18  into --
19      Q.   I'm not asking what you normally would
20  do. I'm asking in this case, did he tell you that?
21      MR. ALTMAN: Hold on. You asked the
22  witness the question, he started answering, you
23  interrupted him. Let him finish the answer unless
24  you want to withdraw the first question.

108

DEPOSITION OF STAN SMITH, Ph.D.

1   BY MR. LILLIENSTEIN:
2       Q.   Dr. Smith?
3       A.   We normally --
4       MR. ALTMAN: Wait. Hold on. Hold on.
5   What are we doing? Are we letting him answer the
6   first question or are you withdrawing that question
7   and asking a new one?
8       MR. LILLIENSTEIN: Keith, the rule is that
9   you can make an objection, you can't make a speaking
10  objection, and then let the witness answer the
11  question.
12      MR. ALTMAN: I'm not making a speaking
13  objection. You interrupted his answer. You need to
14  let him complete his answer or withdraw the
15  question. That's all I'm asking. It's only proper.
16      MR. LILLIENSTEIN: I think the witness is
17  ready to answer.
18      THE WITNESS: I think Mr. Lillienstein --
19      MR. ALTMAN: Wait. Before we go forward, I
20  want to know what question he's answering.
21      MR. LILLIENSTEIN: The question I asked.
22      MR. ALTMAN: Which question is it?
23      Can you please read back the
24  question for me.

109

DEPOSITION OF STAN SMITH, Ph.D.

1       MR. LILLIENSTEIN: I'll rephrase the
2   question.
3       MR. ALTMAN: That's fine.
4   BY MR. LILLIENSTEIN:
5       Q.   Did Mr. Russ tell your staff that he
6   investigated the profitability of the stores he
7   wanted to acquire before trying to acquire them?
8       A.   We normally wouldn't inquire into that
9   and therefore I don't believe he did.
10      Q.   Okay. I believe it's accurate to state
11  you made no attempt to examine the profitability of
12  those stores?
13      A.   Since the assignment was of a completely
14  different nature, that would be outside the scope of
15  our assignment. It would not -- so, the answer is
16  no.
17      Q.   You made no attempt?
18      A.   Mr. Lillienstein, no matter how many
19  times you ask the question, my answer is invariant.
20  What was unclear about my answer that would help you
21  understand it better?
22      Q.   The answer was no. But the question was
23  did you -- you made no attempt to examine the
24  profitability of the store, so I'm just trying to

28 (Pages 106 to 109)

110

DEPOSITION OF STAN SMITH, Ph.D.

1    clarify.
2         Did you make any attempt to examine
3    the profitability of the stores?
4    A.   Because it was outside the scope of our
5    assignment and not relevant to the task we were
6    given, I did not undertake to assess the
7    profitability of the stores beyond what Mr. Russ
8    indicated was the profitability.
9    Q.   Now, if you were to analyze a
10   prospective purchase of a store as an investment,
11   what would you, as an economist, want to look at to
12   determine its profitability?
13   A.   I'm not going to get into that here.
14   It's completely off topic.  And if you want, I can
15   take the 10 hours that it would take to give you a
16   preliminary answer off the record at some other
17   time.  Would you want to see --
18   Q.   I'm not going to just accept that you
19   refuse to answer my question.
20   A.   It's not refuse.  If you're prepared for
21   a 10-hour answer, I will give it to you.
22   Q.   Why don't you try to give me the best
23   answer you can?
24   A.   I can't.
25

111

DEPOSITION OF STAN SMITH, Ph.D.

1    MR. ALTMAN:  Hold on.  He'll answer the
2    question as he sees fit.  The witness has told you
3    he thinks it will take an extended period of time.
4    If you want to engage in that time, the witness will
5    certainly accommodate you.  He's just advising you.
6    And if he starts answering the question you need to
7    let him finish regardless of how long it takes.
8    BY THE WITNESS:
9    A.   A business valuation is a very complex
10   matter.  It depends in particular on each business.
11   But since you aren't -- so that's the short answer.
12        The long answer is, I need to
13   review all the documents of the business and then
14   tell you how I would go about evaluating it.  That's
15   the short answer.
16   BY MR. LILLIENSTEIN:
17   Q.   You didn't see any of the documents of
18   the business in this case, correct?
19   A.   I think you asked the question before,
20   but the answer is no.
21   Q.   You didn't see the documents?
22   A.   Correct.
23   Q.   Did Mr. Russ tell you where these
24   potential business locations were actually located?
25

112

DEPOSITION OF STAN SMITH, Ph.D.

1    A.   I understood that they were within what
2    I would consider to be his geographic area but I
3    don't know their addresses.
4    Q.   Is it true that you never saw any
5    information about where the locations of the
6    prospective businesses were?
7    A.   Mr. Lillienstein, I've said --
8    MR. ALTMAN:  Objection.  Form.
9    BY THE WITNESS:
10   A.   I've said repeatedly, you're asking many
11   questions about these businesses and I wonder if
12   you've ever had the opportunity to depose Mr. Russ
13   because these questions appear to be of compelling
14   interest to you.  They were not of compelling
15   interest to me because the answers would not have
16   benefited me in any way regarding my assignment, and
17   so I don't have documents regarding the businesses.
18        If you can appreciate what my
19   assignment was, and I repeated it several times but
20   I'll do it one more time, to take the testimony that
21   Mr. Russ indicates he will be giving under oath at
22   trial and put a dollar value behind it, then you can
23   appreciate that it was not within the scope of my
24   assignment to determine whether Mr. Russ was stupid
25

113

DEPOSITION OF STAN SMITH, Ph.D.

1    or foolish or brilliant in seeking to acquire these
2    businesses.
3    BY MR. LILLIENSTEIN:
4    Q.   Did Mr. Russ tell you what he would have
5    to pay to acquire the businesses?
6    A.   No.
7    Q.   In evaluating the profitability of a
8    business, would you want to know what the purchaser
9    of that business would have to pay?
10   A.   I evaluated the cash flow of this
11   business, I didn't need to know what he paid.
12   Q.   You evaluated only the cash flow; is
13   that correct?
14   A.   The profit cash flow, yes.
15   Q.   Okay.  And if you were to arrive at a
16   trial figure for what his loss was, wouldn't you
17   have to factor in whatever amount he would have to
18   pay for the business?
19   A.   No.
20   Q.   Why not?
21   A.   Well, you would have to tell me why I'm
22   wrong.  I tell you what I did.  Again, there's 4
23   billion things I didn't do and I don't have an
24   answer for -- for why I didn't do 4 billion
25

29 (Pages 110 to 113)

---

**114**

DEPOSITION OF STAN SMITH, Ph.D.

1  other things even though you think a few of them
2  might have been a good idea.
3
4      Q.   I'm asking you a question that I think
5  should be very simple for an economist to answer and
6  that is when you're purchasing a business and
7  examining whether or not it will be profitable, do
8  you have to factor in the cost of acquisition?
9      A.   I was asked to assess the value of the
10  cash flows that he lost from his inability to
11  acquire the business, and so --
12      Q.   Where in your report -- I'm sorry.  Are
13  you finished?
14      A.   So this is the number.  And in my report
15  I state this is the loss of business profits.
16      Q.   So you don't state that it's a loss of
17  cash flow?
18      A.   It's the --
19      Q.   Your report nowhere uses the phrase
20  "cash flow," does it?
21      A.   Correct.
22      MR. ALTMAN:  Objection.  Foundation.
23  BY THE WITNESS:
24      A.   These profits would be his cash flow.
25

---

**115**

DEPOSITION OF STAN SMITH, Ph.D.

1  BY MR. LILLIENSTEIN:
2
3      Q.   Okay.  You're not equating the word
4  "profit" to cash flow?
5      A.   Yes.  If he had bought these businesses
6  for cash, this is what his cash flow would be, he
7  tells us.
8      Q.   Okay.
9      A.   These profits pretax.
10      Q.   And other than what Mr. Russ told you
11  during the telephone interview, you saw no other
12  documentary or other evidence to support the claim
13  that Mr. Russ owned other check cashing businesses,
14  correct?
15      MR. ALTMAN:  Objection.  Form.  Foundation.
16  BY THE WITNESS:
17      A.   I wasn't seeking to establish support.
18  We didn't ask for it and I don't believe any was
19  provided.
20  BY MR. LILLIENSTEIN:
21      Q.   And you never saw any documents relating
22  to the existing businesses, did you?  In other
23  words, any documents that would show whether that
24  business was generating a profit or not?
25      A.   Not true.

---

**116**

DEPOSITION OF STAN SMITH, Ph.D.

1
2      Q.   What did you see?
3      A.   I have a tax return for a company called
4  Rapid Cash that Mr. Russ indicated was his company.
5  It indicates --
6      Q.   Can you --
7      A.   It indicates that it was making a
8  profit.
9      Q.   What is the date of that tax return?
10      A.   2003.
11      Q.   And what is the taxpayer's name on that
12  tax return?
13      A.   It's a subchapter S called Rapid Cash.
14      Q.   Is that the full name?
15      A.   Rapid Cash Title Loans.  In the notes
16  Mr. Russ indicates that he owns a company called
17  Rapid Cash Advances that offers payday advances.
18      Q.   That tax return that you're looking at,
19  does it have a Bates stamp number on it?
20      A.   No.
21      Q.   Would it be okay with you if we made a
22  copy of that and provided it to me because it has
23  not been produced in discovery?
24      A.   If --
25      MR. ALTMAN:  Well, I don't know that that's

---

**117**

DEPOSITION OF STAN SMITH, Ph.D.

1  exactly true but I certainly don't have any
2  objections to the witness making a copy of that and
3  providing it to you irrespective of whether it's
4  been produced to you or not.
5  BY THE WITNESS:
6      A.   Yes, so long as the plaintiff's counsel
7  has no objection, then I certainly have none.
8  BY MR. LILLIENSTEIN:
9      Q.   Okay.
10      MR. ALTMAN:  I don't have any objection,
11  Dr. Smith.  If there's another document that counsel
12  believes he has not received, it's certainly easier
13  for you to give it to him now than to fight about it
14  so you certainly may give him anything you received.
15      THE WITNESS:  All right.  And we can make a
16  copy during the next break, I assume.  There's a
17  copy machine here.
18      MR. LILLIENSTEIN:  He's just asking if they
19  can make a copy there.
20  BY MR. LILLIENSTEIN:
21      Q.   Dr. Smith, before you put those
22  documents away, is there any other documents that
23  you were shown that would indicate the profitability
24  of Mr. Russ's stores?

25 (Pages 114 to 117)

```
                                                    118
1              DEPOSITION OF STAN SMITH, Ph.D.
2       A.   Not that I can quickly determine.
3       Q.   And now looking at the tax return that
4  you were just referring to, can you tell me whether
5  that -- what is the profit indicated on that tax
6  return for the store for the year 2003?
7       MR. ALTMAN: Objection. Foundation.
8  BY THE WITNESS:
9       A.   I actually can't assert to you that it
10 is -- when you say "the store," Mr. Russ indicated
11 he had five locations in '02, so I believe this
12 would cover more than one store in Orlando.
13           And I actually am not 100 percent
14 sure that it's the same corporate entity that owns
15 the stores because Mr. Russ indicated that his
16 company was called Rapid Cash Advances and this one
17 is called Rapid Cash Title so he may have -- I
18 understand your client has a whole rabbit warren
19 full of corporations that are interrelated and pass
20 assets back and forth, so it's not unusual for one
21 person to own more than one subchapter
22 S-corporation.
23           This one has a slightly different
24 name, Rapid Cash Title Loans. And since I know of
25 people who are in the business of lending money on
```

```
                                                    119
1              DEPOSITION OF STAN SMITH, Ph.D.
2  second mortgages, it sounds like this could be a
3  slightly different type of company than a Rapid Cash
4  Advance, which is a kind of a payroll advance firm.
5  So they may be related but not the same entity.
6  BY MR. LILLIENSTEIN:
7       Q.   Did you rely on that document in any way
8  in forming your opinion?
9       A.   No. So maybe we don't even need to mark
10 it.
11      Q.   No. Don't put it away. Don't put it
12 away.
13           Does that document reflect how much
14 money was distributed to Mr. Russ in 2003?
15      A.   Yes.
16      Q.   What is that amount?
17      A.   Well, let me just say he was -- the
18 answer is no, it doesn't.
19      Q.   What page are you looking at right now?
20      A.   The K1.
21      Q.   What does the K1 show?
22      A.   It shows his name, shows the name of the
23 company, indicates that Mr. Russ owns 100 percent,
24 the ID number. The Social Security number and the
25 ordinary income. It doesn't show the distributions.
```

```
                                                    120
1              DEPOSITION OF STAN SMITH, Ph.D.
2       Q.   What is the ordinary income?
3       A.   Just under 50,000.
4       MR. ALTMAN: I'm sorry. Can you repeat
5  that number. I couldn't hear it.
6       MR. LILLIENSTEIN: Just under 50,000. Just
7  under.
8  BY MR. LILLIENSTEIN:
9       Q.   What is the exact number?
10      A.   49,690.
11      Q.   And looking at the first page or two of
12 that tax return, what does the gross income show?
13      A.   Gross receipts of 574,717.
14      Q.   I'm sorry. Repeat that please.
15      A.   574,717.
16      Q.   And does it indicate the cost of or the
17 expenses?
18      A.   It doesn't have $419,000 worth of
19 expenses which are itemized on Statement 1, which is
20 not attached. It has a few other expenses.
21      Q.   419,000 exactly or what?
22      A.   Approximately. It itemizes a few of
23 them but not the vast majority.
24      Q.   What is the 419,000 number?
25      A.   It's a general category called
```

```
                                                    121
1              DEPOSITION OF STAN SMITH, Ph.D.
2  "Deductions", Line 19, which makes reference to
3  Statement 1 which you would see the detail of the
4  419,000.
5       Q.   I'm asking you what's the actual number?
6       A.   419,858.
7       Q.   And tell me if I already asked this, but
8  I believe you said that there was no other documents
9  reflecting the profitability of Mr. Russ's existing
10 stores that you were given?
11      A.   Not that I readily see. And again, I
12 just caution you, this document may not be related
13 to the stores but related to a --
14      Q.   I understand.
15      A.   -- a different type of business, a
16 similar.
17      Q.   Do you know whether your staff asked
18 Mr. Russ whether that was for -- the income tax
19 return was for the same business he was talking
20 about in the interview?
21      A.   I don't know, but it wouldn't matter.
22      Q.   It wouldn't matter why?
23      A.   If we go through my opinions, I can tell
24 you what did matter. As I said before, there are
25 billions of things that don't matter. And I don't
```

31 (Pages 118 to 121)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

122

DEPOSITION OF STAN SMITH, Ph.D.

1   have an answer why they don't matter. I could just
2   tell you why the things that do matter, matter.
3       Q.   You volunteered it wouldn't have
4   mattered. Why wouldn't it have mattered?
5       A.   I just gave you the answer.
6       Q.   Your answer was to say there's a million
7   things that don't matter and you won't tell me about
8   this one?
9       A.   I don't have a particular answer why the
10  billion things that don't matter don't matter. If I
11  had a copy of your college diploma in my file, it
12  wouldn't matter either.
13      Q.   All right. I'm going to make it easy
14  for you. I don't want you to worry about the
15  million things that don't matter. I'm asking you
16  about this one. Why didn't this tax return or any
17  other tax return matter?
18      A.   Because it didn't have anything to do
19  with my assignment.
20      Q.   Okay. And your assignment was to accept
21  that Mr. Russ would testify a certain way at trial
22  and to give an opinion based on that testimony?
23      A.   Generally, yes, that's correct.
24      Q.   Okay. Now, with regard to your opinions

123

DEPOSITION OF STAN SMITH, Ph.D.

1   on the reduced value of life. I am certain you will
2   correct me, but I'm going to give it a shot anyway.
3       That calculation relies on
4   essentially three numbers, does it not: The value
5   of a statistical life, the impairment rating or the
6   amount by which a person estimates his or her
7   quality of life is reduced, and a person's
8   statistical life expectancy; is that correct?
9       A.   Well, let me comment on the third one,
10  that the life expectancy is the longest to which a
11  loss may be incurred. But I leave it to the trier
12  of fact to determine if the impact on loss of
13  enjoyment of life could be -- could cease at some
14  point prior to the end of life expectancy.
15      Q.   But otherwise I got it right?
16      A.   I would say generally, yes.
17      Q.   Not bad?
18      A.   Excellent.
19      Q.   Okay. Now, your reports refer to value
20  of life. Is it correct that economists frequently
21  refer to value of life in the literature as a value
22  of a statistical life or a value of an anonymous
23  life?
24      A.   Yes.

124

DEPOSITION OF STAN SMITH, Ph.D.

1       Q.   Your opinions attribute the same value
2   of a statistical life to all of the plaintiffs; is
3   that correct?
4       A.   No.
5       Q.   Tell me why that's not correct.
6       A.   Well, each is adjusted.
7       Q.   Adjusted for impairment value,
8   impairment rating and life expectancy?
9       A.   No, before the impairment rating. The
10  average value of life applies to someone who has 45
11  years of remaining life expectancy. If we are
12  applying this to someone who happens to specifically
13  have the 45 years of remaining life expectancy that
14  the statistically averaged person in this country
15  has left, understanding that the average person in
16  this country is in their early 30s and so 45 years
17  is about what each person has left for life
18  expectancy. If we happen to have a plaintiff who
19  has that same average, then what I would say is that
20  that person's value of life, assuming they were a
21  normal person within the broad range of average
22  ability to enjoy life, that that person then would
23  have the same value as the statistical value of
24  life.

125

DEPOSITION OF STAN SMITH, Ph.D.

1       Q.   Maybe I misunderstood. But I thought
2   that your reports all use the same 4.2-million-
3   dollar figure in using 2010 dollars in calculating
4   this particular loss.
5       A.   Well, but we don't attribute that that's
6   the value of life for each plaintiff.
7       Q.   Right. And that's what I thought I was
8   getting at in my first question, that you --
9       A.   It's only a starting point but it's a
10  starting point for -- it's the starting point in the
11  analysis before you even bring in the particulars of
12  the plaintiff.
13      Q.   Okay. And the particulars of the
14  plaintiff are those two other items I mentioned, the
15  impairment rating and his life expectancy, his or
16  her life expectancy, correct?
17      A.   Correct.
18      Q.   Okay. Now, the amount of impairment,
19  that was determined by you how?
20      A.   It wasn't determined by me.
21           (Whereupon, there was a
22           discussion off the record.)
23  BY MR. LILLIENSTEIN:
24      Q.   You took issue with my statement that

32 (Pages 122 to 125)

126

DEPOSITION OF STAN SMITH, Ph.D.

1   you determined the impairment rating and I assume
2   the reason is because you allowed the plaintiffs to
3   determine what they believed their impairment rating
4   was and that you then use that in your report; is
5   that correct?
6       A.   I asked each -- again, as similar to
7   other losses, I asked each plaintiff to indicate to
8   us what would be their assessment at trial of their
9   loss of quality of life or loss of enjoyment of life
10  or impairment rating, these are all rather
11  synonymous terms, yes.
12      Q.   You keep saying "I" but you didn't speak
13  to any of the plaintiffs, we already established
14  that, correct?
15      A.   All of this is conducted.  I conducted
16  all this and utilized assistance to accomplish my
17  objectives.  So you need not reiterate that I
18  actually did not go to the printer to print the
19  report.  There's many things that I did not
20  personally do, but effectively I did all this.  So
21  if I say I requested, the request was passed through
22  staff but that didn't mean I didn't request it.
23      Q.   Okay.  I think the answer could have
24  been simpler, and I would also say that in terms of

127

DEPOSITION OF STAN SMITH, Ph.D.

1   reiterating statements, I think the same advice
2   could be given to you as well.  But let's leave that
3   as it be.
4            You didn't speak to any of the
5   plaintiffs personally, correct?
6       A.   Mr. Lillienstein, you just expressed an
7   interest to move on and save time and yet that's
8   maybe the 10th time you asked that question, so am I
9   to take it you're not serious in your request that I
10  be succinct and expeditious?
11      Q.   I'll try to explain this to you.  Since
12  this is being videotaped, it makes it much more easy
13  for the jury, as I'm sure you can understand, to
14  have one straight click where all of the relevant
15  information is there.  So when I ask you this, it's
16  not because I want to waste time, it's because I
17  want to make it easier for the jury just as you
18  testified earlier that you want to make it easier
19  for the jury.
20      A.   I understand that.  But I just wonder
21  whether plaintiff's counsel has a right to object
22  about questions being asked and answered.  I'll
23  answer it again if there is no objection.
24      Q.   Even if there is an objection, you have

128

DEPOSITION OF STAN SMITH, Ph.D.

1   to answer it.
2       A.   I see.  So I did not speak directly to
3   the plaintiffs.  I explained in great detail that
4   all of these interviews were conducted at my
5   direction and I have not spoken to them as yet.
6       Q.   If the plaintiff during the interview
7   indicated a very high impairment, say 9 or 10, and
8   the statements that they made during that interview
9   did not corroborate that 9 or 10, in your opinion,
10  would you accept the 9 or 10 rating and use it in
11  your report?
12      A.   Well, your question assumes that I am a
13  Ph.D. psychologist where I can take statements
14  about -- and opine as to whether they corroborate or
15  not.  So I will tell you that I didn't see anything
16  implausible in the interviews as I read them, but
17  again, I leave it to a trier of fact.
18           I have known people who have had
19  minor surgery on the small toe of their foot, have
20  catastrophic impact on their life because
21  marathoning was the therapy that they were using to
22  recover from child abuse and rape.
23           So what may appear to be rather
24  minor circumstance to some can turn out to be major

129

DEPOSITION OF STAN SMITH, Ph.D.

1   consequence to others.
2       Q.   But you don't really care in forming
3   your opinion whether it's implausible or not, you're
4   just going to take what they tell you and your
5   assignment is to take that value and then apply it
6   to your methodology?
7            MR. ALTMAN:  Objection.  Misstates his
8   testimony and form.
9   BY THE WITNESS:
10      A.   It does misstate what I just said.
11  BY MR. LILLIENSTEIN:
12      Q.   Tell me if what I said is correct.
13      A.   It is not correct.
14      Q.   Okay.  In any case, in the case of any
15  of the five plaintiffs for which you've given a
16  report, did you not adopt the percent reduction in
17  life that the plaintiff told you?
18           MR. ALTMAN:  Objection.  Form.
19  BY THE WITNESS:
20      A.   Well, we didn't adopt it precisely.  We
21  portrayed much of it and other things also.  So the
22  goal was to portray the testimony reasonably
23  closely.  I would have to look at each report.

33 (Pages 126 to 129)

130

1           DEPOSITION OF STAN SMITH, Ph.D.
2    BY MR. LILLIENSTEIN:
3        Q.    That's what I'm going to ask you to do.
4        A.    So let me just start, for example,
5    with --
6        Q.    Which one are you starting with?
7        A.    With Judson Russ. He indicated that
8    until the end of '07, he believed his loss to be in
9    the 20 to 30 percent -- I'm sorry. In the 70 to 80
10   percent range because this was extremely distressing
11   to him.
12       Q.    Where are you looking at, what page?
13       A.    Page 7 of the work notes, the very end
14   of that paragraph.
15       Q.    You're referring to the sentence which
16   states, "He estimates his quality of life from the
17   time he discovered Northern Leasing's fraud until
18   approximately the end of 2007 to be approximately 20
19   percent to 30 percent and 90 percent and 95 percent
20   thereafter"?
21       A.    I am referring to that sentence. And so
22   we illustrated his reduction to be a 40 to 80
23   percent, not a 70 to 80 percent, loss initially.
24   And then we continued on with the five to 10 percent
25   that he testified thereafter. So we took but gave

131

1           DEPOSITION OF STAN SMITH, Ph.D.
2    some lesser, more conservative figures to the jury
3    in -- by giving them a range for Mr. Russ. We can
4    go through each report but they would probably be
5    something similar.
6        Q.    I'm sorry. So Mr. Russ told you that he
7    estimated his quality of life from the time he
8    discovered Northern Leasing's fraud until
9    approximately the end of 2007 to be approximately 20
10   percent to 30 percent. And then what figure did you
11   use in your report for that same period of time?
12       A.    Well, okay, understand 20 to 30 percent
13   quality of life means a 70 to 80 percent loss. And
14   I illustrated the 40 to 80 percent loss so a loss as
15   little as 40 where as he said it was as little as
16   70.
17       Q.    Okay.
18       A.    Similarly with -- I'm sorry.
19       Q.    Let's do -- what did you do thereafter?
20   What do you use thereafter?
21       A.    He said 90 to 95 percent so we just then
22   took that.
23       Q.    You used both numbers or one number?
24       A.    Both.
25       Q.    Let's go to the next.

132

1           DEPOSITION OF STAN SMITH, Ph.D.
2        A.    Ms. Redner, Gordon Redner, Mr. Redner,
3    on Page 5 indicated a one-third loss or more at the
4    start and a 95 -- and five percent loss thereafter.
5    So we took the one-third at the lower end and then
6    the five percent because he said one-third or more,
7    so we showed 50 percent at the upper end and 10
8    percent thereafter.
9        Q.    Okay. Next.
10       A.    For Thomas Smith, on Page 5 of his
11   interview, I'm speaking in the interview notes
12   exhibit.
13             I assume we're fine with not
14   putting the exhibit numbers in?
15       Q.    Yes.
16       A.    He states 50 percent initially and once
17   this matter is resolved, he believes it might go
18   back to a -- remaining quality of 80 to 90,
19   meaning a loss of 10 to 20. So that was then shown
20   at -- on the low end 40 percent mitigating down to
21   10 percent at the lower end and 60 percent
22   mitigating down to 20 percent on the upper end.
23       Q.    At what period of time did you use --
24       A.    For the mitigation?
25       Q.    Yeah.

133

1           DEPOSITION OF STAN SMITH, Ph.D.
2        A.    Well, he said once the situation
3    resolves, he said later this year. We made that
4    shift in 2011.
5        Q.    Okay.
6        A.    Which means a mitigation by the end of
7    2010.
8        Q.    Next.
9        A.    For Ms. Serin, on Page 5 of the
10   interview notes, she indicated that since the court
11   case got dismissed, she's mostly back to having
12   a 90 to 95 percent remaining quality. So for 2002
13   to 2005, we portrayed to the jury those four years
14   firstly at a 30 percent loss and then at a 50
15   percent loss. The mitigation on the lower end
16   brings the loss down to as little at 5 percent, the
17   mitigation on the higher end of the range brings the
18   loss down to 10 percent as of '06.
19       Q.    Why did you use 10 percent when she said
20   90 to 95 percent?
21       A.    If she says 90 percent quality, that's a
22   10 percent loss.
23       Q.    But she said 90 to 95 percent?
24       A.    We used five percent on the lower end
25   and 10 percent on the upper end. It brackets her --

34 (Pages 130 to 133)

<br>

134

DEPOSITION OF STAN SMITH, Ph.D.

1  it shows the lower and the upper end of her
2  statement.
3
4      Q.   So -- go ahead.  You didn't finish.  I
5  think there's one more.
6      A.   Mr. Lim.  On the bottom of Page 6, he
7  said 50 percent during the time he was dealing with
8  Northern Leasing and 90 to 95 percent value since
9  then.  So we took his 50 percent and showed it in
10  the lower end at 40 and in the upper end at 60,
11  bracketing the 50; and in the lower end showed 5
12  percent loss and at the upper end showed 10 percent
13  loss.
14      Q.   So the actual -- you don't give an
15  opinion as to what the jury should determine as
16  being the loss for any plaintiff, you just
17  illustrate ranges; is that correct?
18      MR. ALTMAN:  Objection.  Misstates his
19  testimony.
20  BY THE WITNESS:
21      A.   Well, I think more succinctly I took the
22  loss percentages given by the plaintiffs and
23  portrayed them usually in a slightly more
24  conservative or proximate manner and then project
25  them out for as long as the trier of fact may wish

135

DEPOSITION OF STAN SMITH, Ph.D.

