UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

MELINDA SERIN, JUDSON RUSS, LONG SOUI LIM,  :
PERI KETTLER, GORDON REDNER, AND THOMAS  :
J. SMITH,                                                                   :          06 CV 1625 (SCR)
                                                                                    :
                                                        Plaintiffs,          :
                                                                                    :
                        -against-                                         :
                                                                                    :
NORTHERN LEASING SYSTEMS, INC., JAY        :
COHEN, RICH HAHN, and SARA KRIEGER,        :
                                                                                    :
                                                        Defendant.      :

------------------------------------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY
## OF PLAINTIFFS' DAMAGE EXPERT, DR. STAN V. SMITH

MOSES & SINGER LLP
*Attorneys for Defendants*
405 Lexington Avenue
New York, New York 10174
(212) 554-7800 (telephone)
(212) 554-7700 (facsimile)

Of Counsel:

Robert D. Lillienstein, Esq.
Declan Butvick, Esq.

845734  011082.0121

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ..................................................................... 3

SUMMARY OF ARGUMENT ................................................................ 3

    A.    Loss of Time Spent ................................................................. 3

    B.    Loss of Credit Expectancy ...................................................... 4

    C.    Additional Cost of Mortgage .................................................. 5

    D.    Lost Business Profits ............................................................. 6

    E.    Reduction In Value Of Life ("RVL") ........................................ 6

ARGUMENT ................................................................................... 7

I.    PLAINTIFFS' EXPERT OPINES ON DAMAGES THAT ARE NOT
AVAILABLE UNDER RICO OR SECTION 349 ..................................... 7

    A.    Purported Damages For Loss Of Time Spent, Reduced Value Of Life, And
Loss Of Credit Expectancy Are Not Recoverable Under RICO ........... 7

    B.    Damages For Loss Of Time Spent, Loss Of Credit Expectancy And RVL
Are Not Recoverable Under Section 349 ................................... 9

    C.    Damages For Injuries That Were Allegedly Incurred Prior To February 24,
2003 Are Not Recoverable Under Section 349 ............................ 12

        1.    Serin's Claims for Loss of Time Spent, Loss of Credit Expectancy,
and RVL ..................................................................... 13

        2.    Russ's Claims For Payments Made To Northern Leasing, Loss Of
Credit Expectancy, Loss of Time Spent And RVL ................. 13

        3.    Lim's Claims for Payments Made to Northern Leasing, Loss of
Time Spent, Loss of Credit Expectancy, and RVL ................. 14

II.    EVEN IF THE DAMAGES THAT PLAINTIFFS SEEK TO RECOVER WERE
AVAILABLE UNDER RICO AND SECTION 349, DR. SMITH'S
TESTIMONY REGARDING SUCH DAMAGES SHOULD BE EXCLUDED
UNDER RULES 702 AND 403 OF THE FEDERAL RULES OF EVIDENCE
AND DAUBERT ..................................................................... 15

    A.    The Standard for Exclusion of Expert Witness Testimony ............... 15

    B.    Dr. Smith's Opinions About The Reduction In The Value Of Life Should
Be Excluded ..................................................................... 17

        1.    Reduced Value Of Life Is Irrelevant To A Calculation Of
Compensatory Damages ................................................. 17

2. Dr. Smith's Methodology Of Calculating RVL Damages Is Unreliable ................................................................ 20

  (i) No Acceptance In The Scientific Community ............................ 23

  (ii) Dr. Smith's Methods Cannot Be Tested. .................................... 25

3. Dr. Smith's Opinions Should Be Excluded Because He Is Not An Expert In The "Value Of Life" ................................................................ 27

C. Dr. Smith's Testimony Regarding Plaintiff Russ' Loss Of Business Profits Is Unreliable And Inadmissible .......................................................... 27

 1. Dr. Smith's Methodology For Determining Lost Business Profits Has Not Been Tested ................................................................ 30

D. Dr. Smith's Opinions On Lost Credit  Expectancy ("LCE") Should Be Excluded ...................................................................................... 30

E. Dr. Smith's Calculations As To Plaintiff Smith's "Additional Cost of Mortgage" Should Be Excluded ................................................... 35

F. Dr. Smith's Opinions As To Loss Of Time Spent Should Be Excluded ............ 37

G. Dr. Smith's Opinion About The Loss Of Payments Made To Northern Leasing Should Be Stricken ................................................................ 38

CONCLUSION ................................................................................................... 39

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
　　303 F.3d 256 (2d Cir. 2002).................................................................................16, 17

*Anderson v. Hale*,
　　No. CIV-02-0113, 2002 WL 32026151 (W.D. Okla. Nov. 4, 2002).................................24

*Anza v. Ideal Steel Supply Corp.*,
　　547 U.S. 451 (2006)........................................................................................32, 36

*Arista Records LLC v. Usenet.com, Inc.*,
　　608 F. Supp. 2d 409 (S.D.N.Y. 2009)....................................................................... passim

*Ayers v. Robinson, et al.*,
　　887 F. Supp. 1049 (N.D. Ill. 1995) ......................................................................... passim

*Baker v. Urban Outfitters, Inc.*,
　　254 F. Supp. 2d 346 (S.D.N.Y. 2003)....................................................................16, 33

*Birdsell v. Bd. of Fire and Police Comm'rs*,
　　No. 85-3371, 1990 U.S. Dist. LEXIS 14961 (C.D. Ill., Oct. 16, 1990)............................24

*Boucher v. Suzuki Motor Corp.*,
　　73 F.3d 18 (2d Cir. 1995) ...........................................................................16, 20, 30, 38

*Bramlette v. Hyundai Motor Co.*,
　　No. 91 C 3635, 1992 WL 213956 (N.D. Ill., Aug. 28, 1992)...........................................24

*Brereton v. United States*,
　　973 F. Supp. 752 (E.D. Mich. 1997)..........................................................................23

*Buckhalter v. Burlington Northern*,
　　Civ. A. No. EC90-139-D-D, 1992 WL 236676 (N.D. Miss. Mar. 23, 1992)...................24

*Buyers and Renters United to Save Harlem v. Pinnacle Group NY LLC*,
　　575 F. Supp. 2d 499 (S.D.N.Y. 2008)..........................................................................12

*Callaghan v. Jacobs*,
　　No. 08 Civ. 03523, 2010 WL 1222048 (S.D.N.Y. March 5, 2010)....................................8

*Carroll v. United States*,
    295 Fed. Appx. 382, 386 (2d Cir. 2008) ............................................................... 8

*Cayuga Indian Nation v. Pataki*,
    83 F. Supp. 2d 318 (N.D.N.Y. 2000) ............................................................. 16

*Celebrity Cruises, Inc. v. Essef Corp.*,
    434 F. Supp. 2d 169 (S.D.N.Y. 2006) ..................................................... passim

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
    650 F. Supp. 2d 314 (S.D.N.Y. 2009) ................................................. 20, 35, 38

*Craft v. Matlack, Inc.*,
    Civ. A. No. 91-2465, 1992 WL 124406 (E.D. La. May 26, 1992) ................................... 24

*Crespo v. City of Chicago*,
    No. 96 C 2787, 1997 WL 537343 (N.D. Ill., Aug 22., 1997) ........................................ 23

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1983) ....................................................................... passim

*Davis v. ROCOR International*,
    226 F. Supp. 2d 839 (S.D. Miss 2002) ............................................................. 23

*Doe v. Tag, Inc.*,
    No. 92 C 7661, 1993 WL 484212 (N.D. Ill Nov. 18, 1993) ........................................ 23

*DuBose v. City of San Diego*,
    No. 99cv2279-L, 2002 WL 34408963 (S.D. Cal. Oct. 1, 2002) ..................................... 23

*Gary Price Studios, Inc. v. Randolph Rose Collection, Inc.*,
    No. 03 Civ. 969, 2006 WL 1319543 (S.D.N.Y. May 11, 2006) ............................ 19, 34, 36

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ...................................................................... 16, 22

*Gristede's Foods Inc. v. Unkechauge Nation*,
    532 F. Supp. 2d 439 (E.D.N.Y. 2007) ............................................................. 13

*Harris and Lee v. United States*,
    Civ. No. 06-0412, 2007 WL 4618597 (D.N.M. June 7, 2007) ........................................ 23

*Hein v. Merck & Co.*,
    868 F. Supp. 230 (M.D.Tenn. 1994) ......................................................... 23, 24, 25

*Jaegly v. Couch*,

439 F.3d 149 (2d Cir. 2006)..........................................................................8

*Joy v. Bell Helicopter Textron*,
    999 F.2d 549 (D.D.C. 1993) ....................................................................16

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)................................................................................16

*Kurncz v. Honda North America*,
    166 F.R.D. 386 (W.D. Mich. 1996) ................................................. passim

*Livingston v. United States*,
    817 F. Supp. 601 (E.D.N.C. 1993).................................................19, 24

*Major League Baseball Props., Inc. v. Price*,
    105 F. Supp. 2d 46 (E.D.N.Y. 2000) .........................................................7

*Martinez v. Caterpillar, Inc.*,
    Civ. No. 06-236, 2007 WL 5377515 (D.N.M. Sept. 6, 2007) ..........................23

*McGuire v. Santa Fe*,
    954 F. Supp. 230 (D.N.M. 1996) .............................................................23

*McMullin v. United States*,
    515 F. Supp. 2d 914 (E.D. Ark. 2007) ....................................................23

*Mercado v. Ahmed*,
    974 F.2d 863 (7th Cir. 1992) ..............................................19, 22, 24, 26

*Mercado v. Ahmed, et al.*,
    756 F. Supp. 1097 (N.D. Ill. 1991) .......................................................23

*Moltner v. Starbucks Coffee Company*,
    No. 08 Civ. 9257, 2009 WL 3573190 (S.D.N.Y. Oct. 23, 2009), *aff'd*, __ F.3d __,
    No. 09-4943-cv, 2010 WL 4291299 (2d Cir. Nov. 2, 2010) ..........................16

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005)....................................................................35

*Park West Radiology, et al., v. Carecore Nat'l., LLC, et al.*,
    675 F. Supp. 2d 314 (S.D.N.Y. 2009).....................................................20

*Robinson v. Sanctuary Record Groups, Ltd.*,
    542 F. Supp. 2d 284 (S.D.N.Y. 2008), *rev'd on other grounds*, Nos. 08-2078-cv,
    08-2320-cv, 08-2333-cv, 2010 WL 2649849 (2d Cir. July 1, 2010) ...................... passim

*Rowe Entertainment, Inc., et al. v. The William Morris Agency, Inc., et al.*,
    No. 98 CIV 8272, 2003 WL 22124991 (S.D.N.Y. 2003) .......................................... passim

*Saia v. Sears Roebuck and Co., Inc.*,
    47 F. Supp. 2d 141 (D.Mass. 1999) ........................................................................ passim

*Spinale v. United States et. al.*,
    No. 03Civ.1704, 2004 WL 50873 (S.D.N.Y. Jan. 9, 2004) .................................................7

*Sullivan v. U.S. Gypsum Co.*,
    862 F. Supp. 317 (D. Kan. 1994) .....................................................................19, 23, 26

