Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
MELINDA SERIN, JUDSON RUSS, LONG SOUI
LIM, PERI KETTLER, GORDON REDNER, and
THOMAS J. SMITH,
                    Plaintiffs,
                              Index No.
         -against-           06-Civ-1625
NORTHERN LEASING SYSTEMS, Inc., JAY COHEN,
RICH HAHN AND SARA KRIEGER,
                    Defendants.
-----------------------------------x
                    October 12, 2010
                    10:10  a.m.


         Deposition of JOSEPH I. SUSSMAN, held
at the offices of Moses & Singer LLP, 405
Lexington Avenue, New York, New York, pursuant to
subpoena, before Barbara Driscoll, a Notary Public
of the State of New York.


HUDSON REPORTING & VIDEO        1-800-310-1769
```

Page 3

1
2      IT IS HEREBY STIPULATED AND AGREED, by
3  and between the attorneys for the respective
4  parties herein, that filing and sealing be and the
5  same are hereby waived.
6
7      IT IS FURTHER STIPULATED AND AGREED
8  that all objections, except as to the form of the
9  question, shall be reserved to the time
10  of the trial.
11
12      IT IS FURTHER STIPULATED AND AGREED that the
13  within deposition may be signed and sworn to
14  before any officer authorized to administer an
15  oath, with the same force and effect as if signed
16  and sworn to before the officer before whom the
17  within deposition was taken.
18
19
20
21
22
23
24
25

Page 2

1
2  A P P E A R A N C E S:
3
4      CHITTUR & ASSOCIATES, P.C.
5      Attorneys for Plaintiffs
6          286 Madison Avenue
7          New York, New York 10017
8      BY:  KEITH L. ALTMAN, ESQ.
9          CHRISTIAN CHITTUR, ESQ. (a.m. only)
10
11
12      MOSES & SINGER LLP
13      Attorneys for Defendants
14          The Chrysler Building
15          405 Lexington Avenue
16          New York, New York 10174-1299
17      BY:  JENNIFER NIGRO, ESQ.
18
19
20      ALSO PRESENT:
21          Andrey Strutinskiy, videographer
22
23
24
25

Page 4

1
2      THE VIDEOGRAPHER:  Today is October 12,
3  2010.  Our time is 10:09 a.m.
4      This is a deposition in a case in the
5  United States District Court for the Southern
6  District of New York, Melinda Serin, et al.,
7  versus Northern Leasing Systems Incorporated,
8  et al., docket number 06 CV 1625.
9      Please everybody introduce themselves
10  for the record.
11      MR. ALTMAN:  Keith Altman, counsel for
12  plaintiffs.
13      MS. NIGRO:  Jennifer Nigro, Moses &
14  Singer, counsel for defendants and the
15  witness.
16      THE WITNESS:  Joseph Sussman as the
17  witness.
18      THE VIDEOGRAPHER:  I am Andrey
19  Strutinskiy, the videographer for this
20  deposition.
21
22
23
24
25

1 (Pages 1 to 4)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 5

SUSSMAN

1  SUSSMAN
2  J O S E P H  I.  S U S S M A N, called as a
3  witness, having affirmed to tell the truth, was
4  examined and testified as follows:
5  EXAMINATION BY
6  MR. ALTMAN:
7      Q.   Please state your name.
8      A.   Joseph I. Sussman.
9      Q.   Please state your business address.
10     A.   132 West 31st Street, Suite 1320, New
11  York, New York 10001.
12     Q.   Mr. Sussman, how are you today?
13     A.   Very good.  Thank you.
14     Q.   My name is Keith Altman.  I represent
15  the plaintiffs in the action of Serin versus
16  Northern Leasing.  I assume you're aware of that?
17     A.   Yes.
18     Q.   Have you ever had your deposition taken
19  before?
20     A.   No.
21     Q.   Have you taken depositions before?
22     A.   Yes.
23     Q.   You're generally familiar with the
24  process.  I don't think we need to waste time
25  going through that, but one thing that is very

Page 6

1  SUSSMAN
2  important to me, if I ask you a question and you
3  answer it, I will assume that you understand the
4  question.  If you don't understand, please let
5  know.
6          Before we begin, I am trying to
7  understand the capacity in which you're here
8  testifying today.  Are you here as an employee of
9  Northern Leasing Systems?
10     A.   No.
11     Q.   Are you as an employee of Northern
12  Leasing Systems?
13     A.   No.
14     Q.   What is the nature of Moses & Singer
15  representing you as an independent individual in
16  this case?
17          MS. NIGRO:  That is probably a question
18  for me if you want it on the record or off.
19          MR. ALTMAN:  Off the record.
20          THE VIDEOGRAPHER:  The time is now
21  10:11 a.m.  We are off the record.
22          (Off the record discussion.)
23          THE VIDEOGRAPHER:  The time is 10:12
24  a.m.  We are back on the record.
25     Q.   Mr. Sussman, did you sign a retainer

Page 7

SUSSMAN

1  SUSSMAN
2  agreement with Moses & Singer for them
3  representing you today?
4      A.   No.
5      Q.   Are you paying Moses & Singer for them
6  representing you here today?
7      A.   No.
8      Q.   Do you know who is paying Moses &
9  Singer for your representation today?
10     A.   Yes.
11     Q.   Who is that?
12     A.   Northern Leasing.
13     Q.   When did Moses & Singer begin to
14  represent you in this matter?
15     A.   I requested Moses & Singer or -- I
16  requested Northern Leasing to represent me -- to
17  request Moses & Singer to represent me while upon
18  -- receiving -- being served with the subpoenas.
19     Q.   Before that time, they had not provided
20  representation to you?
21     A.   Correct.
22     Q.   Are you being paid to be here today?
23     A.   No.  What I mean is, I am not
24  specifically being paid to be here today.
25     Q.   You say --

Page 8

1  SUSSMAN
2      A.   I am not billing for my time.
3      Q.   Are you being paid in any other way
4  other than billing for today?
5          MS. NIGRO:  Objection.
6  You mean as an expert?
7          MR. ALTMAN:  In any capacity.
8          MS. NIGRO:  Relevance, but --
9      A.   I am not being paid to be here today as
10  a witness.  I am being paid by Northern Leasing to
11  do legal work for them, but I am not billing
12  Northern Leasing for my time today in addition to
13  the work that I bill them -- that I provide and
14  bill them for.
15          MS. NIGRO:  Are you asking him whether
16  he has being paid to be here today in this
17  case?
18          MR. ALTMAN:  Yes.
19     A.   No.
20     Q.   That is what I am getting at.
21     A.   I wanted to answer the question
22  correctly.
23     Q.   I am only trying to understand.
24  Basically, you're here on your own time.  You're
25  not being compensated in any way for the time

2 (Pages 5 to 8)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

SUSSMAN

1
2  you're spending here today in this deposition?
3      A.   Correct.
4      Q.   What did you do to prepare for today's
5  deposition?
6      A.   I met with Jennifer yesterday.
7      Q.   How much time did you spend meeting
8  with her?
9      A.   Three hours about, approximately, three
10 or four hours.  I don't remember.
11     Q.   What else did you do to prepare for
12 today's deposition?
13     A.   In addition to meeting with counsel?
14     Q.   Yes.
15     A.   Not much else.
16     Q.   You produced documents in this case,
17 correct?
18     A.   Correct.
19     Q.   Who selected the documents to be
20 produced in this case?
21     A.   I did.
22     Q.   Did you have any assistance with
23 anybody in reviewing what documents to produce?
24     A.   I believe I sought some assistance from
25 some of my staff, but for the most part, it was

SUSSMAN

1
2  myself.  I collected the documents.
3      Q.   You produced documents to plaintiffs in
4  this case, correct?
5      A.   Yes.
6      Q.   You produced them directly to
7  plaintiffs yourself?
8      A.   Yes.  I believe I e-mailed Chris and/or
9  Andrey with documents.
10     Q.   What I am getting at is, you didn't
11 produce the documents to Moses & Singer first who
12 then gave them to plaintiffs; you sent them
13 directly to plaintiffs?
14     A.   Correct.
15     Q.   Are there any documents that you sent
16 Moses & Singer that you didn't send to plaintiffs?
17     A.   Yes.
18     Q.   What was the reason for you not
19 producing those documents?
20     A.   Attorney-client privilege.
21     Q.   With respect to which representation
22 were you asserting that attorney-client privilege?
23     A.   I am not sure I understand --
24          MR. ALTMAN:  Strike it.
25     Q.   We are dealing with cases within a case

SUSSMAN

1
2  here and we will probably have a lot of confusion
3  talking about those two different issues because
4  this is a case about cases.
5          What I want to understand is, was the
6  basis of the privilege about the underlying cases
7  of the plaintiffs or about this case where the
8  plaintiffs are suing Northern Leasing or both?
9      A.   I would say both.
10     Q.   Have you been paid in any way by any
11 individuals for anything you have done with
12 respect to the Serin versus Northern Leasing case?
13     A.   Can you clarify what you mean by
14 individuals?
15     Q.   Have you done any work for Northern
16 Leasing in the Serin versus Northern Leasing case?
17     A.   Yes.
18     Q.   Are you counsel of record in the Serin
19 versus Northern Leasing case?
20     A.   If I recall correctly, I entered into
21 oral arguments with Judge Robinson with counsel
22 for Milberg Weiss and I think my appearance was
23 entered on the record.  That is the extent of my
24 knowledge about my formal -- whether I am formally
25 counsel of record or not.

SUSSMAN

1
2      Q.   But getting back to my question, so you
3  have provided representation to Northern Leasing
4  in the Serin versus Northern Leasing matter?
5      A.   Yes.
6      Q.   Where is your office located?
7      A.   132 West 31st Street, 15th floor.
8      Q.   That is the same building in which
9  Northern Leasing is, correct?
10     A.   Yes.
11     Q.   Do you have your own separate office or
12 are you in space that is owned or rented or leased
13 by Northern Leasing?
14     A.   We have our own separate office which
15 is part of a space that Northern Leasing rents
16 from the landlord.
17     Q.   Do you have a separate entrance into
18 your office or do people enter in through a common
19 area where they can either go to Northern Leasing
20 or to your office?
21     A.   We have a separate entrance.
22     Q.   Do you have any equity in Northern
23 Leasing?
24     A.   No.
25     Q.   When I use the term related entities,

3 (Pages 9 to 12)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 13

SUSSMAN

1    there are several other companies related to
2    Northern Leasing that either share the same
3    business, same space or same ownership.
4         Do you work for other related entities
5    besides Northern Leasing?
6         A.   I am sorry.  When you say related
7    entities, again you're referring to Northern
8    Leasing related entities?
9         Q.   Yes.  For example, MBF is another
10   entity that is associated with Northern Leasing.
11   I know there are others.
12        Do you do work for these other entities
13   besides just Northern Leasing?
14        A.   Yes.
15        Q.   Do you do work for any companies that
16   are not related to Northern Leasing either through
17   sharing space or sharing common ownership or
18   common officers?
19        MS. NIGRO:  Objection.
20        A.   Yes.
21        Q.   What percentage of your work is for
22   these other non-Northern Leasing related entities?
23        A.   I would say about 60 percent Northern
24   Leasing; 40 percent other.  That is rough, a rough

Page 14

SUSSMAN

1    estimate.
2         Q.   It has to be precise or it is no good.
3         A.   Sorry then.
4         Q.   How many attorneys are there in your
5    office?
6         A.   Including myself, three.
7         Q.   As a general proposition, you handle
8    matters for Northern Leasing involved in
9    collection and delinquent leases?
10        A.   Yes.
11        Q.   Are there any other law firms that
12   Northern Leasing and related companies use to do
13   the same activity?
14        MS. NIGRO:  Time frame.  Currently?
15        MR. ALTMAN:  Currently.
16        A.   Yes, although it goes through our
17   office.  In other words, we may retain local
18   counsel to handle collection work.
19        Q.   Is there any collection work that does
20   not flow through the office?
21        A.   A very small percentage, but there is
22   some.
23        Q.   How long have you been working for
24   Northern Leasing?

Page 15

SUSSMAN

1         MS. NIGRO:  Objection.  He is not
2    working for Northern Leasing.
3         Q.   How long have you been provided
4    representation in Northern Leasing and related
5    entities?
6         A.   I have been providing legal services to
7    Northern Leasing since September or October 2002,
8    although I have -- 2003, I was formally retained
9    by -- directly by Northern Leasing to provide
10   legal services to it.
11        Q.   Where are you currently licensed?
12        A.   New York and New Jersey.
13        Q.   When did you become licensed in New
14   York?
15        A.   December 2002 or -- I forget.  I don't
16   know if it is December or January 2003.
17        Q.   When were you licensed in New Jersey?
18        A.   A year earlier.  So I graduated 2001.
19   September, I think, of 2001 or -- I forget how it
20   works in Jersey.
21        MS. NIGRO:  Off the record.
22        (Discussion off the record.)
23        Q.   You sat for the July 2001 bar?
24        A.   Yes, for both.

Page 16

SUSSMAN

1         Q.   Have you ever had any disciplinary
2    complaints brought against you?
3         A.   Can you clarify the question?
4         I have received complaints forwarded by
5    the disciplinary committee that they received and
6    forwarded to me for response, but the disciplinary
7    committee has never taken any action.  They have
8    dismissed them before actually filing its own --
9    whatever the process might be.
10        Q.   How many complaints have you received?
11        A.   I believe three.  I think it is three.
12        Q.   Were they in New York, New Jersey or
13   both?  How did they break out?
14        A.   New York.
15        Q.   When was the first time you received a
16   complaint?
17        A.   I don't remember.
18        Q.   Approximately.
19        A.   2005, 2006.
20        Q.   When was the last time you received a
21   complaint?
22        A.   I received one recently, in the last
23   two months.
24        Q.   What was the nature of the complaint?

4 (Pages 13 to 16)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 17

1                    SUSSMAN
2        A.   It varied.
3        Q.   What was the nature of complaint number
4    one?
5        A.   Don't remember the order.
6        Q.   Pick them whatever order.  Describe
7    them however you want.
8        A.   I don't remember precisely.  I would
9    have to speculate.
10       Q.   Give me your best recollection.
11       A.   My best recollection of one of them
12   would be that our office was attempting to enforce
13   a lease where the lessee thought she or he was not
14   responsible for payments under the lease.  We had
15   initiated litigation on that basis and she was
16   essentially asserting her defenses to the
17   disciplinary committee to take action for my
18   taking legal action on that lease.
19       Q.   Do you remember the name of the
20   complainant?
21       A.   No.
22       Q.   The next one.
23       A.   I don't remember well.  I would be
24   speculating.
25       Q.   Do you have any vague recollection?

Page 18

1                    SUSSMAN
2        A.   Yes.
3        Q.   What is the vague recollection?
4        A.   Similar.  Similar to that one --
5    another action was where my office had obtained a
6    default judgment and we -- our firm was attempting
7    to enforce the judgment and I believe we had
8    restrained the bank account of the judgment debtor
9    and the account holder and judgment debtor filed
10   or submitted a complaint to the disciplinary
11   committee alleging there was no basis to restrain
12   the account.
13       Q.   The third one.
14       A.   I don't remember.
15       Q.   You don't have any vague recollection?
16       A.   I do, but I would be speculating
17   because it is not sharp.
18       Q.   Tell me your best recollection.
19       A.   You will have to give me a few moments
20   to think.
21       Q.   Let's not waste time.  Do you keep a
22   file of these things?
23       A.   Yes.
24       Q.   Do you know where this file is?
25       A.   Yes.

Page 19

1                    SUSSMAN
2        Q.   It would be hard for you to find it?
3        A.   No.
4        Q.   If we ask counsel and counsel agrees,
5    we can locate this information pretty easily?
6        A.   Yes.
7    RQ       MR. ALTMAN:  We will leave it at that
8    then.
9             We will be using a universal exhibit
10   numbering plan to number these exhibits and
11   use the same exhibit numbers through the
12   remainder of the depositions.  We will start
13   with 101 to be clean so we have a clean start.
14   I will hand you a couple of things just to get
15   started.
16            Exhibit 101 is the amended complaint in
17   this action Serin versus Northern Leasing.
18            (Exhibit 101, amended complaint in this
19   action Serin versus Northern Leasing, marked
20   for identification, as of this date.)
21            MR. ALTMAN:  Exhibit 102 is the
22   defendants' answer to the amended complaint in
23   this case.
24            (Exhibit 102, defendants' answer to the
25   amended complaint, marked for identification,

Page 20

1                    SUSSMAN
2    as of this date.)
3            MR. ALTMAN:  I will have questions for
4    you later.
5            The next thing I will mark is Exhibits
6    103 and 104.  Exhibit 103 is the subpoena to
7    Joseph Sussman in this case.
8            (Exhibit 103, subpoena to Joseph
9    Sussman, marked for identification, as of this
10   date.)
11            MR. ALTMAN:  Exhibit 104 is the duces
12   tecum associated with the subpoena for this
13   deposition.
14            (Exhibit 104, duces tecum associated
15   with subpoena, marked for identification, as
16   of this date.)
17       Q.   First I will ask you this.  Exhibit 101
18   is the amended complaint in this case.  I am not
19   going to ask you any substantive questions about
20   it.  I am just asking, have you ever seen this
21   document before?
22       A.   Yes.
23       Q.   Are you generally familiar with the
24   document?
25       A.   Yes.

5 (Pages 17 to 20)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 21

SUSSMAN

1
2    Q.   Exhibit 102 is the answer to the
3  amended complaint.
4    A.   Yes.
5    Q.   Have you ever seen this document
6  before?
7    A.   I must have.
8    Q.   As a witness, did you have any
9  involvement in providing information that forms
10 the basis to -- that forms the basis for the
11 answer to the amended complaint?
12   A.   I don't know.
13   Q.   Exhibit 103 is the subpoena in this
14 case.  Have you seen that document before?
15   A.   Yes.
16   Q.   Exhibit 104 is the duces tecum in this
17 case.  Have you seen that before?
18   A.   Yes.
19   Q.   What did you do to comply with the
20 duces tecum in Exhibit 104?
21   A.   I gathered documents responsive to the
22 duces tecum -- did I say that right?  And the
23 non-privileged documents were provided to counsel
24 for plaintiffs.  The privileged documents were
25 provided ultimately to the judge for in camera

Page 22

SUSSMAN

1
2  inspection as well as counsel, Moses & Singer.
3    Q.   Was there any part of this duces tecum
4  that you didn't comply with for some objection?
5    A.   Other than the documents I provided?
6    Q.   Right.
7    A.   Not to my knowledge.
8    Q.   You have access to Northern Leasing
9  System, correct?
10   A.   Yes.
11      MS. NIGRO:  Objection.  Clarify.
12      When you say their leasing system --
13   Q.   Northern Leasing has a computer data
14 base where they manage information about their
15 leases?
16   A.   Correct.
17   Q.   Can we use the term Northern
18 Leasing-related entities to mean other leasing
19 companies that share common space and ownership
20 with the principals of Northern Leasing so we
21 don't have to repeat all of those qualifications?
22      MS. NIGRO:  I can go on or off.
23      Northern Leasing is described in the
24      document request as its own entity without
25      other affiliates.  It is also the only

Page 23

SUSSMAN

1
2  corporate defendant here.  So I don't mind if
3  you want to take some leeway here, but to the
4  extent we are going to talk about any other
5  affiliate that is not affiliated with this
6  case or named in this case, I am going to
7  object.
8       MR. ALTMAN:  I understand your
9  objection.  I hear your objection.  I don't
10 believe it is valid because if there are
11 actions in common between the various
12 different entities which is really what I am
13 asking about, I think I am entitled to explore
14 that and there is a RICO claim here and that
15 is based on certain activities which may not
16 necessarily be limited to just that identified
17 in the complaint.  There may be other
18 activities that we will discover that form the
19 basis for the RICO complaint as well.
20      MS. NIGRO:  If you look at your
21 document request, you will realize that
22 Northern Leasing was defined as Northern
23 Leasing and not any of its affiliates.
24      MR. ALTMAN:  I didn't ask him to
25 provide documents.  I am asking a simple

Page 24

SUSSMAN

1
2  question about the lease system.
3    Q.   As I understand it -- just as a
4  definitional concept, when I use the term Northern
5  Leasing related entities, can we understand that
6  to mean other leasing companies sharing the same
7  space with common -- some -- common ownership or
8  management?
9       MS. NIGRO:  Objection.
10   A.   Okay.
11      MS. NIGRO:  When you say common --
12 common ownership management, I mean MBF --
13      MR. ALTMAN:  There is Northern Leasing
14 and MBF.  I don't know what other companies
15 there are.  I don't want to list or enumerate
16 them every time --
17      MS. NIGRO:  They are not necessarily
18 owned and not necessarily affiliated.  That is
19 my problem.
20      MR. ALTMAN:  I will ask it differently.
21   Q.   Northern Leasing's leases are not the
22 only leases kept in the leasing system?
23   A.   Yes.
24   Q.   MBF are kept in that same system?
25   A.   Yes.

6 (Pages 21 to 24)

Page 25

SUSSMAN

1
2    Q.   What other companies' leasing leases
3  are kept --
4    A.   There are additional companies kept in
5  the system.
6    Q.   What are the names of those companies?
7    A.   Lease Finance Group LLC and Golden
8  Eagle Leasing LLC and there are a few others,
9  although I don't know specifically what the
10 relationship is, if it is a separate entity or
11 not.  Those are the main ones that I am aware of.
12   Q.   Is the information that is maintained
13 for these leases the same for each one of these
14 companies?
15   A.   Yeah, more or less.
16   Q.   As a routine practice, do you access
17 the lease data base in prosecuting Northern
18 Leasing or these companies' claims?
19       MS. NIGRO:  Objection --
20   A.   Yes.
21       MS. NIGRO:  You can answer.
22   A.   Yes.
23   Q.   Your answer was yes?
24   A.   Yes.
25   Q.   Do you follow the same procedures in

Page 26

SUSSMAN

1
2  prosecuting a claim irrespective of which of these
3  companies is involved?
4    A.   Generally, yes.
5    Q.   When would you do something different?
6    A.   There are differences in the files
7  possibly between a lease that is opened or
8  serviced by Northern Leasing versus Lease Finance
9  Group.  That may affect the way that we prepare a
10 file for legal action, but generally yes, it is
11 the same procedure.
12   Q.   On occasion, Northern Leasing may
13 service an MBF lease, correct?
14   A.   Correct.
15   Q.   And MBF may service a Northern Leasing
16 lease, correct?
17   A.   I am not sure if that is correct.
18   Q.   How many claims a year do you file on
19 behalf of Northern Leasing?
20   A.   I don't know precisely.
21   Q.   Do you have an approximation?
22   A.   Yes.
23   Q.   What is the approximation and whatever
24 time -- give me whatever time scale you can give
25 that to me over.

Page 27

SUSSMAN

1
2    A.   The past two, three years, I would
3  estimate between 1500 and 3000 filings in the
4  civil court -- in other words, per year.
5    Q.   1500 --
6    A.   That is a rough estimate.
7    Q.   Before that?
8    A.   I would say less, but I don't know -- I
9  don't know to date.
10   Q.   What percentage of those end in
11 default?
12   A.   A large percentage.
13   Q.   What do you mean by a large percentage?
14   A.   Well, of the cases that precede --
15 cases that are not settled or otherwise resolved
16 prior to the time period of defendant to answer
17 and defendant defaults, I would say a rough
18 estimate, 90 percent default -- ends up with
19 default judgments.
20       It is a rough estimate, so I am
21 speculating, but I am trying to respond to your
22 question.
23   Q.   You file cases in any other courts
24 besides New York?
25   A.   Yes, on rare occasion.

Page 28

SUSSMAN

1
2    Q.   Is there any court that has more than
3  just a few compared to New York?
4    A.   No.
5    Q.   Of the 1500 to 3000 cases, what
6  percentage is resolved or dismissed without the
7  lessees paying any additional funds?
8    A.   A small percentage.  I wouldn't know
9  that number.
10   Q.   Of the cases where there is not a
11 default, what percentage of those cases is
12 resolved in the defendant's favor?
13   A.   Can you clarify -- I think I
14 understand, but can you --
15   Q.   There are basically three classes of
16 cases.  There are those that once a complaint is
17 filed, they get resolved before an answer is
18 filed, right?
19   A.   Correct.
20   Q.   The second group -- of those that do
21 not resolve that way, you said a large majority of
22 what is left winds up in default?
23   A.   Correct.
24   Q.   Then the third category would be ones
25 where the defendant answers and litigates?

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 29

SUSSMAN

1
2    A.   Correct.
3    Q.   Of the ones that are actually
4  litigated, what percentage of those are resolved
5  in -- either way, either the defendant's favor or
6  in NLS's favor?
7    A.   I understand your question, but I don't
8  know the numbers, but there is a -- there are a
9  number of cases that are resolved -- I would say
10  the majority are resolved in favor of the
11  plaintiff.  There are a number of cases that are
12  resolved in favor of the defendant, but I don't
13  know the numbers of percentages offhand.
14    Q.   Do you track the resolution of each of
15  the cases in some kind of data base or some
16  spreadsheet or something of that nature?
17    A.   Yes.
18    Q.   Does it track, for example, whether it
19  was resolved or whether it was default or whether
20  it was --
21    A.   Not that way.
22    Q.   How does it track?
23    A.   My office utilizes, like we had
24  discussed earlier, the Northern Leasing's case --
25  their collection and customer service software.

Page 30

SUSSMAN

1
2  We -- I mean my office, we utilize that software
3  to -- as a litigation management tool so that we
4  have full access to Northern Leasing's file and
5  then we can program and put into it the litigation
6  information so that we are sharing information
7  about that.  So that information is available.
8        Is it neatly tailored so that you can
9  say what percentage default; what percentage
10  answer?  Not that way.  That is what I meant, but
11  information is discernable.  It is obtainable.
12    Q.   Could you run a report of all the
13  cases, you know, filed within a range of dates and
14  see the case number, a lease number and the
15  resolution?
16    A.   Not exactly, but when effort can be
17  made to obtain information, it wouldn't be as neat
18  as I or you would like.  That is what I am trying
19  to say.
20    Q.   Do you have free access to the Northern
21  Leasing Systems?  Are you able to go and see all
22  the screens and go everywhere within the system?
23    A.   I believe so.  There may be some areas
24  that I don't have access to, but for my purposes,
25  it is adequate.  It is pretty all encompassing.

Page 31

SUSSMAN

1
2    Q.   Is there a specific screen that you go
3  to for tracking the litigation status of these
4  cases?
5    A.   Yes.
6    Q.   What is that called?
7    A.   The post write-off screen.  That is a
8  general description of what I refer to as it.
9    Q.   You're familiar with NLS's business
10  model, correct?
11    A.   Yes.
12        MS. NIGRO:  Objection.
13        You can answer.
14    Q.   You're familiar that purportedly
15  independent organizations go out and get merchants
16  to obtain credit card processing services and
17  equipment and then contacts Northern Leasing to
18  fund the leasing of that equipment, correct?
19        MS. NIGRO:  Objection.
20        You may answer.
21    A.   Yes.
22    Q.   And that once the equipment is actually
23  purchased by Northern Leasing from the vendor,
24  correct?
25    A.   Sorry.

Page 32

SUSSMAN

1
2    Q.   The equipment that is delivered to the
3  merchant is purchased by Northern Leasing from the
4  vendor and then leased to the lessee, correct?
5    A.   Correct.
6    Q.   And that Northern Leasing pays the
7  merchant a certain amount of money, correct?
8    A.   Correct -- excuse me.  That is not
9  correct.  Northern Leasing pays the vendor.
10    Q.   Yes.
11        The amount of money the vendor gets
12  paid for a given lease is dependent on the credit
13  rating of the merchant -- of the personal
14  guarantor, correct?
15        MS. NIGRO:  Objection.
16    A.   From what I understand, it is a
17  relevant factor, but it is only one factor.
18    Q.   Do you have a detailed understanding of
19  the factors how -- what a vendor is paid is
20  determined?
21    A.   I would say no.
22    Q.   Who would be the person at Northern
23  Leasing to discuss that with?
24    A.   Sara Krieger would have an
25  understanding about that.

8 (Pages 29 to 32)

Page 33

SUSSMAN

1
2    Q.    On occasion, when there is dispute over
3  a lease, does Northern Leasing contact one of the
4  ISO's and ask for its money back from the ISO?
5    A.    I understand your question, but I would
6  like to answer it in a little more -- if I can
7  rephrase it because -- what do you mean by
8  dispute?
9    Q.    If a merchant calls up and complains to
10  Northern Leasing that there is something wrong
11  with the leasing or how it was done, does Northern
12  Leasing sometimes go back to the ISO and say, we
13  paid you this money; you need to return that money
14  to us because there is something wrong with this
15  transaction?
16    A.    Yes.
17    Q.    Does Northern Leasing ever get the
18  money back from any of the ISO's?
19    A.    Yes.
20    Q.    When you get the money back from the
21  ISO's, is that reflected in any continuing dispute
22  with the customers?
23        MS. NIGRO:  Objection.
24        You can answer.
25    A.    I don't understand the question.

Page 34

SUSSMAN

1
2    Q.    Let's say the customer signs a 48-month
3  lease for $50 a month and three months into the
4  lease, there is a problem, and let's say Northern
5  Leasing paid $1600 to the vendor for that piece of
6  equipment and the dispute arises, and Northern
7  Leasing goes back to the ISO and says, you have to
8  pay us back that $1600 and the ISO pays back the
9  $1600.
10        If there is still a continuing dispute
11  with the merchant, does Northern Leasing still
12  continue to try to collect on that lease --
13    A.    No.
14        MS. NIGRO:  Objection.
15        You can answer.
16    A.    No.
17    Q.    If the ISO returns the money, do you
18  then cancel the lease at that point?
19    A.    Yes.
20    Q.    Is that the universal policy?
21    A.    I believe so.
22        MS. NIGRO:  When you say you cancel the
23  lease, do you mean Northern Leasing?
24        MR. ALTMAN:  Yes.
25        MS. NIGRO:  Because he is --

Page 35

SUSSMAN

1
2        MR. ALTMAN:  I understand.
3    Q.    If there had been litigation started,
4  you would discontinue any actions at that point?
5    A.    Generally, yes, but it would -- it
6  would depend on the posture of litigation and
7  certainly the issues involved in the litigation,
8  but that would be the way to go, clearly.
9    Q.    If the merchant had paid moneys in over
10  a period of time, do you refund those moneys to
11  the merchant when the lease gets canceled because
12  you got the money from ISO?
13        MS. NIGRO:  By "you" you mean Northern
14    Leasing?
15        MR. ALTMAN:  Yes.
16    A.    From what I understand, it depends on
17  the nature of the dispute or the meritorious
18  defense asserted by the merchant in connection
19  with the lease.
20        MR. ALTMAN:  We will mark the next
21    exhibit as 105 which is the supplemental rule
22    26 disclosures, Northern Leasing, et al.,
23    dated 5th of October, 2010.
24        (Exhibit 105, supplemental rule 26
25    disclosures, Northern Leasing, et al., dated

Page 36

SUSSMAN

1
2  5th of October, 2010, marked for
3    identification, as of this date.)
4    Q.    Have you ever seen this document
5  before?
6    A.    I don't believe so.
7    Q.    If you go to page 5 of the document,
8  number 12, Joseph Sussman is listed on this
9  document?
10    A.    Yes.
11    Q.    That is you?
12    A.    Yes.
13    Q.    Are you aware that you had been listed
14  on the rule 26 disclosure?
15    A.    I was aware that defendants or Northern
16  Leasing would be seeking to present me as a
17  witness; is that correct?  I am not too familiar
18  with federal procedure.
19        MR. ALTMAN:  We will mark as Exhibit
20    106, although it was printed out on October 7,
21    it is an e-mail dated October 5 from Robert
22    Lillienstein to Christian Chittur and others
23    in this case.
24        (Exhibit 106, e-mail dated October 5,
25    marked for identification, as of this date.)

New York          Hudson Reporting & Video          New Jersey
212-273-9911       Nationwide 800-310-1769          732-906-2078

Page 37

SUSSMAN

1
2      Q.   You will see here that Mr. Lilienstein
3  identified individuals that the defendants
4  intended to call in at the trial identified in
5  numbers 1 through 12 of the rule 26 disclosure?
6      A.   Yes.
7      Q.   You're number 12?
8      A.   Correct.
9      Q.   According to this, it is the intention
10  of Northern Leasing to call you as a witness
11  during the trial, correct?
12      MS. NIGRO:   Objection.
13      You can answer.
14      A.   Correct.
15      Q.   Going back to Exhibit 105, number 12
16  where you're listed, there is a description of the
17  knowledge that you purportedly possess.  I will
18  give you an opportunity to read that and ask you
19  if you disagree with anything written there.
20      A.   I agree with that.  I agree with the
21  description.
22      Q.   The first item is NLS's involvement in
23  the collection actions involved in this case,
24  correct?
25      A.   Correct.

Page 38

SUSSMAN

1
2      Q.   The second thing is the -- the
3  collection actions involved in this case would be
4  the collection actions against the individual
5  plaintiffs in this case, correct?
6      A.   You mean that is what is intended in
7  that sentence?  Yes, I believe so.
8      Q.   The procedures followed by NLS
9  regarding collections, correct?
10      A.   Correct.
11      Q.   The procedures followed by NLS in cases
12  involving claims of forgery, correct?
13      A.   Correct.
14      MS. NIGRO:   For the record, the
15      beginning of that sentence is that Mr. Sussman
16      is likely to have knowledge.  It doesn't mean
17      he has all encompassing --
18      MR. ALTMAN:   I understand.
19      Q.   If I am going to ask you questions and
20  we will see whether we have an issue right here --
21      THE WITNESS:   Can I take a break?
22      MR. ALTMAN:   Yes.
23      THE VIDEOGRAPHER:   The time is now
24      10:54 a.m.  We are off the record.
25      (Recess taken.)

Page 39

SUSSMAN

1
2      THE VIDEOGRAPHER:   The time is now
3      11:08 a.m.  We are back on the record.
4      Q.   Mr. Sussman, can you tell me in bullet
5  points the general knowledge you have about the
6  underlying collection actions?
7      I will ask it differently.
8      Can you just describe to me generally
9  the knowledge you have?  We don't have to get into
10  the detail of knowledge right now.
11      A.   I had a knowledge at the time that the
12  Serin action was filed, I familiarized myself, I
13  am sure, with some of the details of the -- I will
14  back up.  I have a general knowledge of the
15  individual collection actions that this action is
16  about.
17      Certainly, I would have been familiar
18  with it prior, if I was the attorney of record, in
19  initiating it and making a review and would have
20  re-familiarized myself when the Serin action was
21  filed or possibly prior to that, but the answer is
22  yes, I have a -- am familiar with some of the
23  details.
24      Q.   I believe you testified earlier that
25  you would have reviewed the information in the

Page 40

SUSSMAN

1
2  leasing system as part of your prosecution of the
3  claim on behalf of NLS, correct?
4      MS. NIGRO:   Objection.
5      You can answer.
6      A.   Yes.  Just to clarify, the way that I
7  reviewed a lease file in making a determination as
8  to whether to take the case and take legal action
9  evolved and initially it may have been a hard copy
10  file when Northern Leasing started moving towards
11  scanning, imaging their documents, we started -- I
12  mean me and my staff, were more dependent on the
13  system.
14      Initially, it was more hard copy
15  documents, files that were provided to us and then
16  we started to move on to the system.  Then we just
17  made our review straight out of the system.  That
18  is where all the information was.
19      Did I answer your question?
20      Q.   Yes, I think you did.
21      What kind of information were you
22  provided when you were provided the hard copy
23  information?
24      A.   It is the same information that is
25  maintained in CCS, but from what I understand over

10  (Pages 37 to 40)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 41

SUSSMAN

1
2 the years I familiarized myself with the documents
3 that are maintained, there are certain standard
4 documents that the company will require before
5 funding, entering into an agreement which would be
6 obviously the lease agreement, chat --
7 verification, processing applications, delivery
8 and acceptance receipt and any correspondence
9 related to the lease that came in to the company
10 or sent out would be in that file.
11    Q.   What about activity logs; would that be
12 in the file?
13    A.   The act -- no.
14       MS. NIGRO:  Objection.
15       Go ahead.
16    A.   I don't believe they were printed -- I
17 don't believe so.
18       Are you referring to the comment log?
19    Q.   Yes.
20    A.   I don't believe they were in those hard
21 copy files, if I remember correctly, although they
22 could have been.  I don't think so.
23    Q.   When did you begin to have direct
24 access on to the leasing system?
25    A.   I don't remember exactly.

Page 42

SUSSMAN

1
2    Q.   Approximately.
3    A.   2003.
4    Q.   Essentially for the whole time that you
5 have been at NLS --
6       MS. NIGRO:  Objection.
7       Representing.
8    Q.   -- representing NLS, you have been
9 working with direct access into the leasing
10 system, correct?
11    A.   Yes.  There was -- I know that
12 initially, I did not have access -- correct.  For
13 certainly the majority -- most of the time.
14    Q.   Who besides you would review
15 information associated with a lease in deciding
16 what further actions to take?
17    A.   Can you clarify what you mean by
18 deciding what action to take?  What action are you
19 referring to?
20    Q.   Before deciding to file a lawsuit, you
21 reviewed the leasing information, correct?
22    A.   Correct.
23    Q.   Who besides you would review that
24 leasing information?
25    A.   That also is something that evolved.

Page 43

SUSSMAN

1
2       So that when I first became acquainted
3 with Northern Leasing, I was actually working for
4 another attorney who was providing collection
5 services for Northern Leasing.  So he employed me
6 on a part time basis to help him review files and
7 handle work that he was doing.  This is early --
8 late 2002 when I first started doing this work.
9       Then I was working alone and with him.
10 We -- I and him would review the files and we
11 would communicate with one or two individuals in
12 Northern Leasing's collection department about
13 files.
14       Eventually, I took on more
15 responsibility and began to do more collection
16 work for Northern Leasing.  I would do it myself
17 and communicate with those individuals.
18 Eventually the workload increased and I hired
19 people.  I hired staff.  Then it would be me and
20 my staff or sometimes my staff, depending on the
21 amount of accounts coming in.
22       So the answer is myself and then
23 eventually myself and my staff, my office --
24 sorry.  I didn't answer your question.
25    Q.   No, you did to some degree.

Page 44

SUSSMAN

1
2       You said there were two individuals in
3 collections that you communicated.  Who were those
4 individuals?
5    A.   It is probably three.
6       From what I remember, there was a woman
7 named Mitzy Rios.  She was the first point person
8 that I was introduced to when I started to do this
9 work.  She is no longer with the company.  I
10 forget when she left.
11       Ricky Brown, Ricardo Brown is his
12 formal name.  He runs the collections department
13 called the legal collections department and Sara
14 Krieger at that time.
15       Now, there are other individuals,
16 Robert Taylor, who also -- a manager in the
17 collections department, so our office would
18 communicate with him.
19    Q.   Still communicate with Sara Krieger?
20    A.   Yes -- yes, but not as much as I did
21 initially back when I first started.
22    Q.   Since you have been directly working
23 with NLS in 2003, do all of the legal complaints
24 filed in New York City go out with your name as
25 the attorney?

New York                Hudson Reporting & Video              New Jersey
212-273-9911            Nationwide 800-310-1769              732-906-2078

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 45

