**United States District Court**
**Southern District Of New York**

| | |
|---|---|
| Melinda Serin, Judson Russ, Long Soui Lim, Peri Kettler, Gordon Redner, and Thomas J. Smith, Plaintiffs<br><br>v.<br><br>Northern Leasing Systems, Inc., Jay Cohen, Rich Hahn, and Sara Krieger Defendants | No. 06 CV 1625 (SCR) |

**Attorneys' Declaration In Support of Motion For Award of**

**Attorneys' Fees and Expenses**

Krishnan Chittur, Esq., an attorney duly admitted to the bar in New York and elsewhere, hereby solemnly affirms and states under penalty of perjury:

1. I am the principal of Chittur & Associates, P.C., lead counsel for the Plaintiffs herein. I file this affirmation in support of Plaintiffs' request, under the Settlement Agreement between the parties, under RICO, and under GBL 349, for an award of a total of $3,344,438.65, comprised of attorneys' fees of $3,202,232 and out-of-pocket expenses of $42,206.65. In accordance with settled law and practice, this includes a multiplier of 4 on the attorney time, which multiplier is to compensate Plaintiffs' counsel for (a) the extremely risky nature of this contingent fee litigation which has gone on for over six years (including the "inextricably linked" underlying City Civil Court proceedings); (b) the significant public policy interests vindicated by this proceeding, as well as (c) the significant monetary recovery for individual Plaintiffs. The five individual Plaintiffs'

accolades speak for themselves about the quality of representation, Plaintiffs' counsel's commitment, and the results obtained. "Ex. 1," Russ letter; "Ex. 2," Smith letter; "Ex. 3," Redner letter; "Ex. 4," Serin Letter; and "Ex. 5," Lim letter.

2. The application is supported by time-sheets which are contemporaneously maintained by lawyers themselves, except in case of the Finkelstein lawyers whose time-sheets are re-constructed based on contemporaneous documents and events. As detailed below, these fees and expenses were reasonably incurred in the prosecution of this action.

3. We are aware that "Man was created on the sixth day so that he could not be boastful, since he came after the flea in the order of creation," Haggadah, *Palestinian Talmud* (4th c.). However, the dictates of this motion require that we take refuge in immortal Montaigne: "To speak less of one's self than what one really is, is folly, not modesty; and to take that for current pay which is under a man's value is pusillanimity and cowardice." Montaigne, *Essays*, ("Use Makes Perfect") (1580-88), *quoted* in R. Tripp, *The International Thesaurus of Quotations*, 409 (1970 Ed.). Accordingly, I have to shelve much conventional modesty in order to justify, on the record, the award of attorneys' fees and expenses sought.

Facts Concerning This Action

4. Plaintiffs were victims of the massive, nationwide fraud which was being orchestrated by Defendants and their cohorts to entrap small businesspersons fraudulently into equipment leases and personal guarantees through systematic deceptive practices. When victims objected, Defendants intimidated them with lawsuits in the New York City Civil Court in Manhattan, far away from their regular abode, so that travel and litigation costs would

easily exceed Defendants' demands for tribute. Most small businesspersons simply succumbed and paid the tribute, which payments had kept the scam alive and profitable for Defendants for over fifteen years.[1] Plaintiffs' signatures were forged onto the alleged leases, but, unlike most other victims, Plaintiffs refused to pay tribute.

5. Plaintiff Judson Russ contacted my firm in 2004 in connection with three lawsuits that Northern Leasing had filed against him in the New York City Civil Court in Manhattan based upon his alleged guarantee of three leases. After discussions with Mr. Russ and review of his documents, it was crystal clear that Defendants knew *long before they brought the lawsuits* that Mr. Russ's signatures had been forged.[2] To avoid the expense of a full-blown trial and long-distance litigation, we moved to dismiss the lawsuits for *forum non conveniens*, on which motion the City Civil Court scheduled a hearing. Consistent with their strategy, Defendants refused to consent to a short, two-week adjournment of that hearing to accommodate Mr. Russ's scheduling conflict. But when Mr. Russ showed up in person in Court, Defendants' representatives were shocked and left speechless: obviously, they had expected that he, like most other victims, would default. Not surprisingly, Defendants had no evidence whatsoever to dispute Mr. Russ's well-supported claims of forgery, and the City Civil Court dismissed those lawsuits.

