UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

MELINDA SERIN, JUDSON RUSS, LONG SOUI LIM,  :
PERI KETTLER, GORDON REDNER, and THOMAS  :
J. SMITH,  :          06 CV 1625 (SCR)
                                                            :
                                    Plaintiffs,  :
                                                            :
              -against-  :
                                                            :
NORTHERN LEASING SYSTEMS, INC., JAY  :
COHEN, RICH HAHN, and SARA KRIEGER,  :
                                                            :
                                    Defendant.  :
-------------------------------------------------------------------- X


### DEFENDANTS' MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFFS' OBJECTIONS TO CERTAIN PORTIONS OF THE REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE OF FEBRUARY 24, 2011


MOSES & SINGER LLP
*Attorneys for Defendants*
405 Lexington Avenue
New York, New York 10174
(212) 554-7800 (telephone)
(212) 554-7700 (facsimile)

Of Counsel:

Abraham Y. Skoff, Esq.
Robert D. Lillienstein, Esq.

TABLE OF AUTHORITIES ........................................................................................II

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ..................................................................................... 3

    A.    Northern's Business ........................................................................ 3

    B.    Plaintiffs' Claims .......................................................................... 3

    C.    The Lack Of Evidence Supporting Plaintiffs' Claims ........................... 4

ARGUMENT ............................................................................................................ 5

I.      LEGAL STANDARD ...................................................................................... 5

    A.    RICO ............................................................................................. 5

    B.    Section 349 .................................................................................... 7

II.     PLAINTIFFS OBJECTION BASED ON THEIR  ALLEGED "SUCCESS" IN
       THIS CASE IS WITHOUT MERIT ................................................................ 7

         1.    Melinda Serin ................................................................... 9

         2.    Judson Russ ..................................................................... 10

         3.    Gordon Redner ................................................................. 11

         4.    Long Soui Lim ................................................................. 12

         5.    Thomas Smith .................................................................. 13

         6.    Defendants' Motions In Limine ......................................... 14

III.    THERE IS NO JUSTIFICATION FOR A MULTIPLIER IN THIS CASE .................. 16

IV.    FEES SHOULD NOT BE BASED ON THE AMOUNTS SPENT BY
       DEFENDANTS ............................................................................................ 19

V.     THE AWARD SHOULD BE REDUCED FOR VAGUE TIME ENTRIES,
       WORK DONE ON OTHER CASES, AND FOR EXCESSIVE BILLING.................. 19

    A.    Vague Time Entries ...................................................................... 19

    B.    Work Performed In Other Cases ...................................................... 21

    C.    Post-Settlement Time Charges ........................................................ 22

    D.    Junior Level Work Performed By More Senior Attorneys .................... 23

VI.    THERE SHOULD BE NO AWARD AGAINST THE INDIVIDUAL
       DEFENDANTS ............................................................................................ 25

CONCLUSION ......................................................................................................... 25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Adorno v. Port Authority of New York and New Jersey*,
685 F. Supp. 2d 507 (S.D.N.Y. 2010)...............................................................8, 9

*Aetna Cas. & Surety Co. v. Liebowitz*, 730 F.2d 905 (2d Cir. 1984)............................................25

*In re AOL Time Warner Shareholder Derivative Litigation*,
No. 02 Civ. 6302, 2010 WL 363113 (S.D.N.Y. Feb. 1, 2010) ..........................................17

*Baird v. Boies, Schiller & Flexner LLP*,
219 F. Supp. 2d 510 (S.D.N.Y. 2002)...............................................................8, 9

*Barfield v. New York City Health and Hospitals Corp.*,
537 F.3d 132 (2d Cir. 2008)........................................................................8

*Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*,
190 F. Supp. 2d 407 (E.D.N.Y. 2002), *rev'd on other grounds and remanded sub nom.*, *Empire Healthchoice, Inc. v. Philip Morris USA, Inc.*, 393 F.3d 312 (2d Cir. 2004) .....................................................................................7

*Cheesecake Factory Assets Co. LLC v. Philadelphia Cheese Steak Factory Inc.*,
No. 05-CV-3243, 2008 WL 2510601 (E.D.N.Y. June 20, 2008) .....................................21

*Chicago Professional Sports Ltd. Partnership v. National Basketball Association*,
No. 90 C 6247, 1996 WL 66111 (N.D. Ill. Feb 13, 1996)..............................................19

*In re Comverse Technology, Inc. Securities Litigation*
No. 06-CV-1825, 2010 WL 2653354 (E.D.N.Y. June 24, 2010) .....................................17

*Dailey v. Societe Generale*,
108 F.3d 451 (2d Cir. 1997).......................................................................21

*Dailey v. Societe Generale*,
915 F. Supp. 1315 (S.D.N.Y. 1996)...............................................................21

*deMunecas v. Bold Food, LLC*
No. 09 Civ. 00440, 2010 WL 3322580 (S.D.N.Y. Aug. 23, 2010) ..................................17

*D.H. Blair & Co., Inc. v. Gottdiener*,
No. 03 Civ. 2908, 2010 WL 4258967 (S.D.N.Y. Oct. 27, 2010) .....................................18

*Diaz v. Paragon Motors of Woodside, Inc.*,
No. CV-03-6466, 2008 U.S. Dist. LEXIS 37440 (E.D.N.Y. May 6, 2008) .......................6

*F.H. Krear & Co. v. Nineteen Named Trustees*,
  810 F.2d 1250 (2d Cir. 1987)................................................................20, 21

*Farrar v. Hobby*,
  506 U.S. 103, 113 S. Ct. 566 (1992)..........................................................7

*Fogarazzo v. Lehman Brothers, Inc.*,
  No. 03 Civ. 5194, 2011 WL 671745 (S.D.N.Y Feb. 23, 2011) .........................................17

*In re Global Crossing Securities and ERISA Litigation*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ...........................................................16, 17

*Green v. Torres*,
  361 F.3d 96 (2d Cir. 2004)......................................................................8

*Gulfstream III Associates, Inc v. Gulfstream Aerospace Corp.*,
  995 F.2d 414 (3d Cir. 1993)....................................................................22

*Hensley v. Eckerhart*,
  461 U.S. 424, 103 S. Ct. 1933 (1983)......................................................6, 8

*Humane Society of the United States v. HVFG, LLC*,
  No. 06 CV 6829, 2010 WL 3322512 (S.D.N.Y. Aug 19, 2010) .........................................8

*Johnson v. Georgia Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974) ...................................................................6

*Kassim v. City of Schenectady*,
  415 F.3d 246 (2d Cir. 2005)....................................................................8

*Kirsch v. Fleet Street Ltd.*,
  148 F.3d 149 (2d Cir. 1998)................................................................6, 21

*Kronfeld v. Transworld Airlines, Inc.*,
  129 F.R.D. 598 (S.D.N.Y. 1990) ...............................................................24

*La Barbera v. Pass 1234 Trucking, Inc.*,
  No. 04 CV 1364, 2007 WL 2908175 (E.D.N.Y. Sept. 28, 2007).....................................21

*Leuzinger v. County of Lake*,
  No. C 06-00398, 2009 WL 839056 (N.D. Cal. Mar. 30, 2009).........................................18

*Lukaszuk v. Sudeen*,
  No. CV 02-5143, 2007 WL 4699018 (E.D.N.Y. Nov. 27, 2007)................................6, 20

*Maley v. Del Global Technologies Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2007)..............................................................................17

*Marshall v. State of New York Div. of State Police*,
    31 F. Supp. 2d 100 (N.D.N.Y. 1998) ...............................................................................21

*McDaniel  v. County of Schenectady*,
    595 F.3d 411 (2d Cir. 2010)..............................................................................................17

*McDow v. Rosado*,
    657 F. Supp. 2d 463 (S.D.N.Y. 2009)................................................................................8