1  to calculate the loss.  But I think you're correct
2  that I did not determine the percentages.
3  BY MR. LILLIENSTEIN:
4      Q.   Or the actual loss?
5      A.   Well, I determined the actual dollar
6  loss based on the percentages provided by the
7  plaintiffs.
8      THE VIDEOGRAPHER:  Three minutes.
9  BY MR. LILLIENSTEIN:
10      Q.   With respect to the methods that your
11  staff uses to inquire about the degree of
12  impairment.  Are there specific questions that
13  you've instructed them to ask?
14      A.   Yes.
15      Q.   What are those questions?
16      A.   Well, they're instructed to explain that
17  we look at loss of enjoyment of life regarding the
18  impact in a variety of areas, specifically those
19  that I spell out in the report, which have to do
20  with the -- any impact on the ability to obtain
21  value and satisfaction from career.  And we know,
22  for example, for one of the gentleman, he had a
23  business opportunity loss, but to what extent did
24  this impact their ability to enjoy the satisfaction

136

DEPOSITION OF STAN SMITH, Ph.D.

1  of their work.
2      Secondly, the ability to enjoy
3  their social and leisure activities, whatever those
4  may be.
5      Thirdly, the ability to derive
6  value and satisfaction from the activities of daily
7  living.  And here, I don't see that any of these
8  folks were impaired from just being able to go about
9  their normal life management from buttoning their
10  shoes to grocery shopping, for example.  I mean,
11  buttoning their shirts, tying their shoes or grocery
12  shopping.
13      And the fourth area is just the
14  internal emotional state, how that's affected them
15  aside from when they're engaged in social and
16  leisure activities, or aside from when they're
17  engaged in their occupation, aside from when they're
18  undertaking activities of daily living, what's their
19  general sense of well-being and how that's impacted
20  that.  Taking all those areas into account, we ask
21  them for an overall assessment of the impact on the
22  quality of life.
23      I think we're going to end my
24  statement and we're going to go on break.

137

DEPOSITION OF STAN SMITH, Ph.D.

1      THE VIDEOGRAPHER:  We're going off the
2  record at the end of Tape No. 3.  The time is 12:26
3  p.m.
4      (Whereupon, there was an
5      intermission.)
6      THE VIDEOGRAPHER:  We're back on the record
7  at the beginning of Tape No. 4.  The time is 12:35
8  p.m.
9  BY MR. LILLIENSTEIN:
10      Q.   Dr. Smith, do you consider a reduction
11  in the value of a person's life to be distinct from
12  injury to a person's business?
13      A.   Yes.
14      Q.   Do you consider reduction in the value
15  of a person's life to be distinct from injury to a
16  person's property?
17      A.   Yes.
18      Q.   Is there any way to test whether the
19  plaintiffs' estimates of the degree of impairment is
20  accurate?
21      MR. ALTMAN:  Objection.  Foundation.
22  BY THE WITNESS:
23      A.   We're going back to the discussion we
24  had, which I think you referred to as a filibuster

35 (Pages 134 to 137)

138

DEPOSITION OF STAN SMITH, Ph.D.

1    at one point in time.  I just needed to give you a
2    complete answer as my oath requires.  That the
3    plaintiffs are free to come into court, and I
4    believe, have the Constitutional right to state what
5    they have assessed their loss of quality of life to
6    be just as they have the freedom to come in and give
7    their best recollection as to the loss of hours and
8    any other facts that they believe are pertinent to
9    their claim so their trier of fact can be fully
10   informed as to all these important facts and
11   testimony of the plaintiffs.
12           And that my assignment was to take
13   the testimony of the plaintiffs and to put dollars
14   behind it.  So there is no Daubert testing needed.
15   It's outside the scope.  The plaintiffs will come in
16   and say, I felt cold, I felt warm, I felt cheated, I
17   felt loss of enjoyment of life.  I believe I spent
18   60 hours or 600 hours.  That's their Constitutional
19   right to state that.  I know of no law in the land
20   that would exclude their testimony.  My simple
21   assignment was to apply a mathematical model to
22   their testimony.
23   BY MR. LILLIENSTEIN:
24       Q.    And with respect to the mathematical

139

DEPOSITION OF STAN SMITH, Ph.D.

1    model that you applied, one of the three factors
2    that you have to use is their estimate of the degree
3    of impairment?
4        A.    Not really.  I can give the trier of
5    fact here's the value of life, here's the value per
6    year.  They can do the fifth grade multiplication.
7    It's fifth grade multiplication.  We learned when we
8    were 12 years old how to take 50 percent of a
9    number, that if someone earns $1.75 or a $1.80
10   selling apples and if Mary is going to earn 50
11   percent of the revenue, then Mary earns 90 cents.
12   We learned that in fifth grade.
13           I actually don't need the
14   percentage of the plaintiffs.  I'm happy to give the
15   model to the jury and they can apply the
16   percentages.  The application of the percentages is
17   the equivalent of adding two plus two.  It's not
18   economics, it's mathematics.
19           The only economics here is what is
20   the value of a statistical life.  That requires a
21   very significant amount of economic knowledge,
22   training and experience, and I have published peer-
23   reviewed articles on this topic and under a Nobel
24   laurate, Dr. Gary Becker, published original

140

DEPOSITION OF STAN SMITH, Ph.D.

1    research on the value of a statistical life.
2           The value of a statistical life is
3    something outside the ken of a jury, but which is
4    why they uniformly accept it as high-quality
5    literature in the field of economics.  The
6    application of the percentage is fifth grade
7    mathematics.
8        Q.    Okay.  So does any of the literature
9    that you've referred to in your report address in
10   any way the use of asking a plaintiff to estimate
11   the reduction in the quality of life?
12       A.    The literature pertains to applying the
13   percentage.  It doesn't specify how that percentage
14   may be arrived at.  And Mr. Chittur chooses to have
15   the jury apply a percentage that the plaintiffs will
16   tell them.  It doesn't matter where the percentage
17   comes from in terms of the model.  But application
18   of the model in this instance is to the jury's
19   statements.  You may come in and say to the jury, we
20   want you to apply 1 percent.  Then the model would
21   apply to your statements.
22       Q.    My question focused on literature.  Are
23   you aware of any literature that addresses the use
24   of the interview technique that your staff uses to

141

DEPOSITION OF STAN SMITH, Ph.D.

1    determine the impairment rating?
2        A.    Well, I published a peer --
3        MR. ALTMAN:  Hold on.  Objection.
4    Misstates his testimony.
5    BY THE WITNESS:
6        A.    I published a peer-reviewed journal
7    article on the use of percentage, but the peer-
8    reviewed literature has not seen the need to go into
9    the very simplistic issue of where the percentages
10   come from because that's an issue for a trial
11   attorney and the strategy of a trial attorney.  So
12   we kind of don't write peer-reviewed journal
13   articles on how a trial attorney should produce
14   information to a jury.
15   BY MR. LILLIENSTEIN:
16       Q.    But you did produce a peer-reviewed
17   article that deals with that?
18       A.    That deals with the application of
19   percentages.  Where the percentages come from is
20   really trial strategy.  In this case, and in almost
21   every case, the civil trial value is for my model of
22   the value of life to be applied to the testimony of
23   the plaintiffs.
24       MR. LILLIENSTEIN:  Jeremy, can you show

36  (Pages 138 to 141)

142

DEPOSITION OF STAN SMITH, Ph.D.

1  Dr. Smith AAA.
2
3      MR. ALTMAN:  Can you describe that for me?
4      MR. LILLIENSTEIN:  It's his CV.
5      THE WITNESS:  Exhibit AAA is my resumé.
6  BY MR. LILLIENSTEIN:
7      Q.   Can you identify on that resumé which
8  peer-reviewed literature you were just referring to?
9      A.   It's the top article on Page 3.
10     Q.   "Hedonic damages and personal injury, a
11  conceptual approach."  That the one you're referring
12  to?
13     A.   Yes.  But there are other articles that
14  also discuss the application, the simple fifth grade
15  mathematical application of a percentage to the
16  value of life statistics.
17     Q.   Is that literature that you've written
18  or others?
19     A.   Others.
20     Q.   Who?
21     A.   Ted Miller, for example.  I cite several
22  of his articles in my report on appendix.
23     Q.   And you're saying that Ted Miller
24  addresses the use of the interview technique or just
25  the application of the results of that technique to

143

DEPOSITION OF STAN SMITH, Ph.D.

1  the value of life?
2      MR. ALTMAN:  Objection.  Form and misstates
3  his testimony.
4  BY THE WITNESS:
5      A.   Discusses the application of a
6  percentage.
7  BY MR. LILLIENSTEIN:
8      Q.   Okay.  Do -- are you aware of any
9  literature that addresses the known or potential
10  rate of error in using the methodology that you use
11  to determine the degree of impairment?
12     A.   There is no rate of error.
13     MR. ALTMAN:  Objection.  Misstates his
14  testimony.  Form.
15  BY THE WITNESS:
16     A.   There is no rate of error.  This is the
17  testimony that the plaintiffs have indicated they
18  will give.  There is no rate of error.  The rate of
19  error is zero.
20  BY MR. LILLIENSTEIN:
21     Q.   You're not aware of any literature that
22  addresses that?
23     A.   There is no rate of error.
24     MR. ALTMAN:  Objection.  Misstates his

144

DEPOSITION OF STAN SMITH, Ph.D.

1  testimony and form.
2  BY MR. LILLIENSTEIN:
3      Q.   Are you aware of any such literature?
4      A.   Mr. Lillienstein, what is the rate of
5  error when I asked you your name earlier and you
6  told me it was Mr. Lillienstein?  What is the rate
7  of error in that answer?  It's the same.  It's the
8  same rate of error as the answer the plaintiffs gave
9  us.  Zero, z-e-r-o.  There is no literature that
10  addresses a process that has no rate of error.
11     Q.   So there is no literature.  Thank you.
12     A.   No, there is no rate of error.
13     MR. ALTMAN:  Objection.  Misstates his
14  testimony.
15  BY MR. LILLIENSTEIN:
16     Q.   Who is Thomas Schelling?
17     A.   An economist who first proposed how to
18  measure the intangible value of life about 50 years
19  ago.
20     Q.   Is he considered authoritative in the
21  field?
22     A.   You know, it's very difficult to say
23  authoritative as a global.  You'd have to tell me a
24  statement.

145

DEPOSITION OF STAN SMITH, Ph.D.

1      Q.   Is he -- is his work generally accepted
2  as authoritative by economists?
3      A.   You have to cite a particular
4  publication, and I am really unaware of all the
5  fields that he's published.
6      Q.   Would you say -- would you give me the
7  same answer if I asked the same question about you?
8      A.   I really don't engage in --
9      MR. ALTMAN:  Objection.
10  BY THE WITNESS:
11     A.   I really don't engage in self-assessment
12  except that I've published in peer-reviewed
13  literature.  So to that extent, opinions are
14  accepted but beyond that.
15  BY MR. LILLIENSTEIN:
16     Q.   Some of your opinions have been
17  criticized in the literature, is that fair to say?
18     A.   Not by economists who have the
19  credentials that typify an expert as having
20  published in the field of the value of a statistical
21  life, published original research.
22
23          The only criticism comes from folks
24  who don't have that hallmark of expertise of having
25  published in the original published peer-reviewed

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

146

DEPOSITION OF STAN SMITH, Ph.D.

1  articles in the original research, people who are
2  more Monday morning quarterbacks, paid business
3  consultants, some have advanced degrees, some do
4  not.  But they don't have the credentials that
5  typifies and is a hallmark of an expert in the field
6  as having had their opinions in original research
7  peer review.  So the answer to that is no.
8     Q.   Is W.K. Viscusi an economist whose work
9  is generally accepted as authoritative in the field?
10    A.   He's recognized as having made valuable
11 contributions to the literature.  I note that he's
12 mentioned in your defense economic expert report.
13           Curiously, the report fails to
14 mention that Dr. Viscusi has testified on the value
15 of life using this exact same process for plaintiffs
16 and I have his sworn testimony indicating that this
17 is exactly the value to use in a court of law when
18 compensation is to be determined.
19    Q.   Doctor Viscusi is also referred to in
20 your expert report, is he not?
21    A.   Some of his articles are, yes.
22    Q.   Your report, as opposed to your
23 appendix, refers to three authors, one of them is
24 Viscusi?

147

DEPOSITION OF STAN SMITH, Ph.D.

1     A.   The report includes the appendix.
2  There's no distinction.  The report consists of
3  several sections, including summary tables,
4  including detail tables, including appendix,
5  including first pages, summary pages.  The report is
6  the report.  You've marked it as an exhibit so you
7  should not try to say it's -- well, I'm just saying
8  it's incorrect to call parts of the report not the
9  report.
10    Q.   I didn't say that.  Your report refers
11 to Viscusi as someone you relied on, true?
12    A.   No.  I cite Viscusi as one of a number
13 of people who published in the peer-reviewed
14 literature on the value of a statistical life.
15           I further tell you, although I
16 didn't say it in the report, that Viscusi has
17 undertaken in sworn testimony to do virtually the
18 same exact thing I've done.  He said he's done it
19 for plaintiffs, he said he did it many times.
20    Q.   Are you aware of the -- any of the cases
21 that you're referring to in which he has given
22 testimony?
23    A.   I was the defense witness in the case in
24 which he testified for plaintiffs in one instance

148

DEPOSITION OF STAN SMITH, Ph.D.

1  and I have his testimony in that case, yes.
2     Q.   Would you provide that to us?
3     A.   Not unless --
4     MR. ALTMAN:  Plaintiffs will take it under
5  advisement after conferring with the witness whether
6  this testimony can be exposed.
7  BY MR. LILLIENSTEIN:
8     Q.   What's the name of that case?
9     A.   I recall the name of the plaintiff,
10 which was Hancofski.
11    Q.   Can you spell that for me?
12    A.   Not from memory, no.
13    Q.   Can you do it phonetically for me
14 though?
15    A.   I can just say it.  You can do it
16 phonetically.  But Hancofski.
17    Q.   And where was that case?
18    A.   Out West but I forget exactly where.
19 California perhaps.
20    Q.   And when did Dr. Viscusi give that
21 testimony?
22    A.   I can't recall exactly the timetable,
23 but I believe somewhere from the mid- nineties to
24 the early 2000, but I'm not exactly sure when in

149

DEPOSITION OF STAN SMITH, Ph.D.

1  that timetable.
2     Q.   So it wouldn't be a case listed in the
3  cases in which you've given testimony during the
4  last four years?
5     A.   I was a defense expert but I did not
6  testify, so it wouldn't be on my list ever.
7     Q.   But in other words, it didn't take place
8  within the last four years?
9     A.   Even if it had, it wouldn't be on my
10 list is my point.
11    Q.   My point is, not your point, it's what I
12 want to ask.
13    A.   It is not on the list and it was before
14 '05.  I believe it was somewhere in the '95 to '05
15 era.
16    Q.   You also refer to T.R. Miller and a
17 study by Thaylor and Rosen; is that true?
18    A.   Yes.
19    Q.   Do you believe that all of these
20 authors' works in the field were authoritative?
21    A.   You can't just say everything someone
22 has written is authoritative.  You really need to
23 take it article by article, because even the best of
24 authors may have written something that wasn't

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

150

DEPOSITION OF STAN SMITH, Ph.D.

1    particularly well regarded.
2        Q.    Are they generally accepted as experts
3    in the field of economics?
4        MR. ALTMAN: Objection.  Foundation.
5    BY THE WITNESS:
6        A.    I candidly doubt whether Sherwin Rosen,
7    who was chairman of the Department of Economics and
8    a member of my thesis committee, I candidly doubt if
9    he ever sought to qualify as an expert.  It's
10   usually the top economists in the country, and I
11   don't mean any disrespect to people who are experts,
12   but typically the very top economists in the
13   country, people like Gary Becker, who was a Nobel
14   prize winner on my committee, people like Sherwin
15   Rosen, who was chairman of the department who
16   produced all the past Nobel prize winners in the
17   world, are somewhat above the profession of being
18   seeking to be hired as experts in courts of law.
19   They typically would prefer to consult to presidents
20   of the United States and other places.
21   BY MR. LILLIENSTEIN:
22       Q.    Does the work by T.R. Miller, "The
23   plausible range for the value of life," which
24   appeared in the Journal of Forensic Economics in

151

DEPOSITION OF STAN SMITH, Ph.D.

1    fall of 1990, does that address the use of the value
2    of life methodology that you advocate in this case
3    to measure compensatory damages?
4        MR. ALTMAN: Objection.  Form.
5    BY THE WITNESS:
6        A.    First of all, it's not what I advocate.
7    What I simply did was take a value of statistical
8    life and apply it.  And Miller has testified that
9    that's a perfectly appropriate thing to do.  I
10   haven't memorized his 1990 article or the updated
11   which you provided, I believe, several years back.
12   I think I can tell you the date of that, if you give
13   me a moment.  In the year 2000.  But whether it's
14   explicit in the article or not, Miller has testified
15   that what I do is exactly the right thing to do in a
16   court of law.
17       MR. LILLIENSTEIN:  Move to strike as
18   nonresponsive.
19   BY MR. LILLIENSTEIN:
20       Q.    Does the article that I just referred to
21   address the use of your methodology as a means of
22   calculating compensatory damages in court?
23       MR. ALTMAN: Objection.  Form.
24
25

152

DEPOSITION OF STAN SMITH, Ph.D.

1    BY THE WITNESS:
2        A.    I know it was lengthy but could I have
3    my last answer read back because I believe I
4    answered the question, if not succinctly, yet did
5    answer it.
6            (Whereupon, the record was
7            read as requested.)
8    BY THE WITNESS:
9        A.    All right.  So just adding to that,
10   because I have not memorized it and I can't tell you
11   for certain, the answer is I don't know.  But it
12   certainly is something that he easily could have
13   written since he's testified exactly to that.
14   BY MR. LILLIENSTEIN:
15       Q.    Would you give the same answer with
16   respect to the Viscusi work that you refer to at
17   Page 5 of your report for Lim?
18       A.    Well, I'm not sure which article --
19       Q.    The article --
20       A.    That's okay.  Viscusi I don't think in
21   there has talked about application in litigation
22   where as Miller, I believe, would have.  So Miller
23   is much more likely to have discussed the litigation
24   application along the lines of what I do.  Viscusi I

153

DEPOSITION OF STAN SMITH, Ph.D.

1    don't believe did in that -- in the articles that I
2    cite.  They were more original research in the value
3    of life.
4        Q.    And did the Richard Thaylor and Sherwin
5    Rosen's work, "The Value of Statistical Life,"
6    address the use of this methodology in court?
7        A.    They didn't address the value of a
8    particular person, they published research on the
9    value of a statistical life, as do most authors.
10           Most authors don't address the
11   issue of what I'll call the engineering application,
12   just as -- Einstein wrote about relativity, but he
13   didn't engineer the atomic bomb, and I don't think
14   any of his articles for which he won the Nobel prize
15   published in the early 20th Century mentioned the
16   application of relativity and its engineering
17   applications to apply to the construction of an
18   atomic bomb for practical purposes.
19           Most original research doesn't
20   specifically address the various applications;
21   sometimes yes, but often not.
22       Q.    Other than the works that you authored
23   or co-authored, which are listed in your report or
24   your appendix, do any of the authorities listed in

39 (Pages 150 to 153)

154

DEPOSITION OF STAN SMITH, Ph.D.

1 the appendix provide support for the use of value of
2 life methodology to measure compensatory damages in
3 court?
4    A.   I would say probably all the articles
5 that are listed in the Journal of Forensic Economics
6 because that's a journal that's more concerned with
7 application as opposed to original research and
8 theory.
9    Q.   Can you take a look at your -- one of
10 your appendices and tell me which articles you're
11 referring to?
12    A.   Anything that would be published in the
13 Journal of Forensic Economics.  Also Miller's
14 Northwestern University law review article would
15 also give detail as to the application in court.
16    Q.   Are you familiar with the 2000 article
17 that is published by Viscusi in the Journal of
18 Forensic Economics entitled "Misuses and Proper Uses
19 of Hedonic Values of Life in Legal Contexts"?
20    A.   Yes.
21       MR. ALTMAN:  Objection.  Foundation.
22 BY THE WITNESS:
23    A.   Somewhat familiar.  It's been a while
24 since I've read it but generally familiar with it.

155

DEPOSITION OF STAN SMITH, Ph.D.

1 BY MR. LILLIENSTEIN:
2    Q.   Is it fair to say that Viscusi
3 criticized the methodology that you use in that
4 article?
5    A.   No.  Viscusi's principal -- Viscusi's
6 point is more political.  Viscusi does not believe
7 that juries should be awarding for loss of enjoyment
8 of life.  He comes to that position from a policy
9 point of view.
10       When asked in a public forum,
11 namely, the annual meeting of the American Economic
12 Association in I believe 1990, when asked in a
13 public forum that if he knew that
14 juries were to award for the loss of enjoyment of
15 life, despite the fact that he does not believe that
16 element should be available to claimants in courts
17 of law, that if juries were yet charged with
18 awarding for the loss of enjoyment of life, asked
19 how he would approach it he said in public forum --
20 which I have actually a signed statement by the then
21 president of the National Association of Forensic
22 Economics who was attending at that meeting --
23 Viscusi said, and I'm more or less quoting, "Well,
24 then, Stan, I would give the jury the numbers that

156

DEPOSITION OF STAN SMITH, Ph.D.

1 you use."
2       And he did actually in sworn
3 testimony, in cases where he was retained by
4 plaintiffs subsequent to that public statement at
5 the annual meeting of the American Economic
6 Association in 1990.  He did give the jury the
7 numbers I use.
8       Actually, he gave the jury higher
9 numbers than I use because Viscusi based his figures
10 on his research and I base my figures on a broad
11 range of research and then discount those averages
12 by 25 percent.  So my numbers are about -- Viscusi's
13 numbers that he testified to would be about 25
14 percent higher than the numbers I would use.
15    Q.   So your understanding of what Viscusi
16 said at this annual meeting of the American
17 Economics Association is based on what someone told
18 you he said?
19    A.   Well, also --
20       MR. ALTMAN:  Objection.  Misstates his
21 testimony.
22 BY THE WITNESS:
23    A.   Well, it's memorialized in writing by --

157

DEPOSITION OF STAN SMITH, Ph.D.

1 BY MR. LILLIENSTEIN:
2    Q.   Just answer my question.
3    A.   I will.
4       MR. ALTMAN:  Hold on.  Let him give you his
5 answer first and if you have an objection, you can
6 make it.
7 BY THE WITNESS:
8    A.   It is memorialized in writing by a
9 signed statement by the then president of the
10 National Association of Forensic Economics who was
11 at the meeting.  But my knowledge about it is
12 actually firsthand because I was at the podium with
13 Kip Viscusi and I'm the one who asked the question
14 and I'm the one that he directed the answer to.  So
15 my knowledge is both firsthand and corroborated by
16 the then president of the National Association of
17 Forensic Economics at that time.  And I doubt that
18 anybody would dispute this discussion of events and
19 Viscusi himself, I have no reason to believe, would
20 ever deny this.
21       He simply does not believe the
22 claimants should have the right to claim loss of
23 enjoyment of life as a compensatory loss in court
24 cases where they've sustained loss of enjoyment of

40 (Pages 154 to 157)

158

DEPOSITION OF STAN SMITH, Ph.D.

1   life.  And he arrives at that position from a policy
2   point of view.
3   BY MR. LILLIENSTEIN:
4        **Q.    You cited a 1990 article by Viscusi that**
5   **was published in the Journal of Forensic Economics.**
6   **Isn't it true in that article Viscusi wrote that "It**
7   **makes no more sense to utilize a uniform value of**
8   **life figure for all people than it does to assume**
9   **that economic damages are the same for every**
10  **wrongful death act"?**
11       A.    I agree with him.  I don't use a uniform
12  value of life for all people.  I don't know of
13  anybody who would disagree with that statement.
14       **Q.    Isn't it true that the United States**
15  **government has not advocated the use of value of**
16  **life concepts in connection with a measurement of**
17  **compensatory damages?**
18           MR. ALTMAN:  Objection.  Foundation.
19  BY THE WITNESS:
20       A.    Look, the United States government is
21  not a single voice.  The United States government
22  uses this methodology absolutely extensively and
23  exclusively for the purposes of -- in the executive
24  branch.  The office of management of the budget --

159

DEPOSITION OF STAN SMITH, Ph.D.

1   let me backtrack.
2           The -- every president since
3   President Carter, who was originally the first cost
4   benefit guy we had in the White House, has signed a
5   presidential executive order that requires that the
6   value of life be measured in all significant
7   legislation and regulation that is administered by
8   the executive branch.
9           So just imagine if you take the
10  combined administration of legislation and
11  regulation by, you know, the Federal Aviation
12  Association, the National Highway Safety
13  Transportation Agency, by Occupational Safety Health
14  Administration, by the Environmental Protection
15  Agency, agency after agency after agency, just
16  imagine the tens and tens and tens of billions and
17  billions of dollars that are expended to comply with
18  regulation, just imagine the vast, vast, vast
19  regulatory apparatus regarding the preservation of
20  health and safety in this country from baby cribs to
21  golf balls to golf clubs.  It's hard to imagine
22  anything that isn't impacted by some regulation that
23  has an impact for risk reduction and preservation of
24  health and safety.

160

DEPOSITION OF STAN SMITH, Ph.D.

1           And in those many, probably
2   hundreds of billions of dollars that have been
3   expended as a result of such regulations and
4   legislation over the course of years, not one
5   federal court has ever seen fit to overturn a
6   regulation or to stay a regulation imposed by an
7   agency based on this value of life literature.  Not
8   one single court has ever said this -- and all that
9   regulation is used, that's imposed, has to, by law,
10  by the presidential executive order, evaluate the
11  cost per life saved as a result of those
12  regulations.
13          That's a uniformly accepted
14  methodology throughout the entire executive branch
15  in the United States.  Not one federal court judge
16  ever has said about any regulation, which has been
17  the subject of litigation, that that regulation
18  should be overturned or not imposed as a result of
19  the deficiency or the inadequacy of the value of
20  life methodology that arrives at a cost per life
21  saved.  Never in the history of the United States
22  has that ever happened.
23          So I guess you could say the
24  government has spoken with a voice that says this

161

DEPOSITION OF STAN SMITH, Ph.D.

1   methodology is the value to be used when impacting
2   the life of every single American through the vast
3   regulatory body and apparatus of the United States.
4           Now, the federal government does
5   not advocate what should go into court any more than
6   it advocates what should go into a Chrysler car.
7   BY MR. LILLIENSTEIN:
8        **Q.    Are you done?**
9        A.    Yes.
10       **Q.    Okay.  It's very long and impressive**
11  **answer.  And of course I have no quarrel with**
12  **anything that you just said, but what you just said**
13  **has nothing to do with the question I asked, which**
14  **is whether or not the government advocates the use**
15  **of this methodology for the calculation of**
16  **compensatory damages in court.  All of what you just**
17  **said had to do with dealing with regulatory work;**
18  **isn't that true?**
19       A.    If I could have my -- my answer read,
20  just the last sentence of my answer read back just
21  to refresh my memory.
22           (Whereupon, the record was
23           read as requested.)
24  BY THE WITNESS:

41 (Pages 158 to 161)

162

DEPOSITION OF STAN SMITH, Ph.D.

1       A.   I might have put you to sleep before I
2   got to that sentence.
3   BY MR. LILLIENSTEIN:
4       Q.   You believe that that sentence answers
5   my question?
6       A.   I think so, yes.  What's missing?
7       Q.   So when Viscusi writes in his 2000
8   article in the Journal of Forensic Economics
9   addressing cases in which plaintiff sought to
10  introduce evidence of hedonic damages in wrongful
11  death cases against the government, he writes:  "In
12  some instances, plaintiff's expert attempted to
13  introduce the hedonic damages approach; however, in
14  every instance the government opposed this
15  methodology and instead chose to base damages on
16  conventional measures such as the present value of
17  lost earnings.  It is consequently incorrect to
18  state, as some hedonic damages have done, that the
19  adopting of hedonic damages values simply follows
20  government practice.  The government's use of these
21  values is quite specific and not for purposes of
22  setting compensation levels."
23           Do you disagree with that
24  statement?

163

DEPOSITION OF STAN SMITH, Ph.D.