*Supply & Building Co. v. Estee Lauder Int'l, Inc.*,
    95 CIV. 8136, 2001 WL 1602976 (S.D.N.Y. Dec. 14, 2001) ...........................................7

*United States v. Roldan-Zapata*,
    916 F.2d 795 (2d Cir. 1990)................................................................................................16

*Williams v. The Dow Chemical Co.*,
    255 F. Supp. 2d 219 (S.D.N.Y. 2003)................................................................................7

## STATE CASES

*Anderson v. Neb. Dep't of Social Servs.*,
    248 Neb. 651 (Neb. 1995)................................................................................................24

*Ashland Management, Inc. v Janien*,
    82 N.Y.2d 395 (1993) ......................................................................................................28

*Baron v. Pfizer, Inc.*,
    42 A.D.3d 627, 840 N.Y.S.2d 445 (3d Dep't 2007).........................................................10

*Chustz v. J.B. Hunt Transp. Inc.*,
    659 So.2d 784 (La. App. 1 1995).....................................................................................24

*Fetzer v. Wood*,
    569 N.E.2d 1237 (Ill. App. 2d 1991) ...............................................................................24

*Foster v. Trafalgar*,
    603 So. 2d 284 (La. App. 2d 1992)..................................................................................24

*Gaidon v. Guardian Life Ins. Co.*,
    96 N.Y.2d 201 (2001) ................................................................................................12, 13

*Kassis Mgmt. Inc. v. Verizon New York, Inc.*,
    No. 104736/2008, 2010 WL 4026388 (N.Y. Sup. Ct. Aug. 18, 2010)..............................10

*Longman v. Allstate Ins. Co.*,
  635 So.2d 343 (La. App. 4 Cir. 1994) ............................................................24

*Loth v. Truck-A-Way Corp.*,
  60 Cal. App. 4th 757 (Cal. Ct. App. 1998) ......................................................24

*Montalvo v. Lapez*,
  884 P.2d 345 (Hawaii 1994) ...........................................................................24

*Patch v. Glover*,
  618 N.E.2d 583 (Ill. App. Ct. 1993) ...............................................................24

*Scharrel v. Wal-Mart Stores*,
  949 P.2d 89 (Colo. App. 1997) .......................................................................24

*Small, et al., v. Lorillard Tobacco Co., Inc.*,
  94 N.Y.2d 43 (1999) .........................................................................................9

*Smith, et al., v. Chase Manhattan Bank, USA, N.A., et al.*,
  293 A.D.2d 598, 741 N.Y.S.2d 100 (2d Dep't 2002)......................................10

*South Lake Limousine and Coach, Inc. v. Brock*,
  578 N.E.2d 677 (Ind. Ct. App. 1991)..............................................................24

*Tall v. Nebraska Dep't Social Serv.*,
  541 N.W.2d 30 (Neb. 1995)..............................................................................24

*Vigiletti v. Sears, Roebuck & Co.*,
  42 A.D.3d 497, 838 N.Y.S.2d 786 (2d Dep't 2007)........................................10

*Wilt v. Buracker*,
  443 S.E.2d 196 (W. Va. 1993), *cert. denied* 114 S.Ct. 2137 (1993) ...............24

## FEDERAL STATUTES

18 U.S.C. § 1962 ..............................................................................................2

18 U.S.C. § 1964...........................................................................................2, 7

Fed.R.Evid. 403 .........................................................................................3, 20

Fed.R.Evid. 702 .....................................................................................passim

## STATE STATUTES

N.Y. Gen. Bus. Law § 349...................................................................9, 10, 13

# SECONDARY AUTHORITIES

Thomas Havrilesky, *The Misapplication of the Hedonic Damages Concept to Wrongful Death and Personal Injury Litigation,* 6 J. Forensic Econ. 93 (1993)...............................24

T.R. Miller, *The Plausible Range for the Value of Life – Red Herrings Among the Mackerel*, 3 J. Forensic Econ. (no. 3), 17-39 (Fall 1999)...................................................24

W.K. Viscusi, *Misuses and Proper Uses of Hedonic Values of Life in Legal Contests*, 13 J. Forensic Econ. 111, 118 (2000) ......................................................................................26

W.K. Viscusi, *The Flawed Hedonic Damages Measure of Compensation from Wrongful Death and Personal Injury*, 20 J. Forensic Econ. 113, 117-118 (2007)...........................26

W.K. Viscusi, *The Econometric Basis for Estimates of the Value of Life*, 3 J. Forensic Econ. (no. 3), 61, 69 (Fall 1999).....................................................................................26

## PRELIMINARY STATEMENT

Defendants, Northern Leasing Systems, Inc. ("Northern Leasing"), Jay Cohen, Rich

Hahn, and Sara Krieger (collectively, the "Defendants"), by their attorneys Moses & Singer LLP,

submit this memorandum in support of Defendants' motion *in limine* to exclude the expert

testimony and reports of Dr. Stan V. Smith ("Dr. Smith"), under Rules 702 and 403 of the

Federal Rules of Evidence, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579,

589 (1983) and its progeny.

Dr. Smith has provided opinions on various categories of alleged by Plaintiffs Melinda

Serin ("Serin"), Judson Russ ("Russ"), Long Soui Lim ("Lim"), Gordon Redner ("Redner"), and

Thomas J. Smith ("Smith") (collectively, the "Plaintiffs").[1]  Specifically, Dr. Smith opines on the

following categories of alleged damages: (i) the loss of payments made to Northern Leasing[2]; (ii)

the loss of time spent[3]; out of pocket expenses[4]; (iii) the loss of business profits[5]; (iv) the loss of

---

[1]  The report for each Plaintiffs is hereinafter referred to as: the "Redner Report," the "Serin Report," the "Russ Report," the "Lim Report," and the "Smith Report."  They are annexed to the accompanying Declaration of Robert D. Lillienstein, as Exhibits A (Redner), B (Serin), C (Russ), D (Lim) and E (Smith).  Annexed to each report are the work notes and interview notes that accompanied each report.

[2]  Dr. Smith calculates this loss for Lim, Redner and Russ.

[3]  Dr. Smith calculates this loss for Lim, Redner, Russ, Serin and Smith.

[4]  Dr. Smith calculates this loss for Russ and Serin.

[5]  Dr. Smith calculates this loss for Russ.

credit expectancy[6]; (v) the additional cost of mortgage[7]; and (vi) the reduction in value of life ("RVL"), also known as loss of enjoyment of life or "hedonic damages."[8]

Dr. Smith's expert reports and testimony should be excluded in their entirety for several different reasons. Certain of these damages are not available under the statutes that form the basis of the Plaintiffs' causes of action (18 U.S.C. § § 1962, 1964 – hereinafter referred to as "RICO", and New York General Business Law § 349 – hereinafter referred to as "Section 349").[9] RICO only permits recovery of damage to a plaintiff's business or property. Several of the categories of damages on which Dr. Smith gives an opinion do not fit this criteria. Section 349 permits recovery only for actual measurable losses incurred by plaintiffs. RVL, loss of time spent, and loss of credit expectancy do not fit that criteria. Further, some of the losses about which Dr. Smith opines took place prior to February 24, 2003, and are therefore time barred under the applicable statute of limitations for Section 349. With respect to all of these unrecoverable losses, there is no basis for admitting Dr. Smith's testimony or reports.

Moreover, even if such damages were available under RICO and Section 349, Dr. Smith's reports and testimony should be excluded because many of the categories of loss on which Dr. Smith opines address only theoretical losses, without any regard to whether a

---

[6] Dr. Smith calculates this loss for Lim, Redner, Russ and Serin.

[7] Dr. Smith calculates this loss for Smith.

[8] Dr. Smith calculates this loss for all five plaintiffs about whom he has given a report. Dr. Smith has not provided a report for Plaintiff Peri Kettler. Ms. Kettler failed to appear for a deposition, and Plaintiffs' counsel has indicated that they do not intend to present any evidence in support of her claims. Defendants will be moving *in limine* to preclude Plaintiffs from presenting any evidence regarding Plaintiff Kettler.

[9] Plaintiffs are seeking damages in the form of compensatory, treble and/or punitive damages, together with attorneys' fees and expenses. Am. Com. ¶¶ 1, 123-136. The Plaintiffs have not pled a claim for any hedonic damages incurred as a result of the alleged violations.

particular Plaintiff actually sustained an actual, measurable loss.  His opinions are riddled with

numerous, speculative assumptions for which there is no evidentiary support whatsoever.  Dr.

Smith's reports eschew the need to base his opinions on actual facts or actual losses.  In most

cases, his opinions rely entirely on one telephone interview that one of his employees conducted

with each Plaintiff.  He was not provided with, and therefore did not review, any of the Plaintiffs

depositions in this case, and he relied on virtually no documentary evidence to support most of

his opinions in this case, including his opinions concerning RVL and loss of business profits –

two of the largest losses that he calculates.  These opinions do not pass muster under Rule 702,

and in many cases, also warrant exclusion under Rule 403 because their prejudicial value

outweighs their limited probative value.[10]

## STATEMENT OF FACTS

The facts pertinent to this motion are contained in Dr. Smith's expert reports, the rebuttal

expert report of Dr. Christopher Erath, and in the transcript of Dr. Smith's deposition, which was

taken on October 29, 2010.  All of these documents are annexed as Exhibits to the Declaration of

Robert D. Lillienstein, which is submitted herewith.

## SUMMARY OF ARGUMENT

### A.      Loss of Time Spent

In giving his opinion as to the value of "loss of time spent" in dealing with Northern

Leasing, Dr. Smith does not purport to address actual monetary losses incurred by any Plaintiff.

Rather, Dr. Smith's reports calculate the loss of time spent by taking each Plaintiff's

---

[10]      Federal Rule of Evidence 403 bars the admission of relevant evidence "if its
probative value is substantially outweighed by the danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless
presentation of cumulative evidence."  Fed.R.Evid. 403.

guess/estimate[11] of the number of hours spent, whether or not the time allegedly spent caused any Plaintiff to lose income.  He then simply multiplies each Plaintiff's estimate by the "median wages of the average of Office Clerks and Payroll and Timekeeping Clerks" in whatever State that particular Plaintiff resided.  Dr. Smith explains that his use of the same wage rate in all cases is justified because he did <u>not</u> attempt to value the time spent by the actual plaintiffs.  His calculation is intended to ascribe a value to the costs that each Plaintiff **would have** incurred had they hired a clerk to deal with Northern Leasing, even though no plaintiff claims to have hired a clerk.  He thus concedes that his opinion is not addressed to the <u>actual</u> <u>losses</u> sustained by each Plaintiff.  For these reasons, Dr. Smith's opinion on the loss of time spent is both speculative, and unrelated to any issue that the jury will be asked to decide in this case.