```
                SUSSMAN
1
2      A.   Since when?
3      Q.   2003.
4      A.   I believe so, yes.
5      Q.   You signed the affirmations that go
6  along with those legal complaints?
7      A.   Do you mean the verifications?
8      Q.   Yes.
9      A.   Well, the client signs the servers.
10     Q.   But there is also sometimes an
11 affirmation on the part of --
12     A.   In a default -- in subsequent
13 proceedings, yes.  Some affirmation is signed by
14 myself or other attorneys in my office.
15     Q.   So other attorneys might sign the same?
16     A.   Yes.
17     Q.   When you review a file, you review the
18 leasing information, do you have a form that you
19 fill out or take notes on that or how do you
20 assimilate all of that information?
21     A.   We don't have a file or checklist.
22          In other words -- you want me to
23 describe the process.  It is a system now.
24          Once upon a time, it was a stack of
25 files, open up the file, look through it, little
```

Page 46

```
                SUSSMAN
1
2  post-its and I would put a comment in and either
3  sign off, you know, or say we are going to sign
4  off on these; we will take these accounts or not,
5  and describe the reasons why we would or would
6  not.
7          Eventually, as I said, the company
8  migrated, but they started to go towards the
9  system, relying on imaging documents.  So my
10 office started to utilize that system for
11 information.
12         We had set up -- we worked together to
13 set up a process, so we could work efficiently so
14 that lease that were -- charged off leases that
15 the company was seeking to push to us to take
16 legal action were put into a status and then they
17 would send e-mails or call or, guys, ready for the
18 new batch that we would like you to review and see
19 if you can take legal action.  Then I and my staff
20 divide it up.  We have parameters which I have
21 educated them to follow.
22         Basically, if in reviewing CCS, the
23 documents and the notes, if there are certain
24 issues, they flag it and put it aside.  If it is
25 okay, then they will -- but they will actually
```

Page 47

```
                SUSSMAN
1
2  kick it out of that status and what is okay stays
3  in the status.
4          What gets kicked out, it gets kicked
5  out for me to review and make a decision whether
6  it is appropriate or not for suit.  That is the
7  process that -- that process has evolved since I
8  started.
9      Q.   Is that process written at all?
10     A.   I believe that -- I recall an e-mail at
11 one point where we might have communicated some
12 information about this, but I don't know for sure.
13 I am speculating.
14     Q.   Do you know where that e-mail exists
15 today?
16     A.   If there was an e-mail, it would exist
17 somewhere on my hard drives somewhere.
18     Q.   Does your firm have a records retention
19 policy?
20     A.   Not a formal one.
21     Q.   Do you have an informal records
22 retention policy?
23     A.   We basically retain everything.
24     Q.   Does your firm use e-mail?
25     A.   Yes.
```

Page 48

```
                SUSSMAN
1
2      Q.   Is it the same e-mail as Northern
3  Leasing, MBF?
4      A.   Yes.
5      Q.   Do you have your own servers?
6      A.   I don't know.  A. I don't know -- we have
7  our own e-mail system and an account.  It has
8  nothing to do with Northern Leasing, but since we
9  are using space that is owned by Northern Leasing,
10 there might be some connection, but I am not
11 familiar with the technicalities of that.
12     Q.   The computers that your firm uses, did
13 your firm purchase them or did NLS?
14     A.   Some are mine.  Some are theirs.
15     Q.   When you have a technical problem, who
16 do you call?
17     A.   Depends on the day.
18     Q.   Who do you call and --
19     A.   At times we were reliant on Northern
20 Leasing's IT department to help us out.  At times
21 we went our own way.
22     Q.   Don't tell Steve --
23     A.   Steve is great.
24     Q.   When you need software, do you purchase
25 software yourself or does NLS get it for you?
```

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 49

```
 1              SUSSMAN
 2     A.   We purchase it ourselves.
 3     Q.   Aside from the matters that are
 4  collection matters that you do for the NLS and
 5  related companies, what other kind of work do you
 6  do for NLS and related companies?
 7     A.   The brunt of it is collection related
 8  work.
 9          For example, something other than that
10  would be this Serin litigation.  When it was
11  filed, I was probably the first person to digest
12  information and recommend what it was worth.  I
13  mean, I don't know that I was the person that they
14  were looking to tell them what to do, but I
15  offered my two cents as any lawyer would.  That
16  kind of thing is something that I provide.  Those
17  are the kinds of services that I provide to
18  Northern.
19     Q.   What kind of work do you do for firms
20  that are not, I think you said 40 percent that are
21  not NLS related?
22     A.   Mostly collection work.  I am a
23  collection guy; commercial collections and retail
24  also; lenders, some other leasing companies, some
25  furniture company, a nursing home, a hodge podge
```

Page 50

```
 1              SUSSMAN
 2  of other clients.
 3     Q.   For any other clients, do you have
 4  direct access to their leasing data bases?
 5     A.   At one point I had access to another
 6  client's -- it wasn't as sophisticated, but I had
 7  access to some of their information.  So the
 8  answer is yes.
 9     Q.   Today, is that true?
10     A.   I don't do work for them unfortunately.
11     Q.   For any other client today, do you have
12  access to their systems?
13     A.   Sorry.  Yes, we do.
14     Q.   When you access the NLS system, are you
15  able to make entries?
16     A.   Yes.
17     Q.   Do you make entries?
18     A.   Yes.
19     Q.   The activity log, do you make entries
20  in the activity log?
21          MS. NIGRO:  Objection.
22          What activity log?
23          MR. ALTMAN:  He used that term.
24     A.   Call, result, comment log.  That is
25  what he is referring to.
```

Page 51

```
 1              SUSSMAN
 2     Q.   Yes.  Whatever it is that logs
 3  activities, do you make entries into that?
 4     A.   Yes.
 5     Q.   Do you review that activity log as part
 6  of your prosecution of a claim?
 7     A.   Yes, I and my staff, sure.
 8     Q.   You said you're now three attorneys?
 9     A.   Yes.
10     Q.   How long were you just one?
11     A.   I don't -- I should know.  I should
12  know this answer off the top of my head.  Maybe
13  '05, '04.
14     Q.   At the time the Serin lawsuit was
15  filed, did you have more than one lawyer?
16     A.   When was this filed?
17          MS. NIGRO:  2006.
18     Q.   I thought that might refresh your
19  recollection.
20     A.   I don't remember.
21     Q.   It says that you also have
22  knowledge of the procedures followed by NLS
23  regarding collections.
24          MS. NIGRO:  You're referring to Exhibit
25     105?
```

Page 52

```
 1              SUSSMAN
 2     Q.   It says you have knowledge of the
 3  procedures followed by NLS regarding collections.
 4          Does that knowledge include what NLS
 5  does before you get the file?
 6     A.   My knowledge, like it says, is -- I am
 7  likely to have some -- I have some knowledge about
 8  that.  Although I like to think I know everything,
 9  I don't.
10          The answer is I know much about -- over
11  the years, I have learned much about the client's
12  work, as I should if I am going to review a file
13  and decide whether to enforce a lease, but it is
14  not -- I always learn something every day.
15     Q.   It says, the procedures followed by NLS
16  in cases involving claims of forgery.
17          Do you have knowledge of what NLS does
18  before the file goes to you or only after?
19     A.   Same answer.  I have knowledge about
20  it.
21     Q.   What is the procedure followed by NLS
22  in cases involving claims of forgery?
23     A.   Again, my understanding, like
24  everything, it depends.  It depends on this and
25  that, but it depends on the particulars of the
```

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 53

SUSSMAN

claim and there is a variety of factors from what I understand the company has to evaluate; whether this is a convenient response to a collection call because -- I don't know if any of you work in collections, it is the most convenient thing to say, if someone is calling you for money, I am not responsible. Well, you signed a lease agreement. Well, I didn't sign the lease agreement. What do you do then? Well, what would you do then?

So the company, I believe, also has evolved, but to the extent that it is -- for example, was this something that was raised early on in the lease. To the extent that there is documentation to support such a claim, what kind of performance under the lease.

Those are just a number of the factors that I think an individual who is fielding or receiving this claim has to evaluate whether to take it further and -- take it seriously enough to proceed -- to look into it further or just to say, well, call again the next day and say, well, maybe this repeats itself.

So -- but eventually or if the information or the factors are present, then there

Page 54

SUSSMAN

is a process where probably a supervisor would have to make this decision. I wouldn't imagine an individual collector can just decide to do this, but an affidavit consistent with FTC's recommendation for identity theft victim; to sign an affidavit setting forth the basis of the claim, talking about forgery here, provide signature specimens in the form of government issued ID, file a police report, et cetera. That information event is provided to Northern Leasing who then has to review it and decide what to do.

That is a very general overview of my understanding of how this works.

Q. Who at Northern Leasing reviews the information once it has been received?

A. I don't know the answer exactly, but the way I understand it is that maybe a supervisor in the collections department would provide that information and he or she would review it.

If the information is there, the file is complete, it eventually gets referred to the risk management department who would review it and they would make the decision whether to -- now, again -- okay. That is the answer.

Page 55

SUSSMAN

Q. Who at risk management is responsible for reviewing these forgery claims?

A. There are a number of individuals that I have -- that I am aware of over the years.

Q. Can you think of some of the names?

A. Yeah. Jenilee Joseph or Josephs. At one point, John Paul Mauge, M A U G E, and others I don't remember.

Q. Do these people have any particular training?

A. Do you want to clarify what you mean by training?

Q. What makes these people qualified to review claims of forgery?

MS. NIGRO: Objection.

You can answer.

A. Well, again, Northern Leasing doesn't consider itself a handwriting expert or in the business of -- you know, as a handwriting expert would be offering an opinion about it, but they, over years, have whatever knowledge and understanding of the business, the way it operates, would presumably train an individual in this area to -- with the appropriate factors,

Page 56

SUSSMAN

basic information to make as best decisions it could make.

The answer is, I don't think they hire somebody with a degree from Harvard in handwriting analysis, et cetera, but I think they are trained on the job for this purpose.

Q. In making a decision whether to prosecute a case, you rely upon the opinion of these people in risk management, correct?

A. Not correct.

Q. How does it go from the opinion of the person in risk management to ultimately decide whether to prosecute a claim?

A. As I said, my job is -- I am an attorney retained by the company to assist in collections, take legal action when necessary and appropriate in an effort to make a recovery on a loss, but as an attorney, it is my duty to have a good -- make a review and understand that there is a good faith basis for asserting a claim.

To the extent that this procedure is present in the file, I have my own duty -- if I am going to sign off a piece of paper that says you owe the company money, I have my own duty to make

Page 57

SUSSMAN

1          SUSSMAN
2   my own determination.
3          I certainly would be interested to see
4   what they have to say and I make my own decision
5   about whether A, I can say that is ridiculous; we
6   can sue on that or it is risky or we don't know,
7   let's not -- a variety of different issues, but I
8   can make my own independent decision.
9       Q.   You're not a handwriting expert,
10  correct?
11      A.   Correct.
12      Q.   Do you ever retain a handwriting expert
13  prior to prosecuting a claim?
14      A.   No -- I don't remember ever doing it in
15  that context.  I think we have retained -- when I
16  say we, me, my office in certain situations, but I
17  don't believe it was prior to deciding whether to
18  proceed with a claim.  I don't recall that.
19      Q.   What are the factors that you use in
20  assessing whether to proceed with a case where
21  there is a claim of forgery?
22      A.   Do you mean what are my factors in
23  determining whether to proceed in a case where a
24  forgery claim has been asserted?
25      Q.   Correct.  I will make sure I

Page 58

1          SUSSMAN
2   understand.
3          I think you testified a few moments ago
4   that before you actually proceed, that you as an
5   attorney have an obligation to insure the claim is
6   meritorious.  Therefore, you make your own
7   independent assessment of the forgery claim in
8   deciding how to proceed, correct?
9       A.   Correct.
10      Q.   How do you go about doing that?
11         One thing we know you don't do is
12  generally hire a handwriting expert, so you use
13  other factors?
14      A.   Yes.  Again, I don't expect that my
15  decision is the truth.  What I mean is, I don't
16  claim to know by my review whether this is what
17  happened or not what happened.  I am making a
18  decision about whether I have a good faith basis
19  for asserting a claim on behalf of the client.
20  That is the way I view my responsibility.
21         Along with that, there are a variety of
22  different factors.  As attorneys would know, you
23  have to make a decision; is it appropriate; does
24  it make sense.  There is a benefit analysis, et
25  cetera.

Page 59

1          SUSSMAN
2          To the extent that a claim has been
3   asserted and it has reached a point where the
4   company is saying -- is still pushing the account
5   that they feel it is entitled to recover on this
6   and they want me to take legal action as their
7   attorney; testifying.  Everything goes into
8   consideration, any piece of information.
9          I -- I don't know that it is the case,
10  but I could certainly see a case where a lessee --
11  a guarantor is asserting he didn't sign the lease
12  and the company received the information and the
13  lease was filed and some people in the company
14  thought that maybe this is valid; some didn't.
15         I could foresee a situation like that
16  and then it comes to me and I can decide, what do
17  I recommend?  What do I see here?  I will make
18  that decision.
19         We have a good faith basis for
20  asserting it.  We are going to court.  It is the
21  court that decides.  We are not the arbiters of
22  facts.  We are seeking the assistance of the court
23  in doing that.
24         For the most part, it is my practice
25  not to take action where there has been a claim

Page 60

1          SUSSMAN
2   that surfaced and looks like it has been
3   substantiated to some degree.  I feel it is not
4   appropriate and so, I mean, there are many factors
5   that would go into it.
6       Q.   I don't think you exactly answered my
7   question, but we will come back to it.  We will
8   fix that.
9          Have there ever been files where the
10  companies wanted to push the claim where they
11  believe it is not a forgery and in your review,
12  you think it is a forgery and decided not to
13  proceed?
14      A.   Yes.
15      Q.   Has it gone the other way around?
16      A.   Yes.
17      Q.   If you believed that it was, in fact, a
18  forgery, you would not proceed with the case,
19  correct?
20      A.   Correct.
21      Q.   If the company believes it has
22  information and hands it off to you, what I want
23  to know is, what are the factors in trying to
24  determine whether this is a forgery, not the whole
25  overall of whether to proceed, just in terms of

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 61

SUSSMAN

1    how you deal with, it is not a forgery; we will
2    definitely not proceed --
3         MS. NIGRO: Objection --
4         MR. ALTMAN: Withdrawn.
5         Q.   There are basically three conclusions
6    that could come out of this, correct, in your
7    review?  One is this document is clearly forged in
8    my opinion, correct?
9         A.   Let me hear it -- take it three --
10         MS. NIGRO:  Give him all three.
11         Q.   One possible outcome is that this is
12    clearly a forgery, correct?
13         A.   Just -- okay, yes.
14         Q.   Correct?
15         A.   Correct.
16         Q.   Another conclusion is that I am pretty
17    confident this is not a forgery and this is a
18    genuine signature?
19         A.   Correct.
20         Q.   The third outcome is, I am unsure; I
21    can't tell one way or other, correct?
22         A.   I don't agree with any of that
23    actually.  I never know.  How can I know if this
24    is a forgery or not a forgery?  I don't think

Page 62

SUSSMAN

1    anybody knows.  Northern Leasing is not present at
2    the signing of the lease.
3         Q.   I wasn't asking you whether you knew.
4    I was asking conclusions that you could reach.
5         A.   I am saying that I will not reach a
6    conclusion if I don't know.  I won't conclude --
7    we are talking semantics here, but I am not going
8    to say that I conclude this was forged; this was
9    not.
10         I am reviewing the file and I am making
11    a determination whether it is appropriate to
12    initiate legal action on it.  That is what I am
13    doing.  And a factor or factors would be whether
14    there is a legitimate defense that would move --
15    would cause me not to take action.
16         Q.   Okay.  Have you ever reviewed a forgery
17    claim and concluded there was a high likelihood
18    this is forged?
19         A.   Yes.
20         Q.   Have you ever reviewed a claim and
21    concluded there is a high likelihood this is not
22    formed?
23         A.   Yes.
24         Q.   Have you ever reviewed a claim where

Page 63

SUSSMAN

1    you could not tell that it was either highly
2    likely it was forged or highly likely it was not
3    forged?
4         MS. NIGRO:  Objection.
5         You can answer.
6         A.   Yes.
7         Q.   Have you ever proceeded on a claim
8    where you believe that there was a high likelihood
9    it was forged?
10         A.   No.
11         Q.   Have you ever not proceeded on a claim
12    where you concluded it was highly likely it was
13    not forged?
14         A.   I think you have to -- I can't follow
15    it.
16         Q.   Have you ever failed to prosecute a
17    claim where you believe that the forgery claim was
18    bogus?
19         MS. NIGRO:  Objection.
20         A.   Still -- sorry.  Not quick enough.
21         Q.   Have you ever failed to prosecute a
22    claim despite your belief that the forgery claim
23    by the defendant was bogus?
24         A.   Yes.

Page 64

SUSSMAN

1         Q.   That would be because other factors may
2    have caused you not to take action besides the
3    forgery?
4         A.   Correct.
5         Q.   Getting back to the original questions,
6    what are the considerations and factors that you
7    use when trying to make a determination of how
8    likely it is that the signatures are forged?
9         MS. NIGRO:  Objection.
10         Asked and answered.
11         A.   Again, I don't know if you want to hear
12    it again.
13         Q.   You didn't answer.
14         I want to know the factors you used --
15    not whether you prosecute the claim.  I want to
16    limit it just to, how do you go about assessing
17    the forgery or the claim of forgery?
18         MS. NIGRO:  Objection renewed.
19         I believe he testified to this, it is
20    file by file, but --
21         A.   Okay.  Let's talk about why -- we will
22    take one example.
23         We have a file.  Let's talk about an
24    individual in my office, my office --

16  (Pages 61 to 64)

Page 65

1           SUSSMAN
2    Q.   I don't mean to interrupt you.  I will
3 put a qualification on this.
4        I am presuming you have been provided
5 with adequate documentation and you're not dealing
6 with a situation where they didn't give you what
7 you needed; where you have all the documents you
8 asked for, the affidavit of forgery and those
9 materials.  I want to make sure in your example we
10 were assuming that.  That is all.
11       MS. NIGRO:  Do you want him to give an
12    example of a particular case?
13       MR. ALTMAN:  He can do an example of a
14    particular case, whatever is convenient.
15    Q.   I want to know when Northern Leasing
16 hands on your desk, here is the affidavit of
17 forgery; here is the surrounding information we
18 collected.  I want to know how you look at that
19 information in assessing whether you believe there
20 is highly a likelihood there is a forgery or not.
21       MS. NIGRO:  Objection.  Asked and
22    answered.
23    A.   Like I said before, my objective is not
24 to determine the likelihood or unlikelihood of the
25 existence of a valid forgery claim as much as it

Page 66

1           SUSSMAN
2 is to evaluate whether this file is -- it is
3 appropriate for me to proceed on this file.
4        Now in doing that, part of it is, well,
5 has a claim of forgery been asserted and has it
6 been substantiated and what are the factors
7 surrounding that.
8        I would -- I and my staff would take --
9 initially my staff, the way it is now, and then me
10 at the end when I make that final decision will
11 take a look at, for example, when was the claim
12 asserted, in what context; what was the history of
13 the communication between the parties, the
14 performance, payments made; what is the
15 documentation in the file; was there a
16 verification; was there a delivery and acceptance
17 receipt; did the client -- did the guarantor or
18 the merchant -- is there indications in the file
19 that the lessee was using the equipment and was a
20 happy paying customer, et cetera, et cetera.
21       That would tend to show that they were
22 fully aware of a lease agreement.  There was a
23 contractual relationship and then when there was a
24 default years later, and an attempt to collect on
25 the lease, a claim is asserted, that would be an

Page 67

1           SUSSMAN
2 example -- that would be a context and factors,
3 information that I would try to digest and make a
4 decision about whether it is appropriate or not to
5 proceed.
6        That is not a full -- I am just -- off
7 the top -- you know, besides looking -- obviously
8 -- the obvious analysis at my own level, the
9 documents, the signatures, the affidavit, if any,
10 et cetera.
11    Q.   If the signatures obviously don't
12 match, does that --
13       MS. NIGRO:  Objection -- sorry.  The
14    word obviously.
15    Q.   If the signatures obviously to you do
16 not match, does that trump all of those other
17 factors?
18    A.   No.
19    Q.   If I understand what you're saying,
20 even if it is clearly; visibly does not appear to
21 be the same signature, you might still proceed
22 with the case anyway?
23       MS. NIGRO:  Objection.  He already
24    testified he is not a handwriting expert.
25    That has been asked and answered.

Page 68

1           SUSSMAN
2       MR. ALTMAN:  Strike that.  I will take
3    a step back.
4    Q.   You look at the signatures and compare
5 the signature, do you not?
6    A.   Sure.
7    Q.   Have you ever seen signatures where
8 they obviously are not the same signature?
9       MS. NIGRO:  Objection.
10    Q.   Obviously to you.
11       MS. NIGRO:  Objection.
12    A.   I have seen a signature on a lease
13 agreement that looks one way and I have seen a
14 signature on a license that looks another way and
15 a signature that looks another way and four
16 different signatures that don't match -- don't
17 obviously match each other to my eyes.  I have
18 seen that.  I have seen numerous other
19 combinations of matching, not matching, et cetera.
20 I have seen all that.
21       I don't claim, like I said, to be a
22 handwriting expert, but it is heart of my
23 analysis, certainly.
24    Q.   Why don't you retain a handwriting
25 expert when there appears to not be a match?

Page 69

SUSSMAN

1              SUSSMAN
2           MS. NIGRO:  Objection.
3      A.   A number of reasons.
4      Q.   Please explain.
5           MS. NIGRO:  I think you're asking him
6      -- you're skating close to his work product,
7      so I will give you a little leeway but nothing
8      is waived.
9      A.   One obvious explanation to me is if a
10  claim is 1500 -- excuse me, and it has been
11  referred to my office for collection and an issue
12  of forgery has arisen, I have no -- it is not
13  clear; it is not obvious one way or another; it is
14  hard to tell, I think a handwriting -- to retain a
15  handwriting expert would cost nearly as much as
16  the actual debt, so it wouldn't make sense to do
17  that.  That is one reason.
18     Q.   Are there others?
19     A.   I believe so.  I haven't thought it
20  through.
21          No.  That would suffice, I would stop
22  right there.
23     Q.   You said in cases that have actually
24  been filed, you have sometimes used handwriting
25  experts, correct?

Page 70

1              SUSSMAN
2           MS. NIGRO:  Objection.  You can answer.
3      A.   I vaguely recall.
4      Q.   Does that mean it hasn't happened very
5  often?
6      A.   Correct.
7      Q.   Can you approximate how many times you
8  used a handwriting expert?
9      A.   No.
10     Q.   Is it more than five?
11          MS. NIGRO:  Objection.
12     A.   I don't know.
13     Q.   You have no --
14          MS. NIGRO:  Objection.
15          MR. ALTMAN:  Let me finish the
16  question.
17          MS. NIGRO:  You're about to ask him the
18  same question.
19     Q.   Do you have a way to find out the
20  answer to that question?
21     A.   Not in a way that I would get an
22  accurate -- a fully accurate answer.
23     Q.   Do you have the name -- if you needed a
24  handwriting expert, do you have one that you would
25  call?

Page 71

1              SUSSMAN
2      A.   Not offhand, no.
3      Q.   You're aware in this case a handwriting
4  expert was retained, correct?
5      A.   I -- I am not aware of, at the moment.
6           MR. ALTMAN:  I will mark this document
7      as Exhibit 107.  It is the report from Applied
8      Forensics LLC dated July 18, 2010 signed by
9      Dennis Ryan, R Y A N.
10          (Exhibit 107, report from Applied
11     Forensics LLC dated July 18, 2010, marked for
12     identification, as of this date.)
13     Q.   I am not going to ask you detailed
14  questions about it.  I just want to know, have you
15  ever seen this report?
16     A.   No.
17     Q.   Were you aware that the expert
18  concluded that he could not determine that any of
19  the signatures were genuine on the leases?
20          MS. NIGRO:  Objection.
21          He just testified he wasn't even aware
22     that there was an expert report.
23          MR. ALTMAN:  No.  He said he hadn't
24     seen it.
25          MS. NIGRO:  No.  Right before that, are

Page 72

1              SUSSMAN
2      you aware that a handwriting expert was
3      retained.
4           MR. ALTMAN:  Okay.
5      Q.   If you had had a handwriting expert in
6      the underlying cases who had said that he believed
7      that -- that he could not tell the signatures were
8      genuine, would you still have proceeded with those
9      cases?
10          MS. NIGRO:  Objection.  Hypothetical.
11     A.   I probably would not have proceeded.
12          MR. ALTMAN:  Off the record.
13          THE VIDEOGRAPHER:  The time is now
14     11:53 a.m.  We are off the record.
15          (Off the record.)
16          THE VIDEOGRAPHER:  The time is now
17     12:08 p.m.  We are back on the record.
18          MR. ALTMAN:  A couple of things I want
19     to clean up before we continue that I had
20     forgotten to ask.
21     Q.   Number one, do you pay rent to NLS for
22  the space?
23     A.   No.
24     Q.   Has that always been the case since you
25  have been there -- since you have been working for

18 (Pages 69 to 72)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 73

```
1              SUSSMAN
2  NLS in this capacity --
3       MS. NIGRO:  Objection.
4       Q.   -- since you have been representing NLS
5  in this capacity?
6       A.   There was a period of time where we
7  negotiated my arrangement and -- well, I don't
8  provide them with a rent check for the space.
9  That has never -- I have never done that.
10      Q.   The attorney's fee that is cited in the
11 complaints, do you receive that entire amount?
12      A.   No.
13      Q.   What is the basis of the calculation of
14 those numbers?
15      A.   The lease contract provides for
16 recovery in the event of -- of an attorney's fee
17 in the event of a default.
18           Generally, the leases provide for
19 recovery of 1500 or 25 percent of amount of the
20 claim, whichever is greater.  That is what the
21 leases typically provide, 1500 or 25 percent of
22 the amount of the claim, whichever amount is
23 greater.
24           So I recommended when I started doing
25 the work that the complaint demand 20 percent as a
```

Page 74

```
1              SUSSMAN
2  standard procedure; 20 percent of the claim as
3  attorneys' fees, contractual attorneys fees.
4       Q.   You said the greater of 1500?
5       A.   Or 25 percent.
6       Q.   Well, most of these claims are for
7  3000, so you never go for 1500 which would be
8  greater than in almost every lease?
9       MS. NIGRO:  Objection.
10      A.   Correct.
11      Q.   I am trying to understand your answer,
12 the greater of which means you would always be
13 getting -- asking for 1500?
14      A.   The leases provide for the lessor's
15 recovery of that amount.  In reality, I don't
16 demand that in the complaint on behalf of the
17 company, but instead demand -- it has been the
18 practice for a while, 20 percent of the amount of
19 the claim.
20      Q.   In terms of compensation, do you get a
21 percentage of the recovery, if any?
22      MS. NIGRO:  I will object.  His
23 compensation -- we have talked about this.
24           With respect to retainer agreements of
25 the plaintiffs between him and Chris, that
```

Page 75