---

[1]Defendants' scam has been the subject of much litigation, including a class action wherein a fraud claim against Defendants and punitive damages thereon, has been upheld and is scheduled to go to trial before the New York Supreme Court, New York County.

[2]Mr. Russ was not even in the country when the alleged leases were signed, as clear from entries in his passport, an ATM receipt from Ukraine, and affidavits. As demanded by Defendants, he sent an affidavit of forgery with all these documents. In court filings in another lawsuit involving Defendants's scam, Defendants claimed that this evidence was "inconclusive."

Meanwhile, Defendants had made adverse entries in his personal credit report and otherwise inflicted injuries on Mr. Russ in Defendants' bid to extract tribute from him.

6. Around the same time, my firm was contacted by Ms. Serin in connection with a similar lawsuit that Defendants had filed against her in the same Court. Ms. Serin, then a 22-year old student in Washington, D.C., was sought to be saddled with personal liability for a business lease allegedly signed in her name in California. As with Mr. Russ, it was clear that Defendants knew *long before they brought the lawsuit against her* that her signatures had been forged.[3] Once again, Defendants persisted in their lawsuit, forcing her to personally come to New York City Civil Court, *pro se*, to attend the hearing in the New York City Civil Court. And when she did appear, Defendants voluntarily dismissed the action against her with prejudice. Meanwhile, Defendants had made adverse entries in her personal credit report and otherwise inflicted injuries on her.

7. The four other Plaintiffs had similar experiences: the signatures of each of them had been forged onto alleged leases, and each (except Mr. Redner)[4] had been sued in the New York City Civil Court based on these forgeries. We were similarly retained by all of them.

8. We reviewed the documents concerning each of these Plaintiffs, and had extensive discussions with each of them. From these discussions, and from other investigation we conducted, Defendants' *modus operandi* was clear: Defendants would bring these

---

[3]Ms. Serin had also submitted an affidavit of forgery and all documents demanded by Defendants, but to no avail. In fact, Defendants had themselves given her a general release in 2003 concerning the same lease, but turned around and demanded tribute from her once again two years later.

[4]Redner had been threatened with such a lawsuit, which was clearly in the works.

fraudulent lawsuits to bully out-of-state individuals, but when the individuals really showed up in Court, Defendants would either voluntarily dismiss the proceeding or fail to present any evidence. This was a clear misuse of our judicial system. While we were also contacted by many other similar victims, those victims were unwilling to shoulder the litigant's typical responsibilities concerning discovery and deposition. However, it was clear that Defendants were regularly misusing New York's judicial system.

9. We conducted a thorough legal research on the viability of holding Defendants accountable for this misuse, and victimizing of hapless victims from other states. Based on our legal research, we drafted and filed a complaint in this action on March 1, 2006. The complaint asserted racketeering claims based upon predicate actions violative of the Hobbs Act (extortion), and under Section 349, GBL.

10. Soon thereafter, we requested Defendants' counsel Milberg Weiss to stay Defendants' lawsuits in the City Civil Court so as to avoid waste of resources in duplicative litigation. However, they refused.[5]

11. The case was assigned to Judge Robinson. In accordance with his Rules, we conferred with Milberg Weiss, and submitted a case management plan. Judge Robinson held an initial conference; but soon thereafter, Defendants' substituted Milberg Weiss with Epstein Becker. Defendants then moved to dismiss the claims in their entirety.

---

[5]Consequently, we sought a pre-motion conference with Judge Robinson for a stay order. However, in light of discussions in the scheduling conference, we refrained from filing that motion. As a result, we had to litigate the City Civil Court lawsuits simultaneously. Defendants' lawsuits against Russ were dismissed only on December 6, 2006, and against Lim on April 20, 2006. The action against Serin was dismissed before this action was commenced, and after some motion practice by us, Defendants effectively abandoned the lawsuits in the City Civil Court against the remaining Plaintiffs.