*Meriwether v. Coughlin*,
    727 F. Supp. 823 (S.D.N.Y. 1989)...................................................................................20

*Miller v. Midpoint Resolution Group, LLC*,
    608 F. Supp. 2d 389 (W.D.N.Y. 2009) ..............................................................15, 16, 18

*Miltland Raleigh-Durham v. Myers*,
    840 F. Supp. 235 (S.D.N.Y. 1993)....................................................................................6

*New York State Association for Retarded Children, Inc. v. Carey*,
    711 F.2d 1136 (2d Cir. 1983)......................................................................................2, 20

*Nu-Life Const. Corp. v. Board of Education of City of New York, Division of School
Buildings of the Board of Education of the City of New York*,
    795 F. Supp. 602 (E.D.N.Y. 1992) ..................................................................................20

*Nwagboli v. Teamwork Transport Corp.*,
    No. 08 Civ. 4562, 2009 U.S. Dist. LEXIS 121893 (S.D.N.Y. Dec. 7, 2009)................6, 7

*Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.*,
    776 F.2d 646 (7th Cir. 1985) ...........................................................................................19

*Oxford Venture Fund Ltd. Partnership v. CIT Group/Equipment Financing, Inc.*,
    No. 89 Civ. 1836, 1990 WL 176102 (S.D.N.Y. Nov 05, 1990) .......................................21

*Pinkham v. Camex, Inc.*,
    84 F.3d 292 (8th Cir. 1996) .............................................................................................22

*Quantum Communications Corp. v. Star Broadcasting, Inc.*,
    491 F. Supp. 2d 1123 (S.D. Fla. 2007) ......................................................................22, 24

*Rabin v. Concord Assets Group*,
    No. 89 Civ. 6130, 1991 WL 275757 (S.D.N.Y. Dec. 19, 1991).......................................17

*Riordan v. Nationwide Mutual Fire Ins. Co.*,
    977 F.2d 47 (2d Cir. 1992)..................................................................................7

*Schwartz v. Chan*,
    142 F. Supp. 2d 325 (E.D.N.Y. 2001) ............................................................20

*Scott v. City of New York*,
    2009 WL 2610747 (S.D.N.Y. Aug 25, 2009), *vacated*, 626 F.3d 130 (2d Cir. Dec.
    1, 2010), *on remand to* No. 02 Civ. 9530, 2011 WL 867242 (S.D.N.Y. Mar. 09,
    2011) ............................................................................................................2, 6

*Shannon v. Fireman's Fund Ins. Co.*,
    156 F. Supp. 2d 279 (S.D.N.Y. 2001)............................................................24

*Skold v. American International Group, Inc.*,
    No. 96 CIV 7137, 1999 WL 405539 (S.D.N.Y. June 18, 1999).......................21

*Storfer v. Guarantee Trust Life Insurance Co.*,
    No. 10-60400-CV, 2011 WL 213461 (S.D. Fla. Jan. 21, 2011) .......................18

*In re Telik, Inc. Securities Litigation*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008)............................................................17

*U.S. Football League v. National Football League*,
    887 F.2d 408 (2d Cir. 1989), *cert. denied*, 493 U.S. 1071 (1990)...................20

*In re Unisys Corp. Retiree Medical Benefits Erisa Litigation*,
    No. 03-3924, 2008 WL 2600364 (E.D. Pa. June 26, 2008).............................22

*Wise v. Kelly*,
    620 F. Supp. 2d 435 (S.D.N.Y. 2008)............................................................20

*In re Worldcom, Inc. Securities Litigation*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005)............................................................17

**STATE CASES**

*Donovan v. Poway Unified School District*,
    167 Cal. App. 4th 567, 84 Cal. Rptr. 3d 285 (2008)........................................18

**FEDERAL STATUTES**

42 U.S.C. §1988.......................................................................................................18

18 U.S.C. § 1964(c) .................................................................................................5

**PRELIMINARY STATEMENT**

Defendants, Northern Leasing Systems, Inc. ("Northern"), Jay Cohen, Rich Hahn and Sara Krieger (the "Individual Defendants" and together with Northern, the "Defendants"), by their attorneys Moses & Singer LLP, submit this memorandum of law in response to Plaintiffs' Opposition To Certain Portions of the Report and Recommendation (the "Report") of Magistrate Judge of February 24, 2011 (dkt. 153) ("Plaintiffs' Mem."). For the reasons that follow, all of Plaintiffs' objections should be rejected.

The argument that an increased award, or even a multiplier, is justified by the "extraordinary result" that they achieved, is simply not based on reality. When the Court compares what Plaintiffs sought in their Amended Complaint to what they achieved through settlement, as Second Circuit case law requires, it is clear that Plaintiffs achieved remarkably little in this case, other than forcing Northern to incur tremendous defense costs. Despite all of the discovery provided by Defendants, Plaintiffs found no support for their contention that Northern "misused" the court system by knowingly filing lawsuits based on forged leases. The confidential settlement agreement does not require Northern to change its business practices in any way, and has no deterrent effect. Under applicable law, Plaintiffs' clear lack of success warrants a further reduction of the amount recommended in the Report, not an increase.[1]

Plaintiffs' suggestion that an award of fees should be linked to the amount of fees that Northern had to pay in defending this case is illogical and unsupported by applicable case law. The amounts spent by Northern were the result of Plaintiffs' aggressive push for discovery, which resulted in nothing of value. The Court should not reward Plaintiffs' counsel for engaging in wasteful litigation.

---

[1]   This argument is discussed in detail in Defendant Northern Leasing System, Inc.'s Objections To Certain Portions Of The Report And Recommendation Of Magistrate Judge Paul E. Davison, Dated February 24, 2011 (dkt.155), at pp. 8-11.

Counsel's argument that they should be compensated for time spent litigating other cases in the New York City Civil Court is disingenuous. Despite submitting a 414 page motion in support of their fee request, Counsel failed to demonstrate that <u>any</u> of the work product from the Civil Court litigations was actually used in the present litigation. Indeed, much of that work involved cases that are completely unrelated to the Plaintiffs in this case.

The Report also properly recommends reduction of Counsel's hourly rates because much of the time was spent performing tasks that should have been performed by less experienced lawyers, or by paralegals or secretaries, at much lower rates. Northern should not be required to compensate Mr. Chittur at $600 per hour for doing legal research. Nor should Northern be required to compensate Mr. Altman at $450 per hour for reviewing documents, or Mr. Strutinskiy at $350 per hour, for holding a video camera, making copies, delivering papers, or arranging the file.

The Magistrate's conclusion that many of Plaintiffs' attorneys' ("Counsel") time charges are excessively vague, and that many others contain numerous tasks lumped together, making it "difficult if not impossible for a court to determine the reasonableness of the time spent on each of the individual services" (dkt/ # 153, p. 13 [internal quotation marks omitted]), is amply supported by the record.

Because Mr. Altman and the other attorneys at Finkelstein & Partners failed to maintain or produce contemporaneous time records, Second Circuit authority requires that all of their time be excluded from any award. *See Scott v. City of New York*, 626 F.3d 130, 133 (2d Cir. 2010); *N.Y. State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1147 (2d Cir. 1983). If the Court decides to include any of the Finkelstein attorneys' time in an award, Defendants believe that the Court should reduce Mr. Altman's time significantly beyond the 35% figure recommended by the

Magistrate.  Finally, Counsel's claim that the individual defendants should be held liable for any award is completely frivolous, and has already been rejected by this Court.