1       A.   I need to see a case, but I will tell
2   you this:  He's not talking about the U.S.
3   government.  He's talking about the -- a defendant,
4   perhaps.  So when he says "the government," do you
5   know what defendant he's talking about?
6       Q.   Yes.  The federal government.
7       A.   No.  The federal government is never a
8   defendant.  There is an agency or branch of the
9   federal government who is a defendant, unless it's
10  in a -- somebody suing the United States of America,
11  which is rare event.
12           But I will tell you this:  When the
13  Senate authored and passed the Victim Compensation
14  Act or the Airline Stabilization Act after 911, the
15  word "hedonic damages," the term which I coined, was
16  specifically codified and written into the numerous
17  elements of damage that were allowed to be recovered
18  by plaintiffs seeking recovery from the 911 Victims
19  Compensation Fund.  So there you have the government
20  specifically advocating the recovery of damages for
21  victims of the 911 Terrorist Act.
22           As the Viscusi statement, it would
23  be -- since we know that Viscusi has sometimes said
24  one thing and sometimes said another thing,

164

DEPOSITION OF STAN SMITH, Ph.D.

1   sometimes said you shouldn't do this in a court of
2   law but then also testified in a court of law and
3   now writes that the government did X, Y and Z, it
4   might be best to actually read a specific case
5   rather than leap to the conclusion that Viscusi
6   accurately portrayed or characterized what happened
7   in a court of law.
8           We certainly know what happened
9   when the government said let's avoid lawsuits in the
10  victim compensation fund.  Let's allow all 3,800
11  plaintiffs come into the fund and claim hedonic
12  damages directly without the need to go to court.
13      Q.   With respect to your opinions on the
14  loss of credit expectancy for Long Lim, Gordon
15  Redner, Justin Russ and Melinda Serin, is it true
16  you've given an opinion as to that item of loss for
17  those four plaintiffs?
18      A.   Yes.
19      Q.   And for Thomas Smith you didn't render
20  an opinion regarding loss of credit expectancy.  In
21  that case you've given an opinion as to an element
22  of damage called additional cost of mortgage?
23      A.   Yes.
24      Q.   Is it fair to say in each case other

165

DEPOSITION OF STAN SMITH, Ph.D.

1   than Thomas Smith, your opinion as to the amount of
2   loss of credit expectancy is unrelated to the actual
3   loss in the form of additional interest paid as a
4   result of damage to credit?
5       MR. ALTMAN:  Objection.  Foundation.
6   BY THE WITNESS:
7       A.   I can't say that but it's in the form of
8   opportunity loss, which is a well understood loss in
9   the field of economics.
10  BY MR. LILLIENSTEIN:
11      Q.   Why can't you answer my question?
12      A.   Because there may be additional out
13  of -- there may be additional credit costs that I am
14  unaware of.  The --
15      Q.   I only asked you about what your opinion
16  says.  And the question is, is your opinion as to
17  the amount of loss of credit expectancy unrelated to
18  actual loss in the form of additional interest paid?
19      A.   It doesn't include actual loss, yes,
20  you're right, in the form of additional interest
21  paid.  There might be such additional loss but I
22  haven't calculated that.
23      Q.   Okay.  Your opinions and your report
24  referred to additional credit capacity, correct?

42 (Pages 162 to 165)

166

DEPOSITION OF STAN SMITH, Ph.D.

1
2      A.    Yes.
3      Q.    Is your opinion of the element of damage
4  called loss of credit expectancy based on analysis
5  of what each plaintiff would have incurred if each
6  of them attempted to borrow up to the limit of what
7  you characterized as their additional credit
8  capacity?
9      MR. ALTMAN: Objection. Form.
10 BY THE WITNESS:
11     A.    My loss is calculated on a method for
12 estimating the value of the option if they'd
13 exercised it to borrow up to that.  It's not all --
14 my analogy, it's -- imagine somebody who's given a
15 raffle ticket.  That raffle ticket can -- is
16 actually an opportunity to get something.  It's not
17 certain but there is some opportunity or say an
18 option where there's an opportunity to do something,
19 so it's putting a value on that option.
20         When a fellow was on the trapeze
21 doing a trapeze act on the high wire in the circus,
22 there's a net below him.  And a fellow might go his
23 entire career working at Cirque du Soleil or other
24 circuses and never actually fall or use that net.
25 But none of those people on the high wire would ever

167

DEPOSITION OF STAN SMITH, Ph.D.

1
2  tell you that they place no value on that net; in
3  fact, they place considerable value on the net and
4  they might not even engage in their career if there
5  were no net.
6         So credit expectancy is a valuable
7  opportunity and I have attempted to value that
8  opportunity in the methodology set forth in the
9  paper.
10 BY MR. LILLIENSTEIN:
11     Q.    And if the trapeze artist did that
12 performance and did not fall, did not need the net,
13 would that person be entitled to recover for the
14 loss of the safety net?
15     A.    No.  It's the other way around.  If the
16 guy didn't need the net, he couldn't take the net
17 back and tell the agency that supplied it to him or
18 rented it to him for that performance that he wants
19 his money back because he didn't use the net.  That
20 net had value.  And if he tried to claim that it had
21 no value, the agency that rented the net to the
22 Cirque du Soleil for that performance would tell him
23 to go jump in the lake; otherwise, why would he have
24 rented the net, even if he didn't fall.
25     Q.    And if the plaintiffs in this case

168

DEPOSITION OF STAN SMITH, Ph.D.

1
2  didn't use their credit availability, they still
3  suffer damages as far as you're concerned?
4      A.    If somebody takes the air bags out of
5  your car, the fact that you may drive for five years
6  with no accidents, would you claim that you've
7  suffered no damages even if all your air bags are
8  missing, some thief steals them?  You go to court
9  and say "No, let the guy go. I haven't had an
10 accident for five years.  That theft didn't affect
11 me at all.  I don't care dropping charges."  I doubt
12 you would do that.
13     Q.    Use your example.  What would be the
14 value of the loss in that case with the air bags?
15     A.    The value of the bags.  If someone took
16 your air bags away, aren't you entitled to new air
17 bags whether you would ever use them or not?  Don't
18 you depend on them in the eventuality?  Wouldn't you
19 like them to be there for your passengers, for your
20 children, for your friends, family, relatives,
21 colleagues?  God forbid you should ever drive a
22 federal judge around in your car, wouldn't that
23 federal judge want to know there's an air bag there?
24     Q.    And you're equating the cost of a
25 tangible thing to the value of an intangible thing

169

DEPOSITION OF STAN SMITH, Ph.D.

1
2  such as credit expectancy?
3      A.    No.  The value --
4      MR. ALTMAN: Objection.  Misstates his
5  testimony.
6  BY THE WITNESS:
7      A.    The value of the air bag is not that
8  it's tangible, the value of the air bag is that it
9  reduces your risk of death.
10 BY MR. LILLIENSTEIN:
11     Q.    You just said the value of the loss in
12 the example you gave would be the cost of the air
13 bag.
14     A.    That's right.  That's the cost of
15 reducing your risk of death.
16     Q.    Okay.  Now, each of your opinions
17 addresses the loss of the ability to borrow on
18 favorable terms whether or not the plaintiff
19 actually attempted to borrow on favorable terms and
20 was unable to do so, correct?
21     A.    We know it happened actually.  Certainly
22 in the instance where the check cashing -- where the
23 landlord of the locations of the check cashing
24 agency refused to extend the lease, which is a form
25 of borrowing.

43 (Pages 166 to 169)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

170

DEPOSITION OF STAN SMITH, Ph.D.

1    Q.   Is that the only case in which it
2 actually happened which you are aware of?
3        MR. ALTMAN:  Objection.  Form and
4 foundation.
5 BY THE WITNESS:
6    A.   I'm going to have to read through all of
7 the work notes because I haven't memorized all these
8 circumstances.
9 BY MR. LILLIENSTEIN:
10    Q.   I'll save you some time.  I think Thomas
11 Smith is the case where you actually gave an opinion
12 as to the element of additional cost of a mortgage.
13        Are there any others?
14    A.   Well, I appreciate you haven't memorized
15 my work notes any more than I have, but the answer
16 is yes.
17    Q.   What are they?
18    A.   In Mr. Lim's interview testimony, he
19 indicated that Mr. Lim attempted to refinance his
20 house but was turned down.
21        Do you realize the impact that your
22 clients have had on these claimants?  I don't
23 think -- you see this as a lawsuit but you don't
24 appreciate the extraordinary loss of enjoyment of

171

DEPOSITION OF STAN SMITH, Ph.D.

1 life, the emotional impact, the offers of extortion,
2 the fact that your clients offered to pollute the
3 entire financial system of this country by supplying
4 false information.  You have no idea what your
5 clients did.  I don't think you have any
6 appreciation for that whatsoever.  And the fact that
7 you -- even the fact --
8    Q.   Neither do you, Dr. Smith, do you?
9    A.   Yes, I do.  I do.  In fact if you read
10 my --
11        MR. ALTMAN:  Hold on.  Hold on.  Hold on.
12 BY MR. LILLIENSTEIN:
13    Q.   You accepted as true everything that the
14 plaintiffs have told you, haven't you, in making
15 this impassioned statement?  You don't know whether
16 that's true or not.
17    A.   Are you denying your clients offered to
18 pollute the credit system with false information by
19 extorting from these clients?
20    Q.   What knowledge do you have of that,
21 Dr. Smith, other than the telephone interview and
22 what the plaintiffs' attorney has told you?
23    A.   That knowledge.
24    Q.   That's it, right?  So your impassioned

172

DEPOSITION OF STAN SMITH, Ph.D.

1 statement just now is based on absolutely nothing.
2    A.   We'll see what the jury decides.
3        MR. ALTMAN:  Hold on.  Hold on.  Objection.
4 Misstates his testimony and foundation.
5 BY MR. LILLIENSTEIN:
6    Q.   My question before that elicited your
7 impassioned statement is whether your opinion as to
8 loss of credit expectancy had anything to do with
9 actual loss?
10    A.   And the answer I gave you was that
11 Mr. Lim testified specifically that he, in addition
12 to the instances that you itemize, also Mr. Lim was
13 turned down for credit attempting to refinance his
14 house.  He also -- I am not finished, sir.
15        He also applied for two credit
16 cards and was denied for both of them.  Mr. Lim
17 reported he never had any credit issues in the past.
18    Q.   And isn't it true that your opinion as
19 to his loss of credit expectancy has nothing
20 whatsoever to do with any of those facts?
21        MR. ALTMAN:  Objection.  Misstates his
22 testimony.
23 BY THE WITNESS:
24    A.   Those facts are in fact the basis for

173

DEPOSITION OF STAN SMITH, Ph.D.

1 which Mr. Lim is claiming loss of credit expectancy.
2 BY MR. LILLIENSTEIN:
3    Q.   Is that the basis on which you've given
4 an opinion as to his loss of credit expectancy?
5    A.   My measurement process, I also explained
6 to you, is in the report.  But Mr. Lim's statement,
7 those facts are the statement for Mr. Lim's claim
8 and his --
9    Q.   Your opinion is what I'm asking you
10 about.  And your opinion makes no effort to tie
11 those actual losses, those claimed actual losses to
12 his loss of credit expectancy, does it?
13    A.   On the contrary --
14        MR. ALTMAN:  Hold on.  Objection.  Form and
15 foundation.
16 BY THE WITNESS:
17    A.   On the contrary, my report contains --
18 my work notes contain those statements, my report
19 refers to the interview of Mr. Lim.  Those are
20 factual according to Mr. Lim.  That's part of the
21 factual basis that proves that he's had a loss of
22 credit expectancy and my report provides a dollar
23 value of that loss.

44 (Pages 170 to 173)

174

1        DEPOSITION OF STAN SMITH, Ph.D.
2    BY MR. LILLIENSTEIN:
3        Q.    The dollar value that you've given is
4    not tied at all to those actual losses that he
5    claims he sustained, isn't that fair to say?
6        A.    Those actual --
7        MR. ALTMAN: Objection. Asked and
8    answered. Hold on. Objection. Asked and answered
9    and misstates his testimony.
10   BY THE WITNESS:
11       A.    Those statements by Mr. Lim formed the
12   factual basis for which he believes he has loss of
13   credit expectancy, and my analysis puts a dollar
14   value on the loss of credit expectancy. It isn't
15   specifically related to each and every instance, but
16   it relates to all the loss of opportunity and
17   expectancy that includes those specific issues.
18   BY MR. LILLIENSTEIN:
19       Q.    What amount of your opinion as to
20   Mr. Lim's loss of credit expectancy is related to
21   his alleged attempt to refinance his mortgage in
22   2005?
23       A.    My opinion relates to all of his loss of
24   credit expectancy. It's not related to each
25   specific item but all his loss of credit expectancy.

175

1        DEPOSITION OF STAN SMITH, Ph.D.
2    It's a bit like saying, well, a 1999 Chevrolet cost
3    10,000. How much did the steering wheel cost? How
4    much did the radio cost? I don't break it down. I
5    can tell you the market value of the car. I don't
6    have a way of parsing out specifically the cost of
7    the steering wheel or the windshield or the
8    headlights.
9        MR. ALTMAN: I want to point out there's
10   about seven minutes left in the scheduled time for
11   the examination. I'm not saying you don't get
12   additional time. I know Dr. Smith has additional
13   commitments that he needs to meet.
14       THE WITNESS: How much time is left on the
15   tape?
16       THE VIDEOGRAPHER: 11 minutes.
17       THE WITNESS: We can go the 11 minutes on
18   the tape. We can finish up on the tape.
19            Is that okay with you, Keith?
20       MR. ALTMAN: I'm totally fine with it if
21   that's okay with you, Dr. Smith.
22       THE WITNESS: I think we'll finish up this
23   tape and you and Mr. Lillienstein can make whatever
24   arrangements are suitable for a continuation if
25   that's needed.

176

1        DEPOSITION OF STAN SMITH, Ph.D.
2    BY MR. LILLIENSTEIN:
3        Q.    Mr. Lim told your staff that he does not
4    recall how much he would have saved on his mortgage;
5    isn't that true?
6        MR. ALTMAN: Objection. Foundation.
7    BY THE WITNESS:
8        A.    I haven't estimated a loss of mortgage
9    for him.
10   BY MR. LILLIENSTEIN:
11       Q.    That's my point. You never saw any
12   mortgage documents or application that he claims
13   that he made?
14       A.    As I said earlier, we don't ask for
15   documentation. All I want to know is what he will
16   be testifying to in the court. The foundation is
17   something you could ask him for.
18       Q.    And you never saw any documents
19   indicating that his attempt to refinance was
20   rejected?
21       A.    Well, same answer.
22       Q.    In forming your opinion as to loss of
23   credit expectancy, would it have been helpful to
24   know how much Mr. Lim's credit score declined as a
25   result of anything that Northern Leasing did?

177

1        DEPOSITION OF STAN SMITH, Ph.D.
2        A.    I don't know that information. I don't
3    have that information.
4        Q.    Would it have been helpful?
5        A.    I can't say without knowing what it
6    would have said.
7        Q.    But you don't know how much it declined,
8    if at all, do you?
9        A.    Well, I can tell you --
10       MR. ALTMAN: Objection. Misstates his
11   testimony.
12   BY THE WITNESS:
13       A.    I can tell you that is based on my many
14   years of experience in analyzing credit damage and
15   routine credit reports, that when you have this type
16   of derogatory information --
17       THE VIDEOGRAPHER: I can't hear you at all.
18   Something you're doing with the wire there. Okay.
19   Can you repeat your answer.
20   BY THE WITNESS:
21       A.    I'll continue if I can. Can we have
22   the court reporter read the first part?
23            (Whereupon, the record was
24            read as requested.)
25

45 (Pages 174 to 177)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

178

DEPOSITION OF STAN SMITH, Ph.D.
1          DEPOSITION OF STAN SMITH, Ph.D.
2   BY THE WITNESS:
3       A.   -- and lawsuits against you pursuing
4   claims on your credit record.  It would be
5   unthinkable to believe it wouldn't have a
6   significant impact on your credit score.  I know of
7   no one in the credit analysis business who would
8   testify that the impact on the score would be
9   anywhere from zero to insignificant and nothing more
10  than that.
11  BY MR. LILLIENSTEIN:
12      **Q.   You are aware of no increased cost of**
13  **borrowing that Mr. Lim actually incurred as a result**
14  **of damage to his credit, correct?**
15      MR. ALTMAN:  Objection.  Foundation.
16  Misstates his testimony.
17  BY THE WITNESS:
18      A.   There often is no increased costs of
19  borrowing when someone has lost their credit
20  expectancy.  There is the loss of opportunity to
21  borrow.  I'm not specifically aware of any
22  incremental cost.
23              Here is the point.  If he had been
24  able -- if his credit score were not so drastically
25  impacted as to yet qualify him for a loan, it's

179

DEPOSITION OF STAN SMITH, Ph.D.
1          DEPOSITION OF STAN SMITH, Ph.D.
2   almost certain it would have been at a higher rate
3   than would have been otherwise.
4   BY MR. LILLIENSTEIN:
5       **Q.   Move to strike that as nonresponsive.**
6   **So you are aware of no actual**
7   **increased costs that he incurred?**
8       A.   Yes --
9       MR. ALTMAN:  Objection.  Misstates his
10  testimony.
11  BY THE WITNESS:
12      A.   The cost of borrowing for Mr. Lim went
13  to infinity.  They refused to provide credit.  That
14  means the effective rate was infinite.  It
15  skyrocketed to an undefined infinite number.
16  BY MR. LILLIENSTEIN:
17      **Q.   And you are assuming that because you're**
18  **accepting what he's told your staff?**
19      A.   That's the cost of credit when you're
20  denied credit, it's an infinite cost.
21      **Q.   Are you assuming that to be true?**
22      MR. ALTMAN:  Objection.  Foundation and
23  form.
24  BY THE WITNESS:
25      A.   About his credit denials?

180

DEPOSITION OF STAN SMITH, Ph.D.
1          DEPOSITION OF STAN SMITH, Ph.D.
2   BY MR. LILLIENSTEIN:
3       **Q.   Yes.**
4       A.   Long time ago in this deposition we
5   talked about what I accepted as true and what I
6   accepted as a statement that I portrayed, so I don't
7   know that we need to revisit that whole colloquy.
8       **Q.   Please do because I just asked you a**
9   **specific question.**
10      A.   Okay.  I said before that the statements
11  of the plaintiffs I've been asked -- that I inquired
12  about and obtained through the interviews that were
13  made at my direction, I've been asked to take the
14  understanding that these will be repeated as sworn
15  testimony at trial and to put a dollar figure,
16  estimate of losses based on the fact testimony of
17  the plaintiffs.  So I've assumed that -- I've
18  accepted these as what will be restated at trial.
19      **Q.   So when you just stated that Mr. Lim's**
20  **credit expectancy went down to zero as a result of**
21  **what took place, you are accepting the truth of what**
22  **Mr. Lim told your staff?**
23      A.   I didn't say his credit expectancy went
24  down to zero.  I said it was reduced as a result of
25  these highly negative circumstances that appeared in

181

DEPOSITION OF STAN SMITH, Ph.D.
1          DEPOSITION OF STAN SMITH, Ph.D.
2   his credit report.
3       THE VIDEOGRAPHER:  Counsel, we have about
4   four minutes left on the tape.
5   BY MR. LILLIENSTEIN:
6       **Q.   How did you determine each plaintiff's**
7   **ability to borrow?**
8       A.   Ability to borrow is generally related
9   to income.  And that's been my experience and the
10  experience of other credit analysts with whom we
11  have had meetings and conferences over the years.  A
12  conservative estimate is the capacity that I use.
13  For example, for Mr. Lim is based on his prior
14  capacity to get a mortgage of $165,000 and his
15  income of $55,000 per year, I estimate that
16  additional credit capacity to be approximately
17  $200,000.
18      **Q.   And in the case of Ms. Serin, your**
19  **report says that you estimated her additional credit**
20  **capacity based on her approximate income of $45,000**
21  **and attempts to purchase a condo and obtain credit**
22  **cards; is that true?**
23      A.   Yes.
24      **Q.   So because she wanted to borrow money,**
25  **that she had the ability to borrow money is your**

46 (Pages 178 to 181)

182

DEPOSITION OF STAN SMITH, Ph.D.

1    testimony?
2        A.    That she --
3        MR. ALTMAN:  Objection.  Misstates his
4    testimony.  Foundation.
5    BY THE WITNESS:
6        A.    Also prior to this incident, she
7    indicated that she had good credit.
8            Look, all of these folks had to
9    have good credit in order for your client to engage
10   in the RICO type practices that they engaged in.
11   Your client wouldn't have lent these people money if
12   they didn't have good credit, isn't that true?
13   BY MR. LILLIENSTEIN:
14       Q.    That's actually false, Dr. Smith.  And
15   what are you basing your statement off of?
16       A.    That's my understanding.  Why would
17   your --
18       THE VIDEOGRAPHER:  Two minutes, counsel.
19   BY THE WITNESS:
20       A.    I thought there was some testimony to
21   that effect in some deposition somewhere but I'm not
22   going to represent that's an opinion of mine.
23   BY MR. LILLIENSTEIN:
24       Q.    And you've never seen any deposition
25

183

DEPOSITION OF STAN SMITH, Ph.D.

1    testimony, you've already said; isn't that correct?
2        A.    I've had it related to me but I'm not
3    going to opine about it.
4        Q.    Your report on Mr. Redner says that
5    Mr. Redner had the ability to borrow considerable
6    sums beyond his current lines of credit; is that
7    true?
8        A.    I'm just reviewing the notes here.
9        Q.    I'm looking at Page 3 of your report of
10   Mr. Redner.  It says "Mr. Redner had the ability to
11   borrow considerable sums beyond his current lines of
12   credit."
13           Am I not reading that accurately?
14       A.    It's not an opinion.  It's his
15   statement.  But basically, without knowing exactly
16   what his capacity was, I illustrated at a benchmark
17   of $10,000 and leave it to the trier of fact to
18   determine how many of those $10,000 units may have
19   applied.  I don't actually give a particular credit
20   capacity for Mr. Redner.
21       THE VIDEOGRAPHER:  Counsel, we need to
22   change the tape or finish up the deposition.  I have
23   20 seconds left.
24
25

184

DEPOSITION OF STAN SMITH, Ph.D.

1    BY MR. LILLIENSTEIN:
2        Q.    Do you have to leave, Dr. Smith?
3        A.    I had planned that 1:30 would be the
4    end.
5        THE VIDEOGRAPHER:  I have to change the
6    tape now.  We're going off the record.  The time is
7    1:34 p.m.
8            (Whereupon, there was an
9            intermission.)
10       THE VIDEOGRAPHER:  We're back on the
11   record.  At the beginning of Tape No. 5.  The time
12   is 1:39 p.m.
13       THE WITNESS:  And I am just packing up,
14   which both of the attorneys for plaintiffs and
15   defendants agree.
16           (Whereupon, there was a
17           discussion off the record.)
18           (The witness leaves.)
19       THE VIDEOGRAPHER:  We're back on the
20   record.  The time is 1:41 p.m.
21       MR. ALTMAN:  This deposition was scheduled
22   with Dr. Smith to end at 1:30 Central, 2:30 Eastern
23   for his scheduling purposes.  That time has elapsed.
24   Plaintiffs don't have any opposition to defendants
25

185

DEPOSITION OF STAN SMITH, Ph.D.

1    taking more time subject to scheduling of Dr. Smith.
2            And the only other issue is that
3    the parties will work out how much time is remaining
4    and then just that defendant needs to provide
5    plaintiffs with a check for Dr. Smith for his time
6    pursuant to the federal rules.
7        MR. LILLIENSTEIN:  And I would just add
8    that the scheduling of this to end at 1:30 Chicago
9    time was not our -- not the defendant's choice.
10   That was something imposed upon us by plaintiffs and
11   Dr. Smith, and so the fact that we are stopping now
12   should not be construed in any way as something that
13   the defendants consented to.
14       THE VIDEOGRAPHER:  Anything further?
15       MR. LILLIENSTEIN:  No.  That's it.
16       THE VIDEOGRAPHER:  This concludes today's
17   deposition of Dr. Stan Smith.  We're of on the
18   record.  The time is 1:42 p.m.
19           (Whereupon, the proceedings
20           were adjourned sine die.)
21
22
23
24
25

47 (Pages 182 to 185)

186

1
2      STATE OF _____ )
3                               ) :ss
4      COUNTY OF _____)
5
6
7          I, Stan Smith, Ph.D., the witness
8      herein, having read the foregoing
9      testimony of the pages of this deposition,
10     do hereby certify it to be a true and
11     correct transcript, subject to the
12     corrections, if any, shown on the attached
13     page.
14
15             _____
16             Stan Smith, Ph.D.
17
18
19
20     Sworn and subscribed to before
21     me, this        day of
22              , 2010.
23
24     _____
25        Notary Public

---

187

1              DEPOSITION OF STAN SMITH, Ph.D.
2      STATE OF ILLINOIS  )
3                        ) SS:
4      COUNTY OF C O O K  )
5          I, SHERI E. LISS, CSR NO. 084-002600, a
6      Certified Shorthand Reporter within and for the
7      State of Illinois, Registered Professional Reporter,
8      Certified Realtime Reporter, do hereby certify that
9      previous to the commencement of the examination,
10     said witness was duly sworn by me to testify; that
11     the said deposition was taken at the time and place
12     aforesaid; that the testimony given by said witness
13     was reduced to writing by means of shorthand and
14     thereafter transcribed into typewritten form; and
15     that the foregoing is a true, correct and complete
16     transcript of my shorthand notes so taken as
17     aforesaid.
18         I further certify that there were present
19     at the taking of the said deposition the persons and
20     parties as indicated on the appearance page made a
21     part of this deposition.
22
23
24
25

---

188

1              DEPOSITION OF STAN SMITH, Ph.D.
2
3          I further certify that I am not counsel
4      for nor in any way related to any of the parties to
5      this suit, nor am I in any way interested in the
6      outcome thereof.
7          I further certify that this certificate
8      applies to the original signed IN BLUE and certified
9      transcripts only.  I assume no responsibility for
10     the accuracy of any reproduced copies not made under
11     my control or direction.
12         IN TESTIMONY WHEREOF I have hereunto set
13     my hand this 1st day of November, A.D., 2010.
14
15
16
17             Sheri E. Liss, CSR, RPR, CRR, CLR
18
19
20
21
22
23
24
25

---

189

1              INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over carefully
4      and make any necessary corrections. You should state
5      the reason in the appropriate space on the errata
6      sheet for any corrections that are made.
7          After doing so, please sign the errata sheet
8      and date it.
9          You are signing same subject to the changes
10     you have noted on the errata sheet, which will be
11     attached to your deposition.
12         It is imperative that you return the original
13     errata sheet to the deposing attorney within thirty
14     (30) days of receipt of the deposition transcript by
15     you. In you fail to do so, the deposition transcript
16     may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

48 (Pages 186 to 189)

190

```
1              E R R A T A
2
3
4
5      I wish to make the following changes,
6   for the following reasons:
7
8   PAGE LINE
9   ___ ___ CHANGE:_____
10  REASON:_____
11  ___ ___ CHANGE:_____
12  REASON:_____
13  ___ ___ CHANGE:_____
14  REASON:_____
15  ___ ___ CHANGE: _____
16  REASON:_____
17  ___ ___ CHANGE: _____
18  REASON:_____
19  ___ ___ CHANGE: _____
20  REASON:_____
21
22  _____   _____
23    WITNESS' SIGNATURE      DATE
24
25
```

49 (Page 190)

**A**

**AA** 3:13 55:12 94:20
**AAA** 3:17 142:2 142:5
**ability** 52:4,10 101:6 124:23 135:21,25 136:3,6 169:17 181:7,8,25 183:6,11
**absent** 82:25
**able** 72:25 95:2 95:16,24 97:12 99:5 100:5,9 136:9 178:24
**absolute** 100:11
**absolutely** 69:19 69:24 70:2 77:17 79:7 158:23 172:2
**absurd** 63:21
**abuse** 128:23
**academic** 72:24
**accept** 58:15,24 110:19 122:21 128:11 140:5
**accepted** 78:7 145:2,15 146:10 150:3 160:14 171:14 180:5,6,18
**accepting** 179:18 180:21
**accident** 168:10
**accidents** 168:6
**accommodate** 111:6
**accompanied** 21:9
**accomplish** 126:17
**accord** 77:17
**account** 136:21
**accounting** 83:9
**accuracy** 54:6 75:20 188:10
**accurate** 21:3