## B.     <u>Loss of Credit Expectancy</u>

Dr. Smith's "loss of credit expectancy" calculations also do not attempt to give an opinion as to losses actually sustained by any plaintiff, for example, in the form of additional borrowing costs that any Plaintiff actually incurred.  In three of the four cases on which Dr. Smith offered an opinion, Dr. Smith was not provided any evidence of increased borrowing costs, and in one case (Lim), he actually disregarded the scant evidence that he had.  His opinions give hypothetical calculations of **potential** loss of ability to borrow, which he concocts based on little more than a guess/estimate as to what each plaintiff **could have** borrowed[12],

---

[11]  According to Dr. Smith's reports, Melinda Serin told Dr. Smith's assistant that she spent between 100 and 200 hours trying to resolve her issues with Northern Leasing.  Exh. B, p.2.  Lung Lim supposedly said that he spent between 200 and 250 hours.  Exh. D, p.3.  This wide range of unsubstantiated estimates is further evidence of the speculative nature of Dr. Smith's opinions.

[12]  This guess/estimate is based on little more than what each Plaintiff told Dr. Smith's employee he or she earned in a particular year.  Incredibly, Dr. Smith's report for Melinda Serin states that he also estimated her potential borrowing power on her "intent to purchase a condo and obtain credit cards."  Exh. B.

multiplied by his guess/estimate as to what the additional interest costs each plaintiff *would have* paid if they had attempted to borrow to the limits of their estimated borrowing power.  Basing his calculation on no evidence whatsoever, and without even purporting to tie his opinions to the particular situation of any plaintiff, Dr. Smith's opinions assume that each Plaintiff *would have had* increased borrowing costs of 13% per annum in all cases, and then calculates a *potential loss*.  This calculation is so speculative, and so divorced from reality, that to allow it to be stated to a jury would be highly prejudicial, with no probative value.

C.   <u>Additional Cost of Mortgage</u>

In his calculation of the "additional cost of mortgage" for Plaintiff Smith, who allegedly told Dr. Smith's assistant that he was denied an attempt to refinance his existing 5.5% mortgage at a 4.5% interest rate, Dr. Smith *does* claim to measure an actual loss.  However, Dr. Smith's opinion is not based on any documentary evidence as to the amount of additional mortgage interest that this Plaintiff allegedly paid, which would have been impossible because Plaintiffs have produced no such evidence in discovery, and Dr. Smith was not provided with any such evidence.  Dr. Smith never saw Mr. Smith's existing mortgage; he never saw any documents showing that Mr. Smith made payments on that mortgage; he never saw any evidence of an attempt to refinance; he never saw any evidence of the terms of the alleged refinancing attempt; and he never saw any evidence that any such attempt was denied, or the reasons why.  Without any such evidence, Dr. Smith nevertheless gives an opinion of Mr. Smith's potential loss, assuming that any alleged damage to Mr. Smith's credit will not be cured for the duration of Mr. Smith's 16.8 year life expectancy.  This type of unsupported, speculative "expert" testimony is not permitted under Rule 702.

**D.**     **Lost Business Profits**

Dr. Smith's opinion regarding Mr. Russ' alleged loss of business profits is probably the most speculative, and the least grounded in fact.  In that case, Dr. Smith gives an opinion as to the lost business profits sustained by Mr. Russ, who claims that he was denied the opportunity to purchase three check cashing locations due to negative marks on his credit report caused by Northern Leasing.  In forming his opinion, Dr. Smith made no independent review of the proposed transactions that were allegedly described to Dr. Smith's assistant during a telephone interview.  Dr. Smith simply adopted and essentially repeated the projection made by Mr. Russ (that two of the stores would generate $72,000 in profit and the third would generate $25,000 per year in profit).  Dr. Smith did not opine as an economist, but is simply repeating Plaintiff's position.  Dr. Smith did not review or analyze, or even ask for one financial record concerning Mr. Russ' existing stores, or the stores that he allegedly sought to acquire.  He did not review a tax return, a financial statement or any books or records of either business.  Moreover, his entire expert opinion is fatally undermined by the fact that he did not even consider or factor in the cost of the acquisition.  As he grudgingly conceded at his deposition, Dr. Smith's opinion therefore does not address lost profits at all; it is nothing more than a regurgitation of the amount of cash flow that Mr. Russ claims he would have earned.  This is precisely the type of "expert" testimony that the court must exclude because of the likelihood that jury will be unduly influenced by Dr. Smith's pedigree, without regard to the fact that he is merely repeating what he was told by the Plaintiff.  Dr. Smith's reports and testimony are incapable of "assisting the trier-of-fact", as required by Rule 702 of the Federal Rules of Evidence.

**E.**     **Reduction In Value Of Life ("RVL")**

Dr. Smith's opinions on RVL damages should be excluded because they are purely theoretical calculations that address the value of an anonymous statistical life, and do not purport

to value the lives of the five individuals who are the Plaintiffs in this case.  Dr. Smith's opinions

in this regard fail to satisfy the "*Daubert*" standards and Rule 702 of the Federal Rules of

Evidence.  While Dr. Smith's reports go to great lengths to establish the credibility and

applicability of RVL damages, his reports misrepresent the authorities that he cites, and fail to

acknowledge that his theory of RVL damages is based on highly questionable, discredited

methodologies.  This has been confirmed in numerous court decisions, many of which excluded

Dr. Smith's own opinions.  The authorities on which Dr. Smith relies confirm that such methods,

which only value a statistical, anonymous life, have no place in determining the type of injury to

business recoverable under RICO or the GBL, or the value of the specific lives of the Plaintiffs

in this case, or compensatory damages.  Accordingly, because Dr. Smith's opinions regarding

RVL damages are neither relevant nor reliable, they, too, must be excluded.

## ARGUMENT

## I.

## PLAINTIFFS' EXPERT OPINES ON DAMAGES THAT
## ARE NOT AVAILABLE UNDER RICO OR SECTION 349

Dr. Smith opines on various types of damages allegedly incurred by the Plaintiffs.  Many

of these damages, however, are not available under RICO or Section 349.  Therefore, any

testimony by Dr. Smith as to such damages is not relevant, and should be excluded under Rules

702 and 403 of the Federal Rules of Evidence.

**A.      Purported Damages For Loss Of Time Spent, Reduced Value Of Life,
         And Loss Of Credit Expectancy Are Not Recoverable Under RICO**

RICO permits recovery only for injury to a Plaintiff's business or property.  18 U.S.C. §

1964(c).  Damages allegedly arising from reduced value of life, loss of time spent, and loss of

credit expectancy are not injuries to business or property, and are not recoverable.

It is well established that damages for personal injuries are not recoverable under civil RICO. *Spinale v. United States et. al.*, No. 03Civ.1704, 2004 WL 50873, at *10 (S.D.N.Y. Jan. 9, 2004) ("Courts have uniformly held that damages for personal injuries and emotional distress are not recoverable under RICO…. Thus, [plaintiff] cannot recover damages for any physical or emotional injuries he may have sustained as a result of the alleged RICO violations." (internal citations omitted)); *Williams v. The Dow Chemical Co.*, 255 F. Supp. 2d 219, 225 (S.D.N.Y. 2003) ("RICO provides recovery for injury to business and property; it does not provide recovery for physical and emotional injuries."); *Major League Baseball Props., Inc. v. Price*, 105 F. Supp. 2d 46, 49 (E.D.N.Y. 2000) ("Congress enacted RICO 'to combat organized crime not to provide a federal cause of action and treble damages' for personal injuries.").

Damages for reduced value of life are not available under RICO because such damages are ordinarily an element of pain and suffering in cases involving personal injuries. *See Carroll v. United States*, 295 Fed. Appx. 382, 386 (2d Cir. 2008) ("[T]he district court did not err in failing to award damages for loss of enjoyment of life because New York does not permit such an award separate from the pain and suffering awarded") (*citing McDougald v. Gurber*, 73 N.Y.2d 246. 256-57 (1989)).  Indeed, Dr. Smith conceded that such damages are not damages to business or property at his depositions.  Exh. F (Smith Depo. Tr.), p. 137).

Claims for loss of time spent are also rooted in personal injury claims, not claims for injury to a business or property.  *See, e.g., Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (loss of time compensable in action for false arrest); *Callaghan v. Jacobs*,  No. 08 Civ. 03523, 2010 WL 1222048, at *4 (S.D.N.Y. March 5, 2010) (discussing loss of time in personal injury case).  Therefore, these damages are not available under RICO, and Dr. Smith's opinion on such damages is irrelevant and should be excluded.  *Daubert,* 509 U.S. at 589.

Dr. Smith opines that Plaintiffs Serin, Russ, Redner and Lim were damaged due to a loss of credit expectancy.  These opinions do not even purport to calculate any actual injury.  Indeed, Dr. Smith's opinion states that they were damaged whether or not they tried to use the credit that Dr. Smith speculates would have been available but for the Defendants' alleged actions.  Exh. B, p. 3; Exh. C, p. 4; Exh. A, p. 3.  Because his opinion does not address any real injury, let alone an injury to business or property, Plaintiffs Serin, Russ, Lim and Redner do not have valid claims for loss of credit expectancy under RICO.

**B.      Damages For Loss Of Time Spent, Loss Of Credit Expectancy And RVL Are Not Recoverable Under Section 349**

Section 349 of the New York General Business Law permits "any person who has been injured by reason of any violation of this section … to recover his *actual damages*…." N.Y. G.B.L. §349(h) (2010) (emphasis added).  Plaintiffs are precluded from recovering damages for loss of time spent, loss of credit expectancy, and loss of enjoyment of life because these are theoretical damages, which do not constitute actual damages or losses, as required by Section 349.

It is well settled that absent proof of actual harm, a plaintiff may not recover damages under Section 349.  *Small, et al., v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 55-56 (1999) (the court of appeals affirmed the dismissal of plaintiffs' claims because "[p]laintiffs' definition of injury is legally flawed.  Their theory contains no manifestation of either pecuniary or 'actual' harm . . . ."); *Smith, et al., v. Chase Manhattan Bank, USA, N.A., et al.*, 293 A.D.2d 598, 599-600, 741 N.Y.S.2d 100, 102 (2d Dep't 2002) (plaintiffs' action was dismissed because, *inter alia*, "the plaintiffs have not alleged, and cannot prove, any "actual injury" as is necessary under General Business Law § 349") (citations omitted); *Kassis Mgm.t Inc. v. Verizon New York, Inc.*, No. 104736/2008, 2010 N.Y. Slip Op. 51761U, 2010 WL 4026388, at *8 (N.Y. Sup. Ct. Aug.

18, 2010) (granting summary judgment on plaintiff's Section 349 claim due in part to plaintiff's failure to show that lost profits were "measured by reliable factors which go beyond mere speculation … Much of the documentary evidence is not actually verifiable.  Therefore, the court must dismiss this action based on the lack of reasonable certainty in calculating the injury…."); *Baron v. Pfizer, Inc.*, 42 A.D.3d 627, 840 N.Y.S.2d 445, 448 (3d Dep't 2007) ("In short, because plaintiff failed to allege actual harm or that she sustained a pecuniary injury, Supreme Court properly determined that she failed to state a claim under General Business Law § 349"); *Vigiletti v. Sears, Roebuck & Co.*, 42 A.D.3d 497, 498, 838 N.Y.S.2d 786  (2d Dep't 2007) *appeal denied* 9 N.Y.3d 818 (2008) (holding that plaintiffs failed to state a cause of action under General Business Law § 349 because "[t]he complaint failed to allege that the plaintiffs and the proposed class members had suffered actual injury as a result of the defendant's allegedly deceptive marketing") (citations omitted).