```
1              SUSSMAN
2  compensation and the agreements between
3  attorneys and clients are not discoverable.
4       MR. ALTMAN:  I am not asking for the
5  exact amount.  I am entitled to understand
6  because of the nature -- the allegations are
7  that the lawsuits are being used as a way of
8  furthering an overall plan, I think we are
9  entitled to know the financial incentive of
10 the lawyer.  I am not going to ask for -- I
11 won't ask him to tell me how much you get from
12 NLS.
13           I am asking him generally where his
14 money comes from.
15      MS. NIGRO:  You're asking him about
16 compensation from his client, from the
17 services provided to his client.  I know that
18 we have already had this battle with respect
19 to plaintiffs' retainer agreement.  I don't
20 understand how that doesn't go both ways.
21           I also don't agree with your assessment
22 that this is somehow relevant to the claims of
23 the case.
24      MR. ALTMAN:  Off the record.
25      THE VIDEOGRAPHER:  The time is 12:13
```

Page 76

```
1              SUSSMAN
2  p.m.  We are off the record.
3           (Discussion off the record.)
4       THE VIDEOGRAPHER:  The time is 12:13
5  p.m.  We are back on the record.
6       MR. ALTMAN:  Notwithstanding your
7  objection, which is not frankly -- I will ask
8  this.
9       Q.   My question still stands, how generally
10 are you compensated by NLS?
11      MS. NIGRO:  I will ask you not to
12 answer that.
13      MR. ALTMAN:  What is your basis for
14 that instruction?
15      MS. NIGRO:  It is not relevant to this
16 case and I haven't been able to ask those
17 questions of plaintiffs either.  They are the
18 ones claiming attorneys' fees and punitive
19 damages in this case.
20      MR. ALTMAN:  Frankly, that is not a
21 legitimate basis for instructing him not to
22 answer.
23      MS. NIGRO:  Your plaintiffs have been
24 instructed not to answer those questions on
25 the grounds of privilege, so I will say
```

New York                Hudson Reporting & Video              New Jersey
212-273-9911             Nationwide 800-310-1769              732-906-2078

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 77

SUSSMAN

1  privilege.
2          MR. ALTMAN:  That is not privileged.
3          MS. NIGRO:  The terms of his retainer
4  agreement with --
5          MR. ALTMAN:  Is not privileged.
6          MS. NIGRO:  Really?  Because the judge
7  ruled otherwise when it came to the plaintiffs
8  retainer agreements.  Judge Quinn ruled
9  otherwise that we weren't entitled to that
10  information.  I am sorry.  You weren't here
11  during the plaintiff's depositions.  Mr.
12  Chittur was here -- please look at me when I
13  am talking.  I will let you confer with
14  Mr. Chittur.
15          I just wanted to state that when I
16  would broach that subject in that context in
17  the plaintiffs' depositions, he would allow me
18  to ask whether or not one exists, but I was
19  not permitted to go any further than that; how
20  people were being compensated; how anybody was
21  getting paid.  That has been documented in
22  this case.
23          MR. CHITTUR:  As a general proposition,
24  that is true.  However, in this case, this is

Page 78

SUSSMAN

1  a racketeering case and the issue of how the
2  person who actually brought the bogus lawsuits
3  had a incentive or not is directly relevant
4  and a material issue at bar.
5          So there is a difference between asking
6  a plaintiff in a general case or a party in a
7  general case about their retainer agreement
8  and in the specific context of this case, of
9  how the incentive system operated for bringing
10  this bogus lawsuit anyway.
11          MS. NIGRO:  You have spoken.  I will
12  strike both terms of the word bogus.  I think
13  that is improper.
14          Also, we clearly disagree.  Plaintiffs
15  have claimed attorneys fees and compensation
16  and punitive damages which we still maintain
17  is discoverable as a damage and yet, it
18  doesn't seem to go both ways here when we are
19  talking about NLS's compensation agreement or
20  Mr. Sussman's agreement with NLS in terms of
21  his compensation for legal services.
22          You want to call the court, we can do
23  that.
24          MR. ALTMAN:  You need to --

Page 79

SUSSMAN

1          MS. NIGRO:  I have already spoken
2  enough on this record.
3          MR. ALTMAN:  Are you going to --
4          MS. NIGRO:  I will direct him --
5          MR. ALTMAN:  The only basis on which
6  you may instruct the witness not to answer is
7  if such information is privileged or if there
8  is a specific order saying that that is not
9  available or if it is harassing the witness.
10          MS. NIGRO:  That is your opinion?
11          MR. ALTMAN:  That is the rules.
12          MS. NIGRO:  One, I definitely think
13  you're harassing the witness because this
14  isn't relevant, but I will say that the terms
15  of his retainer agreement with NLS are
16  privileged.
17          If you need a basis, of the three you
18  just answered; that is what Mr. Chittur
19  claimed for his clients and that is what I
20  claim for this.
21      Q.   Are you going to listen to your lawyer
22  in that regard?
23      A.   Yes.
24          MR. ALTMAN:  We will mark this.  I

Page 80

SUSSMAN

1  won't interrupt the deposition.  We will
2  pursue it later with the court and as a result
3  of which I will not conclude this deposition
4  at the end.  I will hold this deposition open
5  pending that resolution.
6          MS. NIGRO:  That is fine.  We also made
7  the same types of reservations.
8          MR. ALTMAN:  That is fine.
9      Q.   Mr. Sussman, are you paid a fixed fee
10  for each claim or you are you paid on is a
11  contingency?
12          MS. NIGRO:  Objection.  Don't answer
13  that.  Same grounds.
14          MR. ALTMAN:  What are the grounds.
15          MS. NIGRO:  I have already articulated
16  it.
17          MR. ALTMAN:  Could you articulate it.
18          MS. NIGRO:  I already did.  It is the
19  same basis.  The terms of his compensation
20  between him and his client, same -- same
21  objection made by Mr. Chittur over here.
22      Q.   Are you going to listen to your lawyer?
23      A.   Yes.
24          MR. ALTMAN:  I will hand you what I

20 (Pages 77 to 80)

Page 81

SUSSMAN

1  will mark as exhibit 108.  It is a document
2  entitled CCS Users.  It is three pages and it
3  is Bates numbered NLS 02597.
4      (Exhibit 108, document entitled CCS
5  Users, Bates numbered NLS 02597, marked for
6  identification, as of this date.)
7      Q.   What is CCS?
8      A.   I think we discussed this earlier.  I
9  think it is an acronym for, I think, customer and
10 collection services.  It is a data base --
11 software that NLS uses to manage the operation of
12 its lease portfolio.
13     Q.   That software was written in-house,
14 correct?
15         MS. NIGRO:  Objection.
16         You can answer if you know.
17     A.   I believe so.
18     Q.   If we go to the second page of this at
19 the top, Joseph Sussman, attorney listed there,
20 that is correct?
21     A.   Yes.
22     Q.   Can you tell me who else from your
23 office is on this list?
24         MS. NIGRO:  Would you like him to

Page 82

SUSSMAN

1  review the list?
2          MR. ALTMAN:  If he needs to.
3          MS. NIGRO:  Come on, don't you think,
4  to answer your question?
5          MR. ALTMAN:  I thought it was kind of
6  apparent.
7      A.   Zalmy Sussman on the last page is
8  employed by my office, Z A L M Y.
9      Q.   Is that a man or woman?
10     A.   Man.
11     Q.   Is he an attorney?
12     A.   No.
13     Q.   Is he related to you?
14     A.   Yes.
15     Q.   Who is he?
16     A.   My brother.
17     Q.   What position does he have?
18     A.   At certain times -- paralegal work.
19         On the first page I see Ari Erdfarb, E
20 R D F A R B.
21     Q.   Is he an attorney?
22     A.   Yes.
23     Q.   Alla Glozshteyn, G L O Z S H T E Y N, A
24 L L A.  Is she an attorney?

Page 83

SUSSMAN

1      A.   No.
2          This list contains people that were
3  employed; some are -- not all are employed, so
4  would you like names -- what would you like?
5      Q.   If they were either employed now or
6  were employed.
7      A.   Colleen Fluker, F L U K E R.
8      Q.   Was she an attorney?
9      A.   No.  Arsellis Diaz.
10     Q.   Was she an attorney?
11     A.   No.
12         That is it on the list right now.
13         MR. ALTMAN:  I will mark this document
14 as Exhibit 109 which is a document Bates
15 numbered 1314.  It is an ex-parte order and it
16 is through 1317.
17     (Exhibit 109, document Bates numbered
18 1314 through 1317, marked for identification,
19 as of this date.)
20     Q.   I will hand this to you.
21         MS. NIGRO:  Has this been produced to
22 us before?
23         MR. ALTMAN:  You produced it to us --
24         MS. NIGRO:  Good.  When I hear it is an

Page 84

SUSSMAN

1  order, I don't assume --
2          MR. ALTMAN:  I gave a Bates number.
3  You slammed me for the obvious before.
4          MS. NIGRO:  Touche.
5      Q.   Have you seen this document before?
6      A.   Yes.
7      Q.   Can you explain it to me generally?
8      A.   Give me a few moments.  It is bringing
9  back painful memories.
10         As you can see from the ex-parte order,
11 this was an order that I sought on behalf of
12 Northern Leasing in connection with lawsuits that
13 were filed and pending in court and where the
14 defendants -- individual defendants in each case
15 had defaulted, but we were unable to proceed
16 because the court, if I remember correctly, was
17 rejecting the service of process because the
18 notary who signed the -- in other words, the
19 notary for the process server's affidavit, namely
20 Associated Services which is a process server we
21 use in Upstate New York, it was David Martin.  He
22 notarized the -- there is a -- a portion of a --
23 an affidavit of mailing, not the actual process
24 server's affidavit but in certain services under

New York                Hudson Reporting & Video                New Jersey
212-273-9911            Nationwide 800-310-1769                732-906-2078

30ba659c-fafd-4a2d-b2ee-4e016e15179c

SUSSMAN

1  the CPLR, let's say nail and mail provision where
2  the --
3
4        MS. NIGRO:  What are you laughing at?
5        You can strike that.
6     A.   Should I continue?
7        Where a process servers say, we are
8  seeking to serve an individual who lives in
9  California, a process server may serve and execute
10  an affidavit saying he delivered the papers, but
11  in situations where the CPLR requires there be a
12  mailing, the mailing would be done by the New
13  York -- by Associated Services in Upstate.
14        So David Martin would execute an
15  affidavit of mailing; two together would comprise
16  the proof of service filed with the court.  His
17  affidavit, he -- I am sorry.  He didn't execute
18  it.  He would notarize someone in his office's
19  affidavit of mailing.
20        His notary stamp -- if I get this
21  right, his stamp had that his notary expired -- I
22  don't remember the day, let's say January 17,
23  2003.  He had renewed it but he hadn't obtained a
24  new stamp.  So the stamp -- so on March 3, 2004,
25  he stamped -- he notarized and stamped, but the

SUSSMAN

1  stamp said it expired already so the court
2  rejected the papers.  After looking into it, we
3  found out that, well, it is just a stamp; he is
4  actually notarized.
5        So I made an application for an order
6  to -- that -- instructing the clerks not to reject
7  our applications for a default judgment or not
8  invalidate the process server on that basis.  That
9  is my recollection.
10     Q.   You're aware that this lawsuit, Serin
11  versus NLS, has been brought on behalf of six
12  individual plaintiffs, correct?
13     A.   Yes.
14     Q.   Mr. Sussman, when you sign a complaint,
15  do you endeavor to verify the information in the
16  complaint to make sure it is correct to the best
17  of your knowledge?
18     A.   Yes.
19     Q.   If information in the complaint was not
20  correct, that could potentially create problems,
21  correct?
22        MS. NIGRO:  Objection.
23        You can answer.
24     A.   Yes.

SUSSMAN

1
2     Q.   It is important that the information in
3  the complaint be correct?
4        MS. NIGRO:  Objection.
5        You can answer.
6     A.   It is required.
7     Q.   Tell me what you remember about Melinda
8  Serin in this case, the underlying lease.
9        MS. NIGRO:  Objection.
10        You can answer.
11     A.   I remember her name.  I remember -- I
12  am aware that she brought -- one of the individual
13  plaintiffs, but more than that, I prefer to answer
14  a specific question.
15     Q.   Did you file the lawsuit that Northern
16  Leasing brought against Melinda Serin?
17     A.   I don't know.
18        MR. ALTMAN:  I will mark as Exhibit
19     110, a document with the Bates number NLS 545
20     through 551.  It is a bar coded lease
21     document.
22        (Exhibit 110, document with the Bates
23     number NLS 545 through 551, marked for
24     identification, as of this date.)
25        MS. NIGRO:  For the record, this was

SUSSMAN

1
2  this produced clipped together or you clipped
3  this together?
4        MR. ALTMAN:  I can't tell.
5        MS. NIGRO:  Did you get this off a
6     disk?
7        MR. ALTMAN:  We got a bunch of pages in
8     a PDF file.  I don't know that there is any
9     document --
10        MS. NIGRO:  I just --
11        MR. ALTMAN:  I don't know that there is
12     any document separation.  It is possible that
13     Bates number 550 is a second document that is
14     associated with this.
15        MS. NIGRO:  That is precisely what I
16     wanted to clarify.
17        MR. ALTMAN:  I can't tell.
18        MS. NIGRO:  Thank you.  I understand.
19     Q.   My first question to you is, is the bar
20  code cover sheet; have you seen that before --
21  that kind of document before, not necessarily this
22  one?
23     A.   Yes.
24     Q.   What is that?
25     A.   I don't really understand -- I should

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 89

SUSSMAN

1             SUSSMAN
2  know, but I don't really understand how this
3  works, but it is somehow the way that NLS scans
4  documents to a particular lease file.  That is the
5  best I can do.
6     Q.   Did you have anything to do with the
7  drafting of the lease documents -- the form lease?
8       MS. NIGRO:  Objection.
9     A.   What do you mean by the form lease?
10    Q.   The form lease that we are looking at
11  here, starting on page 546, entitled equipment
12  Finance Lease that appears to be four pages, did
13  you participate in the drafting of any version of
14  this lease, not necessarily this particular one?
15    A.   No.
16    Q.   Is that true for any of the Northern
17  Leasing related entities?
18    A.   It is true regarding leases similar to
19  this lease form and of this time period.
20    Q.   Are there other leases which you did
21  help draft the form agreement?
22    A.   What -- if you mean by form agreement,
23  a lease that Northern Leasing uses more than once
24  for lease transactions, yes.
25    Q.   But not this lease?

Page 90

SUSSMAN

1             SUSSMAN
2    A.   Correct.
3       MS. NIGRO:  For the record, I would
4  like to point out that certain of the pages
5  are cut off at the bottom; some of the
6  writing.
7       MR. ALTMAN:  This is the way you
8  produced it to us.
9       MS. NIGRO:  Well, no --
10      MR. ALTMAN:  I will stip -- what?
11      MS. NIGRO:  I think we produced it to
12  you on a disk.
13      MR. ALTMAN:  Right, but when you print
14  out, that is what you get.
15      MS. NIGRO:  I don't know if that is
16  true or false, but I am stating for the record
17  that it appears that the bottom has been cut
18  off.
19      MR. ALTMAN:  This is an accurate
20  representation of what was here -- I will
21  stipulate that -- I will state on the record
22  that I personally, myself, took the PDF files
23  produced by NLS by its counsel to us and
24  printed out these pages and this is what you
25  get.

Page 91

SUSSMAN

1             SUSSMAN
2      MS. NIGRO:  Okay.
3      MR. ALTMAN:  Now I will stipulate that
4  there are probably multiple versions of this
5  particular lease, some of which may have some
6  additional writing at the bottom and the
7  questions I am going to ask are probably not
8  dependent on that particular issue.  If there
9  is an issue with that, we can try to find a
10  better copy of the lease, but I want to make
11  it clear this is what was provided to us.
12    Q.   Mr. Sussman, you are charged with
13  enforcing NLS's rights under these lease
14  agreements, correct?
15      MS. NIGRO:  Objection.
16    A.   Not necessarily the case.
17    Q.   Is that not generally what you do when
18  you file a case on behalf of Northern Leasing
19  leasing?
20    A.   It is.
21    Q.   So when you're involved, you look to
22  this document -- you look at the allegedly signed
23  lease agreement in that particular case to decide
24  what the terms are that should be enforced,
25  correct?

Page 92

SUSSMAN

1             SUSSMAN
2    A.   Correct.
3    Q.   It is important that these leases have
4  responsibilities that go two ways, correct.
5    A.   Correct.
6    Q.   There are some responsibilities for
7  Northern Leasing?
8    A.   Correct.
9    Q.   And there are some responsibilities for
10  the lessee, correct?
11    A.   Correct.
12    Q.   It would be inappropriate for Northern
13  Leasing to do things that are not permitted within
14  the contract, correct?
15      MS. NIGRO:  Objection.
16    A.   I don't know how to answer that
17  question.  To the extent that the action is
18  inappropriate, it is inappropriate.  I don't know
19  how to -- you need to define the relationship.
20    Q.   If Northern Leasing were to -- if the
21  contract said $59 a month and Northern Leasing
22  would continuously take out $99 a month, that
23  would not be appropriate, correct?
24      MS. NIGRO:  Objection.  Hypothetical.
25    A.   If the contract only provided for $59,

New York       Hudson Reporting & Video      New Jersey
212-273-9911      Nationwide 800-310-1769     732-906-2078

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 93

SUSSMAN

1          SUSSMAN
2  it would be inappropriate to charge $99.
3      Q.   My first question to you is, do you
4  recall ever reviewing the contract for Melinda
5  Serin that is Bates 546 through 549?
6      A.   I do recall reviewing this lease
7  agreement.
8      Q.   Do you remember reviewing it at the
9  time that you brought -- at the time that NLS
10  brought suit against Melinda Serin?
11     A.   No.
12     Q.   Would you have reviewed it at that
13  time?
14     A.   If I am the -- if I -- if my law firm
15  initiated a lawsuit, then I or someone in my
16  office would have reviewed this lease agreement
17  prior to initiating the lawsuit.
18     Q.   Would we expect that regardless of
19  which attorney reviewed it, you have the same
20  ethical responsibilities?
21         MS. NIGRO:  Objection.
22     A.   You mean --
23         MR. ALTMAN:  Strike that.
24     Q.   Should it have made a difference which
25  lawyer in your office reviewed it in terms of how

Page 94

1          SUSSMAN
2  this lease should have been prosecuted?
3      A.   No.
4      Q.   No matter which attorney it was, it
5  should have been -- followed the same procedures?
6      A.   Yes.
7      Q.   Should have reviewed the same
8  documents, correct?
9      A.   Correct.
10     Q.   Should have read the lease to see what
11  the terms were, correct?
12     A.   Correct, generally.
13         I have more -- I have more
14  responsibility, the way I have set up my law firm,
15  to make the final decision about an issue but
16  generally, the guidelines would be the same from
17  one attorney to the next.
18     Q.   Does any lawsuit get filed that you
19  don't personally review?
20     A.   Yes.
21     Q.   What would the guidelines be for a
22  lawsuit being filed without your review?
23         MS. NIGRO:  Objection.
24     A.   I think I described the process which
25  we -- and I mean my office, utilizes -- the

Page 95

1          SUSSMAN
2  guidelines I have set in reviewing the
3  appropriateness of an initiating a lawsuit, so --
4      Q.   By the way, have there been times when
5  NLS thought a lawsuit should go forward and you
6  had decided no, it shouldn't?
7         MS. NIGRO:  Objection.
8      A.   I answered that question already, but
9  yes.
10     Q.   Looking at this leasing document, under
11  the schedule of payments, it says the basic
12  monthly lease payment is $59, correct?
13     A.   That is what it looks like.
14     Q.   It says the lease term is 48 months,
15  correct?
16     A.   Correct.
17     Q.   Then it says plus applicable taxes,
18  correct?
19     A.   Correct.
20     Q.   Is there anything on that page talking
21  about a lost damage waiver?
22     A.   Not directly.
23     Q.   Is there anything on that page talking
24  about tax filing fees?
25     A.   I understand that to be referenced in

Page 96

1          SUSSMAN
2  applicable taxes.
3      Q.   A filing fee is in applicable taxes?
4      A.   It is a reference to taxes and what is
5  associated with taxes as defined in the agreement.
6      Q.   So if I were to read this agreement, it
7  is going to tell me that NLS is going to charge a
8  certain amount of money for filing -- that gets
9  paid to NLS?
10         MS. NIGRO:  Objection.
11         MR. ALTMAN:  Can I --
12         MS. NIGRO:  Sorry.
13     Q.   I will start over.
14         If I understand what you're saying, if
15  I read this lease agreement here in the section on
16  taxes, it is going to tell me that NLS will also
17  charge a fee that does not get paid to anybody
18  that goes to NLS for filing the tax paperwork?
19     A.   I don't know --
20         MS. NIGRO:  Objection to the extent
21  that the document speaks for itself.
22     A.   That is my response as well.
23         MR. ALTMAN:  Thank you for coaching.
24         MS. NIGRO:  That is not fair.
25     A.   Then I will give -- those are my words.

24 (Pages 93 to 96)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 97

SUSSMAN

1    SUSSMAN
2  She just said it before me.
3      Q.   She is not supposed to say it before
4  you.
5      A.   I am saying on the record that that is
6  my response.  That is my response to the question.
7  The document provides what it provides.
8      Q.   Would you point to me where the
9  document says that a tax filing fee will be
10  charged?
11     A.   I don't know.
12     Q.   Well, read the lease.  You have it in
13  front of you.
14     A.   All right.
15     Q.   While you're at it -- start with that.
16     A.   I will refer you to section 7 of the
17  lease.  That is my response.
18     Q.   Show me the section here that says that
19  a tax filing fee will be collected.
20     A.   My response to the question is whether
21  there is a reference on the first page to a
22  potential tax filing fee the way you have
23  described it, the way you described it is -- my
24  response is to the extent that the document
25  provides for it.  If you like me to read the

Page 98

1    SUSSMAN
2  provision, I will be happy to.
3      Q.   Sorry --
4      A.   That I am referring to.
5      Q.   I will take a step back.
6           Are you aware that NLS charges some
7  individuals a fee simply for the purposes of
8  paying taxes?
9      MS. NIGRO:  Objection.
10     MR. ALTMAN:  What is the nature of your
11     objection?
12     MS. NIGRO:  First of all, form.  Second
13     of all --
14     MR. ALTMAN:  I want to fix it.
15     MS. NIGRO:  You told me we have the
16     usual stips.
17     MR. ALTMAN:  That is fine.  So
18     relevance, but what is the objection to form?
19     MS. NIGRO:  Read back the question.
20     (Record read.)
21     MS. NIGRO:  You're making a statement.
22     Q.   Does NLS charge certain individuals a
23  tax filing fee?
24     A.   I don't know.
25     Q.   Can you show me in the provision for

Page 99

1    SUSSMAN
2  number 7 where it says that NLS will charge an
3  individual a tax filing fee?
4      MS. NIGRO:  Objection.
5      A.   I don't think I said that, but what I
6  had previously stated was that to the extent that
7  the document provides for it, anywhere in the
8  document, is referenced by the words plus
9  applicable taxes on the first page.
10          I will read section 7 of the lease
11  agreement.  Lessee intends the monthly lease
12  payments hereunder to be net to lessor, and lessee
13  shall pay all sales, use, excise, personal
14  property, stamp, documentary, gross receipt,
15  occupation and other taxes, license and
16  registration fees, assessments fines, penalties
17  and other charges imposed on the ownership
18  possession or use of the equipment during the term
19  of this lease.  Lessor will add such taxes, fees
20  and other charges to the monthly payments
21  hereunder including handling costs.
22          To the extent that such taxes fees and
23  other charges are not imposed in equal monthly
24  payments, lessor may estimate the amount thereof,
25  et cetera.

Page 100

1    SUSSMAN
2      Q.   Does anything that you read there say
3  that NLS will collect a fee payable to NLS for it
4  accepting in a tax form?
5      MS. NIGRO:  Objection.
6      A.   You're asking for my opinion about
7  whether this document provides for such a right?
8      Q.   I am asking you where it says it.
9           You're the attorney who prosecutes
10  claims on behalf of NLS in certain cases.  You're
11  charged with interpreting the terms of this lease.
12  I am asking you, where does it say that NLS will
13  collect a fee for filing tax returns?
14     MS. NIGRO:  Objection.
15     A.   It is not -- that provision is not
16  relevant to my analysis of whether to enforce a
17  breach of contract claim for remaining lease
18  payments.
19          Having said that, handling costs to me
20  seems --
21     Q.   Where is that?
22     A.   In the middle of the paragraph.  That
23  to me is a reference to overhead incurred by the
24  lessor in handling, filing such taxes.
25     Q.   Is the handling cost described anywhere

25 (Pages 97 to 100)

Page 101

SUSSMAN

1
2  in this document?
3        MS. NIGRO: Objection.
4     A.  I don't know.
5     Q.  You have the document in front of you.
6     A.  Do you want me to spend the time to
7  read it?
8        MS. NIGRO: It is up to you. You have
9     got seven hours.
10    Q.  Where should an individual who is
11  reviewing this lease look for handling costs?
12       MS. NIGRO: Objection.
13    A.  I don't know. If I were a lessee, I
14  would review the lease agreement.
15    Q.  Right. So where would a lessee expect
16  to find handling costs if that is what that even
17  means?
18       MS. NIGRO: Objection. It depends in
19    what context we are talking about.
20    Q.  Well, you know what --
21       MS. NIGRO: I would like to talk to you
22    outside.
23       MR. ALTMAN: Off --
24       THE VIDEOGRAPHER: The time is now
25    12:50 p.m. We are off the record.

Page 102

SUSSMAN

1
2       (Recess taken.)
3       MR. ALTMAN: Read back the last
4  question.
5       (Record read.)
6       THE VIDEOGRAPHER: The time is now
7  12:54 p.m. We are back on the record.
8     A.  My response, I think was and is, it
9  depends on in what context we are talking about.
10  A lessee would expect what? A reference to
11  handling costs in what context?
12    Q.  Well, if he was going to be charged
13  handling costs, if that is what that means, and
14  tax filing fees falls under -- a fee for filing
15  the tax return falls under that, where would he go
16  to find out what that number is?
17       MS. NIGRO: Objection.
18    A.  The leasing company.
19    Q.  To the best of your knowledge, without
20  a detailed -- would it require a detailed study
21  for you to answer whether the amount of the
22  handling charge, if that is what it is, is
23  disclosed in the lease?
24       MS. NIGRO: Detailed study of what?
25    Q.  Do you need to read the entire lease

Page 103

SUSSMAN

1
2  line by line to answer whether the amount of the
3  handling charge is defined anywhere in the lease?
4        MS. NIGRO: I thought the question was
5     -- sorry.
6     A.  I can guess and give you an answer, but
7  to answer it correctly, it would require me to
8  read the entire lease agreement.
9     Q.  I am curious about your guess.
10       MS. NIGRO: It is not admissible.
11       MR. ALTMAN: I am entitled to it.
12    A.  It is not in there.
13       MR. ALTMAN: Let's break for lunch.
14       THE VIDEOGRAPHER: The time is now
15    12:55 p.m.
16       (Luncheon recess: 12:55 p.m.)
17
18
19
20
21
22
23
24
25

Page 104

SUSSMAN

1
2     A F T E R N O O N   S E S S I O N
3       (Time noted: 1:54 p.m.)
4  J O S E P H  I.  S U S S M A N, resumed and
5     testified as follows:
6  CONTINUED EXAMINATION
7  BY MR. ALTMAN:
8        THE VIDEOGRAPHER: The time is now 1:54
9     p.m. We are back on the record.
10    Q.  Before we broke for lunch, I had some
11  questions for you about the lease.
12       You see there are numbered sections on
13  the lease, correct?
14    A.  Yes.
15    Q.  I think it goes from 1 up to --
16    A.  One to 25.
17    Q.  Is any one of those 25 things handling
18  charges?
19    A.  I don't think so.
20    Q.  When you filed suit on behalf of
21  Northern Leasing for the dollar amount that you
22  would claim was the outstanding balance would be
23  simply the number of lease payments not already
24  paid, plus the number of remaining lease payments,
25  correct?

26 (Pages 101 to 104)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 105

SUSSMAN

1
2    A.   Correct.
3    Q.   You wouldn't include amounts for lost
4    damage waivers?
5    A.   Correct.
6    Q.   You wouldn't include property tax,
7    correct?
8    A.   Correct.
9    Q.   So it was just purely the lease
10   payments?
11   A.   Correct.
12   Q.   If Northern Leasing had collected
13   moneys it was not entitled to when it was
14   receiving payments, then when you filed suit, the
15   amount of money should have been adjusted to
16   reflect that, correct?
17       MS. NIGRO:  Objection.
18   A.   That sounds like a legal set off,
19   counterclaim, defense and I would take it under --
20   I certainly would consider it as part of my
21   analysis of whether to initiate suit.
22   Q.   I am not asking whether to initiate
23   suit, but let's say, for example, you concluded
24   that the lease payments plus the balance was 2500
25   and it was clear that NLS had collected $100 for

Page 106

SUSSMAN

1
2    some kind of fees that it was not entitled to,
3    would you take that overcharge into account when
4    deciding how much money the defendant actually
5    owed?
6        MS. NIGRO:  Objection:
7    A.   It is hypothetical, the question, and
8    so I will answer a hypothetical question.
9        I would if --
10   Q.   Okay.  It is not a real stretch.
11   A.   Yeah.
12   Q.   If you had looked and saw, boy, they
13   charged $100 for this and let's say they got an
14   extra $100 payment that was not reflected, you
15   would take that into account in determining what
16   was owed, correct?
17       MS. NIGRO:  Objection.
18       You can answer.
19   A.   Correct, but I would -- if I was being
20   asked or if I had to determine the precise amount
21   that Northern Leasing is entitled to, then yes,
22   but whether or not that is a -- as an attorney,
23   there are ways of making a demand in a complaint.
24       You're entitled, as you guys know, or
25   -- to seek an amount and maybe you're entitled to

Page 107

SUSSMAN

1
2    a little less than that amount or something
3    significantly less than that amount, but if there
4    is a good faith basis for asserting an amount and
5    there is a defense out there that might say, well,
6    that amount should be set off by X amount of
7    dollars, that doesn't preclude an attorney from
8    making a demand if he has a good faith basis
9    for -- to do that in a breach of contract, but you
10   have a defense that can be set off.
11       So the question is if I needed to
12   determine as a judge or anybody else for whatever
13   purpose the precise amount that Northern Leasing
14   is entitled to after everything is all adjusted,
15   yes.  But again, wearing the hat that I wear, I
16   think I stated on the record, it would be
17   something that would I would take into
18   consideration.
19   Q.   When you say in your complaint that
20   there is a balance remaining, you're making a
21   fairly definitive statement, aren't you?
22       MS. NIGRO:  Objection.
23   A.   Yes.
24   Q.   When you say there is a balance
25   remaining, that should reflect -- that should

Page 108

SUSSMAN

1
2    accurately reflect how much money the client
3    actually owes, correct?
4        MS. NIGRO:  Objection.
5    A.   Not correct.
6    Q.   Why would it not be an accurate
7    statement of what the client owes on the lease?
8    A.   The representation or the allegation
9    that is set forth in the complaint is that there
10   was a default by the lessee in making a lease
11   payment and under the lease, that triggers an
12   acceleration clause and all unpaid and remaining
13   lease payments become due.  That is the cause of
14   the -- the breach of contract cause of action set
15   forth in the complaint.
16       That is accurate regardless of whether
17   or not there exists a defense -- a breach of
18   contract by the lessee for taxes that were paid or
19   handling fee or whatever other defense may exist
20   or counterclaim or et cetera, so my representation
21   or Northern Leasing's representation set forth in
22   my complaint is accurate.
23       If I moved for summary judgment on that
24   cause of action, I could receive judgment if I put
25   forth the case, regardless of a set off defense.

27 (Pages 105 to 108)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 109

SUSSMAN

1    It would have to be adjusted.
2
3    Q.   To your knowledge, has Northern Leasing
4    ever collected taxes that it didn't pay for
5    whatever reason?
6        MS. NIGRO:  Objection.
7    A.   Not to my knowledge.
8    Q.   I am not suggesting intentionally, but
9    has there ever been a time when they collected
10   let's say a personal property -- what they thought
11   a personal property tax was due and learned later
12   there was no personal property tax; has that ever
13   happened where they refund the taxes back to the
14   customer?
15       MS. NIGRO:  Objection.
16   A.   I wouldn't know.
17   Q.   Has Northern Leasing ever been sued for
18   collecting property taxes and not -- collecting
19   property taxes on behalf of lessees and not
20   actually forwarding them to the appropriate taxing
21   authority?
22       MS. NIGRO:  Objection.
23   A.   I do not know for sure.
24   Q.   When you say you don't know for sure,
25   do you have any recollection?

Page 110

SUSSMAN

1
2        MS. NIGRO:  Objection.
3    A.   Somewhere in my mind, I recall seeing
4    that allegation being made, but I don't recall if
5    it was in the context of a letter or an action or
6    something else.
7    Q.   By the way, have you personally ever
8    been sued?
9    A.   Yes.
10   Q.   The context of these suits, were they
11   as part of your professional activities or were
12   they related to your personal life?
13       MS. NIGRO:  Objection.
14   A.   Professional capacity.
15   Q.   How many times have you been sued?
16   A.   Three times, I think.
17   Q.   Those suits still pending?
18   A.   One of them is.
19   Q.   How were the other two resolved?
20       MS. NIGRO:  Objection.  Relevance.  How
21   is this even relevant to this case?
22   Q.   What was the nature of the two suits
23   that resolved?
24   A.   One action related -- the answer is how
25   it was resolved?  It was dismissed by appellate

Page 111

SUSSMAN

1
2    court and Court of Appeals.
3    Q.   Is that both cases or one case?
4    A.   One case.
5    Q.   The other case?
6    A.   The other case was settled.
7    Q.   What was the allegation in the case in
8    Texas?
9    A.   That I filed suit on a lease
10   purportedly that was not valid.  I don't recall if
11   it was a forgery claim, but some -- that the lease
12   was invalid for a reason I don't remember.
13   Q.   When was that suit approximately filed?
14   A.   Don't know for sure.  2005, '06.
15   Q.   When was it resolved?
16   A.   I don't remember when the decision came
17   down.
18   Q.   You said it had been dismissed on
19   appeal?
20   A.   Correct.
21   Q.   At the trial court level, was it found
22   in favor of the plaintiff?
23       MS. NIGRO:  Objection.
24   A.   If I remember correctly, we entered --
25   counsel entered a special appearance contesting

Page 112

SUSSMAN

1
2    jurisdiction which I guess the special appearance
3    was denied and reversed on appeal, so the case was
4    dismissed on jurisdictional grounds.
5    Q.   So it was never reviewed on its merits?
6        MS. NIGRO:  Objection.
7    A.   I don't know.  I understand your
8    question.  I am not sure.
9    Q.   Was there ever a trial?
10   A.   There was no trial -- no.
11   Q.   You said that was in Texas in about
12   2005.  The other case that was --
13   A.   I don't remember too well.
14   Q.   What state was it in?
15   A.   I think Connecticut.
16   Q.   About when was it?
17   A.   The last two years.
18   Q.   What was the basis of the claim?
19   A.   I believe it was that I had represented
20   to -- I don't think it was the attorney general's
21   office, but it was a consumer protection division
22   or something -- in response to a lessee's
23   complaint that was forwarded to Northern Leasing
24   which I responded to, I had represented that the
25   case would be dismissed because the statute of

New York            Hudson Reporting & Video            New Jersey
212-273-9911          Nationwide 800-310-1769           732-906-2078

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 113

SUSSMAN

1   limitations had expired and I actually
2   acknowledged that it was an over -- that that
3   would be the appropriate action.
4       The case wasn't dismissed. It was a
5   mistake. Something slipped through the cracks and
6   so that was the basis for the suit -- I think the
7   suit was for attorney's fees when the error was
8   pointed out and of course I took the correct
9   action; I realized this had gotten through.
10      So that is what that suit was about.
11  That was resolved out of court.
12  Q.   The case that is still pending?
13  A.   That is the Just Films.
14  Q.   What is that case?
15  A.   I don't know too much about it.
16  Q.   Who is representing you in that case?
17  A.   Jennifer.
18  Q.   When was that case filed?
19  A.   Within a year.
20      MS. NIGRO: March 2010. I can give you
21  the caption and index. It has been moved to
22  federal court.
23  Q.   Are you paying for that representation?
24  A.   No.

Page 114

SUSSMAN

1   Q.   Who is paying for that representation?
2   A.   Northern Leasing.
3   Q.   What kind of case is that?
4       MS. NIGRO: It is a RICO case,
5   purported class action with roughly 35
6   defendants all represented by various lawyers.
7   Q.   Going back to the front page of the
8   lease in the schedule of payments, is there
9   anything there in terms of a lost damage waiver?
10      MS. NIGRO: Objection. Asked and
11  answered but if not, go ahead.
12  A.   In the schedule of payment box, no.
13  Q.   Is there anything on the entire front
14  of the lease discussing lost damage waivers or
15  insurance?
16      MS. NIGRO: Objection. You can answer.
17  A.   Not directly.
18  Q.   Is it in directly?
19  A.   Yes.
20  Q.   Where is it indirectly?
21  A.   There are references to other
22  provisions of the lease agreement and loss and
23  damage waiver is another prevision set forth in
24  the lease agreement.

Page 115

SUSSMAN

1   Q.   Could you point to me where on this
2   first page it points to anything about a lost
3   damage waiver?
4   A.   There isn't a direct reference to the
5   specific provision about a lost damage waiver on
6   the first page, as I said, but there are -- this
7   is the first page of an agreement and the
8   agreement contains a number of provisions. One of
9   them is a loss and damage waiver. It is one
10  agreement.
11  Q.   I understand that, but there is nothing
12  on the first page discussing the lost damage
13  waiver?
14  A.   Correct.
15  Q.   There isn't even an indirect
16  reference -- if you only had this first page of
17  this agreement and that is all that was presented
18  to you, you wouldn't know anything about the lost
19  damage waiver, correct?
20      MS. NIGRO: Hypothetical.
21      You can answer.
22  A.   Correct.
23  Q.   That is what I wanted to know.
24      Going to section 9 of the lease, is the

Page 116

SUSSMAN

1   amounts of the lost damage waiver actually defined
2   anywhere in section 9?
3   A.   The last part of section 9 states that
4   if lessee does not provide evidence of insurance,
5   lessee is deemed to have chosen to buy the loss
6   and destruction waiver at the price in effect;
7   price which lessor reserves the right to change
8   from time to time.
9       So that is -- that is the provision in
10  response to your question.
11  Q.   Is the dollar amount anywhere in that
12  section?
13  A.   No.
14  Q.   So somebody reading this lease would
15  have no idea what that loss damage waiver is,
16  correct?
17      MS. NIGRO: Objection.
18  A.   Not -- certainly upon further inquiry
19  it is very easily determinable.
20  Q.   Somebody reading this lease would not
21  know what the loss damage waiver is?
22      MS. NIGRO: Objection.
23  A.   If somebody was reading the lease and
24  decided not to take any action to become aware of

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 117

SUSSMAN

1               SUSSMAN
2 that amount.
3     Q.   Simple question.
4       MS. NIGRO:  Asked and answered.
5     Q.   If somebody just read this lease, they
6 would have no idea how much the lost damage waiver
7 is, correct?
8       MS. NIGRO:  Objection.
9     A.   Correct.
10    Q.   A few lines up from that, it says --
11 can you read out -- about five sentences down,
12 there is a sentence that starts with all such.
13 Can you read that out loud?
14    A.   All such policies shall provide that
15 such insurance shall not be canceled or modified
16 as against lessor due to any act or neglect on the
17 part of lessee or all -- I can't read that word.
18      MS. NIGRO:  Any.
19   A.   -- or any other party.
20      Continue?
21   Q.   Yes.
22   A.   Lessee shall pay the premiums for such
23 insurance and deliver to lessor satisfactory
24 evidence of the insurance coverage required
25 hereunder on or before the commencement date as

Page 118

1               SUSSMAN
2 requested by lessor.
3   Q.   That is fine.
4     So in other words, a person has to --
5 lessor, that is NLS?
6   A.   Correct.
7   Q.   The lessor has to provide proof of
8 insurance as requested by NLS, correct?
9      MS. NIGRO:  Objection.
10   A.   They are not required to.  It is an
11 option of the lessee to provide -- the way I
12 understand the lease or this provision, to provide
13 proof of insurance.  It is not an absolute
14 requirement.
15   Q.   Well, the first sentence says, lessee
16 shall keep the equipment insured, doesn't it?
17   A.   Correct.
18   Q.   That is not an option, is it?
19      MS. NIGRO:  Objection.  That is not the
20    question you asked him.
21   A.   I understand your question.
22     The reason I am saying that is because
23 since the lease also provides for an alternative
24 in the event that the proof of insurance is not
25 provided, in effect, it provides the lessee with

Page 119

1               SUSSMAN
2 another option.
3   Q.   When is the proof of insurance due?
4   A.   It can be provided, from my
5 understanding is that at any point during the
6 lease.  That is my understanding.  I could be
7 wrong.
8   Q.   It says, shall be provided as requested
9 by the lessor, doesn't it?
10   A.   Where is that?  The sentence that I
11 read?
12   Q.   When it says lessee shall pay the
13 premiums for such insurance and deliver to lessor
14 satisfactory evidence of insurance coverage
15 required hereunder on or before the commencement
16 date as requested by lessor.
17     So the lessor has to request what they
18 want, correct?
19      MS. NIGRO:  Objection.
20    You can answer.
21   A.   If the lessor wants to request
22 something, it needs to make the request, correct.
23   Q.   And a condition precedent -- you
24 understand what a condition precedent is, correct?
25   A.   Yes.

Page 120

1               SUSSMAN
2   Q.   -- to charging the lost damage waiver
3 is that proof of insurance is not provided,
4 correct?
5      MS. NIGRO:  Objection.
6   A.   Correct.
7   Q.   If the lessor, NLS, has to ask for
8 proof of insurance and they don't do so, how can a
9 person have failed to provide it?
10      MS. NIGRO:  Objection.
11   A.   Well, I actually take back my -- I take
12 back my answer.
13     If the question was -- I am sorry.
14 What I had stated earlier is that the lessee is
15 provided with two options, that is still my
16 understanding.
17     If the lessee would like to provide --
18 the contract provides that the lessee shall
19 provide proof of insurance, but the same contract
20 also provides for another alternative.
21   Q.   Which has a condition precedent that
22 they don't provide proof of insurance?
23   A.   Right.
24      MS. NIGRO:  Objection.
25   Q.   My question to you is, according to the

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 121

SUSSMAN

1   contract that you're charged with enforcing or
2   enforcing NLS's rights for, when is the lessee
3   required to provide proof of insurance before they
4   agree to the loss damage waiver?
5       MS. NIGRO: Objection.
6       A.   I also object to the question because I
7   am not entrusted -- that isn't my responsibility,
8   but a lessee -- prior to being charged the loss
9   and damage waiver -- and I would require a careful
10  reading of this provision -- I am speculating now
11  because the lessor would be entitled to charge the
12  loss and damage waiver as long as proof of
13  insurance has not been provided.
14      Q.   As requested by the lessor?
15      A.   I don't know if that is what that
16  means.
17      Q.   It says that --
18      MS. NIGRO: Objection.
19      What is the relevance of this?
20      Q.   Here is my question to you,
21  Mr. Sussman. You're an attorney, right? You have
22  read this provision we have been talking about.
23  You're not quite sure what it means. Yes?
24      MS. NIGRO: Objection. The witness

Page 122

SUSSMAN

1   testified he didn't write this contract.
2       MR. ALTMAN: I don't care.
3       Q.   You're not quite sure what this
4   provision means, correct?
5       MS. NIGRO: Objection.
6       A.   At this very moment, no.
7       Q.   So an individual who is not a lawyer
8   even reading this is charged with a higher level
9   of understanding than you?
10      MS. NIGRO: Objection.
11      A.   Absolutely not.
12      Q.   Wouldn't you agree that the company
13  could have done a better job of making a lessee
14  aware of the need to provide proof of insurance
15  before subjecting themselves to a lost damage
16  waiver by putting that on the front page?
17      MS. NIGRO: Objection.
18      A.   I would say that this information is
19  readily available to any lessee.
20      Q.   You didn't answer my question.
21      Wouldn't you agree it would make the
22  term more clear if on the front page where it
23  talks about how much they are going to pay, it
24  specifically said, if you don't provide proof of

Page 123

SUSSMAN

1   insurance, you agree to the lost damage waiver?
2       MS. NIGRO: Objection.
3       A.   That would be clearer.
4       MS. NIGRO: Are you done questioning
5   things now in the Gagalouses matter? Can we
6   get back to Serin which is a matter pending in
7   the Eastern District.
8       Q.   Mr. Sussman, would you agree that if
9   Melinda Serin was charged for lost damage waivers
10  that really are not in accordance with the
11  contract, that those amounts should have been set
12  off against the amount of money you claim she did
13  owe?
14      MS. NIGRO: Objection. Hypothetical.
15      A.   I don't agree.
16      Q.   If she paid money -- I want to make
17  sure I understand.
18      If she said -- let's say 49.95 for lost
19  damage waivers that NLS was not entitled to
20  collect because there was some finding that they
21  weren't entitled to, that shouldn't have offset
22  what you claim she did owe?
23      MS. NIGRO: Objection.
24      A.   I stated earlier that if that was the

Page 124

SUSSMAN

1   case, that does not preclude me and it is not
2   inappropriate for me to assert a breach of
3   contract claim for lease payments.
4       Q.   That is not what I asked you.
5       I asked you, would it be appropriate to
6   offset the amount of money owed?
7       MS. NIGRO: Objection.
8       A.   And I am saying it wouldn't be
9   inappropriate because not that there is no
10  validity to the setoff, but that one thing doesn't
11  necessarily negate the other. So as an attorney
12  asserting claim for breach of contract, that is
13  what I should do.
14      MR. ALTMAN: I will mark this document
15  as Exhibit 111. This is Bates numbered NLS
16  00766 through -- the Bates numbers are cut
17  off.
18      MS. NIGRO: Really --
19      MR. ALTMAN: Your Bates numbers are off
20  the side.
21      MS. NIGRO: I doubt it.
22      MR. ALTMAN: You doubt it?
23      MS. NIGRO: The Bates numbers are put
24  on electronically while it is being scanned.

31 (Pages 121 to 124)

Page 125

SUSSMAN

1
2     MR. ALTMAN:  Off the record --
3     MS. NIGRO:  Put it all on the record.
4     MR. ALTMAN:  Do you see that --
5     MS. NIGRO:  How do I know that you have
6  not printed it out that way?  I don't know if
7  you read the complaints in this case, but it
8  doesn't have the same allegations that you're
9  claiming in Gagalouses.
10     MR. ALTMAN:  Here is a copy for you.
11     (Exhibit 111, Bates numbers NLS 00766
12     and continuing, marked for identification, as
13     of this date.)
14     Q.   I will not ask you details about
15  Exhibit 111.  All I want to know is, are these
16  generally screen printouts from the CCS system?
17     MS. NIGRO:  Objection.
18     You can answer.
19     A.   I don't believe so.
20     Q.   Do you know what system these are
21  screen printouts from?
22     A.   I think it is a legacy system called
23  Center Point.
24     Q.   Did you have access to the Center Point
25  system when it was in use?

Page 126

SUSSMAN

1
2     A.   I don't recall what access level we
3  had.  That is my answer.
4     Q.   Would you ever have gotten these
5  printouts in the normal course of reviewing a
6  claim?
7     A.   Not in the normal course, meaning on a
8  regular basis.
9     Q.   Had you ever seen these kinds of
10  printouts in any case you worked on?
11     A.   Sure.
12     Q.   Were these printouts the kind of thing
13  you might have requested?
14     A.   Yes.
15     Q.   That is all I want to know on that.
16     MR. ALTMAN:  We will mark this document
17     as Exhibit 112.  This is Bates number NLS
18     00710 which is entitled credit notification.
19     (Exhibit 112, Bates number NLS 00710
20     entitled credit notification, marked for
21     identification, as of this date.)
22     Q.   Have you ever seen this kind of a
23  document before?
24     A.   Yes.
25     Q.   Have you ever seen this particular

Page 127

SUSSMAN

1
2  document before?
3     A.   I don't know.
4     Q.   Is the amount of money that a vendor is
5  paid on a particular lease dependent on the credit
6  rating of the personal guarantor?
7     MS. NIGRO:  Objection.
8     A.   You asked me that question.
9     Q.   I don't remember the answer.
10     A.   It is one of the factors to my -- based
11  on my limited understanding of how that works.
12     MR. ALTMAN:  I will mark this document
13     as Exhibit 113 which is Bates numbered NLS
14     00709 which is a verification form.
15     (Exhibit 113, Bates number NLS 00709,
16     verification form, marked for identification,
17     as of this date.)
18     Q.   Have you ever seen something like
19  Exhibit 113 before?
20     A.   Yes.
21     Q.   Have you ever seen the exact copy,
22  Exhibit 113, which is the verification form in the
23  Melinda Serin matter?
24     A.   I don't recall, but I would think so.
25     Q.   Is that something that you would have

Page 128

SUSSMAN

1
2  routinely reviewed in your preparation for
3  deciding whether to file a case or not?
4     A.   I or my staff, yes.
5     Q.   Can you point to me anywhere on this
6  verification form for Melinda Serin where there is
7  any mention whether the equipment is insured or
8  asking for proof of insurance?
9     MS. NIGRO:  Objection.
10     A.   Is that a claim asserted in Serin?
11     Q.   I am asking the questions here.
12     Is there any mention on there?
13     MS. NIGRO:  Objection.
14     A.   I don't think so.
15     Q.   Do you have any understanding of what
16  the retail price of a Nurit 3010 terminal is?
17     A.   I have a limited understanding.
18     Q.   What is your limited understanding of
19  what the price of that piece of equipment is?
20     A.   Actually, I take that back.  It is a
21  limited understanding.  There are different
22  models.  I don' know those offhand.
23     Q.   Do you know whether, from Exhibit 112,
24  the vendor was paid $1439 for this lease, correct?
25     MS. NIGRO:  Objection.

32 (Pages 125 to 128)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 129

SUSSMAN

1        SUSSMAN
2        You can answer.
3    A.   It appears to be the case from this
4    document.
5    Q.   That is what was paid for a Nurit 3010
6    terminal, correct?
7    A.   Yes.
8    Q.   Do you have any understanding of
9    whether $1439.02 is higher than the retail price
10   of that piece of equipment?
11       MS. NIGRO:  Objection.  The witness
12       just testified he didn't really know what the
13       retail price of the equipment is.
14   A.   The retail -- my -- again, it is a
15   limited understanding, but the retail value -- the
16   retail value of the equipment is in the range of
17   the 1439.
18   Q.   Would it surprise you to know it is
19   more like about five or $600?
20       MS. NIGRO:  Objection.
21   A.   My understanding is that that is the
22   wholesale price.
23   Q.   You just said you didn't have an
24   understanding and when I asked you -- but now, all
25   of a sudden, you know that five or $600 is the

Page 130

SUSSMAN

1        SUSSMAN
2    wholesale price?
3    A.   I said I have a limited understanding.
4    I am only correcting a statement you made which is
5    that to my knowledge, and that is a limited
6    knowledge, the price that you mentioned is a
7    wholesale price.
8    Q.   Is it appropriate for NLS to be paying
9    above retail price to a vendor for pieces of
10   equipment?
11       MS. NIGRO:  Objection.
12   A.   I don't know how to answer that
13   question.
14   Q.   As a general proposition, does NLS ever
15   repossess equipment when it prosecutes a claim
16   against a delinquent lessee?
17   A.   By legal action, do you mean by legal
18   action, a re-po action?
19   Q.   Yes.
20   A.   No.
21   Q.   Why not?
22   A.   You need -- for a variety of reasons,
23   but we do -- when I say we, my office and Northern
24   Leasing at different stages, that is part of a
25   demand that is made for the return of the

Page 131

SUSSMAN

1        SUSSMAN
2    equipment, but I don't take legal action to
3    repossess the equipment.
4        The reason -- one of the reasons, it's
5    also not cost effective to do that.  You usually
6    need to do that in the local -- notwithstanding
7    the forum selection clause in the lease, I think
8    it would be required to initiate an action in the
9    guarantor or the lessee's jurisdiction to
10   repossess the equipment and that is expensive.
11   Q.   That might be considered something
12   related to a self help remedy, wouldn't it?
13       MS. NIGRO:  Objection.
14   A.   I am not sure I understand that.
15   Q.   Do you know what a self help remedy is?
16   A.   Yes.
17   Q.   It is where you can try to do something
18   to mitigate your damages, correct?
19       MS. NIGRO:  Objection.
20   A.   Repeat that.
21   Q.   That is something that you might do to
22   mitigate your damages is to repossess the
23   equipment, correct?
24   A.   Yes, but I don't think that we are in a
25   position to repossess the equipment without legal

Page 132

SUSSMAN

1        SUSSMAN
2    -- without an order.
3    Q.   By the way, the date of these documents
4    -- Exhibit 112 is dated August 17, 2001 and 113 is
5    September 7, 2001, correct?
6    A.   Are you asking about Exhibit 112?
7    Q.   Yes.
8    A.   Where is the date?
9        MS. NIGRO:  On the top.
10   A.   Okay, August 17, yes.
11   Q.   Could you pull Exhibit 110 for a
12   second?
13   A.   Yes.
14   Q.   Could you go to on page 549, number 12,
15   remedies.
16   A.   Okay.
17   Q.   If you start reading the first sentence
18   but you go to point B, it does say, if an event of
19   default shall occur as described in paragraph 11,
20   lessor may at its option at any time without
21   notice and B, without demand or legal process
22   enter into the premises where the equipment may be
23   found and take possession of and remove the
24   equipment or render it unusable without removal --
25   without liability for such retaking?

33 (Pages 129 to 132)

Page 133

SUSSMAN

1
2     A.   Okay.
3     Q.   According to lease terms, you don't
4  need a legal process, do you?
5        MS. NIGRO:  Objection.
6     A.   Okay.
7     Q.   Is that true?
8     A.   That is a valid proposition.
9     Q.   Why doesn't NLS ever do that?
10    A.   I think the answer -- I am speculating,
11 but as an attorney, if they were asking me for my
12 opinion on that, I think it still A, would be
13 expensive to do that and B, still difficult to
14 execute operationally and maybe for other risks
15 and liabilities that might be associated with
16 this.
17       MR. ALTMAN:  We will mark Bates 589 as
18    Exhibit 114 which is a general release.
19       (Exhibit 114, Bates 589, marked for
20    identification, as of this date.)
21    Q.   Have you ever seen this document
22 before?
23    A.   I believe I have.
24    Q.   Did you see this document before you
25 filed suit against Melinda Serin?

Page 134

SUSSMAN

1
2     A.   No, I don't believe so.
3     Q.   Did you review the files of NLS before
4  you filed suit against Melinda Serin?
5     A.   I or my staff would have reviewed the
6  file of Melinda Serin.
7     Q.   In June of 2003, besides yourself, who
8  was on your staff?
9     A.   June of the -- the date of this
10 release.  I don't remember.
11    Q.   There were no other attorneys at the
12 time?
13    A.   Correct.
14    Q.   Given this general release, was it
15 appropriate to file suit against Melinda Serin
16 subsequent to this?
17    A.   Yes.
18    Q.   What is the basis of the
19 appropriateness to file suit?
20    A.   My understanding is that Melinda Serin
21 settled her obligations with Northern Leasing
22 under a payment arrangement where she would be
23 making payment installments and subsequently
24 defaulted on that arrangement, but she had
25 received a release prior to completing the

Page 135

SUSSMAN

1
2  payments.
3     Q.   Where is that mentioned anywhere in
4  this release?
5     A.   I don't think it is.
6     Q.   We can agree there is no mention of any
7  such payment arrangements in this release,
8  correct?
9     A.   Let me just read it to be sure.
10       Correct.
11    Q.   It is not contingent on any payments,
12 correct?
13    A.   That is a legal question, as you know,
14 and I gave you my response.
15    Q.   Since it was not contingent upon any
16 payments, in what way was it appropriate to file a
17 lawsuit against Melinda Serin?
18       MS. NIGRO:  Objection.
19    A.   Disagree with that statement.  You say
20 that the general release is not contingent upon
21 payment.  I am saying that the general release was
22 obtained and negotiated in exchange of commitment
23 for payment.
24    Q.   But that is not noted anywhere in here?
25    A.   That is correct.

Page 136

SUSSMAN

1
2     Q.   What is your basis for saying that?
3     A.   Saying what?
4     Q.   That it was negotiated in exchange for
5  payment.
6     A.   My recollection of the file.
7     Q.   Is it documented anywhere?
8     A.   Yes.
9     Q.   Did you ever contact Melinda Serin
10 subsequent to this general release not contingent
11 on anything and say, you didn't meet the terms of
12 the general release?
13    A.   I don't believe I made such a statement
14 to her, a specific statement like that.
15    Q.   Did you produce the documents that show
16 that this general release was contingent upon
17 payment of certain moneys?
18    A.   Absolutely.
19    Q.   What is the Bates number of the
20 document?
21    A.   I don't know.
22    Q.   When you sued Melinda Serin, did you
23 note in the complaint that a general release had
24 been executed but the terms of which had not been
25 met?

34 (Pages 133 to 136)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 137