12. We conducted extensive legal research, and briefed and argued that motion. At oral argument, Judge Robinson observed that the predicate acts based on violation of the Hobbs Act could not, by themselves, sustain the RICO claims because case law disapproved the mere filing of meritless lawsuits to be predicate acts, and no authority existed to distinguish fraudulent lawsuits from meritless ones. However, we pointed out, and Judge Robinson agreed, that the facts here would also sustain mail and wire fraud, which were indisputably sufficient predicate acts for RICO claims. Accordingly, he dismissed the action with leave to replead. Thereupon, we filed the amended complaint asserting these predicate acts of mail and wire fraud, together with Hobbs Act violations.

13. Despite Judge Robinson's observations from the Bench at oral argument, Defendants - represented by new counsel, Moses & Singer - moved, once again, to dismiss. Once again, we conducted a thorough legal research, and briefed the motion.

14. While that motion was pending, the parties held settlement discussions through a mediator from JAMS, Ms. Margaret Shaw. For this purpose, we enlisted Seth Lesser, Esq., who also has considerable experience handling and resolving complex cases. Unfortunately, those discussions were unsuccessful.[6]

15. By an order of December 18, 2009, Judge Gwin - to whom the case had been reassigned from Judge Robinson - upheld the claims. Thereafter, Judge Gwin held a status conference by telephone, and entered a case management order. Trial was set for September 20, 2010.

---

[6]Attesting to the remarkable success achieved here by Plaintiffs' counsel's efforts is the fact that in those mediation discussions, Defendants offered to pay Plaintiffs cumulatively less than 5% of what they have to pay under this settlement entered into on the eve of trial.

16. We served the automatic disclosures under Rule 26, and reviewed Defendants' disclosures. Discovery then commenced in full swing. Both sides promptly served discovery requests. We consulted with each of the five Plaintiffs, and drafted responses and objections to Defendants' discovery requests, and produced all non-objectionable documents.

17. Discovery was particularly contentious and the parties and the Court spent a significant amount of time resolving discovery issues. We held innumerable "meet and confer" sessions to attempt resolution of discovery deficiencies. Disputes regarding discovery were the subject of over forty letter-briefs, four telephone conferences with the Court, and fifteen written orders from the Court which addressed several issues such as: Defendants' refusal to produce the compensation and personnel records of certain employees, Defendants' refusal to produce complaints with the BBB and governmental authorities, and Defendants' refusal to produce emails of concerned personnel; Defendants' City Civil Court Counsel Sussman's assertion of the attorney-client privilege, and refusal to produce documents; Defendants belated amendment of their Rule 26 disclosures to name hitherto unnamed employees as material witnesses while simultaneously refusing to permit Plaintiffs to take their depositions.

18. Eventually, Defendants produced over a million documents, including about 800,000 emails produced electronically in a hard drive. Plaintiffs' counsel had to review, analyze, and synthesize all these documents and the information contained therein for effective use at deposition and trial.

19. In addition, Plaintiffs' counsel also had to and did confer with Plaintiffs with respect to

various discovery demands from Defendants to ascertain the existence/availability of documents. After review, and after researching viable objections to some discovery demands, Plaintiffs' counsel arranged for production of these documents and served timely objections with respect to the rest.

20. Defendants' discovery tactics were aggressive. This is illustrated by their insistence that Plaintiffs produce bank statements reflecting Defendants' automatic deductions from Plaintiffs' bank accounts going back to over a decade. Defendants' own documents evidenced these deductions, and there was no dispute on this issue. Plaintiffs did not have these bank records. Nevertheless, Defendants raised a Rule 37 dispute seeking orders that Plaintiffs go to their banks and obtain these statements from their banks. Eventually, the Court directed certain Plaintiffs to obtain such statements if available, but the banks reported that these documents would have been destroyed in the normal course several years earlier. Every item in discovery was this contentious and disputed.