## FACTUAL BACKGROUND

### A.  Northern's Business

Northern is an equipment lease finance company that primarily serves the credit card authorization equipment market.  Credit card authorization equipment (*e.g.*, point of sale terminals) is generally marketed by vendors of credit card processing services.  Such vendors typically offer their customers the option of acquiring equipment through a lease, including, but not limited to, the leasing program offered by Northern.  Northern typically has no contact with any merchant/lessee prior to the time when the vendor and the merchant select equipment, choose Northern as the lessor, and submit a signed lease application to Northern.  The lease form is provided to the merchant/lessee by the vendor.  The lease form is submitted to Northern for acceptance only after the merchant/lessee has already signed it.  If, after doing its underwriting, Northern accepts the lease, it purchases the equipment chosen by the merchant from the vendor, and executes the lease.

In the case of the six Plaintiffs in this case, Northern paid the vendors a total of $13,950.31 to purchase equipment that it leased to the businesses identified on the leases – leases that appeared to be valid instruments, duly executed by the persons identified in the documents, and which passed Northern's credit review and verification checks.

### B.  Plaintiffs' Claims

The Amended Complaint alleges a fraudulent scheme that was alleged to consist of starting "bogus legal proceedings" (dkt. 26, ¶13), "[b]ased on forged documents, which Defendants knew were forged" (*id*. at ¶99; emphasis in original), "solely for the purpose of injuring Plaintiffs and recovering unwarranted sums through extortion."  *Id*. at ¶99.  As this Court described Plaintiffs'

claims, "Plaintiffs … allege that Defendants Northern Leasing Systems, Inc. … Jay Cohen, Rich Hahn, and Sara Krieger engaged in a racketeering scheme <u>by forging leases bearing Plaintiffs' names and signatures and then commencing lawsuits against the Plaintiffs in New York City Civil Court</u>, in an effort to extort money from the Plaintiffs, who all live out-of-state."   Opinion & Order, December 17, 2009 (dkt. 46), at p. 1-2 (emphasis added).

### C.       The Lack Of Evidence Supporting Plaintiffs' Claims

Despite the extensive discovery that was provided by Defendants, Counsel was unable to establish that Defendants knowingly commenced any lawsuits based on forged leases, including the lawsuits that were commenced against some of the Plaintiffs.  (Northern didn't sue Redner). Plaintiffs were unable to demonstrate that the lawsuits commenced by Defendants against the Plaintiffs were "bogus", or that Defendants motivation in commencing those lawsuits was anything other than to collect payments that Northern believed, in good faith, were owed to it, after investing thousands of dollars to purchase equipment for these specific Plaintiffs.

Northern invested $13,950.31 in equipment because it believed that there were nine legitimate finance leases in place, that they were all properly signed by the six Plaintiffs, and that Northern could reasonably expect to recoup its investment, and a profit, by receiving the monthly payments called for in those leases.  Northern had no incentive to make an investment in equipment if it had any reason to suspect that a particular lease was forged.  There was nothing in the Plaintiffs' leases to alert Northern to the possibility that the Plaintiffs' signatures were forged. The Plaintiffs' names, addresses, social security numbers, telephone numbers and other identifying information all checked out.  After the leases were signed, Northern verified that the equipment was installed and was operating properly.  And in most cases, monthly lease payments were made by the Plaintiffs via direct withdrawals, known as "ACH withdrawals," from the bank

accounts identified in the leases, for many months, without any objection, before they became delinquent.

Only much later did Northern learn that some of the Plaintiffs (though not all) claimed that their signatures had been forged.  In two cases (Serin and Smith), Northern did not learn of a forgery claim until *after* it had already begun the process of starting lawsuits to collect the amounts due on the leases.  In two cases (Smith and Redner), Northern was *never* advised that the Plaintiff claimed that a signature on the lease was forged until this action was started.

In a situation involving a claim of forgery, Northern has procedures that it follows to determine whether the claim is valid or not.  If it determines that that the lease was forged, it usually has contractual recourse with the vendor, by charging back the amount that Northern originally funded.  Northern has no incentive to fund leases and commence lawsuits against merchants in situations in which it believes that there has been a forgery.  As discussed in greater detail below, after following those procedures, and looking at the facts available to it, Northern was not convinced that there was a forgery in the cases of these Plaintiffs, and as to some of them, Northern filed collection actions. [2]

## ARGUMENT

## I.   LEGAL STANDARD

### A.   RICO

The RICO statute provides that any person injured as a result of a violation thereof may sue and recover damages and "the cost of the suit, including a reasonable attorney's fee."  18 U.S.C. § 1964(c).  In the Second Circuit, what constitutes a reasonable attorney's fee under RICO (or otherwise) is first determined by calculating the "presumptively reasonable fee," or the

---

[2] With respect to a plaintiff who claimed forgery, Northern retained a forensic examiner and former forensic document examiner for the Nassau County Police Department, who determined and opined, as set forth in his expert report, that there was no basis from a normal examination of the document to believe that it was a forgery.  *See* letter, dated October 27, 2010, enclosing expert report of Dennis Ryan.

"lodestar." *See Lukaszuk v. Sudeen*, No. CV 02-5143, 2007 WL 4699018 at *10 (E.D.N.Y. Nov. 27, 2007); *see also Nwagboli v. Teamwork Transp. Corp.*, No. 08 Civ. 4562, 2009 U.S. Dist. LEXIS 121893 at *26 (S.D.N.Y. Dec. 7, 2009); *Diaz v. Paragon Motors of Woodside, Inc.*, No. CV-03-6466, 2008 U.S. Dist. LEXIS 37440 at *19-20 (E.D.N.Y. May 6, 2008).  The "presumptively reasonable fee" or "lodestar" is reached by multiplying all <u>reasonable</u> hours expended by the successful party's attorney by a <u>reasonable</u> hourly billable rate.  *See Mitland Raleigh-Durham v. Myers*, 840 F. Supp. 235, 238 (S.D.N.Y. 1993); *Nwagboli*, 2009 U.S. Dist. LEXIS 121893, at *26 ("[T]he 'presumptively reasonable fee,' … is 'the product of hours worked and an hourly rate.'" (citation omitted).

Courts should exclude hours that are "excessive, redundant, or otherwise unnecessary," and can do so by simply deducting "a reasonable percentage of the number of hours claimed … ." *Nwagboli*, 2009 U.S. Dist. LEXIS 121893, at *30 (citations and internal quotation marks omitted); *Scott v. City of New York*, No. 02 Civ. 9530, 2009 WL 2610747 (S.D.N.Y. Aug 25, 2009) (reducing fee award by 30%), *vacated and remanded on other grounds*, 626 F.3d 130 (2d Cir. Dec. 1, 2010), *on remand,* No. 02 Civ. 9530, 2011 WL 867242 (S.D.N.Y. Mar 09, 2011) (adhering to original award).  The Court should also reduce or eliminate any time charges where the hours were inadequately documented or not reasonably expended.  *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983); *Kirsch v. Fleet Street Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) ("we see no abuse of discretion in the ... reduction for vagueness, inconsistencies, and other deficiencies in the billing records").

The Supreme Court noted in *Hensley*, *supra,* 461 U.S. at 429-430 that a district court may adjust the lodestar amount by taking into consideration the factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-719 (5th Cir. 1974):  "1) the time and labor required; 2) the novelty and difficulty of the questions; 3) the skill requisite to perform the legal

service properly; 4) the preclusion of other employment by the attorney due to acceptance of the case; 5) the customary fee; 6) whether the fee is fixed or contingent; 7) time limitations imposed by the client or the circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation and ability of the attorneys; 10) the 'undesirability' of the case; 11) the nature and length of the professional relationship with the client; and 12) awards in similar cases."

###   B.   <u>Section 349</u>

Pursuant to section 349(h) of the G.B.L., a "court may award reasonable attorneys' fees to a prevailing plaintiff."  G.B.L. § 349(h).  The decision to award attorneys' fees under section 349(h) is discretionary.  *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 190 F. Supp. 2d 407, 421 (E.D.N.Y. 2002), *rev'd on other grounds and remanded sub nom. Empire Healthchoice, Inc. v. Philip Morris USA Inc.*, 393 F.3d 312 (2d Cir. 2004).  The plaintiff bears the burden of showing the reasonableness of the fee award by a preponderance of the evidence.  *Id*. at 422.