61:11 75:16 77:22 109:11 137:21 189:16
**accurately** 164:7 183:14
**achieve** 96:24
**acquire** 98:10 100:9 103:16 106:21 107:16 109:8,8 113:2 113:6 114:11
**acquired** 103:21
**acquiring** 107:16
**acquisition** 114:8
**act** 24:25 36:20 58:14 107:4 158:11 163:15 163:15,22 166:21
**action** 15:24
**actions** 36:21
**activities** 78:24 78:25 82:4 86:15,18 136:4 136:7,17,19
**activity** 74:21 84:4 85:8,24 86:5
**actual** 34:11 79:9 121:5 134:14 135:5,6 165:3,19,20 172:10 173:12 173:12 174:4,6 179:6
**ad** 11:2
**add** 32:13 62:17 62:21 64:16,19 64:21 67:15 68:19 86:14 185:8
**added** 62:7 63:3 63:15 64:4 88:25 89:2
**adding** 139:18 152:10

**addition** 14:22 47:11 102:13 102:16 172:12
**additional** 45:15 93:18 98:5 103:18 164:23 165:4,13,14,19 165:21,22,25 166:7 170:13 175:12,12 181:16,19
**address** 61:17 65:23 140:10 151:2,22 153:7 153:8,11,21
**addresses** 112:4 140:24 142:24 143:10,23 144:11 169:17
**addressing** 18:14 74:11 162:10
**adjourned** 185:21
**adjusted** 124:7,8
**adjustment** 69:4
**administered** 159:8
**administration** 44:12,14 83:9 83:13 159:11 159:15
**administrative** 14:14 43:25,25 44:4,7,11,18 45:5,9 46:24 47:6 85:19
**adopt** 129:17,21
**adopted** 79:5,6
**adopting** 162:20
**advance** 119:4,4
**advanced** 73:7 146:4
**advances** 116:17 116:17 118:16
**advice** 69:15 127:2
**advisement**

13:19 148:6
**advising** 111:6
**advocate** 151:3,7 161:6
**advocated** 158:16
**advocates** 161:7 161:15
**advocating** 163:21
**affect** 79:23 90:21 104:5 168:10
**affirmation** 59:19
**aforesaid** 187:12 187:17
**age** 94:9,17
**agency** 159:14 159:16,16,16 159:16 160:8 163:9 167:17 167:21 169:24
**ago** 32:18 33:18 144:20 180:4
**agree** 40:12 83:11 94:23 97:11 158:12 184:16
**agreement** 15:13 80:19,23 81:3
**ahead** 30:10 51:20 95:11 134:4
**air** 168:4,7,14,16 168:16,23 169:7,8,12
**Airline** 163:15
**akin** 39:8
**al** 6:4,5
**allegations** 87:16 90:4
**alleged** 174:21
**allegedly** 92:9,15
**allow** 93:16 97:14 164:11
**allowed** 126:3 163:18

**alternative** 88:8
**Altman** 4:12 80:14,16,16,17 80:19,24 81:2 81:14 83:20 88:17 89:21 98:19 99:7,18 100:3 102:8 104:12 106:5 106:16,22 107:22 108:5 108:13,20,23 109:4 111:2 112:9 114:22 115:15 116:25 117:11 118:7 120:4 129:8,19 134:18 137:22 141:4 142:3 143:3,14,25 144:14 145:10 148:5 150:5 151:5,24 154:22 156:21 157:5 158:19 165:6 166:9 169:4 170:4 171:12 172:4 172:22 173:15 174:7 175:9,20 176:6 177:10 178:15 179:9 179:22 182:4 184:22
**amended** 50:22
**America** 163:11
**American** 155:12 156:6 156:17 161:3
**amount** 8:10 9:24 30:3 45:16 61:9 62:13 64:23 65:7,18 70:5 72:11 73:21 78:10,15,20 99:11 113:18 119:16 123:7

125:19 139:22
165:2,18
174:19
**amounts** 59:3
61:25
**analogy** 166:14
**analysis** 51:15
51:18 62:21
125:12 166:4
174:13 178:7
**analyst** 42:5
**analysts** 181:10
**analyze** 16:25
24:21 27:4
34:15 63:2
110:10
**analyzed** 24:23
27:2 38:17
**analyzing**
177:14
**Andrey** 4:4 6:19
9:4 77:10
**anguish** 39:18
39:23
**annual** 67:14
70:23 88:23
155:12 156:6
156:17
**anonymous**
123:23
**answer** 7:18
10:12,22 16:2
24:16,25 25:3
28:20 30:9
44:22 45:19,25
46:7,12,19,20
46:22 48:17
52:9,10 58:18
60:18 61:17
62:24 65:21
67:2 68:10
71:6,8,14
72:25 74:7,22
74:23 77:4
79:2 82:19
84:6 86:7,9
87:3 88:19
92:17 96:5,17

96:23 99:19
101:3 105:4,5
105:7,14
107:24 108:6
108:11,14,15
108:18 109:16
109:20,21,23
110:17,20,22
110:24 111:2
111:12,13,16
111:21 113:25
114:5 119:18
122:2,6,7,10
126:24 127:24
128:2 138:3
144:8,9 145:8
146:8 152:4,6
152:12,16
157:3,6,15
161:12,20,21
165:12 170:16
172:11 176:21
177:19
**answered** 22:5
24:14 25:13
28:25 42:23
46:9,13 52:3
61:14,21 71:3
71:12 127:23
152:5 174:8,8
**answering** 10:6
45:21 107:23
108:21 111:7
**answers** 7:16,17
10:8 26:11
31:19,20 60:18
105:16 112:16
162:5
**antecedent**
79:25
**anybody** 41:12
75:14 83:12
157:19 158:14
**anyway** 123:3
**apologies** 49:24
**apologize** 85:6
92:23
**apparatus**

159:20 161:4
**appear** 57:6
112:14 128:24
**appearance**
187:20
**APPEARANC...**
4:2 5:2
**appeared** 4:18
5:19 63:6,17
150:25 180:25
**appears** 63:11
84:12
**appendices**
154:11
**appendix** 49:2
142:22 146:24
147:2,5 153:25
154:2
**apples** 139:11
**applicable** 83:17
**application** 69:3
139:17 140:7
140:18 141:19
142:14,15,25
143:6 152:22
152:25 153:12
153:17 154:8
154:16 176:12
**applications**
153:18,21
**applied** 40:13,16
139:2 141:23
172:16 183:20
**applies** 124:11
188:8
**apply** 36:4 129:6
138:22 139:16
140:16,21,22
151:9 153:18
**applying** 124:13
140:13
**appreciate** 10:15
45:18 69:12,15
77:2,5 112:19
112:24 170:15
170:25
**appreciation**
171:7

**approach** 84:5
142:11 155:20
162:14
**appropriate**
76:21 78:8
84:3 85:8,23
88:24 93:15
151:10 189:5
**approve** 89:19
**approved** 79:8
**approximate**
181:20
**approximately**
6:10 74:9
91:19,23,24
92:10,11 94:17
94:18 98:18,22
120:22 130:18
130:18 131:9,9
181:16
**April** 19:23
**arbitrary** 69:17
**area** 112:3
136:14
**areas** 135:19
136:21
**argued** 28:11
**arranged** 21:6
**arrangements**
175:24
**arrive** 62:19
88:14 97:16
101:3 113:16
**arrived** 88:6
140:15
**arrives** 44:20
158:2 160:21
**article** 74:18,19
88:10 141:8,18
142:9 149:24
149:24 151:11
151:15,21
152:19,20
154:15,17
155:5 158:5,7
162:9
**articles** 139:24
141:14 142:13

142:22 146:2
146:22 153:2
153:15 154:5
154:11
**artist** 167:11
**arts** 42:17
**Asian** 19:22
**aside** 24:8
136:16,17,18
**asked** 10:13
16:21,22,25
19:13 24:13
25:12 26:15
27:4,10,24
28:24 31:3,11
32:16 42:22,24
46:18 51:8
61:12,16,22
63:6,12 65:14
65:15,15,22
66:2 71:11,22
71:23 91:6,11
97:16,22,25
104:2 107:22
108:22 111:20
114:9 121:7,17
126:7,8 127:9
127:23 144:6
145:8 155:11
155:13,19
157:14 161:14
165:16 174:7,8
180:8,11,13
**asking** 26:8
31:18 36:13,14
65:17,20 72:12
73:23 74:6
77:21 107:20
107:21 108:8
108:16 112:11
114:4 117:19
121:5 122:16
140:11 173:10
**aspirin** 72:18
**assert** 118:9
**asserting** 59:21
**assess** 110:7
114:9

**assessed** 100:6
138:6
**assessment** 40:5
91:13 126:9
136:22
**assets** 118:20
**assignment**
34:14 37:18
64:14 73:10
75:19 91:12
106:25 107:12
109:14,16
110:6 112:17
112:20,25
122:20,21
129:6 138:13
138:22
**assist** 52:19,23
**assistance**
126:17
**assistant** 7:2
**assistants** 71:16
**assisted** 35:20
**assists** 43:16,18
**associated** 55:25
56:9,23 83:2
89:9
**Associates** 4:3
6:20
**association** 6:14
74:15 155:13
155:22 156:7
156:18 157:11
157:17 159:13
**assume** 7:18
20:7 23:12,15
24:9 25:9,15
26:6 41:7 52:9
71:25 76:13
89:15 91:7,18
91:22 92:3
99:4,6,17,22
102:13 117:17
126:2 132:13
158:9 188:9
**assumed** 23:12
25:19 68:8
91:3,8 94:13

180:17
**assumes** 94:9
128:13
**assuming** 25:6
31:19 46:19
68:3 97:20,22
124:21 179:17
179:21
**assumption**
23:17 24:18
26:13 93:2
**assumptions**
92:7,20
**astonished** 45:16
**astrutinskiy@...**
4:9
**atomic** 153:14
153:19
**attached** 120:20
186:12 189:11
**attempt** 24:20
74:18 83:4
109:12,18,24
110:3 174:21
176:19
**attempted** 53:21
89:25 162:13
166:6 167:7
169:19 170:20
**attempting**
172:14
**attempts** 86:23
181:21
**attending**
155:23
**attention** 45:16
**attorney** 25:2
26:19 34:18
59:19 141:12
141:12,14
171:23 189:13
**attorneys** 85:17
184:15
**attribute** 86:24
124:2 125:6
**attributing**
24:24 25:5
**August** 19:6

**authored** 153:23
163:14
**authoritative**
144:21,24
145:3 146:10
149:21,23
**authorities**
153:25
**authors** 146:24
149:21,25
153:10,11
**availability**
168:2
**available** 71:24
71:25 88:7
97:18 155:17
**Avenue** 4:6 5:7
**average** 70:17
124:11,16,20
124:22
**averaged** 124:15
**averages** 156:12
**Aviation** 159:12
**avoid** 164:10
**award** 155:15
**awarded** 33:14
**awarding** 155:8
155:19
**aware** 22:13
37:6 72:10
73:19 140:24
143:9,22 144:4
147:21 170:3
178:12,21
179:6
**A.D** 188:13
**a.m** 2:13 6:10
53:9,14 96:8

_____
**B**
_____

**B** 3:7,11 40:21
**baby** 159:21
**bachelor's** 42:16
**back** 14:16 29:6
37:20 48:8
53:12 55:9
83:22 86:9
96:13,19

108:24 118:20
132:18 133:11
137:7,24
151:12 152:4
161:21 167:17
167:19 184:11
184:20
**background**
42:9 47:9
**backtrack** 159:2
**backwards** 89:4
**bad** 123:18
**baffles** 45:23
**bag** 168:23
169:7,8,13
**bags** 168:4,7,14
168:15,16,17
**balls** 159:22
**bank** 60:8,22
**banking** 32:25
**bars** 84:12
**base** 58:17 59:3
75:19 92:4,8
104:9,18,19,24
156:11 162:16
**based** 10:22
68:12 73:14
78:6 84:21
85:6 89:23
90:22,23 91:2
91:20 92:21
93:4 98:8
103:13 104:15
104:23 105:25
106:13 122:23
135:7 156:10
156:18 160:8
166:4 172:2
177:13 180:16
181:13,20
**basic** 34:23 35:5
**basically** 17:15
37:21 75:10
183:16
**basing** 182:16
**basis** 66:22
70:23 83:14
172:25 173:4

173:22 174:12
**Bates** 59:23
116:19
**Becker** 139:25
150:14
**beginning** 20:24
44:11 53:13
96:14 98:18
137:8 184:12
**behalf** 4:18 5:19
8:8 19:7 27:23
28:12 82:4,24
86:17
**belief** 77:12
**believe** 8:9,23
21:19 32:19
39:19,20 41:16
42:21 46:22
48:12 49:4
51:2 52:18
55:8,11 57:3
62:5,13,16
75:23 76:2,4
77:15 78:10,16
78:22 80:14
82:5 84:4,18
84:25 85:8
86:15 92:16
93:14 94:23
97:5 109:10,11
115:18 118:11
121:8 138:5,9
138:18 148:24
149:15,20
151:12 152:4
152:23 153:2
155:7,13,16
157:20,22
162:5 178:5
**believed** 42:25
85:23 98:21
126:4 130:8
**believes** 117:13
132:17 174:12
**belligerent**
46:15
**benchmark**
183:17

**benefit** 159:5
**benefited** 112:17
**best** 27:3 45:2
  46:10 52:3,10
  61:14 69:13
  74:22 88:7
  110:23 138:8
  149:24 164:5
**better** 109:22
**beyond** 110:8
  145:15 183:7
  183:12
**bill** 8:20 64:20
**billing** 16:4
  44:15
**billings** 15:20
  16:13
**billion** 26:10
  69:11 84:22,23
  113:24,25
  122:11
**billions** 121:25
  159:17,18
  160:3
**birth** 35:23
  73:25
**bit** 175:2
**BLUE** 188:8
**body** 161:4
**bomb** 153:14,19
**bookkeeping**
  44:14
**born** 19:22
**borrow** 166:6,13
  169:17,19
  178:21 181:7,8
  181:24,25
  183:6,12
**borrowing**
  169:25 178:13
  178:19 179:12
**Boston** 32:19
  33:20
**bottle** 12:11
**bottom** 67:10
  94:3,7,13
  134:6
**bought** 115:5

**bound** 10:16
**box** 38:5 40:9
**bracketing**
  134:11
**brackets** 133:25
**brain** 72:21
**branch** 158:25
  159:9 160:15
  163:9
**break** 45:14 46:3
  80:25 117:17
  136:25 175:4
**breaking** 81:4
**Brian** 21:16
  41:16 42:8
  45:14,21 50:16
  54:14 90:11
**Brian's** 35:19
  45:11
**brief** 45:14
**briefly** 60:13,14
  60:17
**brilliant** 113:2
**Brilliantly** 43:24
**bring** 8:21 14:9
  125:12
**brings** 133:16,17
**broad** 39:25
  124:22 156:11
**broader** 39:17
**broke** 96:16
**broker** 32:24
  107:4
**brought** 17:25
  18:4
**budget** 158:25
**Building** 5:6
**Bureau** 45:22
  76:19,20
**business** 17:4
  32:25 47:17
  89:12,18 93:16
  93:22 97:3,17
  97:21 98:3,10
  99:11,15,25
  103:15,19,22
  107:4,8 111:10
  111:11,14,19

111:25 113:9
113:10,12,19
114:6,11,15
115:24 118:25
121:15,19
135:24 137:13
146:3 178:7
**businesses** 98:5
  107:6 112:7,12
  112:18 113:3,6
  115:5,13,22
**buttoning**
  136:10,12
**buy** 98:5

### C

**C** 5:13 187:4
**cab** 63:23 79:14
**calculate** 19:13
  22:10 37:14
  81:19 93:15,23
  135:2
**calculated** 22:10
  28:6 39:21,23
  62:4 64:24
  98:8 165:23
  166:11
**calculating**
  21:25 22:25
  93:21 125:4
  151:23
**calculation**
  28:12,22 30:13
  101:7 123:4
  161:16
**calculations**
  20:7 27:25
  101:6 104:6
**California**
  148:20
**call** 7:5 13:14
  14:19 34:11,13
  45:14 48:8
  50:19 67:13
  77:10 147:9
  153:12
**called** 2:3 65:3
  116:3,13,16

118:16,17
120:25 164:23
166:4
**calling** 9:15
**calls** 41:15 85:18
**camera** 55:15
**candidly** 150:7,9
**capacity** 165:25
  166:8 181:12
  181:14,16,20
  183:17,21
**capital** 44:25
**car** 39:5 161:7
  168:5,22 175:5
**cards** 172:17
  181:22
**care** 9:21 99:16
  129:3 168:11
**career** 135:22
  166:23 167:4
**carefully** 189:3
**Carter** 159:4
**case** 1:8 6:7 7:12
  8:8,19 10:17
  12:5,18 13:22
  14:8,11,12
  15:20,22 16:4
  16:6,7,13,21
  17:15 19:9
  22:4,7 23:11
  24:4,4,4,8,22
  28:9 32:21
  33:3,6,9 34:19
  34:23 35:3,17
  35:18 36:18
  37:20,22 41:13
  43:17 44:16
  51:13 52:20
  53:20 55:8
  56:25 57:11
  61:20 66:14
  67:5,6 70:22
  71:22 79:19,21
  79:22 90:4,10
  90:19 95:16,22
  99:12 107:21
  111:19 129:15
  129:15 133:11

141:21,22
147:24 148:2,9
148:18 149:3
151:3 163:2
164:5,22,25
167:25 168:14
170:2,12
181:18
**cases** 15:15,24
  16:10,15,17
  23:7 27:19,22
  27:24 28:4
  31:2,11 32:15
  32:23 33:6
  36:3 38:17,20
  40:14 57:3
  60:25 64:24
  65:4 79:18
  87:9 147:21
  149:4 156:4
  157:25 162:10
  162:12
**cash** 113:11,13
  113:15 114:10
  114:17,20,24
  115:4,6,6
  116:4,13,15,17
  118:16,17,24
  119:3
**cashing** 89:17
  90:2,24 102:6
  103:20 107:8
  115:13 169:22
  169:23
**cast** 77:11
**catastrophic**
  128:21
**categorize** 15:22
**category** 39:25
  120:25
**causality** 26:13
**cause** 25:10
  63:24
**caused** 24:10
  25:23 26:7,14
  98:11
**causes** 24:21
  67:20

**caution** 91:5
121:12
**CC** 3:14 55:12
**cease** 77:7 95:4
123:14
**Central** 184:23
**cents** 139:12
**Century** 153:16
**certain** 19:14
35:2,5 36:17
36:20,21 59:12
59:21 65:4
105:2 122:22
123:2 152:12
166:17 179:2
**certainly** 11:6
14:23 18:22
30:24 35:9
38:2 39:4
40:22 43:21
63:24 70:22
111:6 117:2,8
117:13,15
152:13 164:9
169:21
**certainty** 100:13
**certificate** 188:7
**certified** 2:8,10
6:12 187:6,8
188:8
**certify** 186:10
187:8,18 188:3
188:7
**cessation** 94:14
97:24 100:23
101:8
**chairman** 150:8
150:16
**change** 53:7
183:23 184:6
190:9,11,13,15
190:17,19
**changed** 8:14
**changes** 189:9
190:5
**characterized**
103:20 164:7
166:7

**characterizing**
94:24
**charge** 8:9,16
9:24 15:2,5,8
42:5,6
**charged** 8:7,19
155:18
**charges** 168:11
**charity** 86:3
**cheated** 138:17
**check** 8:22 9:6
9:13 13:7 14:4
22:18 23:5
37:13 48:7,10
89:17,25 90:24
102:6 103:20
107:7 115:13
169:22,23
185:6
**checked** 38:10
38:14,18
**Chevrolet**
100:15,17
175:2
**Chicago** 1:18
2:12 5:16 6:9
42:11,14 47:11
47:12,16 185:9
**chief** 12:11
**child** 128:23
**children** 168:20
**Chittur** 4:3 6:20
8:25 9:10,15
9:16 12:3,18
12:20 13:15
14:23 19:13
47:23,23 50:24
51:8 58:10
60:7 64:11
73:11 91:12
105:5 140:15
**Chittur's** 13:12
14:21
**choice** 185:10
**choose** 45:10
67:4 68:15
**chooses** 140:15
**chose** 67:9,13

83:16 162:16
**Christopher**
5:22 7:5
**Chrysler** 5:6
161:7
**circuit** 36:18,20
**circuits** 39:13
**circumstance**
128:25
**circumstances**
51:16 87:20,20
87:21 101:5
170:9 180:25
**circus** 166:21
**circuses** 166:24
**Cirque** 166:23
167:22
**citations** 48:3
**cite** 142:21 145:4
147:13 153:3
**cited** 158:5
**civil** 2:4 40:14
141:22
**claim** 20:13
31:13 32:17
36:8,10,13,14
40:18 64:20
79:21 115:12
138:10 157:23
164:12 167:20
168:6 173:8
**claimants** 25:8
66:25 69:20
155:17 157:23
170:23
**claimed** 69:20
173:12
**claiming** 79:18
79:20 173:2
**claims** 24:23
26:3 36:17
37:4,8,9 39:15
59:7 79:14
100:7 174:5
176:12 178:4
**clarification**
58:23
**clarify** 32:6

49:18 82:9
110:2
**class** 15:24
**clerk** 83:10,10
83:13 85:19,20
**clerks** 81:21,21
**click** 127:15
**client** 34:22 35:4
59:15 87:5
118:18 182:10
182:12
**clients** 12:13,20
36:2 41:7
170:23 171:3,6
171:18,20
**closely** 129:24
**closer** 67:4
**CLR** 5:24
188:17
**clubs** 159:22
**Code** 2:4
**codified** 79:7
163:17
**COHEN** 1:12
**coined** 163:16
**cold** 75:25
138:17
**colleague** 8:21
61:3
**colleagues** 74:16
168:21
**collect** 85:15,16
**collecting** 35:20
**college** 122:12
**colloquy** 180:7
**color** 100:18
**combined**
159:11
**come** 39:14
47:20 75:24
76:5 78:9
95:18 138:4,7
138:16 140:20
141:11,20
164:12
**comes** 65:8
140:18 145:23
155:9

**commenced**
20:10
**commencement**
187:9
**comment** 30:24
123:10
**commenting**
28:3
**Commerce**
76:20
**commercial**
15:14,19,21
16:7 27:19
**commitments**
175:13
**committee** 150:9
150:15
**communicatio...**
26:18
**company** 8:7
46:25 84:11,13
116:3,4,16
118:16 119:3
119:23
**compelling**
45:13,24 46:5
112:14,15
**compensable**
39:12
**compensation**
13:21 146:19
162:23 163:14
163:20 164:11
**compensatory**
151:4,23 154:3
157:24 158:18
161:17
**competent**
107:10
**competitive** 88:9
**competitor**
89:17 90:2
102:7 103:21
**compiles** 87:23
**complaining**
72:15
**complaint** 25:16
25:20 50:22

86:21 87:13,16
102:14,19,21
102:22,23
103:3,4
**complete** 6:22
7:16 96:25
100:11 108:15
138:3 187:15
**completely**
10:16 98:2
109:14 110:15
**complex** 15:14
15:19,21,23
36:3 111:10
**comply** 159:18
**component**
39:16
**comprehend**
69:2
**computed** 34:3
36:19
**concentration**
47:17
**concepts** 158:17
**conceptual**
142:11
**concern** 70:18
**concerned** 97:4
154:7 168:3
**concerns** 103:17
103:23 104:3
**concludes**
185:17
**conclusion** 164:6
**condo** 181:21
**conduct** 21:17
51:15 52:16
54:25 82:24
**conducted** 21:6
21:12 41:19,21
51:12 53:23
70:19 77:14
88:3 126:16,16
128:5
**conducting**
54:20
**conference** 7:4
80:15

**conferences**
181:11
**conferring** 148:6
**confirm** 54:5
**confused** 84:25
**connection**
65:11 158:17
**consented**
185:14
**consequence**
129:2
**consequences**
38:23
**consequently**
162:18
**conservative**
82:22 83:16
84:5 87:17
131:2 134:24
181:12
**consider** 78:23
81:14 94:11
112:3 137:11
137:15
**considerable**
167:3 183:6,12
**considered**
144:21
**consist** 55:3
**consists** 74:20
147:3
**consolidated**
16:12 32:23
**conspiracy** 33:7
**constitute** 39:3
**Constitutional**
75:24 76:3,5
138:5,19
**construction**
153:18
**construed**
185:13
**consult** 150:20
**consultants**
146:4
**contain** 173:19
**contains** 173:18
**Contexts** 154:20

**contingent** 13:22
**continuation**
175:24
**continue** 77:7
177:21
**continued** 5:2
130:24
**contracted**
12:15
**contrary** 173:14
173:18
**contributions**
146:12
**control** 188:11
**convenient** 81:4
**conventional**
162:17
**conversation**
77:9
**convert** 31:23
**cooking** 74:9
**copies** 14:24
60:8 188:10
**copy** 11:20,25
13:6,7 116:22
117:3,17,18,20
122:12
**cordial** 81:17
**corporate**
118:14
**corporations**
118:19
**correct** 15:16
26:16 27:6,11
29:11 30:6
37:25 49:5
51:5 54:22
61:2 62:22,23
65:5 66:9,12
66:15,20 70:15
72:9 78:13
81:22,23 87:6
87:10 90:17
92:3 93:19
95:6 97:8
98:12 100:25
101:23 111:19
111:23 113:14

114:21 115:14
122:24 123:3,9
123:21 124:4,6
125:17,18
126:6,15 127:6
129:13,14
134:17 135:2
165:25 169:20
178:14 183:2
186:11 187:15
**corrected** 85:5
**corrections**
186:12 189:4,6
**correctly** 29:15
29:16 30:6,25
44:21
**corroborate**
58:12 59:7
128:10,15
**corroborated**
157:16
**cost** 76:7,14 79:5
79:10 82:21,23
114:8 120:16
159:4 160:12
160:21 164:23
168:24 169:12
169:14 170:13
175:2,3,4,6
178:12,22
179:12,19,20
**costing** 91:23
92:11
**costs** 83:2
165:14 178:18
179:7
**counsel** 6:15 7:2
13:16 50:2
53:6 80:19
81:3 93:11
96:2 117:7,12
127:22 181:3
182:19 183:22
188:3
**country** 88:5
124:15,17
150:11,14
159:21 171:4

**COUNTY** 186:4
187:4
**couple** 31:8
32:18 33:25
40:10 44:23
45:8 46:25
89:6
**couple-minute**
80:25
**couple-year**
44:20
**course** 44:23
70:21 73:8
160:5 161:12
**court** 1:2 2:5 6:6
6:13 10:17
11:9,15 29:5
29:22 33:10,12
33:16,19,20
36:11 65:22
75:7,24 77:15
78:2 79:8,10
79:11 91:10
133:10 138:4
146:18 151:17
151:23 153:7
154:4,16
157:24 160:6,9
160:16 161:6
161:17 164:2,3
164:8,13 168:8
176:16 177:22
189:16
**courts** 150:19
155:17
**cover** 118:12
**covered** 91:5
**co-authored**
153:24
**crash** 39:5
**credentials**
145:20 146:5
**credible** 78:6
**credit** 17:5 20:4
20:8 25:24
26:4,6 37:21
38:22 65:11
70:21 85:9,13

85:13 86:20,25
87:11 89:20
95:25 97:12,13
98:11 164:15
164:21 165:3,5
165:14,18,25
166:4,7 167:6
168:2 169:2
171:19 172:9
172:14,16,18
172:20 173:2,5
173:13,23
174:13,14,20
174:24,25
176:23,24
177:14,15
178:4,6,7,14
178:19,24
179:13,19,20
179:25 180:20
180:23 181:2
181:10,16,19
181:21 182:8
182:10,13
183:7,13,20
**cribs** 159:21
**criticism** 145:23
**criticized** 145:18
155:4
**criticizing** 88:10
**CRR** 5:24
188:17
**CSR** 2:8 5:24,25
187:5 188:17
**curious** 29:19
**Curiously**
146:14
**current** 183:7,12
**CV** 142:4