Regarding loss of time spent, Dr. Smith does not purport to value the amount of actual losses incurred by any Plaintiff as a result of time spent addressing the Defendants' alleged actions. [13]  Dr. Smith's calculation is intended to assign a value to the costs that each Plaintiff **would have** incurred had they hired a clerk to deal with the issues caused by Northern Leasing, even though none of the plaintiffs claims to have hired a clerk.  Exh. F (Smith Dep. Tr. p. 85-86).[14]  He thus concedes that his opinions are not addressed to the <u>actual</u> <u>losses</u> sustained by each

---

[13]  For example, Dr. Smith ignored Plaintiffs' actual vocations when calculating damages and even ignored the fact that some Plaintiffs were not even working during the times in question.  *See, e.g.,* Exh. B (Serin Report), pp. 2-3.

[14]   Dr. Smith calculates the loss by taking each Plaintiff's guess/estimate of the number of hours spent, whether or not the time allegedly spent caused any Plaintiff to lose income, and multiplying it by the "median wages of the average of Office Clerks and Payroll and Timekeeping Clerks" in whatever that State that particular Plaintiff resided.  (Exh. A, p.2-3; Exh. B, p.2-3; Exh. C, p.2-3; Exh. D, p.2-3, Exh. E, p.2).

Plaintiff.  The result is that his opinions do not address a loss that is recoverable under Section 349.

Similarly, regarding claims arising from loss of credit expectancy, for four of the Plaintiffs (Serin, Russ, Lim and Redner), Dr. Smith does not purport to give an opinion as to an actual loss caused by damage to their credit.  Rather, his opinions address a ***theoretical*** loss of credit expectancy, which is based on highly speculative guesstimates as to each Plaintiff's "ability to borrow", without regard to whether or not these Plaintiffs actually tried to borrow, and without regard to whether they were either denied a loan, or were forced to pay increased interest.

Dr. Smith's report on Redner is even further divorced from reality than the others because it assigns a value to Redner's loss of credit expectancy even though Mr. Redner "admits to having credit problems in the past," and to "not really using credit cards much."  (Exh. A, p. 2).  And in the case of Lim, while Dr. Smith's report states that Lim claims that he was denied an opportunity to refinance a mortgage, the report further states that Mr. Lim "does not recall how much he would have saved on his mortgage as a result."  Having no evidence of actual losses on which to base his opinion, Dr. Smith nonetheless renders an opinion as to the value of a theoretical loss to Mr. Lim's credit **expectancy**, which is clearly not the same as the actual losses Mr. Lim claims to have sustained.[15]

Damages for RVL are not recoverable under Section 349 for the same reasons discussed above – such damages are purely theoretical, and do not purport to measure actual loss to these Plaintiffs.  It is a creation of Dr. Smith's.  As described in further detail below, Dr. Smith assigned to each Plaintiff a valuation of a statistical life that he calculated approximately twenty

---

[15]  Plaintiff Russ' claim for loss of business profits is arguably related to his alleged impaired credit.  However, Dr. Smith elected to treat that claim separately, and we do as well.

years ago.  Under Dr. Smith's methodology, each statistical life has the exact same value, and there is no need to tailor that value to the particular situation of any Plaintiff.  Thus, he values all five Plaintiffs' lives at $4.2 million, and adjusts that figure only to take into account each Plaintiff's life expectancy and the Plaintiff's own guess/estimate of the amount by which his or her quality of life has been diminished.  By definition, Dr. Smith's "value of life" approach does not measure these Plaintiffs' actual losses, and may not be recovered under Section 349.

**C.      Damages For Injuries That Were Allegedly Incurred Prior
         To February 24, 2003 Are Not Recoverable Under Section 349**

Certain of the Plaintiffs are barred from recovering some of their claimed damages because they were allegedly sustained before February 24, 2003, and therefore, fall outside the applicable statute of limitations.  New York courts have determined that the three year statute of limitations applicable to claims for fraud under New York Civil Procedure is applicable.  *Gaidon v. Guardian Life Ins. Co.*, 96 N.Y.2d 201, 210 (2001).  The statute of limitations begins to run "upon injury by the deceptive act or practice *i.e.* when all of the factual circumstances necessary to establish a right of action have occurred…." *Buyers and Renters United to Save Harlem v. Pinnacle Group NY LLC*, 575 F. Supp.2d 499, 512 (S.D.N.Y. 2008) (holding that plaintiffs could not assert claims that accrued more than three years prior to the filing of the complaint) (citations omitted); *Gristede's Foods Inc. v. Unkechauge Nation*, 532 F. Supp.2d 439, 453 (E.D.N.Y. 2007) (holding that plaintiffs were barred from asserting claims that arose prior to three years before filing suit); *Gaidon*, 96 N.Y.2d at 209-10 ("Thus, accrual of a *section 349(h)* private right of action first occurs when plaintiff has been injured by a deceptive act or practice violating *section 349*."). Specifically, the following damage claims are not recoverable under Section 349:

1.      **Serin's Claims for Loss of Time Spent, Loss of Credit Expectancy, and RVL**

Dr. Smith opines that Plaintiff Serin was damaged for loss of time spent in each year from 2002 through 2006.  Exh. B, p. 3.  Dr. Smith opined that Plaintiff Serin spent 30 hours each year addressing the Defendants' alleged actions.  Any claims arising from time spent before February 24, 2003 (three years before the date of the Original Complaint) are not recoverable under Section 349.  Dr. Smith should not be permitted to testify about any losses accruing prior to February 24, 2003.

Dr. Smith opines that Plaintiff Serin suffered from a loss of credit expectancy from March 2002 through January 2006.  Dr. Smith also opines that she suffered from a reduction in the value of her life from March 1, 2002 through the projected remainder of her life (50 years).  To the extent such damages are cognizable, and they arose prior to February 24, 2003, they are barred by the statute of limitations and Dr. Smith should not be permitted to testify as to those damages.

2.      **Russ's Claims For Payments Made To Northern Leasing, Loss Of Credit Expectancy, Loss of Time Spent And RVL**

According to the Russ Report, Russ claims that he made payments to Northern Leasing totaling $9,247 in 2001 and 2002.  Exh. C, p. 2.  Dr. Smith further opined that Russ was entitled to damages for loss of credit expectancy for the period of November 1, 2002 through December 31, 2006.  Any damages arising from November 1, 2002 through February 24, 2003, however, are time barred, and Dr. Smith may not provide testimony regarding such damages.

Moreover, Dr. Smith also opines that Mr. Russ is entitled damages for loss of time spent and out of pocket expenses during the period of 2002 through 2006.  Any such damages that accrued before February 24, 2003, however, are barred by the statute of limitations, and Dr. Smith may not provide testimony regarding such damages.

Dr. Smith further opines that Russ is entitled damages for the reduced value of his life beginning June 1, 2002 through the projected remainder of his life.  Even assuming arguendo that such damages are cognizable herein, the statute of limitations bars any such claim damages occurring between June 1, 2002 through February 24, 2003, and Dr. Smith may not provide testimony regarding such damages.

3.      **Lim's Claims for Payments Made to Northern Leasing, Loss of Time Spent, Loss of Credit Expectancy, and RVL**

According to the Lim Report, Lim claims to have made payments to Northern Leasing in 1998 totaling $189.  Exh. D, p. 2.  All of those payments were made prior to February 24, 2003.  These claims are time barred, and Dr. Smith should not be permitted to provide testimony regarding such damages.

Dr. Smith also opines that Lim suffered damages arising from loss of time spent from 2001 through 2006, which he estimates at forty hours each year.  All such claims that arose prior to February 24, 2003 are also time barred.  Therefore, Dr. Smith should not be permitted to testify regarding such damages.

Similarly, Dr. Smith opines that Plaintiff Lim suffered damages from a reduced value of life and loss of credit expectancy from May 2001 through the projected remainder of his life, and May 2006, respectively.  Even assuming such damages are cognizable, the statute of limitations bars any such claims to the extent that the damages were incurred before February 24, 2003, and Dr. Smith may not provide testimony regarding such damages.

## II.

## EVEN IF THE DAMAGES THAT PLAINTIFFS SEEK TO RECOVER WERE AVAILABLE UNDER RICO AND SECTION 349, DR. SMITH'S TESTIMONY REGARDING SUCH DAMAGES SHOULD BE EXCLUDED UNDER RULES 702 AND 403 OF THE FEDERAL RULES OF EVIDENCE AND *DAUBERT*

### A.    The Standard for Exclusion of Expert Witness Testimony

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1983), the Supreme Court held that trial courts must perform a gatekeeping function to ensure that scientific testimony "both rests on a *reliable* foundation and is *relevant* to the task at hand. *Id.* at 597 (emphasis added). In determining whether an expert's testimony is reliable and relevant, courts should consider the following factors: (i) whether the theory can and will be tested; (ii) whether the theory has been subject to peer review and publication; (iii) whether there is a known or potential error rate; and (iv) whether the theory has been generally accepted within the scientific community. *Daubert,* 509 U.S. at 593-94; *see also Celebrity Cruises, Inc. v. Essef Corp.,* 434 F. Supp. 2d 169, 176 (S.D.N.Y. 2006).

The Court, in its gatekeeping function, must ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Moltner v. Starbucks Coffee Co.*, No. 08 Civ. 9257, 2009 WL 3573190 (S.D.N.Y. Oct. 23, 2009), aff'd, __ F.3d __, No. 09-4943-cv, 2010 WL 4291299 (2d Cir. Nov. 2, 2010) (*quoting United*

*States v. Roldan-Zapata*, 916 F.2d 795, 805 (2d Cir.1990) (internal quotation marks omitted). The Supreme Court in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), made clear that Rule 702 applies to all types of expert testimony based on technical or other specialized knowledge, not only scientific testimony.  Moreover, the Supreme Court has emphasized that district courts "may conclude that there is simply too great an analytical gap between the data and the opinion proffered" for the opinion to be admissible.  *General Elec. Co. v. Joiner*, 522 U.S. 126, 146 (1997).[16]

In *Baker v. Urban Outfitters, Inc.*, 254 F.Supp.2d 346, 353 (S.D.N.Y. 2003), the Court described the admissibility standards for proposed expert testimony in the Southern District:

> The proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence.  *See, e.g., Cayuga Indian Nation v. Pataki*, 83 F.Supp.2d 318, 322 (N.D.N.Y. 2000).  Though the weight given to expert testimony should be left to the finder of fact, expert testimony should be excluded altogether if it is "speculative" or "conjectural" or if it is based on assumptions "so unrealistic and contradictory as to suggest bad faith."  *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).

Further, in deciding whether a step in an expert's analysis is unreliable, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  *Arista Records LLC v. Usenet.com, Inc.*, 608 F.Supp.2d 409, 423 (S.D.N.Y. 2009) (*citing Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)).  It is well settled that "when an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the

---

[16]  Courts emphasize the importance of resisting "the temptation to answer objections to receipt of expert testimony with the shorthand remark that the jury will give it the weight it deserves." *Boucher v. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1995) (*quoting Joy v. Bell Helicopter Textron*, 999 F.2d 549, 569 (D.D.C. 1993)).

exclusion of that unreliable opinion testimony." *Celebrity Cruises*, 434 F.Supp.2d at 178

(quoting *Amorgianos*, 303 F.3d at 266).