```
1              SUSSMAN
2      A.   No.
3      Q.   Why not?
4      A.   Because it was still the case that
5  there was a valid cause of action for a breach of
6  contract as if the release had not been issued
7  because a settlement agreement was -- had been
8  broken.
9      Q.   You didn't think it was important to
10 put that in the complaint to apprise the court
11 that a general release had been entered that you
12 believed was invalid?
13         MS. NIGRO:  Objection.
14     A.   Counsel, do you think that it is
15 appropriate?
16     Q.   I am not asking -- I am asking the
17 questions.
18         MS. NIGRO:  Boys, please.
19     A.   It is a rhetorical question, but I am
20 saying if you're asking me is it required?  The
21 answer is no, it is not required.
22     Q.   Are you familiar with the ethical
23 cannon that requires candor upon the court?
24         MS. NIGRO:  Are you?
25     A.   Yes.
```

Page 138

```
1              SUSSMAN
2      Q.   You don't think that it would have been
3  appropriate to inform the court in a lawsuit that
4  there was a release which you believed the terms
5  of which had not been met?
6          MS. NIGRO:  Objection.
7      A.   I think that it is entirely appropriate
8  to have filed a complaint with significantly less
9  information that is contained in the complaint
10 under the CPLR as you know.
11     Q.   So you intentionally decided not to
12 include mention of the general release in your
13 complaint?
14     A.   No, that is not correct.  I did not
15 intentionally do that.
16     Q.   Did you know about the general release
17 at the time you filed the complaint?
18     A.   I don't know what -- I don't recall
19 what I knew at the time that I initiated this
20 lawsuit.
21     Q.   Did you review the activity log for
22 this case before you filed the lawsuit?
23     A.   I don't recall the specifics of my
24 review of the file, but that is something that I
25 would review in connection with making a
```

Page 139

```
1              SUSSMAN
2  determination about whether to file suit.
3      Q.   If Melinda Serin had breached the terms
4  of the general release, you would have a breach of
5  contract claim against Melinda Serin for breaching
6  the terms of the general release, correct?
7          MS. NIGRO:  Objection.
8      A.   That is interesting argument and I
9  still -- I maintain that a breach of -- that it
10 falls back to the original position.  There is no
11 settlement, so then the breach of contract
12 remains.
13     Q.   Despite the fact there is a signed
14 agreement?
15         MS. NIGRO:  Objection.
16     A.   This is a general release.
17     Q.   Right.
18     A.   This general release was contingent
19 upon payments pursuant to a settlement agreement
20 between the parties.  That agreement was broken.
21     Q.   Do you have the settlement agreement in
22 writing?
23     A.   I don't believe -- I don't recall, but
24 to my knowledge, there is not a written agreement
25 between the parties setting forth the payment
```

Page 140