21. Plaintiffs' counsel prepared for and took nine depositions of Defendants and various Defendants' employees. Some of these had to be taken multiple times because Defendants produced court-ordered documents belatedly, so that the first deposition had to be kept open and could not be concluded.

22. Plaintiffs' counsel also prepared Plaintiffs for their depositions, and defended those depositions. Four of the Plaintiffs were deposed in New York. One Plaintiff, Thomas Smith, could not travel due to medical reasons. To protect his claims, Plaintiffs' counsel agreed to and did pay for Defendants' counsel's taking of his deposition by videoconference from New York.

23. In addition, Plaintiffs' counsel spoke to and identified non-party witnesses for trial. Defendants issued subpoenas for taking the deposition of these non-party witnesses, which had to be defended by Plaintiffs' counsel. Earlier, Plaintiffs' counsel also subpoenaed Defendants' attorney in the City Civil Court, and took his deposition.

24. Plaintiffs' counsel retained Dr. Stan Smith, a nationally renowned economist, as their testifying expert on the issue of Plaintiffs' damages at trial. Plaintiffs' counsel conferred with Dr. Smith, with Plaintiffs, discussed Dr. Smith's findings, and reviewed his damage reports for each of the five Plaintiffs. Plaintiffs' counsel also responded to Defendants' discovery demands in that connection, and defended Dr. Smith's deposition.

25. Defendants, for their part, retained and provided two expert reports, Dr. Erath's report on Plaintiffs' damages, and Mr. Ryan's report as handwriting expert. Plaintiffs' counsel reviewed these reports, and discussed them with co-counsel and Plaintiffs' own testifying expert Dr. Smith.

26. Dr. Smith's report was also the subject of a *Daubert* motion by Defendants. Plaintiffs' counsel researched and briefed that motion.

27. In addition, Defendants also filed several motions in limine, which had to be researched and briefed by Plaintiffs' counsel.

28. Further, Plaintiffs' counsel also drafted, researched, and prepared Plaintiffs' portion of the Joint Pre-Trial Order, Plaintiffs' Jury Instructions and Jury Charges, and Proposed Voir Dire.

29. Eventually, the matter was settled just four days before trial, on Wednesday, November 10, 2010. By then, Plaintiffs' counsel had expended most of the time necessary to

prepare for trial. The videotaped depositions were reviewed, excerpted, and then synchronized with the transcript for use at trial. Plaintiffs counsel also finalized Plaintiffs' exhibits to be used at trial.

30. The settlement negotiations were arduous and time-consuming. The Court convened a telephone conference for settlement purposes, after which Plaintiffs sent an all-inclusive settlement proposal. Defendants countered with a proposal precluding Plaintiffs' counsel attorneys' fees, and after discussion amongst Plaintiffs' counsel, the parties eventually agreed on a letter agreement of November 10, whereunder the issue of Plaintiffs' counsel's attorneys' fees and expenses was to be determined by the Court, as were any differences with respect to the formalization of the Settlement Agreement. The settlement was affirmed in open Court on November 15, 2010 before Judge Gwin.

31. The entire amount provided for by the settlement goes to the individual Plaintiffs; no portion of that is to be retained for attorneys' fees or litigation expenses. With respect to Plaintiffs' counsel's attorneys' fees and expenses,[7] the agreement provided:

> Northern will not challenge Plaintiffs' attorneys' right to recover attorneys' fees in a hearing or proceeding to be held before Judge Gwin or a U.S. Magistrate Judge. Northern reserves the right to challenge the amount or reasonableness of the attorneys' fees sought by Plaintiffs' attorneys. Judge Gwin will retain jurisdiction over this case until the fee application is decided.

Court Ex. 1, Tr. Nov. 15, 2010.[8]

---

[7]Defendants' counsel acknowledged in a contemporaneous email that "attorneys' fees" was understood to include out-of-pocket expenses also. "Ex. 17," Email of Nov. 10, 2010.