Courts consider the following factors in determining the reasonableness of fee awards under section 349(h):  (i) the time and skill required in litigating the case, (ii) the complexity of issues, (iii) the customary fee for the work, (iv) the results achieved, (v) the lawyer's experience, ability and reputation, (vi) the amount in dispute, and (vii) the benefit to the client.  *Id*. (citing cases); *see also Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 53 (2d Cir. 1992).[3]

## II.   PLAINTIFFS OBJECTION BASED ON THEIR <u>ALLEGED "SUCCESS" IN THIS CASE IS WITHOUT MERIT</u>

The Supreme Court has held that "'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'"  *Farrar v. Hobby*, 506 U.S. 103,

---

[3]   "[A]bsent some overriding reason in policy or contrary state rulings, it is appropriate for federal courts to rely on federal practice in awarding fees under state substantive laws."  *Blue Cross*, 190 F. Supp. 2d at 418.  *See Nwagboli*, 2009 U.S. Dist. LEXIS 121893, at *26-33 (determining appropriate amount to be awarded for attorneys' fees pursuant to GBL § 349(h) by calculating "presumptively reasonable fee").

114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (*quoting Hensley v. Eckerhart*, 461 U.S. 424, 436,

103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)); *accord Barfield v. New York City Health and Hospitals*

*Corp.*, 537 F.3d 132, 152 (2d Cir. 2008); *Baird v. Boies, Schiller & Flexner LLP*, 219 F. Supp. 2d

510, 519 (S.D.N.Y. 2002).

In *Barfield*, the Second Circuit instructed that the "degree of success" inquiry "is not

limited to inquiring whether a plaintiff prevailed on individual claims." 537 F.3d at 152. "Both

the quantity and quality of relief obtained, as compared to what the plaintiff sought to achieve as

evidenced in her complaint, are key factors in determining the degree of success achieved." *Id.*

(quotation marks and citation omitted; emphasis added). *See Kassim v. City of Schenectady*, 415

F.3d 246, 254 (2d Cir.2005) ("a district court, in fixing fees, is obligated to give primary

consideration to the amount of damages awarded as compared to the amount sought") (emphasis

added); *Adorno v. Port Authority of New York and New Jersey*, 685 F.Supp.2d 507 (S.D.N.Y.

2010) (reducing presumptively reasonable fee by 60% to account for lack of success of certain

plaintiffs, who recovered nothing); *Humane Soc. of U.S. v. HVFG, LLC*, No. 06 CV 6829, 2010

WL 3322512 (S.D.N.Y. Aug 19, 2010) (reduction of 25% to reflect fact that plaintiffs' success,

compared to what was initially sought, was at best "partial or limited"); *McDow v. Rosado*, 657

F.Supp.2d 463 (S.D.N.Y. Sept. 29, 2009) (reduction of 12% to reflect lack of success compared to

what was sought); *Green v. Torres*, 361 F.3d 96, 98 (2d Cir. 2004) (*per curiam*) (the court may

exclude hours spent on "severable unsuccessful claims.").

Under the *Barfield* standard, there is no question that Plaintiffs achieved little success.

Plaintiffs Amended Complaint sought damages of not less than **$10 million**, trebled in accordance

with RICO, as well as punitive damages, on behalf of six plaintiffs, and against four defendants.

(dkt.26).  Compare that to what Plaintiffs obtained through settlement:  one received nothing and

had her case dismissed with prejudice[4]; one settled for $10,000; one settled for $15,000; one settled for $25,000; one settled for $45,000; and one settled for $200,000.  All six agreed to dismiss their case with prejudice against three of the four defendants, for nothing.[5]  In total, the six plaintiffs settled for $295,000, or less than 2.95% of the amount they sought to recover.

In *Baird*, a situation closely analogous to this, the Court reduced the requested fee by 60% to reflect plaintiffs' lack of success in accepting an offer of judgment that was far less than the amounts they had originally demanded.  In that case, plaintiffs initially calculated their damages at $1.25 million, but they accepted a settlement of $37,500 (representing 3% of the initial claim), without any admission of liability, and without any injunctive relief.  219 F. Supp. 2d at 512.  The Court found that "plaintiffs accepted the offer of judgment because they realized as the case progressed, that they had little hope of success on the merits," and reduced the fee award by 60%.  *Id.* at 523-25.

As in *Baird*, the settlement in this case represents less than 3% of the amount of Plaintiffs' original claim (before trebling and punitive damages), and clearly reflects Counsel's realization, as trial approached, that they had little hope of success on the merits.  For that reason, the requested fee should be reduced by at least 60%.

### 1.    Melinda Serin

In the case of Melinda Serin, although the Complaint alleged that Northern sued to enforce an equipment lease that it knew had been forged, Northern had no such knowledge when it sued, and Plaintiffs established no facts to show that it did.  At her deposition, Serin testified that she believed that she was the victim of identity theft by her aunt, who signed Serin's name to

---

[4]    This fact alone warrants an overall reduction of any fee award by approximately 17%.  *Adorno*, 685 F. Supp.2d at 518.

[5]    The Magistrate's Report fails to take this fact into consideration.

numerous documents, including the equipment lease with Northern, a bank account, and a fictitious name filing.  None of this was known to Northern when it decided to commence suit.

Even after Serin made her forgery claim known, Northern had reason to suspect that the claim of forgery was fabricated.  Serin's lease payments to Northern stayed current for 6 months, which is highly unusual if a lease document has been forged.  When the payments became delinquent, Northern began a running conversation with someone claiming to be Serin (apparently, Serin's aunt).  That person made alternative payment arrangements with Northern, and eventually agreed to pay off the remainder of the lease, by making a payment by credit card, only to reverse the credit card payment after Northern issued a release.  Serin did not provide Northern with evidence of forgery until *after* Northern decided to commence suit.  That evidence consisted, in part, of an affidavit in which Serin claimed that her aunt had forged her name, but which also stated that Serin was aware that her aunt's business had been formed using Serin's name, and that the bank account listed on the lease was also in her name. These facts, among others, led Northern to question Serin's claim of forgery once it was eventually asserted.

### 2.    Judson Russ

In the case of Judson Russ, there was nothing in the four signed lease forms, or in any of Northern's underwriting, that would have alerted Northern to any irregularities in the lease.  All of the information on all four leases was accurate, including Russ's name, address and social security number, his business name and address, and his bank account name, account number and routing number.   Northern then spent thousands of dollars to buy the equipment chosen by Russ or his employees, and leased these machines to Russ's businesses – three pay-day lending stores that admittedly received and retained the equipment described in the leases.  After receiving the equipment, Russ's businesses paid monthly lease payments for over a year, which would be very odd if there had been a forgery.  At one point during the first year of the leases, when an ACH

payment was not received by Northern, Russ's bookkeeper provided Northern with updated banking information so that Northern could continue receiving ACH payments.  Later, after Northern issued a past due notice for a payment that was missed, one of Russ's employees issued a check payable to Northern.  During these initial communications with Russ's business, no one ever suggested that the leases were forged.