**D**

**D** 3:2,9 11:5,21
11:24
**daily** 136:7,19
**damage** 20:4,8
20:21 23:20
25:10,24 26:6
37:22 38:22

39:13 40:3
62:3 65:12
70:21 85:9,13
85:14 86:20,25
87:11 95:23
98:11 163:18
164:23 165:5
166:3 177:14
178:14
**damages** 28:2,6
28:13,22 29:4
30:13 32:20
33:15,15 34:16
36:5,19 39:3,7
40:12 51:18
94:14 100:24
101:8 142:10
151:4,23 154:3
158:10,18
161:17 162:11
162:14,16,19
162:20 163:16
163:21 164:13
168:3,7
**damaging** 20:12
**data** 43:17 88:9
**date** 8:7 14:4
20:18 21:25
22:3,8,9,11
35:23 73:25
94:11,13 95:3
95:5,17 116:9
151:13 189:8
190:23
**dates** 22:14
85:17
**Daubert** 76:9,17
76:24,25
138:15
**David** 6:12,14
**day** 44:20 72:19
186:21 188:13
**days** 33:18 45:21
45:22 189:14
**DD** 3:14 55:12
**deal** 87:15
**dealing** 36:4
65:19 134:7

161:18
**deals** 141:18,19
**Dear** 19:12
**death** 16:6 27:20
31:4,13 38:7
40:14 158:11
162:12 169:9
169:15
**decide** 66:22
69:10
**decides** 172:3
**decline** 46:6
**declined** 176:24
177:7
**decorum** 77:16
**Deductions**
121:2
**deemed** 189:16
**deep** 70:18
**defendant** 28:12
79:17 163:4,6
163:9,10 185:5
**defendants** 1:14
5:19 6:18 7:3,6
7:10 23:13
24:22,25 26:7
26:14 27:18,23
184:16,25
185:14
**defendant's**
185:10
**defense** 6:4
80:20 146:13
147:24 149:6
**deficiency**
160:20
**definition** 39:17
39:25
**deflated** 89:4
**defraud** 33:7
**degree** 42:13,16
47:12,13 73:6
73:6,7 100:12
135:12 137:20
139:3 143:12
**degrees** 146:4
**deliberate** 52:9
**delinquencies**

98:16,22
**delivered** 12:15
**delivery** 42:6
**delve** 51:14
**denials** 179:25
**denied** 172:17
179:20
**deny** 157:21
**denying** 171:18
**department**
87:22 150:8,16
**depend** 168:18
**depending** 36:17
**depends** 111:11
**depose** 112:13
**deposed** 7:13
**deposing** 189:13
**deposition** 1:1
1:16 2:1,2 3:1
4:1 5:1 6:1,3,7
7:1 8:1,16,21
9:1,22 10:1,19
11:1,3 12:1
13:1 14:1 15:1
16:1,16 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1,11,22
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
51:4 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1

84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1,6
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1,4 181:1
182:1,22,25

183:1,23 184:1
184:22 185:1
185:18 186:9
187:1,11,19,21
188:1 189:3,11
189:14,15
**depositions** 2:6
50:25 51:12,15
**derive** 136:6
**derogatory**
97:12 177:16
**describe** 34:9
142:3
**DeSilva** 32:22
**desire** 77:2
**despite** 155:16
**detail** 45:13,15
46:4 86:17
121:3 128:4
147:5 154:16
**details** 23:3
103:18
**determination**
85:23 95:19
101:4
**determine** 20:18
22:3 25:21
73:21 91:15
110:13 112:25
118:2 123:13
126:4 134:15
135:3 141:2
143:12 181:6
183:19
**determined** 22:6
125:20,21
126:2 135:6
146:19
**diaries** 71:20
**die** 185:21
**difference** 17:14
18:7,8 36:11
61:17 78:16
79:21
**different** 8:12
28:8,16 39:14
50:14 61:16
66:17 79:15

80:3 93:25
104:20 105:11
105:17,18,19
107:9 109:15
118:23 119:3
121:15
**differently** 39:11
**difficult** 88:3
144:23
**digest** 105:6
**dimension** 43:12
63:18
**diploma** 122:12
**directed** 13:16
45:16 157:15
**directing** 92:23
**direction** 11:2
21:6 41:20
77:12 128:6
180:13 188:11
**directions** 69:14
**directly** 21:4,7
21:22 128:3
164:13
**disagree** 158:14
162:24
**discern** 61:17
**discount** 94:22
156:12
**discounted**
17:11,19,20,23
17:24 18:10,13
18:14 19:6
56:8,14,16,22
94:5,6
**discovered**
130:17 131:8
**discovery**
116:23
**discuss** 85:17
142:14
**discussed** 152:24
**Discusses** 143:6
**discussion**
125:23 137:24
157:19 184:18
**dismissal** 98:17
98:23

**dismissed**
133:11
**dispute** 102:25
157:19
**disrespect**
150:12
**distinct** 137:12
137:16
**distinction** 61:18
147:3
**distressing**
130:10
**distributed**
119:14
**distributions**
119:25
**District** 1:2,3 6:6
6:6
**divided** 68:23
**doctor** 30:3 40:8
72:15,15,22,23
146:20
**document** 10:9
10:13,24 11:7
11:17,20 12:23
17:8 18:18,23
26:21,24 35:10
37:11 40:6,23
41:3 50:6
54:23 58:14
59:18 60:18
63:13 117:12
119:7,13
121:12
**documentary**
72:3 102:4
115:12
**documentation**
71:23 72:5
101:24 102:10
176:15
**documents** 8:11
8:13 10:7,9,13
13:8,10,15
14:9,11,16,20
27:2 34:6,14
34:15,21 35:15
47:23 55:11,21

59:6,24 61:4
111:14,18,22
112:18 115:21
115:23 117:23
117:23 121:8
176:12,18
**doing** 43:22
44:17 45:3,8
46:24 47:5
76:6 78:24
83:12 108:6
166:21 177:18
189:7
**DOL** 21:24,24
**dollar** 73:13
87:17 91:13
107:3 112:23
125:4 135:6
173:23 174:3
174:13 180:15
**dollars** 107:12
125:4 138:14
159:18 160:3
**Doody** 5:23 6:11
**doubt** 97:15
150:7,9 157:18
168:11
**dozen** 31:5,14,22
31:22
**dozens** 70:19
**Dr** 2:2 6:3,21 7:8
7:25 8:6 10:6
11:24 12:22
13:3 24:6 41:4
45:18 108:3
117:12,22
137:11 139:25
142:2 146:15
148:21 171:9
171:22 175:12
175:21 182:15
184:3,23 185:2
185:6,12,18
**drastically**
178:24
**drive** 168:5,21
**driver** 79:14,19
85:13

**driving** 74:3
**dropping** 168:11
**du** 166:23
167:22
**dual** 47:14
**due** 26:3 89:6
**duly** 8:2 187:10
**duties** 43:13

**E**

**E** 1:20 2:7 3:2,7
3:11 5:24 35:8
35:13 187:5
188:17 190:1
**earlier** 84:25
91:6 94:11
95:3,17 100:23
127:19 144:6
176:14
**early** 44:2 55:19
99:6 101:8
124:17 148:25
153:16
**earn** 106:2
139:11
**earnings** 162:18
**earns** 139:10,12
**eased** 44:19
**easier** 117:13
127:18,19
**easily** 152:13
**Eastern** 184:23
**easy** 68:25 72:19
122:14 127:13
**Ebling** 21:14,17
41:17 42:8
50:17 90:12
**economic** 23:25
24:18 28:22
29:10,19 30:15
30:21 42:5
43:6,16 44:9
44:24 45:3,4
47:24 62:21
72:10 73:14,19
73:22 74:24,25
75:3,9 76:18
76:18 85:22

139:22 146:13
155:12 156:6
158:10
**economics** 12:9
12:12 42:19
47:14,18 74:6
74:16 76:10
79:3,7 139:19
139:20 140:6
150:4,8,25
154:6,14,19
155:23 156:18
157:11,18
158:6 162:9
165:10
**economist** 69:14
73:23 76:13
88:4 110:12
114:5 144:18
146:9
**economists**
15:25 73:3
74:5,17,20
78:7 79:12
80:9 123:21
145:3,19
150:11,13
**educational** 42:9
47:9
**EE** 3:15 55:12
**effect** 62:17
182:22
**effective** 179:14
**effectively** 97:6
126:21
**effort** 173:11
**efforts** 100:11
**Eight** 33:18
**Einstein** 153:13
**either** 73:6 82:18
122:13
**elapsed** 184:24
**element** 39:12
95:23 155:17
164:22 166:3
170:13
**elements** 163:18
**elicited** 172:7

**emotional** 19:19
20:5,8 39:2,7
40:2 136:15
171:2
**engage** 74:5
111:5 145:9,12
167:4 182:10
**engaged** 84:4
85:24 86:6
136:16,18
182:11
**engagement**
12:2,4
**engineer** 153:14
**engineering**
153:12,17
**enjoy** 124:23
135:25 136:3
**enjoyment** 17:5
26:5 32:20
33:15 38:6
39:12,16,21
40:4,7,17
123:14 126:10
135:18 138:18
155:8,15,19
157:24,25
170:25
**entire** 43:23
103:7 160:15
166:23 171:4
**entitled** 154:19
167:13 168:16
**entity** 118:14
119:5
**entrepreneur**
84:13
**Environmental**
159:15
**equating** 115:3
168:24
**equivalent** 83:5
100:14 139:18
**era** 149:16
**Erath** 5:22 7:5
**errata** 189:5,7
189:10,13
**error** 143:11,13

143:17,19,20
143:24 144:6,8
144:9,11,13
**especially** 74:5
**ESQ** 4:4,12 5:4
5:13
**essentially** 48:25
65:9,17 123:5
**establish** 95:24
115:17
**established**
126:14
**estimate** 27:17
31:6 39:20
48:17 65:18
72:13 82:22
88:14 105:25
139:3 140:11
180:16 181:12
181:15
**estimated** 66:8
66:14 131:7
176:8 181:19
**estimates** 37:14
75:15 123:7
130:16 137:20
**estimating** 72:11
166:12
**et** 6:4,5
**evaluate** 107:5
160:11
**evaluated**
113:11,13
**evaluating**
111:15 113:8
**event** 163:12
**events** 25:7
58:24 157:19
**eventuality**
168:18
**everybody** 41:11
**evidence** 2:7
72:3 102:5
115:12 162:11
**exact** 100:18
120:9 146:16
147:19
**exactly** 47:3

68:23 117:2
120:21 146:18
148:19,23,25
151:16 152:14
183:16
**exaggeration**
63:21
**examination** 2:3
3:4 8:4 175:11
187:9
**examine** 109:12
109:24 110:3
**examined** 8:2
**examiners** 58:15
**examining** 114:7
**example** 16:25
22:23 23:4
36:20 48:24
59:13 62:14
67:16 82:2
89:5 94:15
98:3 130:4
135:23 136:11
142:21 168:13
169:12 181:13
**Excellent** 123:19
**excess** 16:14
**exclude** 138:21
**exclusively**
40:15 47:5
158:24
**excuse** 13:11
**executive** 158:24
159:6,9 160:11
160:15
**exercised** 166:13
**exhibit** 3:9,10,10
3:11,11,12,12
3:13,13,14,14
3:15,15,16,16
3:17,17 11:5
11:21,24 12:22
13:3 18:21
35:8,13 40:21
48:22 49:18,19
49:21,23,23
50:5,9 55:12
56:12 94:4,12

94:20,21,22
132:12,14
142:5 147:7
**exhibits** 11:10
55:17
**existing** 105:12
105:20,24
106:3 115:22
121:9
**exists** 72:6,7
**expect** 15:2
63:19 95:16
**expectancy** 17:5
26:4 95:4
100:24 123:9
123:11,15
124:9,12,14,19
125:16,17
164:15,21
165:3,18 166:4
167:6 169:2
172:9,20 173:2
173:5,13,23
174:13,14,17
174:20,24,25
176:23 178:20
180:20,23
**expeditious**
81:17 127:11
**expended** 87:19
159:18 160:4
**expense** 17:4
**expenses** 57:5,22
58:3,8 62:25
63:8 120:17,19
120:20
**experience**
85:14 139:23
177:14 181:9
181:10
**expert** 5:22 7:6
27:12,22 28:5
28:9,14,23
31:3,12 32:16
38:25 53:16,19
76:5 145:20
146:6,13,21
149:6 150:10

162:13
**expertise** 145:24
**experts** 39:19
150:3,12,19
**expert's** 27:25
**explain** 23:3
127:12 135:17
**explained** 128:4
173:6
**explicit** 151:15
**exposed** 148:7
**expressed** 127:7
**expunged** 97:13
98:16,22
**extend** 169:24
**extended** 111:4
**extensively**
158:23
**extent** 135:24
145:14
**extorting** 171:20
**extortion** 171:2
**extra** 18:9 37:6
**extract** 87:19
**extraordinary**
170:25
**extremely**
130:10
**eyebrows** 63:24

**F**
**fact** 25:2 42:4
46:3 70:4,23
73:15 80:16
85:25 90:19
91:13,15 94:11
101:3 123:13
128:18 134:25
138:10 139:6
155:16 167:3
168:5 171:3,7
171:8,10
172:25 180:16
183:18 185:12
**factor** 89:2
113:18 114:8
**factors** 81:24
139:2

**facts** 90:18 92:6
98:24 101:12
101:13 138:19
138:11 172:21
172:25 173:8
**factual** 47:19
173:21,22
174:12
**fail** 189:15
**failed** 90:2
**fails** 146:14
**failure** 90:23
**fair** 15:18 23:12
45:9 61:8
63:14 78:22
87:2 145:18
155:3 164:25
174:5
**faithfully** 69:5
69:19 86:10
**fall** 67:14 151:2
166:24 167:12
167:24
**false** 171:5,19
182:15
**familiar** 154:17
154:24,25
**family** 168:20
**far** 13:25 16:14
26:17 81:16
97:4 168:3
**fashion** 38:18
**faster** 68:9
**favorable**
169:18,19
**federal** 32:17
33:16,20 36:8
36:10,10,13,14
36:17 39:13,14
75:7 159:12
160:6,16 161:5
163:7,8,10
168:22,23
185:7
**fee** 8:16 12:16
15:16
**feel** 52:13 72:17
73:2

**feeling** 52:16
**Feldman** 6:12,14
**fellow** 166:20,22
**felt** 75:25,25,25
107:10 138:17
138:17,17,18
**field** 39:20 74:14
74:17 79:7
140:6 144:22
145:21 146:6
146:10 149:21
150:4 165:10
**fields** 145:6
**fifth** 139:7,8,13
140:7 142:14
**fight** 117:14
**figure** 45:11
67:14 69:8,9
76:19 94:9
113:17 125:4
131:10 158:9
180:15
**figures** 32:8
70:22 73:14
78:11 81:25
89:3,3 131:2
156:10,11
**file** 14:8 26:25
34:8 35:20
59:10 102:12
103:7,10
122:12
**filed** 6:5 86:19
**files** 34:8 48:10
**filibuster** 77:2
137:25
**fill** 34:22 35:4
**filled** 34:24 35:4
38:15
**financial** 14:7
19:19 85:16
171:4
**find** 10:10 46:4
51:11,25 83:4
83:12 106:25
**fine** 80:23 109:4
132:13 175:20
**finger** 72:16

**finish** 68:10
107:24 111:8
134:4 175:18
175:22 183:23
**finished** 16:2
36:23 114:13
172:15
**FINKELSTEIN**
4:11
**firm** 6:11 7:2
8:14 13:9,12
13:16 21:10
42:5,12 43:7
44:21 119:4
**first** 8:2 10:11
12:7 16:23
17:13 19:11
20:21 21:15
29:15,16 30:15
30:17,20 34:11
37:21 44:21
45:8 49:7
50:11,16 65:13
67:19 73:5
84:6 93:22
107:25 108:7
120:11 125:9
144:18 147:6
151:7 157:6
159:4 177:22
**firsthand** 157:13
157:16
**firstly** 84:16
133:14
**fit** 69:13 74:17
111:3 160:6
**five** 10:5 16:10
16:15,17,23
17:16 22:14
23:5,7 24:14
34:8 35:17
38:19 48:10
50:3 55:24,25
56:22 93:11
118:11 129:16
130:24 132:4,6
133:24 168:5
168:10

**five-year** 67:23
94:15,16
**fix** 43:19
**flashed** 51:20
**flies** 43:11
**flow** 113:11,13
113:15 114:17
114:20,24
115:4,6
**flows** 114:10
**focus** 89:8
**focused** 140:23
**folks** 82:2 136:9
145:23 182:9
**follow** 10:20,25
69:14
**following** 98:17
190:5,6
**follows** 8:3 34:10
162:20
**foolish** 113:2
**foot** 128:20
**forbid** 168:21
**foregoing** 186:8
187:15
**forensic** 74:6,15
79:3,7 150:25
154:6,14,19
155:22 157:11
157:18 158:6
162:9
**forgery** 33:8
**forget** 148:19
**forgive** 32:4
**form** 34:19 35:3
35:25 36:5
38:5,10,14
78:19 88:17
89:21 100:3
106:17 112:9
115:15 129:9
129:19 143:3
143:15 144:2
151:5,24 165:4
165:8,19,21
166:9 169:24
170:4 173:15
179:23 187:14

**formal** 54:23
**formed** 174:11
**forming** 47:20
  52:13,19 53:3
  78:14 80:5,8
  91:17 119:8
  129:3 176:22
**forms** 35:18,18
  38:19
**forth** 118:20
  167:8
**forum** 155:11,14
  155:20
**forward** 108:20
**foundation**
  98:19 102:8
  106:6,22
  114:22 115:15
  118:7 137:22
  150:5 154:22
  158:19 165:6
  170:5 172:5
  173:16 176:6
  176:16 178:15
  179:22 182:5
**founder** 12:10
**four** 8:10,15,21
  10:4 15:25
  27:15 104:22
  133:13 149:5,9
  164:18 181:4
**fourth** 136:14
**frankly** 97:15
**Frank/Gecker**
  5:12 7:2
**fraud** 58:14
  130:17 131:8
**free** 138:4
**freedom** 138:7
**freelance** 83:14
**frequently** 21:24
  51:13 123:21
**friends** 168:20
**front** 50:9
**full** 87:4 116:14
  118:19
**fully** 99:17
  138:10

**fund** 163:20
  164:11,12
**further** 43:9
  45:13 46:4
  76:4 86:14
  99:13 103:10
  147:16 185:15
  187:18 188:3,7
**future** 17:24
  100:9

———
**G**
**G** 3:10 12:22
  13:3
**Gary** 139:25
  150:14
**gather** 73:3,11
**gathered** 47:25
**gathers** 43:17
**gender** 35:24
  73:25
**general** 34:15
  48:17 52:25
  53:4,4 60:21
  83:7 120:25
  136:20
**generally** 34:9
  34:16 79:12
  122:24 123:17
  145:2 146:10
  150:3 154:25
  181:8
**generate** 91:18
  91:22 92:10
**generated** 93:7,9
**generating** 80:8
  92:12 98:6
  105:13,21
  106:4 115:24
**generic** 44:14
  82:20 84:13
**gentleman**
  135:23
**geographic**
  112:3
**Georgia** 87:22
**getting** 23:23
  31:17 34:10

55:16 76:9
  125:9
**GG** 3:12 50:5,9
**give** 7:17 10:12
  14:23 22:22
  27:22,24 28:20
  31:18,20 34:22
  37:17 45:15
  50:5 52:22
  57:10 58:2
  64:13 65:21
  66:17 68:21
  72:13 73:8
  74:22 75:18
  86:8 91:12
  97:25 101:12
  101:14 105:4,5
  110:16,22,23
  117:14,15
  122:23 123:3
  134:14 138:2,7
  139:5,15
  143:19 145:7
  148:21 151:13
  152:16 154:16
  155:25 156:7
  157:5 183:20
**given** 7:12,13
  10:13 12:17,19
  17:14 28:11,17
  28:19 30:11,12
  33:17 38:15
  49:2,5 53:16
  54:16 56:24
  57:3 58:19
  62:7 63:3
  73:15 75:15
  104:23 105:10
  110:7 121:10
  127:3 129:16
  134:22 147:22
  149:4 164:17
  164:22 166:14
  173:4 174:3
  187:12
**gives** 19:8
**giving** 112:22
  131:3

**global** 144:24
**go** 7:15 15:4
  23:2,6 30:10
  47:25 55:9
  59:10 61:5
  68:9 73:5 77:6
  81:10 108:20
  111:15 121:23
  126:19 131:4
  131:25 132:17
  134:4 136:9,25
  141:9 161:6,7
  164:13 166:22
  167:23 168:8,9
  175:17
**goal** 129:23
**God** 168:21
**goes** 72:15
**going** 7:10 9:13
  10:20,21 18:11
  29:17,18,21
  43:19 53:9
  66:16 77:3,6,7
  80:3 96:6
  103:16,23,24
  104:3 105:7
  110:14,19
  122:14 123:3
  129:5 130:3
  136:24,25
  137:2,24
  139:11 170:7
  182:23 183:4
  184:7
**golf** 159:22,22
**good** 6:21 55:19
  81:2 100:19
  114:3 182:8,10
  182:13
**goods** 91:18
  92:10
**Gordon** 1:7
  132:2 164:15
**gotten** 46:19
**government**
  158:16,21,22
  160:25 161:5
  161:15 162:12

162:15,21
  163:4,5,7,8,10
  163:20 164:4
  164:10
**government's**
  162:21
**grade** 139:7,8,13
  140:7 142:14
**graduate** 42:10
  47:10,16
**great** 43:8 45:6
  47:2,22 128:4
**grocery** 136:11
  136:12
**gross** 120:12,13
**ground** 43:9
**Group** 12:9,12
**guarantee** 12:13
  12:18
**guess** 30:16 38:4
  48:19 59:15
  96:4 160:24
**guessing** 70:7
  71:2,10
**guide** 37:17
**guided** 36:17
**guides** 73:23
**guy** 12:11 159:5
  167:16 168:9

———
**H**
**H** 3:7
**HAHN** 1:13
**half** 31:14,22
  101:15,18
**hallmark** 145:24
  146:6
**Hancofski**
  148:11,17
**hand** 188:13
**handed** 55:22
**handfull** 32:23
**happen** 124:19
**happened** 90:25
  101:20 160:23
  164:7,9 169:21
  170:3
**happens** 124:13

**happy** 46:5
  84:20 139:15
**hard** 83:12
  159:22
**hate** 34:14
**Hawaii** 63:9
**headlights** 175:8
**health** 159:14,21
  159:25
**hear** 29:15 63:19
  120:5 177:17
**heard** 29:11
  72:22 75:12,13
**hedonic** 27:25
  30:13,16,17,20
  40:12 142:10
  154:20 162:11
  162:14,19,20
  163:16 164:12
**held** 6:8
**help** 53:2 61:16
  92:4 109:21
**helpful** 36:9,16
  52:2,13 53:3
  176:23 177:4
**hereunto** 188:12
**he'll** 45:14 111:2
**high** 30:14,24
  67:5 69:8
  128:8 166:21
  166:25
**higher** 15:16
  28:16 133:17
  156:9,15 179:2
**highly** 180:25
**Highway** 159:13
**high-quality**
  140:5
**hired** 150:19
**history** 160:22
**hit** 39:5
**hoc** 11:2
**hold** 39:11
  107:22 108:5,5
  111:2 141:4
  157:5 171:12
  171:12,12
  172:4,4 173:15

**happy** 174:8
**home** 72:18
**honeymoon** 63:8
**hopefully** 77:3
**hotel** 64:3,20
**hour** 2:13 15:7
  15:10 76:14
  78:5 79:13,14
  79:19,20 80:12
  81:20 83:11,12
  89:5
**hourly** 76:21
  78:8 79:9
**hours** 8:16,21
  33:25 66:8,11
  66:15,19,23
  67:22 68:12,17
  68:18,19,22,23
  69:23 70:6
  71:2,9 74:2,10
  74:10 76:2,6,7
  78:4 110:16
**house** 159:5
  170:21 172:15
**human** 44:25
**hundred** 27:14
  27:16 31:9,9
  40:10 106:10
**hundreds** 12:19
  160:3
**hypothetical**
  99:14,19
  101:14
**hypotheticals**
  105:17

———————
**I**
**ID** 119:24
**idea** 114:3 171:5
**identical** 18:16
**identify** 6:24
  11:24 13:5
  19:5 41:3 48:2
  55:22 142:7
**II** 3:15 55:12
**Illinois** 1:18 2:6
  2:9,12 5:16 6:9

**illustrate** 187:2,7
**illustrate** 134:17
**illustrated**
  130:22 131:14
  183:17
**imagine** 75:11
  88:4 159:10,17
  159:19,22
  166:14
**impact** 26:4
  36:19 91:13
  123:13 128:21
  135:19,21,25
  136:22 159:24
  170:22 171:2
  178:6,8
**impacted** 136:20
  159:23 178:25
**impacting** 161:2
**impair** 95:25
**impaired** 136:9
**impairment**
  123:6 124:8,9
  124:10 125:16
  125:19 126:2,4
  126:11 128:8
  135:13 137:20
  139:4 141:2
  143:12
**impassioned**
  171:16,25
  172:8
**imperative**
  189:12
**implausible**
  128:17 129:4
**important** 36:7
  51:6 78:23
  138:11
**imposed** 160:7
  160:10,19
  185:11
**imprecise** 31:24
**impressive**
  161:11
**improper** 28:8
**improperly** 28:5
**inability** 114:10

**inadequacy**
  160:20
**incident** 182:7
**include** 39:16,22
  82:7 92:6
  103:3 165:20
**included** 39:24
  63:8
**includes** 89:11
  147:2 174:17
**including** 12:20
  32:19 33:15
  147:4,5,5,6
**income** 80:8
  97:19 100:6,7
  100:12 104:8
  119:25 120:2
  120:12 121:18
  181:9,15,20
**income-produ...**
  78:17,24
**inconsistencies**
  58:22
**incorrect** 147:9
  162:18
**increase** 44:24
**increased**
  178:12,18
  179:7
**incremental**
  178:22
**incurred** 19:9
  123:12 166:5
  178:13 179:7
**independent**
  44:13
**independently**
  39:24
**India** 9:16,17
**indicate** 103:22
  117:24 120:16
  126:8
**indicated** 84:10
  98:21 106:8
  107:9 110:9
  116:4 118:5,10
  118:15 128:8
  130:7 132:3

**indicates** 66:2
  112:22 116:5,7
  116:16 119:23
**indicating** 95:7
  102:5 146:17
  176:19
**indicator** 88:7
**individual** 16:23
  25:7 36:5
**individuals** 36:4
**infinite** 179:14
  179:15,20
**infinity** 179:13
**inflation** 89:2,7
**informally** 34:24
**information**
  34:19 35:3,18
  35:20,22 40:11
  47:19,25 51:9
  54:15 58:6,16
  58:17 59:9
  60:11 63:6,11
  63:12 64:9,11
  64:12 65:6,8
  70:13 73:4,11
  85:16,16
  103:10 107:11
  112:6 127:16
  141:15 171:5
  171:19 177:2,3
  177:16
**informed** 138:11
**initial** 34:23
  35:19 37:17
  47:6 50:18
  100:10
**initially** 130:23
  132:16
**initials** 41:24
  42:3 49:16
  50:14,18
**injured** 19:23
**injuries** 19:14
  31:13
**injury** 16:6