**B.     Dr. Smith's Opinions About The Reduction**
**In The Value Of Life Should Be Excluded**

There are several reasons why the Court should exclude Dr. Smith's opinions regarding

the RVL or "hedonic" damages.  First, RVL damages have no applicability to the particular

Plaintiffs in this case.  Second, even if such damages were applicable to these Plaintiffs, Dr.

Smith fails to articulate his methodology, or explain in any detail whatsoever, the basis for the

principal assumption he relies on in formulating his opinions – how he determined the value of a

statistical life.  Third, while the "value of a statistical life" has found general acceptance by

economists for certain purposes, the use of such calculations to value a particular life for

purposes of determining compensatory damages has not found general acceptance.  Dr. Smith's

method for calculating RVL or hedonic damages lacks general acceptance and reliability as

required by *Daubert*.  Finally, Dr. Smith is simply not an expert on the value of these Plaintiffs'

lives, and therefore, cannot be of any assistance to the trier of fact.

**1.     Reduced Value Of Life Is Irrelevant To A**
**Calculation Of Compensatory Damages**

In his reports, Dr. Smith goes to great lengths to defend calculations of the value of life.

In doing so, he cites numerous authorities.  What Dr. Smith does not disclose, however, is that

calculating the value of an anonymous statistical life, which is what these authorities do, has

nothing to do with computing compensatory damages for actual people.  Calculations of the

value of life have been often used for "assessing the costs and benefits of government

investments in safety and environmental protection."  See Exh. G (Expert Report of Dr.

Christopher Erath), at p. 10.[17]  Such calculations are used by the government to determine whether certain safety precaution measures are cost-effective and necessary.  They purport to value a theoretical anonymous statistical person, and have no relevance to the actual people involved in this case.  They are not generally accepted for use in the valuation of any one individual's life for any purpose, let alone for the purpose of calculating compensatory damages in Court.

      Dr. Smith's list of supportive authorities is misleading.  While these authorities may support calculating the "value of life" for specific purposes – such as whether it makes economic sense to impose a particular governmental health or safety regulation – they do <u>not</u> do so in the context of valuing individual lives or in the context of calculating damages based on the reduced value of such a life.  Any suggestion to the contrary by Dr. Smith is tantamount to a misrepresentation to the Court.  *Ayers v. Robinson, et al.,* 887 F. Supp. 1049, 1059-64 (N.D. Ill. 1995) (Dr. Smith's methods described as, *inter alia,* "unreliable," "not constitut[ing] a sound study," "[having] low probative value," "[of] no use to a jury," and "deceptive").  Indeed, W.K. Viscusi, one of Dr. Smith's most relied upon economists, confirms that Dr. Smith's application of value of life calculations to individuals is completely misplaced.  *See* W.K. Viscusi, *The Econometric Basis for Estimates of the Value of Life,* 3 J. Forensic Econ. (no. 3), 61, 69 (Fall 1999) ("it makes no more sense to utilize a uniform value-of-life figure for all people than it does to assume that economic damages are the same for every wrongful death case").

      Dr. Smith does not even make the attempt to bridge the analytical gap between his statistical value of life estimates and each of the Plaintiffs' actual lives.  The reason why his

---

[17]  Dr. Smith's reports state that the "underlying, academic, peer-reviewed studies fall into two general groups: (1) consumer behavior and purchases of safety devices; (2) wage risk premiums to works; in addition, there is a third group of studies consisting of cost-benefit analyses of regulations."  *See, e.g.*, Exh. D, p. 5.

reports are silent on the issue is because there is no relationship between his conclusions and the Plaintiffs themselves.  Dr. Smith's valuation of the "value of life" does not account for a single fact that is specific to any of the Plaintiffs' lives.  Based on his reports, he would have arrived at the same conclusion even if he had known nothing about the Plaintiffs, other than their age and the amount that they claim their quality of life was reduced.  *Gary Price Studios, Inc. v. Randolph Rose Collection, Inc.,* No. 03 Civ. 969, 2006 WL 1319543, at *7 (S.D.N.Y. May 11, 2006) (court excluded expert testimony for having "too great an analytical gap between the data and the opinion proffered") (citations omitted).

Indeed, federal courts nationwide have specifically recognized this as a flaw in Dr. Smith's methodology.  *Saia v. Sears Roebuck and Co., Inc.*, 47 F. Supp.2d 141, 148 (D.Mass. 1999) (holding that Dr. Smith's methodology is unreliable because it does not take into account any facts particular to plaintiff); *Kurncz v. Honda North America*, 166 F.R.D. 386, 390 (W.D. Mich. 1996) (Dr. Smith's valuation of statistical life is an "unhelpful" means for valuing plaintiff's life); *Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir. 1992) ("we have serious doubts about [Smith's] assertion that the studies he relies upon actually measure how much Americans value life"); *Ayers,* 887 F. Supp. at 1060 ("Whether sex or race (or both) matter to life fulfillment is an interesting question, but one into which Hedonic Damages does not delve.  Its authors' representation that it has done so is grossly misleading"); *Sullivan v. U.S. Gypsum Co.*, 862 F. Supp. 317, 321 (D. Kan. 1994) ("[t]he studies relied upon by Mr. Smith do not use methodology designed to calculate the loss of enjoyment of life, yet are nonetheless extrapolated by Mr. Smith into what he claims to be valid data . . . ."); *Livingston v. United States,* 817 F.Supp. 601, 606 (E.D.N.C. 1993) (the values used by plaintiff's expert for the "values of life and the pleasures of life" were better characterized as "measuring the value of avoiding risk").

Based on the foregoing, Dr. Smith's analysis is nothing more than an apples-to-oranges comparison, is entirely unreliable and should be excluded.  *E.g., Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F.Supp.2d 314, 318-319 (S.D.N.Y. 2009) (holding that in determining whether expert evidence is reliable, a court must reject the expert's testimony if it is "based on assumptions that are so unrealistic and contradictory" that the testimony amounts, in essence, to an "apples and oranges comparison") (*citing Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996)) (internal quotations omitted).

As the Court said in *Ayers*:

> One other consideration, already touched upon, plays out for the most part under Rule 403 and helps to explain why willingness-to-pay methodology may be an appropriate guide for regulators but not for courts and juries traversing the difficult terrain of valuing life. Those two activities have very different foci: Regulators deal in averages, while courts deal with specific cases. **Thus a statistical mean may have validity in the former context, while at the same time it simply creates the already-mentioned deceptive appearance of precision in the latter.**  887 F. Supp. at 1064 (emphasis added)

**2.      Dr. Smith's Methodology Of Calculating RVL Damages Is Unreliable**

Even if this Court were to determine that calculations with respect to the value of a statistical, anonymous life are relevant to the Plaintiffs' purported compensatory damages, the manner in which Dr. Smith calculated such damages is entirely speculative and unreliable.

First, although Dr. Smith's reports spend a great deal of time defending the "methodology," he offers no real description of that methodology.  At best, he explains the premise of calculating the value of a statistical life but does not provide any details about how such calculations were made.  The Court must be able to examine the methodology to determine its accuracy and credibility.  Dr. Smith's reports are big on conclusions but short on actual methods.  *Park West Radiology, et al., v. Carecore Nat'l., LLC, et al.*, 675 F.Supp.2d 314, 328

(S.D.N.Y. 2009) (court excluded expert testimony, in part, because "it is hard to determine what methodology or data, if any, Powell uses to form his conclusions . . . .").

Dr. Smith begins with the unsupported conclusion that each of the Plaintiffs' lives has a value of $4.2 million.  Dr. Smith arrives at that conclusion without doing any independent investigation, relying on a simple average that he generated over 20 years ago which produced a statistical value of life from studies of the same issue done by others.  Most of these other studies adopt what is known as the "willingness to pay" ("WTP") model, pursuant to which calculations are made based on what people will pay for small reductions in safety risk.  All Dr. Smith did in the Plaintiffs' reports is use a 20 year old derivation of other reports, and adjust it for inflation.  But Dr. Smith does not explain in any detail at all, how any of these other WTP studies arrived at their respective valuations.  His methodology appears to rely on an average of 47 studies that was reported by  T.R. Miller in his article entitled "The Plausible Range for the Value of Life – Red Herrings Among the Mackerel."  T.R. Miller, *The Plausible Range for the Value of Life – Red Herrings Among the Mackerel*, 3 J. Forensic Econ. (no. 3), 17-39 (Fall 1990).  That methodology, however, has been soundly rejected

> . . . Plausible Range takes 67 willingness-to-pay studies conducted between 1969 and 1990, makes a number of so-called "adjustments" and concludes that the value of a statistical life is between $1.5 and $3.5 million . . . . Any objective reader can recognize the methodology as one that has made whatever adjustments were necessary to bring the raw data within the target range. Adding, subtracting, multiplying and dividing with a predetermined result in mind cannot be fairly labeled science.

*Ayers,* 887 F.Supp. at 1060-61.

Dr. Smith's analysis is nothing more than a compromise of other people's wide ranging analyses, which he misleadingly portrays as a precise number.[18]  This methodology has also been sharply criticized.  *Ayers,* 887 F.Supp. at 1063 ("it is frankly bogus to massage those numbers, as both Hedonic Damages and Plausible Result have done, to create a deceptive appearance of precision rather than the true picture of an enormous spread in 'value.'  That is both fatal in Rule 702 terms and a basis for exclusion under Rule 403's balancing test.").

After Dr. Smith "calculated" the value of each Plaintiff's life, he appears to calculate the reduction in value of such life by assigning "impairment ratings" which are specific to each Plaintiff.  The impairment ratings, however, are based solely on the Plaintiffs' own biased assessments.  That too undermines Dr. Smith's opinion because it is well settled in this District that an expert witness may not solely rely on information provided to him/her from the party that has retained their services.

In *Arista Records*, the expert "offered opinions about the capacity and capabilities of Defendants' server and software,  . . . *by simply accepting what Defendant Reynolds told him.*"  608 F.Supp.2d at 424 (emphasis added).  The Court struck that testimony from the expert's report, holding, "it is well settled that an expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge."  *Id.* at 425.  *See also Robinson v. Sanctuary Record Groups, Ltd.*, 542 F.Supp.2d 284, 292 (S.D.N.Y. 2008) (excluding expert testimony regarding damages, the Court held, "[the expert's] methodology is founded on hearsay supplied by Plaintiffs' counsel-hardly a source of first-hand,

---

[18]   In the Appendices to his Reports, Dr. Smith writes: "The actual value that I use, <u>$4.1 [sic] million</u> . . . was originally based on a review conducted in the late 1980s averaging the results published by that time.  I have increased that late 1980s value only by inflation over time."  See, e.g., Exh. D (Lim), at p. 12 (emphasis added).  In fact, Dr. Smith used a $4.2 million figure in all of his reports in this case, raising even more questions as to their reliability, and further undermining their validity.

independent expert knowledge- incomplete comparisons, and dubious assumptions"); *rev'd on other grounds*, Nos. 08-2078-cv, 08-2320-cv, 08-2333-cv, 2010 WL 2649849 (2d Cir. July 1, 2010); *Rowe Entertainment, Inc., et al. v. The William Morris Agency, Inc., et al.*, No. 98 CIV 8272 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003) ("[a]ny expert should be aware that a party and counsel in litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply") (*citing Supply & Building Co. v Estee Lauder Int'l, Inc.*, 95 CIV. 8136, 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2001)).