```
1              SUSSMAN
2  terms, but I could be wrong and possibly that
3  there is a document that sets forth the payment
4  plan.  I don't remember.
5      Q.   Getting back to my question, you
6  decided that this document was null and void when
7  you filed the lawsuit against Melinda Serin,
8  correct?
9      A.   I didn't say that and again, I don't
10 recall my specific review of this file.
11     Q.   Did you discuss the existence of a
12 general release with anybody at Northern Leasing?
13         MS. NIGRO:  Objection.
14     A.   Can you clarify the time frame?
15     Q.   Before you filed the lawsuit against
16 Melinda, did you have a conversation with anybody
17 at Northern Leasing concerning this general
18 release?
19     A.   I don't recall.
20     Q.   Do you have any notes on your review of
21 the Melinda Serin file?
22     A.   Not anything other than what has been
23 produced.
24     Q.   What concerning Melinda Serin is
25 contained within the privileged documents?
```

35 (Pages 137 to 140)

1              SUSSMAN
2         MS. NIGRO: Objection.
3     Q.   Are there any documents concerning
4  Melinda Serin or Melinda Serin's case in the
5  privileged documents?
6     A.   What is in -- privilege log -- what is
7  set forth in the privilege log, that is the
8  description that has been provided to counsel.
9     Q.   I am just asking if you have any
10 recollection of whether there are documents
11 concerning Melinda Serin in the documents that you
12 asserted privilege on.
13    A.   Yes.
14    Q.   I am curious.  You say you don't
15 remember anything -- you don't remember specific
16 details of Melinda Serin, but yet you remember or
17 you know that she didn't -- that this agreement
18 you claim was violated?
19         MS. NIGRO: Objection.
20         MR. ALTMAN: Strike that.  That was a
21    terrible question.
22         MS. NIGRO: You're just
23    mischaracterizing his testimony.
24    Q.   Before you filed the lawsuit, had you
25 analyzed this contract -- general release to see

1              SUSSMAN
2  if the terms had been satisfied?
3     A.   Did you ask me did I?  Did I do that?
4     Q.   Yes.
5     A.   I don't recall.
6     Q.   If it was in NLS's lease system, you
7  would have had access to it, correct?
8     A.   Correct.
9     Q.   Are you saying that the terms of the
10 general release weren't met based upon an
11 after-the-fact review of the Serin file or did you
12 know about it before you filed the lawsuit?
13         MS. NIGRO: Objection.
14    A.   I don't know.
15         I have knowledge about what I have
16 testified to regarding this case, but I don't -- I
17 can't sit here and tell you what I knew and what
18 specifically -- or I don't have a specific
19 recollection about the review of this particular
20 file prior to initiating the lawsuit.  That is the
21 best I can do.
22    Q.   Who is it that told you the terms of
23 this general release were not met?
24         MS. NIGRO: Objection.
25    A.   I don't remember if it was anybody or

1              SUSSMAN
2  if it was my own review together with a
3  conversation.  I don't remember.
4     Q.   You said the settlement agreement
5  wasn't in writing.
6         MS. NIGRO: Objection.
7     Q.   How would you know what the terms were?
8         MS. NIGRO: Objection.
9  Mischaracterizes his testimony.
10         MR. ALTMAN: Strike that.
11    Q.   I think you said before there was a
12 settlement agreement that in exchange for a
13 general release, Ms. Serin would pay some money?
14    A.   Correct.
15    Q.   I asked you was that settlement
16 agreement in writing and you said no, it wasn't?
17    A.   Correct -- not correct.
18         MS. NIGRO: I think he said it might
19    not have been in writing.
20    A.   I don't know and it is possible it is
21 in writing.
22    Q.   If it is writing, where is it?
23    A.   In documents that have been produced to
24 counsel, to you.
25    Q.   On a break, I will see if I can find

1              SUSSMAN
2  that quickly looking through your documents.
3         Was that settlement agreement signed by
4  Ms. Serin, by the way?
5     A.   No, I don't think so.
6     Q.   So a settlement that is not signed by
7  Ms. Serin you say is binding upon Ms. Serin?
8         MS. NIGRO: Objection.
9     Q.   Excuse me.  This is a general release.
10 This is binding on your client.  You don't need
11 both parties to sign a general release, correct?
12    A.   Correct, but that notwithstanding, a
13 general release is always -- if there is no
14 consideration, it is not binding.  The
15 consideration for the general release was
16 settlement payments, but you asked an earlier
17 question; that the settlement between Serin and
18 Northern Leasing, to the extent that it is in
19 writing -- I am sorry -- would have been produced.
20         MR. ALTMAN: We will mark Exhibit 115.
21         (Exhibit 115, Bates number 584, May 2,
22    2005 letter from Northern Leasing to Melinda
23    Serin, marked for identification, as of this
24    date.)
25         MR. ALTMAN: Exhibit 115, Bates number

36 (Pages 141 to 144)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 145

SUSSMAN

1
2  584, May 2, 2005 letter from Northern Leasing
3  to Melinda Serin.
4     Q.   Is that correct?
5     A.   Yes.
6     Q.   The first sentence is -- are you
7  familiar with the fair credit collection act?
8     A.   No.  I think it is -- I know what you
9  mean.  Fair credit reporting act?
10    Q.   No.  There are several different ones.
11    A.   The CRA?
12          MS. NIGRO:  Back up.  What was the
13    question?
14    Q.   Fair credit collection act, maybe that
15  is the wrong term, but there is an act that
16  defines the responsibilities of debt collectors,
17  right?
18    A.   Yes.
19    Q.   Are you familiar with that act?
20    A.   I have that understanding.
21    Q.   You collect debts?
22    A.   Correct.
23    Q.   It is important that you're familiar
24  with that statute, correct?
25    A.   Correct.

Page 146

SUSSMAN

1
2     Q.   The letter dated May 2, 2005, says
3  outstanding balance of $1,232.66?
4     A.   Yes.
5     Q.   That is a demand for payment, correct?
6     A.   Correct.
7     Q.   It says, the above account has been
8  referred to our office for collection of your
9  outstanding balance, correct?
10    A.   Correct.
11    Q.   Do you know what a validation clause
12  is?
13    A.   Can you tell me what it is?
14    Q.   Validation clause is language to the
15  effect telling an individual they have a right to
16  dispute the debt if they don't believe it is
17  accurate.  Are you familiar with that term?
18    A.   Tell me more.
19    Q.   Are you familiar with what a validation
20  clause is?
21    A.   I am.
22    Q.   Is there a validation clause in this
23  letter?
24    A.   Well, a validation clause that you were
25  referring to is under the FDCPA, fair debt

Page 147

SUSSMAN

1
2  collection practices act.
3          That requires that a validation notice
4  be set forth in a letter.  It does not pertain to
5  this particular account.
6     Q.   Why is that?
7     A.   Because it is not debt as it is defined
8  under the FDCPA.
9     Q.   The language says, this account has
10  been referred to this office for collection of
11  your, you, individual outstanding balance,
12  correct?  It is addressed to Melinda Serin.
13          MS. NIGRO:  It is addressed to -- the
14    document is addressed to Jim Cameron Garage
15    Doors, Melinda J. Serin.
16    Q.   It is your position that a validation
17  clause was not required in this letter; is that
18  your position?
19    A.   Correct.  Notwithstanding that, there
20  is -- there are statements in this letter inviting
21  the recipient to contact the lessor leasing to
22  discuss --
23    Q.   If they dispute the debt -- sorry.
24  There is no pending question.
25          MR. ALTMAN:  I will mark this document

Page 148

SUSSMAN

1
2  as 116, Bates number 592 through 596.
3          (Exhibit 116, Bates number 592 through
4    596, marked for identification, as of this
5    date.)
6     Q.   This is a letter from you to Melinda
7  Serin, correct?
8     A.   Correct.
9     Q.   The letterhead at the top says the Law
10  Offices of Joseph Sussman, correct?
11    A.   Correct.
12    Q.   By the way, the last letter, Exhibit
13  115, was Northern Leasing, correct?
14    A.   Correct.
15    Q.   Exhibit 116, that is addressed to
16  Melinda Serin, correct?
17    A.   Correct.
18    Q.   It is not addressed to Jim Cameron
19  Garage Doors?
20    A.   Correct.
21    Q.   Is there a validation clause anywhere
22  in this letter?
23    A.   No.
24    Q.   You signed this letter?
25    A.   Yes.

37 (Pages 145 to 148)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 149

SUSSMAN

1
2    Q.   You notice that it is dated May 17,
3    2005?
4    A.   Yes.
5    Q.   The letter before is May 2, 2005?
6    A.   Correct.
7    Q.   The letter before says the outstanding
8    balance is $1,238.60?
9    A.   Correct.
10   Q.   Your letter just 15 days later now has
11   the balance of $2,478?
12   A.   Correct.
13   Q.   Where did the other 1200 and some odd
14   dollars come from?
15   A.   The 2,478 represents the balance of
16   lease payments under the --
17   Q.   What was the $1,238.60 listed as the
18   outstanding balance.
19   A.   I can venture a guess, but that is --
20      MS. NIGRO:  Objection.  He is not the
21   author of this letter.
22   Q.   Before you filed suit, you would have
23   reviewed this letter, correct?
24   A.   Not necessarily.
25      MS. NIGRO:  You're talking about 115

Page 150

SUSSMAN

1
2    now?
3       MR. ALTMAN:  Yes.
4    A.   Not necessarily.
5    Q.   You wouldn't have reviewed a demand for
6    payment?
7    A.   Not necessarily.
8    Q.   You have no explanation of the
9    difference between the two amounts?
10   A.   I have, but it would be a guess.
11   Q.   What is your guess?
12      MS. NIGRO:  Objection.
13      You can answer.
14   A.   The number in Benita Burton's letter
15   represents the balance of payment under her
16   agreement on behalf of Northern Leasing that she
17   negotiated with Serin.
18      I don't know if that number is the
19   balance of settlement payments or the balance of
20   payments crediting her for payments made.  I don't
21   know at what juncture it was made, but it has
22   something to do with the fact that she had made an
23   agreement with Northern Leasing.
24   Q.   You were not aware of that amount?
25   A.   I was not aware of what amount?

Page 151

SUSSMAN

1
2    Q.   The 1238.
3    A.   I was not aware of that amount in what
4    context?
5    Q.   Well, I am still trying to understand
6    why 15 days after this letter was sent out, you
7    sent out a demand for 2,478.
8    A.   I explained I sent out a demand for the
9    balance of lease payments.
10   Q.   But I think you said that the 1238 --
11   your guess is that the 1238 was the amount of
12   money that Serin was supposed to pay for the
13   unconditional release?
14      MS. NIGRO:  Objection.  It was a guess.
15   It is a guess.
16   Q.   If that were the case, why isn't that
17   the amount of money that was owed?
18   A.   If that was the case, then why is that
19   the amount of money owed meaning in my complaint
20   -- my demand letter?
21   Q.   Right.  Why didn't you demand the same
22   $1,238?
23   A.   I demanded the amount of money owed
24   under the lease.
25      MR. ALTMAN:  We will mark this document

Page 152

SUSSMAN

1
2    marked as Exhibit 117.  It is Bates NLS 00552.
3       (Exhibit 117, Bates NLS 00552, marked
4    for identification, as of this date.)
5    Q.   This is a charge back request
6    terminating a lease.
7       MS. NIGRO:  It is a document entitled
8    charge back --
9       MR. ALTMAN:  Yeah, yeah.
10   Q.   Have you ever seen this document
11   before?
12   A.   I don't remember specifically.
13   Q.   You produced a number of documents in
14   this case; we talked about that earlier today.
15   A.   Correct.
16   Q.   Is it a fair assumption that everything
17   you produced to us you reviewed at some point in
18   time?
19   A.   Yes.
20      MR. ALTMAN:  We will mark as Exhibit
21   118, a document Bates stamped NLS 633 through
22   639 which are the activity logs for Melinda
23   Serin and the payment history for Melinda
24   which I combined into one exhibit.  It may
25   have existed as two separate documents.

38 (Pages 149 to 152)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 153

SUSSMAN

1
2        (Exhibit 118, document Bates stamped
3    NLS 633 through 639, marked for
4    identification, as of this date.)
5        Q.   You had access to this activity log,
6    correct?
7        A.   Correct.
8        Q.   You would have reviewed, if not a
9    printout of the activity log, the activity log
10   within the leasing system, correct?
11       A.   Correct.  It depends when the review
12   would have taken place.
13       Q.   Before the lawsuit was filed when you
14   did the review which was sometime in 2005, I
15   believe.
16       A.   Right.  So I or my staff would have
17   made a review of these comments, correct.
18       Q.   Do you see on Bates 635, on 6/23/2003,
19   it says -- 6/24/2003, it says mailed release to
20   PG, personal guarantor?
21       A.   Yes.
22       Q.   That is Melinda Serin?
23       A.   Yes.
24       Q.   You were aware that a release had been
25   sent to Melinda Serin before you filed lawsuit,

Page 154

SUSSMAN

1
2    correct?
3        A.   I can't answer that question.
4        I testified earlier that I don't -- I
5    can't testify to my -- to what -- to my review at
6    the time.  I don't remember.
7        Q.   Even if you had remembered, your
8    opinion was the release was invalid anyway?
9        MS. NIGRO:  Objection.  That wasn't his
10   testimony.
11       Q.   Is the release valid or not?
12       A.   The release is contingent upon payments
13   being made.  Those payments weren't made.  So it
14   falls back to the original rights of the parties
15   under the agreement.
16       Q.   You're staying the general release was
17   not valid?
18       A.   Not binding.  I don't know if there is
19   a difference in this terminology.  I am saying the
20   appropriate way to proceed to enforce rights of
21   the parties is to proceed under the lease, not
22   under -- under the lease and not the release.
23       MS. NIGRO:  Not the leaseback.
24       Sorry for the joke.
25       MR. ALTMAN:  That is okay.

Page 155

SUSSMAN

1
2        Q.   Would you go to the last two pages --
3        A.   The last.
4        Q.   The payment history.
5        MS. NIGRO:  638 and 639.
6        Q.   We have a column there for -- would you
7    have reviewed the payment history as part of your
8    review?
9        A.   Not necessarily.
10       Q.   The column that is other RES billed,
11   what is that?
12       A.   Well, I --
13       Q.   Is that the lost damage waivers?
14       A.   It looks like it, but I am not sure
15   what the words -- what it stands for.  The amount
16   looks like lost damage waivers.
17       Q.   The next page on 8/12/2002, there is a
18   property tax charge of $13.80, correct?
19       MS. NIGRO:  Where?
20       Q.   The last page, 8/12/2002, there is a
21   property tax charge of $13.80, correct?
22       A.   Yes.
23       Q.   There is a property tax fee of $20,
24   correct?
25       A.   Under the charge column.

Page 156

SUSSMAN

1
2        Q.   Under the charges column, Ms. Serin was
3    charged $20 for a property tax fee.  I don't know
4    if that is correct.  I don't know if she was
5    charged, if it was communicated to her, if an
6    attempt was made to collect it, but it appears
7    under the charges column?
8        MR. ALTMAN:  Let's take a break.
9        THE VIDEOGRAPHER:  The time is now 3:02
10   p.m.  We are off the record.
11       (Recess taken.)
12       THE VIDEOGRAPHER:  The time is now 3:18
13   p.m.  We are back on the record.
14       Q.   Who told you to file the lawsuit
15   against Melinda Serin?
16       A.   I don't think -- again, I don't
17   recollect very well the specifics of my review and
18   even how the accounts were forwarded, but in 2005,
19   I am guessing now though, the accounts -- we
20   printed out demand letters and complaints for
21   leases that were ready -- that were forwarded --
22   in other words, it wasn't -- I don't think it was
23   verbally communicated to me to go ahead and sue on
24   the Melinda Serin file, but I don't remember.
25       Q.   Were you aware before you filed the

39 (Pages 153 to 156)

1                SUSSMAN
2  lawsuit that there was a forgery claim, correct?
3        MS. NIGRO:  Objection.
4        You can answer.
5     A.   I don't remember what my knowledge was
6  of -- during the review or prior to initiating
7  lawsuit.
8     Q.   When did you become aware that there
9  was a forgery claim?
10    A.   I recall -- affirm -- I know that I was
11  aware of the date that she appeared in the civil
12  court for a pre-arb.  On that date or in the weeks
13  that ensued, I certainly would have become aware
14  of it.  I recall becoming aware of it is what I
15  mean to say.
16    Q.   How did you investigate Melinda Serin's
17  forgery claim?
18        MS. NIGRO:  Objection.
19    A.   I don't know if I investigated the
20  forgery claim the way I would have investigated it
21  prior to initiating the lawsuit.  It was in a
22  different context at that point.
23    Q.   Is it your testimony that prior to
24  filing the lawsuit, you had no idea that Melinda
25  Serin had claimed that the documents had been

1                SUSSMAN
2  forged?
3     A.   That is not my testimony.
4     Q.   Did you know or didn't you know?
5        MS. NIGRO:  Objection.
6     A.   I don't remember.
7     Q.   You don't have notes?
8     A.   I testified earlier that I used the CCS
9  system as a litigation management tool.  To the
10  extent that there were notes, it would have been
11  recorded in that system.
12    Q.   Is it a fair statement that any notes
13  within Melinda Serin's record was information you
14  knew at that point in time?  You may not remember
15  it now, but you knew at that point in time?
16        MS. NIGRO:  Objection.  You can answer.
17    A.   Can you just repeat it?
18    Q.   You would have read the entire activity
19  file that existed before filing lawsuit, correct?
20    A.   Not exactly that way.  I explained the
21  review process.
22        The review process does not entail
23  reading every single word on this printout; it
24  doesn't, but it would in all likelihood have
25  required a review of information contained in this

1                SUSSMAN
2  printout.
3        Do you understand what I mean?
4     Q.   How would you have decided what to have
5  reviewed in this document and what not to have
6  reviewed?
7     A.   I stated what the criteria -- some of
8  the general criteria are or is that I utilize in
9  reviewing a file.
10        A forgery claim is something that I
11  would have expected to have been brought to my
12  attention by my staff or if I am reviewing it, it
13  was something that I would note and look into
14  further.
15    Q.   Would the statement debit account for
16  final payment of 248.20 which settles account in
17  full be relevant?
18        MS. NIGRO:  Where are you?
19        MR. ALTMAN:  I am asking a general
20    proposition.
21        MS. NIGRO:  Now you're reading from the
22    document.  Where are you reading from?
23        MR. ALTMAN:  I am asking a general
24    proposition.
25        MS. NIGRO:  But tell me where -- why

1                SUSSMAN
2  not?
3        MR. ALTMAN:  I will.  Fine.  On 635.
4        MS. NIGRO:  Okay.
5     Q.   Is that something that would be
6  important when you reviewed an account?
7     A.   Yes.
8     Q.   Mailed release to PG; is that something
9  that would have been important?
10    A.   Absolutely.
11    Q.   Statements that she didn't sign the
12  lease, would that be important to your review or
13  that she says she didn't sign the lease?
14    A.   Yes.
15    Q.   I am not saying you would believe it,
16  but you would certainly review that information,
17  correct?
18    A.   Sure.
19    Q.   We are going to shift gears now and
20  talk about somebody sells.  Judson Russ, Rapid
21  Cash.  Tell me what you recall about the Rapid
22  Cash.
23    A.   I recall Judson Russ in a general
24  manner and some specifics, but if you continue, I
25  will be happy to tell you what I know and what I

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 161

SUSSMAN

1    SUSSMAN
2    remember and what I don't.
3        Q.   Did you review all the information that
4    Judson Russ filed before you filed the lawsuit
5    against Judson Russ?
6        A.   I don't think I reviewed all the
7    information.  I reviewed the information that I
8    thought was relevant for my review.  So yes, that
9    would have been something that would have been
10   reviewed prior to suing.
11       Q.   What information did you review in the
12   Judson Russ file before you filed a lawsuit?
13       A.   I don't remember specifically how that
14   review went.
15       Q.   I will hand you what has been marked as
16   Exhibit 119.
17           (Exhibit 119, Bates numbers 839 through
18   842, marked for identification, as of this
19   date.)
20           MR. ALTMAN:  Exhibit 119 is Bates
21   number 839 through 842.  This is the Northern
22   Leasing Systems for equipment file lease for
23   219169.  The only reason I am that specific is
24   because there is a number of leases associated
25   with Mr. Russ.

Page 162

1    SUSSMAN
2        Once again, I think we have an issue
3    that with this copy of the lease may have cut
4    some information off the bottom.
5        I am willing to stipulate that --
6        MS. NIGRO:  You're not going to ask him
7    any questions that would be affected by it?
8        MR. ALTMAN:  Yes.  There are better
9    copies of the lease.  This happens to be the
10   one that I got.
11       Q.   By the way, as a general proposition,
12   there is no spot, even though it is not here,
13   there is no spot in the page 1 of X for a
14   signature from a lessee, correct?
15       A.   Sorry.
16       Q.   Even though it is not here, the page 1
17   of 4 that you just mentioned, there isn't any line
18   or something next to it designed for a lessee to
19   initial that he has seen that page, correct?
20       A.   That he has seen --
21       Q.   That he has seen page 1, 2, 3 or 4 --
22       MR. ALTMAN:  Strike that.
23       Q.   Are you familiar that in some documents
24   that -- agreements that are multiple pages, space
25   is put at the bottom for the signer's initials

Page 163

1    SUSSMAN
2    demonstrating that they are aware that that page
3    existed?
4        A.   I am familiar with spaces on additional
5    pages for initials.
6        Q.   That is not done on your lease
7    agreement here, correct?
8        A.   No, it doesn't look like it.
9        Q.   It wouldn't be difficult to print a
10   line for an initial on the bottom of the lease?
11       A.   To print it?  No.
12       Q.   Would that have made it more clear that
13   an individual had seen all the pages if they had
14   initialed each page?
15       MS. NIGRO:  Objection.
16       A.   Can you repeat the question?
17       MS. NIGRO:  You're asking his personal
18   opinion.
19       Q.   As a lawyer, would it have been clearer
20   that a person had read each of the pages of the
21   lease if they had initialed somewhere on each of
22   the pages?
23       A.   If you mean to ask if each page would
24   have been initialed by the signer, would that be a
25   very good indication that he or she has read all

Page 164

1    SUSSMAN
2    the pages, the answer is yes.
3        Q.   Okay.  Is there some reason why
4    Northern Leasing has chosen not to?
5        MS. NIGRO:  Objection.
6        Q.   You're aware that many of the claims
7    against Northern Leasing are involved with the
8    fact that lessees are not aware that there is more
9    than one page to the lease, correct?
10       MS. NIGRO:  Objection.
11       A.   I am aware of Mr. Chittur's claim that
12   that is a claim of many lessees.
13       Q.   So independent of Mr. Chittur, you're
14   not aware of other individuals who have claimed
15   that they only saw one page of the lease?
16       A.   It is a very rare occurrence that that
17   claim has been made, other than clients of
18   Mr. Chittur.
19       Q.   When you say very rare, how rare?
20       A.   Very rare.
21       Q.   Do you know what the term fair market
22   value means?
23       MS. NIGRO:  Objection.  Relevance.
24       A.   I remember fair market value from law
25   school.  I don't know if I understood it well

41 (Pages 161 to 164)

Page 165

SUSSMAN

1   then.  I have a very limited understanding of what
2   -- if it is a legal term, but -- so I have some
3   understanding of it.
4       Q.   Do you have any understanding of the
5   tax implications of the difference between a lease
6   that is, let's say, a dollar buyout versus a fair
7   market value lease?
8       MS. NIGRO:  Objection.
9       A.   I know it has to do with depreciation
10  and things like that, but there is more.
11      Q.   We don't have to go into the same
12  detail we went into with Melinda Serin, but under
13  the scheduled payments, there is no mention here
14  of any tax filing fees?
15      A.   There is a reference to plus applicable
16  taxes on scheduled payments in bold.
17      Q.   But there is no reference to plus fees,
18  handling fees, tax preparation fees or any such
19  fee, correct?
20      MS. NIGRO:  That specific language, is
21  that your question?
22      A.   If I were signing the lease that stated
23  plus applicable taxes and I was concerned about
24  what that meant, I would inquire further.
25

Page 166

SUSSMAN

1       Q.   Taxes means fees to Northern Leasing?
2       MS. NIGRO:  Objection.
3       A.   Taxes means what taxes means.  I would
4   like to know what they mean by plus applicable
5   taxes.
6       Q.   Is a fee to Northern Leasing for filing
7   a form a tax?
8       MS. NIGRO:  Objection.
9       A.   Sorry.
10      Q.   Is a fee paid to Northern Leasing
11  solely for filing a tax -- for preparing a tax
12  form a tax?
13      MS. NIGRO:  Objection.
14      A.   I don't know.
15      Q.   You don't know if that is a tax?
16      A.   I don't know if a filing -- if a fee is
17  a tax?
18      Q.   No.  A fee that NLS charges customers
19  for filling out paperwork, is that a tax?
20      MS. NIGRO:  You're asking him for a
21  legal definition of a tax?
22      MR. ALTMAN:  Right.  He is a lawyer.
23      MS. NIGRO:  So am I and I don't know --
24      Q.   Is that a tax?
25

Page 167

SUSSMAN

1       MS. NIGRO:  Do you know one way or the
2   other?
3       A.   I don't know.
4       Q.   Is there any mention here on lost
5   damage waiver of insurance under scheduled
6   payments?
7       A.   Doesn't appear to be.
8       MR. ALTMAN:  I will hand you what we
9   will mark as Exhibit 120.  It is a Bates
10  number 849.
11      (Exhibit 120, Bates number 849, marked
12  for identification, as of this date.)
13      MR. ALTMAN:  I have spoken with
14  counsel.  There was some dialogue earlier
15  about me asking the witness about some
16  questions about how he has been paid and
17  defense counsel raised a privilege objection.
18      MS. NIGRO:  Among others.
19      MR. ALTMAN:  We have agreed that
20  without me having to ask every question that I
21  might ask to only have her object, that I have
22  sufficiently preserved the issue for further
23  follow up with the court if necessary.
24      MS. NIGRO:  That is true, but only to
25

Page 168

SUSSMAN

1   the extent it fits within the seven hours
2   allowed for this witness, so I would reserve
3   time if I were you.
4       MR. ALTMAN:  I don't know if I need to
5   do that.
6       MS. NIGRO:  No, you do.
7       MR. ALTMAN:  We will see.
8       MS. NIGRO:  You do.  I am only
9   preserving it to the extent that it falls
10  within the seven hours.  So you do in terms of
11  the stip.
12      MR. ALTMAN:  I will ask for more time.
13      MS. NIGRO:  You won't get it.
14      MR. ALTMAN:  We will see.
15      Q.   This is a verification form for Mr. --
16  for Rapid Cash, correct?
17      A.   Correct.
18      Q.   The piece of equipment is the IVI CTX
19  3000?
20      A.   Correct.
21      Q.   Do you have any understanding what the
22  retail cost of that piece of equipment is?
23      A.   No.
24      Q.   This verification form shows that Mr.
25

42 (Pages 165 to 168)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 169

SUSSMAN

1
2  Russ did not actually verify the lease, correct?
3        MS. NIGRO:  Objection.
4     A.   I don't know if there is enough
5  information here to affirmatively say that is
6  correct.
7     Q.   At the bottom do you see it says
8  verified lease with Daniel Magyari?
9     A.   Yes.
10    Q.   That is not Judson Russ?
11    A.   Correct.
12    Q.   This individual didn't speak to Judson
13 Russ, correct?
14       MS. NIGRO:  Objection.
15    A.   It is correct that this document does
16 not expressly refer to a conversation with Mr.
17 Russ.  That doesn't mean -- I don't know.  It is
18 possible that they spoke with Mr. Russ as well,
19 but this document shows that there was a
20 conversation with Mr. Magyari.
21    Q.   There is no conversation with Mr. Russ
22 reflected on this document, correct?
23    A.   Correct.
24    Q.   If I represented to you -- there are
25 four verification forms associated with Mr. Russ,

Page 170

SUSSMAN

1
2  correct?
3        MS. NIGRO:  Objection.
4        MR. ALTMAN:  Strike that.
5     Q.   There are four leases?
6     A.   Yes.
7     Q.   There would have been four verification
8  forms?
9     A.   Likely.
10    Q.   Do you have any reason to believe that
11 the verification is not the same for all four of
12 them?  I just don't want no mark every single one
13 of them.
14        Is it your understanding that the
15 verifications were all done with Mr. Magyari?
16    A.   I don't know.
17       MS. NIGRO:  You would have to show him.
18    Q.   By the way, going back to Exhibit 119
19 which is the lease, what is the date of Exhibit
20 119, the date the lease was signed?
21    A.   By Judson Russ or -- what is the date
22 on the lease?
23    Q.   What is the date on the lease that
24 is --
25    A.   3/26/01.

Page 171

SUSSMAN

1
2     Q.   Was this lease signed personally
3  directly by Judson Russ?
4     A.   I wouldn't know.
5     Q.   Are you aware that Mr. Russ claimed and
6  provided proof to Northern Leasing that he was not
7  in the country the day this lease was signed?
8        MS. NIGRO:  Objection.
9        You can answer.
10    A.   I am aware.
11    Q.   Do you have any reason to question,
12 based upon the proof you were provided, that Mr.
13 Russ was outside of the country?
14    A.   I have no -- do I have any reason to --
15    Q.   Do you have any basis for disputing
16 that his passport, visas and ATM receipts are
17 forged and not accurate?
18       MS. NIGRO:  Objection.
19    A.   I don't have -- I have never received
20 the original documents, so to --
21       MS. NIGRO:  For the record, we called
22    for his passports.  They were never produced.
23    We called for the machines and they were never
24    produced.
25       MR. STRUTINSKIY:  We notified you the

Page 172

SUSSMAN

1
2     passport is in our possession and you can
3     inspect it any time you wanted.
4        MS. NIGRO:  I never got that notice,
5     but I would like to schedule time to look at
6     it and the machines.
7     Q.   Is it your only basis that you haven't
8  seen the original passports?
9     A.   Continue.  Sorry.
10    Q.   Is your only basis for questioning
11 whether Mr. Russ was outside of the country that
12 you haven't seen the original passport?
13       MS. NIGRO:  Objection.
14    A.   No.
15    Q.   What other basis do you have for
16 believing he was not actually out of the country?
17    A.   Are you asking me for my opinion about
18 the validity of his claim?
19    Q.   I am asking you based upon -- I will
20 ask it again.
21       Based upon information presented to
22 Northern Leasing and to you, was Judson Russ
23 outside of the United States on March 26, 2001?
24       MS. NIGRO:  Objection.
25    A.   Time frame for that?

43 (Pages 169 to 172)

Page 173

SUSSMAN

1   SUSSMAN
2   Q.   On March 26, 2001.
3   A.   Today, what is my opinion based on the
4   information provided to me?
5   Q.   Yes.
6   A.   From his passport, it looked like he
7   was out of the country.
8   Q.   There was also a visa that showed he
9   was out of the country, right?
10          MS. NIGRO:  Show him the document.
11   A.   I don't remember.
12   Q.   Do you have any legitimate basis for
13   questioning his passport?
14          MS. NIGRO:  Objection.
15          MR. ALTMAN:  I can strike that.
16   Q.   Do you have any basis for believing his
17   passport is not --
18          MS. NIGRO:  Doctored?
19   Q.   -- his passport is not genuine?
20          MS. NIGRO:  Objection.
21   A.   I have a sense -- had a sense that Mr.
22   Russ was disingenuous about a lot of things
23   relating to this lease, so that goes together with
24   my answer to this question.
25   Q.   What basis do you have to say that Mr.

Page 174

SUSSMAN

1   SUSSMAN
2   Russ was in the United States on March 26, 2001?
3   A.   I don't know where Mr. Russ was or is.
4   Q.   What information would have been good
5   enough for NLS to convince NLS that Mr. Russ was
6   not in the United States on March 26, 2001?
7          MS. NIGRO:  Objection.
8   A.   I don't know and I don't know if that
9   is -- if that was the real issue in terms of
10   evaluating his purported claim.
11   Q.   One thing is correct, if Mr. Russ was
12   not in the United States, he didn't sign this
13   document, correct?
14          MS. NIGRO:  Hypothetical.  Objection.
15          MR. ALTMAN:  It is not hypothetical.
16          MS. NIGRO:  Yes, it is.  You said if.
17   A.   Mr. Russ could have signed an agreement
18   wherever he was.
19   Q.   This agreement was signed personally in
20   Florida, wasn't it?
21   A.   How do you know?
22   Q.   So you're saying now that the ISO was
23   in the Ukraine when -- was in the Ukraine when
24   this lease was signed?
25          MS. NIGRO:  Objection.  He clearly said

Page 175

SUSSMAN

1   SUSSMAN
2   he doesn't know.
3   A.   I didn't say that, but I don't know
4   today exactly where this lease was signed and I
5   don't know exactly where Mr. Russ was the date
6   this was signed.
7   Q.   Didn't you have an obligation to
8   ascertain that before you filed a lawsuit?
9          MS. NIGRO:  Objection.
10   A.   I don't agree with that statement.  I
11   have an obligation to make a -- to have a good
12   faith basis for asserting a claim.
13   Q.   What is your good faith basis for
14   asserting that Mr. Russ was in the United States
15   on March 26, 2001?
16          MS. NIGRO:  Objection.
17   A.   I didn't say that I am required to have
18   a good faith basis for that particular -- for that
19   fact.  I am saying that I expect of myself as an
20   attorney to have a good faith basis for asserting
21   a claim under this lease and guarantee, period.
22   Q.   So the fact that it is unlikely that
23   Mr. Russ actually signed the lease -- I will not
24   get into the issue of whether he authorized
25   anybody to sign the lease which is totally

Page 176

SUSSMAN

1   SUSSMAN
2   separate.  The fact that Mr. Russ did not himself
3   sign this lease is not anything you were concerned
4   about?
5          MS. NIGRO:  Objection.
6   A.   It is something that I would have been
7   concerned about, but I disagree with the
8   separation of the two issues.  It is directly
9   connected, the authorization, the authority of
10   someone to sign his name or lack thereof.
11   Q.   Shouldn't this have been signed if --
12   this is only -- and plaintiff is not conceding
13   this, Mr. Magyari was given authority; shouldn't
14   this have been signed Daniel Magyari and not
15   Judson Russ?
16          MS. NIGRO:  Objection.
17   A.   I don't know.  I tend to disagree with
18   that statement.
19   Q.   As a person who enforces rights based
20   upon leases, isn't it important for you to know
21   agency type concepts in terms of what somebody is
22   authorized to do and not do?
23          MS. NIGRO:  Objection.
24   Q.   As an agent.
25          MS. NIGRO:  Objection.

44 (Pages 173 to 176)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 177

SUSSMAN

1            SUSSMAN
2      A.   I don't know how to answer that
3  question.  It is important for me to know how to
4  do my job.
5            To the extent that those areas of law
6  are relevant, then it is important for me to be
7  aware of that, yes.
8      Q.   So my question to you is, if
9  Mr. Magyari was given authority, shouldn't
10  Mr. Magyari sign this lease in his name?
11          MS. NIGRO:  Objection.  Asked and
12      answered.
13     Q.   If that is who signed the lease.
14     A.   I understand your question.  I don't
15  agree that it is a -- that it is across the board
16  rule that way.
17          It is very often the case that there
18  are authorized signatories and there are a number
19  of ways of doing it.  You can authorize somebody
20  to sign your name or you can authorize -- Andrey
21  signs Chris's name.  He signs Chris's signature on
22  legal documents and then he writes KS or vice
23  versa.  I have seen it both ways and both are
24  appropriate.
25     Q.   There is an indication that the

Page 178

1            SUSSMAN
2  signature was not actually signed by the person
3  whose name is there, correct?
4      A.   There is an indication where?
5      Q.   The situation you just described where
6  Andrey might sign Mr. Chittur's name, there is
7  also an indication that Andrey is signing for
8  Mr. Chittur, isn't it?
9      A.   Yes.
10     Q.   It wouldn't be appropriate for Andrey
11  to sign Mr. Chittur's name and not indicate that
12  he was signing Mr. Chittur's name, correct?
13     A.   I disagree.  I don't know -- no.  I
14  mean, I think it would be entirely appropriate if
15  the authority was granted.
16     Q.   To sign without any indication that
17  somebody was signing on your behalf?
18     A.   Yes.
19     Q.   Nevertheless, this lease was dated
20  3/26/01, correct?
21     A.   Correct.
22     Q.   By the way, who was the ISO who brought
23  the contract to Mr. Russ?
24     A.   I don't know.
25     Q.   Go to the fourth page of the lease.  It

Page 179

SUSSMAN

1            SUSSMAN
2  is MSI Orlando, Inc., isn't it?
3          MS. NIGRO:  The dealer's bill of sale?
4          MR. ALTMAN:  Yes.
5      A.   Yes.
6      Q.   It is also dated 3/26/01?
7      A.   Yes.
8      Q.   MSI Orlando, do you know if they have
9  an office in the Ukraine?
10     A.   I don't know.  Maybe Mr. Russ would
11  know.
12     Q.   Who is responsible for knowing about
13  your ISO's?
14          MS. NIGRO:  Objection.
15     Q.   Knowing details of the ISO's; who
16  Northern Leasing does business with.
17     A.   A number of people.
18     Q.   Who?
19     A.   My understanding, Sara Krieger, for
20  example, would have knowledge about ISO's.
21          MR. ALTMAN:  Exhibit 121 is Bates
22      number 896.
23          (Exhibit 121, Bates number 896, marked
24      for identification, as of this date.)
25     Q.   This is a document dated March 30,

Page 180

1            SUSSMAN
2  2001?
3      A.   Correct.
4      Q.   Have you ever seen this document
5  before?
6      A.   I believe I have.
7      Q.   This is a document purportedly
8  giving -- Mr. Magyari is authorized to make any
9  and all confirmations of service for Scan Check
10  per the signed agreement that I have submitted for
11  services.  Please forward any questions that might
12  pertain to this agreement to Mr. Magyari.
13          Did I read that correctly?
14     A.   Yes.
15     Q.   What is Scan Check; do you know?
16     A.   Not exactly.
17     Q.   Do you have any understanding what it
18  is?
19     A.   I have my -- I think it is a -- I am
20  guessing.  I think it is a service for a check
21  verification service but relating to
22  check verification processing, account, equipment.
23     Q.   What is the basis of that knowledge?
24     A.   My work for Northern Leasing.
25     Q.   Who provides that service?

New York              Hudson Reporting & Video              New Jersey
212-273-9911          Nationwide 800-310-1769          732-906-2078

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 181

1           SUSSMAN
2     A.   Who provide the service in this
3   particular case; is that the question?
4     Q.   I don't even know what Scan Check is
5   because that is the only reference to Scan Check
6   that I can see anywhere.  I am trying to
7   understand what it is and who sells it.
8     A.   From this document, I don't know -- I
9   would imagine a variety of vendors sell services
10  -- there are probably a number of service
11  providers providing services for check
12  verification.
13    Q.   The lease is dated 3/26/2001?
14        MS. NIGRO:  Referring to Exhibit 119?
15        MR. ALTMAN:  Yes.
16    A.   Yes.
17    Q.   What is date of this document?
18    A.   3/30/2001.
19    Q.   That is after this lease was signed,
20  isn't it?
21    A.   Yes.
22    Q.   Did you ever realize that before today?
23    A.   I don't know.
24    Q.   Doesn't that raise a question of
25  whether Mr. Magyari actually had the authority he

Page 182

1           SUSSMAN
2   claimed to have at the time that the lease was
3   signed?
4        MS. NIGRO:  Objection.
5     A.   It could raise a question.  I could see
6   it also -- but it is certainly not a
7   contradiction.  It is not -- it could support the
8   same -- it could support it the same way.
9     Q.   If Mr. Magyari had the authority on
10  March 30, okay, how does that support a document
11  signed on March 26?
12    A.   Mr. Magyari had the authority on the
13  30th in connection with this Scan Check servicing
14  and presumably, the point of that authority was to
15  facilitate these transactions.
16    Q.   How could he have had the authority to
17  sign it on the date of lease if the authority was
18  granted after the date of lease?
19    A.   This document tells me, if anything,
20  that Mr. Magyari would have had the authority to
21  execute the document on behalf of Mr. Russ.
22    Q.   Did he have it on March 26, 2001?
23        MS. NIGRO:  Objection.
24    A.   I believe he did.
25    Q.   What is your basis for that belief --

Page 183

1           SUSSMAN
2     A.   This document --
3     Q.   Dated March 30, 2001?
4     A.   -- is a basis for that belief.  I am
5   referring to 121.
6     Q.   A document dated after another document
7   that was signed?
8     A.   Correct.
9     Q.   Can you explain to me how that
10  demonstrates that on March 26, four days before
11  this document was signed, Mr. Magyari had the
12  authority?
13        MS. NIGRO:  Objection.
14    A.   I did already.
15    Q.   I don't understand it.  Could you
16  explain it again?  I must be a little slow.
17    A.   This document, and I am referring to
18  Exhibit 121, is a letter from Judson Russ
19  authorizing Daniel Magyari to make confirmations
20  in connection with Scan Check services.
21        Scan Check services, my understanding
22  is that is referring to the IVI CTX 3000 equipment
23  and related services associated with that
24  equipment and the fact that it is dated on that
25  date, the fact that this authorization is so close

Page 184

1           SUSSMAN
2   to the lease tells me they certainly were
3   connected.
4        The point of this document is to
5   facilitate the -- facilitate the completion of
6   these transactions so that these check cashing
7   stores can get the services they wanted.
8     Q.   This document was not signed on March
9   26, 2001?  I am referring to Exhibit 121.
10  Correct?
11        MS. NIGRO:  Objection.
12        You can answer.
13    A.   The document speaks for itself.
14    Q.   Answer my question, please.  It was not
15  signed on March 26, 2001, correct?
16    A.   I don't know.
17        MS. NIGRO:  How does he know that?
18    Q.   It is dated March 30, 2001?
19    A.   Correct.
20    Q.   It has two faxes on it, both dated
21  3/30/2001?
22    A.   Correct.
23    Q.   One is from area code 407.  That is in
24  the Orlando area, correct?
25    A.   I don't know.

Page 185

SUSSMAN

1            SUSSMAN
2      Q.   I will represent to you that it is.
3           MS. NIGRO:  I believe you.
4      Q.   Area code 847, that is the Chicago
5  suburbs.  Is either one of those from the Ukraine?
6      A.   I don't believe so.
7      Q.   Do you see anything on this document
8  that would suggest it was faxed or transmitted in
9  any way from the Ukraine?
10     A.   I can't answer that question.
11          Counsel, you have represented that
12 these area codes, Orlando and Chicago suburbs,
13 that might be the case.  I don't know how a fax
14 transmitted from the Ukraine would be
15 transmitted -- the technology in transmitting the
16 fax, but I am sure there is a variety of ways that
17 faxes can get transmitted.  I don't know how those
18 numbers would be displayed.
19     Q.   Is there anything on this document
20 suggestive that this document was faxed from the
21 Ukraine?
22          MS. NIGRO:  Objection.
23     A.   Affirmatively suggesting that?
24     Q.   Yes.
25     A.   No.

Page 186

1            SUSSMAN
2      Q.   In what capacity does this letter
3  suggest Mr. Magyari has the authority to act?
4      A.   Can you be a little more specific?
5      Q.   Does this letter allow Mr. Magyari to
6  subject Mr. Russ to personal obligations?
7      A.   It doesn't appear to.
8      Q.   If Mr. Magyari signed Mr. Russ's name
9  to the personal guarantee, he wasn't authorized to
10 do so, was he?
11     A.   From this agreement here?
12     Q.   Yes.
13     A.   I don't think so.
14     Q.   Then if Mr. Russ did not sign the
15 document because he was in the Ukraine as his
16 passport demonstrates, then is there any evidence
17 that any other individual had the authority to
18 bind Mr. Russ personally to anything in respect to
19 any of these -- this transaction?
20          MS. NIGRO:  Objection.
21          You can answer.
22     A.   My recollection of the file is that Mr.
23 Russ was fully aware or -- Mr. Russ was aware -- I
24 don't know if I would say -- was aware of these
25 transactions and ratified them; was interested in

Page 187

1            SUSSMAN
2  keeping the leases; wasn't objecting to it.
3           There were points where that was
4  indicated -- that was indicated in the file.
5      Q.   That wasn't my question.
6           My question is, is there any document
7  -- if Mr. Russ didn't sign this document, is there
8  any document that purportedly authorizes someone
9  to sign and bind Mr. Russ personally to any
10 obligations?
11     A.   The verification form, for example,
12 would be one.
13     Q.   Which was verified by Mr. Magyari?
14          MS. NIGRO:  Objection.
15          You can answer.
16     A.   Correct.
17     Q.   And that shows that Mr. -- somebody had
18 the authority to bind Mr. Russ personally?
19     A.   If you're asking if that provides
20 authority, if that is sufficient authority to bind
21 Mr. Russ, my reason is it could.
22     Q.   Can we agree that Mr. Russ was not
23 spoken to on the verifications?
24     A.   I am not ready to agree to that.  I
25 stated earlier that from the verification form,

Page 188

1            SUSSMAN
2  there is no indication that he participated in the
3  verification process.
4      Q.   I personally have seen Northern Leasing
5  Systems -- one of their affiliates' lease data
6  base and its comprehensiveness and their data.
7           Would you agree that Northern Leasing
8  is comprehensive in the kind of information that
9  it maintains associated with a lease?
10          MS. NIGRO:  Objection.
11          He doesn't know what you're referring
12 to -- he doesn't know what you have seen.
13     A.   I also don't know what you mean; part
14 of the rhyme.
15     Q.   NLS data base is a pretty extensive
16 data base?
17     A.   Correct.
18     Q.   It contains a lot of information about
19 a lease?
20     A.   Correct.
21     Q.   Pretty much you would never have to go
22 anywhere else, at least in the last seven, eight
23 years, to look for information about a lease,
24 correct?
25     A.   Incorrect.

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 189

SUSSMAN

1
2    Q.   What would you not find in the NLS
3 system?
4    A.   There is additional information.
5        There is another -- there are other
6 software programs.  I think I mentioned one.
7 There is another one called Lapse.  That contains
8 other information.
9    Q.   What does Lapse contain?
10    A.   Information about the originations
11 process of the lease.  It is sort of a -- I don't
12 know enough about how the systems work, but I know
13 there is information contained.
14    Q.   Is Lapse currently being used or is
15 that a legacy system?
16    A.   It is currently being used.
17        MS. NIGRO:  What is a legacy system?
18        MR. ALTMAN:  He knows it.
19        MS. NIGRO:  Sorry.
20    Q.   Is a legacy system a system that was in
21 use at one time and is no longer being used?
22    A.   Right.
23    Q.   Is Lapse still being used?
24        MS. NIGRO:  It is a nicer word than
25 retired.

Page 190

SUSSMAN

1
2    A.   Yes.
3    Q.   What other data bases are currently in
4 use at Northern Leasing?
5    A.   No.  That is the one that I know of.
6    Q.   You still take the position that you're
7 unsure as to whether Mr. Russ actually verified
8 these leases?
9    A.   I am saying that to this day, my review
10 of the file and having seen Mr. Russ, having seen
11 his statements together with his -- with
12 information in the file, I don't believe that what
13 he is saying is true in all respects.
14        I believe that he knew about these
15 leases.  I believe he authorized Magyari to sign
16 for the -- sign his leases -- if he didn't sign it
17 himself, then he authorized him to sign these
18 agreements.  I think he wanted to enter into these
19 agreements for his company.
20        So I don't -- I certainly don't know
21 everything about this, but there is certain
22 information that tells me that not everything he
23 is saying is so.
24    Q.   That doesn't answer my question.
25        My question was, do you have any

Page 191

SUSSMAN

1
2 realistic basis for claiming that Mr. Russ
3 actually received -- actually verified these
4 leases and not Mr. Magyari?
5        MS. NIGRO:  Objection.
6        You can answer.
7    A.   No.  From the verification form, I
8 stated earlier there is no indication that Mr.
9 Russ participated in the verification process.
10    Q.   Or for all four of them, correct?
11        MS. NIGRO:  Objection.
12    Q.   Do I need to show you all of them?
13    A.   To the extent that they are identical,
14 then my answer is the same.
15    Q.   How is it that verification by
16 somebody else is a validation of whoever signed
17 the personal guarantee section of the leases that
18 Mr. Russ granted that person the authority to do
19 so?
20    A.   Again, if you're asking me for the
21 basis of my opinion today about why or why -- why
22 or why not Mr. Russ would be liable under this
23 lease, if that is what you're asking me --
24    Q.   Let's take today.
25    A.   Today, then the verification form which

Page 192

SUSSMAN

1
2 indicates that there was a verification process
3 between Northern Leasing and Mr. Russ tells me
4 that the issue about the authority of Mr. Magyari,
5 to the -- with Mr. Russ in connection with these
6 agreements was an issue that was present at the
7 time of the origination of the lease, and it was
8 brought to their attention, and based on my
9 understanding of Northern Leasing's interests and
10 policies and procedures, that tells me that they
11 were comfortable funding this lease and not --
12 instead of entering into an awful deal where they
13 will end up losing money because the signatories
14 weren't authorized.
15        MR. ALTMAN:  Read back the question.
16        (Record read.)
17        MR. ALTMAN:  Objection.  Not
18 responsive.
19    Q.   At the time that you were filing a
20 lawsuit against Mr. Russ -- we will get to it -- I
21 will represent you are the individual that sent
22 the letter to Mr. Russ at the time -- what did you
23 do to conclude that the personal guarantee was
24 valid?
25    A.   I don't remember.

Page 193

SUSSMAN

1
2    Q.   Did you keep any notes of what you did
3  to verify the personal guarantee?
4    A.   I stated earlier that to the extent
5  that a note was made, it could have been stored in
6  the CCS system.  I would have generated a comment.
7    Q.   You're aware that Mr. Russ was out of
8  the country essentially from long before this
9  lease till more than a year after this lease was
10 signed, correct?
11       MS. NIGRO:  Objection.
12    A.   I am not -- I don't understand exactly
13 where he was; how he was running his companies; he
14 was present or -- to this day, I don't understand
15 how that works.
16    Q.   Do you have any basis to suspect that
17 he spent an extensive amount of time in the United
18 States during that time period?
19    A.   Yes.
20    Q.   What is your --
21    A.   My recollection is that he was in and
22 out.
23       From the documents provided, it was
24 hard for me to determine when he was in and when
25 he was out, but it looked to me like he had

Page 194

SUSSMAN

1
2  traveled to and from a few times.
3    Q.   A few times.
4       Do you know how much time he spent in
5  the United States in that time period?
6    A.   No.
7    Q.   Was it more than a few weeks?
8    A.   I don't know.
9    Q.   If it was a few weeks out of some 15
10 months, would you consider that an extensive
11 amount of time in the United States?
12       MS. NIGRO:  Objection.
13    A.   I don't even know what extensive means.
14       Whether he was here or there, I am just
15 saying there seems to be a some confusion as to
16 how he was managing his operations when he was --
17 if he was not present and yet there is indications
18 that he certainly was managing his operations, his
19 stores.  So how that information all fit together
20 is not entirely clear to me today.
21       MR. ALTMAN:  We will mark this document
22    as Exhibit 122, Bates number 879.
23       (Exhibit 122, Bates number 879, marked
24    for identification, as of this date.)
25    Q.   This is a letter dated March 29, 2001.

Page 195

SUSSMAN

1
2  This is a credit notification for Mr. Russ,
3  correct?
4    A.   Yes.
5    Q.   On one of the four leases, correct?
6    A.   I guess so.  I can't exactly tell but
7  it sounds right.
8    Q.   It shows that the vendor was paid
9  $2,034.48, correct, for this lease?
10    A.   I don't think this document shows he
11 was paid.  This was an application or -- but that
12 is the amount of funding sought by the vendor.
13    Q.   Sought.
14       It says, dear vendor, the application
15 you have submitted for the above referenced lessee
16 has been approved as follows, funding amount.
17       That is from NLS to the vendor?
18    A.   Yes.
19    Q.   So that is what Northern Leasing
20 intends to pay the vendor?
21    A.   Yes.
22    Q.   That is not subject to further
23 negotiation, right?
24       MS. NIGRO:  Objection.
25    A.   Correct.

Page 196

SUSSMAN

1
2       (Exhibit 123, Bates number 853, marked
3    for identification, as of this date.)
4    Q.   In fact, Exhibit 123, Bates number 853,
5  which is a Center Point check request shows a
6  check request to be sent to MSI Orlando for
7  $2034.48?
8    A.   Yes.
9    Q.   This is one of the leases?
10    A.   Yes.
11       MR. ALTMAN:  I will mark this as
12    Exhibit 124.
13       (Exhibit 124, Bates number 876 and 851,
14    marked for identification, as of this date.)
15       MR. ALTMAN:  Bates number 876 is
16    Exhibit 124.
17    Q.   I will hand this to you.  This is a
18 charge back request terminating a lease, correct?
19    A.   Correct.
20    Q.   Dated 9/11/02, correct?
21    A.   Yes.
22    Q.   This demonstrates that there is -- this
23 is a document where you were seeking to recover
24 money from the ISO, correct?
25       MS. NIGRO:  Objection.

49 (Pages 193 to 196)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 197

1              SUSSMAN
2       You mean Northern Leasing?
3          MR. ALTMAN: Yes.
4       A.   Also, I don't agree -- I disagree. The
5    document is a form that would be utilized by
6    Northern Leasing to seek a charge back, but it is
7    not clear from the document alone what action was
8    taken -- was ought to be taken.
9       Q.   I didn't ask that.
10        I am asking, this is the kind of form
11   that NLS uses when it wants to get money back from
12   a vendor?
13      A.   In connection with that effort, yes.
14      Q.   It says fraud here, correct?
15      A.   It says that, yes.
16      Q.   There is no question that by 9/11/2002,
17   NLS was aware that Mr. Russ claimed there is some
18   kind of fraudulent activity associated with his
19   leases?
20        MS. NIGRO: Objection.
21      A.   I tend to share that assumption, but I
22   don't have all the information in front of me to
23   make that determination, but it is a fair
24   assumption.
25      Q.   Will you accept my representation that

Page 198

1              SUSSMAN
2    this happened with all four of the leases?
3       A.   No.
4          MR. ALTMAN: Just to save an exhibit, I
5    will add a page to Exhibit 124.
6          MS. NIGRO: That is totally up to you.
7    It is your record.
8          MR. ALTMAN: Let's save a number. So
9    we are adding Bates 851 to Exhibit 124.
10      Q.   The second page of 124, this is a
11   charge back request form for another one of the
12   Russ leases, correct?
13      A.   Yes.
14      Q.   It has a different lease number at the
15   top?
16      A.   Correct.
17      Q.   It says substantively the same thing,
18   correct?
19      A.   Yes.
20      Q.   I don't have them here, but would you
21   have any expectation that the other two leases
22   would be any different?
23      A.   To the extent that -- I will say what I
24   said earlier. To the extent that the documents
25   contain the same information, then I would be

Page 199

1              SUSSMAN
2    happy to respond to questions that --
3       Q.   I wasn't going to ask you a question.
4          MR. ALTMAN: We will mark Exhibit 125,
5    Bates 989, I think -- the Bates number is cut
6    off.
7          (Exhibit 125, Bates 989, marked for
8    identification, as of this date.)
9          MR. ALTMAN: Off the record.
10        (Discussion off the record.)
11        MR. ALTMAN: I had a brief discussion
12   with counsel.
13        Where there are multiple copies of many
14   of the documents that have been used as
15   exhibits, some of which may be better copies
16   than others and that counsel for the parties
17   have agreed that another better copy of the
18   document that is the same as one that has been
19   marked can be used in its place for trial
20   purposes.
21        MS. NIGRO: To the extent that it is
22   authenticated and admissible and all that
23   other good stuff that goes with trial.
24      Q.   Exhibit 125. Do you see there is an
25   invoice service charge?

Page 200

1              SUSSMAN
2       A.   Yes.
3       Q.   Where does it say in the lease anything
4    about invoice service charges?
5       A.   I will refer you to 119.
6          If you look in the about-your-bank
7    section, right above the bolded capitalized
8    portion, almost right in the middle of that
9    section --
10      Q.   I see it. In the section
11   about-your-bank is where you put in that you're
12   going to charge if you invoice them.
13        That is fine. Thank you.
14        MR. ALTMAN: The next exhibit is
15   Exhibit 126, Bates number 1084 through 1085.
16        (Exhibit 126, Bates number 1084 through
17   1085, marked for identification, as of this
18   date.)
19      Q.   This is entitled affidavit of forgery.
20   Have you ever seen this document before?
21      A.   I believe I have.
22      Q.   On the 21st of August of 2002, Mr. Russ
23   signed an affidavit sent to him by Northern
24   Leasing Systems, correct? It has Northern Leasing
25   System at the top?

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 201