[8]The settlement is confidential, and hence, not being submitted herewith. It is, however, a part of the Court record of November 15, 2010, and can be readily provided for confidential review by the Court upon request.

32. However, Defendants have continued to drag their heels on formalizing the Settlement Agreement. Defendants first circulated a draft of such agreement on November 12, 2010, which Plaintiffs' counsel promptly reviewed and marked up to reflect the true intent of the agreement, and circulated that on November 14, 2010. Defendants' counsel said nothing about Plaintiffs' proposed revisions in the November 15th conference; however, thereafter, they claimed that Plaintiffs' revisions were material changes to the Settlement Agreement. Judge Gwin resolved that issue, but Defendants have still not submitted final papers whereby Plaintiffs can get paid their dues under the Settlement Agreement.[9]

33. Plaintiffs are obviously delighted with the settlement: Defendants had sued to recover money *from* them, and Plaintiffs could had been unable to get lawyers to defend them. We not only defended Plaintiffs successfully, but got them a handsome monetary compensation. As Plaintiff Judson Russ has stated:

> I found no one interested in defend[ing] my case, let alone help me recuperate the losses I had suffered due to Northern Leasing trashing my personal credit report based on these forgeries. I was at a total loss on what to do, when I came across your firm during a search on the Internet. Boy, was that a god-send! . . .
> . . . From being unable to get a lawyer to represent me, I found excellent representation. . .
> . . . Throughout this entire period, your persistence and commitment to protecting my interests was remarkable. You ungrudgingly put in the time and resources that were necessary. I know that you have had significant ongoing expenses, but you never let my case suffer for want of attention or time for over six years. Finally, you obtained a settlement where I am to

[9] Defendants submitted a revised "final" agreement on December 21, but when Plaintiffs' counsel reviewed and approved it promptly, Defendants reneged. Asserting that their own documents did not accurately reflect the parties' agreement, they sent yet another version - but this time also, made it "subject to revision." Plaintiffs' counsel refused to waste further time reviewing yet another draft until Defendants reverted with a version which was - at least according to Defendants - the final version which the parties could sign off.

> be paid multiple times what I had expected to recover.
> You far exceeded anything I expected. Words cannot express how delighted I am at the quality of your legal services, your commitment to protecting my interests, your performance throughout the last six years, and the success you achieved.

"Ex. 1," Russ letter.

34. The deterrent effect, and public policy implications of this proceeding are also recognized by the Plaintiffs themselves. As Plaintiff Smith stated:

> Hopefully, we have now put a stop to the unfair and unjust practices of Northern Leasing. Without your held, I am sure that we would still be trying to deal with Northern Leasing and their unscrupulous business practices.

"Ex. 2," Smith letter. The other three Plaintiffs have also echoed these sentiments. "Ex. 3," Redner letter ("It has been a long time coming since 2004 when it all started. I am very pleased with the outcome of my case . ."); "Ex. 5," Lim ("For years, my family and I had suffered various forms of threats, intimidations and extortions from these cons. I am so glad you put an end to it. . . There was moment I thought this case would never getting anywhere and it impossible to win, but your tireless efforts and persistent in your works had made all this possible. . . I hope every person had been victimized by NLS will come to seek helps from you."); "Ex. 4," Serin Letter ("Mr. Chittur made sure to get me what I wanted, and what I deserved.").

35. In sum, Plaintiffs' counsel put in a humongous amount of time and effort for over six years in this complicated case. This motion for attorneys' fees is being filed in accordance with the directions of Judge Gwin on November 15, 2010.[10]

---

[10]The briefing schedule was amended once to accommodate Plaintiffs' counsel's trial in the United States Court for Eastern District of New York.

Attorneys' Background, Experience

36. I am the principal of Chittur & Associates, P.C., a small Manhattan-based law firm specializing in complex civil litigation. As the principal attorney for Plaintiffs in this case, I oversaw the prosecution of this case from the inception. Being a small firm, we are particularly sensitive to conducting litigation efficiently, and to avoiding wasteful or duplicative work. The necessity for this heightened sensitivity is only highlighted by the contingent nature of cases such as this where we are required to keep investing time and resources for years and years, often with no relief in sight.