Russ testified that he believed that one of his employees, Daniel Magyari, who helped run Russ's business, is the person who signed his name on the leases.[6]  Russ left Magyari in charge of his business for long periods of time while Russ was out of the country.  He also admitted that ***Magyari and others had authorization to sign Russ's name*** in many circumstances (even though Russ claims that leasing was not one of those circumstances). Discovery did not reveal any evidence either that Northern forged Russ's name or sued on documents that it either knew or suspected of being forged.[7]

### 3.  Gordon Redner

Redner was never sued by Northern.  Indeed, Redner never notified Northern that he believed the lease in his name was forged until this lawsuit was commenced.  When attempts to ACH his bank account were returned for insufficient funds, Northern contacted Redner, who did not protest or claim forgery.  Rather, he asked for an equipment manual because he didn't understand the prompts.  He never disputed an adverse charge on his credit report to the credit reporting agency.  He admitted signing a document that refers to the equipment that Northern leased to him, and to a lease of 48 months at $49.00 per month plus tax, even though he contradictorily claimed that someone forged his name to an equipment lease containing those

---

[6]    Defendants' handwriting expert was prepared to testify that upon visual examination of the leases and comparison of the signatures on those leases with other known signatures of Russ, he could not determine that they were forged.

same terms.  Redner also admitted receiving the equipment described in the allegedly forged

equipment lease, and that he never returned it.  Northern did not commence a lawsuit against

Redner, "bogus" or otherwise.

### 4.      Long Soui Lim

There is nothing in Lim's lease, or in any of Northern's underwriting, that would have

alerted Northern to any irregularities in the lease.  Lim admitted that all of the information on the

lease was accurate, including his name, address, social security number and telephone number, as

well as his business's name and address, and his bank's name, routing number and account.  Lim

admitted that he provided the vendor with that information, as well as a check for $143, and that

he understood that he was acquiring credit card processing equipment, which he admited

receiving.  Lim made three payments on the lease via ACH deductions before calling Northern to

state that the vendor had come and picked up the equipment, and that Lim could not locate the

vendor.  In June 2001, after numerous unsuccessful attempts by Northern to contact Lim, Northern

started suit, which was later discontinued voluntarily due to improper service.  In response to that

suit, Lim contacted Northern in July 2001, claiming for the first time – three years after the lease

was signed – that his signature had been forged.  He then sent documents to Northern allegedly

showing that his signature had been forged.  Those papers were reviewed by two Northern

employees, including a manager, who both concluded that the allegedly forged signature appeared

to be similar to the genuine signatures.  Defendants' handwriting expert was prepared to testify at

trial that he was unable to make a determination as to whether the signature was genuine or not.

Because Northern had legitimate reasons to question the validity of Lim's forgery claim, it

commenced a second suit to recover the amounts due under the lease.

---

[7] Northern agreed to pay Russ more than the others because he was the only plaintiff who arguably could have shown damage to his business, which would be compensable under RICO, and potentially subject to trebling.

### 5.      Thomas Smith

There is nothing in Smith's lease, or in any of Northern's underwriting, that would have alerted Northern to any irregularities in the lease.  Smith admits that all of the information on the lease was accurate, including his name, address, social security number and telephone number, as well as his business's name and address, and his bank's name, routing number and account.  Smith clearly knew that he was signing up for credit card processing, and admits his signature on the credit card processing agreement that he executed on the same day as the date of the lease.  He admits that the signature on a check payable to Northern is his signature.  After Northern accepted the lease, Northern received a full year of monthly payments via ACH without any complaint from Smith.  When a payment due in November 2003 was not received, Northern spoke to Smith on the phone.  Smith said nothing about his signature being forged.  Subsequently, Northern received payment of the amount due.  In March 2004, Northern received a letter from an attorney representing Smith, which said nothing about forgery.  In April 2004, Northern spoke to one of Smith's employees, who said that the business was not using the machine, and that they would like to terminate the lease and return the equipment.  Nothing was said about a forgery.

Smith never told Northern that his signature was forged.  He never presented Northern with any evidence of forgery, forms of ID or signatures showing that his signature was different than the signature on the lease.  He never filed a police report and he never disputed the adverse entry to his credit report with any credit reporting agency.  Based on all of the foregoing, Northern decided to commence suit to recover the amount due under the lease, which it did in June 2004.  After filing suit against Smith, Smith's attorney attempted to negotiate a settlement with Northern, without ever mentioning a claim of forgery.  It is hard to fathom how anyone could allege, in good faith, that Northern commenced suit against Smith to enforce an equipment lease that it "knew" had been forged.

### 6.      Defendants' Motions *In Limine*

Shortly before the settlement was reached, Defendants filed two motions which, if granted, would have made it unlikely that Plaintiffs would be able to sustain their burden of proof as to liability, or that they would be able to prove that they sustained recoverable damages.  In the first motion (dkt. #130), which was filed on November 3, 2010 – one week before the settlement was reached – Defendants moved to exclude the expert reports and testimony of Plaintiffs' damages expert, Stan Smith, on several grounds.  Dr. Smith had opined that Plaintiffs collectively sustained between $6,903,487 and $8,534,223 in damages, most of which consisted of what he termed "hedonic damages" or "reduction in the value of life" – another way of saying pain and suffering. Defendants sought to exclude Smith's testimony because neither of the statutes that formed the basis for the Plaintiffs' causes of action permits recovery for pain and suffering.  Defendants' also sought to exclude Dr. Smith's testimony on the grounds that he sought to give an opinion on theoretical damages, as opposed to actual damages, and because his opinions were riddled with numerous, speculative assumptions for which there was no evidentiary support.  (dkt. 130).  By agreeing to settle, Plaintiffs avoided having to respond to that motion.

In the second motion (dkt. 132), Defendants sought to prevent Plaintiffs from introducing evidence, *inter alia*, of alleged bad acts or allegedly improper behavior that was unrelated to the claims alleged in the Amended Complaint.  This motion was necessitated by Counsel's apparent change in strategy as trial approached.  Recognizing that they had uncovered no evidence to support their contention that Defendants had a practice of starting lawsuits to enforce equipment leases that they knew to be forged, Counsel submitted a proposed pre-trial order that made clear that Plaintiffs were going to try to show that Northern was a bad actor generally, based largely on unsubstantiated complaints that had been made by non-parties, involving situations that were

wholly unrelated to and dissimilar from the claims asserted by the Plaintiffs in this case.[8]

Defendants' second motion was filed on November 8, 2010.  Plaintiffs agreed to settle two days

later, without having to oppose the motion.

We submit that Plaintiffs' agreement to settle for so much less than they had originally

sought, is strong evidence that they were unsuccessful.  The settlement does not serve to "deter"

future "misuse" of the courts, as Plaintiffs' claim, because no such misuse took place.  The

confidential settlement agreement requires no changes in Northern's business practices, contains

no admission of wrongdoing on the part of Northern, and requires a small monetary payment.

Plaintiffs appear to equate their "success" in forcing Northern to spend money defending

the case with success in achieving the damages that they sought for themselves.  But that is not the

appropriate way to evaluate success in this case in the Second Circuit.  To make a "generous"

award in this case would reward Plaintiffs for pursuing claims that had little chance of success,

and for forcing Defendants to engage in needless litigation, something that has been expressly

rejected by the Courts.  *Miller v. Midpoint Resolution Group, LLC*, 608 F. Supp. 2d 389, 396

(W.D.N.Y. 2009):

> Reduction of fees is particularly appropriate because . . . many of
> plaintiff's time entries "were a result of discovery requirements ...
> necessary to [Defendant's] challenge to the Plaintiff's claim of actual
> damages" [citation omitted] - a claim as to which plaintiff and her
> attorneys were (and should have expected to be) largely
> unsuccessful.
>
> Therefore. . . . the public interest must also be considered in
> determining what fee is "reasonable".  "Waste is not in the public
> interest.  The Congress that passed the Fair Debt Collection Prac-
> tices Act in 1977 could hardly have wished to reward lawyers for
> doing nonproductive work and wasting their adversaries' time and
> the time of the courts as well."  [Citations omitted] (emphasis
> added).

---

[8]   Much of the time spent in discovery was focused on these irrelevant issues.