19:18,19,20
20:2,5,7,15,15
20:19 22:9,11
27:20,23 31:4
38:7,20,24
39:3 40:13
137:13,16
142:10
**inquire** 77:25
107:18 109:9
135:12
**inquired** 180:11
**inquiry** 65:9
**insignificant**
178:9
**instance** 10:11
28:10 40:16
140:19 147:25
162:15 169:22
174:15
**instances** 162:13
172:13
**instruct** 54:24
**instructed**
135:14,17
**instructions**
7:15 189:1
**intake** 35:3,17
**intangible**
144:19 168:25
**intelligent** 26:9
**intensive** 44:9
**interest** 112:15
112:16 127:8
165:4,19,21
**interested** 30:5
188:5
**interesting** 39:9
**intermission**
53:11 96:10
137:6 184:10
**internal** 136:15
**interrelated**
118:19
**interrupted**
107:24 108:14
**interview** 21:2,5
21:12,17 48:4

48:12 49:8
50:12 54:25
65:25 66:5
69:5,21 102:3
102:17 103:13
104:11 115:11
121:20 128:7,9
132:11,11
133:10 140:25
142:24 170:19
171:22 173:20
**interviewees**
66:6
**interviews** 41:19
41:22 47:24
48:15 53:22
54:2,20 58:10
70:20 88:23
90:16 104:17
128:5,17
180:12
**introduce** 6:15
162:11,14
**introduced** 7:8
**introductions**
6:22
**invariant** 109:20
**investigate**
24:21 32:12
**investigated**
25:4 106:20
107:15 109:7
**investigating**
61:11
**investigator**
25:2,3 107:5
**investigators**
58:15
**investment**
110:11
**invoice** 8:9,15
**invoices** 14:20
**involve** 15:24
34:16
**involved** 36:8
**involving** 31:4
31:12 32:17
**irrelevant** 45:17

84:17,19,23,24
**irrespective**
117:4
**issue** 16:19
24:19 103:2,10
125:25 141:10
141:11 153:12
185:3
**issues** 23:23
25:22 87:14
89:20 90:3
91:16 172:18
174:17
**item** 38:5 62:3,3
64:23 65:2
89:11 164:17
174:25
**itemize** 172:13
**itemized** 120:19
**itemizes** 120:22
**items** 125:15

———————
**J**
———————

**J** 1:8
**January** 93:16
97:8
**JAY** 1:12
**Jeremy** 5:13
6:25 18:20
35:7 40:20
55:11 141:25
**jkleinman@fg...**
5:18
**Job** 1:21
**John** 5:23 6:11
**joined** 80:15
**joke** 95:14
**Jones** 36:20
**journal** 74:18,19
88:10 141:7,13
150:25 154:6,7
154:14,18
158:6 162:9
**JSG** 1:9 6:7
**judge** 25:21
77:10,12,16
160:16 168:22
168:23

**judicial** 36:18
**Judson** 1:5
130:7
**July** 14:4 17:9
101:15
**jump** 167:23
**juries** 155:8,15
155:18
**jury** 25:21 33:13
33:14 68:11,16
68:25 69:9
73:13 75:25
76:12 91:12
101:2 127:14
127:18,20
131:2 133:13
134:15 139:16
140:4,16,20
141:15 155:25
156:7,9 172:3
**jury's** 140:19
**Justin** 164:16

———————
**K**
———————

**K** 187:4
**kaltman@law...**
4:17
**keep** 26:8 55:14
66:16 92:3
126:13
**Keith** 4:12 81:16
108:9 175:19
**ken** 140:4
**kept** 71:17,19,20
**Kettler** 1:7
26:16,19,25
**Kettler's** 27:4
**key** 44:22
**kind** 76:16 83:13
119:4 141:13
**Kip** 157:14
**KK** 3:16 55:12
**Kleinman** 5:13
6:25,25 11:4,6
11:9,14,19
12:21 18:22
35:9 40:22
**knew** 155:14

**know** 8:14,18
9:4 13:13 14:2
14:3 24:7
25:17 26:17
28:7 29:18,23
36:7,16 37:7,8
38:25 41:7,21
42:9,18 43:5
45:12 48:14,16
51:14 60:10
61:13 67:23,25
68:3,22 71:5
71:21 72:14
75:13 84:8,14
87:22 88:8
94:2 95:18
96:24 99:23
102:11 104:2,4
108:21 112:4
113:9,12
116:25 118:24
121:17,21
135:22 138:20
144:23 152:3
152:12 158:13
159:12 163:6
163:24 164:9
168:23 169:21
171:16 175:12
176:15,24
177:2,7 178:6
180:7
**knowing** 177:5
183:16
**knowledge**
13:13 45:2
46:10 53:17
75:13 79:12
139:22 157:12
157:16 171:21
171:24
**known** 128:19
143:10
**knows** 78:3
**KRIEGER** 1:13
**K1** 119:20,21

———————
**L**
———————

**Labor** 45:22
76:20 87:23
**laid** 25:16
**lake** 167:23
**land** 81:5 138:20
**landlord** 89:18
169:23
**larger** 39:17
**LaSalle** 5:14
**lasted** 48:15
**late** 97:5
**laurate** 139:25
**law** 6:25 10:17
36:18 37:8
39:4 77:15
138:20 146:18
150:19 151:17
154:15 155:18
160:10 164:3,3
164:8
**lawsuit** 98:24
170:24
**lawsuits** 86:19
87:12 98:17
164:10 178:3
**lay** 81:5
**leading** 74:14
**leap** 164:6
**learn** 84:17
**learned** 20:11,20
139:8,13
**learning** 45:22
**lease** 59:21 60:5
169:24
**Leasing** 1:11 6:5
17:3 20:12
24:9 25:10
26:3 57:4,11
57:15,19 58:4
58:7,12 59:8
59:17,20 60:9
62:2,11 95:25
98:12,14,15
134:8 176:25
**Leasing's** 130:17
131:8
**leave** 25:20
91:15 123:12

127:3 128:18
183:18 184:3
**leaves** 184:19
**led** 81:24
**left** 48:9 50:3
51:23 81:8,13
93:12 95:8
96:11 124:16
124:18 175:10
175:14 181:4
183:24
**legal** 23:23 38:25
39:9 154:20
**legislation** 159:8
159:11 160:5
**leisure** 80:7
136:4,17
**lending** 118:25
**lengthy** 152:3
**lent** 182:12
**lesser** 131:2
**letter** 12:2,4
**letters** 50:16
**letting** 108:6
**let's** 24:4 42:8
48:9 55:9 56:3
127:3 131:19
131:25 164:10
164:11
**level** 77:8 88:6
98:6
**levels** 162:23
**Lexington** 5:7
**liability** 23:18
23:20 24:18
25:21 51:17
**liable** 23:13,16
**life** 17:6 26:5
30:14 32:20
33:15 38:6
39:12,16,21
40:4,7 95:4
100:24 123:2,6
123:8,9,11,14
123:15,21,22
123:23,24
124:3,9,11,12
124:14,18,21

124:23,25
125:7,16,17
126:10,10
128:21 129:18
130:16 131:7
131:13 135:18
136:10,23
137:12,16
138:6,18 139:6
139:21 140:2,3
140:12 141:23
142:16 143:2
144:19 145:22
146:16 147:15
150:24 151:3,9
153:4,6,10
154:3,20 155:9
155:16,19
157:24 158:2,9
158:13,17
159:7 160:8,12
160:21,21
161:3 171:2
**likelihood** 100:8
**likewise** 101:20
**Lillienstein** 3:5
5:4 6:17,17,21
7:4 8:5 9:11,20
10:15,25 11:4
11:12,15,22,23
12:21 13:2,14
13:20 18:20
19:4 22:20
24:2,15 25:18
29:5,13 32:2,9
35:7,14 40:20
41:2 42:24
43:4 45:10
46:11,15,17
48:20 49:11,14
49:24 50:4,8
52:11,17,24
53:15 54:10,11
54:17 55:15,20
60:6,15,24
62:10,20 64:15
69:11 70:12
71:7,15 72:14

75:6,8 77:5
80:14,22 81:10
81:18 82:15
83:22 84:7
86:22 88:18
90:5 91:25
93:13 96:4,15
96:18 97:2
99:3,9,21
100:21 102:15
104:14 106:12
106:18 107:13
108:2,9,17,19
108:22 109:2,5
109:19 111:17
112:8 113:4
115:2,20 117:9
117:19,21
119:6 120:6,8
125:24 127:7
129:12 130:2
135:4,10
137:10 138:24
141:16,25
142:4,6 143:8
143:21 144:3,5
144:7,16
145:16 148:8
150:22 151:18
151:20 152:15
155:2 157:2
158:4 161:8
162:4 165:11
167:10 169:10
170:10 171:13
172:6 173:3
174:2,18
175:23 176:2
176:10 178:11
179:4,16 180:2
181:5 182:14
182:24 184:2
185:8,16
**Lim** 1:6 18:17
19:7,9,15,22
20:11,20 21:2
21:4,13 22:6
24:6,6 25:23

48:21 56:5,12
56:15,15 57:6
57:14 59:11,13
59:15 60:7
61:22 62:14
66:7 67:2,5,22
68:13 82:3,10
82:11,13,14
134:6 152:18
164:15 170:20
172:12,13,17
173:2,20,21
174:11 176:3
178:13 179:12
180:22 181:13
**limit** 166:6
**limited** 30:3
35:21
**Lim's** 20:19 49:9
170:19 173:7,8
174:20 176:24
180:19
**Line** 121:2 190:8
**lines** 152:25
183:7,12
**Liss** 1:20 2:8
5:24 6:13
187:5 188:17
**list** 41:6,9,12
43:16 62:2
63:7 149:7,11
149:14
**listed** 149:3
153:24,25
154:6
**literature** 72:10
72:24 73:20,22
74:24,25 75:3
75:9,12 123:22
140:6,9,13,23
140:24 141:9
142:8,17
143:10,22
144:4,10,12
145:14,18
146:12 147:15
160:8
**litigation** 15:15

15:19,21,23
16:10 152:22
152:24 160:18
**little** 51:17 67:12
67:20,20 92:14
131:15,15
133:16
**living** 136:8,19
**LLP** 4:11 5:3,12
7:2
**loan** 178:25
**Loans** 116:15
118:24
**located** 111:25
**locations** 81:22
89:17 93:18
98:10 102:6
103:15,16,20
104:22 105:20
105:23,25
106:2,3 107:8
111:25 112:6
118:11 169:23
**long** 1:6 19:15
19:22 43:10
44:17 45:3
48:14 55:18
63:17 69:4
111:8,13 117:7
134:25 161:11
164:15 180:4
**longer** 97:18
**longest** 123:11
**look** 10:14,24
19:11 36:9
48:21 50:11
55:10 60:16,17
63:10 67:10
79:4 102:11,23
106:24 110:12
129:24 135:18
154:10 158:21
182:9
**looked** 35:13
57:7
**looking** 8:13
10:7,8,12
18:17,18 35:2

36:25 38:3
40:8 59:18,24
67:8 76:19
89:18 103:6,22
116:18 118:3
119:19 120:11
130:12 183:10
**losing** 55:14
**loss** 17:2,2,3,4,4
17:5 22:2,4,8
22:11,25 24:10
24:22 25:23
26:4 32:19
33:5 38:6
39:11,16,20
40:3,6,17
57:15,18,21
62:3 64:5,23
65:2,3 68:12
75:19 78:10
79:18,20 88:15
89:12,12 90:25
90:25 93:15,21
94:15,16,17
95:2,4,17 97:3
97:6,14,23
98:2,8 99:5,11
99:14,25
113:17 114:15
114:16 123:12
123:13 125:5
126:10,10
130:8,23
131:13,14,14
132:3,4,19
133:14,15,16
133:18,22
134:12,13,16
134:22 135:2,5
135:7,18,24
138:6,8,18
155:8,15,19
157:23,24,25
164:15,17,21
165:3,4,9,9,18
165:19,20,22
166:4,11
167:14 168:14

169:11,17
170:25 172:9
172:10,20
173:2,5,13,22
173:24 174:12
174:14,16,20
174:23,25
176:8,22
178:20
**losses** 17:25 19:9
19:14 22:24
24:23 25:4,4,5
27:5 58:17
73:14 84:21
94:9,11 126:8
173:12,12
174:4 180:16
**lost** 78:17,22,23
79:24 80:6,7
86:19 89:16
97:19 100:7
114:10 162:18
178:19
**lot** 45:20 51:16
**low** 30:24 69:7
70:24 83:16
132:20
**lower** 28:13,15
132:5,21
133:15,24
134:2,10,11
**lunch** 55:19

——————

### M

**machine** 117:18
**Madison** 4:6
**maintain** 14:7
32:13
**major** 47:14
128:25
**majority** 39:15
45:6 47:2,22
120:23
**making** 64:20
108:13 116:7
117:3 171:15
**male** 19:22
**man** 26:10

**manage** 107:10
**management**
136:10 158:25
**manner** 69:3
92:25 134:24
**marathoning**
128:22
**mark** 11:10
119:9
**marked** 11:20
49:25 147:7
**MARKED/RE...**
3:8
**market** 32:14
76:7 79:4
175:5
**marks** 53:8
**married** 19:22
**Mary** 139:11,12
**masters** 47:11
47:15
**match** 83:17
85:2
**math** 62:22
**mathematical**
18:9 138:22,25
142:15
**mathematics**
47:14 62:18
139:19 140:8
**matter** 6:4 9:15
13:22 15:23
36:10 39:10
40:18 45:13,15
45:17 62:22
70:18 80:6
107:7 109:19
111:11 121:21
121:22,24,25
122:2,3,3,8,11
122:11,13,16
122:18 132:17
140:17
**mattered** 122:5
122:5
**matters** 8:12
14:15 51:14
82:8 83:8

85:17,18 87:13
**mean** 17:22 36:9
44:3,7 62:4
90:6,8 95:11
95:22 99:23
100:5 102:13
126:23 136:11
150:12
**meaning** 92:3
132:19
**means** 35:21
51:20,22
131:13 133:6
151:22 179:14
187:13
**measure** 144:19
151:4 154:3
**measured** 159:7
**measurement**
158:17 173:6
**measures** 162:17
**mechanism** 79:3
**median** 81:20
88:5
**meet** 175:13
**meeting** 155:12
155:23 156:6
156:17 157:12
**meetings** 181:11
**Melinda** 1:5
164:16
**member** 65:14
65:16 150:9
**members** 34:17
**memorialized**
156:24 157:9
**memorize** 98:24
**memorized** 88:2
151:11 152:11
170:8,15
**memory** 74:8
76:12 148:13
161:22
**mental** 39:18,23
**mention** 146:15
**mentioned** 9:2
41:16 67:17
125:15 146:13

153:16
**method** 79:5
166:11
**methodology**
39:22 69:3
73:20 77:21
80:10 88:11
129:7 143:11
151:3,22 153:7
154:3 155:4
158:23 160:15
160:21 161:2
161:16 162:16
167:8
**methods** 135:11
**mid** 148:24
**middle** 50:17
67:6
**mileage** 100:18
**Miller** 142:21,23
149:17 150:23
151:9,15
152:23,23
**Miller's** 154:14
**million** 63:20
122:7,16
**mine** 182:23
**minimum** 77:16
**minor** 128:20,25
**minus** 43:12
**minute** 26:9
**minutes** 50:3
51:22 70:17
81:6,8,13
93:12 95:8
135:9 175:10
175:16,17
181:4 182:19
**mischaracteri...**
52:8
**mischaracteri...**
87:3
**mischaracteri...**
52:5 75:2
**missing** 56:2,4
162:7 168:8
**misspoke** 57:9
**misstate** 129:11

**misstates** 83:20
99:7 104:12
106:5,16 129:8
134:18 141:5
143:3,14,25
144:14 156:21
169:4 172:5,22
174:9 177:10
178:16 179:9
182:4
**mistranscribe**
29:22
**misunderstand**
75:17
**misunderstan...**
85:6
**misunderstood**
125:2
**Misuses** 154:19
**mis-shuffled**
63:10
**mis-Xeroxed**
63:10
**mitigating**
132:20,22
**mitigation**
132:24 133:6
133:15,17
**model** 68:11
138:22 139:2
139:16 140:18
140:19,21
141:22
**modest** 17:17
83:8
**modestly** 85:19
**moment** 22:22
56:19 66:17
151:14
**Monday** 146:3
**money** 8:6,14
62:13 118:25
119:14 167:19
181:24,25
182:12
**month** 31:2,10
31:12,16 32:15
91:19,23,24

92:11,12
**months** 47:3
101:21
**morning** 6:21
34:5 146:3
**mortgage** 32:24
32:25 164:23
170:13 174:21
176:4,8,12
181:14
**mortgages** 119:2
**Moses** 5:3 6:18
**motion** 76:24,25
**move** 46:2 73:18
127:8 151:18
179:5
**multiplication**
76:19 139:7,8
**multiplied** 78:12
88:24
**multiply** 76:15
**multiplying**
76:21

___

**N**

**N** 3:2
**name** 6:11 21:15
26:23 32:21
35:23 50:17
73:24 116:11
116:14 118:24
119:22,22
144:6 148:9,10
**national** 74:15
74:15 155:22
157:11,17
159:13
**nationwide** 78:8
**nature** 33:5 69:2
107:9 109:15
**necessarily**
32:13
**necessary** 11:16
89:2 189:4
**need** 7:15 10:9
10:23 26:2
29:23 51:14
53:6 74:25

79:25 96:2
99:13 101:13
105:8 108:14
111:7,13
113:12 119:9
126:18 139:14
141:9 149:23
163:2 164:13
167:12,16
180:7 183:22
**needed** 43:9
51:10 87:15
138:2,15
175:25
**needs** 99:19
175:13 185:5
**negative** 180:25
**neither** 67:9
84:5 171:9
**net** 166:22,24
167:2,3,5,12
167:14,16,16
167:19,20,21
167:24
**neurosurgeon**
79:13,18 85:12
**neurosurgery**
72:20
**never** 13:23 27:9
53:21 69:22
72:22 75:12
88:9,11 97:20
112:5 115:21
160:22 163:8
166:24 172:18
176:11,18
182:25
**new** 1:3 4:7,7,15
5:8,8 6:6 61:13
95:14 108:8
168:16
**Newburgh** 4:15
**nineties** 148:24
**NN** 3:16 55:12
**Nobel** 139:24
150:14,17
153:15
**nonresponsive**

73:18 151:19
179:5
**non-income-p...**
78:25
**non-legal** 16:11
**normal** 10:18,21
124:22 133:11
136:10
**normally** 107:18
107:20 108:4
109:9
**North** 5:14 6:8
**Northern** 1:11
6:5 17:3 20:12
24:9 25:9 26:3
57:4,11,15,19
58:4,7,12 59:8
59:16,20 60:9
62:2,11 86:19
89:25 95:24
98:12,14,15
130:17 131:8
134:8 176:25
**Northwestern**
154:15
**Notary** 186:25
**note** 31:25 49:8
146:12
**noted** 189:10
**notes** 20:11 21:8
21:23 34:2
41:25 48:7
49:3,4,18
50:12 54:4,6,8
54:10,12 55:25
56:5,6,6,6,9,23
65:25 66:2
89:9 90:11
103:25 116:15
130:13 132:11
133:10 170:8
170:16 173:19
183:9 187:16
**not-income-pr...**
78:18
**November** 22:24
188:13
**number** 31:23

49:5 63:14,15
63:17 67:4,6,9
67:13 68:13,16
68:22,24,25
74:12 76:22
93:25 101:19
114:14 116:19
119:24,24
120:5,9,24
121:5 131:23
139:10 147:13
179:15
**numbers** 59:24
62:6,9 63:2,18
64:4 69:4 72:4
123:5 131:23
132:14 155:25
156:8,10,13,14
156:15
**numerous**
163:17

**O**

**O** 187:4,4
**oath** 51:25
112:22 138:3
**object** 92:25
127:22
**objection** 22:16
23:21 24:11
25:12 28:24
42:22 52:14,20
64:6 70:8 71:3
71:11 83:20
88:17 89:21
98:19 99:7,18
100:3 102:8
104:12 106:5
106:16,22
108:10,11,14
112:9 114:22
115:15 117:8
117:11 118:7
127:24,25
129:8,19
134:18 137:22
141:4 143:3,14
143:25 144:14

145:10 150:5
151:5,24
154:22 156:21
157:6 158:19
165:6 166:9
169:4 170:4
172:4,22
173:15 174:7,8
176:6 177:10
178:15 179:9
179:22 182:4
**objections** 75:7
117:3
**objectives**
126:18
**obtain** 135:21
181:21
**obtained** 180:12
**occupation** 83:5
84:8,14,16,24
85:3,25 88:7
136:18
**Occupational**
159:14
**occupations**
88:2
**occurred** 20:2
**October** 1:17
2:12 6:9 18:2
**odd** 68:24
**offer** 46:6
103:24
**offered** 46:3
171:3,18
**offers** 116:17
171:2
**office** 13:12
14:17,21 32:11
34:2,10 81:21
83:10 158:25
**offices** 2:11 6:8
**okay** 7:19 8:18
9:3,19,23 10:6
12:4 14:16,21
16:8 19:3,11
21:3,12 22:21
23:15,19 24:20
26:24 30:11,23

31:18 34:19
35:13,25 37:4
37:12 40:19
42:21 43:5
47:4,8 51:24
59:22 61:24
66:7 67:11
68:6 69:25
72:2 75:7,14
81:14 88:22
91:3 94:6
95:15 101:7
109:11 113:16
115:3,8 116:21
117:10 122:21
122:25 123:20
125:14,19
126:24 129:15
131:12,17
132:9 133:5
140:9 143:9
152:21 161:11
165:24 169:16
175:19,21
177:18 180:10
**old** 139:9
**once** 132:16
133:2
**ones** 57:12
**one-eighth** 68:18
68:19
**one-tenth** 68:20
**one-third** 132:3
132:5,6
**operate** 91:24
92:12
**opine** 128:15
183:4
**opined** 28:23
**opining** 25:5
**opinion** 7:11
28:21 30:12
52:13,19 53:3
56:24 57:4,10
58:2 59:3 74:2
78:9,14,19
79:11,11,24
80:8,12 86:23

89:15,23 90:21
90:22 91:17
92:8 93:4
95:19 97:16,23
97:25 99:10
103:24 104:9
104:15,18,19
104:23,25
105:10,11,19
106:13 119:8
122:23 128:10
129:4 134:15
164:17,21,22
165:2,16,17
166:3 170:12
172:8,19 173:5
173:10,11
174:19,23
176:22 182:23
183:15
**opinions** 19:8
23:10 44:13
45:20 47:20
80:5 81:19
92:5,21 121:23
122:25 124:2
145:14,17
146:7 164:14
165:24 169:16
**opportunities**
97:18,21
103:19
**opportunity**
79:9 89:16
93:7,16 95:2
95:17 97:4
98:3,5 99:6,11
99:15 100:2
102:5 104:22
112:13 135:24
165:9 166:16
166:17,18
167:7,8 174:16
178:20
**opposed** 31:23
45:4 146:23
154:8 162:15
**opposition**

184:25
**option** 166:12,18
166:19
**order** 10:18
51:10,15 66:17
159:6 160:11
182:10
**ordinary** 119:25
120:2
**organization**
74:14,14
**orientation**
34:23 37:19
**origin** 40:18
**original** 139:25
145:22,25
146:2,7 153:3
153:20 154:8
188:8 189:12
**originally** 159:4
**Orlando** 118:12
**outcome** 13:22
188:6
**outside** 74:17
76:25 77:23
109:15 110:5
138:16 140:4
**out-of-pocket**
17:3 57:5,7,10
57:22 58:3,8
62:25 63:7,8
63:20
**overall** 136:22
**overly** 92:23
**oversimplify**
87:14
**overturn** 160:6
**overturned**
160:19
**owned** 115:13
**owns** 116:16
118:14 119:23
**o'clock** 2:13

**P**

**packing** 184:14
**page** 3:4 37:10
37:11,11,21

38:3,4 43:16
49:7,15 50:11
94:3,7,12,13
94:20,21
119:19 120:11
130:12,13
132:3,10 133:9
134:6 142:9
152:18 183:10
186:13 187:20
190:8
**pages** 40:10 59:9
60:10 61:4
103:8 147:6,6
186:9
**paginate** 60:11
**paid** 12:11 13:25
14:2,3 82:5
113:12 146:3
165:4,19,22
**pain** 39:8,17,22
72:15
**paper** 167:9
**papers** 63:9
**paragraph**
16:23 17:13
19:12,21 94:7
130:14
**Pardon** 68:2
**parsing** 175:6
**part** 13:21 49:17
49:19,21,22
173:21 177:22
187:21
**particular** 24:8
25:6 36:19
54:9 74:11
95:23 111:11
122:10 125:5
145:4 153:9
183:20
**particularly**
70:19 150:2
**particulars**
125:12,14
**parties** 185:4
187:20 188:4
**PARTNERS**

4:11
**parts** 147:9
**party** 25:6
**pass** 118:19
**passed** 126:22
163:14
**passengers**
168:19
**patient** 72:23
**pay** 12:16 113:6
113:10,19
**payday** 116:17
**payment** 13:7
14:25 16:19
57:15,19 62:16
**payments** 13:9
13:11,15 14:13
14:20 17:2,2
26:2 57:4,10
58:3,7,11 59:8
59:12,21 60:8
61:9,25 62:5,9
62:11
**payroll** 81:21
83:10,13 85:20
119:4
**peculiarities**
36:21,22 37:5
**peer** 139:23
141:3,8 146:8
**peer-reviewed**
72:23 74:18,19
88:10,11 141:7
141:13,17
142:8 145:13
145:25 147:14
**people** 25:11
41:10 54:24
118:25 128:19
146:2 147:14
150:12,14,15
158:9,13
166:25 182:12
**people's** 41:24
**percent** 89:6
118:13 119:23
129:17 130:9
130:10,19,19

130:19,19,23
130:23,24
131:10,10,12
131:13,14,21
132:4,6,7,8,16
132:20,21,21
132:22 133:12
133:14,15,16
133:18,19,20
133:21,22,23
133:24,25
134:7,8,9,12
134:12 139:9
139:12 140:21
156:13,15
**percentage**
27:17 139:15
140:7,14,14,16
140:17 141:8
142:15 143:7
**percentages**
134:22 135:3,7
139:17,17
141:10,20,20
**perfectly** 151:10
**perform** 41:12
**performance**
167:12,18,22
**performed**
72:21 82:24
83:7,9
**Peri** 1:6 26:16
26:19,25 27:4
**period** 44:20
47:7 67:24,24
94:16 111:4
131:11 132:23
**person** 72:12
118:21 123:7
124:15,16,18
124:22,23
153:9 167:13
**personal** 16:5
27:20,23 31:4
31:13 38:24
39:3 40:13
142:10
**personally**

126:21 127:6
**persons** 187:19
**person's** 42:3
123:8 124:21
137:12,13,16
137:17
**pertaining** 2:6
**pertains** 140:13
**pertinent** 138:9
**phone** 41:15
74:3 85:17
**phones** 45:21
**phonetically**
148:14,17
**phrase** 92:18
114:19
**Ph.D** 1:1,16 2:1
3:1,3 4:1 5:1
6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1,10 71:1
72:1 73:1 74:1
75:1 76:1,10
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1

95:1 96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1,14 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:7,16 187:1
188:1
**place** 20:8 90:20

101:8,15 149:8
167:2,3 180:21
187:11
**places** 150:21
**plaintiff** 2:3 48:5
53:2 59:20
69:6 71:16
74:8 75:21
76:6,12,22
77:22,25 78:2
78:3,12 124:19
125:7,13,15
126:8 128:7
129:18 134:16
140:11 148:10
162:10 166:5
169:18
**plaintiffs** 1:9
4:18 8:8 21:5,7
21:18,21 27:18
27:21 32:24
33:8 37:25
50:25 51:25
56:24 58:13,25
59:7 61:10,19
64:12 65:7,18
65:21 70:20
71:22 72:4
74:6 75:15,23
82:19,20 83:6
83:18 86:16,25
87:5,15,18,18
88:23 90:12
92:22 124:3
126:3,14 127:6
128:4 129:16
134:22 135:8
137:20 138:4
138:12,14,16
139:15 140:16
141:24 143:18
144:9 146:16
147:20,25
148:5 156:5
163:19 164:12
164:18 167:25
171:15,23
180:11,17