Under *Daubert,* two of the key factors for determining relevance and reliability are: (i) whether the theory has been tested; and (ii) whether it has been generally accepted within the scientific community.  Neither of those elements is satisfied here.  509 U.S. at 589.

### (i)        No Acceptance In The Scientific Community

Dr. Smith's reports go to great lengths to defend his methods of calculating RVL damages.  He does so because Judges in both federal and state courts throughout the country have written opinions specifically *rejecting* his methodologies and opinions.  *Mercado*, 974 F.2d at 869-71; *Saia*, 47 F. Supp.2d at 148-49 (finding Dr. Smith's hedonic damages testimony inadmissible because his calculations are untestable and the theory does not meet the requirement of general acceptability); *Ayers,* 887 F. Supp. at 1059-64 (described Dr. Smith's methods, *inter alia,* as "unreliable," "not constitut[ing] a sound study," "[having] low probative value," "[of] no use to a jury," and "deceptive").[19]

---

[19]    *See also, Brereton v. United States,* 973 F. Supp. 752, 758 (E.D. Mich. 1997) (finding Dr. Smith's calculations of hedonic damages unreliable under *Daubert*); *Crespo v. City of Chicago*, No. 96 C 2787, 1997 WL 537343, at *2-*3 (N.D. Ill., Aug 22., 1997) (excluding Dr. Smith's hedonic damages testimony due to lack of unanimity among economists as to which life valuation studies ought to be considered) (*citing Mercado v. Ahmed,* 756 F. Supp. 1097 (N.D. Ill. 1991)); *Kurncz*, 166 F.R.D. at 388-91 (finding Dr. Smith's hedonic damages testimony inadmissible under *Daubert*); *Sullivan*, 862 F. Supp. at 321 ("the court does not believe that the testimony [of Mr. Smith] is scientifically valid, nor would it assist the trier of fact to understand

Separate and apart from cases involving Dr. Smith's specific methods, the calculation of hedonic damages, generally, has been routinely rejected by both federal and state courts throughout the country as well.  *McMullin v. United States,* 515 F.Supp.2d 914, 928 (E.D. Ark. 2007); *Martinez v. Caterpillar, Inc.*, Civ. No. 06-236, 2007 WL 5377515 (D.N.M. Sept. 6, 2007); *Harris and Lee v. United States*, Civ. No. 06-0412, 2007 WL 4618597 (D.N.M. June 7, 2007); *Anderson v. Hale*, No. CIV-02-0113, 2002 WL 32026151 (W.D. Okla. Nov. 4, 2002); *DuBose v. City of San Diego*, No. 99cv2279-L, 2002 WL 34408963 (S.D. Cal. Oct. 1, 2002); *McGuire v. Santa Fe*, 954 F.Supp. 230 (D.N.M. 1996); *Hein v. Merck & Co.,* 868 F. Supp. 230, 235 (M.D. Tenn. 1994) (rejecting hedonic damages testimony as insufficiently reliable or valid to meet the requirements of *Daubert*); *Livingston v. United States,* 817 F.Supp. 601 (E.D.N.C. 1993); *Craft v. Matlack, Inc.*, Civ. A. No. 91-2465, 1992 WL 124406 (E.D. La. May 26, 1992); *Scharrel v. Wal-Mart Stores*, 949 P.2d 89 (Colo. App. 1997); *Montalvo v. Lapez*, 884 P.2d 345 (Hawaii 1994); *Wilt v. Buracker*, 443 S.E.2d 196, 205 (W. Va. 1993), ("[t]he majority of jurisdictions that have addressed whether expert testimony based upon willingness-to-pay studies

---

the evidence or determine a fact at issue"); *Doe v. Tag, Inc.*, No. 92 C 7661, 1993 WL 484212, at *2-*3 (N.D. Ill Nov. 18, 1993); *Bramlette v. Hyundai Motor Co.,* No. 91 C 3635, 1992 WL 213956, at *3-*7 (N.D. Ill., Aug. 28, 1992); *Buckhalter v. Burlington Northern*, Civ. A. No. EC90-139-D-D, 1992 WL 236676, at *1-*2 (N.D. Miss. Mar. 23, 1992); *Mercado v. Ahmed, et al.*, 756 F.Supp. 1097, 1102-03 (N.D. Ill. 1991); *Davis v. ROCOR International*, 226 F.Supp.2d 839, 842 (S.D. Miss 2002); *Birdsell v. Bd. of Fire and Police Comm'rs*, No. 85-3371, 1990 U.S. Dist. LEXIS 14961, at *3 (C.D. Ill., Oct. 16, 1990); *Loth v. Truck-A-Way Corp.*, 60 Cal. App. 4th 757, 760 (Cal. Ct. App. 1998) ("We conclude [that Smith's] testimony on hedonic damages was inadmissible as a matter of law and its admission was prejudicial."); *Talle v. Nebraska Dep't Social Serv.*, 541 N.W.2d 30 (Neb. 1995) (holding that lower court erred in admitting Dr. Smith's testimony on hedonic damages); *Anderson v. Neb. Dep't of Soc. Servs.*, 248 Neb 651, 668-71 (Neb. 1995) (same); *Chustz v. J.B. Hunt Transp., Inc.*, 659 So. 2d 784 (La. App. 1 1995) (excluded Smith's testimony on hedonic damages); *Longman v. Allstate Insurance Co.*, 635 So. 2d 343 (La. App. 4 Cir. 1994); *Patch v. Glover*, 618 N.E.2d 583 (Ill. App. Ct. 1993); *South Lake Limousine and Coach, Inc. v. Brock*, 578 N.E.2d 677 (Ind. Ct. App. 1991); *Fetzer v. Wood*, 569 N.E.2d 1237 (Ill. App. 2d 1991).

is relevant to one's loss of enjoyment of life have concluded that such testimony is inadmissible"); *Foster v. Trafalgar*, 603 So. 2d 284 (La. App. 2d 1992).

In addition to well established judicial precedent rejecting Dr. Smith's approach, many economists question Dr. Smith's methods, further indicating that they are not generally accepted. The "list of economists who have, in one way or another, criticized this misapplication [of hedonic damages] reads like a professional Who's Who[.]"  Thomas Havrilesky, *The Misapplication of the Hedonic Damages Concept to Wrongful Death and Personal Injury Litigation,* 6 J. Forensic Econ. 93 (1993).

Dr. Erath's report discusses at length the lack of general acceptance of Dr. Smith's methodology as applied to the Courtroom.  Dr. Erath concludes that Dr. Smith's claim that his "value of life" methodology has been generally accepted among economists is inaccurate and misleading.

> It is certainly true that the "value of life" literature is well-established within economics … in examining the compensation necessary to accept a small incremental risk.  Dr. Smith's methodology, which attempts to transform the compensation necessary to accept a small incremental risk to the value of the ability to lead a normal life, is not.  He mischaracterizes the literature by writing that his estimate is based on "what we, as a contemporary society, actually pay to preserve the ability to lead a normal life."  In fact, the studies examine the amounts individuals are willing to pay to accept a small increase in a perceived risk of death.

Exh. G, p. 11.

### (ii)    Dr. Smith's Methods Cannot Be Tested.

As described, Dr. Smith's calculation of RVL damages is based on the following: (i) a statistical value of life calculated over 20 years ago based on other WTP studies for which Dr. Smith provides no explanation; (ii) an impairment rating which is entirely based on the subjective bias of the Plaintiffs; and (iii) an estimated life span which fails to take into account

any facts peculiar to the individual Plaintiffs in this case.  Such methodology cannot be adequately tested.

First, Dr. Smith's method is not testable because it is based on other studies whose conclusions are widely varied.  *See Saia,* 47 F.Supp.2d at 148 ("there is significant reason to doubt the testability of hedonic damage calculations based on Dr. Smith's willingness-to-pay models"); *Kurncz,* 166 F.R.D. at 389-90 (courts must consider high rate of error as various WTP valuations vary between \$100,00 and \$12 million); *Hein*, 868 F.Supp. at 232 (no retrospective validation of valuation of hedonic damages possible).  Furthermore, because Dr. Smith's method is entirely based on one random, unexplained assumption after another, it is simply unpredictable, uncontrolled and thus, impossible to be tested.  *Campania,* 650 F.Supp.2d at 321; *Arista Records,* 608 F. Supp. 2d at 423 (holding that expert testimony should be excluded if speculative or conjectural); *Celebrity Cruises,* 434 F.Supp.2d at 187 (rejecting expert's opinion of lost enterprise value because each component of his calculation was flawed).  Finally, Dr. Smith himself admitted that his methods cannot be tested.  *Saia,* 47 F.Supp.2d at 149 ("Indeed, in the case at bar, Dr. Smith acknowledges that his theories cannot be tested . . .").  As such, it fails to satisfy the standard set forth by *Daubert*.[20]

---

[20]   Smith asserts that "it is important to note that this methodology is endorsed and employed by the U.S. Government as the standard and recommended approach for use by all U.S. Agencies in valuing life for policy purposes, as mandated in current and past Presidential Executive Orders in effect since 1972, and as discussed in 'Report to Congress on the Costs and Benefits of Federal Regulations,' <u>Office of Management and Budget</u>, 1998, and 'Economic Analysis of Federal Regulations Under Executive Order 12866,' <u>Executive Office of the President, Office of Management and Budget</u>, pp. 1-37…[et al]."  *See, e.g.*, Exh. D (Lim Report),  p. 11.  Smith, however, misrepresents the government's position on hedonic damages, as the government too has opposed the methodology.  *See* W. Kip Viscusi, *Misuses and Proper Uses of Hedonic Values of Life in Legal Contexts*, 13 J. Forensic Econ. 111, 118 (2000) (Misuses and Proper Uses) ("It is consequently incorrect to state, as some hedonic damage experts have done, that the adopting of hedonic values simply follows governmental practice.  The government's use of these values is quite specific and not for purposes of setting compensation

### 3.      Dr. Smith's Opinions Should Be Excluded Because He Is Not An Expert In The "Value Of Life"

The purpose of expert witness testimony is to assist the trier of fact utilizing his/her unique expertise.  As such, "a witness who knows no more than the average person is not an expert."  *Mercado*, 974 F.2d at 870.  What is absent from Dr. Smith's reports is an explanation of why he knows better than the average juror, what a life is worth.  The answer is absent from his reports because he does not know better than the average juror what a life is worth.  *Id.* at 871. Indeed, the studies on which he relies have been criticized as deficient because they, *inter alia*, ignore other influences that might impact an individual's decision, including the marketing or affordability of a particular safety measure.  *Id.*; *Sullivan*, 862 F.Supp at 321 (holding that Dr. Smith's methodologies had no relevance to the individual plaintiffs); *Kurncz*, 166 F.R.D. at 390 ("While the statistical approach may be useful for writing regulations, courts have found it rather 'callous and unhelpful' for jurors assessing individual lives. . . .  Mr. Smith's method is nothing more than a compilation of lay responses") (citation omitted).  Accordingly, since Dr. Smith is not an expert on the value of the Plaintiffs' lives, or any individual life, his opinion cannot assist the trier of fact and should be excluded.