```
             SUSSMAN
1
2         MS. NIGRO:  Objection.
3     A.   Looks that way, yes.
4     Q.   On the second page of this, you
5  provided some signature information, correct?
6     A.   Mr. Russ?
7     Q.   Yes.
8     A.   Yes.  It looks like signature
9  specimens.
10        MR. ALTMAN:  We will mark Exhibit 127.
11  It is Bates number 850.
12        (Exhibit 127, Bates number 850, marked
13  for identification, as of this date.)
14     Q.   On 126, can we agree that he wrote down
15  the wrong date on point 2; that date is in error,
16  the lease date is 3/26/2001?
17        MS. NIGRO:  Objection.
18     A.   Yeah.  I don't have a -- I don't agree.
19     Q.   You think there are four other leases
20  from March 26, 2002?
21     A.   No, but I don't know what -- if he made
22  a mistake, then why he would have made -- it was a
23  mistake or -- I don't know.  The document has a
24  date on it.  If it was referring to -- what is
25  meant by that --
```

Page 202

```
             SUSSMAN
1
2     Q.   He has the right month?
3     A.   Yes.
4     Q.   He has the right year?
5     A.   Just -- the wrong year.
6     Q.   He has the right day?
7     A.   Correct.
8     Q.   He has the right month, correct?
9     A.   Correct.
10     Q.   He has the right lease numbers,
11  correct?
12     A.   I have to check them, but let's assume
13  he does.
14     Q.   The only thing that appears there to
15  be -- the year is incorrect?
16     A.   Correct.
17     Q.   Are there four other leases that Mr.
18  Russ signed in addition to the four that have been
19  the subject of the lawsuit?
20     A.   Not that I am aware of.  I am aware of
21  a situation where a similar mistake was made by
22  myself in connection with litigation papers by
23  Mr. Chittur where Mr. Chittur was not willing to
24  make a similar assumption.
25     Q.   This is not a lawyer who is doing this.
```

Page 203

```
             SUSSMAN
1
2  This is a private individual, correct?
3     A.   Correct.
4     Q.   This was not done in the context of
5  litigation, correct?
6     A.   I don't know.
7     Q.   Was a lawsuit filed against Mr. Russ at
8  the time of this affidavit?
9     A.   I don't think so, but --
10     Q.   I will represent to you the lawsuit was
11  filed after July 15, 2003.
12     A.   Okay.
13     Q.   So this was not done in connection with
14  a lawsuit?
15     A.   Correct.
16        MR. ALTMAN:  Now I will mark Exhibit
17  127, Bates number 850.
18        (Exhibit 127, Bates number 850, marked
19  for identification, as of this date.)
20     Q.   Have you seen this document before?
21     A.   I don't remember.
22     Q.   This is a letter purportedly from Mr.
23  Russ to Northern Leasing, correct?
24     A.   Correct.
25     Q.   This is where Mr. Russ is supplying you
```

Page 204

```
             SUSSMAN
1
2  the affidavit of forgery, correct?
3         MS. NIGRO:  Objection.
4         Supplying Northern Leasing?
5         MR. ALTMAN:  Northern Leasing.
6     A.   I have to read it.  The letter
7  references an affidavit of forgery that was
8  previously supplied.
9     Q.   All right.  We can move on.
10        At any time did anybody did you or
11  anybody at NLS complain to Mr. Russ that you
12  believed his passports were not genuine?
13        MS. NIGRO:  Objection.
14     A.   I don't know -- I think that that issue
15  was raised and discussed between counsel at
16  various points in the litigation.
17     Q.   When you say between counsel --
18     A.   Myself and Mr. Chittur's firm.
19     Q.   Was it reviewed before you filed suit
20  against Mr. Russ?
21     A.   I don't remember, as I stated earlier,
22  the review for this particular file; these
23  particular files.  I don't recall today.
24     Q.   If, in fact, it is true that Mr. Russ
25  was in the Ukraine as his passport indicates,
```

New York                Hudson Reporting & Video                New Jersey
212-273-9911          Nationwide 800-310-1769               732-906-2078

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 205

SUSSMAN

1        SUSSMAN
2  would you agree he didn't sign these leases
3  himself?
4        MS. NIGRO: Objection.
5     A.   I will say this. If I was -- I stated
6  earlier that I don't know the precise location of
7  where the lease was signed and where Mr. Russ was
8  when the lease was signed. I don't know. And I
9  don't remember what I thought at the time -- what
10  I was aware of, what I reviewed and what I thought
11  at the time prior to initiating the lawsuit.
12     Q.   In deciding to file a lawsuit, you have
13  to take a look at all the evidence, correct, that
14  you have; is that correct?
15     A.   No, not all the evidence but --
16     Q.   You take a look at a set of -- all was
17  the wrong term.
18          You look at a set of evidence before
19  deciding to file a lawsuit, correct?
20     A.   Information.
21     Q.   Information; is that correct?
22     A.   Yes.
23     Q.   Some of it is contradictory, correct?
24     A.   It could be on occasion.
25     Q.   Some of it requires that you make an

Page 206

SUSSMAN

1        SUSSMAN
2  assessment of how likely that information is to be
3  true; is that fair?
4     A.   For purposes of my responsibility as an
5  attorney, yes, that is part of -- that is
6  necessary to carry on my duty.
7     Q.   As you sit here today, is it likely
8  that Mr. Russ was outside of the United States at
9  the time he signed these leases?
10        MS. NIGRO: Objection.
11     A.   It is -- it appears to me -- and I
12  think it appeared to me when I became aware of the
13  information that he seemed to have traveled to the
14  Ukraine. That much is clear to me.
15          When, for how long, with who, for what
16  purpose, who was running his business and all of
17  that, is not clear to me.
18     Q.   Is it also likely that he himself did
19  not sign these leases?
20        MS. NIGRO: Objection.
21     Q.   If you put any alleged authority aside,
22  I am talking physically whether he himself put the
23  pen to the paper and signed the leases.
24        MS. NIGRO: Objection. Asked and
25  answered.

Page 207

SUSSMAN

1        SUSSMAN
2     A.   As I sit here today, the signature to
3  me looks similar. The signature on other
4  documents looks pretty similar. So that is -- if
5  you want that --
6     Q.   If it is likely that Mr. Russ was not
7  in the United States --
8        MS. NIGRO: Objection.
9        MR. ALTMAN: Hold on.
10     Q.   Is it likely that these leases were
11  signed in the United States?
12     A.   Typically, the leases are signed in the
13  United States.
14     Q.   Have you seen any evidence at all that
15  these leases were not signed in the United States?
16     A.   To the extent that Mr. Russ was in the
17  Ukraine at the time the leases were signed, that
18  is evidence that the leases may have been signed
19  in the Ukraine.
20     Q.   Aside from that, have you seen any
21  evidence at all that these leases were signed
22  outside of the United States?
23     A.   No, not to the my knowledge.
24        MS. NIGRO: Let's take a break.
25        THE VIDEOGRAPHER: The time is 4:32

Page 208

SUSSMAN

1        SUSSMAN
2  p.m. We are off the record.
3        (Recess taken.)
4        THE VIDEOGRAPHER: The time is now 4:52
5  p.m. We are back on record.
6        MR. ALTMAN: Mr. Sussman, this is
7  Exhibit 128, Bates number 892.
8        (Exhibit 128, Bates number 892, marked
9  for identification, as of this date.)
10     Q.   This is some information provided to
11  you by Mr. Russ. Have you ever seen that before?
12        MS. NIGRO: Objection.
13        You can answer.
14     A.   I don't think that is correct to say it
15  was provided to me.
16     Q.   It was provided to Northern Leasing,
17  correct?
18     A.   It appears to be so.
19     Q.   You represent Northern Leasing,
20  correct?
21     A.   Yes.
22     Q.   It would have been a document that you
23  would have reviewed in your representation of
24  Northern Leasing?
25     A.   Today I can say that I likely saw this

52 (Pages 205 to 208)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 209

SUSSMAN

1    SUSSMAN
2  document at some point in time, but I don't recall
3  when I saw it.
4        MR. ALTMAN:  Exhibit 129 is Bates
5  numbers 1207 through 1210.
6        (Exhibit 129, Bates numbers 1207
7    through 1210, marked for identification, as of
8    this date.)
9    Q.    Exhibit 129 is a letter dated July 15,
10  2003 signed by you, correct?
11  A.   Yes.
12  Q.    Is there any validation clause on that
13  letter?
14        MS. NIGRO:  Objection.
15        You can answer.
16  A.    To the extent that you're referring to
17  a validation clause required under the fair debt
18  collection practices act, this letter does not --
19  does not contain one, nor is one required.
20        MR. ALTMAN:  Objection.  Nonresponsive
21    to the portion after does not contain one.
22        MS. NIGRO:  Objection.  He is allowed
23    to give his full response.
24        MR. ALTMAN:  No, he is not.  He is
25    allowed to answer my question.

Page 210

1    SUSSMAN
2        MS. NIGRO:  He did.
3        MR. ALTMAN:  And then added more.
4        MS. NIGRO:  You don't mind when he adds
5    more to other questions when it is convenient
6    to you.
7        MR. ALTMAN:  That is my prerogative.
8    Q.    This document here, by the way, is a
9  letter that you sent on July 15, 2003 and --
10        MS. NIGRO:  Objection.
11        Is that a question?
12  Q.    -- on one of the leases, correct?
13  A.    Correct.  It is dated July 15, 2003.
14  Q.    Would you have sent the same letter out
15  for the other three leases?
16  A.    A similar letter, yes.
17  Q.    At this time you were aware that Mr.
18  Russ had claimed that the leases this been forged,
19  correct?
20        MS. NIGRO:  Objection.
21  A.    Not correct.  I stated that I don't
22  recall what -- I don't recall reviewing these four
23  leases today.  I don't recall it.
24  Q.    You would agree that Northern Leasing
25  certainly knew that Mr. Russ had signed an

Page 211

1    SUSSMAN
2  affidavit of forgery before these leases, correct?
3        MS. NIGRO:  Objection.
4        You can answer.
5    A.    Correct -- when you say Northern
6  Leasing, certainly there were individuals who
7  would have been aware.
8    Q.    That would be important for you to know
9  in preparing these complaints, correct?
10        MS. NIGRO:  Objection.
11  A.    Correct.
12  Q.    Would it have been appropriate for you
13  to comment upon the alleged forgeries in this
14  complaint?
15        MS. NIGRO:  Objection.
16  A.    Can you repeat it?
17  Q.    Would it have been appropriate in the
18  factual allegations of your complaint to have put
19  in any mention of the alleged forgery?
20  A.    For the purpose of asserting a breach
21  of contract cause of action, it is not required.
22        I stated earlier, a lesser statement --
23  less information is perfectly appropriate under
24  the CPLR and so my answer is that there is nothing
25  inappropriate about asserting a breach of contract

Page 212

1    SUSSMAN
2  claim.
3    Q.    On page 1209, point five says, pursuant
4  to the business described above on 4/2/201,
5  plaintiff entered into a non-cancelable lease
6  agreement with Rapid Cash; payment on which was
7  personally guaranteed by defendant.  Copy of the
8  agreement is attached as Exhibit A.
9    A.    Correct.
10  Q.    First of all, the lease was entered
11  into on 3/26/2001?
12        MS. NIGRO:  Objection.
13  A.    Not correct.
14  Q.    When was the lease signed?
15        MS. NIGRO:  Objection.  Asked and
16  answered.
17        Are you asking when it was dated?
18  Q.    The lease was signed by whomever,
19  whether it was Mr. Russ or otherwise, on 3/26/201,
20  correct?
21  A.    The lease is dated 3/26/01.
22  Q.    That is when it was signed, correct?
23  A.    The signature appearing on the lessee
24  acceptance portion and the personal guarantee
25  section of the lease contains a date of 3/26/01.

Page 213

SUSSMAN

1
2    Q.   That is not 4/2/2001?
3    A.   Correct.
4    Q.   So that is the wrong date?
5    A.   Incorrect.
6    Q.   What is that date?
7    A.   That date represents my understanding
8    that that is the date that Northern Leasing
9    accepted the lease and signed or executed the
10   lease or issued the funding.
11   Q.   The individual was bound on 3/26/2001
12   but Northern Leasing wasn't bound on 3/26/201?
13   A.   Incorrect.
14   Q.   What is the date, 3/26 or 4/2?
15   A.   The date of what?
16   Q.   That the lease was entered into.
17   A.   On 4/2/2001, the lease agreement was
18   reached retroactive to -- on 4/2 is the date that
19   Northern Leasing entered into the transaction.
20   Q.   But that is not what it says here.  It
21   says plaintiff -- sorry.  You're right.  Wrong
22   plaintiff.  Sorry.  But what is not true here is
23   that the payment was personally guaranteed by
24   defendant?
25   A.   That is your opinion.

Page 214

SUSSMAN

1
2    Q.   You said before that you saw no
3    authority that was granted to anyone allowing them
4    to sign as personal guarantor for Mr. Russ,
5    correct?
6    A.   Sorry.  Can you repeat?
7    Q.   You said before you saw no document
8    that Mr. Russ had given anyone else authority to
9    sign as personal guarantor on his behalf, correct?
10       MS. NIGRO:  Objection.
11   A.   I don't remember if I stated that.  I
12   think I did, but I would like to clarify that and
13   state that -- what I stated previously, that
14   there's indications in the file that these leases
15   were authorized and that a good faith basis to
16   pursue breach of contract claims are or is
17   present.
18   Q.   That is a different issue.  I asked
19   you, was the -- you said before it is likely that
20   Mr. Russ was out of the country.
21       MS. NIGRO:  That is not what he said
22       before.  That mischaracterizes his testimony.
23   Q.   Let's go through it again.
24       Is it likely that Mr. Russ was not in
25   the country on 3/26/2001?

Page 215

SUSSMAN

1
2    A.   I don't know.
3    Q.   You said before it was likely.  Now
4    you're changing it?
5        MS. NIGRO:  No.  Where did he say it
6        was likely?  Go back.
7    Q.   I asked you, based upon what we talked
8    about and you weigh all the information, and I
9    said based upon it, it was likely that Mr. Russ
10   was not in the country.  You said based upon what
11   I have seen, it was likely that Mr. Russ was not
12   in the country.  You want to change that?
13       MS. NIGRO:  Find it in the record,
14       where that is his testimony.
15       MR. ALTMAN:  I don't have to do that.
16       MS. NIGRO:  You're asking him to change
17       existing testimony.
18   Q.   I will ask the question again.
19       Is it likely that Mr. Russ was not in
20   the United States on March 26, 2001 based on all
21   the information you have seen?
22   A.   I don't know.
23   Q.   Now you don't know?
24       MS. NIGRO:  Excuse me.
25   A.   I didn't know before and I don't know

Page 216

SUSSMAN

1
2    now.
3        I think that in the context of the
4    question posed, my response was, based on this
5    information, it is likely, based on all the
6    information, but based on the information known to
7    me today, I don't know.
8        Based on the information known to me at
9    the time of the review, I don't recall.  So my
10   answer is I don't know.
11   Q.   Would it have been important for you to
12   figure that out before you filed a lawsuit?
13       MS. NIGRO:  Objection.
14   A.   It would be relevant.
15   Q.   But you didn't figure that out before
16   you filed the lawsuit, did you?
17       MS. NIGRO:  Objection.
18   A.   I don't remember.
19   Q.   You don't remember.  Okay.
20       As you sit here today, it is a true
21   statement that Mr. Russ personally guaranteed the
22   lease?
23       MS. NIGRO:  Objection.
24   A.   As I sit here today, I maintain that
25   there is a good faith basis for making this -- for

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 217

SUSSMAN

1          SUSSMAN
2  signing this complaint.
3       Q.   I didn't ask you that question whether
4  there was a good faith basis.
5          I asked you, as you sit here today, is
6  it your testimony that Mr. Russ personally
7  guaranteed the leases?
8          MS. NIGRO:  Objection.
9       A.   If you mean did Mr. Russ physically
10 take a pen and sign the lease agreement at issue,
11 I don't know.
12      Q.   You didn't tell the court you didn't
13 know that, did you, when you filed the complaint?
14 You put that in here as a factual allegation.
15         MS. NIGRO:  You asked the question
16 before as he sits here today.
17         MR. ALTMAN:  Never mind.  Withdrawn.
18         MS. NIGRO:  The question asked before
19 wasn't withdrawn.
20         MR. ALTMAN:  No.  That is fine.
21         MS. NIGRO:  Which was as he sits here
22 today.
23         MR. ALTMAN:  Okay.
24      Q.   I think I asked you this earlier.  What
25 information could Mr. Russ have provided to you --

Page 218

SUSSMAN

1          SUSSMAN
2          MS. NIGRO:  Objection.
3       Q.   -- to convince you that he was not in
4  the United States on March 26, 2001?
5          MS. NIGRO:  Objection.  I think you
6  mean to Northern Leasing.
7          MR. ALTMAN:  No.  To him before
8  deciding to file the lawsuit.
9          MS. NIGRO:  That Mr. Russ provide
10 things to him?  Okay, go ahead with that
11 question.
12      Q.   What information could he have provided
13 to you to convince you he was not in the country
14 on that day?
15      A.   A passport -- the information that was
16 provided would have been helpful.
17      Q.   So if he showed you a passport that
18 showed him outside of the United States and
19 entering the United States afterwards along with a
20 Visa, that should have been good enough, right?
21         MS. NIGRO:  Objection.
22      A.   It would have been good enough for
23 what?
24      Q.   For you to determine he wasn't in the
25 country.

Page 219

SUSSMAN

1          SUSSMAN
2       A.   Would have been helpful.
3       Q.   My question to you is, what would --
4  what you're saying then is that you can't tell me
5  what information somebody would need to provide to
6  you that they were not in the country; is that
7  what you're telling me?
8       A.   No.  I mean, I -- you're a trial
9  lawyer; I am not, but I would imagine there is all
10 sorts of evidence, eyewitnesses and documentary
11 evidence that would show where he was on a certain
12 date.  That is not the entire picture and issue
13 that we are discussing.
14         If you want me to answer the question,
15 the question is, it is helpful.  What would be
16 enough, I answered it.  It would be helpful.
17      Q.   Helpful --
18      A.   I don't know what would be enough.
19      Q.   Isn't it your job when you're assessing
20 whether you should file a lawsuit to make those
21 determinations?
22         MS. NIGRO:  Objection.
23      A.   No.
24      Q.   Is it your testimony that despite NLS
25 and presumably you having been provided with an

Page 220

SUSSMAN

1          SUSSMAN
2  affidavit of forgery along with passports that
3  showed he was not in the country, none of that
4  information was considered when you decided to
5  proceed with this lawsuit?
6          MS. NIGRO:  Objection.
7       A.   None -- if you're saying that the
8  information that we are looking at here that has
9  been produced and provided to Northern Leasing by
10 Mr. Russ would have been considered or should have
11 been considered, no, I don't agree with that.  It
12 would have been relevant to my consideration in
13 connection with my review of the file.
14         MR. ALTMAN:  This is Exhibit 130, Bates
15 1050 through 1056.
16         (Exhibit 130, Bates 1050 through 1056,
17 marked for identification, as of this date.)
18      Q.   This is a summons and complaint along
19 with, I believe, a judgment and an attorney
20 affirmation, correct?
21      A.   Well, yes.  It is a summons and a
22 complaint and an application for a default
23 judgment.
24      Q.   The affirmation --
25      A.   And an attorney affirmation.

55 (Pages 217 to 220)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 221

SUSSMAN

1
2    Q.   It is not signed, correct?
3    A.   Correct.
4    Q.   That may be just that there were
5  multiple copies of this and this is just one that
6  is not signed?
7    A.   Correct.
8    Q.   Did you, in fact, sign one of these?
9        MS. NIGRO:  Objection.
10   A.   Presumably in connection with an
11  application for a default judgment, I would have.
12   Q.   My question to you is, number 11, why
13  would you have waived attorneys fees?
14   A.   On the application for judgment?
15   Q.   Yes.
16   A.   I found that pursuing attorneys fees on
17  smaller dollar amounts was very time consuming and
18  sometimes too difficult a hurdle to pursue on
19  every occasion.
20       MR. ALTMAN:  This is Exhibit 131.  This
21       is Bates, I think, 992 through 996.
22       (Exhibit 131, Bates 992 through 996,
23       marked for identification, as of this date.)
24   Q.   Exhibit 131 is a -- I don't know
25  exactly what it is but it was ultimately found to

Page 222

SUSSMAN

1
2  be an answer by Mr. Russ, correct, to the
3  complaint of Northern Leasing?
4    A.   If I remember correctly, this was his
5  answer he submitted pro se in response to the
6  complaint.  I am not sure if there are four of
7  these or if he used one or all four.  It looks
8  like there are two index numbers on this answer,
9  but I don't know if that is -- I can't say.  It is
10  an answer to at least one of the complaints.
11   Q.   The date of this is the 26th of
12  September, 2003, correct?
13   A.   Where --
14   Q.   It was received by the civil court on
15  that date?
16   A.   Yes.
17   Q.   Why did you get a default judgment
18  against Mr. Russ when Mr. Russ answered?
19   A.   I don't remember -- is that correct,
20  that Northern Leasing obtained a default judgment
21  on all these cases?
22   Q.   At least on one of them we looked on.
23   A.   No.  That was just an application.  Was
24  a default actually entered?
25       MS. NIGRO:  We have no documents that

Page 223

SUSSMAN

1
2  say that.
3    A.   I don't remember.  It could be the
4  case.  I don't think we have seen it today.
5    Q.   You certainly signed in Exhibit 130
6  that -- you represent that the defendant had not
7  appeared or answered, correct?
8    A.   Correct.
9    Q.   It is not true though, is it?
10       MS. NIGRO:  Objection.
11   A.   It could be true.  This answer is dated
12  September 26, 2003.  Let's see when the time to
13  file the answer was --
14       MS. NIGRO:  The summons that you have
15       is Exhibit 130.
16   Q.   On page 1053 is your statement for
17  judgment, proof of default --
18   A.   No.  I am trying to figure out in
19  2004 -- I think in 2004 in the civil court, it was
20  served and then filed.  Give me a second.
21       The recital on the proposed judgment
22  states that service was completed on 9/2/03.  So
23  30 days after that is -- the answer was filed
24  within the time to answer, but -- and I don't
25  remember, but a likely explanation was that we --

Page 224

SUSSMAN

1
2  I wasn't provided with this answer in time.  I
3  wasn't aware that the answer had been filed.
4       MS. NIGRO:  Which file number are you
5       referring to?
6    Q.   This is dated May 26, 2004, isn't it?
7       MS. NIGRO:  What?
8    Q.   Look at page 1053.
9       MS. NIGRO:  Which is a statement.
10   Q.   The undersigned affirms this statement
11  to be true under the penalty of perjury?
12   A.   Correct.
13   Q.   That is way after --
14   A.   Correct, but I still would not have
15  been aware if a copy wasn't provided to me that a
16  answer was filed.
17       This is a common problem in civil court
18  particularly.  Pro se's may not serve a copy on
19  plaintiff.  We wouldn't be aware that the answer
20  has been filed.
21       MR. ALTMAN:  We will mark Exhibit 132,
22       Bates number 1076 through 1087, copies of Mr.
23       Russ's passport.
24       (Exhibit 132, Bates 1076 through 1087,
25       marked for identification, as of this date.)

56  (Pages 221 to 224)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 225

SUSSMAN

1
2     Q.   Have you ever seen this before?
3     A.   I don't know.
4          MS. NIGRO:  Is this supposed to be a
5     full copy of his passport?
6          MR. ALTMAN:  These are the pages out of
7     NLS's files.
8          MS. NIGRO:  Your client provided it to
9     NLS, so where is the rest of the passport?
10         MR. ALTMAN:  I don't know.  I don't
11    know that he was required to produce every
12    page in his passport.
13         MS. NIGRO:  I am just asking.  Saying
14    something is incomplete in our file might mean
15    that your guy didn't give it to us.  So I am
16    just asking.
17         MR. ALTMAN:  Exhibit 133, we will mark
18    now, is Bates number 1039 through 1047.
19         (Exhibit 133, Bates 1039 through 1047,
20    marked for identification, as of this date.)
21    Q.   Have you seen this document before?
22    A.   Yes.
23    Q.   This is a letter to Mr. Russ offering
24    to enter into a mutual settlement agreement
25    concerning the leases, correct?

Page 226

SUSSMAN

1
2     A.   Yes.
3     Q.   This document was signed by Northern
4     Leasing but it was not ever executed by Mr. Russ?
5          MS. NIGRO:  Objection.
6     A.   The agreement of mutual release?
7     Q.   Yes.
8     A.   I haven't seen an executed agreement.
9     Q.   The copy that is here is not executed?
10    A.   Correct.
11    Q.   You have never seen an executed
12    agreement?
13    A.   Correct.
14    Q.   There are stipulations of
15    discontinuance attached as part of this?
16    A.   Correct.
17    Q.   Those would have your signature on
18    them, correct?
19    A.   Correct.
20    Q.   They would have been signed by Mr.
21    Russ?
22    A.   Correct.
23    Q.   When you have a stipulation of
24    discontinuance, that typically requires the
25    signature of both parties?

Page 227

SUSSMAN

1
2     A.   Sure.
3     Q.   Otherwise, it is not a stipulation,
4     correct?
5     A.   Correct.
6     Q.   Significant motion practice took place
7     concerning the claims against Mr. Russ?
8     A.   Yes.
9     Q.   Did there come a time when all that
10    motion practice was taking place with those claims
11    that NLS filed another lawsuit against Rapid Cash?
12    A.   Yes.
13    Q.   Why didn't you name them as a plaintiff
14    when you first sued Mr. Russ -- sorry, as a
15    defendant?
16    A.   They -- often it is the case that the
17    lessee defaults on a lease because they are no
18    longer in business.
19         Since they are not required to be a
20    party because the guarantee is separate and not --
21    they are not required to be joined, we as Northern
22    Leasing is entitled to proceed directly against
23    the guarantor, I found and I think the company
24    agrees that it is more -- it makes more sense to
25    proceed directly against the guarantor.

Page 228

SUSSMAN

1
2     Q.   Why wouldn't you proceed against both?
3          MS. NIGRO:  Objection.  You're skating
4     on his work product.  I think he has a right
5     to claim privilege to that.
6          THE WITNESS:  I am asserting that.
7     Q.   Why didn't you proceed against both in
8     Melinda Serin's case?
9          MS. NIGRO:  Objection for the same
10    reason.
11         MR. ALTMAN:  I think don't think there
12    is any privilege with respect to Melinda
13    Serin.
14         MS. NIGRO:  About what he was thinking
15    when he filed a lawsuit against --
16         MR. ALTMAN:  That is correct.
17         MS. NIGRO:  Would you like to have to
18    answer a question that asks what you were
19    thinking when you decided to file a lawsuit?
20    You don't think that is a lawyer's work
21    product --
22         MR. ALTMAN:  That may be true, but your
23    client listed Mr. Sussman as a person who was
24    going to talk about these cases.
25         MS. NIGRO:  Right.

57 (Pages 225 to 228)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 229

SUSSMAN

1
2      MR. ALTMAN:  So there is no more
3  privilege.
4      MS. NIGRO:  No, that doesn't mean that
5  he can't ever claim privilege over anything.
6  You know that.
7      MR. ALTMAN:  I think he can't claim
8  privilege about any of the five plaintiffs
9  associated in this case.
10     THE WITNESS:  That is ridiculous.
11     MS. NIGRO:  Judge Quinn didn't rule
12 that Mr. Sussman's documents weren't
13 privileged.  He was reviewing them for the
14 crime fraud exception just like he was
15 recently reviewing our privilege documents for
16 the same issue and weeded through ones which
17 he felt were not subject to privilege and
18 which were.  If what you were saying was
19 correct, nothing in this case could be
20 withhold on the basis of privilege.
21     MR. ALTMAN:  Subsequent to Judge
22 Quinn's rulings just last week, Northern
23 Leasing on its own decided to list Mr. Sussman
24 as a witness that they intended to call at
25 trial.

Page 230

SUSSMAN

1
2      MS. NIGRO:  That's right.  On the
3  issues that are here.
4      MR. ALTMAN:  On the underlying claims
5  of these cases.  I am asking with respect to
6  Melinda Serin, why --
7      MS. NIGRO:  I thought you were asking
8  with respect to Judson --
9      MR. ALTMAN:  First I asked generally.
10 You objected on privilege, but now with
11 respect to these witnesses, I don't think you
12 can make the same assertion with respect to
13 these cases --
14     MS. NIGRO:  But Judson Russ is also one
15 of those cases.
16     MR. ALTMAN:  I didn't ask it first with
17 respect to Judson Russ --
18     MS. NIGRO:  Yeah, you did.
19     MR. ALTMAN:  We will start over.
20 Q.   Melinda Serin, why didn't you sue
21 Melinda Serin and the corporate entity?
22 A.   I am issuing the same objection, same
23 objection as Russ.
24 Q.   I didn't ask it with Russ.
25     MS. NIGRO:  He is saying that it is his

Page 231

SUSSMAN

1
2  work product.  I am not even the one saying it
3  is my work product.
4      MR. ALTMAN:  Except that your client
5  waived the privilege with respect to these
6  plaintiffs.
7      MS. NIGRO:  Has that even been
8  determined?
9      I think I have given you a lot of
10 leeway with respect to decisions made back and
11 forth because I understand the argument you're
12 making, but I don't think it is -- I don't
13 think it is a blanket thing that they can
14 never claim privilege as to any of these
15 cases.
16     If that were so, Judge Quinn's order of
17 the 6th would have been different.
18     MR. ALTMAN:  Judge Quinn didn't know
19 you had added him as a witness after that.
20     MS. NIGRO:  Judge Quinn knows the whole
21 basis of your claim is allegedly bogus
22 lawsuits.
23     MR. ALTMAN:  There is a difference
24 between us taking Mr. Sussman's deposition and
25 Northern Leasing deciding to add him as a --

Page 232

SUSSMAN

1
2  to identify him under rule 26 and identify him
3  as a witness they intend to call.
4      MS. NIGRO:  Show me the authority that
5  says he can never claim work product, not
6  attorney-client privilege.  You're
7  confusing the two.
8      THE VIDEOGRAPHER:  The time is 5:23
9  p.m.  We are going off the record.
10     (Recess taken.)
11     THE VIDEOGRAPHER:  The time is now 5:25
12 p.m.  We are back on the record.
13     MR. ALTMAN:  Counsel and I had a
14 discussion on this issue whether the
15 information plaintiff seeks is privileged
16 under work product.  We can't agree to the
17 topic and it didn't seem to be productive for
18 us to continue the discussion.
19     Hopefully, with agreement of defendant,
20 plaintiff are just reserving our right to
21 pursue this matter with the judge as opposed
22 to asking the witness question after question
23 for which they will object on the same
24 privilege.
25     Is that fair enough?

58 (Pages 229 to 232)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 233