37. I have over 30 years of experience in complex litigation, including trials and appeals. I am a graduate of Harvard Law School and have been admitted to the bar in Mumbai, India, in several jurisdictions in the United States, and in the U.S. Supreme Court. Prior to founding Chittur and Associates, P.C., I was associated with nationally renowned litigation firms handling complex litigation. I have litigated before federal and state courts, conducted trials with and without juries, briefed and argued innumerable motions and several appeals, and also settled several complex cases. "Ex. 6," Biographical Data. The contents of this Biographical Data are true and accurate.

38. I have a track record of success in considerable number of cases before state and federal courts. "Ex 7," List of reported cases, with brief descriptions of some successes. In fact, I have come in for specific praise repeatedly for the quality of my work by judges, including Judge John S. Martin, Jr., of United States District Court (S.D.N.Y.) ("untiring efforts"); Justice Stephen Crane of the New York Supreme Court, New York County, and later of the Appellate Division, Second Department ("zealous representation"), Justice

Cahn, also of the New York Supreme Court, New York County ("unusually literate," "achieved very substantial results"), Justice Austin of the New York Supreme Court, Nassau County, and now of the Appellate Division, Second Department (""Mr. Chittur has been nothing short of tenacious on behalf of his client . . . it is, in fact, noted that his efforts were herculean and difficult ... which his client should note and should be appreciative of"), and most recently, Justice Martin Shulman of the New York Supreme Court, New York County ("more than qualified, is very experienced in prosecuting class actions").

39. Mr. Strutinskiy is an associate at my firm, and has worked under my supervision in this case. He is a 2003 graduate of Tulane Law School, and is admitted to the Bar in Ukraine and in New York (2004). Since my firm is a small firm, he is actively involved in every case that we handle, and as such has six years' experience.

40. The other attorneys involved have submitted their own declarations verifying their qualifications and billing rates.

Billing Rate, Time and Expenses

41. Annexed hereto is the time sheet that I maintained contemporaneously. "Ex. 18." These are true and accurate records of my time spent on this case, as recorded in my computer with the time software, Amicus Attorney (ver. 5.5.1). These time sheets reflect that I spent 560 hours in this case, which include 65.9 hours (as of yesterday) in the preparation of this fee application. As permitted by case law, I will submit a supplementary affirmation with the additional time and expense which may be incurred thereafter in connection with this motion.

42. My current billing rate is $600 per hour; that is the rate charged to our firm's regular paying clients. "Ex. 8," Retainer Agreement of May 29, 2010, with names redacted. Courts have held that contemporaneous billing rates should be used for award of attorneys' fees, and $600 is on the lower end of the range of normal fees for attorneys of my standing in Manhattan.

43. The reasonableness of my billing rate of $600 is also supported by the accompanying declarations of Stephen Gardner, Esq., "Ex. 9", and Brian Bromberg, Esq. "Ex. 10".

44. Further, these rates are also in line with Defendants' counsel's own billing rates, as clear from their own billing records,[11] which were produced under express orders from Judge Gwin on November 15, 2010. "Ex. 11." These billing records reflect rates of $635 for Mr. Skoff, an attorney of comparable experience and skill.[12]

45. Mr. Strutinskiy has billed a total of 617 hours, using the same software Amicus Attorney 5.5.1. Strutinskiy Aff., Ex. 12. His billing rate of $350 is also the rate at which our firm bills his time to our regular paying clients. His time includes 7.6 hours spent on this fee motion, and will be supplemented later as stated above.