The same is true here. Counsel should not be compensated for discovery aimed at issues unrelated to this case, which resulted in nothing of use to the Plaintiffs, and which caused Defendants to incur fees and expenses unnecessarily. Counsel should not be rewarded for bringing a weak case and achieving a meager result for the client, by allowing them to walk away with a jackpot in legal fees. We submit that this is not the intent of the law, it is not what the controlling precedent requires, and it should not be countenanced by this court.[9]

## III.   THERE IS NO JUSTIFICATION FOR A MULTIPLIER IN THIS CASE

Plaintiffs' objection to the Magistrate's recommendation that no multiplier be used to compute the award in this case should be overruled. There is no justification for a multiplier in this case. Moreover, Plaintiffs fail to cite one case involving RICO or GBL Section 349, in which a multiplier was awarded. Our research also failed to reveal any such case.

In making their argument that a multiplier of four is appropriate, Counsel relies on a number of class action common fund cases, with settlements reaching the hundreds of millions of dollars or more, which have no bearing on this case. *In re Global Crossing*, 225 F.R.D. 436 (S.D.N.Y. 2004), a class-action alleging violations of federal securities laws and ERISA, the court approved a partial settlement of $245 million, noting that the figure amounted to "one of the largest settlements since the passage of the Private Securities Litigation Reform Act." *Id.* at 447. The Court approved the fees and expenses agreed to in a sliding scale retainer agreement that was

---

[9]   The cases cited by Plaintiffs to support their argument that an increased award is warranted because of the settlement's deterrent effect, or to provide an incentive to take on difficult cases, are distinguishable. In *Miller, supra*, the Court substantially <u>reduced</u> the fees claimed by Plaintiffs' attorneys, from $18,045 to $7,000, because they were largely unsuccessful at trial, recovering only $500 in actual damages, compared to their claim of $10,000 in actual damages.   Notwithstanding the lack of a substantial monetary recovery, the Court found that Plaintiffs had established multiple violations of the Fair Debt Collection Practices Act, so that "a fee award in an amount sufficient to have some deterrent effect-and to encourage counsel to continue taking cases of this type is appropriate."  Here, in contrast, Plaintiffs failed to establish any violation of either RICO or Section 349, and settlement will have no deterrent effect.  In *Hicks*, a securities class action settled for $10 million, the Court approved an award of 30% of the amount of the settlement, finding that such an award provided a sufficient incentive for the attorneys to take on the risks associated

negotiated prior to the commencement of litigation by class counsel and the sophisticated lead

plaintiffs "operating under the oversight of the Ohio Attorney General."  The Court approved the

fees calculated under the retainer agreement, which resulted in a small multiplier, noting that "in

class action cases under the PSLRA, courts presume fee requests submitted pursuant to a retainer

agreement negotiated at arm's length between lead plaintiff and lead counsel are reasonable."  *Id.*

at 466.  *In re Comverse Technology*, No. 06-CV-1825, 2010 WL 2653354 (E.D.N.Y. June 24,

2010) involved a securities class action that resulted in a $165 million common fund settlement.

*Maley v. Del Global Technologies Corporation*, 186 F. Supp. 2d 358 (S.D.N.Y. 2007) involved a

securities class action that resulted in a $11.5 million common fund settlement.  *In re Worldcom,*

*Inc. Securities Litigation*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) involved the settlement of a

securities class action for in excess of $6 billion.  *In re Telik, Inc.*, 576 F. Supp. 2d 570 (S.D.N.Y.

1984) involved the settlement of a securities class action for $5 million.  *deMunecas v. Bold Food*,

*LLC*, No. 09 Civ. 00440, 2010 WL 3322580 (S.D.N.Y. Aug. 23, 2010) involved an $800,000

settlement of a class action alleging labor law violations.  *In re AOL Time Warner Shareholder*

*Derivative Litigation*, No. 02 Civ. 6302, 2010 WL 363113 (S.D.N.Y. Feb. 1, 2010) involved the

settlement of securities and ERISA class actions in which the settlement obtained by counsel

consisted of "cutting-edge" changes in corporate governance.  *Rabin v. Concord Assets Group*,

No. 89 Civ. 6130, 1991 WL 275757 (S.D.N.Y. Dec. 19, 1991), involved the settlement of a class

action in which there was a cash payment of $2.7 million and a restructuring of the mortgage debt

on the numerous properties which were the assets of the defendant real estate limited partnerships.

*Fogarazzo v. Lehman Bros., Inc.*, No. 03 Civ. 5194, 2011 WL 671745 (S.D.N.Y Feb. 23, 2011)

involved a securities class action which settled for $6,750,000, where the court approved a fee

award equal to one-third of the lodestar.  *McDaniel v. County of Schenectady*, 595 F.3d 411, 424

with the case.  Defendants submit that the Court in this case should likewise award approximately one-third

(2d Cir. 2010) involved a class action asserting violations of inmates' constitutional right not to be illegally strip searched.[10]

The Magistrate's Report correctly concluded that these class action common fund cases provide no precedent for a multiplier in this case.  (dkt.153, p.24).  Notably absent from Plaintiff's Memorandum is a citation to even one case in which a multiplier was applied in a case involving either RICO, or Section 349.  The absence of such authority strongly suggests that a multiplier is not available in this type of case.

Counsel's argument that a multiplier is warranted because "significant public policy interests [were] vindicated" (Chittur Dec., ¶1) is illusory.  "Waste is not in the public interest.  The Congress . . . could hardly have wished to reward lawyers for doing nonproductive work and wasting their adversaries' time and the time of the courts as well." *Miller,* 608 F. Supp. 2d 396 (internal quotation marks omitted).  Moreover, if Plaintiffs and Counsel comply with confidentiality provisions of the settlement, the public will likely never be aware of the terms of the settlement.  Nor will the settlement have a "deterrent effect" on anyone.  Northern did not agree to change any aspect of the way it does business, and did not admit that it did anything wrong.  The meager settlement amount agreed to by Plaintiffs is indicative of the fact that there was no evidence to support their claim that Northern was "misusing" the courts.

---

of the amount of the settlement.

[10]   Plaintiffs also rely on cases from other jurisdictions that rely on state law not applicable here.  *See D.H. Blair & Co., Inc. v. Gottdiener*, No. 03 Civ. 2908, 2010 WL 4258967 at *7 (S.D.N.Y. Oct. 27, 2010) (claim for attorneys' fee claim decided under Florida law); *Leuzinger v. County of Lake*, No. C 06-00398, 2009 WL 839056 (N.D. Cal Mar. 30, 2009) (claim decided under the California Fair Employment and Housing Act); *Donovan v. Poway Unified School Dist.*, 167 Cal.App.4th 567, 628, 84 Cal.Rptr.3d 285 (200*) (decided under California's private attorney general doctrine (California Code of Civil Procedure, §1021.5) and under 42 U.S.C. §1988);  *Storfer v. Guarantee Trust Life Ins. Co.*, No. 10-60400-CV, 2011 WL 213461 (S.D. Fla. Jan. 21, 2011) (fee award under is Florida Statutes, § 627.428, which awards fees to an insured who recovered benefits under an insurance contract).

**IV.     FEES SHOULD NOT BE BASED ON THE AMOUNTS SPENT BY DEFENDANTS**

The fees expended by defendants in this case have little or no relevance to the value of the

fees to which Plaintiffs' counsel should be entitled, and should not be the basis of any award.

Indeed, the decision on which Plaintiffs' primarily rely – *Chicago Professional Sports Ltd.*

*Partnership v. National Basketball Association*, No. 90 C 6247, 1996 WL 66111 at *3 (N.D. Ill.

Feb 13, 1996) – forcefully undermines their argument:

> [I]t is not an abuse of discretion to find that a defendant's costs and
> hours *are irrelevant* to the reasonableness of a plaintiff's claimed
> award.  *Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.*, 776 F.2d 646,
> 659 (7th Cir. 1985).  Because a particular litigation may have
> precedential value as to a defendant's rights against numerous
> potential future plaintiffs, defendants often expend more money in
> legal fees than that defendant would otherwise spend where the
> litigation were not as precedentially valuable to the defendant.