184:15,25
185:6,11
**plaintiff's** 26:19
28:14,23 30:12
80:13 81:20
117:7 127:22
162:13 181:6
**planned** 184:4
**plausibility**
58:21
**plausible** 150:24
**Plaza** 2:12
**please** 6:15 7:21
10:11 12:22
13:5 18:20,21
19:5 29:6 30:4
35:8 40:21
45:19 55:23
56:20 83:23
108:24 120:14
180:8 189:3,7
**plus** 16:16 43:12
81:12 139:18
**podium** 157:13
**point** 16:11
21:21 23:25
28:8 81:4
123:15 125:10
125:11,11
138:2 149:11
149:12,12
155:7,10 158:3
175:9 176:11
178:23
**pokes** 72:16
**policy** 155:9
158:2
**political** 155:7
**pollute** 171:3,19
**portion** 101:10
**portray** 68:11
73:13 129:23
**portrayed**
129:22 133:13
134:23 164:7
180:6
**posing** 105:17
**position** 9:12

12:8 86:16
155:9 158:2
**possibilities**
70:15
**possibility**
100:23
**possibly** 31:9
**potential** 111:25
143:10
**PP** 3:17 55:13
**practical** 153:19
**practically**
67:12
**practice** 10:18
10:21 12:7
16:18 53:25
54:3 162:21
**practices** 182:11
**precise** 31:17,19
31:23 32:7,8
**precisely** 64:22
129:21
**prefer** 10:8
150:20
**preliminary**
37:19 110:17
**premarked**
11:13
**preparation**
15:8,11 34:7
43:18 51:11
**prepare** 26:15
**prepared** 10:4
19:7 21:9
22:14 27:8
34:11 110:21
**preparing** 33:21
**present** 5:21
6:23 17:25
18:4 75:4
162:17 187:18
**presented** 91:14
**preservation**
159:20,24
**president** 12:10
74:12 84:10
155:22 157:10
157:17 159:3,4

**presidential**
159:6 160:11
**presidents**
150:20
**pretax** 115:9
**pretend** 37:7
**pretty** 35:23
**previous** 187:9
**previously** 7:8
56:15,16
**principal** 85:22
155:6
**print** 126:19
**printer** 126:19
**prior** 11:10
123:15 181:13
182:7
**private** 25:2
58:15
**prize** 150:15,17
153:15
**probably** 7:14
26:10 30:9,21
31:5 38:15
44:19 51:13
63:9 67:20
94:24 131:4
154:5 160:2
**problem** 65:19
65:24
**procedure** 2:4
34:10 72:11
**proceed** 23:6
**proceeding**
80:18
**proceedings**
96:12 185:20
**process** 61:6
69:4 77:13
88:3,16 144:11
146:16 173:6
**processes** 74:5
77:14
**produce** 34:17
93:18 141:14
141:17
**produced** 27:13
47:24 116:23

117:5 150:17
**production**
13:14 14:19
44:12
**profession**
150:18
**Professional**
2:10 187:7
**profit** 92:12 93:9
93:22 98:6
105:13,21
106:9,11
113:15 115:4
115:24 116:8
118:5
**profitability**
106:20 107:15
109:7,12,25
110:4,8,9,13
113:8 117:24
121:9
**profitable** 114:7
**profits** 17:4
89:13 114:15
114:24 115:9
**project** 31:8
134:24
**projected** 17:25
**projections** 18:6
**promise** 12:14
**pronoun** 80:2
**proper** 108:16
154:19
**properly** 63:22
**property** 137:17
**proposed** 144:18
**prospective**
110:11 112:7
**Protection**
159:15
**proves** 173:22
**provide** 10:10
12:12 31:3,12
32:16 33:10
41:6 50:24
51:9 60:7
101:5 148:3
154:2 179:13

185:5
**provided** 11:20
12:2 48:3
58:16,18 64:10
72:9 100:8
115:19 116:22
135:7 151:12
**provides** 100:22
101:2,5 173:23
**providing** 107:3
117:4
**provision** 83:2
**proximate**
134:24
**Prudential** 2:11
**psychologist**
128:14
**psychology**
70:10
**public** 155:11,14
155:20 156:5
186:25
**publication**
145:5
**published**
139:23,25
141:3,7 145:6
145:13,21,22
145:25,25
147:14 153:9
153:16 154:13
154:18 158:6
**publishes** 88:8
**purchase** 89:16
89:25 93:7,17
102:6 104:22
107:10 110:11
181:21
**purchaser** 113:9
**purchasing**
106:2 114:6
**purpose** 37:16
**purposely** 83:15
**purposes** 2:7
153:19 158:24
162:22 184:24
**pursuant** 2:4
185:7

**pursuing** 20:12
178:3
**put** 55:11 62:7
63:3,15 64:17
87:16 88:15,23
107:3,12
112:23 117:22
119:11,11
138:14 162:2
180:15
**puts** 174:13
**putting** 132:14
166:19
**P.C** 4:3
**p.m** 137:4,9
184:8,13,21
185:19

———————
**Q**
**qualified** 53:19
53:21
**qualify** 150:10
178:25
**quality** 100:18
123:8 126:10
130:16 131:7
131:13 132:18
133:12,21
136:23 138:6
140:12
**quantify** 101:11
**quarrel** 161:12
**quarter** 101:22
**quarterbacks**
146:3
**quarters** 27:21
**question** 7:18,19
10:12 22:5
24:13,16 26:8
29:4,14,17,21
30:8,10 37:3
39:10 45:19,25
46:7,10,12,13
46:18,21 52:3
52:10 58:20
60:18,19 61:12
61:22 62:15
63:22 65:15

66:2 67:21
70:15,25 71:5
71:8,21 72:2
72:25 73:23
74:20 77:3,21
77:24 79:2
80:4 82:14
83:23 84:6
96:17,19,23
98:25,25 99:19
105:7 107:23
107:25 108:7,7
108:12,16,21
108:22,23,25
109:3,20,23
110:20 111:3,7
111:20 114:4
125:9 127:9
128:13 140:23
145:8 152:5
157:3,14
161:14 162:6
165:12,17
172:7 180:9
**questioning**
27:25
**questions** 7:11
10:7,22 18:12
66:4 74:6 91:7
92:2 112:12,14
127:23 135:13
135:16
**quickly** 48:11
103:11 118:2
**quite** 36:3 60:10
70:24 162:22
**quoting** 155:24

———————
**R**
**R** 190:1,1
**rabbit** 118:18
**race** 35:23 73:24
**radio** 175:4
**raffle** 166:15,15
**raise** 63:24
**raised** 77:8
**range** 66:24 67:5
67:15 68:13

70:2,25 71:9
124:22 130:10
131:3 133:17
150:24 156:12
**ranges** 134:17
**rape** 128:23
**Rapid** 116:4,13
116:15,17
118:16,17,24
119:3
**rare** 163:12
**rate** 76:21 78:8
78:12 79:9
83:5,10,16,17
84:3 85:2,7,21
85:23 88:5,24
89:3 93:19
143:11,13,17
143:19,19,24
144:5,7,9,11
144:13 179:2
179:14
**rates** 82:5 87:23
88:12
**rating** 123:6
124:9,10
125:16 126:2,4
126:11 128:11
141:2
**rationale** 23:3
**read** 16:24 25:20
29:6,8 43:15
45:22 46:21
72:24 83:22,25
86:9,12 94:14
96:19,21
102:24 108:24
128:17 152:4,8
154:25 161:20
161:21,24
164:5 170:7
171:10 177:22
177:24 186:8
189:3
**readily** 121:11
**reading** 93:24
94:19 183:14
**reads** 30:6

**ready** 108:18
**realistic** 94:10
**realize** 80:22
170:22
**really** 39:4 85:22
86:14 96:24
97:17,24 129:3
139:5 141:21
145:5,9,12
149:23
**realm** 70:14
77:23
**Realtime** 2:10
187:8
**reason** 18:12
22:12 23:17
27:7 48:8
58:20 68:15
98:7 126:3
157:20 189:5
190:10,12,14
190:16,18,20
**reasonable**
76:14 82:22
93:17
**reasonably**
63:11 129:23
**reasons** 22:13
190:6
**recall** 26:20
28:10,15 30:23
32:10 42:15
60:22 74:8
103:9 148:10
148:23 176:4
**recapture** 97:19
**receipt** 189:14
**receipts** 120:13
**receive** 16:18
**received** 13:9
71:25 117:13
117:15
**reception** 44:15
**recognize** 26:24
**recognized**
146:11
**recollection**
10:22,23 14:6

22:19 26:22
27:3 61:15
138:8
**record** 7:9 16:24
29:7 32:2 53:9
53:12,25 62:16
66:4,5 83:24
86:11 96:7,13
96:20 98:16
110:17 125:23
137:3,7 152:7
161:23 177:23
178:4 184:7,12
184:18,21
185:19
**recorded** 53:23
**records** 14:5,8
71:17,19,20,20
**recover** 95:2,16
97:14 98:2
99:5,14 128:23
167:13
**recovered** 99:17
99:22,24
163:18
**recovery** 100:20
163:19,21
**Redner** 1:7 56:7
57:18 132:2,2
132:2 164:16
183:5,6,11,11
183:21
**reduced** 123:2,8
180:24 187:13
**reduces** 169:9
**reducing** 169:15
**reduction** 30:13
129:17 130:22
137:11,15
140:12 159:24
**reestablish**
100:6
**refer** 10:9 20:15
21:24,24 39:8
40:2 41:25
90:14 123:20
123:22 149:17
152:17

**reference** 94:12
94:21 97:13
121:2
**referred** 19:18
89:12 137:25
140:10 146:20
151:21 165:25
**referring** 17:7,8
20:16 49:9
54:9,9,11
82:10,10,11
118:4 130:15
130:21 142:8
142:11 147:22
154:12
**refers** 42:4 50:19
60:5 146:24
147:11 173:20
**refinance** 170:20
172:14 174:21
176:19
**reflect** 69:19
119:13
**reflected** 23:11
**reflecting** 13:8
14:20 49:8
121:9
**refresh** 10:23
14:6 26:22
161:22
**refuse** 46:12
110:20,21
**refused** 169:24
179:13
**refusing** 46:19
**regard** 16:10
58:7 82:8
95:22 100:19
122:25
**regarded** 150:2
**regarding** 17:9
26:16,19,25
59:12 79:3
83:8 97:16
112:17,18
135:18 159:20
164:21
**regardless** 111:8

**Registered** 2:10
187:7
**regulation** 159:8
159:12,19,23
160:7,7,10,17
160:18
**regulations**
160:4,13
**regulatory**
159:20 161:4
161:18
**Regus** 2:11 6:8
**reiterate** 126:18
**reiterating**
127:2
**rejected** 176:20
**related** 14:11,14
119:5 121:12
121:13 174:15
174:20,24
181:8 183:3
188:4
**relates** 174:16
174:23
**relating** 115:21
**relatively** 69:16
85:19
**relatives** 168:20
**relativity** 153:13
153:17
**relevant** 51:10
110:6 127:15
**reliable** 88:13
**relied** 47:20
147:12
**relies** 123:4
**rely** 119:7
**remaining**
124:12,14
132:18 133:12
185:4
**remarks** 77:12
**remedy** 65:11,23
85:9,15 87:20
96:25
**render** 164:20
**rendered** 8:7
23:10

**rented** 167:18,21
167:24
**repeat** 73:10
86:10 120:4,14
177:19
**repeated** 61:10
112:20 180:14
**repeatedly**
112:11
**rephrase** 29:14
29:17,18,21
91:25 109:2
**rephrasing** 30:8
**replacement**
76:14 79:5
100:12
**report** 8:17 10:2
16:19 17:9,12
17:21,24 18:3
18:10,17 19:7
19:8,12 22:18
23:2,11 24:8
26:15 27:8
31:3,12 32:16
34:11,12,17
42:7 43:17
48:2,3,21 49:2
49:10 51:11
55:9 56:2,12
56:13,16 57:14
61:10 62:3,7
63:4,16 64:5
64:18 66:11,19
87:24 88:15
89:9,11 93:14
94:5,6 97:13
100:22 114:12
114:14,19
126:5,20
128:12 129:17
129:24 131:4
131:11 135:20
140:10 142:22
146:13,14,21
146:23 147:2,3
147:6,7,9,10
147:11,17
152:18 153:24

165:24 173:7
173:18,19,23
181:2,19 183:5
183:10
**reported** 1:20
5:24 65:2
70:22 172:18
**reporter** 2:9,10
2:11 6:13 7:21
11:10,15 29:5
29:22 95:7
177:22 187:6,7
187:8
**reports** 7:11
8:10,17 10:4
16:24 17:15,16
18:10,11 20:15
21:9 22:14
23:12 27:12
43:18 44:12
48:25 55:24
56:8,14,17,22
65:3 123:20
125:3 177:15
**represent** 64:12
69:5,19 73:14
104:6 182:23
**represented**
64:4
**representing**
6:18,20 7:10
59:16
**reproduced**
188:10
**request** 10:16
13:6 58:17
77:18 126:22
126:23 127:10
**requested** 29:8
83:25 86:12
96:21 126:22
152:8 161:24
177:24
**requests** 10:16
14:23
**require** 77:16
**requirement**
8:24

**requires** 138:3
139:21 159:6
**research** 43:17
44:10 140:2
145:22 146:2,7
153:3,9,20
154:8 156:11
156:12
**resolve** 65:24
87:21
**resolved** 9:15
39:11 132:17
**resolves** 133:3
**respect** 20:14
40:5 58:11
62:25 64:22
66:7 77:17
78:21 135:11
138:25 152:17
164:14
**respectful** 77:13
**responded** 87:12
**responsibilities**
43:14 44:24
**responsibility**
188:9
**responsible**
24:24
**responsive** 63:12
**rest** 56:13 57:13
**restate** 32:2
**restated** 180:18
**restaurants**
84:12
**restroom** 44:22
**result** 15:15 65:8
68:13 69:16,18
86:19,20,20
87:15 90:3
160:4,12,19
165:5 176:25
178:13 180:20
180:24
**results** 142:25
**resumé** 142:5,7
**retained** 156:4
**retainer** 13:6
15:13

**retention** 83:2
**retired** 86:2
**return** 116:3,9
116:12,18
118:3,6 120:12
121:19 122:17
122:18 189:12
**revenue** 139:12
**reverse** 25:25
**review** 34:6,15
51:3,7 75:4
90:9 111:14
146:8 154:15
**reviewed** 50:21
63:5 139:24
141:9
**reviewing** 103:5
183:9
**revisit** 180:7
**ribs** 72:16
**RICH** 1:12
**Richard** 153:5
**RICO** 32:17
33:2 37:4
182:11
**ride** 63:23
**right** 18:15 23:6
23:9 30:2 35:6
40:14 55:17,21
56:21 57:14,16
57:25 59:16
61:7 65:14
67:6 75:24
76:3,5 77:11
88:20,21 89:10
95:25 99:2
117:16 119:19
122:14 123:16
125:8 127:22
138:5,20
151:16 152:10
157:23 165:21
169:14 171:25
**risk** 159:24
169:9,15
**rlillienstein@...**
5:10
**Robert** 5:4 6:17

**room** 6:23 72:20
**Rosen** 149:18
150:7,16
**Rosen's** 153:6
**roughly** 74:13
**round** 31:24
67:14 68:15
**Route** 4:14
**routine** 177:15
**RPR** 5:24
188:17
**rule** 52:25 53:4,5
108:9
**rules** 2:5 185:7
**rushed** 72:20
**Russ** 1:6 16:25
17:10 56:6
57:8,21,24
89:9,16 91:8,9
92:9 93:5,6,17
94:5,6,25
95:15 96:25
97:12 98:15,21
99:5,11 102:2
102:5 103:7,19
104:3,10,16
105:11,20
106:3,19 107:2
107:9 109:6
110:8 111:24
112:13,22,25
113:5 115:10
115:13 116:4
116:16 118:10
118:15 119:14
119:23 121:18
122:22 130:7
131:3,6 164:16
**Russ's** 89:19,23
90:10,12 91:18
93:15,21 98:9
102:12 103:13
117:25 121:9

——————
**S**
**S** 3:7 116:13
**Sad** 56:10
**safety** 159:13,14

159:21,25
167:14
**SARA** 1:13
**sarcasm** 77:7,8
**sarcastic** 77:11
**satisfaction**
12:13,18
135:22,25
136:7
**save** 46:23 61:20
102:24 127:8
170:11
**saved** 160:12,22
176:4
**saw** 95:9,9 102:4
112:5 115:11
115:21 176:11
176:18
**saying** 63:20,25
75:21 100:14
102:16 126:13
142:23 147:8
175:2,11
**says** 15:14 19:12
32:3 37:13
38:5 43:15
49:15 52:6
57:18,21 60:4
72:16 133:21
160:25 163:5
165:17 181:19
183:5,11
**scale** 72:16 73:2
**scheduled**
175:10 184:22
**scheduling**
41:14 44:5,6
44:15 184:24
185:2,9
**Schelling** 144:17
**School** 47:17
**science** 42:17
76:8,18
**scope** 76:25
109:15 110:5
112:24 138:16
**score** 176:24
178:6,8,24

**scratch** 34:25
**scratched** 35:21
**script** 54:18,21
**second** 19:21
37:11 38:4
81:7 119:2
**Secondly** 136:3
**seconds** 183:24
**section** 36:21
37:13,16
**sections** 147:4
**Security** 119:24
**see** 11:22 19:16
19:24 26:24
38:8 48:7 54:4
54:6 56:3 59:6
63:13 69:13
72:3,7 93:25
94:2,3 97:17
101:24 110:18
111:18,22
116:2 121:3,11
128:3,16 136:8
163:2 170:24
172:3
**seeing** 60:22
103:11
**seek** 58:22
102:10
**seeking** 25:25
65:11,23 85:9
86:25 87:19
113:2 115:17
150:19 163:19
**seen** 13:3 21:23
72:22 74:17
88:9,11 141:9
160:6 182:25
**sees** 111:3
**select** 81:24
**selected** 85:5,7
85:21
**self-assessment**
145:12
**sell** 89:18 103:22
**selling** 139:11
**Senate** 163:14
**send** 34:17 73:7

**senior** 42:4
**sense** 84:13
  136:20 158:8
**sent** 72:18
**sentence** 130:15
  130:21 161:21
  162:3,5
**separate** 39:12
**separately** 18:12
  49:25
**series** 8:11
**Serin** 1:5 6:4
  56:5 57:7,24
  66:14 67:7,17
  70:4 82:10,17
  84:14 133:9
  164:16 181:18
**serious** 127:10
**served** 27:9
**services** 8:7 15:3
  41:13 82:23
  83:3
**set** 8:10,16 78:6
  167:8 188:12
**sets** 49:16 55:25
**setting** 162:23
**seven** 175:10
**shape** 100:19
**sheet** 189:6,7,10
  189:13
**Sheri** 1:20 2:7
  5:24 6:13
  187:5 188:17
**Sherwin** 150:7
  150:15 153:5
**shift** 133:4
**shirts** 136:12
**shoes** 136:11,12
**shopping** 136:11
  136:13
**short** 47:6
  111:12,16
**shortened** 92:24
**shorthand** 2:8
  187:6,13,16
**shot** 123:3
**show** 11:5 12:22
  18:21 35:7

40:6,20 115:23
  119:21,25
  120:12 141:25
**showed** 132:7
  134:9,11,12
**showing** 60:8
**shown** 117:24
  132:19 186:12
**shows** 119:22,22
  134:2
**sic** 62:14 82:3
**side** 28:5 51:13
  77:9
**side-step** 92:15
**sign** 51:19 95:9
  189:7
**SIGNATURE**
  190:23
**signatures** 33:8
**signed** 59:19
  155:21 157:10
  159:5 188:8
**significant**
  139:22 159:7
  178:6
**significantly**
  105:16,18
**signing** 189:9
**similar** 33:8
  38:17 85:15
  91:7 121:16
  126:7 131:5
**similarly** 70:20
  131:18
**simple** 16:7
  62:18 68:16
  69:4 73:23
  74:7,7 88:16
  114:5 138:21
  142:14
**simpler** 126:25
**simplistic**
  141:10
**simply** 10:18,25
  16:11 18:5
  63:2 72:12
  76:15,18,24
  151:8 157:22

162:20
**simultaneously**
  15:25
**sine** 185:21
**Singer** 5:3 6:18
**single** 16:10
  48:12 60:16,17
  88:10 158:22
  160:9 161:3
**sir** 16:4 172:15
**sit** 26:20 32:11
**situated** 70:20
**situation** 65:12
  74:11 85:10
  133:2
**six** 43:12,23 45:7
  55:4 68:23
**skyrocketed**
  179:15
**sleep** 162:2
**sleeping** 74:3
**slight** 36:11
**slightly** 93:25
  118:23 119:3
  134:23
**small** 84:12
  128:20
**Smith** 1:1,8,16
  2:1,3 3:1,3 4:1
  5:1 6:1,3,21
  7:1,8,25 8:1,6
  9:1 10:1,6 11:1
  11:20,24 12:1
  12:8,12,22
  13:1,3 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1,24
  23:1,4 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1,22
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1 40:1 41:1
  41:4 42:1 43:1
  44:1 45:1,18
  46:1 47:1 48:1

49:1,23 50:1
  51:1 52:1 53:1
  54:1 55:1 56:1
  56:6 57:1,11
  58:1,2 59:1
  60:1 61:1 62:1
  63:1 64:1 65:1
  66:1 67:1 68:1
  69:1 70:1 71:1
  72:1 73:1 74:1
  75:1 76:1 77:1
  78:1 79:1 80:1
  81:1 82:1 83:1
  84:1,8,10 85:1
  86:1 87:1 88:1
  89:1 90:1 91:1
  92:1 93:1 94:1
  95:1 96:1,16
  97:1 98:1 99:1
  100:1 101:1
  102:1 103:1
  104:1 105:1
  106:1 107:1
  108:1,3 109:1
  110:1 111:1
  112:1 113:1
  114:1 115:1
  116:1 117:1,12
  117:22 118:1
  119:1 120:1
  121:1 122:1
  123:1 124:1
  125:1 126:1
  127:1 128:1
  129:1 130:1
  131:1 132:1,10
  133:1 134:1
  135:1 136:1
  137:1,11 138:1
  139:1 140:1
  141:1 142:1,2
  143:1 144:1
  145:1 146:1
  147:1 148:1
  149:1 150:1
  151:1 152:1
  153:1 154:1
  155:1 156:1

157:1 158:1
  159:1 160:1
  161:1 162:1
  163:1 164:1,20
  165:1,2 166:1
  167:1 168:1
  169:1 170:1,12
  171:1,9,22
  172:1 173:1
  174:1 175:1,12
  175:21 176:1
  177:1 178:1
  179:1 180:1
  181:1 182:1,15
  183:1 184:1,3
  184:23 185:1,2
  185:6,12,18
  186:7,16 187:1
  188:1
**social** 119:24
  136:4,16
**Soleil** 166:23
  167:22
**somebody** 44:20
  63:7,19,23
  70:16 86:2
  100:15 163:11
  166:14 168:4
**someone's** 64:19
**somewhat** 32:7
  79:17 150:18
  154:24
**sophisticated**
  45:4
**sorry** 59:25
  64:25 67:24
  82:13 114:12
  120:4,14 130:9
  131:6,18
**sort** 33:7 85:20
**sought** 84:3
  107:10 150:10
  162:10
**SOUI** 1:6
**sound** 70:18
**sounds** 119:2
**sources** 48:2
**Southern** 1:3 6:6

**space** 189:5
**speak** 21:4,20
    102:22 126:13
    127:5 128:3
**speaking** 75:7
    88:25 108:10
    108:13 132:11
**specialist** 6:13
**specific** 44:16
    86:17,18
    135:13 162:22
    164:5 174:17
    174:25 180:9
**specifically**
    30:23 42:15
    60:22 104:5
    107:7 124:13
    135:19 153:21
    163:17,21
    172:12 174:15
    175:6 178:21
**specified** 16:22
**specify** 79:25
    99:13 140:14
**speculate** 70:11
**speculating** 64:7
**speed** 60:21
**spell** 135:20
    148:12
**spend** 33:21,24
    45:11 74:2,9
    74:10,11,21
**spending** 79:13
    79:14
**spent** 25:25
    45:21 57:19,21
    63:23 64:2,23
    65:3,7,10,18
    65:23 67:23
    69:22 70:5,17
    71:17 72:12
    73:5,21 76:2,6
    78:4,15,20,24
    80:7 82:6
    86:24 87:17
    138:18
**spoken** 21:7,22
    128:6 160:25

**ss** 186:3 187:3
**Stabilization**
    163:15
**staff** 8:10 21:10
    34:16 41:6,8
    43:16 53:23
    54:15 55:6
    65:13,16 90:19
    92:10,16 93:6
    102:3 103:14
    104:2 106:19
    109:6 121:17
    126:23 135:12
    140:25 176:3
    179:18 180:22
**stamp** 116:19
**Stan** 1:1,16 2:1,2
    3:1,3 4:1 5:1
    6:1,3 7:1,25
    8:1 9:1 10:1
    11:1 12:1 13:1
    14:1 15:1 16:1
    17:1 18:1 19:1
    20:1 21:1 22:1
    23:1 24:1 25:1
    26:1 27:1 28:1
    29:1 30:1 31:1
    32:1 33:1 34:1
    35:1 36:1 37:1
    38:1 39:1 40:1
    41:1 42:1 43:1
    44:1 45:1 46:1
    47:1 48:1 49:1
    50:1 51:1 52:1
    53:1 54:1 55:1
    56:1 57:1 58:1
    59:1 60:1 61:1
    62:1 63:1 64:1
    65:1 66:1 67:1
    68:1 69:1 70:1
    71:1 72:1 73:1
    74:1 75:1 76:1
    77:1 78:1 79:1
    80:1 81:1 82:1
    83:1 84:1 85:1
    86:1 87:1 88:1
    89:1 90:1 91:1
    92:1 93:1 94:1

**95:1 96:1 97:1**
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1,25
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1,18
186:7,16 187:1
188:1
**standard** 11:25

39:22 74:4
    79:3
**standing** 94:22
**stapled** 35:18
**start** 24:5 42:8
    59:11 92:2
    130:4 132:4
**started** 25:8 34:2
    97:6 107:23
**starting** 125:10
    125:11,11
    130:6
**starts** 111:7
**state** 2:5,9 21:3
    109:11 114:15
    114:16 136:15
    138:5,20
    162:19 186:2
    187:2,7 189:4
**stated** 28:4
    69:20 180:19
**statement** 46:16
    51:24 52:12,18
    52:22,25 59:14
    88:12 91:20
    92:5 93:2,5
    106:14 120:19
    121:3 125:25
    134:3 136:25
    144:25 155:21
    156:5 157:10
    158:14 162:25
    163:23 171:16
    172:2,8 173:7
    173:8 180:6
    182:16 183:16
**statements**
    59:12 60:8,23
    61:9 66:5
    71:24 90:23
    91:2,3 92:9,22
    106:15 127:2
    128:9,14
    140:20,22
    173:19 174:11
    180:10
**states** 1:2 39:10
    39:11,15 93:14

130:16 132:16
    150:21 158:15
    158:21,22
    160:16,22
    161:4 163:11
**stations** 90:2,24
**statistical** 123:6
    123:9,23 124:3
    124:24 139:21
    140:2,3 145:21
    147:15 151:8
    153:6,10
**statistically**
    124:15
**statistics** 45:23
    73:6,8,9 76:20
    78:7 142:16
**stay** 160:7
**steals** 168:8
**steering** 175:3,7
**stellar** 42:10
    47:10
**step** 18:9
**Stephanie** 42:3
    47:8 53:16
    55:6
**Stetson** 6:8
**stock** 32:14
**stole** 100:15
**stop** 84:18
**stopped** 34:3
**stopping** 185:12
**store** 93:8
    109:25 110:11
    118:6,10,12
**stores** 91:18
    92:10 93:6,19
    100:10 105:12
    106:8,20
    107:15 109:7
    109:13 110:4,8
    117:25 118:15
    121:10,13
**straight** 7:7 77:4
    127:15
**straightforward**
    15:23
**strategy** 141:12