### C.      Dr. Smith's Testimony Regarding Plaintiff Russ' Loss Of Business Profits Is Unreliable And Inadmissible

In his report on Plaintiff Russ, Dr. Smith merely adopts the projection of lost business profits given by Russ himself, without any further expert analysis.  *See* Exh. C, p. 3.  This fact renders Dr. Smith's opinion concerning loss of business profits inherently unreliable.  *Arista*

---

levels.");  W. Kip Viscusi, *The Flawed Hedonic Damages Measure of Compensation for Wrongful Death and Personal Injury*, 20(2) J. Forensic Econ. 113, 117-118 (2007) (Flawed Hedonic Damages).

*Records,* 608 F.Supp.2d at 424; *Robinson,* 542 F.Supp.2d at 292; *Rowe,* 2003 WL 22124991, at *3.

Dr. Smith's report is premised on the following assumptions: (i) that Russ owns a check cashing business that in 2009 yielded him a net business income of approximately $399,000; (ii) while he was being sued by Northern Leasing, Russ had the opportunity to purchase three check cashing locations from a competitor but was unable to do so because the landlord would not approve the transactions as a result of Plaintiff Russ' credit problems; (iii) Russ' better earning store locations make a profit of approximately $72,000 a year; (iv) two of the three "lost" stores would have generated at least $72,000 a year in profit, and the third store would have generated $25,000 of profit annually; and (v) the loss of business opportunity began on January 1, 2007. *Id.*  Every single one of these factual assumptions is based entirely on hearsay statements provided by the Plaintiff to Dr. Smith's assistant during a telephone interview.  Not a single one was verified by any supporting documentary evidence – no such supporting evidence was either provided to the expert or produced in discovery -- making them entirely speculative. *Ashland Management, Inc. v Janien*, 82 N.Y.2d 395, 403 (1993) (under New York law, loss of profits must be proved with reasonable certainty, and may not be based on speculation).

Incredibly, Dr. Smith's analysis of lost profit improperly fails to take into consideration the amount of money that Mr. Russ would have had to pay to acquire the three stores.  *See* Exh. G (Erath Report), p. 6.  In other words, his opinion of lost profit assumes that the three business, which were supposedly able to generate $169,000 in profit each year, were going to be given to him for nothing.  At his deposition, Dr. Smith attempted to avoid this obvious flaw in his "analysis" by claiming that his opinion deals with lost cash flow, and not lost profits.  Exh. F, p.

113-114.  If we take Dr. Smith at his word,[21] then his opinion does not even purport to address the actual loss of business profits in this case, and his opinion should be excluded for that reason alone.

It goes without saying that no business seller would sell three businesses that were generating $169,000 in annual pre-tax profit, for $0.  Because Dr. Smith concedes that he did not take the cost of acquisition into consideration, Dr. Smith' opinion is exposed as being completely unreliable as a measure of lost business profits.  *Robinson*, 542 F.Supp.2d at 291 (expert testimony excluded, because, among other things, expert did not account for costs and expenses that plaintiff would have incurred but for defendants' actions).

The lack of reliability of Dr. Smith's opinion as to lost business profits is further demonstrated by the flawed methodology that he used.  He simply accepted what Russ told him about what the annual profit of the three stores might be and put it in his report, without any critical analysis at all.  Dr. Smith's opinion was rendered without reviewing a single piece of documentary evidence as to the profitability of Mr. Russ' existing stores, or of the past profitability of the stores that he was supposedly going to acquire.  Although he conceded at his deposition that, as an economist, he would want to review "all the documents of the business" in evaluating a potential business acquisition (Exh. F, p. 111), he rendered his opinion without the benefit of any documents.  *Id.*  He simply accepted Mr. Russ' statement that the stores would have generated $169,000 per year in profit, and then did a calculation of how much ***cash flow*** Mr. Russ would have "earned" on this potential acquisition – without any consideration of the associated costs – over the course of his remaining 28 year life expectancy.

---

[21]  "I evaluated the cash flow of this business, I didn't need to know what he paid."  Exh. F, p. 113:11-12))

It is inconceivable that an opinion that was arrived at using such flawed methodology, and that is so saturated with false assumptions and analytical gaps, could assist the trier of fact in any way whatsoever.  This type of opinion is based solely on Dr. Smith's pedigree, lacks probative value, and is inherently misleading of the jury and prejudicial.   This Court should exercise its gatekeeping function to exclude Dr. Smith's opinion as to Russ' alleged damages for "loss of business profits."  *See e.g. Boucher,* 73 F.3d at 22 (holding that expert testimony that was not accompanied by sufficient foundation should have been excluded).

     **1.     Dr. Smith's Methodology For Determining
            Lost Business Profits Has Not Been Tested**

Dr. Smith's methodology for determining "lost business profits" appears to be as follows: (i) accept rough estimates of future profitability from the plaintiff, a non-expert interested party, without any corroboration (including a single projection or tax return), or any analysis of the underlying transactions; (ii) apply an arbitrary steady 3% growth rate that also has no connection to the underlying business; and (iii) assume no costs for the transaction.  Plaintiffs cannot possibly claim that such a method has any scientific basis that has either been tested or generally accepted, as required by *Daubert*, 509 U.S. at 593  ("Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields.").  Accordingly, Dr. Smith's opinion should be excluded for failing to use a methodology that is testable, recognized or generally accepted.  *Id.* at 593-94.

**D.     Dr. Smith's Opinions On Lost Credit
       Expectancy ("LCE") Should Be Excluded**

Dr. Smith's "method" for determining LCE damages is based on so many unfounded and inaccurate assumptions that it is impossible for it to serve as a reliable source of information to the trier of fact.

Dr. Smith's analysis begins with the unfounded presumption that there is a value of credit expectancy irrespective of whether that credit was actually used.  Therefore, according to Dr. Smith, even if someone had no idea that their credit score was impaired during a certain period of time, and never sought to utilize any such alleged available credit during that time (e.g. they did not need or try to borrow money), that individual was nevertheless damaged.  Dr. Smith does not explain how such a person would be damaged but rather makes the absurd analogy that the ability to borrow is akin to a safety net for a trapeze artist and thus, has value upon which damages can be based.  Therefore, according to Dr. Smith, the Plaintiffs are entitled to monetary damages even in the absence of an actual loss.  That approach is contrary to the requirements of the statutes at issue, and is belied by common sense and is completely unsubstantiated by Dr. Smith.

Dr. Smith's calculations are based on faulty, inaccurate and speculative assumptions.  First, for each Plaintiff, he opines that he/she had a certain amount of credit availability based on little more than what they claimed to be earning at a given point in time.  For example, for Gordon Redner, who apparently told Dr. Smith's staff that he "admits to having credit problems in the past, and to not really using credit cards much," (Exh. A, at p.4), Smith nonetheless opines that Mr. Redner had "the ability to borrow considerable sums beyond his current lines of credit", which he estimates to be at least $10,000.  Dr. Smith's report gives no explanation as to what methodology he used to arrive at that estimate, and provides no information or data to support that figure, which appears to be pulled out of thin air.  He does not purport to know how leveraged each Plaintiff is or was during the time in question.  Nor does he purport to know how much each Plaintiff has in the way of unencumbered assets.  Therefore, the entire starting point for his calculation—the Plaintiff's credit availability—is completely speculative and lacks even a

shred of factual support.  For this reason alone, his opinion should be excluded.  *Celebrity Cruises,* 434 F.Supp. 2d at 186 ("[a] methodology so sensitive to one highly subjective variable lacks the necessary reliability").

After speculating about each Plaintiff's credit availability, Dr. Smith computes the damages by further assuming that the Plaintiff would have to borrow funds at an interest rate of 25% instead of 12%.  Yet he provides no explanation as to the methodology he followed to arrive at these particular interest rates.  Are these credit card rates?  Why did he choose these rates as opposed to home mortgage rates, which are demonstrably lower?  Incredibly, he assumes the same interest rates for *all* of the Plaintiffs, without explaining why, and without providing any information or data to support those figures.  He does not refer to the Plaintiffs' credit histories, outstanding debts, income, assets or liabilities.  Accordingly, Dr. Smith's methodology of assigning random credit availabilities and interest rates to the Plaintiffs in determining their alleged damages falls beyond any possible scope of credibility.  Accordingly, his opinions on these damages should be excluded.  *Id.*

In addition, to the extent that any of the Plaintiffs specifically alleged that their credit score was impaired, Dr. Smith assumes, without corroboration, that there is a nexus between the impaired credit score and the alleged actions by Northern Leasing.  Yet, Dr. Smith offers no support for such speculation.  His reports are silent as to the Plaintiffs' credit histories and financial condition for all of the times in question, which may have been responsible for any impaired credit.  *Compare Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458-459 (2006). Solely relying on the hearsay statements of the Plaintiffs renders his reports both unreliable and speculative.  *Arista Records,* 608 F.Supp.2d at 424; *Robinson,* 542 F.Supp.2d at 292; *Rowe,* 2003 WL 22124991, at *3.

Moreover, for some of the Plaintiffs, Dr. Smith made additional assumptions in calculating damages that are also entirely speculative and unsubstantiated.  Dr. Smith further speculates that Lim would have had a credit availability of at least $200,000.  Exh. D, p. 4.  He bases this conclusion on the unsubstantiated assertion by Lim that he was previously able to obtain a mortgage of $165,000 and earned approximately $55,000 per year.  *Id.*  Dr. Smith, however, again did nothing to show the reasonable basis for his conclusion, or to corroborate Lim's claims regarding his mortgage and income, notwithstanding the fact that such information should have been readily available.  Furthermore, taking Lim's assertions at face value, there are still no facts that disclose when Mr. Lim obtained his mortgage, what the terms of that mortgage were, and what his credit availability was at that time.  To suggest that just because at one unknown point in time Mr. Lim says that he was able to obtain a $165,000 mortgage, his credit and income will be the same or better for the rest of his life is absurd.  But Dr. Smith's opinion relies on that very absurd assumption.  Furthermore, notwithstanding the fact that his own report reveals that Mr. Lim does not even claim that he was injured by any impact on his credit until 2004 or 2005 (when Mr. Lim allegedly tried to refinance his home mortgage and obtain credit cards), Dr. Smith, without explanation, calculates Mr. Lim's damages beginning in 2001.  *Id.* at 3-4.  Finally, it is unclear why Dr. Smith would not compute the damages, at least partially, based on mortgage rates at the time of the failed refinancing.  Instead, he applies an interest rate calculation that has no bearing to the real estate market in 2004 or 2005.  *Id.* at 4.  As such, Dr. Smith is comparing apples to oranges which provides no value to the trier of fact.[22]  *Baker,* 254

---

[22]  As evidenced by Dr. Smith's opinion regarding Plaintiff Smith's damages arising from the "additional cost of mortgage," Dr. Smith understands that computing damages with respect to a failed refinancing using non-mortgage interest rates, is nonsensical.