```
1              SUSSMAN
2         MS. NIGRO: If the question is why
3   didn't you sue the entity versus why didn't
4   you sue the guarantor, the answer is that
5   would be correct for now.
6         MR. ALTMAN: I may have asked other
7   questions.
8         MS. NIGRO: Then I suggest you ask
9   those questions and I will raise my
10  objections.
11    Q.  Did you discuss with anybody at
12  Northern Leasing why you didn't sue the
13  individuals and the -- Melinda Serin and Jim
14  Cameron Doors?
15    A.  Specifically?
16    Q.  Yes.
17    A.  I don't recall.
18    Q.  Did you have any discussions with
19  Northern Leasing for any of the plaintiffs in the
20  Serin matter as to why you didn't also sue the
21  business entity as well as the individual?
22    A.  I don't recall.
23    Q.  When you brought the suit against Rapid
24  Cash directly, did you tell the judge in the
25  actions against Mr. Russ personally that you had
```

Page 234

```
1              SUSSMAN
2   also filed a suit against Rapid Cash?
3     A.  Do you have copy of the complaint?
4     Q.  Sure.
5         MR. ALTMAN: We will mark it as Exhibit
6   134.
7         MS. NIGRO: You might have misspoken in
8   the question.
9         MR. ALTMAN: It is Bates 999 through
10  1014.
11        (Exhibit 134, Bates 999 through 1014,
12  marked for identification, as of this date.)
13        THE WITNESS: Can you read back the
14  question?
15        (Record read.)
16    A.  Are you going to ask it both ways?
17    Q.  Yes.
18    A.  I don't remember, but I am guessing --
19  I don't think so.
20    Q.  Did you tell the judge -- the case
21  against Russ --
22    A.  I take that back. I don't remember.
23    Q.  The case against Russ personally was
24  resolved after the date you received a default
25  judgment in Rapid Cash, correct?
```

Page 235

```
1              SUSSMAN
2     A.  I don't know. I will take your
3   representation.
4         MS. NIGRO: Objection.
5         Was it resolved?
6         MR. ALTMAN: It was dismissed.
7         MS. NIGRO: Dismissed.
8     Q.  It was after the default judgment,
9   right?
10    A.  Again, I will take that -- I will take
11  your representation.
12    Q.  Did you ever tell the judge in that
13  matter at any time that you had received a default
14  judgment against Rapid Cash?
15    A.  You just stated that the default
16  judgment was obtained after the Russ --
17    Q.  No. The other way around. The default
18  judgment in Russ was --
19    A.  Let's see.
20    Q.  -- before 2006.
21        The decision and order dismissing the
22  Russ case is dated December 4, 2006. The judgment
23  was granted on May 25, 2006.
24        At any time between May 25, 2006 when
25  you got this default and the dismissal of the Russ
```

Page 236

```
1              SUSSMAN
2   personal case, did you ever tell the judge that
3   you had obtained a default judgment against Rapid
4   Cash?
5     A.  I don't remember. If -- I don't
6   remember. It is very likely that I would have.
7     Q.  Would it have been appropriate for you
8   to have told the judge?
9         MS. NIGRO: Objection.
10    A.  It may have been relevant and it is
11  likely that it was discussed.
12    Q.  Would it be inappropriate to not have
13  told the judge about the default judgment?
14        MS. NIGRO: Objection.
15    A.  I don't want to answer that question.
16  It depends in what context for what purpose.
17    Q.  At the time you were seeking to recover
18  money from Mr. Russ, you had already had a
19  judgment against Rapid Cash. Weren't you trying
20  to double dip at that point?
21    A.  No, not at all.
22    Q.  You were seeking summary judgment
23  against Mr. Russ, weren't you?
24    A.  I don't remember. I recall cross
25  moving for summary judgment or moving for summary
```

New York                Hudson Reporting & Video              New Jersey
212-273-9911            Nationwide 800-310-1769             732-906-2078

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 237

SUSSMAN

1        SUSSMAN
2   judgment.
3        Q.   And if summary granted had been
4   granted, you might have had a judgment against Mr.
5   Russ personally?
6        A.   Yes.  I don't think that the dates are
7   all -- all work out.  It is going to take some
8   time to sort out the chronology.
9            MR. ALTMAN:  We will mark the stuff and
10       we will get it right.
11       A.   The Rapid Cash action, notice was
12   provided to Mr. Chittur who was representing Mr.
13   Russ.  So there was no question about notice and
14   that all parties being aware of what was going on.
15           To the extent that you're trying to
16   state that I deliberately concealed information
17   from a judge, that is certainly not the case.
18   This was full disclosure.  This may not have been
19   an opportunity to formally present it in the Russ
20   case, but it certainly was circulated.
21   Information was shared.
22           MR. ALTMAN:  I will mark this document
23       as Exhibit 135 which is Bates number 920
24       through 930.  This is the memorandum of law in
25       support of plaintiff's cross motion to lift

Page 238

1        SUSSMAN
2   the automatic stay of discovery and in
3   opposition to defendants' motion for summary
4   judgment.
5            (Exhibit 135, Bates number 920 through
6        930, marked for identification, as of this
7        date.)
8        Q.   Your name is on the front?
9        A.   Yes.
10       Q.   You signed it on the back?
11       A.   Yes.
12       Q.   It is dated July 17, 2006, correct?
13       A.   Correct.
14       Q.   I think it is on the second page, one
15   thing I want to ask you about under statement of
16   facts, it starts the court respectfully; do you
17   see that?
18       A.   Yes.
19       Q.   That was attached at the same time as
20   this.
21           My first question is, is there any
22   mention anywhere in this motion dated two months
23   after you obtained judgment that you had obtained
24   full judgment against Rapid Cash?
25           MS. NIGRO:  You mean in this document?

Page 239

SUSSMAN

1        SUSSMAN
2            MR. ALTMAN:  In this motion that you
3        signed two months after.
4        A.   Counsel, I don't know.  I would have to
5   read it, but there was no effort to conceal
6   information.  It is a public record.  Parties were
7   served.  If it was not specifically brought to the
8   attention of a judge in this motion, it was
9   apparently not relevant to the issues being
10   litigated at that very moment or relevant but not
11   -- I didn't see it important to point it out in
12   these papers.  But it is not the case that I was
13   trying to hide information.  The information was
14   not concealed from anybody.
15       Q.   First of all, it was contested as to
16   whether Rapid Cash was ever served correctly,
17   right?
18       A.   I don't remember that.
19           MS. NIGRO:  Did you have a document
20       that shows that?
21       A.   But I do have the decision granting the
22   judgment, Judge Miller Gross Matos, M A T O S.
23       Q.   That is not the same judge you had the
24   personal cases against Russ?
25       A.   Correct.

Page 240

1        SUSSMAN
2            MR. ALTMAN:  We will mark these for
3        now.  Can we get copies done because these are
4        out of the actual file?
5        Q.   First of all, was Rapid Cash being
6   represented by Mr. Chittur at the time of the
7   default motion?
8        A.   I believe so, but I don't remember.  I
9   assume -- I think I assumed they were.
10           MR. ALTMAN:  I will mark as Exhibit 136
11       two e-mails, one dated June 18, 2006 and the
12       other one dated August 1, 2006 between Joseph
13       Sussman and Mr. Chittur concerning this
14       matter.
15           I will see if these refresh your
16       recollection and then afterwards -- can you
17       make the photocopies now?
18           MS. NIGRO:  Yes.
19           THE VIDEOGRAPHER:  The time is 5:38
20       p.m.  We are off the record.
21           (Discussion off the record.)
22           THE VIDEOGRAPHER:  The time is 5:45
23       p.m.  We are back on the record.
24           (Exhibit 136, e-mails dated June 18,
25       2006 and August 1, 2006 between Joseph Sussman

60 (Pages 237 to 240)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 241

SUSSMAN

1      and Mr. Chittur, marked for identification, as
2  of this date.)
3      Q.   The e-mails are marked as Exhibit 136.
4          Mr. Sussman, do you recall the e-mails
5  in Exhibit 136?
6      A.   No, but I see it now.
7      Q.   You did send a response back to
8  Mr. Chittur?
9      A.   Yes.
10     Q.   Is there any reason you would suspect
11  these e-mails are not real?
12     A.   No.
13     Q.   Does this refresh your recollection
14  that there was some question as to whether the
15  corporation had been properly served?
16     A.   It refreshes my recollection that
17  Andrey Strutinskiy sent me an e-mail stating the
18  follow -- stating what is stated here.
19     Q.   What happened to the Rapid Cash
20  default?
21     A.   What happened to it?
22     Q.   Yes.
23     A.   What do you mean?
24     Q.   Have you been paid on it?  Is it still

Page 242

SUSSMAN

1  hanging out there?  Has it been vacated?
2      A.   I --
3          MS. NIGRO:  When you say you have been
4      paid --
5      A.   I don't remember.  Is it in this
6  e-mail?
7      Q.   No.  I am asking if you know what the
8  status of that default judgment is.
9      A.   To the best of my recollection, it is
10  still standing.
11     Q.   Have you done anything to collect on
12  it?
13     A.   I don't remember.  I may have, but I
14  don't remember.
15         I also vaguely recalled during the
16  break actually putting it in a footnote or perhaps
17  it is in other documents submitted to the court.
18     Q.   That is what I wanted to bring up.  It
19  is actually mentioned in a footnote which is the
20  declaration of Sara Krieger which I will mark as
21  the next exhibit.
22         MR. ALTMAN:  Mark Exhibit 137.
23         (Exhibit 137, Bates 952 through 960,
24      marked for identification, as of this date.)

Page 243

SUSSMAN

1      Q.   Bates 952 through 960 is Exhibit 137.
2          You will find if you go to the bottom
3  of page 959 --
4      A.   Yes.
5      Q.   The declaration is not part of your
6  motion, right?
7      A.   It certainly is.
8          MS. NIGRO:  It is referenced.
9      A.   What do you mean?
10     Q.   It is referenced, but it is not in the
11  text of your motion?
12     A.   Counsel, the affidavit is the most
13  integral part of the motion.  Without the
14  affidavit, there is no notion.
15     Q.   Please answer the question.
16     A.   That is the answer.
17     Q.   Is it contained within the motion
18  itself?
19     A.   Yes.
20     Q.   Not a reference to the declaration --
21  let's be very precise.
22         MS. NIGRO:  Do you mean the memorandum
23      of law?
24     Q.   In the words of memorandum of law, the

Page 244

SUSSMAN

1  four corners of that memorandum of law, is there
2  any mention of this other lawsuit?
3      A.   Counsel, in New York, the memorandum of
4  law does not become part of the appellate record
5  but the affidavits do.
6          The affidavit is the more important
7  document here.
8      Q.   Please answer my question.
9      A.   The answer is yes --
10     Q.   In the four corners --
11     A.   It references the affidavit in
12  memorandum of law.
13     Q.   I didn't ask references --
14     A.   It is the statement of fact.  It is the
15  statement of facts of the --
16     Q.   Mr. Sussman, I know it is late in the
17  day --
18         MS. NIGRO:  Don't do that.  Stop acting
19      like he is tired and he doesn't remember.  He
20      is telling you his answer.
21     Q.   It is your testimony ---
22         MS. NIGRO:  The question was the
23      motion.
24     Q.   The four corners of Exhibit 135

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 245

```
                  SUSSMAN
 1
 2    contains the language that there is another
 3    lawsuit?
 4        A.   In the four corners of Exhibit 135 is
 5    contained a reference to -- there is a
 6    statement of facts. Every memorandum of law is
 7    supposed to have a statement of facts. I think
 8    that is out of CPLR. If not, it is common
 9    practice.
10        My statement of facts of my memorandum
11    of law is the affidavit of Sara Krieger. That is
12    what it is.
13        Q.   Just answer my question.
14        A.   The answer is yes. The answer is yes.
15        Q.   Let's be precise. Physically on the
16    papers that comprise Exhibit 135, are those words
17    there that there is another lawsuit?
18        A.   I will let you have this one. Yes, it
19    is not there. It is not in this --
20        Q.   Thank you. That is all I was asking.
21        MS. NIGRO:  Keith, your question was
22    whether or not it was in the motion and the
23    answer was yes. You then changed it to
24    memorandum of law. You have less than an hour
25    with this witness left.
```

Page 246

```
                  SUSSMAN
 1
 2        Q.   All right. Let's go.
 3        MS. NIGRO:  Are you kidding me?
 4        Q.   Would you go to number 35 in the
 5    Krieger declaration.
 6        A.   Number what?
 7        Q.   Point 35 -- wait a minute. Go to 953
 8    for a second, page 953.8.
 9        A.   Paragraph 8?
10        Q.   I want you to go to the last sentence
11    of point 28. It says, the verifier will also
12    confirm the monthly payment plus tax and it puts
13    in parens, loss and damage waiver fee if
14    applicable, and once the lease commences, the
15    lessee's obligations are irrevocable.
16        A.   Yes.
17        Q.   We looked at verification forms and
18    none of them had anything about the loss damage
19    waiver, correct?
20        A.   Yes.
21        MS. NIGRO:  You mean the verification
22    forms you have shown him today?
23        MR. ALTMAN:  Yes.
24        A.   I stated earlier that the verification
25    form itself does not have a direct reference, but
```

Page 247

```
                  SUSSMAN
 1
 2    that doesn't mean that the verification process
 3    does not include a question about loss and damage
 4    waiver.
 5        Q.   Does it?
 6        A.   I have stated that in the past and it
 7    has been stated.
 8        Q.   Number 16, it says, each agreement
 9    provides for Rapid Cash to make basic monthly
10    payments in the amount of $59 plus applicable
11    taxes. A loss damage waiver fee --
12        A.   Where are you?
13        Q.   Number 16.
14        A.   Yes.
15        Q.   Each agreement provides for Rapid Cash
16    to make basic monthly lease payments to NLS in the
17    amount of $59 plus applicable taxes and a loss and
18    damage waiver fee.
19        A.   Yes.
20        Q.   How come it doesn't qualify that,
21    unless insurance was provided?
22        A.   Because the word applicable modifies
23    loss and damage waiver fee as well.
24        Q.   No --
25        A.   That is my understanding of it and I
```

Page 248

```
                  SUSSMAN
 1
 2    have what to do with this affidavit.
 3        Q.   You're saying the plus applicable
 4    taxes, it is -- so applicable applies to loss
 5    damage waiver as well as taxes?
 6        A.   Yes.
 7        Q.   In 21 --
 8        A.   This is Sara Krieger's --
 9        Q.   It starts, attached hereto is a fax
10    letter from Mr. Russ authorizing -- and then it
11    goes on. Is that what it says?
12        A.   Yes.
13        Q.   That is not what it actually says. It
14    says for the Scan Check services.
15        A.   The words are different. Check cashing
16    services are not the same words as Scan Check,
17    that is correct.
18        Q.   Mr. Magyari did not authorize -- if Mr.
19    Russ actually gave that authorization to Magyari,
20    he didn't authorize Mr. Magyari to make all
21    confirmations related to the check cashing
22    services for Rapid Cash which is very different,
23    isn't it? That is the business of the company.
24        What you're saying there is that
25    Mr. Magyari had authority to do anything on behalf
```

62 (Pages 245 to 248)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 249

```
 1              SUSSMAN
 2  of Rapid Cash.
 3      A.   Let's back up.
 4          Are you asking me to explain my
 5  understanding about this paragraph 21?
 6      Q.   You wrote it, right?
 7      A.   I drafted the affidavit.
 8      Q.   So you basically drafted that language,
 9  right?
10      A.   Okay.
11      Q.   My question to you is, is that related
12  to check cashing services for Rapid Cash -- what
13  is the business of Rapid Cash?
14      A.   I believe they are a check cashing
15  stores.
16      Q.   What you have said here,
17  notwithstanding what the document says, is that
18  Magyari had authority to do everything related to
19  check cashing services which is the entire
20  business of Rapid Cash, right?  It is imprecise?
21      A.   The question is imprecise.
22          MS. NIGRO:  Objection.
23      A.   That doesn't seem like a reasonable --
24  it says here that Mr. Russ -- and I will read what
25  it says.  Then you draw your own conclusion what
```

Page 250

```
 1              SUSSMAN
 2  it means.
 3          Attached hereto as Exhibit F is a fax
 4  letter from Mr. Russ authorizing Daniel Magyari to
 5  make all confirmations related to the check
 6  cashing services for Rapid Cash.
 7      Q.   Rapid Cash's business is check cashing
 8  services, right?
 9      A.   I think so.
10      Q.   Isn't it a fair reading of that that
11  Mr. Magyari had authority to do anything with
12  respect to Rapid Cash?
13      A.   No.
14          MS. NIGRO:  I will object because when
15       you're referring to Rapid Cash, we have
16       established that there are four entities, one
17       of which is not even titled Rapid Cash.
18          When you're asking these questions --
19       can we be specific?
20      Q.   You certainly say -- you said Rapid
21  Cash and not the other accounts, correct?
22      A.   Rapid Cash is defined in this affidavit
23  as Rapid Cash Advances, Inc.
24          MS. NIGRO:  I just wanted to know which
25       Rapid Cash we were referring to.
```

Page 251

```
 1              SUSSMAN
 2      Q.   Taking what you just said there, if you
 3  pull Exhibit 121, the company referred to -- is it
 4  Rapid Cash Title Loans, isn't it?
 5      A.   Yes.
 6      Q.   That is not Rapid Cash Advance, is it?
 7      A.   I don't know -- I understand that it is
 8  not the same name, but I don't know what was
 9  intended because there were a variety of different
10  corporate names and it seemed -- so I would be
11  speculating, but suffice to say that it could have
12  very well been referring to Rapid Cash Advances,
13  Inc.
14      Q.   Don't you think that something that
15  supposedly gives authority to somebody to enter
16  into agreements is supposed to be construed pretty
17  strictly?
18      A.   Yes.
19      Q.   You don't even know that this authority
20  applies to any of the companies under which
21  Mr. Magyari engaged the leases, do you?
22      A.   I have an opinion about what this
23  document is purporting to do and I stated that.
24      Q.   You think that your opinion of what the
25  document is stated to do trumps the plain language
```

Page 252