46. In addition, the following attorneys also worked on discrete assignments in this case:

a. Mr. Sharma did legal research and assisted with drafting the Amended Complaint, and briefing on Defendants' subsequent motion to dismiss. His background, qualifications, and billing rates are detailed in his affirmation, Sharma Decl., "Ex. 13."

b. Mr. Lesser was involved primarily in the attempts to settle the case through

---

[11]Despite Judge Gwin's orders, Defendants redacted the most material information, such as what the specific person did, in their time-sheet productions. These wholesale redactions are clearly improper, and render it impossible to determine whether these time-sheets are accurate and encompass all the billings for this case. This is especially problematic since Defendants' counsel have been representing Northern Leasing in several other related cases also. But even de hors such information which could enable us discovery billing errors or failure to bill for activities in this case, Defendants' own documents reveals the no-holds barred tactics they employed in this action.

[12]These records also reflect a billing rate of $695 per hour for Mr. Bressler, who is not even a litigator or trial lawyer.

mediation. His background, qualifications, and billing rates are detailed in his affirmation, Lesser Decl., "Ex. 14";

c. Mr. Altman handled the e-discovery, reviewed the emails and other electronic documents, conducted depositions, and was actively involved in the discovery and pre-trial preparations. He also enlisted his colleagues from his firm to assist in briefing some issues. His background, qualifications, and billing rates are detailed in his affirmation, Keith Decl., Ex. 15.", together with Exhibits A-I.

Expenses

47. In addition, my firm incurred expenses of $41,275.45. in the prosecution of this case. "Ex. 15," Expenses incurred. Mr. Altman's firm incurred expenses of $931.20 as detailed in his affirmation. These expenses were reasonably incurred and are fully compensable.

48. We do not seek reimbursement for several categories of expenses which are routinely billed by other law firms to their clients. Indeed, Defendants' own billing records reflect several such items, such as bills for telephone, legal research (lexis/nexis, westlaw), carfare, and secretarial overtime.

49. As explained above, we also seek a relatively modest multiplier of 4. In this context, it is significant that the very nature of the racketeering at issue made it well- nigh impossible to obtain competent legal representation. The individual Plaintiffs were all out-of-state residents who had to be defended in the small claims section of the City Civil Court. The tenacious battle put up by Defendants, who spent over $2.3 million before finally agreeing to settle this action, only proves how hard-fought and difficult this action was.

Plaintiffs' counsel put in tireless efforts, and did not flinch at any time and finally, obtained a result that each Plaintiff was delighted with.

50. Moreover, from a public policy perspective, the significance of Plaintiffs' counsel's willingness to undertake prosecuting these claims can hardly be overstated. Defendants were clearly misusing the state court judicial system. This misuse had continued for a prolonged period of time, and given the relatively small amounts involved, was difficult if not impossible to stop, especially given the shrinking budgets of law enforcement authorities. Not a single attorney general or similar authority ever commenced proceedings to stop this misuse. Hence, Plaintiffs' counsel's success in this lawsuit should be appositely rewarded with a multiplier on their lodestar.

51. Thus, the total attorneys' fees and expenses sought by my firm for this case is as follows:

| Description | Rate | Number | Amount |
|---|---|---|---|
| Krishnan Chittur | $600 | 560 hours | $336,000 |
| Andrey Strutinskiy | $350 | 617.2 hours | $216,020 |
| Keith Altman & other Finkelstein lawyers | $425 | 582.3 hours | $247,477.50 |
| Seth Lesser | $660 | 8.5 hours | $5,610 |
| H. Rajan Sharma | $350 | 58.43 hours | $20,450.5 |
| Total | | 1,826.43 hours | $825,558 |
| Multiplier of 4 | | | $3,302,232 |
| | | | |

| Expenses | | | |
|---|---|---|---|
| Chittur & Associates | | | $41,275.45 |
| Finkelstein & Partners | | | $931.20 |
| Total Expenses | | | $42,206.65 |
| | | | |
| Grand total | | | $3,344,438.65 |

52. In view of the aforesaid, I request that the Court enter an award of attorneys' fees and expenses in the total amount of $3,344,438.65, to be supplemented with time spent and expenses incurred since December 29, 2010, the entire amount to carry with interest from the date of the award at the statutory rate.

Dated: New York, New York
December 30, 2010

/S/
Krishnan Chittur, Esq.