Similar reasoning applies here.   In this case, any adverse judgment – even one for the

small sums that five of the six plaintiffs settled for here – could have led to a number of follow-on

suits, brought by plaintiffs' lawyers motivated by the prospect of recovering a substantial fee

award irrespective of the value or merits of a potential plaintiff's claim.  It would have been

irresponsible for Northern not to vigorously defend an action seeking $30 million in damages, plus

punitive damages and attorneys' fees.  Northern's decision to spend significant amounts to defend

this case is unrelated to the reasonableness of the fees sought by Plaintiffs.

**V.      THE AWARD SHOULD BE REDUCED FOR VAGUE TIME ENTRIES,**
**WORK DONE ON OTHER CASES, AND FOR EXCESSIVE BILLING[11]**

**A.      Vague Time Entries**

"A party seeking attorneys' fees bears the burden of supporting its claim of hours

expended by accurate, detailed, and contemporaneous time records."  *Lukaszuk*, 2007 WL

4699018 at *10; *see also Carey*, 711 F.2d at 1148.  The Court should reduce or eliminate time

---

[11]   Annexed hereto as an Appendix is a chart listing all of the time charges that were improper.

charges that are documented by vague descriptions of legal work performed.[12]  *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1265 (2d Cir. 1987); *Wise v. Kelly*, 620 F.Supp2d 435, 442 (S.D.N.Y. 2008); *Nu-Life Const. Corp.*, 795 F. Supp. at 605 (reducing requested fee award from $303,235.25 to $174,850 based on vague descriptions of legal work performed, failure to provide contemporaneous time records and failure to substantiate hours purportedly billed to plaintiff relating to the one successful claim); *U.S. Football League v. National Football League*, 887 F.2d 408, 415 (2d Cir.1989), *cert. denied* 493 U.S. 1071 (1990) (lodestar reduced 30% due to vague documentation of time entries); *Meriwether v. Coughlin*, 727 F.Supp. 823, 830-31 (S.D.N.Y. 1989) (30% reduction to fees requested due to vagueness and inability to match fees with successful claims).

Many of Counsel's time entries are too vague to give the Court sufficient information on which to base an award.  For example, Mr. Chittur has multiple entries such as "email Serin", "tc mindy Serin"; "mtg Andrey re Russ"; "email Seth"; "tc Seth", "email"; "email to def counsel", "ltr to Judge"; "tc client"; "email re expert".[13]  Courts have routinely eliminated or reduced these types of entries, and others like them, because they do not provide enough detail to evaluate whether the charge is compensable.  *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 172 (2d Cir. 1998) (entries such as "letter to court", "staff conference", or "work on motion" are too vague to sufficiently document the hours claimed); *Skold v. American International Group, Inc.*, No. 96 CIV 7137,

---

[12]  Similarly, with respect to attorney's fee requests under section 349(h), courts "must consider the specificity of counsel's time records when it assesses a claim for attorneys' fees."  *Schwartz v. Chan*, 142 F. Supp. 2d 325, 332 (E.D.N.Y. 2001) (citation omitted).  The party seeking an attorney's fee award has the burden of documenting the amount of an attorney's fee award.  *Id.* at 331.  Such documentation "must include a proper basis for determining how much time was spend on particular claims, including a detailed and specific record of the work that was completed."  *Id.* (citations and internal quotation marks omitted).

[13]  Mr. Chittur is co-counsel of record with Seth Lesser (presumably the "Seth" referred to above) in another lawsuit in which Moses & Singer are attorneys for the defendants.  *Gagasoules v. MBF Leasing, LLC*, 08-cv-2409 (E.D.N.Y.).  Mr. Chittur's time records give no indication whether the telephone calls and e-mails involved this case, or the other, unrelated case.  Many of the email entries have the subject line redacted, making it impossible to determine whether they relate to this action or not.

1999 WL 405539 at *10 (S.D.N.Y. June 18, 1999) ("Entries such as 'telephone call', 'consultation', and 'review of documents' are not sufficiently specific so as to enable the court to determine whether the hours billed are excessive"), *citing Dailey v. Societe Generale*, 915 F.Supp. 1315, 1328 (S.D.N.Y. 1996), *aff'd in part, vacated in part on other grounds*, 108 F.3d 451 (2d Cir.1997).

In addition, as the Magistrate found, "Mr. Atman's records contain numerous "miscellaneous entries, such as "Miscellaneous trial preparation activities", which courts have found to be too vague.  *See* dkt.153, at 13, *citing* Krear, 810 F.2d at 1265 and *Marshall v. N.Y. Div. of State Police*, 31 F. Supp.2d 100, 106 (N.D.N.Y. 1998).  Further, Mr. Altman's reconstructed time records, billed in increments of one full hour, and which frequently lump several tasks into one entry, are clearly insufficient.  *Cheesecake Factory Assets Co. LLC v. Philadelphia Cheese Steak Factory Inc.*, No. 05-CV-3243, 2008 WL 2510601 at *5 (E.D.N.Y. June 20, 2008); *La Barbera v. Pass 1234 Trucking, Inc.*, No. 04 CV 1364, 2007 WL 2908175 at *7 (E.D.N.Y. Sept. 28, 2007); *Oxford Venture Fund Ltd. Partnership v. CIT Group/Equipment Financing, Inc.*, No. 89 Civ. 1836, 1990 WL 176102 at *2-4 (S.D.N.Y. Nov 05, 1990) (reducing fee request based on .25 hour increments by 30%).

For all of these reasons, the Court should adopt the Report's recommendation that Counsel's hours be reduced at least by the amounts recommended by the Magistrate: 10% in Mr. Chittur's case, and 15% in Mr. Strutinskiy's case.[14]

### B.    <u>Work Performed In Other Cases</u>

Many of the time charges for which Mr. Chittur and Mr. Strutinskiy seek to be compensated relate to their representation of clients (Plaintiffs Smith, Lim and Russ and others) in New York City Civil Court.[15]  Counsel argues that these time charges are compensable in this case

---

[14]   For the reasons set forth in Defendants' Objections to the Magistrate's Report (dkt.153), none of Mr. Altman's time charges should be included in any award.

[15]   These entries are highlighted in red in the Appendix.

because they are "inextricably linked" to this action.  However, other than Counsel's conclusory statement that the "fees and expenses incurred in those proceedings resulted in work product that was actually used here" (dkt. 142 at p. 8), there is nothing in Plaintiffs' 414 page motion to show that any work product from those cases was used in this case.  *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 414, 420 (3d Cir. 1993) (to be compensable, fees or expenses incurred in the other litigation resulted in work product must be actually utilized in the instant litigation).[16]  Moreover, it is clear that many of Counsel's Civil Court charges have nothing to do with this case, and Counsel is being purposely misleading to suggest that they are.[17]  The Magistrate's Report properly excluded charges relating to Civil Court litigation from the recommended award.

### C.   Post-Settlement Time Charges

The Report correctly recommends the exclusion of some, though not all, of the time spent by Plaintiffs' counsel in litigating post settlement issues – issues that this Court previously characterized as "slightly ridiculous" (dkt. 147, p.2).  That litigation did nothing to assist Plaintiffs in generating the settlement, and served only to delay the date on which the settlement proceeds

---

[16]   The other cases on which Counsel rely are also inapposite.  In *In re Unisys Corp. Retiree Medical Benefits Erisa Litigation*, No. 03-3924, 2008 WL 2600364, at *9 (E.D. Pa. June 26, 2008) the instant litigation was same litigation as the original class action, but was proceeding under a different caption.  In *Pinkham v. Camex, Inc.*, 84 F.3d 292 (8th Cir. 1996), both cases were for copyright infringement that were consolidated for trial.  The Court held that since 90% of billed time was necessary to both actions, recovery of fees for full amount of time for joint preparation was appropriate.  In *Quantum Communications Corp. v. Star Broadcasting, Inc.*, 491 F.Supp. 2d 1123, 1134-35 (S.D.Fla. 2007), the related litigation was a bankruptcy, where counsel had to get the automatic stay lifted in order to pursue the instant litigation.