141:21
**stream** 97:19
  100:6,7 104:8
**Street** 5:14 6:9
**strike** 73:18
  151:18 179:5
**structure** 48:25
**Strutinskiy** 4:4
  6:19,19 9:6,17
  13:18 22:16
  23:21 24:11
  25:12 28:24
  31:25 42:22
  46:9,13 48:19
  49:9,17,22
  52:5,14,20
  54:8 55:16
  59:23 60:3,15
  62:8 64:6 70:8
  71:3,11 75:2
  82:9 96:11
**study** 149:18
**studying** 74:10
**stuff** 44:4
**stupid** 112:25
**subchapter**
  116:13 118:21
**subject** 38:6
  73:12 76:17,24
  79:10 160:18
  185:2 186:11
  189:9
**submission**
  11:11 34:12
**submitted** 63:7
**subscribed**
  186:20
**subsequent**
  19:14 92:6
  98:23 156:5
**substantial**
  33:14
**substantially**
  15:16
**substitute** 88:9
**succeeds** 95:15
  95:21
**succinct** 127:11

**succinctly**
  134:21 152:5
**sued** 87:5 89:24
**suffer** 168:3
**suffered** 168:7
**suffering** 39:8
  39:17,23
**suffices** 41:9
**suggest** 70:6
**suggestion** 69:13
**suggests** 71:9
**suing** 59:15
  163:11
**suit** 20:21 188:5
**suitable** 175:24
**Suite** 2:12 4:6
  5:15 6:9
**summarized**
  94:20
**summarizing**
  61:19
**summary** 147:4
  147:6
**sums** 183:7,12
**supervision** 82:8
  82:25
**supplied** 167:17
**supplies** 84:11
  84:11
**supplying** 171:4
**support** 34:17
  71:24 115:12
  115:17 154:2
**supporting** 72:3
**supports** 72:11
  73:20
**suppose** 59:10
**supposedly** 93:5
**Supreme** 2:5
  79:8,10,11
**sure** 11:25 18:18
  39:13 42:16,20
  42:23 43:3
  50:17 54:15
  56:21 63:5,11
  69:14 72:5
  118:14 127:14
  148:25 152:19

**surgery** 72:21
  128:20
**surrounding**
  51:16
**survey** 88:2
**surveys** 87:25
**Sussman** 59:16
  59:20
**sustained** 25:24
  70:21 99:12
  157:25 174:5
**sustaining** 20:4
**sustains** 40:17
**swap** 56:18
**swear** 7:22
**switch** 96:3
**switching** 31:21
**sworn** 7:24 8:2
  52:12,18,25
  59:12,14 64:13
  65:22 73:12
  91:10 146:17
  147:18 156:3
  180:14 186:20
  187:10
**synonymous**
  126:12
**system** 171:4,19
**Systems** 1:11 6:5
**S-corporation**
  118:22

──────────

**T**

**T** 3:7 190:1
**table** 94:14,22
  101:3
**tables** 49:3 147:4
  147:5
**take** 9:21 13:18
  24:4 32:12
  45:14 46:3
  48:21 50:11
  55:10 58:18
  67:16,18 68:17
  68:20 72:19
  78:11,15 80:25
  90:20 96:24
  98:2 101:18,21

102:11 106:25
  106:25 110:16
  110:16 111:4
  112:21 127:10
  128:14 129:5,6
  138:13 139:9
  148:5 149:8,24
  151:8 154:10
  159:10 167:16
  180:13
**taken** 2:4,7 6:3
  69:7,8 90:11
  187:11,16
**takes** 111:8
  168:4
**talk** 81:11
**talked** 152:22
  180:5
**talking** 30:19
  51:21 62:8,9
  62:10 88:20
  90:15 105:22
  105:24 121:19
  163:3,4,6
**talks** 57:14
**tallied** 62:19
**tally** 61:25
**tangible** 168:25
  169:8
**tape** 6:2 50:3
  51:23 53:7,8
  53:13,23,25
  81:7,9,11
  93:12 96:3,7
  96:14 137:3,8
  175:15,18,18
  175:23 181:4
  183:23 184:7
  184:12
**task** 104:6 110:6
**tax** 116:3,9,12
  116:18 118:3,5
  120:12 121:18
  122:17,18
**taxi** 85:13
**taxicab** 79:19
**taxpayer's**
  116:11

**TCW** 50:19
**teach** 44:21
**technique**
  140:25 142:24
  142:25
**Ted** 142:21,23
**telephone** 44:22
  49:4,8 50:12
  50:19 53:22
  90:15 102:3,17
  103:13 104:10
  104:17 115:11
  171:22
**Telephonically**
  5:22
**tell** 10:10 23:24
  24:3 29:25
  35:15 39:2,4
  47:3 52:23
  60:21 65:21
  67:12 70:16
  75:24 77:6,10
  84:20,21 93:24
  94:25 102:21
  104:18,19,24
  105:14,15
  106:19 107:14
  107:21 109:6
  111:15,24
  113:5,22,23
  118:4 121:7,23
  122:3,8 124:6
  128:16 129:5
  129:13 140:17
  144:24 147:16
  151:13 152:11
  154:11 163:2
  163:13 167:2
  167:17,22
  175:5 177:9,13
**tells** 76:12 115:7
**tend** 10:7
**tendered** 11:8,18
  12:24 18:24
  35:11 40:24
  50:7
**tens** 159:17,17
  159:17

**tenure** 45:6
**term** 163:16
**terms** 26:14
  44:24 126:12
  126:25 140:18
  169:18,19
**Terrorist** 163:22
**test** 75:15 77:20
  137:19
**testified** 8:3 25:8
  32:18 38:21
  64:10 67:18
  68:14 76:22
  78:11 85:2,4
  127:19 130:25
  146:15 147:25
  151:9,15
  152:14 156:14
  164:3 172:12
**testify** 9:13
  75:22 86:16
  88:5 122:22
  149:7 178:8
  187:10
**testifying** 65:10
  78:3 176:16
**testimony** 7:14
  10:3 15:2,4,6
  15:11 20:6
  21:2 22:8
  27:23,24 28:11
  28:17,19,21
  30:11 33:2,10
  33:17 52:6
  53:17 64:13
  65:22 69:2,5
  69:21 73:12,15
  74:24 75:3,10
  75:18,19 77:25
  78:4,5 83:15
  83:21 88:22
  89:24 90:6,7
  90:10,13,14
  91:10,14 92:22
  98:9 99:8
  100:22 104:7
  104:13 106:6
  106:17 107:2

107:12 112:21
122:23 129:9
129:23 134:19
138:12,14,21
138:23 141:5
141:23 143:4
143:15,18
144:2,15
146:17 147:18
147:23 148:2,7
148:22 149:4
156:4,22 169:5
170:19 172:5
172:23 174:9
177:11 178:16
179:10 180:15
180:16 182:2,5
182:21 183:2
186:9 187:12
188:12
**testing** 77:23
  138:15
**textbook** 73:7
**Thank** 10:19
  144:12
**Thaylor** 149:18
  153:5
**theft** 168:10
**theory** 154:9
**therapy** 128:22
**thereof** 188:6
**thesis** 150:9
**they'd** 166:12
**thief** 168:8
**thing** 56:3 76:16
  85:20 147:19
  151:10,16
  163:25,25
  168:25,25
**things** 35:5 37:8
  41:15 43:23
  60:22 68:16
  69:12 84:22,24
  86:21 113:24
  114:2 121:25
  122:3,8,11,16
  126:20 129:22
**think** 11:16

26:10 30:18
32:7 38:18,18
38:19 41:5
48:22 51:6
57:9 61:2
67:19 68:17,18
68:19 79:16
82:13 83:11
92:23,24 94:10
95:14,20 96:23
98:25 104:25
105:3,9 108:17
108:19 111:20
114:2,4 126:24
127:2 134:5,21
135:2 136:24
137:25 151:13
152:21 153:14
162:7 170:11
170:24 171:6
175:22
**thinks** 99:19
  111:4
**third** 38:5 93:8
  106:11 123:10
**Thirdly** 136:6
**thirty** 189:13
**Thomas** 1:8
  22:23 132:10
  144:17 164:20
  165:2 170:11
**thoroughly**
  102:24
**thought** 8:24
  9:14 24:13
  36:15 51:9
  61:14 70:14
  125:2,8 182:21
**thousand** 59:9
  61:4 103:8
  106:10
**thousand-pers...**
  74:13
**three** 15:24
  27:21 45:21,22
  50:16 89:16,25
  90:24 93:6,18
  98:5,10 100:16

100:17 101:21
102:6 103:15
103:20 105:22
106:2 123:5
135:9 139:2
146:24
**ticker** 32:14
**ticket** 64:3
  166:15,15
**tie** 173:11
**tied** 174:4
**time** 15:8 17:3
  23:2 25:7,25
  28:9,9 29:15
  29:16 30:4,15
  30:16,17,20
  33:21,24 40:16
  40:17 43:11
  45:11,19 46:23
  47:2,7 53:9,13
  57:18,21 61:16
  61:20 64:23,25
  65:3,7,9,18,22
  67:23 68:12
  70:5 71:17,20
  72:12 73:4,21
  74:9,21 77:4
  78:15,17,17,18
  78:20,21,23
  79:4,24 80:6,7
  80:7,7,13,21
  80:25 81:20
  82:6,7 86:18
  86:24 87:17,18
  88:20 89:4
  93:17 95:10
  96:7,14 100:10
  100:13,20
  102:24 105:6,8
  110:18 111:4,5
  112:21 127:8,9
  127:17 130:17
  131:7,11
  132:23 134:7
  137:3,8 138:2
  157:18 170:11
  175:10,12,14
  180:4 184:7,12

184:21,24
185:2,4,6,10
185:19 187:11
**timekeeping**
  81:21
**times** 7:13,14
  31:14 109:20
  112:20 147:20
**timetable** 148:23
  149:2
**timetables** 43:18
**Title** 116:15
  118:17,24
**today** 8:11,22
  14:10 15:2
  32:11 33:22
  45:11
**today's** 16:16
  185:17
**toe** 128:20
**told** 8:20 20:20
  20:25 37:21
  57:12 58:13,25
  61:25 62:14
  63:14 64:2,17
  66:25 68:5
  69:22 70:4
  72:18 73:15
  75:18 90:18
  91:9 97:23,24
  98:15 104:10
  104:16,20,21
  105:12,20
  106:3 111:3
  115:10 129:18
  131:6 144:7
  156:18 171:15
  171:23 176:3
  179:18 180:22
**top** 35:19 37:13
  38:5 49:15
  50:15 67:9
  94:19 142:9
  150:11,13
**topic** 110:15
  139:24
**total** 9:25 16:13
  31:15

**totally** 175:20
**tracks** 43:17
**train** 64:3
**trained** 35:2
  42:11 44:10
  54:14 55:7
  71:18 73:3
  85:19
**training** 43:6,8,9
  55:3,5 72:24
  139:23
**transaction**
  107:5
**transactions**
  89:19
**transcribe** 54:3
**transcribed**
  29:12,16,20
  187:14
**transcript** 30:6
  186:11 187:16
  189:14,15
**transcripts** 51:4
  51:7 188:9
**transition** 45:12
**Transportation**
  159:14
**trapeze** 166:20
  166:21 167:11
**treated** 15:19
**trial** 7:14 15:4,4
  15:5,11 64:10
  64:13 73:13
  91:15 104:7
  107:3 112:23
  113:17 122:22
  126:9 141:11
  141:12,14,21
  141:22 180:15
  180:18
**tried** 83:17 85:2
  167:20
**trier** 91:15 94:10
  101:2 123:12
  128:18 134:25
  138:10 139:5
  183:18
**trouble** 32:12

92:14
**truck** 39:5
**true** 18:8 22:7
  23:19 25:19
  38:19 39:6
  52:8 57:5,7
  58:24 65:4
  90:20 91:4,7
  98:14 102:4
  106:4 112:5
  115:25 117:2
  147:12 149:18
  158:7,15
  161:19 164:16
  171:14,17
  172:19 176:5
  179:21 180:5
  181:22 182:13
  183:8 186:10
  187:15
**truth** 20:22
  180:21
**try** 34:24 35:4
  58:21,22 68:25
  110:23 127:12
  147:8
**trying** 32:2,6
  61:20 93:3
  107:16 109:8
  109:25
**turn** 37:10 49:7
  128:25
**turned** 170:21
  172:14
**turning** 37:20
**twist** 61:13
**two** 2:11 17:20
  32:22 49:16
  50:14 51:20,22
  72:19 79:18
  93:6 95:8,11
  106:8 120:11
  125:15 139:18
  139:18 172:16
  182:19
**two-year** 45:12
**tying** 136:12
**type** 20:17 83:5

119:3 121:15
  177:15 182:11
**types** 37:9 39:14
  63:18
**typewritten**
  187:14
**typically** 8:17
  22:11 34:22
  36:5 40:13
  71:19 87:25
  150:13,20
**typifies** 146:6
**typify** 145:20
**typo** 43:19
**T.R** 149:17
  150:23

_____

**U**

**Uhl** 42:3 53:16
**Uhl's** 47:8
**ultimate** 42:6
**ultimately** 58:9
**unable** 98:10
  169:20
**unaware** 103:18
  145:5 165:15
**unclear** 48:9
  109:21
**undefined**
  179:15
**undergraduate**
  47:13 73:6
**underlie** 90:3
**understand** 7:12
  9:16 28:20
  54:15 73:12
  74:7 91:14
  106:24 109:22
  118:18 121:14
  127:14,21
  131:12
**understanding**
  9:9 13:24
  20:23 33:4
  37:18 38:16
  77:14 103:14
  124:16 156:16
  180:14 182:17

**understood** 7:19
  30:21 63:22
  104:7 107:2
  112:2 165:9
**undertake** 82:3
  110:7
**undertaken**
  85:18 147:18
**undertaking**
  85:15 136:19
**undertook** 82:4
  85:9 86:18
**undiscounted**
  17:12,21,22
  18:3,5,13
  56:13
**undo** 86:25
**unfair** 79:17
**uniform** 158:8
  158:12
**uniformly** 140:5
  160:14
**United** 1:2
  150:21 158:15
  158:21,22
  160:16,22
  161:4 163:11
**units** 183:19
**universally** 78:7
  79:5,6
**University** 42:11
  42:14 47:11,12
  47:16 154:15
**unrelated** 85:24
  165:3,18
**unthinkable**
  178:5
**unusual** 70:19
  70:23 118:20
**updated** 151:11
**upper** 132:7,22
  133:25 134:2
  134:10,12
**upset** 76:2
**use** 28:7 29:19
  34:20 36:5
  54:18,21,24
  66:23 73:21

92:19 98:9
  100:16 101:3
  125:3 126:5
  128:11 131:11
  131:20 132:23
  133:19 139:3
  140:11,24
  141:8 142:24
  143:11 146:18
  151:2,22 153:7
  154:2 155:4
  156:2,8,10,15
  158:12,16
  161:15 162:21
  166:24 167:19
  168:2,13,17
  181:12
**uses** 66:11,19
  114:19 135:12
  140:25 154:19
  158:23
**usually** 51:15
  134:23 150:11
**utilize** 158:8
**utilized** 126:17
**U-h-l** 42:3
**U.S** 6:6 79:8,11
  163:3

_____

**V**

**V** 3:12 55:12
  95:9
**valuable** 146:11
  167:6
**valuation** 111:10
**value** 17:25 18:4
  19:14 30:13
  38:6 69:20
  78:5,21 79:24
  80:6,12 81:19
  86:24 87:17
  88:24 91:13
  107:3 112:23
  114:9 123:2,5
  123:20,22,22
  123:23 124:2,8
  124:11,21,24
  124:24 125:7

129:6 134:8
135:22 136:7
137:12,15
139:6,6,21
140:2,3 141:22
141:23 142:16
143:2 144:19
145:21 146:15
146:18 147:15
150:24 151:2,8
153:3,6,8,10
154:2 158:8,13
158:16 159:7
160:8,20 161:2
162:17 166:12
166:19 167:2,3
167:7,20,21
168:14,15,25
169:3,7,8,11
173:24 174:3
174:14 175:5
**valued** 25:4 89:6
**values** 154:20
162:20,22
**valuing** 79:4
**variation** 17:17
17:18
**variations** 17:20
26:9,11,12
**variety** 135:19
**various** 8:11
21:9 24:25
39:14 81:22
87:25 153:21
**vast** 120:23
159:19,19,19
161:3
**vastly** 79:15
**veracity** 91:16
**verify** 61:3
**versus** 6:4 17:23
18:13 32:23
**vice** 74:12
**victim** 163:14
164:11
**victims** 163:19
163:22
**victory** 51:19

95:9
**video** 6:13
**Videoconferen...**
4:5,13 5:5
**Videographer**
5:23 6:2 7:21
50:2 53:6,12
81:8 93:11
96:2,6,13
135:9 137:2,7
175:16 177:17
181:3 182:19
183:22 184:6
184:11,20
185:15,17
**videotaped** 1:16
2:2 6:3 127:13
**view** 16:11 23:25
28:8 55:15
155:10 158:3
**virtually** 147:18
**Viscusi** 146:9,15
146:20,25
147:12,13,17
148:21 152:17
152:21,25
154:18 155:3,7
155:24 156:10
156:16 157:14
157:20 158:5,7
162:8 163:23
163:24 164:6
**Viscusi's** 155:6,6
156:13
**voice** 158:22
160:25
**volunteered**
122:4
**vs** 1:10

_____
**W**
**W** 3:10 18:21
48:22 49:23
56:15
**wage** 83:4,16,17
83:19 84:3
85:2,7,21
87:23 89:6

**wages** 81:20
**wait** 7:16 68:9,9
96:5 108:5,20
**waiting** 37:2
**want** 23:5 24:5
41:7 45:13
60:11,16,17
76:13 87:14
92:18 99:4,16
99:16,22
102:21 107:25
108:21 110:12
110:15,18
111:5 113:9
122:15 127:17
127:18,19
140:21 149:13
168:23 175:9
176:15
**wanted** 103:16
106:21 109:8
181:24
**wants** 167:18
**warm** 75:25
138:17
**warren** 118:18
**washer** 12:11
**wasn't** 42:21,25
82:16,18 83:19
115:17 125:21
149:25
**waste** 127:17
**wasting** 45:19
**way** 25:15 26:13
31:17 62:18
67:8,10 69:8,9
69:13 75:14
77:20 79:2
103:24 112:17
119:7 122:22
137:19 140:11
167:15 175:6
185:13 188:4,5
**website** 15:14
45:23
**week** 70:17 74:2
105:6
**weeks** 32:18

**weird** 68:24
**welcome** 80:17
**well-being**
136:20
**well-established**
78:6
**went** 179:12
180:20,23
**West** 148:19
**we'll** 10:10 13:18
96:4 172:3
175:22
**we're** 18:18
30:21 36:4
43:8 53:9,12
55:19 88:20
96:6,13 132:13
136:24,25
137:2,7,24
184:7,11,20
185:18
**we've** 12:19
81:12 91:5
**whatsoever**
171:7 172:21
**wheel** 175:3,7
**WHEREOF**
188:12
**White** 159:5
**wholesale** 84:11
**wildly** 70:14
**windshield**
175:7
**winner** 150:15
**winners** 150:17
**wire** 166:21,25
177:18
**wish** 11:9 48:18
80:24 134:25
190:5
**withdraw**
107:25 108:15
**withdrawing**
108:7
**withdrawn**
101:25
**witness** 5:22
6:20 7:6,22,23

9:4,8,18 11:5
11:11,19 18:21
19:2 22:17
23:22 24:12
25:14 29:2,9
32:3,4,5 35:8
35:12 40:21
43:2 46:9,14
49:12,20 50:5
52:6,7,15,21
54:13 55:14,18
59:25 60:4,20
62:12 64:8
70:9 71:4,13
80:17,20,24
81:6,12,16
82:12 84:2
86:13 89:22
96:22 98:20
99:18 100:4
102:9 106:7,23
107:23 108:11
108:17,19
111:3,5,9
112:10 114:23
115:16 117:3,6
117:16 118:8
129:10,20
134:20 137:23
141:6 142:5
143:5,16
145:11 147:24
148:6 150:6
151:6 152:2,9
154:23 156:23
157:8 158:20
161:25 165:7
166:10 169:6
170:6 172:24
173:17 174:10
175:14,17,22
176:7 177:12
177:20 178:2
178:17 179:11
179:24 182:6
182:20 184:14
184:19 186:7
187:10,12

**won** 153:15
**wonder** 63:9
  112:12 127:21
**word** 28:7 29:3,3
  29:10,19 30:15
  30:16 92:14
  98:9 115:3
  163:16
**words** 29:23
  31:21 86:10
  115:23 149:8
**work** 12:5 21:8
  21:23 41:10,25
  43:25 44:7,18
  45:4,5,9 46:24
  47:6 48:7 49:3
  49:18 52:16
  54:12 55:25
  56:5,5,6,6,9,23
  65:25 83:7,12
  89:9 130:13
  136:2 145:2
  146:9 150:23
  152:17 153:6
  161:18 170:8
  170:16 173:19
  185:4
**worked** 43:10
**working** 15:25
  166:23
**works** 86:2
  149:21 153:23
**world** 150:18
**Worldwide** 6:12
  6:14
**worry** 122:15
**worth** 89:5
  120:18
**wouldn't** 40:17
  63:24 104:4,9
  107:18 109:9
  113:17 121:21
  121:22 122:4,5
  122:13 149:3,7
  149:10 168:18
  168:22 178:5
  182:12
189:1 190:23

**write** 74:18,19
  141:13
**writes** 162:8,12
  164:4
**writing** 156:24
  157:9 187:13
**written** 54:23
  142:17 149:23
  149:25 152:14
  163:17
**wrong** 30:2
  94:25 113:23
**wrongful** 16:6
  27:20 40:14
  158:11 162:11
**wrote** 153:13
  158:7
**W.K** 146:9

**X**

**X** 3:2,7,13 55:12
  56:12 76:7
  164:4

**Y**

**Y** 164:4
**Yeah** 41:11
  132:25
**year** 27:13,16
  31:6 68:12,17
  68:18,20 86:3
  92:13 93:8,9
  97:9,10 101:16
  101:18 105:13
  106:9,11 118:6
  133:3 139:7
  151:14 181:15
**years** 12:20
  27:15 42:12
  43:12,23 44:2
  44:23 45:7,8
  46:25 55:4
  67:15 68:24
  70:21 74:13
  100:16,17
  124:12,14,17
  133:13 139:9
  144:19 149:5,9

151:12 160:5
168:5,10
177:14 181:11
**Yesterday** 34:5
**York** 1:3 4:7,7
  4:15 5:8,8 6:7

**Z**

**Z** 164:4
**zero** 143:20
  144:10 178:9
  180:20,24
**z-e-r-o** 144:10

**$**

**$1** 86:3
**$1.75** 139:10
**$1.80** 139:10
**$10** 89:5
**$10,000** 183:18
  183:19
**$100** 64:3,20
**$12,000** 91:19
  92:11
**$14** 83:11,12
**$15,000** 16:14
**$165,000** 181:14
**$2,500** 13:7
**$20** 63:23 76:14
**$200,000** 105:13
  181:17
**$25** 79:21
**$25,000** 93:9
**$2500** 13:25
  79:22
**$315** 15:7,10
**$3165** 8:17 16:16
  16:19
**$4,470,906** 93:23
**$419,000** 120:18
**$45,000** 181:20
**$50,000** 105:21
**$55,000** 181:15
**$6,000** 92:11
**$72,000** 92:13
  93:8
**$75** 64:2

**0**

**000037** 60:4
**0086224** 60:5
**02** 118:11
**03** 22:24
**05** 149:15,15
**06** 97:5,6 133:18
**06-CV-1625** 1:9
  6:7
**07** 97:8 98:23
  101:15,19
  130:8
**084-002600** 2:8
  5:25 187:5

**1**

**1** 6:2 18:2 19:23
  20:3,9,22
  22:24 53:8
  93:16 97:8
  101:15 120:19
  121:3 140:21
**1st** 188:13
**1:30** 184:4,23
  185:9
**1:34** 184:8
**1:39** 184:13
**1:41** 184:21
**1:42** 185:19
**10** 17:15 20:23
  33:18 56:7
  63:20 72:17,19
  73:2 76:6
  110:16 128:8
  128:10,11
  130:24 132:7
  132:19,21
  133:18,19,22
  133:25 134:12
**10th** 127:9
**10,000** 175:3
**10-hour** 110:22
**10:12** 53:13
**100** 66:15 67:22
  70:5 71:9
  118:13 119:23
**10017** 4:7
**10174** 5:8
**11** 3:9 19:23

175:16,17
**11:11** 96:7
**11:25** 96:14
**1100** 4:6
**12** 3:10 19:6
  139:9
**12,000** 91:23
**12:26** 137:3
**12:35** 137:8
**12551** 4:15
**1279** 4:14
**142** 3:17
**15** 94:12,21
**150** 66:19,23
  67:22
**16** 17:9
**18** 3:10 31:15
**180** 6:8
**19** 121:2
**1969** 19:23
**1983** 36:21
**1990** 151:2,11
  155:13 156:7
  158:5
**1999** 100:15,17
  175:2

**2**

**2** 53:13 72:17
  96:7
**2:30** 184:23
**20** 81:12 130:9
  130:18 131:9
  131:12 132:19
  132:22 183:24
**20th** 153:16
**200** 31:9 66:8,15
  70:2,6 71:9
**2000** 148:25
  151:14 154:17
  162:8
**2001** 19:23 20:3
  20:9,11 22:6
  67:24
**2002** 133:12
**2003** 116:10
  118:6 119:14
**2005** 133:13

174:22
**2006** 67:24
**2007** 93:16 97:5
   97:7 98:18
   99:6 101:8,10
   130:18 131:9
**2008** 89:7
**2009** 89:3,6
**2010** 1:17 2:13
   6:10 14:4 17:9
   18:2 19:6
   125:4 133:7
   186:22 188:13
**2011** 133:4
**20179** 1:21
**212** 4:8 5:9
**225** 68:23
**23** 81:8
**240** 66:11 69:22
   70:2
**25** 156:13,14
**25,000** 106:11
**250** 66:8 70:3
**276-1400** 5:17
**286** 4:6
**29** 1:17 2:12
   6:10

**3**
**3** 94:3,8,13 96:14
   137:3 142:9
   183:10
**3,031,000** 94:18
**3,800** 164:11
**30** 130:9,19
   131:10,12
   133:14 189:14
**30s** 124:17
**300** 4:14
**312** 5:17
**3165** 10:2
**325** 5:14
**35** 3:11 68:17
**3500** 2:12 6:9
**36** 68:19
**370-0447** 4:8
**38.32** 68:22

**4**
**4** 84:22,23 94:14
   94:20 113:23
   113:25 137:8
**4-D** 94:22
**4.2-million**
   125:3
**40** 3:11 68:12
   130:22 131:14
   131:15 132:20
   134:10
**405** 5:7
**419,000** 120:21
   120:24 121:4
**419,858** 121:6
**45** 68:18 70:17
   124:11,14,17
**49,690** 120:10

**5**
**5** 20:22 132:3,10
   133:9,16
   134:11 152:18
   184:12
**50** 3:12 39:10
   132:7,16
   133:14 134:7,9
   134:11 139:9
   139:11 144:19
**50,000** 120:3,6
**50-50** 27:19
**516** 4:16
**55** 3:12,13,13,14
   3:14,15,15,16
   3:16,17
**554-7807** 5:9
**574,717** 120:13
   120:15

**6**
**6** 3:5 134:6
**6,000** 91:24
**6-year** 67:24
**60** 132:21 134:10
   138:19
**600** 138:19
**606** 37:11 38:4
**60654** 5:16

**625** 5:15
**67** 94:17

**7**
**7** 14:4 130:13
**70** 130:9,23
   131:13,16
**72,000** 106:9
**79** 94:10
**795-6605** 4:16

**8**
**80** 130:9,22,23
   131:13,14
   132:18
**816,000** 94:16

**9**
**9** 128:8,10,11
**9:00** 2:13 6:10
**9:58** 53:9
**90** 130:19 131:21
   132:18 133:12
   133:20,21,23
   134:8 139:12
**911** 163:15,19,22
**95** 130:19 131:21
   132:4 133:12
   133:20,23
   134:8 149:15