F.Supp.2d at 384 (court rejected expert's opinion, in part, because it relies on an irrelevant comparison of two different types of damages).

Dr. Smith's report for Serin is mired in additional false and misleading assumptions. Dr. Smith concludes that Plaintiff Serin's available credit was $150,000 because of her income of $45,000 (which was not verified), and because of her "intent to purchase a condo and obtain credit cards." Exh. B, p. 3. To accept the validity of Dr. Smith's methodology would require accepting the absurd premise that an individual's credit availability is dictated by how much the individual wants to spend, irrespective of their credit worthiness. If that were true, no one would ever be denied a loan, and every Plaintiff could enhance Dr. Smith's calculation of lost credit expectancy through the simple expedient of saying that he or she wanted to buy a really big house and a really expensive car.[23] No bona fide expert would follow such inherently unreliable methodology in giving an "expert" opinion. It is thus not surprising that Dr. Smith's report is silent as to its general acceptance among economists.

Finally, for Plaintiff Russ, Dr. Smith assumes a credit availability of $325,000 solely based on a 2004 credit report. Exh. C, p. 4. Dr. Smith fails to explain how a credit report for June 1, 2004 is indicative of anything other than an individual's credit score as of June 1, 2004, let alone credit availability for the entire four year period of November 1, 2002 through December 31, 2006. In order to arrive at his conclusion, Dr. Smith would have had to speculate that Plaintiff Russ' credit report did not change during that four year period. Yet, Dr. Smith provides no basis for such speculation. As a result, his report and testimony with respect to Plaintiff Russ' damages for loss of credit expectancy should be excluded. *Arista Records,* 608 F.Supp.2d at 409 (holding that expert testimony should be excluded if speculative); *Compania,*

---

[23] Dr. Smith also made the same absurd assumption in the Lim Report. Exh. D, p. 4.

650 F.Supp.2d at 321 ("without any reliable basis for Searles' opinions, and in the face of

analysis that is built upon one baseless, flawed assumption after another, PepsiCo's motion to

exclude Searles' opinion and testimony is granted"); *Gary Price Studios*, 2006 WL 1319543 at

*7 ("there is simply too great an analytical gap between the data and the opinion proffered,

which is to say, Zumwalt's methodology is simply inadequate to support the conclusions

reached.  In that circumstance, *Daubert* and Rule 702 mandate the exclusion of the unreliable

testimony") (quoting *Nimely v. City of New York*, 414 F.3d 381, 396-97) (internal quotations

omitted).

**E.      Dr. Smith's Calculations As To Plaintiff Smith's
        "Additional Cost of Mortgage" Should Be Excluded**

Dr. Smith renders an opinion regarding damages that Plaintiff Smith allegedly incurred as

a result of his inability to refinance his mortgage in May 2010.  Exh. E, p. 3.  Dr. Smith's

opinion, however, merely repeats the conclusions given to him by Mr. Smith, without any

independent analysis or examination of the facts.

Dr. Smith asserts that Mr. Smith was denied the opportunity to refinance his mortgage

"because of negative reporting on the part of Northern Leasing on his credit report."  *Id.*  Dr.

Smith's report provides no support for that statement, and he does not claim to have based it on

any documentary evidence that he reviewed.  He doesn't claim to have seen Mr. Smith's existing

mortgage, or any document reflecting an attempt to refinance, much less a denial of that attempt,

or the reasons for such denial.  Plaintiff Smith may have been denied the opportunity to refinance

his mortgage for any one of a number of reasons, including a lower credit score or a general

tightening of mortgage criteria caused by the recent financial crisis.  But that is hardly conclusive

that such denial is attributable to Northern Leasing.  Nevertheless, Dr. Smith arrives at that

conclusion without reviewing a single document in connection with the failed attempt to

refinance.  *Id.* at 1.  Nor did Dr. Smith review any documentation with respect Mr. Smith's

current credit status.  *Id.*  While Mr. Smith *may* have had a 781 credit score in 2002, his

attempted refinance did not occur until nearly eight years later.  A lot can happen in eight years

that could have adversely impacted Plaintiff Smith's credit worthiness independent of any action

on the part of Northern Leasing.  Blindly relying on the hearsay statements of the Plaintiff is not

a proper basis for an expert opinion.  *Arista Records,* 608 F.Supp.2d at 424; *Robinson,* 542

F.Supp.2d at 292; *Rowe,* 2003 WL 22124991, at *3.  And causation by factors other than a RICO

violation precludes recovery under RICO.  *Anza*, 547 U.S. at  458-459.

　　　　Dr. Smith's report is also speculative because it assumes that Mr. Smith will never be

able to refinance his mortgage at an interest rate below his current interest rate of 5.5%.

Incredibly, Dr. Smith arrives at that conclusion without any understanding of Mr. Smith's credit

history, other than his credit score from over eight years ago.  Moreover, he does not purport to

know whether Mr. Smith's credit score continues to be impaired such that if he attempted to

refinance his mortgage today, he would still not be able to secure a better interest rate.  Finally,

even if Mr. Smith's credit score remains affected, the only way he would be entitled damages is

if Mr. Smith is successful in establishing that Northern Leasing improperly impaired his credit in

a manner that is in violation of RICO.  Dr. Smith renders no opinion on why the jury should

assume that the interest rates will, at the very least, never be less than 5.5% for the rest of Mr.

Smith's life.  There are simply too many analytical gaps, and too little substantive information,

on which Dr. Smith bases his opinion.  Therefore, his testimony and report ought to be excluded.

*Compania*, 650 F.Supp.2d at 321; *Gary Price Studios, Inc.*, 2006 WL 1319543 at *7.

**F.    Dr. Smith's Opinions As To Loss Of Time Spent Should Be Excluded**

In Dr. Smith's expert reports for Redner, Serin, Russ, Lim and Smith, Dr. Smith reports that they incurred damages for lost time spent.[24]  *See* Exh. A, p. 2-3; Exh. B, p. 2-3; Exh. C, p. 2-3; Exh. D, pp. 2-3; Exh., p. 2.  For each of those Plaintiffs, his analysis includes: (i) uncorroborated estimates of time spent by the Plaintiffs resisting the Defendants' alleged actions, and (ii) a calculation that consists of multiplying the alleged number of hours lost by an hourly wage derived from the "median wages of the average of Office Clerks and Payroll and Timekeeping Clerks" for the state in which the Plaintiff resides.

*Daubert* and Rule 702 require the exclusion of opinion testimony when it is based on information that is inadequate to support the conclusions reached.  *See e.g. Celebrity Cruises, Inc.*, 434 F.Supp.2d at 176 (citations omitted).  Under that standard, Dr. Smith's assessment of the Plaintiffs' loss of time spent should be excluded.  First, Dr. Smith failed to investigate whether any of the Plaintiffs actually lost any income as a result of the alleged time spent.  Therefore, Dr. Smith's opinion is either pure speculation or premised on the unsupportable position that damages should be awarded even where there is no apparent injury.

Moreover, Dr. Smith blatantly ignored each Plaintiff's actual income (or lack thereof) which should have been easily determinable by reviewing their tax returns, and substituted it with an arbitrary wage amount for "Office Clerks and Payroll and Timekeeping Clerks."  As noted above, this methodology is based on what Dr. Smith believes it would have cost the Plaintiffs to hire a clerk to address Defendants' actions.  His methodology therefore bears absolutely no relation to any loss allegedly actually suffered by the Plaintiffs.  Indeed, Dr. Smith went so far as to describe the Plaintiffs' actual occupations as "irrelevant."  Exh. F, p. 84.  Such

---

[24] Smith's "Loss of Time Spent" for Mr. Russ and Ms. Serin includes "Out-of-Pocket Expenses" as well, discussed *infra*.

inexplicable methodology renders his opinion completely unreliable and wholly lacking as an aid

to the jury. *Boucher,* 73 F.3d at 21-22 (expert testimony regarding lost earnings should have

been excluded for lacking sufficient factual foundation because the opinion was based on

assumptions that contradicted Plaintiff's actual employment history).[25]

G.     **Dr. Smith's Opinion About The Loss Of Payments**
       **Made To Northern Leasing Should Be Stricken**

       In Dr. Smith's expert reports for Plaintiffs Russ, Redner, and Lim, Dr. Smith reports that

they paid $9,247.00, $230.24, and $189 respectively to Northern Leasing.  *See* Russ Report, p. 2;

Redner Report, pp. 2-3; Lim Report, p. 2.  There is no independent analysis or verification,

however, of these numbers.  It is unclear what exactly Dr. Smith's analysis brings to the table

other than basic arithmetic.  This "expert testimony" is simply a regurgitation of what these

persons told Dr. Smith, and lacks the required "scientific, technical, or other specialized

knowledge" that will assist the trier of fact to understand the evidence. Fed. R. Evid. 702.

Because  Dr. Smith merely relied on the hearsay statements of the Plaintiffs without verifying or

corroborating any information at all, his conclusion as to this should be excluded.  *Arista*

---

[25] Dr. Smith's report for Serin demonstrates the specious nature of his "methodology."
According to Dr. Smith's report for Serin: (i) Serin first learned about Northern Leasing while
she was in college at UCLA in 2002; (ii) in 2003, she moved to Washington D.C. "working part-
time doing technical support and getting her Master's degree in political management;" and (iii)
she allegedly spent between 100 and 200 hours addressing the Defendants' alleged actions.  Exh.
B, p. 2.  Notwithstanding those assertions in his own report, Dr. Smith calculates Serin's
damages by using the median wages of the Office Clerks and Payroll and Timekeeping Clerks in
Washington D.C. and assumes that 30 hours were spent each year from 2002 through 2006. *Id.*
at 3.  Therefore, Dr. Smith ignored the fact that in 2002 Plaintiff Serin was a student in
*California* and apparently not earning any wages.  He also assumes, without any support, that
Plaintiff Serin spent an equal amount of time each year addressing the Defendants' alleged
actions.  Furthermore, in addition to ignoring the fact that while in Washington D.C., Plaintiff
Serin was not working full-time, Dr. Smith inexplicably ignores her actual vocation and instead
ascribes to her damages an arbitrary, statistical median wage for a job that has no connection to
Plaintiff Serin's actual *known* employment history.

*Records,* 608 F.Supp.2d at 424; *Robinson,* 542 F.Supp.2d at 292; *Rowe,* 2003 WL 22124991, at

*3.

## **CONCLUSION**

For the foregoing reasons, we respectfully request that all of Dr. Smith's opinions be

excluded with respect to all Plaintiffs.

Dated:  New York, New York
        November 3, 2010

       MOSES & SINGER LLP

       By: _____/s/_____
       Robert D. Lillienstein, Esq. (RL-4585)
       Declan M. Butvick, Esq. (DB-8289)
       405 Lexington Avenue
       New York, New York  10174
       Tel.: (212) 554-7807
       *Attorneys for Defendants*