```
 1              SUSSMAN
 2  of the document?
 3      A.   No.  I am not stating that.
 4          I am merely stating what might form a
 5  basis for recommending and taking legal action on
 6  an account referred to me by Northern Leasing.
 7      Q.   But taking what you have said is, that
 8  document does not grant authority to Rapid Cash
 9  Advance, does it?
10      A.   I don't agree with that statement.
11          (Witness confers with counsel.)
12      Q.   Mr. Sussman, what did counsel just
13  whisper to you?
14          MS. NIGRO:  I did whisper something to
15       him; I am allowed to.  You and Mr. Strutinskiy
16       have been whispering --
17          MR. ALTMAN:  He is a witness.  He is
18       being questioned.
19          MS. NIGRO:  I am his lawyer.  I am
20       allowed to confer with him.
21      A.   I didn't hear what she said.  That is
22  my answer.
23      Q.   Go to paragraph 35.
24          MS. NIGRO:  For the record, Mr. Chittur
25       does the same thing with his depositions of
```

Page 253

SUSSMAN

1
2  plaintiffs.  So I don't understand what you're
3  objecting to.
4      Q.   Point 35 says, on or about November 19,
5  2002 after receiving the affidavit of forgery from
6  Mr. Russ, NLS referred the matter to Mr. Joseph
7  Rogers of its risk management department for
8  review.
9      A.   It states that.
10     Q.   Who is Mr. Rogers?
11     A.   It is risk management department.
12     Q.   Do you know who he is?
13     A.   I know -- I think I recall his face.
14     Q.   Did you have a conversation with him
15  concerning the forgery claim?
16     A.   Not to my recollection.
17     Q.   Number 36, can you tell me where Mr.
18  Rogers determined that the signature on the leases
19  were genuine?
20     A.   That is a trick question.  What it
21  states here is that Mr. Rogers determined that
22  termination of the lease was not warranted because
23  of NLS communication between the parties
24  reflecting Rapid Cash's full awareness of the
25  leases including Rapid Cash's repeated and

Page 254

SUSSMAN

1
2  consecutive pages without voicing concern, all the
3  while maintaining possession of NLS's equipment.
4      Q.   Does it say in there that he determined
5  that the documents were not forged?
6      A.   It doesn't say those words in that
7  paragraph.
8      Q.   In fact, in paragraph 39, it states
9  that, without further expert handwriting analysis
10  and disclosure from defendant and NLS, it can't be
11  conclusively determined if defendant himself
12  affixed his signature to the lease agreements.
13     A.   Correct.
14     Q.   But you never determined whether he had
15  actually signed that agreement, did you?
16     A.   Me myself, Joseph Sussman?
17     Q.   Yes.
18     A.   That is correct.
19     Q.   You never engaged an expert to do that
20  either?
21     A.   Not to my knowledge.
22     Q.   Why not?
23     A.   I think that that information is also
24  privileged information, work product.
25     MS. NIGRO:  The witness testified

Page 255

SUSSMAN

1
2  earlier that there was a cost benefit analysis
3  that goes into handwriting experts.  I don't
4  know if that applies here.
5      Q.   Did that apply in this case?
6      A.   Forget about the privilege for a
7  moment.  That would still be the case.  An expert
8  -- a handwriting expert is expensive and also not
9  conclusive particularly when being litigated.
10     In other words, if it was just a
11  question of making my own assessment and assuming
12  the cost issue wasn't present, it is helpful, but
13  as you well know, it certainly won't decide the
14  issue for everybody.
15     So that would have been a litigation --
16  a strategic decision in terms of the litigation.
17     MR. ALTMAN:  I will mark Exhibit 138 --
18  by the way, before we do that.
19     Q.   You were going to grant Mr. Russ
20  personally -- not you but NLS was going to give
21  Mr. Russ personally a release.  We talked about
22  that before?
23     A.   I think from what I remember from those
24  documents, there was an effort between the parties
25  to try to settle all claims.

Page 256

SUSSMAN

1
2     MS. NIGRO:  You're referring to Exhibit
3  133.
4     MR. ALTMAN:  That is fine.
5      Q.   Did you intend on going and suing Rapid
6  Cash after you received the release from Mr. Russ?
7      A.   I don't remember.  I don't -- I think
8  this release would have covered claims.  I don't
9  remember what my intention was.  I don't think so.
10     Q.   The fact that you also sued Mr. Russ
11  and then separately sued Rapid Cash, that didn't
12  seem to cause a problem, correct?
13     A.   A problem for what?
14     Q.   That you filed two different lawsuits
15  with two different judges seeking to recover the
16  same funds?
17     A.   It didn't --
18     MS. NIGRO:  Objection.
19     A.   -- cause a problem for who?  For me?
20     Q.   Yes.
21     A.   Because -- why --
22     Q.   Why didn't you join -- you said you
23  would consent to join Rapid Cash.
24     Why didn't you just put Rapid Cash when
25  you filed those lawsuits?  Instead of doing that,

30ba659c-fafd-4a2d-b2ee-4e016e15179c

1           SUSSMAN
2  why didn't you add Rapid Cash into the existing
3  lawsuits?
4          MS. NIGRO:  This might go back to the
5      whole work product argument we had earlier.
6          MR. ALTMAN:  Exhibit 138 is Bates 1031
7      through 1037.
8          (Exhibit 138, Bates 1031 through 1037,
9      marked for identification, as of this date.)
10     Q.   I won't ask you questions really about
11 this, other than this is a copy of the call log,
12 the activity log and the payment history for the
13 Russ account, correct?
14     A.   For which, all of them or one of them?
15     Q.   I think it is for one of the leases.
16     A.   Yes.
17     Q.   You would have had access to these
18 materials when you filed the Russ lawsuit,
19 correct?
20     A.   I think so.
21     Q.   Was it a strategy of you and NLS to
22 subject defendants in lawsuits brought by NLS to
23 significant expenses associated with defending
24 those lawsuits?
25          MS. NIGRO:  Objection.

1           SUSSMAN
2          You can answer.
3     A.   No.
4     Q.   In how many of your lawsuits filed on
5  behalf of NLS did you notice the deposition of the
6  plaintiff in New York?
7          MS. NIGRO:  You mean defendants --
8     Q.   Deposition of the defendant.
9     A.   I don't know the number.  Very small
10 percentage.
11     Q.   In how many of them did you send out
12 demands for interrogatories?
13     A.   I don't know how many.
14     Q.   A large percentage, a small percentage?
15     A.   Small percentage.
16     Q.   In how many did you send out discovery
17 demands?
18     A.   Same answer.
19     Q.   I will hand you Exhibit 139 which is
20 Bates number Sussman 339 through 345.
21          (Exhibit 139, Bates number Sussman 339
22      through 345, marked for identification, as of
23      this date.)
24     Q.   This is for Mr. Russ a notice for
25 deposition, a notice for New York, correct?

1           SUSSMAN
2     A.   Yes.
3     Q.   First request for documents.
4     A.   Yes.
5     Q.   And there is no request for
6  interrogatories.
7          You're asking for all merchant credit
8  card processing statements for March 1, 2001 until
9  the present day concerning four different
10 companies, correct?
11     A.   Correct.
12     Q.   All documents and communications
13 concerning checks against Scan Check or other
14 check verification services?
15     A.   Correct.
16     Q.   Do you think this kind of -- we can go
17 on for 22 different document requests.  Do you
18 think that is an appropriate level of discovery in
19 a lawsuit to recover lease payments?
20          MS. NIGRO:  Objection.
21     A.   I thought it was appropriate in this
22 case.
23     Q.   You didn't want to get a handwriting
24 expert, but you had no trouble inflicting
25 significant expenses upon the plaintiffs, correct

1           SUSSMAN
2  -- upon the defendant --
3          MS. NIGRO:  Objection.
4     A.   Not correct.  I actually don't recall
5  -- counsel can tell us if we actually received any
6  documents in response to the demands.
7     Q.   The case was dismissed, wasn't it?
8     A.   Yes.
9     Q.   But you were certainly asking for it
10 and it certainly -- certainly, you didn't seem to
11 be concerned about what costs you would make the
12 plaintiffs go through, correct?
13          MS. NIGRO:  Objection.
14     A.   That wasn't my intention.
15     Q.   Did you consider the proportionality of
16 your requests in light of the dollar amounts at
17 stake?
18          MS. NIGRO:  Objection.
19     A.   It seemed to me based on Judson Russ's
20 counsel's demand -- settlement demand, settle
21 their claims or counterclaims, that this case was
22 worth a heck of a lot of money.  So in that
23 context, it was entirely appropriate.
24     Q.   You made that same kind of demands to
25 other of the Serin plaintiffs, didn't you?

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 261

SUSSMAN

1    SUSSMAN
2         MS. NIGRO: Objection.
3         A.   I don't know if that is correct -- some
4    of them. Tom Smith.
5         Q.   And I think Mr. Lim.
6         A.   I don't think Lim went to discovery.
7         MS. NIGRO: Can you please show him the
8    documents.
9         MR. ALTMAN: I will. Exhibit 140 is
10   Sussman 644 through 650.
11        (Exhibit 140, Sussman 644 through 650,
12   marked for identification, as of this date.)
13        Q.   This is the notice of deposition and
14   request for document of Mr. Lim, correct?
15        A.   Yes.
16        Q.   This is dated even before the Serin
17   lawsuit was filed?
18        A.   Is that correct? I don't know.
19        MS. NIGRO: The Serin lawsuit was filed
20   twice.
21        Q.   It was filed originally in March of
22   2006, correct?
23        MS. NIGRO: I don't know.
24        MR. ALTMAN: I believe --
25        MS. NIGRO: I am just saying I don't

Page 262

1    know.
2         Q.   If that is true, November 22, 2005 is
3    before that date.
4         A.   Correct.
5         MS. NIGRO: October?
6         Q.   The deposition was noticed --
7         MS. NIGRO: Sorry. I thought you were
8    talking about the demands.
9         Q.   At any time did you have discussions
10   with NLS over how much it costs a defendant to
11   defend a lawsuit brought by you?
12        MS. NIGRO: Objection.
13        A.   In the context of the Long Lim case?
14        Q.   In the context of any of the Serin
15   plaintiffs.
16        A.   I don't recall.
17        Q.   Have you had that discussion at all
18   with respect to any suits that Northern Leasing
19   has filed?
20        MS. NIGRO: Objection.
21        A.   I also don't recall.
22        Q.   Do you have some thoughts on how
23   expensive it might be for a person to come to New
24   York to defend a lawsuit filed by Northern

Page 263

SUSSMAN

1    Leasing?
2         A.   Yes, I do.
3         Q.   What do you that would be for a
4    plaintiff coming from California?
5         A.   I think that for a plaintiff who would
6    like to resolve a dispute, it would be very
7    efficient to engage in reasonable settlement
8    discussions which did not take place, in my
9    opinion, because of Mr. Chittur's law firm's
10   interference with that effort.
11        Q.   Do you ever use the cost of coming to
12   New York to defend in your settlement discussions
13   with other lessees?
14        A.   Counsel, counsel for lessees?
15        Q.   No.
16        A.   Just directly?
17        Q.   Yes.
18        A.   If the question is in a discussion that
19   I would have with a pro se defendant, would that
20   -- it is possible that could come up in
21   conversations? It is possible. Do I recall
22   specific conversation? No.
23        Q.   Does Ms. Krieger verify all of the
24   complaints you send out?

Page 264

1    SUSSMAN
2         A.   Yes.
3         Q.   Who else would verify them?
4         A.   Different individuals have verified
5    complaints, different stages, different periods of
6    time.
7         Q.   Are they all corporate officers?
8         A.   I know Ms. Krieger is.
9         Q.   As part of their verification, do they
10   review the file in the leasing system themselves?
11        A.   I don't think they -- she would review
12   each individual file herself, no.
13        Q.   What does whoever signs the
14   verification do to verify?
15        A.   That person would be fully aware of the
16   policies and procedures of the company and the
17   records maintained in the system and how they
18   would be followed so that -- which is the only
19   basis of information the company has to form an
20   opinion or to be able to verify information as it
21   states in the verification of the complaint.
22        Q.   For example, a verification that you
23   put in the Serin case says that Sara Krieger
24   affirms under penalties of perjury and says that
25   she is the vice president of plaintiff, Northern

Page 265

SUSSMAN

1    Leasing; that she has read the verified complaint
2    and knows the contents thereof; that the same is
3    true to her own knowledge except as to those
4    matters therein stated to be upon information and
5    belief.  As to those matters, she believes them to
6    be true.
7          MS. NIGRO:  Number?
8          MR. ALTMAN:  That was Exhibit 116.
9       Q.   Is that generally what the verification
10   would say?
11      A.   Yes.
12      Q.   Does that imply that that person has as
13   much knowledge about the underlying facts of the
14   case as you do?
15      A.   I don't know.  My knowledge might be
16   more hands-on than the person verifying, but the
17   information would be the same.
18      Q.   For example, would that person who
19   signs the verification be presumed that they have
20   reviewed the call -- the activity log for that
21   case?
22      A.   No.
23      Q.   How would they be verified -- then what
24   are they verifying?

Page 266

SUSSMAN

1       A.   I stated that already.
2            Based on the same information that I
3    reviewed, in order for a lease to proceed to the
4    point where it is referred to my office for
5    collection, there are policies and procedures in
6    place that --
7       Q.   Okay.
8       A.   -- and based on the information
9    maintained by Northern Leasing so that -- based on
10   my understanding, Northern Leasing's own policies
11   and procedures would provide a sufficient basis
12   for the verifier to verify the contents are true.
13      Q.   Do you have that policy -- not
14   necessarily in your possession here but back at
15   your office, do you have those policies?
16      A.   Those -- we have discussed the policies
17   and procedures.  They have been produced.  We have
18   testified about process and I am sure there is
19   more that I don't know about.
20      Q.   Do you really know what the basis of
21   the verification is that is signed there or are
22   you just relying upon Ms. Krieger or whoever else
23   signs it that they have done their job?
24      A.   No.  I am confident about my office's

Page 267

SUSSMAN

1    independent review of the file.  I am confident
2    about that.
3            If you're asking me what the basis of
4    information -- what Ms. Krieger's basis for
5    signing a verification is, well, I have stated to
6    you what that basis might consist of.
7       Q.   But you don't --
8       A.   If you're asking me what is my basis, I
9    already stated it.
10      Q.   I am trying to understand what that
11   verification means.
12          MS. NIGRO:  Right, but it is her's.
13      A.   It is her's.
14      Q.   If you don't have personal knowledge as
15   to what she is actually attesting to, that is
16   fine, I will ask her.  I just want to know whether
17   you do or don't.
18      A.   I answered the question.  The personal
19   knowledge would come from information maintained
20   in Northern Leasing's files together with the
21   policy and procedures in place.
22      Q.   You didn't ask Ms. Krieger, what did
23   you review to make this verification, did you,
24   let's say the Serin complaint?

Page 268

SUSSMAN

1       A.   In so many words I did by presenting a
2    document for her to sign.  That is precisely what
3    the point of the verification is.
4       Q.   That is not the same thing as asking
5    her.  Did you ask Ms. Krieger with respect to the
6    Serin complaint, Ms. Krieger, please tell me what
7    you reviewed that gives you the basis to sign this
8    verification?
9       A.   I did not ask her that question.
10      Q.   You don't know what she reviewed to
11   make -- sign the verification, correct?
12      A.   I don't know.
13      Q.   She looked at the complaint, you know
14   that, and she signed the verification, correct?
15      A.   Correct.
16      Q.   Beyond that, you don't have personal
17   knowledge?
18      A.   Of Ms. Krieger's --
19      Q.   Review?
20      A.   -- review of the file?
21      Q.   Sufficient to allow her to sign the
22   verification.
23      A.   I already answered that question.
24          MR. ALTMAN:  We will mark this document

67 (Pages 265 to 268)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 269

SUSSMAN

1
2 as Exhibit 141. It is NLS 1689.
3       (Exhibit 141, NLS 1689, marked for
4 identification, as of this date.)
5   Q.   It is a one-page verification form for
6 the Smith case.
7   A.   Correct.
8   Q.   Have you seen this document before?
9   A.   I believe so.
10   Q.   Can you show me on here where it says
11 anything about lost damage waivers?
12   A.   No.
13       MR. ALTMAN: We will mark this document
14 as Exhibit 142, which is Bates number 1856.
15       (Exhibit 142, Bates number 1856, marked
16 for identification, as of this date.)
17   Q.   I will give this to you. It is a
18 letter from Northern Leasing to Tom Smith,
19 addressed to Tom Smith.
20       Do you see a validation clause on that
21 letter?
22   A.   To the extent that you're referring to
23 a validation clause pursuant to FDCPA, one is not
24 required in an effort to collect a debt related to
25 this account.

Page 270

SUSSMAN

1
2   Q.   Do you see --
3   A.   But notwithstanding, there isn't
4 language that would consist of a validation
5 clause.
6       MR. ALTMAN: I will mark Exhibit 143.
7 It is a letter dated March 29, 2004.
8       (Exhibit 143, letter dated March 29,
9 2004, marked for identification, as of this
10 date.)
11   Q.   It is another letter to Tom Smith. You
12 see a validation clause?
13   A.   Same answer as previous.
14       MR. ALTMAN: We will mark Exhibit 144
15 which is Bates number 1733 through 1741.
16       (Exhibit 144, Bates number 1733 through
17 1741, marked for identification, as of this
18 date.)
19   Q.   These are two faxes from you to Tarly
20 Dall in the Tom Smith case, T A R L Y, D A L L?
21   A.   Yes.
22   Q.   This appears to be an affidavit that
23 you drafted on behalf of Tarly Dall in the case of
24 Northern Leasing versus Tom Smith?
25   A.   Yes.

Page 271

SUSSMAN

1
2   Q.   Did you write this declaration for
3 Tarly Dall?
4   A.   I believe I drafted it.
5   Q.   Was Tarly Dall paid for the time
6 reviewing this affidavit?
7   A.   No.
8       MR. ALTMAN: We will mark as 145, Bates
9 1696 through 1705.
10       (Exhibit 145, Bates 1696 through 1705,
11 marked for identification, as of this date.)
12   Q.   Exhibit 145 is a notice of deposition
13 and document request and interrogatories to Tom
14 Smith.
15   A.   Right.
16   Q.   Do you think that was the appropriate
17 level of discovery in a lease dispute case?
18   A.   As stated earlier, under normal
19 circumstances it would not be for a small dollar
20 dispute but given Christian Chittur and his law
21 firm's insistence on litigating this and making
22 ridiculously high settlement demands instead of
23 engaging in reasonable settlement, it was the only
24 course that we could take. So it was entirely
25 appropriate.

Page 272

SUSSMAN

1
2       MS. NIGRO: For the record, counsel is
3 addressed on this document notice -- it is
4 addressed to counsel.
5       MR. ALTMAN: We will mark as Exhibit
6 146, Bates number Sussman 2730 through 2735.
7       (Exhibit 146, Bates number Sussman 2730
8 through 2735, marked for identification, as of
9 this date.)
10   Q.   Letter dated July 2, 2003, written by
11 you?
12   A.   Yes.
13   Q.   It is a letter to Mr. Long Lim?
14   A.   Yes.
15   Q.   It says, the personal guarantee section
16 of the lease provides that you as guarantor will
17 be fully responsible for all of the lessees, its
18 obligations thereunder?
19   A.   Yes.
20   Q.   Is there a validation clause anywhere
21 on this letter?
22   A.   To the extent that -- same answer as
23 previous. The same answer as previous to the same
24 question.
25       MR. ALTMAN: We will mark as Exhibit

68 (Pages 269 to 272)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 273

```
1              SUSSMAN
2     147, a document Bates 1653.
3          (Exhibit 147, document Bates 1653,
4     marked for identification, as of this date.)
5     Q.   This says stipulation of
6  discontinuance.
7     A.   Correct.
8     Q.   Do you see a signature there from Long
9  Lim?
10    A.   No.
11    Q.   How could that be a stipulation of
12 discontinuance without Mr. Lim's signature?
13    A.   Because in New York, you can
14 discontinue an action prior to a answer being
15 filed.  No answer was filed here.
16          It could be that it is technically --
17 should be a notice of discontinuance instead of
18 stipulation, I am not sure, but what this document
19 is doing is discontinuing an action.  So the court
20 accepts that since it is just dismissing the
21 action.  That is my understanding of how this
22 would work.
23          MR. ALTMAN:  We will mark Exhibit 148,
24    Sussman Bates 629 through 632.
25          (Exhibit 148, Sussman Bates 631 and
```

Page 274

```
1              SUSSMAN
2     632, marked for identification, as of this
3     date.)
4     Q.   Just to be clear, documents with your
5  Bates numbers on it came out of your files,
6  correct?
7     A.   Correct.
8     Q.   Whose notes are these?
9     A.   Can I talk with counsel?
10    Q.   Sure.
11          THE WITNESS:  Can we step out?
12          MS. NIGRO:  Sure.
13          THE WITNESS:  Can I take this with me?
14          MS. NIGRO:  I will even give you break
15    time.
16    Q.   Before you confer, there is a question
17 pending.
18          MS. NIGRO:  What is the question?
19          (Record read.)
20    A.   Is the question the printed --
21    Q.   The first two pages, whose notes are
22 those?
23    A.   Okay.  I am not ready to answer that
24 question.  I wanted to -- before you asked that
25 question to confer with counsel.
```

Page 275

```
1              SUSSMAN
2     Q.   You have to answer my question before
3  you can --
4     A.   I believe this information might have
5  been produced in error and should have been
6  withheld under privilege.
7     Q.   That is fine.
8          MS. NIGRO:  The top portion or the
9     entire document?
10          THE WITNESS:  The top portion.
11    Q.   I will take your representation about
12 that --
13          THE WITNESS:  Give me a moment.
14          MR. ALTMAN:  He said the P word.  So if
15    you want to take it off the table -- now that
16    I understand what the issue is, now if you
17    need to consult, please do so.
18    A.   Based on my review of this document, it
19 seems to me that I produced this document to
20 Mr. Chittur in error and it should have been
21 withheld.  I didn't realize this document was
22 produced.
23          MS. NIGRO:  The top part?
24          THE WITNESS:  The top part.
25          MS. NIGRO:  Not Amy's underlying
```

Page 276

```
1              SUSSMAN
2     e-mail.
3          THE WITNESS:  Right, which has been
4  produced by NLS directly.
5          MR. ALTMAN:  I will hand this to you
6  now.  We will mark the rest of the document as
7  Exhibit 148.
8          MS. NIGRO:  I appreciate you returning
9  a document that we are claiming as privileged.
10         MR. ALTMAN:  I will do that under one
11 condition, that you forward that document to
12 the judge.
13         MS. NIGRO:  Fair.
14         MR. ALTMAN:  Which he had not had an
15 opportunity to review so that he can make the
16 determination.
17         MS. NIGRO:  To the extent that it
18 wasn't included in the documents that the
19 judge has already looked at that Mr. Sussman
20 withheld -- sometimes there's multiple copies;
21 I can commit to doing that.
22         Is that what you were going to say?
23         THE WITNESS:  Exactly.
24         MR. ALTMAN:  We will delete or
25 segregate the electronic copies of the
```

69 (Pages 273 to 276)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 277

SUSSMAN

1
2 document that we have pending on the
3 resolution of the court.
4        Once we figure out what is going on,
5 then -- there is still the pending issue of
6 whether such a document -- privilege has been
7 waived anyway.  We will address that with the
8 court.  For right now, we will segregate the
9 document and look at it no further.
10       MS. NIGRO:  Okay.
11       THE WITNESS:  Thank you.
12       MR. ALTMAN:  Bates numbers 629 and 630
13 has been removed from Exhibit 148 because of
14 possible inadvertent production.
15       We are now changing the Bates numbers
16 to Sussman Bates 631 to 632.
17  Q.   Please take a look at the bottom
18 paragraph.  Who is Amy Tangey?
19  A.   She was employed by Northern Leasing.
20  Q.   What role did she serve?
21  A.   I think as a risk manager.
22  Q.   Would you look at the bottom.
23       Would you read for the record the
24 second sentence starting with when compared?
25  A.   When compared against the signatures on

Page 278

SUSSMAN

1
2 the lease, I lean in the direction of stating that
3 the signatures do not match.
4  Q.   That is all you need to read.
5       It was the opinion of the person at
6 Northern Leasing, the risk manager for Mr. Lim,
7 that the signatures didn't match?
8  A.   I think I have to read the entire
9 document because there is an opposite perspective
10 mentioned on the second page.
11  Q.   I didn't ask you a question about that.
12  A.   Sorry.  I genuinely misunderstood your
13 question.
14       MR. ALTMAN:  Read back the question.
15       (Record read.)
16  A.   Correct.
17       MR. ALTMAN:  I will mark as Exhibit
18 149, Sussman 639, a single page, a July 9,
19 2001 letter from Lim to Northern Leasing.
20       (Exhibit 149, Sussman 639, marked for
21 identification, as of this date.)
22  Q.   Have you seen this letter before?
23  A.   I believe so.
24  Q.   Did you see it before you filed suit
25 against Mr. Lim?

Page 279

SUSSMAN

1
2  A.   I don't remember.
3       MR. ALTMAN:  I will mark as Exhibit
4 150, Bates 1652.
5       (Exhibit 150, Bates 1652, marked for
6 identification, as of this date.)
7  Q.   It is Bates NLS 1652, an August 31,
8 2004 letter.
9       MS. NIGRO:  It is 6:45.
10       MR. ALTMAN:  Five more minutes.
11  A.   Did you ask me a question?
12  Q.   I was asking, have you ever seen this
13 document before?
14  A.   I don't know.
15  Q.   Mr. Sussman, we have reviewed at least
16 in great detail Mr. Russ and Ms. Serin's files,
17 correct?
18  A.   Today, you mean.
19  Q.   The review we did today we probably
20 spent maybe three hours or so on those two files.
21       How does that compare to the amount of
22 time you would have spent reviewing a file before
23 deciding whether to proceed with a suit?
24  A.   That is more time than I would likely
25 spend in reviewing one particular file.

Page 280

SUSSMAN

1
2  Q.   If you knew everything we discussed
3 today, is there anything that you would have done
4 different in terms of filing any of the lawsuits
5 of the plaintiffs involved in this case?
6       MS. NIGRO:  Objection.
7  A.   If I knew that my client would spend as
8 much money as it has today defending this
9 litigation because I initiated a lawsuit on these
10 individual files, I most certainly would have
11 recommended -- I most certainly would have not
12 initiated the lawsuit.  That alone would have --
13  Q.   I appreciate what you're saying, but
14 taking the fact that we are involved in a lawsuit
15 out of it, just purely the review of the
16 information, would you have done anything
17 differently?
18       MS. NIGRO:  Objection.
19  A.   Yes.
20  Q.   What would you have done differently?
21  A.   I would -- I don't know what decision I
22 would come to, but if I had all the information
23 that I am aware of today or appreciated that
24 information and decided to initiate a lawsuit, I
25 would have done so in an effort to show that I am

Page 281

```
 1              SUSSMAN
 2  aware of the -- I would have made an effort to
 3  draft a complaint that would show that I and my
 4  client were not proceeding with our eyes blind but
 5  that we are asserting a claim notwithstanding the
 6  purported defenses.
 7      Q.   Would you have still filed all the
 8  claims?
 9      A.   I don't know.
10      Q.   A couple of last questions.  Does
11  anybody look at how many claims you process per
12  week, per month, per year by some time scale?
13  Does anybody analyze your productivity?
14      A.   I think so.
15      Q.   Is that somebody at NLS that analyzes
16  your productivity?
17      A.   Yes.
18      Q.   Do they compare your recovery rate
19  versus the amount of time that you spend?
20          MS. NIGRO:  Objection.
21      A.   I don't know.
22      Q.   Do they ever have meetings with you to
23  discuss your productivity?
24          MS. NIGRO:  Objection.
25      A.   There were likely discussions.
```

Page 282

```
 1              SUSSMAN
 2      Q.   Who was involved in those discussions?
 3      A.   Ricky Brown, Sam Bono and maybe
 4  previously Sara Krieger.
 5      Q.   Mr. Sussman, thank you.
 6          MS. NIGRO:  It is 6:50.
 7      Q.   Thank you for your time.
 8      A.   Thank you.
 9          MR. ALTMAN:  There are some outstanding
10      disputes in terms of some privilege issues
11      that we did not resolve.  We may resolve those
12      things and you may take the position that we
13      have used up all our time; we may take a
14      different position, but with the exception of
15      those issues, you know, we will consider the
16      deposition concluded for today.
17          MS. NIGRO:  Thank you.
18          (Continued on next page.)
19
20
21
22
23
24
25
```

Page 283

```
 1
 2          THE VIDEOGRAPHER:  The time is now 6:51
 3  p.m., October 12, 2010.  This will conclude
 4  today's deposition of Mr. Sussman.  We are off
 5  the record now.
 6      (Time noted:  6:53 p.m.)
 7
 8
 9          JOSEPH I. SUSSMAN
10
11  Subscribed and sworn to before me
12  this      day of        , 2010.
13
14
15  (Notary Public)
16  My Commission Expires:
17
18
19
20
21
22
23
24
25
```

Page 284

```
 1
 2              C E R T I F I C A T E
 3  STATE OF NEW YORK   )
                        ss:
 4  COUNTY OF NEW YORK   )
 5
 6      I, BARBARA DRISCOLL, a Shorthand
 7  Reporter and a Notary Public within and for the
 8  State of New York, do hereby certify that the
 9  foregoing deposition of JOSEPH I. SUSSMAN was taken
10  before me on the 12th day of October, 2010;
11      That the said witness was duly sworn
12  before the commencement of his testimony; that the
13  said testimony was taken stenographically by me and
14  then transcribed.
15      I further certify that I am not related
16  by blood or marriage to any of the parties to this
17  action or interested directly or indirectly in the
18  matter in controversy; nor am I in the employ of
19  any of the counsel in this action.
20      IN WITNESS WHEREOF, I have hereunto set
21  my hand this 25th day of October, 2010.
22
23
24
              BARBARA DRISCOLL
25
```

Page 285

```
 1
 2                  I N D E X
 3   Examination                    Page
 4   JOSEPH I. SUSSMAN    MR. ALTMAN        5
 5
 6              E X H I B I T S
 7   No.        Description        Page
 8    1   amended complaint in this action Serin   19
 9   01   versus Northern Leasing
10    1   defendants' answer to the amended       19
11   02   complaint
12    1   subpoena to Joseph Sussman             20
13   03
14    1   duces tecum associated with subpoena   20
15   04
16    1   supplemental rule 26 disclosures,      35
17   05   Northern Leasing, et al., dated 5th of
18        October, 2010
19    1   e-mail dated October 5                 36
20   06
21    1   report from Applied Forensics LLC      71
22   07   dated July 18, 2010
23    1   document entitled CCS Users, Bates     81
24   08   numbered NLS 02597
25    1   document Bates numbered 1314 through   83
```

Page 286

```
 1
 2   09   1317
 3    1   document with the Bates number NLS 545   87
 4   10   through 551
 5    1   Bates numbers NLS 00766 and continuing  125
 6   11
 7    1   Bates number NLS 00710 entitled credit  126
 8   12   notification
 9    1   Bates number NLS 00709, verification    127
10   13   form
11    1   Bates 589                    133
12   14
13    1   Bates number 584, May 2, 2005 letter    144
14   15   from Northern Leasing to Melinda Serin
15    1   Bates number 592 through 596            148
16   16
17    1   Bates NLS 00552              152
18   17
19    1   document Bates stamped NLS 633 through  153
20   18   639
21    1   Bates numbers 839 through 842           161
22   19
23    1   Bates number 849             167
24   20
25    1   Bates number 896             179
```

Page 287

```
 1
 2   21
 3    1   Bates number 879             194
 4   22
 5    1   Bates number 853             196
 6   23
 7    1   Bates number 876             196
 8   24
 9    1   Bates 989                    199
10   25
11    1   Bates number 1084 through 1085         200
12   26
13    1   Bates number 850             201
14   27
15    1   Bates number 850             203
16   27
17    1   Bates number 892             208
18   28
19    1   Bates numbers 1207 through 1210        209
20   29
21    1   Bates 1050 through 1056                220
22   30
23    1   Bates 992 through 996                  221
24   31
25    1   Bates 1076 through 1087                224
```

Page 288

```
 1
 2   32
 3    1   Bates 1039 through 1047                225
 4   33
 5    1   Bates 999 through 1014                 234
 6   34
 7    1   Bates number 920 through 930           238
 8   35
 9    1   e-mails dated June 18, 2006 and August  240
10   36   1, 2006 between Joseph Sussman and Mr.
11        Chittur
12    1   Bates 952 through 960                  242
13   37
14    1   Bates 1031 through 1037                257
15   38
16    1   Bates number Sussman 339 through 345   258
17   39
18    1   Sussman 644 through 650                261
19   40
20    1   NLS 1689                     269
21   41
22    1   Bates number 1856            269
23   42
24    1   letter dated March 29, 2004            270
25   43
```

72 (Pages 285 to 288)

30ba659c-fafd-4a2d-b2ee-4e016e15179c

Page 289

```
 1
 2   1   Bates number 1733 through 1741        270
 3   44
 4   1   Bates 1696 through 1705              271
 5   45
 6   1   Bates number Sussman 2730 through 2735   272
 7   46
 8   1   document Bates 1653                 273
 9   47
10   1   Sussman Bates 631 and 632           273
11   48
12   1   Sussman 639                         278
13   49
14   1   Bates 1652                          279
15   50
16
17          INFORMATION REQUESTED
18          Page    Line
19           19      7
20
21          MARKED FOR RULINGS
22          Page    Line
23           79     25
24
25
```

Page 290

```
 1   OCTOBER 12, 2010 - JOSEPH I. SUSSMAN
 2          E R R A T A
 3    I wish to make the following changes, for the
 4   following reasons:
 5   PAGE LINE
         _____ _____ CHANGE _____
 6          REASON _____
 7    _____ _____ CHANGE _____
            REASON _____
 8
         _____ _____ CHANGE _____
 9          REASON _____
10    _____ _____ CHANGE _____
            REASON _____
11
         _____ _____ CHANGE _____
12          REASON _____
13    _____ _____ CHANGE _____
            REASON _____
14
         _____ _____ CHANGE _____
15          REASON _____
16    _____ _____ CHANGE _____
            REASON _____
17
         _____ _____ CHANGE _____
18          REASON _____
19    _____ _____ CHANGE _____
            REASON _____
20
         _____ _____ CHANGE _____
21          REASON _____
22    _____ _____ CHANGE _____
            REASON _____
23
         _____ _____ CHANGE _____
24          REASON _____
         _____ _____ CHANGE _____
            REASON _____
25   Hudson Reporting & Video, Inc.    1-800-310-1769
```

New York          Hudson Reporting & Video          New Jersey
212-273-9911      Nationwide 800-310-1769          732-906-2078