[17]   For example, Mr. Chittur has a 1.3 hour entry on April 8, 2006 that includes, "review of Chang complaint"; he has a 1.7 hour entry on March 30, 2006 that includes the entry, "review California complaint"; and he has a 1.2 hour entry on July 8, 2006 that includes the entry, "review answering papers in Dougish."  Mr. Strutinskiy has a 2.1 hour entry on July 20, 2005 for "Court appearance in Civ Ct for Lim and Dougish motions"; he has a 3.9 hour entry on May 25, 2006 that includes "Filing motions in Civ Ct re Russ, McAndrew, Kabbage;" and he has a 1.2 hour entry on July 5, 2006 that includes a telephone conference involving the "Kabbage" case.  None of these charges has anything to do with this case.

were paid.[18]   The Magistrate allowed a reasonable amount of time spent by Plaintiffs' counsel in litigating the fee application, but properly found that the 115.7 hours sought by Plaintiffs was "excessive" and "'suspect' given the miscalculations . . . typos and other citation errors found within the memorandum and reply submitted by Plaintiffs' counsel." (dkt.153, p. 7).   That finding is supported by the record.[19]

        **D.**        **Junior Level Work Performed By More Senior Attorneys**

The Magistrate's conclusion concerning the reasonable hourly rates to which Plaintiffs' counsel should be adopted.   The Report properly recommends that Mr. Chittur's hourly rate be reduced from $600 to $450 because much of the time spent by Mr. Chittur was spent doing legal research that is "more appropriately left to a more junior attorney." *Id.* at 20.[20]   S*hannon v. Fireman's Fund Insurance Co.*, 156 F.Supp.2d 279, 301-302 (S.D.N.Y. 2001) (reducing total hours billed by senior partner who charged, *inter alia*, for legal research that should have been handled by younger associate); *Kronfeld v. Transworld Airlines, Inc.*, 129 F.R.D. 598, 603 (S.D.N.Y. 1990) (reducing hourly rate billed for 60 hours of research and other similar work done by senior attorney by 33.3%).   The Report also notes that the time records submitted by Mr. Strutinskiy, an associate whose rates are substantially lower than Mr. Chittur's, "show significantly fewer hours devoted to 'research' than do Mr. Chittur's records", undermining Mr.

---

[18]   After asserting a baseless claim that Defendants' counsel surreptitiously changed the terms of the settlement that Plaintiffs' counsel had affirmed in open court, which was rejected by this Court (dkt. 139), most of the post-settlement litigation involved the Plaintiffs' refusal to actually sign a formal settlement agreement. (*See* dkt. 147).   Plaintiffs have still not delivered settlement agreements signed by the Plaintiffs, even though signed copies of those agreements were delivered to Plaintiffs' counsel, together with the settlement proceeds, on February 8, 2011.

[19]   Since November 15th, Mr. Chittur billed a total of 65.9 hours, Mr. Altman billed 32.80 hours, and Mr. Strutinskiy billed a total of 7.6 hours, representing a total of $56,140 in fees (billed at the rates they are seeking).

[20]   Mr. Chittur billed a total of 125 hours at $600/hr for activities that included doing legal research. These time entries are highlighted in dark blue on the Appendix.

Chittur's claim he had to do the legal research because no one else was available to do so in his small firm.[21]  (dkt. 153, p. 20).

Similarly, it is proper to reduce Mr. Strutinskiy's rate to $300, or even less, because "a great deal of his time was devoted to tasks more properly accomplished by a paralegal or secretary, such as "scheduling meetings, leaving voicemails, scanning and downloading documents, [] organizing documents and files" and "attendance and filming" depositions. (dkt.153, p. 21).[22]

Finally, if the Court determines that Plaintiffs are entitled to any award for the time spent by Mr. Altman,[23] the Court should adopt the Report's recommendation that Mr. Altman's hourly rate be reduced from $425 to $275, or even less.  Mr. Altman was admitted to practice in 2008, is not qualified to be admitted in New York,[24] and as Plaintiffs' Memorandum concedes, was "brought . . . into the case primarily for e-discovery purposes."  Plaintiff's Mem, p.16.  Much of what he did involved the "review[ of] the electronic discovery produced by Defendants".

---

[21]   It should be noted that Mr. Sharma, whose billing rate was $350, could have done research, and Mr. Altman's firm has several more junior attorneys (including himself) available to do legal research, as does Mr. Lesser's firm.

[22]   As shown in the Appendix, Mr. Strutinskiy billed a total of 53.1 hours for videotaping seven (7) depositions; Mr. Chittur billed a total of 18.6 hours for attending depositions that Mr. Altman was conducting, and which Mr. Strutinskiy was videotaping; Mr. Strutinskiy billed a total of 22.8 hours for doing tasks such as copying or burning CD's or DVD's – tasks typically done by secretaries or IT personnel, and considered part of overhead; Mr. Strutinskiy billed a total of 19.8 hours for services that included acting as a messenger; Mr. Strutinskiy billed a total of 13.8 hours for services that are normally done by a secretary or paralegal, such as "arranging the file" or filing", "making copies", scanning and emailing documents to co-counsel; Mr. Altman billed a total of 8 hours for doing work typically done by an IT person, such as loading Defendant's document production into Concordance, and preparing images; Mr. Chittur billed a total of 125 hours at $600/hr for activities that included doing legal research

[23]   Defendants have objected to certain portions of the Magistrate's Report, including the recommendation that Plaintiffs' counsel be credited with any amount for Mr. Altman's time, because Mr. Altman admittedly failed to provide the Court with contemporaneous time records.  *See* dkt.155.

[24]   We represented to the Magistrate, and Mr. Altman has not disputed, that he is ineligible to be admitted in New York because he obtained his law degree through an online course that is not recognized in New York.

(dkt.150, ¶14).  The Magistrate properly found that this type of work does not justify the $425 per hour rate that Plaintiffs requested.  (dkt.153, p.19-20).

## VI.    THERE SHOULD BE NO AWARD AGAINST THE INDIVIDUAL DEFENDANTS

Plaintiffs' claim that the individual defendants should be held jointly liable for the attorneys fees to be awarded by the Court is frivolous, as it has already been rejected by this Court. (dkt. 139, p. 3-4).   The Magistrate recognized that this "Court has found that, under the terms of the settlement, the individually named defendants would not be held jointly and severally liable for any award of attorneys' fees."   (dkt. 153, p.6).  Plaintiffs have provided the Individual Defendants with a general release that releases them from all claims of any kind, without exception.  Accordingly, the Individual Defendants may not be held liable for any portion of any award.[25]

### CONCLUSION

For the reasons stated above, Plaintiffs' objections should be overruled in their entirety.

Dated:  New York, New York
        March 28, 2011

                                        MOSES & SINGER LLP
                                        *Attorneys for Defendants*

                                        By: _____/s/_____
                                            Abraham Y. Skoff, Esq.
                                            Robert D. Lillienstein, Esq.
                                        The Chrysler Building
                                        405 Lexington Avenue
                                        New York, New York 10174
                                        Tel: (212) 554-7800

---

[25]   Moreover, although Northern agreed not to contest Plaintiffs' right to seek fees, the Individual Defendants made no such agreement.  Because Plaintiffs' agreed to settle their case against the Individual Defendants, they are not entitled to an award of fees.  *Aetna Cas. & Surety Co. v. Liebowitz*, 730 F.2d 905, 907 (2d Cir. 1984) ("Nothing in [RICO's statutory] language indicates an intent to authorize an attorney's fee award … for a plaintiff's successfully negotiating a settlement of his claim.")