**GUTRIDE SAFIER LLP**
ADAM J. GUTRIDE (State Bar No. 181446)
SETH A. SAFIER (State Bar No. 197427)
KRISTEN SIMPLICIO (State Bar No. 263291)
835 Douglass Street
San Francisco, California 94114
Telephone: (415) 336-6545
Facsimile:  (415) 449-6469

**McNUTT LAW GROUP**
MICHAEL SWEET (State Bar No. 184345)
SHANE MOSES (State Bar No. 250553)
188 Embarcadero, Suite 800
San Francisco, California 94105
Telephone: (415) 995-8475
Facsimile:  (415) 995-8487

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| JUST FILM, INC.; RAINBOW BUSINESS SOLUTIONS, D/B/A PRECISION TUNE AUTO CARE; BURLINGAME MOTORS, INC.; DIETZ TOWING, INC.; THE ROSE DRESS, INC.; VOLKER VON GLASENAPP; JERRY SU, VERENA BAUMGARTNER; TERRY JORDAN; ERIN CAMPBELL; AND LEWIS BAE on behalf of themselves, the general public and those similarly situated <br><br> Plaintiffs, <br><br> v. <br><br> MERCHANT SERVICES, INC.; NATIONAL PAYMENT PROCESSING; UNIVERSAL MERCHANT SERVICES LLC; UNIVERSAL CARD, INC., JASON MOORE; NATHAN JURCZYK, ROBERT PARISI, ERIC MADURA, FIONA WALSHE, ALICYN ROY; MBF LEASING LLC; NORTHERN FUNDING LLC; | CASE NO. CV 10-01993 JL <br><br> UNLIMITED CIVIL CASE <br><br> SECOND AMENDED CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED |

1   NORTHERN LEASING SYSTEMS, INC.; GOLDEN
    EAGLE LEASING LLC; LEASE SOURCE –LSI, LLC;
2   LEASE FINANCE GROUP, LLC; JAY COHEN;
    LEONARD MEZEI; SARA KRIEGER; BRIAN
3   FITZGERALD; SAM BUONO; MBF MERCHANT
    CAPITAL, LLC; RBL CAPITAL GROUP, LLC;
4   WILLIAM HEALY; JOSEPH I. SUSSMAN; JOSEPH I.
    SUSSMAN, P.C.; AND SKS ASSOCIATES, LLC;
5
6       Defendants
7

8
9       The Plaintiffs named herein, by and through their counsel, bring this Second Amended

10  Class Action Complaint against the Defendants named herein, on behalf of themselves and those

11  similarly situated, for violations of sections 17200 and 17500 *et seq.* of the California Business

12  and Professions Code; violations of the Racketeer Influence and Corrupt Organizations Act

13  ("RICO"); violations of the Fair Credit Reporting Act ("FCRA"); breach of contract; fraud, deceit

14  and/or misrepresentation; negligent misrepresentation, conversion, and abuse of process. The

15  following allegations are based upon information and belief, including the investigation of

16  Plaintiffs' counsel, unless stated otherwise.

17                          **INTRODUCTION**

18      1.      Defendants are engaged in a nationwide scheme of mail fraud, wire fraud, bank

19  fraud, and other criminal acts against small business owners, in connection with the leasing of

20  credit card processing equipment and sale of electronic payment processing services. Defendants

21  associate amongst themselves and with other entities to make automatic debits from small

22  business owners' bank accounts, using the automated clearing house (ACH) process, for amounts

23  that are not legally justified. Defendants acquire the ACH authorizations through inducing small

24  businesses to enroll in electronic payment processing services by falsely promising low rates and

25  by making materially false and misleading comparisons between their rates and competitors.

26  Defendants do not disclose that their rates (1) are only available for a small set of transactions and

27  (2) exclude hefty charges for related equipment. After Defendants present small business owners

28  with enrollment forms and contract documents, and the documents are signed, Defendants alter

the contracts by adding pages that were never shown to the businesses and by filling in blank areas with new terms.  These newly added pages and terms include purported provisions for early termination fees, liquidated damages, liability limitations, arbitration clauses, and choice-of-law and choice-of forum provisions.  Sometimes, Defendants go so far as to forge the initials or signatures of the small business owners on the newly added pages or filled in areas.  The contracts contain unconscionable provisions, such as long-term leases that require the small businesses to pay wildly inflated monthly rental fees for credit card processing terminals, inflated early-termination fees, "taxes" that are not actually due or paid to any taxing authority, and "insurance premiums" that do not actually pay for any insurance coverage.  The contracts also purport to require the business owners to personally guarantee the contracts, and contain choice-of-law and choice-of forum provisions that purport to allow Defendants to sue the businesses and their owners in states that have no connection to the transaction and no personal jurisdiction.  Defendants make automatic debits from the business owners' accounts to collect these amounts, and if the business owners close the accounts, they bring lawsuits based on the contracts in the far-away forums, using knowingly forged documents and making false claims about the right to litigate in those forums.  When the business owners sue Defendants on claims such as those in this suit, Defendants often settle out of court prior to class certification.  Even when small business owners pay all fees demanded by Defendants to close their accounts and settle all claims, Defendants will years later make additional automated debits for amounts that are not due.

## PARTIES

### Plaintiffs

2.      Just Film Inc. ("Just Film") is, and at all times alleged in this Complaint was, a film sales business operating in the city of San Francisco.  At all times alleged in this Complaint, it was owned and operated by Plaintiff Volker Von Glasenapp.

3.      Rainbow Business Solutions, d/b/a as Precision Tune Auto Care ("Precision") is, and at all times alleged in this Complaint was, an auto repair business operating in the city of Milpitas, California.  It is owned and operated by Plaintiff Jerry Su.

4.      Burlingame Motors, Inc. ("Burlingame Motors") is, and at all times alleged in this Complaint was, an auto repair business operating in the city of Burlingame, California. Plaintiff Verena Baumgartner is the manager and a majority shareholder of Burlingame Motors.

5.      Dietz Towing, Inc. ("Dietz Towing") is, and at all times alleged in this Complaint was, a towing business operating in the city of Ontario, California. Plaintiff Terry Jordan is the CEO of Dietz Towing and a minority shareholder.

6.      The Rose Dress Inc. ("The Rose Dress") is, and at all times alleged in this Complaint was, a formalwear business operating in the city of Milpitas, California.  It is owned and operated by Plaintiff Lewis Bae.

7.      Plaintiff Erin Campbell ("Campbell") is the owner of Erin Campbell d/b/a Silicon Valley Pet Clinic ("SVPC").  SVPC is, and at all times alleged in this Complaint was, a veterinary office operating in Santa Clara, California.  SVPC formerly was known as Sunclare.

8.      Precision, Just Film, Burlingame Motors, Dietz Towing, The Rose Dress, Su, Baumgartner, Jordan, Bae, Campbell, and Von Glasenapp are collectively referred to as "Plaintiffs."

**Merchant Services Defendants**

9.      Defendant Merchant Services, Inc. is a corporation, whose principal place of business is at 9012 Research Drive, Suite 200, Irvine, CA.

10.      Defendant Merchant Services, Inc., also operates under the names of Defendants Universal Card, Inc.; National Payment Processing; and Universal Merchant Services LLC.  All these entities share the same principal place of business and are collectively referred to herein as "Merchant Services Companies."

11.      Defendant Jason Moore is the President, Chief Executive Officer, and majority shareholder of each of the Merchant Services Companies.

12.      Defendant Nathan Jurczyk is the Vice President of Operations of Defendant National Payment Processing and a shareholder of at least one of the Merchant Services Companies.  Defendant Jurczyk holds himself out as the Vice President of Defendants Merchant Services and Universal Merchant Services.

13.     Defendant Robert Parisi is the Senior Vice President of Defendant National Payment Processing and a shareholder of at least one of the Merchant Services Companies. Defendant Parisi holds himself out as the Senior Vice President of Defendants Merchant Services and Universal Merchant Services.

14.     Defendant Eric Madura is the Manager of Corporate Operations for Defendant National Payment Processing, and holds himself out as the Manager of Corporate Operations for Defendants Merchant Services and Universal Merchant Services.

15.     Each of the Merchant Services Companies is the alter ego of each of the other Merchant Services Companies and of Moore, Jurczyk and Parisi, and it had such unity of interest and ownership that the separate personalities of the companies and the individuals no longer existed. The entities other than Merchant Services Inc. were created by Defendant Merchant Services and by Defendant Jason Moore to hide assets, to ensure fraudulent actions went undetected, and to further the goals of the Enterprise.  Merchant Services Companies comingled assets and did not observe corporate formalities, such as maintaining up-to-date records with the California Secretary of State and providing an agent for service of process that could be located.

16.     Defendant Moore also exercises control over a number of entities created to perpetrate fraud, including JWM Holdings, LLC, a Nevada limited liability company registered as a domestic entity in both California and Nevada ("JWM Holdings"); La Quinta Holdings LLC, a Nevada limited liability company not registered to do business in California ("La Quinta"); 9012 Research Drive LLC; Dean Martin Drive LLC; Big Sky Court Holdings LLC; Camel Point Enterprises LLC; E Coast Highway Holdings LLC; Harbor Cove Holdings LLC; Calvados Holdings LLC; Camden Holdings LLC; and Ladcom Group Inc.  Mr. Moore utilizes the address P.O. Box 1169, Corona del Mar, California as a personal address as well as the business address for many of these entities.  These entities are collectively known as the "Moore Shell Companies."  Each of the Moore Shell Companies was and is owned, managed and controlled by Jason Moore; assets were comingled amongst the Shell Companies and Jason Moore; corporate formalities were not observed; each were and is a mere alter ego of each of the other Moore Shell Companies and of Jason Moore, and it had such unity of interest and ownership that the separate

1    personalities of the companies and the individual no longer existed.

2       17.    Defendant Moore or one of the Moore Shell Companies owns the property located

3    at 9012 Research Drive, the principal place of business for the Merchant Services Companies.

4       18.    Until June 2009, Defendant Fiona Walshe worked as a regional sales manager for

5    the Merchant Services Companies.  She furthered the goals of the Enterprise by assisting the

6    Merchant Services Companies with a series of fraudulent mailings and phone calls, as described

7    herein.

8       19.    Cross-Defendants Atlas Payment Processing, Protégé Investments, Inc., Rover

9    Enterprises, Inc., and Merchant Services, F.A., Inc. currently maintain their principal place of

10   business at 4423 Fortran Court San Jose, CA.  These entities share common office space and

11   control and are not legally distinct from each other.  These entities, which are referred to herein as

12   the "Protégé Companies" are managed by Defendant Fiona Walshe.

13      20.    Until about June 2009, the Merchant Services Companies and the Protégé

14   Companies shared an office at 111 North Market St., Suite 800, San Jose, CA.  Until at least June

15   2009, the Merchant Services Companies, Jason Moore, Nathan Jurczyk and Robert Parisi

16   conspired with Defendant Walshe to control the Protégé Companies, directing these organizations

17   to engage in high-pressure sales tactics and approving and financially benefiting from the

18   fraudulent activities in which they engaged as described herein. Until at least June 2009, Walshe

19   and the Protégé Companies were under common control and indistinguishable from the Merchant

20   Services Companies.

21      21.    Defendant Alicyn Roy worked as Senior Account Executive for the Merchant

22   Services Companies.  She furthered the goals of the Enterprise by assisting the Merchant Services

23   Companies with a series of fraudulent mailings and phone calls, as described herein.

24      22.    The Merchant Services Companies, Moore, Jurczyk, Parisi, Madura, Walshe and

25   Roy are collectively referred to herein as the Merchant Services Defendants.

26      23.    Defendants Moore, Jurczyk, Parisi, Madura and Roy direct and control the

27   Merchant Services Defendants and worked in concert to cause the Merchant Services Defendants

28   to engage in the conduct described in this complaint.  Until June 2009, Defendant Walshe also

directed and controlled the Merchant Services Defendants and worked in concert with Defendants Moore, Jurczyk, Parisi and Madura to cause the Merchant Services Defendants to engage in the conduct described in this complaint.

24.    Defendants Moore, Jurczyk, Parisi, Madura, Walshe, and Roy are collectively referred to herein as the Merchant Services Companies Control Persons.

25.    The Merchant Services Defendants share with the Northern Leasing Companies an address on West 83rd Street in Burr Ridge, Illinois and a P.O. Box in Sioux Falls, South Dakota.

**Leasing Defendants**

26.    Defendant Northern Leasing Systems Inc. has its principal place of business at 132 West 31st Street, 14th Floor, New York, NY 10001-3405 ("Leasing Defendant Headquarters"). It is the owner (either directly or indirectly) of Defendant MBF Leasing LLC; Defendant Golden Eagle Leasing LLC; Defendant Lease Source – LSI, LLC; Defendant Lease Finance Group, LLC; and Defendant SKS Associates, LLC; all of which share the same addresses and which are collectively referred to herein as the "Northern Leasing Companies." Some or all of these entities also use an address on West 83rd Street in Burr Ridge, Illinois and several different post office boxes in South Dakota and New York. All these entities are purportedly involved in the financing of equipment used by small businesses to process credit card payments. Defendant Northern Leasing Systems Inc. also operates in Canada under the same name and in the United Kingdom as Forrester UK Holdings LLC, which also maintains an office at the Leasing Defendant Headquarters.

27.    Defendants Golden Eagle Leasing LLC; Lease Source-LSI, LLC; and Lease Finance Group, LLC (collectively, "Northern Acquisition Companies") were all independent companies until Northern Leasing purchased them at various points during the last ten years. Leasing Defendants continue to hold these companies out to the public as separate, fully functioning organizations, when in fact they do not employ a staff, maintain a board of directors, or observe other corporate formalities.

28.    Defendant SKS Associates operates from the Leasing Defendant Headquarters and from 333 Seventh Street, New York, New York. Until March 11, 2011, it was known as Lease

Residuals Holdings (OFC), LLC. Its alter-egos are Lease Residual Holdings (SOV), LLC and Lease Residual Holdings, LLC (collectively, "SKS Shell Companies"), both of which operate from the same locations. SKS Associates maintains a website, www.skspmt.com, which is registered to an IP address located in New York and belonging to Northern Leasing. It uses a phone number previously belonging to Defendant Lease Finance Group and connected to the Northern Leasing switchboard. It is believed to be managed and controlled by Defendants Leonard Mezei, Jay Cohen, and Sara Krieger.

29. Each of the Northern Leasing Companies is the alter ego of each of the other Northern Leasing Companies, and have such unity of interest and ownership that separate personalities of the companies do not exist. Assets were comingled amongst these companies and their different names were maintained only for the purposes of deceiving third parties into believing they were independent entities, as described in paragraphs 83.

30. Defendant Jay Cohen is the President and Chief Executive Officer of Northern Leasing Systems, Inc. Defendant Cohen is also an officer at Defendants MBF Leasing, LLC, Northern Funding, LLC; Golden Eagle Leasing, LLC; Lease Finance Group, LLC; and RBL Capital Group, LLC. Defendant Cohen also uses the names Ari Cohen, Ari P. Cohen, Ari Jay Cohen, and Jay P. Cohen.

31. Defendant Leonard Mezei is the chairman of the board of Northern Leasing Systems, Inc. Defendant Mezei is also an officer at Defendants MBF Leasing; Northern Funding LLC; Lease Finance Group, LLC; and RBL Capital Group, LLC.

32. Defendant Sara Krieger is the Vice President for Operations of Northern Leasing Systems, Inc. and MBF Leasing, LLC.

33. Defendant Brian Fitzgerald was the former Executive Vice President for Business Development at MBF Leasing, LLC at all times relevant to this complaint.

34. Defendant Sam Buono was the Vice President of Collections and Customer Service at MBF Leasing, LLC and Northern Leasing Systems, Inc. until 2009 and still is involved with operations on a part time basis.

35. Defendant Joseph I. Sussman is an attorney and the principal of Defendant Joseph

I. Sussman, P.C., a law firm (collectively the "Sussman Defendants" or "Sussman"). Defendant

Joseph I. Sussman, P.C. is an alter-ego of the Northern Leasing Companies, created to mislead

alleged debtors and the courts. Since 2003, Mr. Sussman has practiced law from the Leasing

Defendant Headquarters, by filing collection actions against merchants on behalf of the Northern

Leasing Companies.

36. Defendants Cohen, Mezei, Krieger, Fitzgerald, Buono and Sussman direct and

control the Northern Leasing Companies and are herein collectively referred to as the Northern

Leasing Companies Control Persons. They worked in concert to cause the Northern Leasing

Companies to engage in the conduct described in this complaint. In particular, the Northern

Leasing Companies Control Persons each directed the Northern Leasing Companies to maintain

continuous and systematic contacts with merchants and members of the Enterprise located in the

state of California to accomplish the acts alleged herein. The Northern Leasing Companies

Control Persons further directed the Northern Leasing Companies to consummate the unlawful

transactions described herein with Plaintiffs and other Californians, to unlawfully deduct monies

from accounts of Plaintiffs and other Californians, and to attempt to enforce unlawful contractual

provisions against Plaintiffs and other Californians; and they have profited from those activities.

37. Defendant Cohen is also the President of Forrester UK Holdings LLC, and First

Funds LLC, which is owned by Principis Capital LLC. Defendant Cohen is also a principal of

GCN Holdings, LLC, which is also based at Leasing Defendant Headquarters. First Funds LLC

and GCN Holdings, LLC are collectively referred to herein as the "Cohen Shell Companies."

38. Defendant Mezei is a principal at several other companies, including but not

limited to, Compass USA SPE, Compass Financial Partners LLC, and Compass USA GP LLC.

Defendant Mezei also is a principal at a number of companies operating from 333 Seventh Street,

New York, New York (another address used by the Northern Leasing Companies), including

Economic Growth Group, Economic Group Pension Services, Inc., Greater Metropolitan

Corporation, and Bibin.com LLC. Compass USA SPE; Compass Financial Partners LLC;

Compass USA GP LLC; Economic Growth Group; Economic Group Pension Services, Inc.;

Greater Metropolitan Corporation; and Bibin.com LLC are collectively referred to as the "Mezei

1    Shell Companies."

2       39.     Defendant Krieger is also a principal in SK Investments, LLC ("Krieger Shell

3    Company"), which also operates from 333 Seventh Street, New York.

4       40.     Defendants Cohen, Mezei, and Krieger are also principals at approximately 20

5    holding companies, each named Northern Leasing Systems and identified with a roman numeral

6    and which are collectively referred to herein as the "Northern Leasing Systems Shell

7    Companies." The Northern Leasing Systems Shell Companies are located at 333 Seventh Street

8    and/or Leasing Defendant Headquarters.

9       41.     Defendants Cohen, Mezei, and Krieger are also principals at Northern Capital

10    Associates, Inc., Northern Capital 2010 LLC, and approximately 20 holding companies, each

11    named Northern Capital Associates and identified with a roman numeral and which are

12    collectively referred to herein as the "Northern Capital Associates Shell Companies." The

13    Northern Capital Associates Shell Companies are located at 333 Seventh Street and/or the

14    Leasing Defendant Headquarters.

15       42.     Defendant Northern Funding LLC and Canopy Capital Group (collectively "Real

16    Estate Financing Shell Companies") are located at 333 Seventh Street, New York, New York.

17       43.     The Northern Leasing Companies, Cohen, Mezei, and Krieger transferred monies

18    that they earned from the enterprise to some or all of the Cohen Shell Companies, the Mezei Shell

19    Companies, the Krieger Shell Company, the Northern Capital Associates Shell Companies and

20    the Real Estate Financing Shell Companies

21       44.     Defendant MBF Merchant Capital LLC has its principal place of business 281

22    West 83rd Street, Burr Ridge, Illinois. Until 2005, it went by the name MBF Leasing, LLC.

23       45.     Defendant RBL Capital Group, LLC has its principal place of business at the

24    Leasing Defendant Headquarters but has used as its address 281 West 83rd Street, Burr Ridge,

25    Illinois. RBL Capital Group and MBF Merchant Capital further the goals of the Enterprise by

26    investing proceeds of the Northern Leasing Companies' fraud through loans to sales agents.

27       46.     Defendant William Healy is the sole president and shareholder of MBF Merchant

28    Capital and acted as president of Defendant RBL Capital Group.

47.     Healy is also affiliated with Funds 4 Growth, LLC ("Healy Shell Company"), which operates out of the same addresses on West 83rd Street in Burr Ridge, Illinois as MBF Merchant Capital.

48.     Defendant Healy directed MBF Merchant Capital and RBL Capital Group to maintain continuous and systematic contacts with certain merchants and certain members of the Enterprise located in the state of California to accomplish the acts alleged herein.  Defendant Healy further directed MBF Merchant Capital to consummate the unlawful transactions described herein with the Merchant Services Companies, and he has profited from those activities.

49.     Defendant Healy transferred monies that he and MBF Leasing earned from the Enterprise to RBL Capital Group, LLC and the Healy Shell Company.

50.     Northern Leasing Companies, MBF Merchant Capital, RBL Capital Group, Jay Cohen, Leonard Mezei, Sara Krieger, Brian Fitzgerald, Sam Buono, William Healy, Joseph I. Sussman, and Joseph I. Sussman P.C. are collectively referred to herein as the "Leasing Defendants."

**Further Allegations About Defendants and the Enterprise**

51.     The named Defendants identified in paragraphs 9 through 50 of this Complaint are collectively referred to hereafter as "Defendants."

52.     Leasing Defendants have created an associated-in-fact enterprise with Merchant Services Defendants and other unscrupulous independent sales organizations and agents.  This enterprise is designed to defraud small businesses and hide profits earned through their criminal activities ("the Enterprise").

53.     At all times herein mentioned, each of the Defendants was the agent, servant, representative, officer, director, partner or employee of the other Defendants and, in doing the things herein alleged, was acting within the scope and course of his/her/its authority as such agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendant.

54.     At all times herein mentioned, Defendants, and each of them, were members of, and engaged in, a joint venture, partnership and common enterprise, and acting within the course

and scope of, and in pursuance of, said joint venture, partnership and common enterprise.

55.     At all times herein mentioned, the acts and omissions of Defendants, and each of them, concurred and contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

56.     At all times herein mentioned, Defendants, and each of them, ratified each and every act or omission complained of herein.  At all times herein mentioned, the Defendants, and each of them, aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

## **JURISDICTION AND VENUE**

57.     This action is brought by Plaintiffs pursuant, *inter alia*, to the California Business and Professions Code, sections 17200 and 17500.  Plaintiffs and Defendants are "persons" within the meaning of the California Business and Professions Code, section 17201.

58.     This action is also brought by Plaintiffs pursuant, *inter alia*, to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961.

59.     This action is also brought by Plaintiffs pursuant, *inter alia*, to the Fair Credit Reporting Act, 15 U.S.C. § 1681.

60.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants across the state of California and the nation, including within, affecting, and emanating from various municipalities within the jurisdiction of the United States District Court for the Northern District of California including the cities of San Francisco, San Jose, Milpitas, and Burlingame.

61.     Each of the Defendants has engaged, and continues to engage, in substantial and continuous business practices in California, including the acts alleged herein.

62.     Defendants are engaged in a multi-state criminal enterprise with the purpose of defrauding Plaintiffs in California, as well as Class Members across the United States.  It is necessary to bring all of the participants in this enterprise before a single court in a single trial, in furtherance of the ends of justice.

63.     There is no other district outside of California that would have personal

-12-

Second Amended Class Action Complaint

jurisdiction over all Defendants based on sufficient minimum contacts.

64.     To the extent that this Court does not have personal jurisdiction over any defendant in this action under the California long-arm statute, it has personal jurisdiction over that defendant pursuant to 18 U.S.C. § 1965.

65.     Accordingly, Plaintiffs allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

### A.     Summary of the Electronic Payments Processing Industry

66.     All Defendants are connected to the electronic payments processing industry (the "Industry").  The Industry is composed of companies that deal in the processing of credit card transactions and related products and services, including the sale and lease of equipment to process the transactions.

67.     Two of the most important players in the Industry are Visa and Mastercard, which have created a network, called the interchange, through which financial transactions may be processed.  Banks are permitted to become members of the interchange, and thus to issue credit and debit cards, and to sell credit card processing services to merchants.  Banks, in turn, may license and register companies and individuals to market and sell credit card processing services to merchants.  These companies and agents are known as Independent Sales Organizations and Merchant Service Providers ("registered ISO/MSP"s or "ISO/MSP" or "ISO").

68.     The ISO/MSP must be registered with both Visa and Mastercard, as well as with a bank, or with a bank approved processing entity ("Processor").  Thousands of Processors, and ISO/MSPs are associated with Visa and Mastercard through their regulations to conduct electronic payment transactions.

69.     On each credit or debit card transaction, merchants pay a fee that is determined by a variety of factors, including the type of debit or credit card used by the customer to make the purchase.  That fee is then shared among (1) the bank that issued the credit or debit card to the customer, (2) the interchange, (3) the bank through whom the merchant is accepting the card, (4) the ISO/MSP that solicited the merchant and/or provides customer service to the merchant (if any) and (5) the third party-processor (if any).

70.     Merchants signing up for services to enable them to accept credit and debit cards must acquire equipment necessary for processing the transaction, such as card terminals, PIN pads, and check swiping machines.   Often, ISO/MSPs will offer free equipment to induce merchants to enroll with their processing services.  In other cases, the ISO/MSP will offer equipment for sale and/or recommend the equipment to be purchased and possible vendors.  Credit card processing terminals can typically be purchased, new, for not more than a few hundred dollars.  Finally, many merchants may already own equipment or may prefer to purchase the equipment elsewhere and can often opt to use that when enrolling in a new electronic payment processing service.

**B.     Summary of the Enterprise.**

71.     The Enterprise is centered around the Leasing Defendants.  Leasing Defendants associate and conspire with various ISO/MSPs to trap customers into purported long-term "leases" for credit card processing equipment.  Although such equipment is often provided by more reputable ISOs for free, or is available for purchase at a relatively nominal costs, Leasing Defendants' "leases" require merchants to pay monthly fees of $50 to $200, for at least 48 months, if not in perpetuity.  The "leases" are not true finance leases, however, because Leasing Defendants do not provide the equipment to be leased, nor is there any relationship between the monthly fee being charged and the amount they may pay to finance the equipment purchase.  Instead, nearly all of the money collected under these "leases" goes to (1) pay bounties to the ISO/MSPs that are part of the Enterprise for inducing the "leases" to be signed and (2) the profits of the Leasing Defendants.

72.     When ISO/MSPs in the Enterprise seek out merchants who wish to accept credit and debit cards, they simultaneously are seeking merchants to enroll in unconscionable, fraudulent leases for credit card processing equipment.  These ISO/MSPs do not provide free equipment or allow merchants to provide their own equipment; rather, through a series of deceitful misrepresentations and forged documents, they enroll these merchants in unconscionable, fraudulent equipment leases.  Leasing Defendants then pay to the ISO/MSP a high commission for securing these leases on their behalf.

73. Leasing Defendants further assist the ISO/MSPs to hide the true terms of the lease from the merchants being enrolled and to prohibit merchants from repudiating the leases by, *inter alia,* (1) using a contract that appears to be one-page in length, with all signatures on the first page, when in fact there are three subsequent pages not shown to the merchant; (2) failing to engage in industry-standard verification procedures to ensure that the merchant knowingly signed the lease, and instead deeming the lease accepted upon the merchants' acknowledgment of receipt of the credit card terminal; (3) rejecting all claims by merchants of fraudulent inducement, regardless of the facts presented; (4) hiding their identities from merchants; and (5) engaging in abusive tactics to collect on the amounts purportedly owed on the leases, including by making false reports to credit bureaus and filing unsupportable collection actions in foreign forums. These actions, and others, are further detailed in this Complaint.

74. It is common industry practice for the lease financing company to impose a cap on the rate at which the equipment can be leased, which is based on the price at which the equipment could be purchased. Leasing Defendants have eschewed this practice, and conspire with dishonest ISO/MSPs to enroll merchants in the most expensive leases possible.

75. Leasing Defendants have associated with dozens of ISO/MSPs, including the Merchant Services Defendants, who advertise and enroll merchants into equipment finance leases while simultaneously entering these merchants into credit card processing agreements.

76. The Enterprise consists of Leasing Defendants and the ISO/MSPs, including the Merchant Services Defendants, who have committed thousands of acts of mail and wire fraud in furtherance of their goals of defrauding small businesses.

**C.** **Overview of Defendants' Roles In The Enterprise.**

77. The activities of the Enterprise are accomplished and furthered through a series of thousands of acts of wire fraud and mail fraud and extensive money laundering as described in this Complaint. The acts are numerous and systematic and represent a pattern of racketeering activity which injures small businesses and represents an ongoing threat.

78. The Leasing Defendants participate in the Enterprise by financing the leases of the electronic payment processing equipment provided by Merchant Services Defendants and other

ISOs to merchants.  The Leasing Defendants rely on the Enterprise, and specifically, their association with Merchant Services and other ISOs, to solicit merchants to lease equipment under onerous, unconscionable terms.

79.     Merchant Services Defendants are one spoke in a wheel of dishonest ISOs with which Leasing Defendants associate to carry out their fraud.

- **Leasing Defendants Have Created An Extensive Network of Shell Companies To Obsure The True Identities Of Those Responsible.**

80.     Through the creation of shell companies and the acquisition of other equipment lease finance companies, Leasing Defendants have created a complex web of alter-egos essential to the furtherance of their fraud.  This web ensures that their unlawful acts remain hidden and that victims and the courts are unable to identify the responsible party.

81.     The Leasing Defendants are not separate entities but alter-egos of each other, directed by the Northern Leasing Control Persons to incorporate under a variety of names and continue to use the business names of companies they acquired to confuse and mislead merchants. The Northern Leasing Companies are not meaningfully distinct corporate entities but sham companies created to further the fraud.

82.     The Northern Leasing Companies share the same addresses, registered agents, and addresses for service of process. Northern Leasing Systems Inc. is the principal occupant of the Leasing Defendant Headquarters, where most of its alter-egos and shell companies are based.

83.     The Northern Leasing Companies are inadequately capitalized.  Under the direction of Cohen, Mezei, and Kreiger, the expected payment streams due from class members under the leases are securitized and sold to third parties.  The Northern Leasing Control Persons then treat the revenues from the leases (and from the sales of securitized interests in their leases) as their personal assets instead of treating them as assets of the Northern Leasing Companies, by transferring these monies to shell companies subject to their personal control, including the Northern Leasing Shell Companies, the Northern Capital Shell Companies, Cohen Shell Companies, Mezei Shell Companies, Krieger Shell Companies, and the Real Estate Shell Companies. Few to no assets are left behind in the accounts of the Leasing Companies

themselves. Leasing Defendants intentionally engage in these practices in an attempt to prevent adequate recovery by victims if successfully sued.

84.     The Leasing Defendants do not abide by other corporate formalities. They provide different sworn statements at different times as to which individuals are officers and directors and as to the locations of their operations, as described in paragraphs 95, 115-122. They use bogus addresses, as described in paragraphs 115-122. They rely heavily on the use of post office boxes. They initiate collections activities and lawsuits in the name of one company when a different company purportedly leased the equipment, as described in paragraphs 479-483.

85.     The Northern Leasing Control Persons run the operations of Northern Leasing; MBF Leasing; Golden Eagle Leasing; Lease Finance Group; LeaseSource-LSI, LLC; SKS Associates, LLC; and Joseph I. Sussman, P.C. from the Leasing Defendant Headquarters. These entities share a common switchboard, staff, postage meter, computer network, and server.

86.     Leasing Defendants continue use the former addresses belonging to the Northern Acquisition Companies in mailings pertaining to these entities, even where those addresses are defunct. Likewise, the Leasing Defendants frequently use their Burr Ridge address and P.O. Boxes in New York and South Dakota to create the illusion that the Entity Defendants are separate entities with addresses located around the country or to confuse merchants and courts.

87.     All correspondence is mailed by Leasing Defendants from the Leasing Defendant Headquarters. Leasing Defendants use letterhead representing that the mail is coming from a Illinois or other addresses in New York, but all correspondence is postmarked with the same postage meter, with the identification number 049J82037058 and sent from zip code 10001. This postage meter is located at the Leasing Defendant Headquarters.

88.     The main phone number greets callers with the phrase "Your Leasing Company" and does not identify a company.

89.     Golden Eagle's sole operating address and phone number is shared with Northern Leasing. Its only officer is Defendant Cohen, and it does not maintain a website or employ staff. Rather, the Northern Leasing Control Persons direct the continued creation and enforcement of Golden Eagle leases, which ISOs market on its behalf, leading merchants to believe they are

Second Amended Class Action Complaint

1    contracting with a real company and not simply a front for a fraudulent operation.  It is

2    inadequately capitalized, as its assets are transferred in the manner described in paragraph 83.

3        90.    Northern Leasing acquired Defendant Lease Source-LSI, LLC, and represents to

4    the public that it is a separate entity.  Its only officer is Defendant Cohen, and it does not maintain

5    a website or employ staff.  Rather, the Northern Leasing Control Persons direct the continued

6    creation and enforcement of Lease Source-LSI leases, which ISOs market on its behalf, leading

7    merchants to believe they are contracting with a real company and not simply a front for a

8    fraudulent operation.  It is inadequately capitalized, as its assets are transferred in the manner

9    described in paragraph 83.

10       91.    Northern Leasing acquired Defendant Lease Finance Group in 2005, and

11   represents to the public that it is a separate entity.  Its only officers are Defendants Mezei and

12   Defendant Cohen, and it does not maintain a website or employ staff.  Rather, the Northern

13   Leasing Control Persons direct the continued creation and enforcement of Lease Finance Group

14   leases, which ISOs market on its behalf, leading merchants to believe they are contracting with a

15   real company and not simply a front for a fraudulent operation.  It is inadequately capitalized, as

16   its assets are transferred in the manner described in paragraph 83.

17       92.    Until 2005, Lease Finance Group was owned by CIT Corporation and operated out

18   of Illinois.  Leasing Defendants continue to use the now defunct Illinois address on all Lease

19   Finance Group leases and correspondence.  Since 2005, under Cohen and Mezei's direction,

20   thousands of mailings with the defunct Illinois address as the return address have been sent to

21   merchants around the country.

22       93.    After the filing of the initial Complaint in this action, Leasing Defendants began

23   acting under the name SKS Associates and claiming that SKS Associates had "purchased" certain

24   leases from the other Leasing Defendants and was now taking action to collect on those leases.

25   The leases on which it purported to collect were leases that had already been terminated and paid

26   in full, making any purchase of these worthless leases impossible.  In fact, SKS Associates is just

27   another part of the same alter ego.  Additional information associated with this alter-ego is

28   detailed in paragraphs 153-63.

- **<u>Leasing Defendants Intentionally Misrepresent Their
Identifications To Confuse the Class Members and the Courts</u>**

94.     When talking to merchants, the court, or the public, the Leasing Defendants and

represent themselves as employees and agents of the alter-ego at the subject of the dispute.

95.     Every equipment lease used by Northern and MBF is approved by Sara Krieger,

who represents that she is the Vice President of that respective company.  In sworn statements,

however, Sara Krieger has represented that she has such a role only with Northern Leasing, or

MBF, and/or Lease Finance Group, and not all these companies.  These leases are mailed to class

members upon complaints and to support legal action against them.

96.     The equipment leases used by the Northern Acquisition Companies do not have a

space for a signature of approval because there are no employees or officers of these companies.

97.     Leasing Defendants employ another Legal Collections Manager named Louis

Cucinotta as a Legal Collections Manager.  At various times during the class period, Mr.

Cucinotta has identified himself as the Legal Collections Manager for each of the Leasing

Defendants in correspondence and calls to class members and in legal filings.

98.     On September 17, 2009, Mr. Cucinotta represented that he was the Legal

Collections Manager for Northern Leasing. This representation was made on the notarized

verification sheet in support of a complaint filed by the Sussman Defendants against a class

member.  This complaint and verification sheet were subsequently mailed by Leasing Defendants

to California.

99.     On December 15, 2009, Mr. Cucinotta represented that he was the Legal

Collections Manager for MBF Leasing. This representation was made on the notarized

verification sheet in support of a complaint filed by the Sussman Defendants against a class

member.  This complaint and verification sheet were subsequently mailed by Leasing Defendants

to California.

100.     In 2010, Mr. Cucinotta placed a series of calls to a class member in Louisiana,

representing that he was the Legal Collections Manager for Lease Finance Group.

101.     Mr. Cucinotta has represented himself to be the Legal Collections Manager of all

these entities as well as LeaseSource-LSI, LLC and Golden Eagle Leasing hundreds of times

throughout the class period. These representations are made on notarized verification sheets in support of complaints filed by the Sussman Defendants in New York state court against class members. These complaints and verification sheets are mailed to class members all over the country.

102.    Mr. Cucinotta has represented himself to be the Legal Collections Manager of each of the Leasing Entity Defendants in phone calls directed to class members around the country.

103.    Leasing Defendants employ an individual named Robert Taylor as a Legal Collections Manager. At various times during the class period, Mr. Taylor has identified himself as the Legal Collections Manager for each of the Leasing Defendants.

104.    On June 8 2010, Mr. Taylor represented that he was the Legal Collections Manager for Lease Finance Group. This representation was made on the notarized verification sheet in support of a complaint filed by attorney Ari Madoff in Illinios against a class member. This complaint and verification sheet were prepared in New York under the direction of Leasing Defendants, notarized by a New York County notary public, and mailed to Mr. Madoff in Illinois for filing there, and to a class member in Texas.

105.    On July 14, 2010, Mr. Taylor represented that he was the Legal Collections Manager for Northern Leasing. This representation was made on the notarized verification sheet in support of a complaint filed by the Sussman Defendants in New York state court against a class member. This complaint and verification sheet were subsequently mailed by Leasing Defendants to a class member in Illinois.

106.    On August 9, 2010, Mr. Taylor represented that he was the Legal Collections Manager for Northern Leasing. This representation was made on the notarized verification sheet in support of a complaint filed by the Sussman Defendants in New York state court against a class member. This complaint and verification sheet were subsequently mailed by Leasing Defendants to a class member in Maryland.

107.    On August 9, 2010, Mr. Taylor represented that he was the Legal Collections Manager for Northern Leasing. This representation was made on the notarized verification sheet in support of a complaint filed by the Sussman Defendants in New York state court against a class

Second Amended Class Action Complaint

member. This complaint and verification sheet were subsequently mailed by Leasing Defendants to a class member in South Carolina.

108. On August 10, 2010, Mr. Taylor represented that he was the Legal Collections Manager for MBF Leasing. This representation was made on the notarized verification sheet in support of a complaint filed by the Sussman Defendants in New York state court against a class member. This complaint and verification sheet were subsequently mailed by Leasing Defendants to a class member in California.

109. On October 13, 2010, Mr. Taylor represented that he was the Legal Collections Manager for Northern Leasing. This representation was made on the notarized verification sheet in support of a complaint filed by the Sussman Defendants in New York state court against a class member. This complaint and verification sheet were subsequently mailed by Leasing Defendants to a class member in Illinois.

110. On January 10, 2011, Mr. Taylor represented that he was the Legal Collections Manager for Northern Leasing. This representation was made on the notarized verification sheet in support of a complaint with the intent to be filed in New York state court by the Sussman Defendants. This complaint, verification sheet, and a cover letter from the Sussman Defendants threatening to file the lawsuit unless the class member paid the amount due within ten days were mailed by the Sussman Defendants to Washington shortly thereafter.

111. Mr. Taylor has represented himself to be the Legal Collections Manager of all these entities as well as LeaseSource-LSI, LLC and Golden Eagle Leasing hundreds of times throughout the class period. These representations are made on notarized verification sheets in support of complaints filed by the Sussman Defendants against class members. These complaints and verification sheets are mailed to class members all over the country.

112. Mr. Taylor has represented himself to be the Legal Collections Manager of each of the Leasing Entity Defendants in phone calls directed to class members around the country.

113. Throughout the class period, Leasing Defendants have employed dozens more individuals in their collections department who each have made hundreds or thousands of false representations about the nature of their association to class members.

114.    The Sussman Defendants and Buono have trained the collections department to represent to class members that they are the Legal Collections Manager for whatever Northern Leasing Company debt is the subject of their call, mailing, or complaint.  Under Sussman and Buono's direction, these collections workers have collectively placed thousands of calls, mailed thousands of collections letters, and signed thousands of verification sheets in support of court filings misrepresenting the nature of their association.  Sussman and Buono know these calls, mailings, and filings to be misleading, but instruct the collections department to make these representations to increase their ability to successfully collect the fraudulent debts.

115.    The leases created with the Golden Eagle Leasing brand name represent that the company is based in Ridgefield, Connecticut, and contain a Connecticut choice of law clause. Nevertheless, Northern Leasing Defendants, under the direction of Defendants Buono and Sussman file collections actions in the New York county court, representing that the entity's principal place of business is the Leasing Defendant Headquarters.

116.    The leases created with the LeaseSource-LSI brand name represent that the company is based in Melville (Suffolk County), Long Island. Nevertheless, Northern Leasing Defendants, under the direction of Defendants Buono and Sussman file collections actions in the New York county court, representing that the entity's principal place of business is the Leasing Defendant Headquarters.

117.    The leases created with the Lease Finance Group brand name represent that the company is based in Illinois. Nevertheless, Northern Leasing Defendants, under the direction of Defendants Buono and Sussman file collections actions in the New York county court, representing that the entity's principal place of business is the Leasing Defendant Headquarters.

118.    In July 2010 in this litigation, Leasing Defendants stated, through an affidavit filed in this lawsuit by Sara Krieger, that Lease Finance Group continues to run its operations from Illinois.

119.    In a separate litigation in 2007, Sara Krieger represented to the District Court for the Northern District of Illinois that she was the Vice President of Lease Finance Group.  In that same declaration, Sara Krieger verified that Lease Finance Group was headquartered in Illinois,

even though Illinois operations had ceased in 2005 when Northern Leasing purchased it. Defendant Joseph Sussman notarized this document.

120.    Northern Leasing Defendants, under the direction of Defendants Buono and Sussman, file collections actions in the New York county court, representing that Lease Finance Group's principal place of business is the Leasing Defendant Headquarters.  Since 2006, the Sussman Defendants have filed thousands of cases on behalf of Lease Finance Group, each representing that the company's headquarters is the Leasing Defendant Headquarters in New York.

121.    Class members with Lease Finance Group leases often will not learn that the company is headquartered in New York until the Sussman Defendants direct litigation towards them.

122.    Leasing Defendants also have retained an attorney in Illinois, Ari Madoff, to represent Lease Finance Group in collections matters in Illinois.  Mr. Madoff has filed hundreds of lawsuits in Cook County, Illinois since 2009, each representing that Lease Finance Group's headquarters are in Illinois.  These filings are prepared under Sussman's direction at the Leasing Defendant Headquarters and verified and notarized by employees of Leasing Defendants working at the Northern Leasing Headquarters.  Under Sussman's direction, the filings are sent via mail and interstate wires to Illinois for filing in the Cook County court.

  ▪  **Jay Cohen and Leonard Mezei Direct, Manage, and Oversee**
     **All Fraudulent Activities Conducted by the Leasing Defendants**

123.    The Leasing Defendants operate under the direction of Jay Cohen and Leonard Mezei, who manage the operations of Leasing Defendants and its participation in the Enterprise. Defendants Cohen and Mezei oversee Leasing Defendants' operations, making key decisions to further the fraud and increase the profits of both the Leasing Defendants and their own personal Shell Companies.  For example, Defendants Cohen and Mezei managed, oversaw, and approved the acquisition of the Northern Acquisition Companies, ratifying the decision to continue to hold these companies out as separate businesses, even though their true intent was to convert them into shell companies to confuse and mislead victims and the courts.

124. Defendants Cohen and Mezei know that the leases enforced by the Northern Leasing Companies have been obtained through fraud, forgery, and deceit, and have structured their series of shell companies to further that fraud and ensure that victims who are harmed cannot be adequately compensated.

- **Sara Krieger Negotiates With Dishonest ISOs and Knowingly Executes Fraudulent Contracts**

125. Defendant Sara Krieger participates in the Enterprise and ensures its success by soliciting new ISOs and executing the fraudulent lease agreements. Defendant Krieger knows or reasonably should know that these leases have been forged or obtained through fraud and deceit, but approves them to increase her own personal profit and the profits of the Leasing Defendants.

126. Defendant Krieger sought out the Merchant Services Defendants in California, and directed the continued business relationship with them, despite knowing of the widespread fraud. In May 2010, two months after this lawsuit was filed, Defendant Krieger negotiated renewed contractual terms with the Merchant Services Defendants, and specifically, Defendant Robert Parisi. Defendant Krieger was well aware of the widespread fraud being conducted by and alleged against the Merchant Services Defendants, but made the decision to continue working with the Merchant Services Defendants to increase the Leasing Defendants' profits, and the profits of her shell companies.

- **Sam Buono, Joseph I. Sussman, and Joseph I. Sussman, P.C. Unlawfully Collect Fraudulent Debts**

127. Defendants Sam Buono, Joseph I. Sussman, and Joseph I. Sussman, P.C. participate in the fraud by directing the aggressive, illegal collections methods used to bolster profits. They know that the leases have been procured through fraud, forgery, and deceit, but enforce them anyway to increase their personal profits and the profits of the Leasing Defendants. Because of the high default rate among merchants who have been fraudulently enrolled in the leases, an aggressive debt collection and legal strategy is integral to the success of the Enterprise.

128. The Sussman Defendants, who purport to have a separate law office, actually practice from Leasing Defendant Headquarters. Sussman's primary if not only clients appear to be those entities operating out of that office. Sussman files thousands of collections lawsuits a

1    year on behalf of Northern Leasing, MBF Leasing, and the Northern Acquisition Defendants.

2         129.    Defendant Joseph I. Sussman, P.C., is an alter-ego of the Northern Leasing

3    Companies, and is used to intimidate and confuse alleged debtors and mislead the courts.  Its

4    phone number is not owned by Sussman, but rather, by the Northern Leasing Companies.  Class

5    members and their attorneys who call the number on Sussman's letterhead speak to a receptionist,

6    who is directed by Defendants Sussman and Buono to transfer these callers to the Northern

7    Leasing collections department, even if the caller requests to speak to Defendant Joseph Sussman

8    or another lawyer in his office.  Defendants Cohen and Buono collaborated with the Sussman

9    Defendants to create this arrangement.

10        130.    Additional details of Defendants Sussman and Buono's participation are described

11   more fully in paragraphs 292-312 and 315-317.

12   ▪ **Leasing Defendants, led by Defendants Cohen, Healy, and**
     **Fitzgerald, Conspired with Merchant Services Defendants to**
13   **create MBF Leasing**

14        131.    Until approximately late 2003, William Healy was the President of Defendant

15   Lease Finance Group.

16        132.  In or around 2003, the Northern Leasing Companies, at the direction of

17   Defendants Mezei, Cohen, Fitzgerald, and Healy, created the "MBF Leasing" brand.  Healy

18   formed MBF Leasing, LLC, an Illinois company (which is now known as Defendant MBF

19   Merchant Capital LLC).  Northern Leasing formed a wholly owned subsidiary, also called MBF

20   Leasing, LLC, a New York company (which is still known as Defendant MBF Leasing, LLC).

21   Although created in two places and purporting to be separate, unrelated companies, the two

22   arms of MBF Leasing worked in concert to further the goals of the Enterprise.  The Illinois arm

23   (now known as Defendant MBF Merchant Capital) solicited ISOs and referred them to the New

24   York arm (Defendant MBF Leasing LLC) to form partnerships by which the ISOs would solicit

25   merchants on behalf of Leasing Defendants.  Under the MBF arrangement, the Leasing

26   Defendants would allow ISO/MSPs marketing on their behalf to set terms at exorbitant rates

27   bearing no relationship to the price of the equipment and lock merchants into four-year leases.

28   Leasing Defendants then pay ISO/MSPs based on the present value of the expected future

Second Amended Class Action Complaint

payment stream, creating an incentive for the ISO/MSPs to set the monthly lease rates as high as possible.

133.    ISOs/MSPs soliciting leases on behalf of MBF Leasing do not adhere to the standard industry practice whereby the amounts at which equipment can be leased are capped at rates more closely related to the purchase price of the equipment.  For example, where other equipment leasing companies set the lease price cap of a credit card terminal at $30 per month for four years, MBF Leasing would allow for that piece of equipment to be leased at $150 per month or more for four years.

134.    Because no merchants would willingly agree to pay $4800 or more for a machine worth far less than $500, Leasing Defendants relied on Defendants Healy and Fitzgerald, and the creation of MBF Illinois (now known as Defendant MBF Merchant Capital) to solicit unscrupulous ISO/MSPs, which could secure these leases through forgery, fraud, and deceit.

135.    When conspiring on this plan in or around 2003, Defendants Mezei, Cohen, Fitzgerald and Healy knew the risks and the likelihood of harm to merchants from such a plan. To protect themselves from liability, Mezei, Cohen, Fitzgerald, and Healy created two separate limited liability companies--one in New York and one in Illinois--to act as a double firewall. MBF Illinois (Defendant MBF Merchant Capital) would solicit unscrupulous ISOs but MBF New York (Defendant MBF Leasing) would collect the payments, and transfer those payments to Northern Leasing and associated companies, including the Mezei Shell Companies, the Cohen Shell Companies, and the Healy Shell Companies.  By dividing up the process into multiple parts, Mezei, Cohen, Fitzgerald, and Healy hoped to prevent victims of this scheme from identifying and holding accountable the responsible parties.

136.    After the agreement to participate and further the Enterprise through this new arrangement was finalized, in or around 2003, Defendants Healy and Fitzgerald directed MBF Illinois (MBF Merchant Capital) to seek out unscrupulous ISO/MSPs to refer to MBF Leasing New York (Defendant MBF Leasing).  At the time, Merchant Services Defendants had started to develop a successful business throughout Southern California and because of their access to so many merchants and willingness to use forgery and deceit, they were excellent candidates for

1    MBF Leasing to pilot their scheme.

2         137.    To finalize the arrangement, Defendant Healy worked with Defendant Moore in

3    2003.

4         138.    Defendants Healy, Fitzgerald, Cohen, and Mezei knew that contracting with

5    Moore and the Merchant Services companies would result in substantial financial harm to

6    merchants in California, but proceeded with the deal because the projected financial rewards were

7    high.

8         139.    To further ensure the success of the model, Healy, Fitzgerald, and Moore designed

9    a version of the MBF Equipment Finance Lease which contained the Merchant Services logo on

10   it, as described in paragraphs 171 and 223. Leasing Defendants knew this company name to be

11   highly misleading and determined this to be of extra benefit to their operations.

12        140.    Because of the success in the arrangement, in 2006, Defendant Fitzgerald

13   renegotiated the arrangement with Merchant Services Defendants, while knowing that thousands

14   of California businesses had been harmed by the Merchant Services Defendants' misleading

15   tactics.

16        141.    Defendant Sara Krieger continued the arrangement in 2010, after this lawsuit had

17   been filed and while knowing that thousands of California businesses had been harmed by the

18   Merchant Services Defendants' misleading tactics.

19        142.    Defendants Healy, Fitzgerald, and Krieger all knew that contracting with Merchant

20   Services Defendants was likely to result in grave financial harm to California residents, but

21   contracted with Merchant Services Defendants anyway to increase their profits.

22        143.    As a principal at MBF Leasing, Healy directed its participation in the Enterprise,

23   and profited from its fraud. Specifically, Defendant Healy sought out ISO/MSPs, including those

24   based in California, that would act as the Leasing Defendants' agents and lease equipment from

25   the Leasing Defendants at exorbitant rates.  Defendant Healy and his alter-ego, MBF Illinois

26   (now Defendant MBF Merchant Capital) received a commission for identifying agents willing to

27   commit fraud, and the remainder of the Leasing Defendants earned high profits from contracting

28   with unscrupulous ISO/MSPs, furthering the goals of the Enterprise.

144. During that time, from approximately 2003 to 2006, MBF New York (Defendant MBF Leasing LLC) employed staff, contractors, and agents to work from the Illinois office and under Defendant Healy's direction, solicited business in California.

145. Around the time he created MBF Leasing, LLC (now Defendant MBF Merchant Capital), Defendant Healy hired Brian Fitzgerald to serve as the Vice President of Business Development. Defendant Fitzgerald worked from the office in Burr Ridge with Defendant Healy to recruit these ISO/MSPs, including those in California.

146. In 2005, MBF New York (Defendant MBF Leasing, LLC) purported to purchase the assets of its alter-ego, MBF Illinois (Defendant MBF Merchant Capital LLC). The assets of its alter-ego were simply MBF New York's obligations to pay MBF Illinois. After the purported sale of assets, Defendant Healy renamed the MBF Illinois shell corporation MBF Merchant Capital. Defendant Fitzgerald purportedly began working directly for the New York based Defendant MBF Leasing, but continued to do so from Illinois, in a suite sharing the same Burr Ridge address as MBF Merchant Capital.

147. Defendants Healy and Fitzgerald's efforts to recruit unscrupulous ISO/MSPs to conduct business on behalf of the remainder of the Leasing Defendants has resulted in thousands of Class members in California and nationwide being defrauded by both the Leasing Defendants and ISO/MSPs such as Merchant Services Defendants. Defendants Healy and Fitzgerald knew this was the inevitable result of their scheme with Cohen, Mezei, and Moore.

148. Defendant Healy and MBF Merchant Capital's current business purpose is to loan money to ISOs, who in turn market leases for the Leasing Entity Defendants. They hold themselves out as members of the electronic transactions industry, attending regular conferences on the matter.

   ▪ **Leasing Defendants Created Shell Companies, Including Defendants RBL Capital and SKS Associates To Hide Assets**

149. Defendants Moore, Cohen, Mezei, Healy, and Krieger direct and participate in the development and expansion of the shell companies and alter-egos. They have created the Moore Shell Companies, Cohen Shell Companies, Mezei Shell Companies, Healy Shell Companies,

Krieger Shell Company, Northern Capital Associates Shell Companies, Northern Leasing Shell companies, SKS Associates, and Real Estate Financing Shell Companies as described above, in which they invest the profits earned from the Enterprise's illegal activities. They have overseen, managed, and ratified the Leasing Defendants' corporate fraud to increase the profits of one or more of the Shell Companies.

150. Defendant Healy served as the Acting President of RBL and oversaw a number of its transactions, including a $2 million loan to an ISO/MSP in October 2006. Mr. Healy received a commission from RBL for these transactions.

151. RBL does not maintain a staff. Its officers are Defendants Cohen and Mezei.

152. Leasing Defendants operate RBL as an investment company from their offices to further their fraud. Specifically, Defendants utilize RBL to loan money to the ISO/MSPs, such as those it recruited through Defendants Healy and MBF Merchant Capital. Thus, Leasing Defendants profit from ISO/MSPs in two ways, by financing their efforts to sign merchants up for fraudulent leases and by benefiting from the exorbitant leases these ISO/MSPs trick merchants into entering.

153. In February 2011, Leasing Defendants employed their shell company Defendant SKS Associates to further defraud class members in. Leasing Defendants, under the direction of Defendants Mezei, Cohen, and Krieger, purported to have the Northern Leasing Companies transfer to SKS Associates certain old, terminated leases of class members who had paid the value of their leases in full and returned the equipment.

154. Leasing Defendants, under the direction of Mezei, Cohen, and Krieger, created form letters to class members, informing them that an audit had been conducted on their old, closed accounts, and that taxes and fees were due. The letters then provide an amount purportedly owed, typically in the $70 or $80 range, though occasionally over $100. Finally, the letters inform class members that the amount will be deducted from their account. The letters are signed "SKS Associates." At the time these letters were written, Leasing Defendants, Mezei, Cohen and Krieger knew that in fact no such taxes and fees were due and they had no intention of forwarding to any taxing authority the taxes and fees being collected.

155.     The letters are dated during the last two weeks of February 2011, and inform class members that the deduction will happen on a date in March.  Leasing Defendants typically do not mail the letters until a day or two before the deduction.

156.     For example, Leasing Defendants prepared a letter on February 28, informing a class member in California that he owed taxes and fees and the amount would be deducted on March 11.  The envelope is postmarked with a New Jersey zip code on March 8, ensuring that the class member would not receive the letter before the March 11 withdrawal through interstate wires.  Because many banks require that account holders dispute ACH withdrawals within 24 hours of their occurrence, Leasing Defendants ensure that the withdrawal will go through without question.

157.     During the first two weeks of March, Leasing Defendants sent thousands of these letters out, each following a similar pattern.  Other examples include a letter sent to Colorado dated February 18 advising of a withdrawal on March 3 and postmarked on March 5, and a letter sent to Texas dated February 25 advising of a withdrawal on March 10 and postmarked on March 7.  Each distinct letter was sent through the mail and the associated funds withdrawn using interstate wires.

158.     Since February 2011, many merchants have had such ACH withdrawals made from their accounts by SKS Associates, even though (1) the merchants never had any contractual relationship with SKS Associates or authorized ACH withdrawals by that entity and (2) the merchants did not in fact owe any money to SKS Associates or any other Leasing Defendants.

159.     To further this fraud, in February 2011, Leasing Defendants acquired the website www.skspmt.com. The website is hosted at 65.213.122.141, a server owned by Northern Leasing.

160.     The website states that "Recently SKS associates acquired all the rights,title [sic] and interest in certain leases owned by your equipment leasing company and a lease you entered into with them was part of the acquisition."  *See* http://skspmt.com/ (last visited March 9, 2011).

161.     The website does not contain an address, but states that its customer service number is 866-286-8841, which is also the customer service number for Defendant Lease Finance Group.

183621.1

-30-

162.    Merchants who call the number to question the withdrawal are frequently greeted by a voicemail box, as Leasing Defendants have no intention of fielding these calls. Occasionally, merchants are connected to a customer service representative.  Leasing Defendants have instructed that customer service representative to refuse to provide an accounting of amounts owed and if the customer demands a copy of the tax filings, to tell them it will be mailed to them. Leasing Defendants then do not mail these filings because they do not exist.

163.    Merchants who have closed the bank accounts associated with their old lease and learn from their banks of the attempted withdrawal often call Leasing Defendants to inquire about the attempted withdrawals. Leasing Defendants refuse to provide an accounting of amounts owed, and inform merchants that if they do not pay, Leasing Defendants will send the amount to collections and place the unpaid amount on their credit report.

- **Merchant Services Defendants Participation In the Enterprise.**

164.    Under the direction of Defendants Moore, Parisi, Jurczyk, and Madura, Merchant Services Defendants market and sell electronic payment processing services to merchants.  They also license and contract with independent sales agents, such as Defendant Fiona Walshe and the Protégé Companies, to act as agents on their behalf and on behalf of the Leasing Defendants.

165.    Merchant Services Defendants hold themselves out as a legitimate businesses within the electronic payments industry but associate themselves with Leasing Defendants to engage in a pattern of racketeering designed to defraud small businesses and increase the profits of all entities and individuals associated with the Enterprise.

- **Defendant Moore Chose The Name "Merchant Services" To Mislead Class Members**

166.    In the early 1990s, Defendant Moore was fired for fraud and forgery from an ISO known as Universal Savings Bank.  Shortly thereafter, Defendant Moore began a new ISO, and selected the name Universal Merchant Services for his new company so that he could falsely represent to merchants that he was affiliated with "Universal," a short name for the legitimate Universal Savings Bank.

167.    In approximately 1999, after about five years of operations under Universal

1  Merchant Services, Defendant Moore created Merchant Services, Inc.  Just as selecting the name

2  "Universal Merchant Services" implied a connection to Universal Savings Bank, the name

3  "Merchant Services" could be used to imply a connection with a limitless number of reputable

4  card processors, deceiving even more merchants.  Indeed, in the sale of credit processing services,

5  Merchant Services Defendants have falsely claimed to represent or be affiliated with numerous

6  reputable banks, such as JP Morgan Chase, Chase Paymentech, and/or Wells Fargo.  Merchant

7  Services Defendants do not actually sell processing services for of these companies, nor do they

8  use them to process any of the transactions.  Instead, transactions are processed through the

9  unrelated third-party processors, such as TransFirst LLC and First Data ("Processors").

10      168.    Merchant Services Defendants, under the direction of Defendant Moore, then

11  created a simple, text only logo for Merchant Services, Inc., which does not contain the word

12  "Inc.," to further deceive customers into thinking they are the division of legitimate companies

13  responsible for merchant card processing.  Merchant Services Defendants will print logos of the

14  legitimate companies beneath their own logo on their card and Defendants Moore, Parisi, and

15  Jurczyk instruct their sales representatives to play up their relationship to these legitimate

16  companies when marketing their services.

17      169.    For example, although Merchant Services Defendants have registered for a test

18  account with Wells Fargo, as of March 8, 2010, they had never done any processing through

19  Wells Fargo.  Nevertheless, on the bottom of its website they falsely and deceptively states

20  "Merchant Services, Inc. is a registered ISO/MSP of Wells Fargo Bank, N.A., Walnut Creek,

21  CA."  *See* http://www.merchantsvcs.com/, last visited January 31, 2011.  Underneath that

22  disclosure, the webpage identifies National Payment Processing as "a registered ISO of Columbus

23  Bank and Trust Company, Columbus, GA."  *See id.*

24      170.    For several years, until approximately 2005, Fifth Third Bank directly authorized

25  Defendant Merchant Services, Inc. to market and sell merchant services on its behalf.  Merchant

26  Services Defendants, at the direction of Jason Moore, represented to Class Members that they

27  were with "Fifth Third Merchant Services."  Class Members complained to Fifth Third Bank

28  about forged Equipment Leases and misleading rate quotes and Fifth Third revoked Merchant

1    Services Defendants' authorization to market leases.

2    171.    Merchant Services Defendants also put their "Merchant Services" logo at the top

3    of most leases secured on behalf of Leasing Defendants so that class members believe that they

4    are leasing equipment directly from them and so that class members do not notice or question the

5    role of the third party Leasing Defendants.  Leasing Defendants agreed to this false statement,

6    because the customer deception increases their profits, furthering the goals of the Enterprise.

7         ▪ **Defendant Moore Relies on a Series of Shell Companies To
              Confuse Class Members**

8    172.    In the last ten years, Defendant Moore created two additional companies to assist

9    with his merchant card processing business, Defendants National Payment Processing and

10   Universal Card.

11   173.    All sales agents and independent contractors working for the Merchant Services

12   Entities are instructed to represent to class members that they are affiliated with Merchant

13   Services, and not to inform class members about the entities National Payment Processing or

14   Universal Card.  But Merchant Services, Inc. is not a registered ISO of the Processors on whose

15   behalf it markets credit card processing.  Rather, Merchant Services Defendants have registered

16   National Payment Processing with some entities and Universal Card with other processing

17   entities.  This ensures that when complaints are lodged, the Processors are not easily able to

18   identify the responsible ISO.

19   174.    Sales agents and staff are affiliated with National Payment Processing and

20   Universal Card.

21   175.    Merchant Services Defendants represent on leases that "UMS" or Defendant

22   Universal Merchant Services is the equipment supplier.  Merchant Services Defendants also use

23   the name "UMS" as the name of a collections agency, when harassing merchants for alleged

24   unpaid debt.  Purported outstanding debt is reported to the credit bureaus under the name

25   "Universal Merchant Services."  Despite regularly conducting business under that name,

26   Merchant Services Defendants do not maintain an up-to-date registration with the Secretary of

27   State for Universal Merchant Services and continue to represent that it does not exist.

- **Moore, Parisi, Jurzyck, Roy and Walshe Trained Each Other and New Contractors Others to Replicate and Direct Fraud.**

176.    In 2006, because of Defendant Walshe's exceptionally high sales, Defendant Moore saw an opportunity to expand his sales force beyond the Orange County area.  Defendant Moore and Walshe agreed that Walshe would relocate from the Irvine area to San Jose to open a new office to further the goals of the Enterprise.  To faciliate this arrangement, Defendant Walshe and Cross-Defendant Anthony Kutscher created the Protégé Shell Companies.  Walshe, Kutscher, and the Protégé Shell Companies then conspired and contracted with Defendant Moore and the Merchant Services Companies to market and sell electronic payment processing services and equipment leases on behalf of the Enterprise.  Walshe would purport to act as an "independent contractor," applying the sales tactics and training programs created by Defendant Moore. To do this, Walshe was empowered to hire additional purported "independent contractors" to solicit new customers for Merchant Services and the Enterprise to defraud.  In return for her work directing the fraud of the Merchant Services Defendants in a new region of California, Walshe would receive a larger percentage of profits.

177.    Defendant Moore has replicated this model in numerous cities and states.  Moore, the Merchant Services Companies, and the sales agent collectively target a new region to expand operations.  Top sales agents are identified by Moore to hire and direct a team of sales representatives in this new region.  For example, Joe Parisi, brother of Defendant Robert Parisi, leads a satellite office in Hawaii.  Other sales representatives direct teams of sales agents in numerous regions and states, including, but not limited to, Sacramento and Arizona.  Contracts are signed purporting to designate each of these persons as "independent contractors" when in fact they are directed to follow the instructions provided by the Merchant Services Companies, Moore, Parisi and Jurzcyk, and in turn, direct the perpetuation of fraud as described in this complaint.

178.    Defendants Moore, Parisi, and Jurzcyk have devised a training method described in paragraphs 185-198.  Moore, Parisi, and Jurzcyk have applied that training method to dozens of sales representatives all over the country.

179. Defendants Walshe and Roy have learned from that training method and in turn train others, as described in paragraphs 208 and 230.

**D.  Defendants Engage In Fraudulent Practices To Increase Their Revenues And Further The Goals Of The Enterprise.**

180. Defendants utilize a variety of fraudulent or misleading business practices to recruit new customers and sell them contracts for equipment and other services. Defendants train their employees to engage in these practices, using standardized training materials and information. Defendants use their roles in the Enterprise to carry out their fraud.

▪ **Authorizing Criminals and Dishonest Agents.**

181. Leasing Defendants hire and associate with ISOs who hire and contract with criminals and other individuals with a history of dishonesty.

182. In 2006, Kmia McDaniels, an employee of Merchant Services Defendants and their customer service liaison to Leasing Defendants, was arrested and convicted of wire fraud. Ms. McDaniels had been stealing funds from the merchant accounts. Despite this, Leasing Defendants never conducted an investigation or enacted safeguards to ensure that their agents, Merchant Services Defendants, would protect against this behavior in the future.

183. Leasing Defendants do not require ISOs such as Merchant Services Defendants to conduct background checks on agents authorized to sell Equipment Finance Leases on their behalf. As a result, Leasing Defendants have provided authorization to numerous sales agents and ISOs operating across the country who have been convicted of check fraud, embezzlement, and forgery, both before and after their association with Leasing Defendants. When defrauded merchants provide evidence of criminality associated with the agent responsible for their lease, the Leasing Defendants do not investigate and insist the lease is valid.

184. Merchant Services Defendants and Leasing Defendants prefer to work with convicted criminals because they can threaten to report these individuals to parole and probation officers for minor violations if the individuals protest against the fraudulent conduct. For example, Merchant Services Defendants, under the supervision of Defendants Parisi and Jurczyk have accused employees of petty thefts (such as removal of pencils or snacks from the break

room) to keep them silent about the wrongdoing described in this complaint. In addition, Merchant Services Defendants expect that any testimony against them by former employees will be less credible if the employees are convicted criminals.

- **Training Employees, Contractors, and Agents To Commit Fraud**

185.     Merchant Services Defendants, under the direction of Defendants Moore, Parisi, and Jurzcyk, have devised a systematic method for furthering their fraud. Merchant Services Defendants purposefully recruit new hires without experience in the industry to ensure their deceptive methods go unquestioned.

186.     Merchant Services Defendants, under the leadership of Defendants Moore, Parisi, and Jurzcyk have created a detailed training manual and two week long training session for all new sales representatives.

187.     During the first week, all new sales representatives travel to Merchant Services Defendants' headquarters in Irvine, California. There, Defendants Jurzcyk and Parisi train new sales representatives on how to complete the Rate Estimation Comparison Sheet ("Rate Sheet"), a marketing tool designed to illustrate the false savings to the class members, by purporting to compare the class members' current rates with the rates of Merchant Services Defendants, suggesting that class members will save significant amounts of money by switching.

188.     The Rate Sheet training instructs new agents to only use the lowest processing rate, for which only a limited number of the least common credit cards qualify, when representing the processing rates to potential customers. New sales representatives are further instructed on how to inflate the fees paid by the merchant to their current Processor so that the rates charged by Merchant Services Defendants appear significantly lower.

189.     Merchant Services Defendants also train the sales representatives to avoid using the term "lease" when discussing the equipment, and to portray the price of the equipment lease as a "service fee" on the Rate Sheet.

190.     Merchant Services Defendants further trained sales agents to inform merchants that they offer "wholesale rates," "eliminate the middleman," and that they are affiliated with

reputable companies, such as Chase Paymentech, even if no such affiliation existed.

191.    Finally, Merchant Services Defendants train the sales representatives to visit potential customers at peak times to increase the chance that the merchant will be distracted and ask fewer questions before agreeing to the deal.

192.    During the second week of training, Merchant Services Defendants send the new sales representatives out to begin soliciting new merchants.  This practice, called "ride alongs" involves a district manager, such as Defendants Walshe or Roy, riding along in a car with the new sales representative and approaching customers, so that they may train the new sales representative to apply what was learned in the first week.  During this week, Merchant Services Defendants, including Walshe and Roy, heavily emphasize the importance of the equipment leases.  Specifically, new sales representatives are instructed to charge extremely high rates for the Equipment Leases, and are taught how to obscure the key information about the lease from Class Members when making the sales pitch.  New agents are also routinely instructed never to leave copies of the Equipment Finance Lease and Application for Merchant Agreement and to get signatures on blank forms.   Finally, new agents are trained with a stock set of replies to common merchant questions so that agents will not provide merchants with truthful information.  Among these stock replies are that all services and associated payment obligations may be cancelled at any time.

193.    Merchant Services Defendants hold meetings every Monday morning.  These meetings are led by Defendants Moore, Jurczyk, and Madura, and are used to update the sales representatives on changes in the forms and contracts, new fees to be charged to merchants, and other administrative matters.  Participation by all sales representatives across the country, either in person or by phone, is mandatory.

194.    Defendants Moore, Jurczyk, and Parisi also use the meetings to identify which sales representatives should be promoted.  Defendants Moore, Jurczyk, and Parisi viewed sales representatives who asked questions, complained, or expressed concern about the impact of the changes on their customers as liabilities and not to be trusted with information about their fraudulent operations.  Loyal representatives who expressed enthusiasm for the company at these

-37-
Second Amended Class Action Complaint

1   meetings were promoted.

2       195.    To sell as many expensive leases as possible, Defendants Moore, Parisi, and

3   Jurczyk periodically hold "Lease Contests." These contests are for a set period of time, open to

4   all sales representatives associated with the Merchant Services Defendants, and are announced

5   and promoted at the regular Monday meetings. At the end of the time period, Merchant Services

6   Defendants add up the value of all leases secured by each sales representative and award prizes to

7   the individuals who secured the highest amount of lease values.

8       196.    These lease contests have proven to be incredibly successful in encouraging sales

9   representatives to enroll merchants in expensive, unconscionable leases.

10      197.    Defendants Moore, Parisi, and Jurczyk have developed a method for identifying

11  and soliciting new customers. Merchant Services Defendants employ a team of telemarketers,

12  who work from their Irvine headquarters. Each sales agent is assigned at least one telemarketer

13  who solicits leads for the sales agents in their geographic area. The telemarketers are trained to

14  call merchants and represent that they are with "Merchant Services" and have reviewed the

15  merchant's current processing charges and would like to send a representative out to discuss a

16  lower rate. Merchants, who are led to believe the telemarketer is associated with their current

17  merchant services provider, agree to meet with a representative.

18      198.    Defendant Moore and Parisi directs the telemarketers and sales agents to obtain

19  information about class members' current charges with other ISOs through trickery and deceit, by

20  calling that class member's merchant card services provider in advance of the meeting and

21  representing to that provider that they are authorized to obtain the information. Once armed with

22  information about the class members' processing rates, the telemarketers can rely that information

23  to the sales agents, who in turn can manipulate the numbers using the formula devised by Moore

24  to represent high savings by switching.

25          ■ **Relying on Independent Contractors To Avoid Liability**

26      199.    Merchant Services Defendants rely on purported independent contractors to act as

27  their agents as well as assist them in the management and direction of the fraud. The Regional

28  Managers, such as Fiona Walshe, and District Managers, such as Alicyn Roy, are purportedly not

employees of Merchant Services Defendants, but rather are purported contractors of Universal

Card and National Payment Processing, who are told to hire their own staff.  The telemarketing

team described in paragraphs 197-198 are also not employees, but rather independent contractors

paid by the sales agents on whose behalf they make calls.  Merchant Services Defendants, at the

direction of Defendants Moore, Parisi, and Jurzcyk employ this arrangement to avoid legal

liability for the fraud these purported contractors carry out on their behalf for their benefit.

200.    Merchant Services Defendants use a payment structure that encourages their

contractors and agents to carry out the fraud.  Agents are paid on a commission basis and only

make the income promised to them if they follow Merchant Services Defendants' oral

instructions to commit fraud.  Specifically, agents derive the largest portion of their income from

commission earned from the equipment leases, and earn only a few dollars of commission from

the electronic payment processing.  Sales representatives who do not get merchants to agree to

certain fees must pay those out of pocket, resulting in a situation where, rather than earning

commission on a sale, the sales representatives are paying money out of their personal accounts

or earned commission from the equipment leases to increase the profits of Merchant Services

Defendants.  To avoid this, sales representatives will simply alter the contractual documents after

the fact, to ensure they themselves are not charged for doing their job.

201.    The first $15,000 in commission earned by the sales representatives is placed in a

risk pool by Defendants Moore, Parisi, and Jurczyk.  Merchant Services Defendants inform the

sales agents that the money is used to cover Merchant Services Defendants' costs associated with

merchants who complain.  For example, if Merchant Services Defendants agree to waive a

cancellation fee to avoid customer legal action, Merchant Services Defendants deduct the

cancellation fee from the sales representatives' risk pool.  Sales representatives are promised that

the $15,000 will be returned to them upon departure from the company, but this money is never

returned.

202.    Merchant Services Defendants also charge sales representatives a variety of other

fees, including a monthly $500 desk fee.  The sales representatives who would like a telemarketer

to drum up leads for them must pay that representatives wages from their commission earned

from the equipment leases, deducted from their risk pool, or collected from them personally if they do not earn enough from their sales to cover these costs. As a result of the high costs associated with employment with Merchant Services Defendants, sales representatives do not earn any money unless they create, sell, and forge equipment leases at exorbitant rates.

203. As a result of the compensation scheme and the extent of the fraud, few sales agents last longer than a few months. Because the turnover among sales representatives is so high, Merchant Services Defendants encourage sales representatives immediately to seek out easy targets to ensure Merchant Services Defendants profit from the sales representatives' short tenure.

■ **Threatening Former Sales Representatives**

204. Merchant Services Defendants employ a variety of tactics to harass and intimidate former sales representatives to ensure the sales representatives do not discuss the fraud.

205. After a sales agent terminates his relationship with Merchant Services Defendants, Defendant Jurczyk mails them a letter threatening them with monetary fines, legal action, and other penalties if the agent discloses any information about their tenure with Merchant Services Defendants to any third party. The purpose of these intimidating mailings is to discourage agents from reporting the wrongdoing of the Defendants to attorneys or law enforcement.

206. Merchant Services Defendants have cross-claimed against Defendant Walshe and the Protégé Companies in this suit in an attempt to avoid liability for their own actions and to intimidate her.

■ **False And Misleading Rate Quotes**

207. Merchant Services Defendants offer merchant card services (on behalf of themselves and Processors) and equipment (on behalf of themselves and Leasing Defendants).

208. Defendants Moore and Parisi devised a sales pitch, which they train sales agents to replicate across the country. Defendants Walshe and Roy not only participate in the sales pitches, recruiting new customers but also direct and train new sales agents to conduct the sales pitch in the same fashion. Merchant Services Defendants, including Defendants Walshe and Roy, visit Class members in the Class members' places of business and offer low rates for credit card processing services. Merchant Services Defendants inform class members that they are able to

Second Amended Class Action Complaint

offer such low rates because they are direct representatives of a bank and have eliminated the "middleman," thus offering "wholesale" rates.

209. When calling on class members to solicit new business, Merchant Services Defendants use the Rate Sheet.

210. When making the sales pitch to potential customers, Merchant Services Defendants, including Defendants Walshe and Roy, represent that the rates contained on the rate sheet are an accurate and complete illustration of both the charges class members currently pay as well as the charges that will be associated with Merchant Services Defendants' services.

211. Using the Rate Sheet, Merchant Services Defendants, at the direction of Defendants Moore and Parisi, however, intentionally omit key information about different, higher rates for the most commonly used types of credit cards as well as other monthly fees, equipment leasing charges, taxes, and insurance costs, while simultaneously distorting the rates merchants currently pay. For example, Merchant Services Defendants have structured the Rate Sheet in such a way that it suggests to class members, and they have trained agents to say, that merchants do not pay fees based on the types of cards processed, but rather a single fixed rate (usually 1.79%) for all transactions, plus a flat monthly "service fee." The monthly "service fee" is represented to cover all card transactions processed, customer support, and equipment. In reality, the "service fee" is the monthly payment for the equipment lease, and merchants must pay additional fees to Merchant Services Defendants and the Processor for the actual electronic payment transactions.

212. In a small box in one of the two upper corners, the Rate Estimate Comparison Sheet deceptively contains the following language: "By signing below, I agree that all fees have been sufficiently explained to my satisfaction" and provides a signature line. Thus, merchants are led to believe that the fees represented on the Rate Estimate Comparison Sheet are a true and accurate depiction of the costs and savings associated with Defendants' services and that they have entered into a contract for these services at the stated rates.

213. Based on Merchant Services Defendants' representations, class members are led to believe that they will be receiving low, discounted rates, when in fact Merchant Services and

Leasing Defendants later bill them for significantly higher, non-disclosed rates.   In reliance on the low, discounted rates, class members agree to enroll in Merchant Services Defendants' merchant card services.

- **Falsely Stating That New Equipment Must Be Acquired From the ISO.**

214.     Leasing Defendants seek out and conspire with ISOs, including the Merchant Services Defendants, who will falsely inform class members that their existing credit card processing equipment is outdated or incompatible with their networks, and that credit card processing equipment available for purchase at stores like Costco is not compatible with their networks.  ISOs, including the Merchant Services Defendants, acting on behalf of themselves and as agents of the Leasing Defendants, also falsely represent that obtaining the equipment through them is a better deal, because they can replace or repair it if the equipment breaks or malfunctions.  Another common misrepresentation by ISOs and Merchant Services Defendants, acting on behalf of themselves and as agents of the Leasing Defendants, is to falsely tell class members that they must obtain new equipment that may only be obtained from the ISO.

215.     To ensure class members are misled into believing that the transaction is a good value, Defendants Moore and Parisi have devised a strategy for obscuring the fact that the equipment is being provided under a long-term lease at exorbitant rates.  Defendants Moore and Parisi train sales agents on this strategy and District Managers such as Defendants Walshe and Roy, who in turn train additional sales agents.   Specifically Merchant Services Defendants instruct their agents to avoid using the term "Lease" when speaking with prospective customers about the "new equipment."  Merchant Services Defendants also train their employees to obscure the terms "Equipment Finance Lease" and "Noncancellable Equipment Finance Lease" appearing at the top of some of the leases with their arms, the tops of their clipboards, or other papers.

216.     Leasing Defendants collaborated with ISOs to design the lease so that key information was only contained along the top line, conspiring with the ISOs to encourage them to present the information to class members on a clipboard, obscuring the word "noncancellable."

217.     With respect to those class members who are able to view the entire Equipment

Second Amended Class Action Complaint

183621.1

Finance Lease being offered to them by the Merchant Services Defendants, they are informed that the "lease" is simply an accounting tool for Merchant Services Defendants, enabling them to charge "wholesale rates," but that merchants can cancel any time. They also deceptively inform class members that even with the cost of the new equipment, class members will still save money by using the Merchant Services Defendants' services because they are paying "wholesale" processing rates.

218.    Leasing Defendants have received numerous calls from merchants who complained to them that Merchant Services Defendants as well as other ISOs represented to them that the lease was cancellable or that the terms were different than what was presented. Leasing Defendants do not provide relief to victims of Merchant Services Defendants and other ISOs who lodge such complaints, because they have permitted Merchant Services Defendants and other ISOs to make such representations on their behalf. Leasing Defendants also refuse to modify the lease to make it more difficult for their agents, including Merchant Services Defendants, to mislead merchants because the current form has proven so successful at furthering the Enterprise's fraud.

219.    The terms of the lease result in the class members often paying at least $1,200 per year, or $4,800 for the term of the lease, for using this equipment. The same equipment can be purchased new for less than $500 at a variety of stores, including Costco. Leasing Defendants know that Merchant Services Defendants and other ISOs willfully conceal these material facts by misrepresenting the nature of the equipment being leased until after the lease is signed.

220.    Frequently the equipment provided by Leasing Defendants under a lease ends up being no different from the equipment that the class member already owned, which Merchant Services Defendants, other ISOs, and Leasing Defendants falsely told the class member was outdated and needed to be replaced. In fact, in many instances, Merchant Services Defendants, other ISOs, and Leasing Defendants actually provide class members with refurbished equipment, which they misrepresent as being new.

▪ **Falsely Promising To Buy Out Existing Leases.**

221.    Merchant Services Defendants and Leasing Defendants also induce class members

to sign the contracts by offering to buy out their current equipment lease contracts with existing processors. After the class members sign the new lease with Merchant Services Defendants and Leasing Defendants, however, Merchant Services Defendants, including Defendant Madura, and Leasing Defendants refuse to honor these offers, so class members are left owing fees and penalties to third parties with whom they had prior credit-card processing contracts.

▪ **Altering Equipment Lease After It Is Signed.**

222. The Merchant Services Defendants and other ISOs provide a contract to class members, which is entitled "Equipment Finance Lease." The Equipment Finance Lease was created by Leasing Defendants, who intentionally designed it to be misleading and confusing to merchants as possible. The first page of the lease appears to be a complete contract, including signature lines. Leasing Defendants conspired and collaborated amongst themselves and with ISOs to design the lease so that merchants would be shown and/or receive only one page, and that later, three additional pages (whose existence is sometimes mentioned in the small print of the first page) could be added. Leasing Defendants also designed the lease so that their agents, the ISOs and sales representatives, could easily alter the terms on the successive three pages after the first page of the lease had been signed.

223. Leasing Defendants conspired with Merchant Services Defendants, including Defendant Moore, to create and/or use a special version of the Equipment Finance Lease, which prominently placed the Merchant Services logo at the top left corner of the lease to obscure Leasing Defendants role in the scheme from class members. Leasing Defendants and Merchant Services Defendants then placed the address shared by Merchant Services Defendants and Defendants Healy and Fitzgerald on the lease.

224. Leasing Defendants maintain a variety of other versions of the Equipment Finance Lease, including leases for each of the Northern Acquisition Companies. Each version is designed so that the ISO can easily hide key terms or otherwise misrepresent the nature of the agreement.

225. This Equipment Finance Leases frequently will contain the name of either Merchant Services Defendants or one of the Leasing Defendants in the corner and has the

following sections on the first page:

    a.  "About Your Business" – Where the parties provide the identity of the leasee, including the type of business, address, phone number, and contact name;

    b.  "Equipment Supplier" – Where Defendants provide the name and address of the "supplier" of the hardware to be used by leasees;

    c.  "Equipment Information" – Where Defendants write in the manufacturer and identifying information of the hardware to be leased;

    d.  "Schedule of Payments" – Where the monthly lease fee is written;

    e.  "About Your Bank" – Where lessee provides the bank name account number, and routing number;

    f.  "Lease Acceptance" – Where the lessee signs the lease; and

    g.  "Personal Guaranty" – Where the lessee provides his home address, social security number, and agrees to be personally liable.

226.    Until at least January 1, 2008, Merchant Services Defendants and Leasing Defendants informed class members that was only one page to the Equipment Finance Lease. Although the document had fine print at the bottom far left corner of the page that states "page 1 of 4," Merchant Services Defendants and Leasing Defendants either copied that language onto the document after it was signed or selected the small font size and placement to conceal from class members the idea that there were additional pages, which were not shown to class members. Defendant Moore, acting behalf of himself and the Merchant Services Defendants, as well as an agent of the Leasing Defendants, has instructed and trained sales agents to withhold these pages from class members.  Other ISOs and agents of the Leasing Defendants instruct and train their agents in a similar fashion.  Thus, when approaching merchants, Merchant Services Defendants and the other ISOs intentionally led class members to believe that the one page provided is the entire agreement containing all transaction terms.  The one page Equipment Finance Lease appears to be a complete document, containing all material information customarily expected by class members and other small businesses. The first page of the Lease is in fact a complete contract in itself and by its terms excludes the addition of other pages.  Later, the ISO, such as

1   Merchant Services Defendants use scanning and photocopying equipment, or trace the signatures

2   with pen and ink, to transform the one page document into what appears to be a two-page double

3   sided brochure, in which the page shown to the merchant is the first page and there are three

4   additional pages of previously undisclosed terms.

5        227.    According to the hidden second through fourth pages of the lease, the Equipment

6   Leases solicited by ISOs, such as Merchant Services Defendants, on behalf of Leasing

7   Defendants are for a 48 month term. Nevertheless, Leasing Defendants intentionally designed the

8   first page of the lease to have the lease term followed by a blank line, knowing that merchants

9   would not agree to pay such hefty fees for 48 months. By leaving the term blank, Leasing

10  Defendants allowed the sales agents (including Merchant Services Defendants) to inform

11  merchants that there is no fixed term, only to later fill in the blank with 48 months after the

12  merchant has signed it.

13       228.    ISOs such as Merchant Services Defendants, working on behalf of the Leasing

14  Defendants, tell Class members that there are no options to purchase or otherwise obtain

15  processing equipment from other vendors, and that equipment will be provided by the ISO.

16       229.    With respect to the Merchant Services Defendants, Defendants Moore, Parisi,

17  Walshe, and Roy do not store nor do they provide sales agents with catalogs of equipment to

18  present to Class Members to assist them in their equipment selection so that Class Members can

19  make an informed decision to buy or lease the equipment. Rather Merchant Services Defendants

20  inform Class Members that Merchant Services Defendants will select the equipment for them.

21  Because the Class Member is not given an opportunity to select the equipment prior to signing the

22  Equipment Finance Lease, the section for "Equipment Information" is left entirely blank.

23  Merchant Services Defendants select the equipment and fill in the blank after the Class Members

24  have signed the Lease. Merchant Services Defendants also do not disclose the cost or purchase

25  price of the equipment or provide any means to pay for the equipment in a single lump sum.

26       230.    After the contract is signed, Merchant Services Defendants have trained District

27  Managers, including Defendant Roy and Walshe, who in turn train sales agents to take the signed

28  copy of the document and tell class members that they will make copies at Merchant Services

Defendants' offices, and then return the documents by mail.  Typically, the documents are never

mailed to Class members.  If Class members follow up to request the documents, the requests are

often ignored, or Merchant Services Defendants refuse to provide documents.

231.    When a dispute arises, Merchant Services Defendants, often under the direction of

Eric Madura, will refer Class members to Leasing Defendants.  Because of the misleading nature

of the initial interaction, this is often the first time Class Members learn about the existence of

Leasing Defendants.

232.    Because Leasing Defendants know that the ISO/MSPs who are marketing leases

on their behalf do not routinely provide merchants with copies of the leases, Leasing Defendants

maintain a dedicated telephone number and email address for "Lease Documents." Leasing

Defendants, under the direction of Defendants Cohen, Krieger, Buono, and Sussman will send

Class Members copies of the signed Equipment Finance Lease, which they know the Merchant

Services Defendants and other ISOs to have altered by adding pages not previously presented,

changing key terms of the contract, and/or filling in blank parts of the forms with new

information.

233.    The one-page Equipment Finance Lease often has the name of the Merchant

Services Defendants at the top, leading class members to believe that Merchant Services

Defendants are the Leasing Party.  The Equipment Finance Lease may also have a blank for the

leasing party, and the blank is not filled in at the time class members sign.  After the contract is

signed, Merchant Services Defendants, including Defendants Walshe and Roy, fill in the blank to

state that the Equipment Finance Lease is with Leasing Defendants.  Merchant Services

Defendants then falsely claim to have no control over Leasing Defendants, that the lease

transaction was separate from the processing transaction, and that they are unable to resolve

problems with leased equipment or with monthly leasing charges.

234.    In some instances, Merchant Services Defendants, including Defendants Walshe

and Roy will add a forged signature, in the form of handwritten initials, to the remaining

previously undisclosed pages of the Equipment Finance Lease, to make it look as if the class

member previously saw, approved and initialed these pages.  In fact, the pages were never

1 presented to the class member.

2     235.    If Class Members inform Merchant Services Defendants that they do not want to

3 enter into an equipment lease when contracting for merchant processing services, then Merchant

4 Services Defendants, including Defendant Walshe, will create entirely forged versions of the

5 Equipment Finance Lease.

6     236.    While the Leasing Defendants rely on Article 2A of the Uniform Commercial

7 Code to avoid obligations under traditional contract law, the Equipment Finance Lease does not

8 conform with the UCC. Class members, the lessees in the Equipment Finance Lease, do not

9 receive a copy of the contract between Merchant Services Defendants and Leasing Defendants

10 prior to signing the Equipment Lease. Class members are not given the opportunity to approve

11 the contract between Leasing Defendants and Merchant Services Defendants as a condition of the

12 lease. Class members do not receive an accurate and complete statement of promises and

13 warranties and disclaimers of any warranties prior to signing the lease. Leasing Defendants do

14 not inform Class members of their rights with respect to the party providing the equipment to be

15 leased.

16     237.    Leasing Defendants know that the "financing" being provided under the lease has

17 no relationship to the cost of the equipment purportedly being "financed." After class members

18 sign the incomplete lease agreement, Leasing Defendants pay the ISO, such as Merchant Services

19 Defendants, a lump sum payment in exchange for receiving the right to all future lease payments.

20 This lump sum payment is supposedly made so that ISO can acquire from a third-party vendor the

21 new processing equipment that the class member selected, and then transfer ownership of the

22 equipment to the Leasing Defendants. In fact, the ISO and Leasing Defendants know not only

23 that the equipment was not selected by the class member, and that the amount paid to the ISO is

24 far in excess of the cost of the equipment or reasonable marketing expenses. The lump sum

25 payment by Leasing Defendants to the ISO is not based on the actual cost of equipment or

26 reasonable marketing expenses, but only the discounted present value of the expected lease

27 payments.

28     238.    Leasing Defendants represent to merchants, however, that the lease payments are

related to the fair market value of the equipment being leased.  In the section entitled "Buyout Option," Leasing Defendants define "fair market value" at the expiration of the lease term as "a percentage of the aggregate lease payments."  On a 48 month lease, that percentage is set at 10%.  Thus, as Leasing Defendants have defined it, the fair market value of a four year old piece of equipment would be determined by the rate at which the sales agent randomly assigned to it when entering the merchant into the lease.  Applying this logic, a four-year-old piece of equipment, purchased new for $500, and leased for $150/month, would be worth $720.  In fact, the real value of that equipment on the open market would be less than half the original purchase price, and likely close to $0.

239.    While Leasing Defendants disclaim warranties on page 2 of the Equipment Finance Lease, this page of the Lease is not provided to Class members prior to entering into the Lease.  Class Members do not sign page 2 of the Lease.

- **Failing to do due diligence.**

240.    Merchant Services Defendants and Leasing Defendants have conspired to create a sham system to vet and approve equipment leases.

241.    In instances where Merchant Services Defendants create expensive leases for multiple pieces of equipment, Merchant Services Defendants and Leasing Defendants purport to require proof of financial stability before approving the leases.  Merchant Services Defendants maintain a stock set of "financials," consisting of a few balance sheets and annual reports for non-existent companies.  When a lease for multiple credit card machines is created for a class member, Merchant Services Defendants use one of their stock financials, changing just the identifying information associated with the company.  Merchant Services Defendants then use the mail to send these financial statements to Sara Krieger for her approval.  Sara Krieger has received hundreds of identical sets of financial data, each purporting to be a unique set of financial records justifying that class member's suitability for an expensive lease.  Sara Krieger routinely approves such leases on the basis of these fake financial statements.

242.    To further the goals of the Enterprise, around 2005 or 2006, Leasing Defendants and Merchant Services Defendants conspired to develop a system that purports to ensure Class

1 Members have actually agreed to the lease, when in fact they have not. When Merchant Services

2 Defendants first began marketing on behalf of Leasing Defendants, page 2 of the Equipment

3 Finance Lease contained the following term:

4 "If within sixty (60) days from the date Lessor orders the Equipment, same has
not been delivered, installed and accepted by Lessee in form satisfactory to
5 Lessor, Lessor may on ten (10) days written notice to Lessee, terminate this Lease
and its obligation to Lessee."
6

7 The provision allowed Leasing Defendants, the "Lessor," to revoke the Equipment Finance Lease

8 if they were not sufficiently satisfied that the Lessee had agreed to the terms and would accept the

9 equipment. This provision reflected the practice employed by Leasing Defendants prior to 2006,

10 whereby the Leasing Defendants would telephone Class Members shortly after receiving the lease

11 to confirm that a lease was signed prior to approving the Lease. As a result of this practice,

12 Leasing Defendants, and in particular, Defendant Krieger, found that class members would

13 routinely deny entering into such an agreement. Because Leasing Defendants' arrangement with

14 Merchant Services Defendants was otherwise profitable, Leasing Defendants did not want to

15 refuse to authorize Merchant Services Defendants to market such leases on its behalf, despite the

16 obvious fraud. Rather, in furtherance of the Enterprise, Leasing Defendants agreed with

17 Defendants Moore and Parisi to remove that term from the leases solicited by Merchant Services

18 Defendants, permitting Defendants Krieger to approve all leases, without any basic underwriting

19 standards.

20 243. To create the illusion that Leasing Defendants were conducting due diligence,

21 Leasing Defendants, created an "Acknowledgement of Receipt Form" to serve as a substitute for

22 the telephone calls. This form has Merchant Services Defendants logo at the top and is a simple

23 check list that the merchant initials to signify that he has accepted the card processing equipment

24 and understands its terms. Leasing Defendants, including Defendants Krieger, Cohen, Fitzgerald,

25 and Mezei, and Merchant Services Defendants, including Defendants Moore and Parisi, agreed

26 that if Merchant Services Defendants provided this form when they submitted the leases for

27 approval, Defendant Krieger would routinely approve the leases without placing a phone call to

28 verify that the merchant agreed to the lease.

244.     The "Acknowledgement of Receipt Form" suggests that a merchant who has initialed the form has received the credit card processing equipment. It is frequently dated on the same day that the merchant purportedly enrolled in electronic payment processing services with Defendants. Merchant Services Defendants do not provide the equipment on that day, rather it is delivered days later. Where Merchant Services Defendants present the form to merchants to sign, they obscure the terms and represent that it is a formality required by the equipment supplier and merchants choosing not to sign it would pay an extra fee. Where a merchant chooses not to sign it, Merchant Services Defendants, including Defendants Walshe and Roy, routinely forge class members' signatures on it.

245.     Each piece of equipment leased by Leasing Defendants has a unique serial number, which the Leasing Defendants require the sales agent to write onto the equipment lease after it has been signed so that the Leasing Defendants can track whether the correct piece of equipment has been returned at the end of the lease. But, the "Acknowledgment of Receipt Form" does not have a blank for the serial number to be written in, because Leasing Defendants know that the ISO is not actually delivering the equipment to the merchant when securing that signature.

246.     Because this abdication of due diligence has proven successful in entrapping small businesses in fraudulent leases, the Leasing Defendants now allow other ISOs marketing on their behalf to follow this practice.

- **Failure to Enact an Adequate and Effective Fraud Reporting System.**

247.     Because numerous Class Members complain to Leasing Defendants about forgery and fraud, Leasing Defendants have created a fraud reporting system that discourages Class Members from filing complaints, and accordingly, relieves Leasing Defendants of their obligation to investigate.

248.     The three page fraud reporting form threatens Class Members with criminal prosecution for false statements in bolded font at the top of every page. Leasing Defendants designed the form in this way to intimidate Class Members and deter them from filing the report.

It also requires that the Class Member submit a police report with the fraud report before Leasing Defendants will investigate the claim. Leasing Defendants know that police departments typically view this as a civil matter and have chosen to require a police report because they are more interested in placing obstacles before the Class Member than investigating fraud.

249.    The fraud form also requires that a Class Member claiming fraud provide five separate notarized copies of his or her signature, a photocopy of a valid identification containing a photo and a signature, and three cancelled checks. These requirements are designed to deter Class Members from claiming fraud, in part because they raise the specter that the Leasing Defendants will use the signatures and identification to perpetrate additional fraud and identity theft against them.

250.    The fraud form also asks if the Class Member has received and used the machine. Despite knowing about the fraudulent conduct in which their ISOs such as Merchant Services engage as described in this complaint, Leasing Defendants use the mere acceptance of the equipment as justification for determining that no fraud occurred.

251.    Leasing Defendants know that one of the most widespread frauds perpetrated on Class Members is when the ISO only provides the merchant with the first page of the four page contract. Despite this, there is no question or portion of the fraud reporting form asking the merchant if this is the alleged fraud.

252.    The fraud form instructs the Class Members to mail the completed form and supporting, highly personal and extensive documentation to a post office box in South Dakota, further deterring class members from reporting.

253.    Where a Class Member successfully completes the entire fraud form, the Leasing Defendants do not conduct an investigation and simply inform the Class Member that they have reviewed the signatures and concluded them to be the same, even when the Class Member provides evidence that he or she was in a different city at the time of the transaction or that his/her social security number differs from that on the sheet.

254.    If a Class Member who has completed the entire fraud form later defaults, Leasing Defendants use the information provided on the fraud form to harass the Class Member.

- **Incorporating Unconscionable, Unexplained Terms In Buried Portions of Contractual Documents Relating To The Equipment Finance Lease**

255.     The later-added, non-disclosed lease pages also include key disclosures that alter the terms of the agreement.  For example, the additional pages contain information about liquidated damages for termination, additional fees and rates that will be charged, and high late fees, and details about Merchant Services Defendants' ability to assign the contract rights for the equipment lease to third parties.

256.     The later-added, non-disclosed contract pages also include a number of unconscionable provisions.  For example, some versions of the Equipment Finance Lease contain a clause where the party to the lease agrees to be sued for breach or non-payment in the State of New York and waives its rights to a jury trial, to participate in a class action lawsuit, or to pursue any other representative action, including private attorney general action.  In addition, the party to the lease purportedly agrees that the lease will automatically renew on a month-to-month basis at the end of the 48-month term, unless it provides Leasing Defendants thirty days written notice of termination.

- **Altering Merchant Card Services Contract After It Is Signed**

257.     When selling card processing services, Merchant Services Defendants are marketing the services of entities connected to the Interchange.  From approximately 2006 to 2009, Merchant Services Defendants marketed on behalf of the Processor TransFirst, LLC.  To enroll in electronic payment processing services through TransFirst, class members are required to sign a document entitled "Application for Merchant Agreement," which provides some of the terms and fees to be charged and contains several pages of forms for the class member to complete.  On page 6 (of 7), a signature line is included.  Merchant Services Defendants, including Moore, Parisi, Walshe, and Roy train sales agents to represent to Class members that the pages of the Application with which they are presented reflect the entire arrangement with the Merchant Services Defendants.  Where Class members are provided with just select pages of the 7 page Application, Merchant Services Defendants, including Defendants Madura, Walshe, and Roy, later copy the page numbers onto the form and forge class members' initials and signatures

on the remaining pages.

258.    Small print on page 6 of the Application for Merchant Agreement tells the signer to review the terms and conditions of a "Merchant Card Processing Agreement included with this application."  However, at the time they are induced to sign the Agreement, Class Members typically are not provided with the "Merchant Card Processing Agreement," which is a separate ten-page document.  In addition, even if they do present the Application for Merchant Agreement to the class members, many fields are left blank and Merchant Services Defendants orally convey information to the class members that is inconsistent with what is later written in the blanks. Defendants Moore, Parisi, Walshe, and Roy have trained sales representatives and agents of Merchant Services Defendants to leave Class Members businesses without having filled in all of the fields on the contract, and Defendants Walshe and Roy routinely leave Class Members' businesses without those key fields completed.  Then Merchant Services Defendants complete these fields after the class members have signed the document, with terms that are different than those on which the parties verbally agreed.

259.    Where a complete contract is agreed upon, Merchant Services Defendants will replace pages in the contracts with new pages and altered terms, insert new pages where needed, photocopy the appropriate page numbers on those documents, and forge the class members signatures in the appropriate places.

260.    Merchant Services Defendants then send these forged contracts to the Processors for processing.

261.    Defendant Madura periodically reviews the rates and fees being charged to merchants, regularly identifying new fees to impose on class members.  For example, Merchant Services Defendants represented to Class members that they do not charge Payment Card Industry Compliance Fees ("PCI fees").  After thousands of Class Members had enrolled, Defendant Madura began charging these PCI fees to merchants and notifying them via the mail.

262.    When Class Members discover the increased rates, they will often call the Processors to complain about the errors.  Because Merchant Services Defendants have taken steps to ensure that the Processors have a different name for them than the merchants do, the merchants

are not able to get the Processors to correct the fraud.

■ **Incorporating Unconscionable, Unexplained Terms In Buried Portions of Contractual Documents Relating to Merchant Card Services**

263. The Processors provide Merchant Services Defendants a Merchant Card Processing Agreement, which contains onerous terms and conditions which the Processors and Merchant Services Defendants enforce when Class Members contest problems with their processing service. As discussed above, the ten-page Merchant Card Processing Agreement is typically not shown to the Class Members before a dispute arises, nor is it ever directly signed by Class Members.

264. Merchant Services Defendants sometimes photocopy a signature block containing the Class member's signature on the top corner of the first page of the Merchant Card Processing Agreement; nowhere else on the document do signatures or an acknowledgement of the terms appear. For other Class members, no signature block appears until he or she contests the terms of the purported agreement; at that point Merchant Services Defendants create a signed version using scanners and computer programs to copy the signature block onto the document.

265. The Processors and the Merchant Services Defendants invoke the Merchant Card Processing Agreement because it is purportedly incorporated by reference in the Application for Merchant Agreement, on a page of the Application that is not routinely shown or explained to merchants.

266. The first two pages of the Merchant Card Processing Agreement are a glossary of terms. Buried on, and after, page six of the Merchant Card Processing Agreement are onerous terms. For example, the term of the agreement is three (3) years. The Processors provide themselves unilateral termination rights at any time during the three year period, but impose severe penalties on Class members for early termination. The early termination fee is the "amount equal to the greater of (i) the average monthly processing fees charged to Merchant for the previous 12 months (or such shorter time if the merchant has processed for less than 12 months) multiplied by the number of months remaining under the agreement, or (ii) $495."

267. The last two pages of the Merchant Card Processing Agreement contain choice-of-law and choice-of-forum provisions, stipulating that any legal action will be subject to arbitration under Colorado law.

268. The last page of the agreement holds that the applicant is a personal Guarantor who will be jointly and severally liable.

269. Merchant Services Defendants do not explain the personal guaranty to class members, nor do they explain the effect of the choice-of-law and choice-of-forum provisions or the arbitration clause.

- **Fraudulently Charging a "First and Last Month" Deposit**

270. At the time Merchant Services Defendants sign class members up for credit card processing services, Merchant Services Defendants, including Moore, Parisi, Walshe, and Roy train sales agents to induce class members to sign an ACH form to authorize automatic bank withdrawals, telling class members that the form is needed to permit the credit card revenues to be deposited in, and processing fees to be deducted from, class members' accounts. Merchant Services Defendants then immediately deduct from class members' bank amounts an amount approximately equal to twice the monthly rate on the lease.

271. When Class Members question the withdrawal from their accounts, Merchant Services Defendants, under the direction of Defendant Madura, inform those class members that this withdrawal is the first and last month lease payment, when in fact, it does not count towards the 48 months of the term, so that class members are essentially paying for at least 50 months. The money is not paid to Leasing Defendants, rather Merchant Services Defendants keep this money for themselves.

272. Merchant Services Defendants, including Defendant Moore, and Leasing Defendants have agreed that, if in the unusual event a merchant successfully revokes his Equipment Finance Lease, Merchant Services Defendants do not have to refund to Leasing Defendants any payments received if that merchant has paid at least two months of his term. Only in those instances do the Merchant Services Defendants pay the money to Leasing Defendants. Thus, by immediately and fraudulently withdrawing the first and last month

payments from class members' bank accounts, Merchant Services Defendants ensure that they will not have to incur any of the financial risk from their fraudulent deals.

- **Fraudulently Charging a Cancellation Fee**

273.    At the time they sell the credit card processing services to Class members, Merchant Services Defendants tell Class members that the services can be cancelled at any time. They hide the provision of the Merchant Card Processing Agreement that provides for a 36-month term and a cancelation fee. When class members cancel, Merchant Services Defendants modify the ACH form that was previously signed by Class members and submit it to Class members' banks to debit a $495 cancellation fee.  Defendant Madura oversees Merchant Services Defendants' efforts to debit the cancellation fees. Merchant Services Defendants then share this fraudulently obtained fee with the Processor.  Alternatively, they ask the Processor, purportedly on behalf of the Class member, to waive the cancellation fee, and then keep the entire cancellation fee for themselves.

- **Deducting Funds And Transaction Fees For Personal Property Taxes**

274.    Class members in equipment leases with Leasing Defendants will receive letters a couple times a year informing them of their obligation to pay a personal property tax on the equipment they are leasing.  The letters do not provide any information on how these taxes are calculated or any information that might otherwise be needed in a tax filing.  The letters do not bear any name or signature of a particular person or department at the Leasing Defendant, but are signed only in the company name, e.g., "MBF Leasing."

275.    The amount of the tax, as determined by Leasing Defendants, is withdrawn from Class members' bank accounts, along with a processing fee, typically $25.  Class members are not given an option to opt out of having Leasing Defendants file this on their behalf to avoid paying the $25.

276.    While the Equipment Lease typically includes a clause about Class members' obligations to pay these taxes, the page containing this information is rarely given to Class members at the time of signing.  The Lease is also silent about the processing fee that Class

1   members will have to pay.

2      277.   When Class members ask Leasing Defendants for proof of these filings, Leasing

3   Defendants routinely do not respond.

4      278.   The taxes and fees collected under these provisions are not actually due to, nor are

5   they remitted to, any taxing authority. Rather, the Leasing Defendants simply transfer the

6   revenues to their shell companies.

7      279.   In February and March 2011, Leasing Defendants, through their alter-ego, SKS

8   Associates, sent letters to hundreds or thousands of lessees, informing them that SKS had

9   acquired the rights to their leases. The letter informed these Class members that an "audit" was

10   conducted on their accounts and had found that "certain taxes and related fees due were either not

11   collected or under collected." Each letter stated an amount due, but provided no accounting or

12   explanation of how this amount was determined, and simply just stated it included "tax

13   processing and filing fees."

14      280.   The letter then informed the class members that SKS intended to debit their

15   accounts. In early March, 2011, SKS debited hundreds or thousands of class members' bank

16   accounts for fraudulent sums of money, using the bank account information these class members

17   had provided to the original lessor.

18      281.   In some cases, these "audits" were performed on old leases, where the class

19   member had finished paying and sent back the machine years ago and had not had any

20   communication with any Leasing Defendant in years.

21                ▪   **Providing Deceptive, Fraudulent Bills to Customers**

22      282.   Merchant Services Defendants use different bill formats to confuse customers and

23   hide false charges. For example, Merchant Services Defendants bill class members each month

24   for fees purportedly incurred when processing transactions. Merchant Services Defendants will

25   refuse to provide itemized bills so that class members can identify if the charges are accurate and

26   instead hide additional, fraudulent charges in the lump sum that Merchant Services Defendants

27   demand from class members.

28      283.   The statements provided by Merchant Services Defendants are misleading in other

ways.  For example, the statements show only a very low discount rate of less than two percent being applied to the customer's transactions.  The statements also list, however, various other fees and charges, such as "Debit Access Fee," "PCI Compliance Fee," "Non-Qualified Surcharge," and others, which total more than twice the discount fees applied.  As a result, while the statement suggests that the customer is only being charged a discount fee of less than two percent for processing transactions, they are actually being charge as much as three to five percent.

284.    Because the terms of the contracts provide class members with thirty (30) days to dispute charges, Merchant Services Defendants will delay informing class members of the Processor's role in billing until after the thirty days has passed, making it impossible for class members to resolve their billing problems directly with Processors.  Merchant Services Defendants rely on Defendant Madura, to be the first line of defense in customer service inquires to ensure that the merchant does not notify the Processor of problems until the time has passed for Processor to address them.

- **Charging Lease Payments Long After Expiration of Lease.**

285.    The Leasing Defendants have included a provision in most of their leases which automatically renews the lease for thirty days if the class members do not follow a certain procedure for terminating the lease and sending back the equipment.

286.    Most class members do not receive all four pages of the lease, and when they are provided those additional pages, Leasing Defendants intentionally print them in hard to read, small font, on poor quality printers.  Thus, class members often are unaware of the procedures for cancelling the lease.

287.    Leasing Defendants often do not answer calls placed to them, directing them to voicemail, which they do not return.  Thus, class members seeking to inquire how to stop the automatic withdrawals from their bank account at the end of their lease term often are unable to learn the correct procedure.  Class members who do not follow the precise procedures outlined in the cancellation policy are subjected to a barrage of collections calls and threats to destroy their credit.

■ **Enforcing Illegal "Evergreen" Provisions.**

288.    Prior to being acquired by Leasing Defendants in 2003, Golden Eagle Leasing was based in Connecticut.  Its leases contained a provision that results in the lease automatically renewing for an extra year if the precise cancellation procedure is not followed.

289.    New York law prohibits the use of "evergreen" provisions in leases, which result in the lease being automatically renewed for periods of time longer than just thirty days.

290.    Leasing Defendants are aware of the New York law, but continue to enforce the Golden Eagle evergreen provisions against class members in New York courts under New York law.

291.    Where collections actions are filed in New York courts to enforce amounts purportedly owed through the enforcement of the illegal evergreen provisions, the Sussman Defendants intentionally omit such details and provide illegible copies of the leases, to facilitate default judgments.

■ **Engaging In Harassing, Abusive Debt Collections Methods**

292.    When class members attempt to get out of their contracts and leases, Leasing and Merchant Services Defendants aggressively attempt to collect these debts.  At the direction of Defendants Parisi and Madura on behalf of the Merchant Services Defendants and Defendants Cohen, Buono, and Sussman on behalf of the Leasing Defendants, Defendants send threatening letters and make repeated harassing phone calls, sometimes dozens of calls every single day, to attempt to collect debts and to threaten to destroy Class Members' personal credit ratings.

293.    Class Members are often forced to change their bank accounts, phone numbers, and other information to try to avoid the aggressive and harassing collection methods.

294.    Leasing Defendants, led by Defendants Buono and Sussman, have devised a debt collection strategy integral to the success of the fraud and the Enterprise as a whole.  In 2003 or 2004, Sussman conspired with other Leasing Defendants to create Joseph I. Sussman, P.C., to file collections lawsuits on behalf of the Leasing Defendants.  Under the guise of being represented by an independent law firm, Leasing Defendants, at the direction of Buono and Sussman file collections lawsuits to collect on the fraudulent debt in the state of New York, regardless of where

the leases were signed or where the owners currently reside, and are filed against the personal guarantor, usually the individual owner of the business.

295.    Leasing Defendants' goal is to obtain default judgments which can be sold to collection agencies and also to extort payment from Class members who wish to preserve their good credit ratings.  Leasing Defendants, under the direction of Buono and Sussman, often choose not to file collection actions against New York residents, because they know that such residents are more likely to answer, but rather direct a pattern of lawsuits against residents across the nation, including California.

296.    Since 2003, the Sussman Defendants have filed over 20,000 lawsuits on behalf of Leasing Defendants.  Leasing Defendants currently have over 6,000 collections cases active in the state of New York, some dating back to 2003.  Thousands more have resulted in default judgments.  Leasing Defendants filed over 2,500 collections lawsuits in 2010 alone.[1]  In February 2011, the Sussman Defendants filed another 348 collections lawsuits.

297.    The Sussman Defendants know that the vast majority of the leases underlying the collections actions were secured by forgery, fraud, or deceit, but file lawsuits to collect on the alleged debt anyway to increase their profits and the profits of the Enterprise.

298.    Since being named a Defendant in this matter, Defendant Sussman and his law firm, Defendant Joseph I. Sussman, P.C., have filed more than 2,000 new collections lawsuits on behalf of Leasing Defendants.  They have also moved for default judgments in hundreds of these, despite knowing the full extent of the fraud, employing questionable service methods, and having no good faith basis to pursue.

299.    When Class members do file answers, Leasing Defendants often will take no further action to prosecute the case, but will keep the lawsuits pending indefinitely.

300.    When class members obtain attorneys who demand Sussman demonstrate a good

---

[1] The New York State website lists that Mr. Sussman is the attorney of record for 2875 cases filed in 2010.  Approximately 255 of these cases are on behalf of First Funds, LLC, an entity that loans capital to small businesses.  Jay Cohen, President of Northern Leasing Systems is also president of that company.  The remainder of Mr. Sussman's lawsuits are on behalf of MBF Leasing, Northern Leasing, and the Northern Acquisition Companies.

faith basis for pursuing the cases, Sussman withdraws the complaint and Leasing Defendants cease all collections efforts against that class member.

301.    In legal filings, the Sussman Defendants inform class members of the amount of debt purportedly owed, as well as attorneys' fees.  The amount of attorneys' fees the Sussman Defendants charge class members is always 20% of debt purportedly owed.

302.    Because of the agreement between the Leasing Defendants and the Merchant Services Defendants to remove the lease caps on MBF leases solicited by Merchant Services, the amounts owed on defaulted leases solicited by Merchant Services are significantly greater than other leases.  For example, the total amount owed on an MBF lease solicited by Merchant Services Defendants in California typically exceeds $5,000, and often is even twice that amount, whereas the amounts owed on other leases is typically much less, often less than $3000.  Thus, the 20% share to the Sussman Defendants is accordingly much greater, while the work associated with these collections is no different than other collections on behalf of the other Northern Leasing Companies.  As a result, the Sussman Defendants direct their sham litigation towards class members California, where most of the Class Members who have defaulted on fraudulent MBF leases solicited by Merchant Services reside to increase their profits and the profits of the Enterprise.

303.    The Sussman Defendants occasionally do not serve the parties being sued to increase the chances of obtaining a default judgment.

304.    These Class members only find out about the lawsuit after receiving a notice informing them of the default judgment, when an item appears on their credit report, or when the Sussman Defendants place a lien on their bank account on behalf of one or more of the Leasing Defendants.  Other class members are never notified.

305.    The equipment leases contain a provision whereby the lessee agrees to accept service by certified mail.  The Sussman Defendants however, do not employ this method.  Rather, the lawsuits are sent regular mail.  Leasing Defendants know that after their pattern of mailing harassing, threatening collections letters to the class member daily or weekly for months or years, class members routinely stop opening all mail from Leasing Defendants.

306.   Occasionally, Leasing Defendants hire a purported process server to falsify a proof of service of personal delivery, which the Leasing Defendants file with the New York county court.  Leasing Defendants know that the process servers they hire do not follow the procedures required by New York Rules of Civil Procedure.  For example, when the process server purports to make substitute service, Leasing Defendants do not actually send a copy of the summons and complaint by first class mail as required by Rule 308.

307.   The Sussman Defendants also routinely violate Rule 305 of the New York Rules of Civil procedure by falsely representing the basis for venue.  In preparing the summons, the Sussman Defendants represent the basis for venue as the Leasing Defendants' place of business in New York, even where those Defendants had previously represented to the class members that they were located in other states, as described in paragraphs 115-121.  Leasing Defendants intentionally do not claim that the basis for venue is a forum selection clause in a credit transaction agreement, to avoid the additional scrutiny that would accompany this claim.

308.   To further obscure facts from the Court, the Sussman Defendants prepare the complaints in violation of Rule 3013 of the New York Rules of Civil Procedure, in that they do not provide sufficiently particular details of the key facts in the case, such as the lessee's residence or that all negotiations and obligations under the contract took place out of state.

309.   The Sussman Defendants also know that Class members are not routinely provided with all four contractual pages and are tainted by fraud.  When preparing lawsuits, the Sussman Defendants are not provided with the original lease.  Rather, they take a copy of the first page of the lease (containing the merchants' signatures) to which they (or their alter egos at Leasing Defendants) affix stock sets of second through fourth pages.  They then falsely represent, without any personal knowledge, that these additional terms and conditions were given to the class member at the time of signing and are properly incorporated into the contract.  The Sussman Defendants have made this representation in thousands of lawsuits filed in New York County Court, and in the related mailings to class members nationwide.

310.   The harassment often continues long after a default judgment is entered for Leasing Defendants.  Defendants Sussman and Joseph I. Sussman, P.C. engage in a practice of

sending information subpoenas to Class Members, including those residing in California, asking over 100 questions, some highly personal. For example, the subpoena asks class members about their assets, such as the value of all their stock and mutual funds, as well as asking them to provide extensive details about their possessions, including details about the value of their jewelry, art, or other personal property. It also asks them for the name and address of their accountant, details about any insurance policies they might be a party to, copies of bank statements and tax returns, safe deposit box records, copies of titles to cars, and their last will and testament. The subpoena threatens fines, attorneys' fees, and imprisonment for non-compliance.

311.     Leasing Defendants also threaten lawsuits against individuals whose debts were discharged in bankruptcy.

312.     In July 2009, the laws in New York changed, enabling debt collectors to place a lien on out-of-state bank accounts if the alleged debtor's bank maintained a branch in New York. As a result, Leasing Defendants, under the direction of Defendants Sussman and Buono, have begun seizing Class members' bank accounts in California and other states to collect on the fraudulent debts. Often, these debts are many years old, and in some cases, the class members had never received notice that a lawsuit had ever been filed against them.

- **Holding Individuals Liable on Contracts and Leases And Making Illegal Credit Inquiries**

313.     When businesses default, Defendants aggressively pursue the purported individual guarantor for cancellation fees and the balance owed, including placing items on the guarantor's consumer credit reports and directing calls and mailings to their residences. These threats culminate in lawsuits filed against the personal guarantor.

314.     In the event of a default, Merchant Services Defendants conduct credit inquiries into Class Members' personal credit report to intimidate Class Members into paying. Class members never sign any document granting Merchant Services Defendants the right to view their credit, nor do they give the Processor permission to authorize third parties to view their credit report.

315.     The Equipment Finance Leases in use by the Northern Leasing Companies do not

Second Amended Class Action Complaint

183621.1

1   authorize the Northern Leasing Companies to conduct credit inquiries on Class Members'

2   consumer credit inquiries after the initial approval of the lease, nor do they authorize them to

3   conduct credit inquiries after the term expires.  Despite this, Leasing Defendants routinely

4   conduct inquiries on Class Members' consumer credit reports without authorization. These

5   inquiries are conducted by different Leasing Defendants, multiple times a year, for many years.

6       316.    Leasing Defendants, under the direction of Defendants Buono and Sussman,

7   conduct these inquiries to assess the guarantor Class members' financial stability and assets.

8   Armed with this information, Defendants Buono and Sussman instruct their debt collections

9   departments to threaten the guarantor Class with excellent credit scores, threatening to undermine

10  their years of diligence by placing adverse items on the consumer credit reports.

11      317.    Leasing Defendants, under the direction of Defendants Buono and Sussman,

12  instruct their collections and legal departments to use information obtained from these credit

13  reports in making threats.  For example, class members who recently obtained a mortgage will be

14  threatened with losing their new house, or those with open lines of credit will receive suggestions

15  by Leasing Defendants to use their line of credit to pay of the balance.

16          ▪ **Denying The Existence Of A Contract To Avoid Liability**

17      318.    Merchant Services Defendants solicit customers, represent to customers that they

18  will be contracting with them, place their logos on the Equipment Finance Lease, handle

19  customer service complaints, withdraw processing fees from Class members' bank accounts,

20  deposit transaction revenues into Class members' bank accounts, have the authority to negotiate

21  termination fees, send collections letters, and generally hold themselves out as parties to all

22  contracts entered into by Class members and other Defendants.

23      319.    When Merchant Services Defendants are sued on a breach of contract, they argue

24  that no contract exists between them and Class Members.  In support of this argument, they point

25  to the Equipment Finance Lease, which features their logo at the top but not a line for their

26  acceptance, and to the Application for Merchant Agreement, which stipulates that it is between

27  Processor and Class Members.  And, despite requiring merchants to sign the Rate Estimate

28  Comparison Sheet, Merchant Services Defendants represent that that is not a contract.

### E. Defendants Have Been Sued And Investigated By The Government On Multiple Occasions.

320. Defendants have been sued in a variety of federal and state courts and are the subjects of numerous investigations by state attorney generals for fraudulent leasing and billing practices.

321. In *Simington v. Lease Finance Group, LLC,* et al., No. 10-cv-6052 (S.D.N.Y.), suit was brought by a merchant on its behalf and on behalf of a putative class, against Defendants Lease Finance Group, LLC and Northern Leasing Systems, Inc., as well as American Bancard Systems, Inc., and Comerica Incorporated. The complaint alleges violations of state consumer protection statutes, common law fraud, negligent misrepresentation, conversion, breach of contract, and unjust enrichment, and involves allegations identical to those presented here.

322. In *Vandyke v. Northern Leasing Systems, Inc., et al.*, No. 07-1877 (E.D. Cal.), suit was brought by an individual, against Northern Leasing Systems, Inc. The complaint alleged several causes of action, including violations of the Fair Credit Reporting Act, citing Northern Leasing Systems' habitual viewing of the plaintiff's personal credit report. In an opinion dated October 14, 2009, Magistrate Judge Gregory G. Hollows denied Northern Leasing Systems, Inc.'s motion to dismiss, agreeing with the plaintiff that the credit inquiries conducted long after the commercial credit transaction had been completed would be prohibited under the Fair Credit Reporting Act. *See Vandyke v. Northern Leasing Systems, Inc.*, 2009 U.S. Dist. LEXIS 95757 (Oct. 14, 2009).

323. In *Pludeman* v. *Northern Leasing Systems, et al.,* No. 101509/2004 (N.Y. Supr. Ct.), suit was brought by several merchants, on their own behalf and on behalf of a putative class, against Defendant Northern Leasing Systems, Inc., Jay Cohen, Steve Bernadone, and Sara Krieger, as well as other Northern executives, in New York state court. The Amended Complaint alleges violations of the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962 et seq. ("RICO"); Electronic Funds Transfer Act, 15 U.S.C. §1601 *et seq.*; Fair Debt Collection Practices Act, 15 U.S.C. §1692 *et seq.*; as well as causes of action for fraud, negligent misrepresentation, breach of implied covenant of good faith and fair dealing, breach of contract, unjust enrichment, and money had and received. The trial court initially dismissed all claims

1  other than those for fraud, unjust enrichment, and money had and received.  On appeal, the breach

2  of contract claim was reinstated against Defendant Northern Leasing Systems only.  *Pludeman*,

3  837 N.Y.S.2d 10, 12-13 (N.Y. Supr. Ct. App. Div. 2007), *aff'd*, 890 N.E.2d 184 (N.Y. Ct. App.

4  2008); *see also id.*, 2009 NY Slip Op 51290U, 890 N.Y.S.2d 370 (N.Y. Supr. Ct. Apr. 24, 2009).

5  Class certification was granted only as to the breach of contract claim, and only with respect to an

6  allegation that Defendants had improperly charged a monthly $4.95 "loss damage waiver" fee

7  that was not disclosed on the first page of the lease, and was denied in all other respects.  *See*

8  *Pludeman*, 2009 NY Slip Op 51290U, 890 N.Y.S.2d 370 (N.Y. Supr. Ct. Apr. 24, 2009), at *2,

9  12; *see also id.,* Index. No. 101059/04, Mot. Seq. 004 (slip. op.) (N.Y. Supr. Ct. Aug. 29, 2006),

10  at 11.  Summary judgment was granted for Plaintiff and the class on this claim, *see Pludeman*,

11  2010 NY Slip Op 50530U, 27 Misc 3d 1203(A) (N.Y. Supr. Ct. Mar. 25, 2010), but the judgment

12  was appealed.  As of the date of the filing of this Complaint, the *Pludeman* case remains pending.

13       324.  In *Serin et al. v. Northern Leasing Systems, Inc., et al.*, No. 7:06-cv-01625-JSG

14  (S.D.N.Y.), several merchants brought suit on their own behalf and on behalf of a putative class,

15  against Defendant Northern Leasing Systems, Inc., Jay Cohen, Sara Krieger, and other Northern

16  executives in U.S. District Court for the Southern District of New York.  The amended complaint

17  alleges violations of RICO and deceptive trade practices under New York law.  The district court

18  denied Defendants' motion to dismiss, *id.* (slip. op. at 29) (S.D.N.Y. Dec. 15, 2009).  The case

19  settled in the fall of 2010, just before trial.

20       325.  In *Garner* v. *MBF Leasing, LLC, et al.,* No. 1:07-cv-05607-CM (S.D.N.Y.), one

21  merchant brought suit on its own behalf and on behalf of a putative class, against Defendants

22  MBF Leasing LLC, Brian Fitzgerald, Sam Buono, and William Healy.  The action was filed in

23  the United States District Court for the Southern District of New York.  The amended complaint

24  alleges violations of the Fair Credit Reporting Act, 15 U.S.C. §§1681 *et seq*.; New York Fair

25  Credit Reporting Act, N.Y. Gen. Bus. L., §380 *et seq*.; New York Insurance Law §§1102 and

26  2102; breach of contract; aiding and abetting breach of contract; concerted action; civil

27  conspiracy; unjust enrichment; money had and received; and defamation.  After the defendants

28  filed a motion to dismiss, the plaintiff voluntarily dismissed the case.

326.     In *Gagasoules et al v. MBF Leasing LLC, et al,* No. 2:08-cv-02409-ADS-ARL
(E.D.N.Y.), several merchants brought suit on their own behalf and on behalf of a putative class,
against Defendants MBF Leasing LLC, Brian Fitzgerald, Sam Buono, and William Healy.  The
suit is pending in the United States District Court for the Eastern District of New York.  The
complaint alleged violations of the Fair Credit Reporting Act, 15 U.S.C. §§1681 *et seq.*, New
York Fair Credit Reporting Act, N.Y. Gen. Bus. L., §380 *et seq*.; New York Insurance Law
§§1102 and 2102; and New York law of conspiracy; concerted action; breach of contract; aiding
and abetting breach of contract; unjust enrichment; money had and received; and defamation.  In
an order dated February 2, 2009, all claims were dismissed other than the breach of contract claim
against MBF Leasing.  *See Gagasoules,* No. 2:08-cv-02409 (slip. op.) (E.D.N.Y. Feb 2, 2009), at
19-20.  As of the date of the filing of this Complaint, the *Gagasoules* case remains pending.

327.     In *Greene d/b/a Tisa's Cakes v. Northern Leasing Systems, Inc. et al.,* No. 1:09-
cv-05679-RJD –SMG (E.D.N.Y), one merchant brought suit, on behalf of itself and a putative
class, against Defendant Northern Leasing, Inc., as well as Online Data Corporation and
iPayment, Inc.  The suit was filed in the Eastern District of New York.  The complaint makes
claims under the New York Consumer Protection Act and for unjust enrichment related to the
imposition of early termination fees for lease cancellation.  On February 23, 2010, the plaintiff
voluntarily dismissed its claim against Northern Leasing, but the case remains pending against the
other defendants.

328.     In *ERA Automotive Repair, LLC v. Leasesource, Inc., et al,* Case No. 2:09-cv-
01192 (S.D.W.V)*,* one merchant brought suit, on behalf of itself and a putative class, against
Defendants Lease Source, Inc.; Northern Leasing Systems, Inc.; Prodigy Payment Systems, LLC;
and Dale Burger, in West Virginia state court.  Defendants removed the case to the U.S. District
Court for the Southern District of West Virginia.  The complaint alleges causes of action for
fraud; negligent misrepresentation; joint venture; civil conspiracy; and conversion.  The case was
settled on an individual basis and dismissed.  *Id.* (slip. op. at 1-2) (S.D.W.C. Jan. 6, 2010).

329.     In *Navratil v. Merchant Services, Inc., et al,* No. 2:09-cv-05945-DDP-SS (C.D.
Cal.), one merchant brought suit, on behalf of himself and a putative class, against Defendants

Merchant Services Inc.; Universal Card, Inc.; National Payment Processing; and Jason Moore. The suit was filed in the U.S. District Court for the Central District of California. The second amended complaint alleges violations of RICO; and California state law claims for fraud and deceit; negligent misrepresentation; violation of Business & Professions Code section 17200 *et seq.*; and unlawful recording in violation of California Penal code sections 632 and 632.7. The case was dismissed for lack of standing. *See Navratil*, No. 2:09-cv-05945 (slip. op. at 5) (C.D. Cal. Jan. 25, 2010).

330. In *Jones et al v. MBF Leasing LLC, et al,* No. 4:10-cv-00409-CVE-FHM (N.D. Okla.), two plaintiffs brought suit against Defendants MBF Leasing, LLC; Northern Leasing Systems, Inc.; and LeaseSource-LSI, LLC. The suit was filed in the U.S. District Court for the Northern District of Oklahoma and alleges violations of the Fair Credit Reporting Act and Oklahoma common law after the defendants pursued debt collections efforts against the plaintiff without a reasonable basis. The case settled out of court in February 2011.

331. In 2007, the Attorney General of Missouri sued Northern Leasing for defrauding merchants in lease contracts related to credit card processing terminals. *See Missouri v. Northern Leasing Systems Inc.*, No. 0722-CC01084 (City of St. Louis, Missouri). The suit led to a stipulated judgment by which Northern Leasing agreed to cancel leases issued in Missouri and refund specified amounts to merchants. *Id.* (docket entry Oct. 31, 2007).

332. In 2002, the Federal Trade Commission sued Certified Merchant Services and its officers, Jonathan Frankel, Craig Frankel, and Randall Best, in the U.S. District Court for the Eastern District of Texas. It is not clear that any Defendant in this action was also a defendant in that case. In December 2002, the defendants agreed to a stipulated judgment by which they paid $23.5 million and agreed not to alter documents relating to merchant accounts, engage in certain billing and debiting practices, or continue their practice of misrepresenting the savings that merchants would obtain from conducting business with these service providers. *See Federal Trade Commission v. Certified Merchant Services, Ltd., et al.,* No. 4:02-cv-44 (W.D. Tex. Jan. 28, 2004).

333. All of these lawsuits involve facts similar to those alleged in this Complaint.

### F. Hundreds Of Class Members Have Written Complaints About Defendants.

334.  Defendants have also been the subject of hundreds of complaints that merchants have posted on online bulletin boards, sent to the Better Business Bureau, and filed with government agencies.  For example, on January 19, 2010, a merchant in Needville, Texas, wrote:

> In April of 2006 I entered an agreement for processing credit card transactions from Integrity of Houston. Terminal would not work (salesman said that I needed to install a new phone line in addition to my four existing phones) so I tried to return equipment. Integrity refered me to MBF Leasing who said I was responsible for lease (that I never filled out or signed). I had to close my bank account to keep them from stealing my money. Now they are seeking a Judgement (sic). These people must be stopped and put in jail. (sic)

See http://www.ripoffreport.com/credit-card-processing-companies/integrity-of-texas-m/integrity-of-texas-mbf-leasi-bb6d6.htm, last visited March 10, 2010.

335.  As another example, on July 28, 2007, a merchant in San Francisco, California wrote:

> Like hundreds of others small businesses got rip-off by MBF leasing/Northern Leasing, Fiona Walshe came to my store sell me the credit card processing merchant account. She promised lower rate, no contract, cancel any time if not satisfy. Even I already own processing equipment for my previous merchant account, she said it won't work for their program; I had to lease one from her. Thinking I can cancel the account anytime and wanting to give it a try, so I went along. Then she had me signed few pages of application for merchant account service. Few months later I found they over charge me and cancel the service with them. Then MBF leasing starts harass me with 10 to 15 phone calls a day. Now I realized when I signed the application, without disclose to me, she had mix-in one page of equipment leasing agreement with MBF. If I been told there was a 48 months no cancel leasing contract to signed and with two monthly payments are enough to buy the whole machine, obviously I wouldn't signed the contract.
>
> Now I found out at least six businesses in the same building where I am in San Francisco fell for the same scam. And hundreds of more are victimized by MBF all over the country. In New York there is a class action lawsuit against MBF / Northern leasing.

See http://www.ripoffreport.com/credit-card-processing-ach-companies/mbf-leasing-northern/mbf-leasing-northern-leasing-9673e.htm, last visited March 10, 2010.

336.  As still another example, on August 2, 2007, a merchant purporting to be in New York City wrote:

> My company entered into an agreement with MBF Leasing (a.k.a. Northern Leasing) as part of a credit card processing agreement with Universal Merchant Services. Universal told me that we could only get the great rates if we leased the equipment from MBF.

Second Amended Class Action Complaint

183621.1

We were to save over $10K per year by switching to their service. The rep from Universal Merchant Services stipulated that his offer for the reduced fees required for us to lease the equipment. Based on the projected cost-savings, I agreed.

Later, I found out that the agreements (credit card purchasing and equipment leasing) were separate. In fact, I did not need to lease the equipment. I called to get out of the lease, but according to MBF, we would have had to buy out the lease. This meant paying $433.48 for 2 terminals for each month remaining on the lease. If I had to do that, I might as well keep paying the lease and have the use of the equipment….Over the course of the lease, MBF charged us $10,403.52 for 2 credit card terminals that cost $155.00 each to purchase.

MBF's contract is written in such a way that it is irrevocable by the lessee unless the agreement is paid off in full. Early termination per MBF's contract means the lessor gets paid in full for the entire lease and the lessee loses the equipment.

See http://www.ripoffreport.com/financial-services/mbf-leasing/mbf-leasing-merchant-services-ebcb3.htm, last visited March 10, 2010.

337.    Numerous merchants have complained about the recent actions by SKS Associates, which are further explained, *supra*, in paragraphs 153-163, at http://www.complaintsboard.com/complaints/golden-eagle-leasingsks-associates-c429779.html, last visited March 14, 2011.

338.    Copies of these and many other similar online complaints from Class Members are attached hereto as Exhibit A.

G.    **Plaintiffs' Experiences**

▪    **Just Film, Inc.**

339.    Just Film, Inc. is a small business specializing in the sale of photographic film and at all relevant times was owned and operated by Mr.Volker Von Glasenapp.  It operates out of a single store in San Francisco.

340.    On or about June 5, 2007, Von Glasenapp was approached in his store by Defendant Fiona Walshe, acting on behalf of herself and the Merchant Services Defendants, who in turn, were acting on behalf of themselves as well as agents of Leasing Defendants.  Ms. Walshe presented Just Film with her business card, which identified her as the regional manager of Merchant Services.  The address on the card was: 111 North Market St., Suite 800, San Jose, CA 95113.  The telephone number was (408) 213-5400 and the fax was (408) 213-1611.  The bottom of the card read: "A registered ISO/MSP of JP Morgan Chase, Chicago, IL."

341. On behalf of all the Defendants, Walshe offered Just Film assistance with its merchant card services.

342. On or about June 5, 2007, Walshe informed Mr. Von Glasenapp that he could save money by signing up with the Merchant Services Defendants' service. She also stated that the Merchant Services Defendants were a direct representative of JP Morgan Chase, and as such, the lower rates were the result of them eliminating "the middleman."

343. At the time, Just Film had begun searching for new hardware to accept debit cards and credit cards. Walshe did a few calculations in Just Film's store on a Rate Estimation Sheet and told Von Glasenapp, on the basis of those calculations, that the Merchant Services Defendants' service would save the business money. The Rate Sheet also indicated that Just Film would pay a 1.79% processing rate on all credit card transactions.

344. Ms. Walshe gave Mr. Von Glasenapp a one-page contract to sign. This contract was labeled "Equipment Finance Lease." The contract had Merchant Services name and logo in the upper left hand corner, and listed their address as 16W281 West 83rd Street, Burr Ridge, IL. Many of the fields for the cost of the equipment and term (length) of the lease were left blank. Mr. Von Glasenapp wanted to purchase the equipment outright, but based on Ms. Walshe's representations, he believed that leasing the equipment was necessary to enroll in the services and a good value. He reviewed the terms on the contract and signed it. Ms. Walshe took the contract and did not give Mr. Von Glasenapp a copy.

345. Included on the Equipment Finance Lease was a section entitled "Personal Guaranty." Mr. Von Glasenapp completed that portion, agreeing to be personally liable for any debts.

346. Sometime after Just Film executed the documents provided by Merchant Services, Merchant Services, using its California offices in San Jose and Irvine, utilized the telephone, Internet, and mail to send falsified documents to the Processors in Colorado and Georgia, and to Leasing Defendants in New York and Illinois. Merchant Services shared with Leasing Defendants the lease and Just Film's relevant information, such as his bank account numbers, to facilitate the processing of payments. Merchant Services Defendants colluded amongst

themselves and with Leasing Defendants to determine who would fill in the blanks and otherwise forge the additional supporting documents, the rates at which the payments would be processed, and the cost of the lease. To execute this scheme, Defendants relied on the Internet, phone, and mail to circulate those documents.

347. On or about June 29, 2007, Defendant Sara Krieger approved Just Film's Equipment Finance Lease. Defendant Krieger knew or had reason to know that terms in that lease were altered after Just Film signed it, that Just Film would be harmed by being forced to pay such exorbitant rates for this equipment, and that Von Glasenapp would be harmed by facing the risk of legal action in New York as a result of being a party to this lease.

348. After the Equipment Finance Lease was approved by Defendant Krieger, Leasing Defendants paid Merchant Services a lump sum in exchange for the right to receive the lease payments set forth in the lease with Just Film. This sum was paid by wire transfer or mail.

349. In June or July of 2007, a representative from the Merchant Services Defendants arrived and installed the debit and credit card equipment so that Just Film could begin using it.

350. On or about July 3, 2007, Defendant Merchant Services withdrew $325.48 from Just Film's bank account as a first and last month's deposit for the terminal. This fee was withdrawn by Merchant Services Defendants via wire transfer and automatic debits from Just Film's bank account, using the Internet and telephone lines. The withdrawal did not correspond to any term in the contracts or lease. Rather, Merchant Services Defendants withdrew this money as a first and last month payment on the Equipment Lease to ensure that Leasing Defendants would compensate them for securing the lease. Merchant Services Defendants did not return this money to Just Film, and instead deposited into their own bank accounts.

351. On or about July 3, 2007, MBF Leasing withdrew $185.37 from Just Film's bank account. This amount was higher than what Just Film had been told by Merchant Services Defendants it would be charged. This fee were withdrawn by Leasing Defendants via wire transfer and automatic debits from Just Film's bank account, using the Internet and telephone lines.

352. After Just Film began using the terminal in approximately June or July 2007,

Merchant Services Defendants began working with the Processor to process transactions.

353. After Just Film began using the terminal in June or July 2007, it began receiving bills and statements via the mail every month detailing the fees that were being deducted from its bank account. Beginning in June 2007, the Processor electronically debited from Just Film's bank account, processing fees each month. The Processor transferred a portion of those fees to the Merchant Services Defendants. Merchant Services Defendants distributed a portion of the money received to Defendants Parisi, Jurzyck, and Moore, and Moore then transferred that money to the Moore Shell Companies. These transactions were conducted via wire transfer and automatic debits using interstate telecommunications wires.

354. The charges appearing on the statements and being withdrawn from Just Film's account were different and higher than what Just Film had been told would be charged by Ms. Walshe. Specifically, Just Film was being charged processing rates of 3.04% on all mid-qualified transactions and 3.29% on all non-qualified transactions, substantially higher rates than the 1.79% processing rate which had been promised to Just Film by the Merchant Services Defendants' agents.

355. The statements provided to Just Film complicated and hid the fact that Just Film was paying an extremely high rate for his transactions – and a much higher rate than what Ms. Walshe told Mr. Von Glassenapp that Just Film would be paying. For example, in August 2008, the statement represents to Just Film that the discount percentage is listed as 1.79%, amounting to $235.68 on a total sales amount of $16,660.02, which appears to be an unusually low rate. The fees additional fees listed on the same statement, however, amount to $308.34, for a total of $544.02, or approximately 3.3% of transactions. These fees were not disclosed to Just Film at the time it entered into the agreement.

356. Beginning in August 2007, MBF Leasing began electronically debiting approximately $167.69 once a month from Just Film's bank account. These fees were withdrawn by Leasing Defendants via wire transfer, using the Internet and telephone lines.

357. In approximately late 2007 or early 2008, Von Glasenapp contacted the Merchant Services Defendants by telephone to question the high fees and the monthly automatic

withdrawals.  Merchant Services Defendants responded that all fees were in accordance with the contract that Just Film had signed.

358.    Merchant Services Defendants eventually informed Von Glasenapp that Leasing Defendants were responsible for the equipment lease, and Von Glasenapp was to contact them for any problems he was having with the equipment. Von Glasenapp did not know of the existence of Leasing Defendants until that time.

359.    On or about January 10, 2008, Leasing Defendants mailed to Just Film a letter informing Just Film that they would be debiting its account an extra $81.01 that month, in addition to its $167.69 monthly payment.  This amount was purportedly for "personal property tax" and included a $25.00 fee for filing the required personal property tax return.  The letter also informed Just Film that Leasing Defendants was its "taxing authority for the fiscal year 2008." The letter noted the amount would be debited the day after the date on the letter, January 11, 2008.  The return address on the envelope stated it came from Illinois and the letter was signed, "MBF Leasing" without any person's name or signature.  Leasing Defendants took no steps to ensure that Just Film received this letter prior to the date of the additional debit.

360.    Just Film had not previously been informed about its obligation to pay personal property tax on the leased equipment, nor was any information about it included on the one page Equipment Finance Lease that Von Glasenapp had been presented by Fiona Walshe.

361.    Leasing Defendants did not request any information from Just Film that would typically be provided in a personal property tax return.  Leasing Defendants never provided Just Film with a copy of its personal property tax return or any verification that the return was actually filed. No personal property tax return was ever filed on its behalf with the City and County of San Francisco by Leasing Defendants.

362.    On or about January 11, 2008, Leasing Defendants deducted $81.01 from Just Film's bank account, using the telephone wires and internet.  Leasing Defendants deposited this into their own accounts and the accounts of the shell companies.

363.    Just Film began looking for new providers.  It was not until September 2008 that Just Film was able to find a new merchant card service provider.

364.  On September 17, 2008, Leasing Defendants mailed to Just Film a letter informing Just Film that they would be debiting its account an extra $79.84 that month, in addition to its $167.69 monthly payment.  This amount was purportedly for the "applicable personal property tax" and included a $25.00 fee for filing the required personal property tax return.  The letter noted the amount would be debited on or about September 29, 2008. The return address on the envelope stated it came from Illinois and the letter was signed, "MBF Leasing" without any person's name or signature.

365.  Shortly after receiving that letter, Just Film informed Leasing Defendants that they had already withdrawn its taxes for 2008 and demanded a refund and proof of filing.  Leasing Defendants did not respond.

366.  On September 23, 2008, Just Film instructed its bank to block all withdrawals coming from the Merchant Services Defendants and Leasing Defendants.  It also returned the hardware via certified mail, confirming receipt by Defendants of the returned equipment.

367.  Shortly thereafter, Just Film began receiving letters and statements via the mail from Merchant Services Defendants and Leasing Defendants demanding payment.

368.  Leasing Defendants mailed to Just Film demands for payment on October 3, 2008, October 14, 2008, and October 15, 2008.  The bills instructed Just Film to mail its payments to a P.O. Box in South Dakota.  During that time period, Leasing Defendants in New York and Illinois placed harassing calls to Von Glasenapp demanding payment.  The callers identified themselves as working for MBF Leasing.  During those phone calls, Leasing Defendants informed Von Glasenapp that he would need to pay over $5000 to cancel Just Film's contract.

369.  On October 9, 2008, Just Film faxed a request in writing to Merchant Services Defendants requesting that they close the account.  Defendant Eric Madura reviewed the request and decided to impose a cancellation fee on Just Film.  Merchant Services Defendants then mailed to Just Film a statement on October 15, 2008, demanding $540 to cancel the account.  That same day, Merchant Services Defendants mailed to Just Film a separate statement demanding $177.87 in other charges, identified on the statement as simply "Month of September."  No other details about this charge were provided.  Both amounts included $45 fines,

1    which did not comport with any provision in any contract.

2         370.    On or about October 16, 2008, Defendant Universal Merchant Services LLC

3    conducted an inquiry on Mr. Von Glasenapp's consumer credit report.  That same day, at the

4    direction of Defendant Madura, Merchant Services, Inc. sent via U.S. Mail a letter to Plaintiff von

5    Glasenapp personally, at his home address, a demand for $717.87.  The letter demanded payment

6    within 7 days and threatened to take legal action against Mr. Von Glasenapp personally as well as

7    Just Film.

8         371.    When Mr. von Glasenapp received the October 16 letter several days later, he

9    emailed Merchant Services Defendants and requested that a copy of the agreement be mailed to

10   him.  When he did not receive a response, he sent an email again the following day.  On October

11   24, 2007, Mr. von Glasenapp faxed a request to Merchant Services Defendants for his contract

12   and they replied by email agreeing to mail the contract.

13        372.    In the days following the October 24, 2007 email, Merchant Services Defendants

14   used the mail to send to Just Film the fraudulent contracts it intended to enforce against him.

15   Defendant Madura included in the mailing more than a dozen pages of supposed contract

16   documents, most of which Just Film and Mr. von Glasenapp had not previously seen.  Parts of the

17   one-page Equipment Finance Lease that previously were blank had been filled in.  That document

18   was followed by an additional three pages that had never previously been shown to Just Film.

19   Merchant Services Defendants also provided a ten page "Application for Merchant Agreement,"

20   which Mr. von Glasenapp had not previously seen.  Most of the handwriting on the document was

21   not his, but appeared to have been traced or photocopied onto portions of the document not

22   previously shown to or signed by him. Merchant Services Defendants also provided a copy of the

23   Merchant Card Processing Agreement, which Mr. von Glasenapp had also not seen or signed.

24   That document contained a signature block in the top left corner, with what appeared to be his

25   signature appearing in a gray box above the line.  Next to his name, was the title "CEO," which

26   was not Mr. von Glasenapp's title.  The handwriting used to write "CEO" and the date was

27   different than his own and different from the handwriting appearing on the other documents.

28        373.    Because Just Film's bank had been ordered not to pay Defendants, Just Film

continued to receive letters in the mail and phone calls from Leasing Defendants in New York demanding payment for services. Just Film received calls and letters from both Merchant Services and MBF Leasing.

374. Between October 2008 and March 2009, Leasing Defendants, at the direction of Defendant Buono, in New York, placed telephone calls to Just Film nearly every day to collect the fraudulent debt Leasing Defendants claimed Just Film owed to Defendant MBF Leasing. Leasing Defendants would sometimes call multiple times a day. The persons placing the call identified themselves as calling on behalf of MBF Leasing and would demand that Just Film or Mr. von Glasenapp pay the remaining balance of the lease.

375. During this time, Just Film's phones were set up to forward calls to Mr. von Glasenapp's personal cell phone in the evenings. When Mr. von Glasenapp would turn on his phone in the morning, there would be several messages from the Leasing Defendants, who had been instructed by Defendant Buono to place calls to collect the debt late in the evenings and in the middle of the night.

376. The calls stopped for a few weeks around December 2008 but resumed again in January 2009. The calls, which came across state lines, began to get increasingly aggressive. These calls were placed almost every day from January 2009 to March 2009. Leasing Defendants would threaten to ruin Mr. von Glasenapp's and Just Film's credit, and informed him that they would bring a lawsuit against Mr. von Glasenapp in another state.

377. Because of the threatening and repetitive nature of these calls, Just Film attempted to discuss the issue with the Leasing Defendants. Mr. von Glassenapp, on behalf of Just Film, called the number that was provided, (800) 683-5433, which is believed to be based in New York. During his attempts to reach someone at the number, the voice recording did not identify the company as MBF Leasing, but simply as "Your Leasing Company." The automated recording did not contain instructions directing him to dial a certain extension to speak with someone at MBF Leasing, thus Mr von Glassenapp could not discern whether the individuals to whom he spoke were actually affiliated with MBF Leasing or with another entity also utilizing that phone number.

378.    Once von Glassenapp reached a live person, the Leasing Defendants falsely informed him, over the inter-state telephone lines, that his outstanding balance for the leasing of the equipment, which he had already returned, was $7,337.02.  This was the balance owed on a four-year lease for the equipment, despite the fact that it could have been purchased for around $500 at Costco. Mr. von Glassenapp eventually agreed to pay and paid a portion of the amounts allegedly due from his own personal accounts, because he believed that by doing so he would avoid being personally sued in New York and because Leasing Defendants told him that doing so would protect his credit score.

379.    On February 20, 2009, MBF Leasing, LLC conducted an inquiry on Mr. Von Glasenapp's consumer credit report.

380.    On March 20, 2009, Universal Merchant Services LLC conducted an inquiry on Mr. Von Glasenapp's consumer credit report.

381.    In April 2009, MBF Leasing, LLC placed a derogatory, charge-off item on Mr. Von Glasenapp's consumer credit report.

382.    Leasing Defendants did not provide Mr. von Glassenapp with a receipt or a release of claims.

- **Precision Tune Auto Care**

383.    Plaintiff Precision Tune Auto Care was approached by the Merchant Services Defendants on March 30, 2008.  The agent of the Merchant Services Defendants, Derrick Yu, had his car fixed at Precision Tune Auto Care and offered Plaintiff assistance with its merchant card services.  Precision Tune Auto Care was an existing customer of Merchant Services and MBF Leasing.

384.    Mr. Yu provided Precision Tune Auto Care with his business card.  The card said that he was with Merchant Services, located at 111 North Market St., Suite 800, San Jose, CA 95113.  The telephone number was (408) 213-5400 and the fax was (408) 213-1610.  The bottom of the card read: "Independent Sales Contractor of TransFirst.  Sponsorship provided by Columbia (sic) Bank and Trust Company, Columbus, Georgia (sic)."

385.    Mr. Yu then provided Precision Tune Auto Care with a Rate Sheet and did some

calculations based on Precision Tune Auto Care's monthly sales volume.  The Merchant Services Defendants' calculations suggested that Precision Tune Auto Care could reduce its (monthly) electronic payment processing costs by $259.74, or 17.89% by renegotiating its existing contract.

386.    Jerry Su, the owner of Precision Tune Auto Care, signed the Rate Sheet and the Application for Merchant Agreement on April 7, 2008.   When Mr. Su completed the application, most of the fields were blank.  Based on Mr. Yu's representations and the calculations on the Rate Sheet, Mr. Su believed that he would be saving money.

387.    Mr. Su asked to use the existing credit card processing terminals, which he was leasing from Defendant MBF Leasing, rather than renegotiate a new equipment lease, but Yu and the Merchant Services Defendants informed Precision Tune Auto Care that this was impossible, falsely stating that the new service had special features with which its current equipment was not compatible.  Mr. Yu also informed Mr. Su that his current lease with Leasing Defendants would be terminated upon entering into a new lease. Mr. Yu also informed Mr. Su that there would be no separate equipment leasing fee, but rather that the cost of leasing the equipment was included in the monthly service fee.

388.    Based on the Merchant Services Defendants' statements, Precision Tune Auto Care agreed to lease one terminal.  Merchant Services Defendants presented Precision Tune Auto Care with the Equipment Lease, though most of the fields, including the fields for details about equipment pricing, were blank.  Mr. Yu represented that all information would be the same as his current lease with Leasing Defendants.  Mr. Su signed the personal guaranty portion of the Lease on April 7, 2008.  Mr. Yu photocopied Mr. Su's driver's license before leaving.

389.    Sometime after Precision Tune executed the documents provided by Merchant Services, Merchant Services, using its California offices in San Jose and Irvine, utilized the telephone, Internet, and mail to send falsified documents to Processors in Colorado and Georgia, and to Leasing Defendants in New York and Illinois.  Merchant Services shared with Leasing Defendants the lease and Precision Tune's relevant information, such as his bank account numbers, to facilitate the processing of payments. Merchant Services Defendants colluded amongst themselves and with Leasing Defendants to determine who would forge the additional

1  supporting documents, the rates at which the payments would be processed, and the cost of the

2  lease. To execute this scheme, Defendants relied on the Internet, phone, and mail to circulate

3  those documents.

4      390.    After Mr. Su signed the lease, but before the equipment arrived, Leasing

5  Defendants called Mr. Su to confirm that he was canceling his old lease and entering into a new,

6  more expensive lease for two terminals. Mr. Su informed Leasing Defendants that he only

7  wanted to lease one terminal. Leasing Defendants instructed him to discuss this issue with

8  Merchant Services Defendants. Following that call, Mr. Su called Merchant Services Defendants

9  to alert them of the problem. Merchant Services Defendants told Mr. Su that it was Leasing

10  Defendants' error. Despite being notified of the problem with the lease, Sara Krieger did not wait

11  for Mr. Su to resolve the matter with Merchant Services Defendants, but instead, approved the

12  Equipment Lease. Defendant Krieger knew or had reason to know that terms in that lease were

13  altered after it was signed. Defendant Krieger also knewthat Precision Tune would be harmed by

14  being forced to pay such exorbitant rates for this equipment and that Mr. Su risked legal action in

15  New York as a result of being a party to this lease.

16      391.    On May 8, 2008, Merchant Services Defendants faxed to Mr. Su a copy of the

17  Rate Estimate Comparison Sheet, which he had signed. Later, upon closer review he realized that

18  additional information had been written on it and some of the numbers were changed.

19      392.    In early May 2008, the Merchant Services Defendants delivered a new card

20  processing terminal to Precision Tune Auto Care, but it did not function correctly. The Merchant

21  Services Defendants instructed Precision Tune Auto Care to wait while they resolved the

22  problem. Several weeks passed without a solution, but Mr. Su was billed for services during this

23  time.

24      393.    Specifically, Merchant Services withdrew $432.99 via wire transfer, using the

25  Internet and telephone lines, from Precision's bank account on May 27, 2008. MBF Leasing

26  withdrew $37.95 on May 27, 2008; $145.66 on June 2, 2008; and $437.94 on June 2, 2008, via

27  wire transfer using the Internet and telephone lines. Because Mr. Su's existing lease with Leasing

28  Defendants resulted in a $145.66 withdrawal, Mr. Su surmised that his old lease had not been

cancelled, despite the facts that he entered into a new lease and was advised that his old lease would be terminated.

394.    On or about June 6, 2008, the Merchant Services Defendants brought two replacement terminals.  The replacement terminals were the exact make and model as Precision Tune Auto Care's old equipment, which Merchant Services Defendants had previously stated were incompatible with their services.  Because Merchant Services Defendants had provided Precision Tune Auto Care with two terminals instead of one, Mr. Su immediately informed them of the error.  Merchant Services Defendants informed Precision that it was their standard practice to provide customers with two terminals in case one was defective and that Precision would not be charged for the second terminal.

395.    On or about June 10, 2008, Precision received in the mail a copy of the Equipment Finance Lease, with new information filled in and additional pages included.  The Lease indicated that he had leased two terminals.  The charge listed on the lease is $399.99 a month.

396.    On or about June 12, Mr. Yu telephoned Precision Tune on behalf of Merchant Services Defendants.  Mr. Su explained his concerns, including the two equipment terminals, the fact that his old lease was not cancelled, and the extremely high charges, including the fact that he was being billed both for equipment and for a high service fee from Merchant Services Defendants.  Merchant Services Defendants did not address Mr. Su's concern, rather, Mr. Yu falsely informed Plaintiff that the excessive charges should not matter as he was still saving money under the new contract.

397.    To attempt to resolve the error and identify the responsible parties, Mr. Su contacted various Defendants' consumer service representatives to complain and sent numerous faxes and letters.  Each time, he had to call several numbers.  Sometimes the numbers – which had been provided to him by Defendants - were not operational; other times he would be put on hold and dropped, or he would be told to try a different number.  As a result, it would take days or weeks to reach a person working for the Merchant Services Defendants or Leasing Defendants.  The Merchant Services Defendants and Leasing Defendants ignored Precision Tune Auto Care's concerns about being charged for the period when it did not actually have working equipment.

-82-

Second Amended Class Action Complaint

398.     Since May 2008, Precision Tune Auto Care has been charged approximately $437.94 a month by the Leasing Defendants for the two machines, when his previous service charged him $145.66 per month for the same exact machine, resulting in Precision Tune paying approximately $292.28 a month more for the same service.  Because Merchant Services Defendants had represented that he would be saving $250.74 a month, Precision Tune was actually paying approximately $534.02 more each month than it had been promised.

399.     Leasing Defendants automatically debit the amount of $437.94 once a month from Precision Tune Auto Care's bank account, through the Internet and telephone lines.

400.     During this time, Precision Tune Auto Care continued to write and call Merchant Services and no employee was willing to address his concerns.

401.     Mr. Su finally spoke by telephone with Anthony Kutscher, Jr., whose business card identified him as the regional manager of Merchant Services.  The phone number and fax number were the same as Mr. Yu's, but his business card stated his location as: 1631 North First Street, Suite 200, San Jose, CA, 95112.  Mr. Su also made repeated calls to other customer service representatives at Merchant Defendant, including Denise Dallas.  No employee was willing to address Precision Tune Auto Care's problems.

402.      On or about August 28, 2008, Fiona Walshe of Merchant Services sent Precision Tune Auto Care a letter on Merchant Services letterhead through the mail, which purported to address its concerns.  Ms. Walshe identified Mr. Yu as the "Merchant Services Account Executive."  On behalf of the Merchant Services Defendants, Ms. Walshe agreed to refund Precision Tune Auto Care the charges for the months in which it had no working equipment, but stated that the Merchant Services Defendants had determined that there were no grounds for rescinding the contract or the lease.  The Merchant Services Defendants falsely claimed that Precision Tune Auto Care had ordered two pieces of equipment and falsely stated that Mr. Yu had explained all the terms of the lease to Mr. Su.

403.     The August 28, 2008 letter from Ms. Walshe on behalf of Merchant Services Defendants also said that Merchant Services Defendants mailed to Leasing Defendants a notice to cancel Precision Tune's previous lease, but that it was Mr. Su's responsibility as a business owner

1   to ensure that it was indeed cancelled.  This directly contradicted representations made to Mr. Su

2   by Merchant Services Defendants' salesperson at the time Mr. Su was convinced to sign his

3   contract.

4        404.    The August 28, 2008 letter indicated that Defendant MBF Leasing was to receive a

5   copy.  Merchant Services Defendants used the mail or Internet to send them a copy of the letter.

6        405.    Mr. Su continued to try to resolve the issue.  In February 2009, Mr. Su spoke with

7   Defendant Madura and requested copies of the contract.  Defendant Madura mailed the

8   documents to Mr. Su, and he received those on February 19, 2009.  Many of the fields that had

9   been left blank when Mr. Su completed the application had been filled in by Merchant Services

10   Defendants, including Fiona Walshe and Eric Madura.

11        406.    Because Precision Tune's issues were not resolved, Precision Tune continued to

12   try to negotiate with the Merchant Services Defendants.  Those negotiations were not fruitful and

13   Precision Tune eventually filed a lawsuit in small claims court in 2009.  Only after this small

14   claims action was filed did Merchant Services Defendants present Mr. Su with a lease for two

15   equipment terminals.  Merchant Services Defendants had altered the lease so that it showed the

16   number of terminals leased was not one but two.  Many other fields, which had been blank at the

17   time that Mr. Su originally signed the document, were now filled in.

18        407.    On September 11, 2009, Precision Tune Auto Care agreed to dismiss the small

19   claims suit without prejudice, in exchange for Merchant Services Defendants' agreements to

20   change their pricing structure.  Defendant Madura also tried to trick Precision Tune Auto Care

21   into dismissing its small claims suit with prejudice, but Precision Tune Auto Care refused.

22   Following the dismissal without prejudice, Merchant Services Defendants briefly reduced the

23   pricing structure charged to Precision Tune for a few months but it was not long before Defendant

24   Madura raised the rates back to their previous level in contravention of the assurances made in

25   order to induce Precision Tune to dismiss the small claims action.

26        408.    During the period from June 2008 to the present, Precision Tune Auto Care has

27   been forced to make lease payments for two unwanted credit card machines at the rate of $437.94

28   a month.  In addition, from June 2008 through September 2009, and again since at least January

2010, Precision Tune Auto Care has been forced to pay rates for each credit and debit card transaction that are higher than the amounts promised in the Rate Sheet.  Both the lease payments and the credit and debit card transaction payments have been automatically debited from Precision Tune Auto Care's bank account every single month, by Defendants, through the Internet and telephone lines, and statements reflecting these improper amounts have been sent by Defendants, through the mail, on, at least, a monthly basis.

409.    On June 4, 2010, the Defendants in this action filed a motion to dismiss the Class Action Complaint in this matter.  In support of its motion, the Merchant Services Defendants included a version of the Application for Merchant Agreement purportedly filled out in connection with the Precision Tune transaction. The Application differs substantially from the document Mr. Su signed and contain false statements of fact, suggesting that Mr. Su could not have reviewed or completed the document that Defendants are trying to enforce against him.  For example, the Application submitted by the Merchant Defendant states that Mr. Su has owned Precision Tune Auto for ten years, when in fact Mr. Su bought the franchise in 2007. Additionally, the application submitted by Merchant Services Defendants clearly has been altered to change the number of pieces of equipment from "1" to "2".

### ▪ <u>Burlingame Motors</u>

410.    Plaintiff Burlingame Motors was approached by agents of Merchant Services Defendants, who in turn, were acting on behalf of themselves as well as agents of Leasing Defendants in April or May 2007.  The agent spoke with Ms. Baumgartner and informed her that the business could see substantial savings if it contracted with Merchant Services for processing.

411.    The agent completed a Rate Sheet for Burlingame Motors indicating that the company would save approximately $107.53 a month or 45% on credit card processing charges by contracting with Merchant Services.  The Rate Sheet also indicated that Burlingame Motors would pay a 1.79% processing rate on all credit card transactions.

412.    On or about May 2, 2007, Ms. Baumgartner, on behalf of Burlingame Motors, reviewed the Rate Sheet and signed her name in the corner.  Burlingame Motors also provided the agent with its bank account information to begin processing transactions.

413.  The agent asked Burlingame Motors to lease equipment, but Burlingame Motors declined.

414.  Sometime after Burlingame Motors executed the documents provided by Merchant Services, Merchant Services, using its California offices in San Jose and Irvine, utilized the telephone, Internet, and mail to send falsified documents to the Processors in Colorado and Georgia, and to Leasing Defendants in New York and Illinois.  Merchant Services shared with Leasing Defendants Burlingame Motors' relevant information, such as its bank account numbers, to facilitate the processing of payments.  Merchant Services Defendants colluded amongst themselves and with Leasing Defendants to determine who would forge the lease and additional supporting documents, the rates at which the payments would be processed, and the cost of the lease.  To execute this scheme, Defendants relied on the Internet, phone, and mail to circulate those documents.

415.  On or about May 22, 2007 when Ms. Baumgartner was not in the office, an agent of Merchant Services Defendants came to the store and delivered and installed a credit card processing terminal.  He left his card, which identified him as John Greene, the "Development Manager" at Merchant Services.

416.  When Ms. Baumgartner learned about the equipment installation, she tried numerous times to call Merchant Services to inform them about the mistake and could not reach anyone.

417.  Burlingame Motors received its first statement from the Processor via the mail in June 2007.  Because it had only conducted processing for a couple weeks, Burlingame Motors did not notice a problem.

418.  In July 2007, the Processor sent a statement to Burlingame Motors through the mail. Baumgartner reviewed the transactions and noticed that the rates being charged were substantially higher than what had been quoted to her on the rate sheet.  In particular, the statement included charges for items entitled "Mid Qualified Surcharge" and "Non Qualified Surcharge."

419.  Baumgartner called Merchant Services Defendants to explain the problems on the

bill and the discrepancies with the rates previously quoted. Merchant Services Defendants explained that the rates on the rate sheet which had been presented to her by the salesperson only applied to a limited number of transactions, but not to "mid" and "non-qualified" transactions, namely premium credit cards, rewards credit cards, or mileage credit cards, which would be transacted at a much higher rate.

420. The Rate Estimation Comparison Sheet indicated that all transactions processed by the Processor would be processed at a rate of 1.79%. But Burlingame Motors was being assessed that rate only on basic cards; Merchant Services Defendants and the Processor were charging Burlingame Motors much higher rates for other cards, such as mileage or rewards cards.

421. Because nearly all of Burlingame Motors customers had paid with a credit card that rewards the user with some form of points or other perks, Burlingame Motors did not see the savings promised by Merchant Services Defendants via the Rate Sheet but rather, paid substantially more than it previously had paid. Specifically, Burlingame Motors paid to the Processor 3.04% on all mid-qualified transactions and 3.29% on all non-qualified transactions, substantially higher rates than the 1.79% processing rate which had been promised to Burlingame Motors by the Merchant Services Defendants.

422. Despite the fact that most credit cards used by consumers fall into the categories of premium credit cards, rewards credit cards, or mileage credit which would not qualify for the lower rates represented by Merchant Services Defendants, the salesperson intentionally failed to mention this to Burlingame Motors when assuring Ms. Baumgartner that she could significantly lower the rates the company paid for credit card transactions by contracting with Merchant Services Defendants.

423. Burlingame Motors closed its bank account to stop the transactions and contacted Merchant Services to notify them that it was canceling its account.

424. On or about August 1, 2007, Merchant Services Defendants, at the direction of Defendant Madura, mailed a letter to Burlingame Motors informing Burlingame Motors that it would have to pay $26,118.29 as a cancellation fee. The letter referenced a provision in the contract. Having received this letter demanding the extraordinary cancellation fee, Ms.

Second Amended Class Action Complaint

Baumgartner, on behalf of Burlingame Motors, reviewed the documents left by the salesperson and could not find such cancellation provision in any of them.

425. On September 26, 2007, Burlingame Motors received copies of the supposed contracts, including the Equipment Finance Lease, the Application for Merchant Agreement, and the Merchant Card Processing Agreement, via email from Defendant Madura to her attorney. Numerous blank fields had been filled in, and Ms. Baumgartner's signature and initials had been forged on a number of documents, including the application and the lease.

426. The first page of the Equipment Finance Lease says "Merchant Services" in the top left corner, and the address provided is 16W281 West 83rd Street, Burr Ridge, IL, 60527. With the exception of what appeared to be Ms. Baumgartner's signature, none of the handwriting was hers. The first page of the Equipment Finance Lease stated that Ms. Baumgartner was to pay $129.99/month for 48 months. The Equipment Finance Lease was followed by three additional pages of terms.

427. The Application for Merchant Agreement had been filled in with terms different than what had been promised to Ms. Baumgartner verbally and on the Rate Sheet. For example, the Application stated that additional surcharges would be placed on Mid-Qualified and Non-Qualified transactions, which was not part of the initial representation and agreement. The Application also stated that Ms. Baumgartner had purchased the equipment for $129.99, contradicting the information provided on the Equipment Finance Lease.

428. Defendant Madura also sent to Ms. Baumgartner's attorney a "Merchant Card Processing Agreement." While Ms. Baumgartner's signature appeared in the top left corner, Merchant Services Defendants had simply photocopied the signature block appearing on the Rate Sheet directly onto the Merchant Card Processing Agreement, as the two signatures were identical. And, as with the Rate Sheet, the text above Ms. Baumgartner's signature on the Merchant Card Processing Agreement read, "By signing below, I agree that all fees have been sufficiently explained to my satisfaction." The Merchant Card Processing Agreement had not previously been shown to Ms. Baumgartner.

429. That Agreement contained a provision allowing the Processor to charge as

"damages" for termination the average monthly processing fees multiplied by the number of months remaining on the agreement. The Merchant Card Processing Agreement also stated that the term of the agreement was 36 months, information that was not provided to Ms. Baumgartner in writing or verbally when she contracted for service. Thus, because Ms. Baumgartner had 33 months left on her agreement, Merchant Services had calculated that $26,118.29 was due, as a "reasonable computation of the financial harm caused by termination," pursuant to the Agreement, which had not been provided to Ms. Baumgartner.

430. When the agent of Merchant Services Defendants had presented Ms. Baumgartner the Rate Sheet, the agent compared the revenues earned by her current processor and the new one to illustrate her savings. The Rate Sheet represented that the revenues to Merchant Services would be $6,239.52 over the course of four years, substantially less than the $26,118.29 over three years, which she was now being asked to pay as damages.

431. Also Included in the documents set by Defendant Madura on September 26, 2007 was a purported "Delivery and Acceptance Receipt," which stated that the signatory "certifies that all the above-referenced Equipment has been delivered and inspected, is in good working order and has been installed to the satisfaction of Lessee." Underneath that, someone had signed Ms. Baumgartner's signature and dated it May 2, 2007. Defendant Madura also sent to Ms. Baumgartner via her attorney an "Installation Form" noting that the same equipment had been delivered, accepted, and installed by an employee of Burlingame Motors on May 22, 2007. The two dates—May 2 and May 22—were obviously in conflict.

432. From October to November 2007, Burlingame Motors worked with Merchant Services Defendants and Leasing Defendants to try to resolve the issue with the Leasing Defendants. During this time, Burlingame Motors received numerous harassing calls from Leasing Defendants at the direction of Defendant Buono demanding payment on the debt.

433. Burlingame Motors eventually paid $495 to Merchant Services to try to put an end to the harassment.

- **Dietz Towing**

434. Dietz Towing was approached by an agent of Merchant Services Defendants,

Alicyn Roy, on or about October 2, 2007. Ms. Roy presented Dietz Towing with her business card, which listed her title as Senior Account Executive. The business card said "Merchant Services" on it, and below that, two joined octagons which appeared to resemble the Chase bank logo and the words "Chase Paymentech Strategic Partner." The address on the card was: 9012 Research Drive, Suite 200, Irvine, California 92618. The telephone number was (949) 861-4000 and the fax number was (909) 625-0581. The bottom of the card read: "A registered ISO/MSP of Chase Paymentech."

435. On behalf of the Merchant Services Companies, Moore, Parisi, Jurczyk, and herself, Ms. Roy falsely represented that she was offering merchant services on behalf of Chase Paymentech. Ms. Jordan was currently processing payments through Paymentech, but Ms. Roy informed her that she could sign a new contract to get better rates.

436. On behalf of Merchant Services Defendants, Ms. Roy gave Dietz Towing a quote using the Rate Sheet, which showed she could save substantial money by entering into a new contract. Based on Ms. Roy's representations about working on behalf of Chase Paymentech, Ms. Jordan believed she was contracting with Chase Paymentech.

437. Ms. Roy informed Dietz Towing that it needed new equipment. It was Dietz Towing's preference to purchase the equipment outright, but Ms. Roy informed Dietz of the benefits of leasing, specifically that it would save her money and that if the equipment stopped working, she could get it replaced. Dietz Towing agreed to lease the equipment.

438. Ms. Roy presented Dietz Towing with two pages, the first page of the Equipment Finance Lease and the first page of the Application for Merchant Agreement. Many of the fields were blank. Ms. Roy informed Dietz Towing that they would be filled in with the information on the Rate Sheet. Dietz Towing completed the first page of the Equipment Finance Lease and initialed the Application for Merchant Agreement.

439. Sometime after Dietz Towing executed the documents provided by Merchant Services, Merchant Services, using its California offices in San Jose and Irvine, utilized the telephone, Internet, and mail to send falsified documents to the Processors in Colorado and Georgia, and to Leasing Defendants in New York and Illinois. Merchant Services shared with

Leasing Defendants the lease and Dietz Towing's relevant information, such as his bank account numbers, to facilitate the processing of payments. Merchant Services Defendants colluded amongst themselves and with Leasing Defendants to determine who would forge the additional supporting documents, the rates at which the payments would be processed, and the cost of the lease. To execute this scheme, Defendants relied on the Internet, phone, and mail to circulate those documents.

440. Sometime thereafter, Defendant Sara Krieger approved Dietz Towing's Equipment Finance Lease. Defendant Krieger knew or had reason to know that terms in that lease were altered after Dietz Towing signed it. Defendant Krieger also knew or had reason to know that Dietz Towing would be harmed by being forced to pay such exorbitant rates for this equipment and that Ms. Jordan risked legal action in New York as a result of being a party to this lease.

441. In December 2007, Dietz Towing reviewed its bank statements and saw that MBF Leasing was debiting $108.74 a month from her bank account, using the Internet and telephone wires.

442. Dietz Towing also saw withdrawals and deposits from Merchant Services for card processing. The amount seemed higher than what had been previously quoted to her. Specifically, Dietz was being charged an extra 1.25% on mid-qualified transactions and 1.50% on non-qualified transactions, despite their representation that Dietz Towing would pay a flat, wholesale rate on all transactions.

443. In December 2007, Ms. Jordan phoned the number on the business card provided to her by Ms. Roy to ask about the equipment leasing. Ms. Jordan believed this was Chase Paymentech's merchant card services number. The customer service representative told her that the lease had been sold to MBF Leasing. This was the first time Ms. Jordan learned about MBF.

444. Ms. Jordan asked if she could just buy out the lease, but Merchant Services Defendants told her she would have to pay in excess of $3,000 to get out of the 48 month lease. Ms. Jordan asked for a copy of all contracts to be sent to her.

445. On December 10, 2007, Merchant Services Defendants used telephone wires to fax Ms. Jordan a copy of the Equipment Finance Lease. Ms. Jordan was surprised to see the

previously blank field for the lease payment had been filled in with $99.99 for 48 months.  Ms. Jordan was also surprised to see the additional three pages in the contract, containing the terms with harsh early termination penalties.  Merchant Services Defendants did not provide Ms. Jordan with a copy of her Merchant Agreement at the time the sales representative called on her business or at any other time until she requested them.

446.    Between November 2007 and the present, Leasing Defendants have withdrawn approximately $108.74 a month from Dietz Towing's bank account using the Internet and telephone wires.

447.    On or about January 10, 2008, Leasing Defendants mailed to Dietz Towing a letter informing Dietz Towing that they would be debiting its account an extra $62.68 that month, in addition to its $108.74 monthly payment.  This amount was purportedly for its "personal property tax" and included a $25.00 fee for filing the required personal property tax return.  The letter also informed Dietz Towing that Leasing Defendants was its "taxing authority for the fiscal year 2008."  The letter noted the amount would be debited on the following day, January 11, 2008. The return address on the envelope stated it came from Illinois and the letter was signed, "MBF Leasing" without any person's name or signature.

448.    On or about January 11, 2008, Leasing Defendants deducted $62.68 from Dietz Towing's bank account, using the telephone wires and internet.  Leasing Defendants deposited this into their own accounts and the accounts of the shell companies.

449.    On or about September 17, 2008, Leasing Defendants mailed to Dietz Towing a letter informing Dietz Towing that they would be debiting its account an extra $61.89 that month, in addition to its $108.74 monthly payment.  This amount was purportedly for the "applicable personal property tax" and included a $25.00 fee for filing the required personal property tax return.  The letter noted the amount would be debited on or about September 29, 2008. The return address on the envelope stated it came from Illinois and the letter was signed, "MBF Leasing" without any person's name or signature.

450.    On or about September 29, 2008, Leasing Defendants deducted $61.89 from Dietz Towing's bank account, using the telephone wires and Internet. Leasing Defendants deposited

this into their own accounts and the accounts of the shell companies.

451.  On or about January 14, 2010, Leasing Defendants mailed to Dietz Towing a letter informing Dietz Towing that they would be debiting its account an extra $50.91 that month, in addition to its $108.74 monthly payment.  This amount was purportedly for the "applicable property tax for 2011" and included a $25.00 fee for filing the required property tax return.  The letter noted the amount would be debited on or about January 25, 2010. The return address on the envelope stated it came from Illinois and the letter was signed, "MBF Leasing" without any person's name or signature.

452.  On or about January 25, 2010, Leasing Defendants deducted $50.91 from Dietz Towing's bank account, using the telephone wires and internet. Leasing Defendants deposited this into their own accounts and the accounts of the shell companies.

453.  In sending these letters, Leasing Defendants did not request any information from Dietz Towing that would typically be provided in a personal property tax return. Leasing Defendants never provided Dietz Towing with copies of the property tax returns it filed on Dietz Towing's behalf or any verification that the returns were actually filed.   No property tax returns were ever filed by Leasing Defendants on behalf of Dietz Towing.

454.  After Dietz Towing began using the terminal in October or November 2007, it began receiving bills and statements via the mail every month detailing the fees that were being deducted from its bank account.  These statements were mailed by the Processor from Colorado to Dietz Towing once a month from approximately October 2007 to May 2010.

455.  Beginning in October or November 2007, the Processor electronically debited from Dietz Towing's bank account, processing fees each month.  The Processor transferred a portion of those fees to the Merchant Services Defendants. Merchant Services Defendants distributed a portion of the money received to Defendants Parisi, Jurzyck, and Moore, and Moore then transferred that money to the Moore Shell Companies.

456.  These transactions were conducted via wire transfer and automatic debits using interstate telecommunications wires.

457.  Every month, the fees withdrawn appeared to be higher than what Ms. Roy had

Second Amended Class Action Complaint

indicated to Dietz at the start of the contract.

458.    In May 2010, Dietz Towing was having problems with her equipment terminal. The technology was out of date and it could no longer process transactions in a way that its vendors preferred.  Ms. Jordan telephoned Merchant Services Defendants and Leasing Defendants to attempt to resolve the issue.

459.    Leasing Defendants told her it would cost her $1700 to end her equipment lease. Because Dietz Towing had been paying over $100 a month for over two years on the equipment and because of the high rates through Merchant Services Defendants, Dietz Towing began to look into other solutions.

460.    Ms. Jordan called Chase Paymentech to end Dietz Towing's merchant account with them.  Chase Paymentech informed her that it had not processed payments on her behalf since the fall of 2007, when the account had been transferred to a different processor, TransFirst.

461.    On or about May 14, 2010, Ms. Jordan contacted Transfirst and asked it to cancel Dietz Towing's account.  That same day, Jordan called the Merchant Services customer service number to verify that Dietz Towing's account had never been with Paymentech and to request a copy of the contracts.  Merchant Services Defendants, under the direction of Defendant Madura, mailed to Dietz Towing a copy of the Equipment Finance Lease, Application for Merchant Agreement, and Merchant Card Processing Agreement.

462.    When Dietz Towing received these documents, Ms. Jordan noticed that the Application for Merchant Agreement was seven pages long, not one, and her initial and signature had been forged on the remaining six pages.  The blank fields on the first page had been filled in. Ms. Jordan had not previously seen the Merchant Card Processing Agreement and her signature did not appear anywhere on it.  And, the Equipment Finance Lease provided to her differed from the version provided to her in December 2007.

463.    Approximately two weeks later, Merchant Services called Dietz Towing and informed Ms. Jordan that it would cost $495 to cancel Dietz Towing's account with Merchant Services and TransFirst.  Dietz Towing paid the money via wire transfer and transferred its services to another bank.

464.   After Dietz Towing and Ms. Jordan joined this suit, Merchant Services Defendants produced a copy of the Merchant Card Processing Agreement purporting to contain Ms. Jordan's signature.  Ms. Jordan did not sign that document.

- **The Rose Dress, Inc.**

465.   Plaintiff The Rose Dress was approached by the Merchant Services Defendants in May 2005.  The agent of the Merchant Services Defendants offered savings on credit card transactions.  The Rose Dress showed the agent some recent processing statements and the agent represented to The Rose Dress that it could see substantial savings by contracting with them for card services.

466.   The Rose Dress was presented with the first page of the Application for Merchant Agreement and Bae provided Merchant Services Defendants with its bank account information.

467.   The agent offered the Rose Dress an opportunity to lease the credit card equipment but The Rose Dress declined.

468.   Sometime thereafter, Merchant Services Defendants created an Equipment Lease and mailed the fraudulent lease to New York where Defendant Sara Krieger approved it.  Defendant Krieger knew or had reason to know that terms in that lease were fraudulent.  Defendant Krieger also knew that Rose Dress would be harmed by being forced to pay such exorbitant rates for this equipment and that Mr. Bae risked legal action in New York as a result of being a party to this lease.

469.   Several weeks later, in May or June 2005, an agent of Merchant Services Defendants came to the store to install a credit card terminal.  Around that time, the Rose Dress examined its bank statement and saw that MBF Leasing withdrew over $160 from its bank account.

470.   Bae attempted to contact Merchant Services Defendants to discuss the error.  Merchant Services Defendants said told him that he had leased the equipment at that rate and informed him to take it up with Leasing Defendants.  Merchant Services Defendants also offered to send to him his contract.

471.   Merchant Services Defendants mailed to the Rose Dress a copy of the Equipment

Second Amended Class Action Complaint

Finance Lease. It indicated that the Rose Dress had leased the credit card terminal for $159.99 a month for 48 months. While the Lease was on behalf of the Rose Dress, none of the handwriting, signatures, or initials on the sheet appeared to be Mr. Bae's.

472. The Equipment Finance Lease identified "The Rose Dress Inc." as the Lessee. Under "Lease Acceptance," Mr. Bae's signature appeared above "Lessee." That section of the lease contained the following language: "INVESTIGATIVE CREDIT REPORT: Applicant authorizes MBF Leasing LLC, its assigns or its agents to obtain an investigative credit report from a credit bureau or a credit agency and to investigate the references given on any other statement or data obtained from Lessee." The term "Applicant" is not defined anywhere in the lease.

473. On the Equipment Finance Lease, someone had identified Plaintiff Lewis Bae as the personal guarantor of the lease, and his signature had also been forged. The Equipment Finance Lease contained no information authorizing any Leasing Defendant to obtain a credit report or investigate information relating to the guarantor.

474. When Bae tried to resolve the issue by discussing it with Merchant Services Defendants and Leasing Defendants, he was told the Lease was irrevocable and nothing could be done.

475. When the Rose Dress could not resolve the issue, it cancelled its account with Merchant Services Defendants and closed its bank account to stop the withdrawals from Leasing Defendants.

476. For several months following the closure of its bank account, the Rose Dress received numerous harassing calls and letters from Leasing Defendants, demanding payment on the lease. The calls were often made during business hours and affected its business, because they interfered with customer service.

477. Because the calls were so frequent and relentless, the Rose Dress changed its telephone number.

478. Since 2006, Leasing Defendants have relied on their various alter-egos to harass Mr. Bae and attempt to extort money from him. While Mr. Bae has allegedly only signed one

lease with Leasing Defendants, Leasing Defendants have created no less than three versions of this lease. At least two of these leases assign rights to MBF Leasing and at least one lease assigns rights to Northern Leasing. Both entities have sought to enforce the lease against Mr. Bae.

479. On July 17, 2006, Northern Leasing, by and through the Sussman Defendants, filed a lawsuit against Mr. Bae and The Rose Dress in New York County Court. The Sussman Defendants knew or had reason to know that the underlying lease was obtained through forgery, fraud, and deceit but filed it anyway.

480. The Sussman Defendants never served Mr. Bae and have taken no steps to litigate their case. The case is still pending in New York.

481. On June 28, 2007, Leasing Defendants sent Mr. Bae a letter advising him that a lawsuit had been filed against him and offered him an opportunity to settle. The letter was signed by Louis Cucinota, who represented that he was with the Legal Collections Department at MBF Leasing. Defendants Sussman and Buono instructed the Legal Collections Department to prepare and mail the letter, knowing that Mr. Bae had not been served, and that the basis for the lawsuit was fraudulent.

482. The letter also informed Mr. Bae that the parties to the lawsuit were MBF Leasing LLC and Mr. Bae, despite the fact that the lawsuit had actually been filed by Northern Leasing against Mr. Bae and The Rose Dress.

483. Despite not having any contract with Mr. Bae, Defendant Northern Leasing has used its lawsuit against him as justification to monitor and destroy Mr. Bae's personal credit history. Following the filing of this lawsuit, Northern Leasing used interstate wires to have the unpaid debt placed on Mr. Bae's personal credit report as a "Charge Off" with a Severity level of 9. This charge off continues to affect Mr. Bae to this day.

484. Defendant MBF Leasing also has continued to monitor Mr. Bae's personal credit report. MBF Leasing is registered at the credit bureaus under two identification numbers, one affiliated with "MBF Leasing" and one affiliated with "MBF Leasing LLC." Both list addresses and phone numbers in Burr Ridge, Illinois.

485. "MBF Leasing LLC" conducted an inquiry on Mr. Bae's personal credit report

through Experian on September 25, 2008 and February 22, 2010.

486. "MBF Leasing" conducted an inquiry on Mr. Bae's personal credit report through Experian and Transunion on December 11, 2009.

487. Leasing Defendants knew they had no authorization or contractual basis to conduct these inquiries, but did so anyway to harass and intimidate Mr. Bae.

488. These inquiries caused Mr. Bae's credit score to decrease, making him less attractive to lenders and potential business partners, and caused him emotional distress.

489. On March 22, 2010, the Sussman Defendants filed a complaint against Mr. Bae, personally in the Civil Court of the City of New York, County of New York. The plaintiff in the case was Defendant MBF. The complaint demands payment of $7,199.55 for the remaining balance on the equipment lease and no less than $1439.91 in attorney fees, equaling exactly 20% of the purported remaining balance.

490. The Sussman Defendants chose to file a second complaint against Mr. Bae, a California resident, because Mr. Bae owed substantially more than the average Class Member, as a result of him being a victim of MBF and the California-based Merchant Services Defendants (which did not cap the monthly lease amounts). Defendants Sussman would receive 20% of that amount, considerably higher than for most leases outside of California.

491. The complaint and summons were sent via the mail to a purported process server, with instructions from the Sussman Defendants to deliver it to Mr. Bae's business address in California.

492. The Sussman Defendants then filed a proof of service that falsely states that the complaint was left with an employee of the Rose Dress, Kim Lee. However, the Rose Dress has never employed anyone by that name, nor does it employ anyone matching the description of the individual in the proof of service. The Sussman Defendants knew or had reason to know that the proof of service was falsified.

493. The summons demands that Plaintiff appear in the Civil Court of the City of New York, County of New York.

494. Attached to the complaint filed by Leasing Defendants is a copy of the lease Mr.

Bae purportedly signed as well as the three pages of lease terms. The lease terms are photocopied using a blurry, smeared font and are nearly entirely illegible. The "Acceptance" portion of the Lease is cut off, obscuring the names of the parties approving the lease.

495. While the lawsuit against Bae was filed by MBF Leasing, the second page of the Equipment Lease identifies Northern Leasing Systems Inc. as the lessor. The first page of the Equipment Lease identifies Merchant Services in the top left corner. MBF Leasing does not appear anywhere on the lease.

496. Leasing Defendants, under the direction of the Sussman Defendants, intentionally chose to use a poor copy of the lease terms so that Mr. Bae would not be able to understand the terms and identify the responsible parties, and because Defendants Buono and Sussman had no intention of litigating the matter before a judge in the Civil Court of the City of New York, County of New York.

497. The Sussman Defendants knew or had reason to know that Mr. Bae was not provided with the additional three pages of the lease and the full extent of the lease terms. The Sussman Defendants were not provided with a complete original copy of Mr. Bae's lease because none existed. Rather, the Sussman Defendants (or their alter egos the Leasing Defendants) affixed a stock set of terms and conditions to a photocopy of the first page of the lease, which they then submitted to the New York County Court and mailed to the process server in California.

498. In his July 2010 declaration to this Court, Mr. Sussman provides two versions of this lease, a copy of the illegible one accompanying the complaint against Mr. Bae, and a cleaner version, containing different terms in the later three pages. These two sets both differ from the three pages attached to Mr. Bae's lease which was submitted to this Court by the Merchant Services Defendants in July 2010. Sussman's conduct demonstrates that he is aware that neither he nor Leasing Defendants have any reasonable basis to assert which lease (if any) was signed by Mr. Bae nor to sue Mr. Bae for breach of that lease.

- **Silicon Valley Pet Clinic**

499. Plaintiff Erin Campbell d/b/a Silicon Valley Pet Clinic entered into a lease for a credit card terminal with Defendant Lease Finance Group in September 2002. Plaintiff Erin

1  Campbell was the guarantor.

2       500.    Campbell completed the lease, providing SVPC's bank account information to

3  make the monthly payments of approximately $86.55. According to the lease, this amount was

4  for monthly lease payments and applicable taxes.

5       501.    On September 27, 2002, Lease Finance Group deducted $86.55 twice from

6  SVPC's bank account. On October 2002, Lease Finance Group deducted $86.55 from SVPC's

7  bank account.

8       502.    Beginning in November 2002, Lease Finance Group made two monthly

9  withdrawals, one for $86.55 and one for $5.00. Both were made on the same day every month,

10  typically on the 27th. This continued through July 2006.

11       503.    On or about August 27, 2006, Lease Finance Group withdrew $86.55 and $6.30.

12       504.    On September 27, 2006, Lease Finance Group withdrew $91.55. These monthly

13  withdrawals continued until May 27, 2007.

14       505.    In June 2007, Campbell and SVPC closed their account with Lease Finance

15  Group. On or about June 11, 2007, Lease Finance Group withdrew a final payment of $91.55.

16       506.    During the years on which Campbell and SVPC made payments to Lease Finance

17  Group, they were occasionally charged for property tax. Specifically, Lease Finance Group

18  withdrew $3.48 on October 27, 2004 and $6.30 on August 27, 2006 for property taxes.

19  Throughout the duration of her lease, Campbell and SVPC never received a bill or statement

20  about these property taxes or any other taxes purportedly due.

21       507.    On or about March 10, 2011, Campbell received a letter from SKS Associates.

22  The letter informed her that SKS Associates had acquired the rights and title to her old Lease

23  Finance Group lease. It also informed her that she owed $85.50 for taxes and filing costs

24  associated with her equipment. The letter then informed her the amount would be deducted on

25  March 15, 2011. Because Campbell had closed her bank account in the four intervening years

26  since the termination of her lease, she knew they could not access the funds.

27       508.    On or about March 10, 2011, Campbell called the number listed on the letter. She

28  was directed through the Leasing Defendants switchboard, and was prompted to enter an

extension to discuss taxes.  When she reached a representative of the Leasing Defendants, he asked her to verify the last four digits of her social security number.  He then informed Campbell that SKS was the same thing as Lease Finance Group, and disputed her claim that the letter informed her that SKS had purchased the lease.

509.     When Campbell inquired about the nature of the charges, Leasing Defendants' representative told her that they had paid taxes on her behalf to the government and now Campbell owed them.  He then insisted that she must pay her taxes, and told her if she did not, he would be forced to send it to the credit bureau.

510.     Campbell requested a copy of her lease be sent to her.  On March 11, 2011, Leasing Defendants faxed her a copy of her payment history but have refused to provide her a copy of her lease.  The payment history does not reflect any unpaid taxes, nor does it provide any calculation of how Leasing Defendants arrived at $85.50 purportedly owed.

511.     Leasing Defendants continue maintain the amount is owed to them and Campbell believes they will report this item to the credit bureaus.

## **CLASS ALLEGATIONS**

512.     Plaintiffs bring certain claims in this action, as set forth in this Complaint, against Defendants on behalf of themselves and a Class of all others similarly situated.  The Class is defined as follows:

> All persons and businesses who, from March 26, 2006 to the present, were bound by contracts or leases for merchant card services and/or related equipment with any of the Defendants, or signed personal guarantees for such contracts, or against whom Defendants attempted to enforce such contracts or leases, attempted to collect monies allegedly owed under such contracts or leases, or reported to credit agencies that monies were due under such contracts or leases.

Such persons shall be referred to as "Class Members" or "class members."

513.   Plaintiffs bring other claims in this action, as further set forth in this Complaint, on behalf of one or more Subclasses, defined as follows:

| Subclass | Definition | Plaintiffs |
|---|---|---|
| Merchant Services Electronic Payment Processing Subclass | Class Members who were entered into contracts for electronic payment processing services by the Merchant Services Companies and their agents. | Von Glasenapp, Just Film, Su, Precision Tune, Burlingame Motors, Jordan, Dietz Towing |
| Northern Leasing Subclass | All Class Members who were bound by equipment finance leases with any of the Northern Leasing Companies. | All Plaintiffs |
| Northern Leasing California Subclass | All Northern Leasing Subclass members who reside in or are incorporated in California. | All Plaintiffs |
| Northern Leasing One Page Contract Subclass | Members of the Northern Leasing Subclass who were bound by a equipment finance lease in use by Leasing Defendants until January 1, 2008 in which the first page did not contain the phrase "The undersigned has read all 4 pages of this lease with all terms filled in and agrees to be bound by all the terms of this lease" in the "LEASE ACCEPTANCE" section. | Von Glasenapp, Just Film, Baumgarten, Burlingame Motors, Jordan, Dietz Towing, Bae, The Rose Dress |
| Credit Monitoring Class | Members of Class who had their consumer credit reports inspected, viewed, monitored, or otherwise retrieved from a consumer credit reporting agency by any of the Merchant Services Defendants or Leasing Defendants. | Von Glasenapp, Bae |
| Abuse Of Process Class | Members of Class Who Were Sued In New York by Leasing Defendants In Connection With Any Lease | Bae |

514.   This action has been brought and may properly be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed class is

Second Amended Class Action Complaint

183621.1

1    easily ascertainable.

2        515.    Numerosity: Plaintiffs do not know the exact size of the Class and each of the

3    Subclasses, but it is estimated that each is composed of more than 100 persons.  The persons in

4    the Class and each Subclass are so numerous that the joinder of all such persons is impracticable

5    and the disposition of their claims in a class action rather than in individual actions will benefit

6    the parties and the courts.

7        516.    Common Questions Predominate: This action involves common questions of law

8    and fact to the potential class and subclasses because each class and subclass member's claim

9    derives from the same set of deceptive, unlawful and/or unfair statements and omissions.  The

10   common questions of law and fact predominate over individual questions, as proof of a common

11   or single set of facts will establish the right of each member of the classes to recover.  Among the

12   questions of law and fact common to the class are:

13          a)    Whether Defendants were engaged in a RICO association and engaged in a

14   pattern of activity designed to defraud Plaintiffs and the Class;

15          b)    Whether Defendants conspired to engage in a pattern of activity designed to

16   defraud Plaintiffs and the Class;

17          c)    Whether the contracts entered into by class members are enforceable and/or

18   unconscionable;

19          d)    Whether Defendants unfairly, unlawfully and/or deceptively failed to

20   provide class members all pages of operative agreements (including documents incorporated by

21   reference) and/or to alter such documents after they had been signed by class members;

22          e)    Whether Defendants unfairly, unlawfully and/or deceptively failed to

23   inform class members of the exorbitant rates for leasing equipment;

24          f)    Whether Defendants' advertising and marketing materials regarding their

25   merchant card services and/or equipment that they sold or leased were likely to deceive Class

26   Members or was unfair;

27          g)    Whether Defendants unlawfully monitored the credit reports of Class

28   members;

h)      Whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

i)      The amount of revenues and profits Defendants received and/or the amount of monies or other obligations lost by Class Members as a result of such wrongdoing;

j)      Whether Class Members are entitled to declaratory, injunctive and other equitable relief and, if so, what is the nature of such relief; and

k)      Whether Class Members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

517.    Typicality: Plaintiffs' claims are typical of the class and subclasses because Plaintiffs entered into contracts with Defendants and their agents that are identical or nearly identical to the standard form contract used by Defendants and their agents.  Thus, Plaintiffs and Class and Subclass Members sustained the same injuries and damages arising out of Defendants' conduct in violation of the law.  The injuries and damages of each Class and Subclass Member were caused directly by Defendants' wrongful conduct in violation of law as alleged.

518.    Adequacy: Plaintiffs will fairly and adequately protect the interests of all Class Members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain.  Plaintiffs also have no interests that are in conflict with or antagonistic to the interests of Class Members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the class.  No conflict of interest exists between Plaintiffs and Class Members hereby, because all questions of law and fact regarding liability of Defendants are common to Class Members and predominate over any individual issues that may exist, such that by prevailing on their own claims, Plaintiffs necessarily will establish Defendants' liability to all Class Members.  Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class Members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class Members.

Second Amended Class Action Complaint

519.    Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action.  The prosecution of individual remedies by members of the class and subclasses will tend to establish inconsistent standards of conduct for the Defendants and result in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions world engender.  Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

520.    Nexus to California:  The State of California has a special interest in regulating the affairs of corporations that do business here.  Defendants maintain places of business in California and have agents soliciting business in California as set forth herein.  In addition, the acts complained of herein emanated from or involved decisions made by Defendants and their agents and alter-egos in California.  Accordingly, there is a substantial nexus between Defendants' unlawful behavior and California such that the California courts should take cognizance of this action on behalf of a class of individuals who reside anywhere in the United States.

521.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### PLAINTIFFS' FIRST CAUSE OF ACTION
**Conduct and Participation in a RICO Enterprise Through a
Pattern of Racketeering Activity
(RICO 18 U.S.C. § 1962(c) ("RICO"))
On Behalf Of Themselves and the Class
Against All Defendants**

522.    Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as

Second Amended Class Action Complaint

if set forth herein.

523.   Defendants are individuals and/or entities capable of holding a legal or beneficial interest in property, within the meaning of "person" as defined in 18 U.S.C. § 1961(3).  The association is composed of the Merchant Services Defendants and Leasing Defendants.

524.   Defendants are associated with each other as an Enterprise within the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4).

525.   Defendants associated together as an Enterprise for the purpose of executing a scheme to defraud class members through a pattern of racketeering consisting of distinct acts of mail fraud, wire fraud, and money laundering.

526.   Merchant Services Defendants participate in the Enterprise by directing their employees, agents, and alter-egos to solicit contracts and leases with small businesses, and then forging and profiting from those leases.

527.   Specifically, Defendants Moore, Parisi, Jurczyk, Walshe, and Roy participate in the Enterprise by managing and directing the fraud, including training their subordinates and other officers and directors to conduct the fraud.

528.   Defendant Moore also participates by creating misleading and deceptive business names, conspiring with Leasing Defendants, developing a series of shell companies and alter-egos, and laundering the proceeds of the fraud through the Moore Shell Companies.

529.   Defendants Walshe and Roy further participate in the Enterprise by forging documents, directly misleading merchants on the true nature of the deal, and by training sales agents to do the same.

530.   Defendant Madura participates in the fraud by forging documents, inserting new contractual pages into merchant documents, identifying new and fraudulent fees to impose on merchants, and by enforcing steep cancellation fees knowing that the merchants were never informed of those terms.

531.   Defendants Universal Card, Inc., National Payment Processing, Inc., and Universal Merchant Services, LLC participate in the fraud by acting as alter-egos of Defendants Merchant Services, Inc., Moore, Parisi, and Jurzcyk.

532.    Leasing Defendants participate in the Enterprise by colluding with Merchant Services on the creation of misleading contracts and advertisements, on forgery of the contracts to increase their profits, and on hiding the terms of the agreements from the small businesses.

533.    Defendants Cohen and Mezei participate in the Enterprise by managing and directing the fraud, including operating numerous alter-egos and shell corporations to funnel proceeds from the fraud, often times with the assistance and direction of Defendant Krieger, as set forth in paragraphs 26-29, 36-43, 83-84, 123-124

534.    Defendant Cohen, with Defendants Krieger, Healy, and Fitzgerald, further participated in the Enterprise by conspiring with Defendant Moore and the other Merchant Services Defendants to enter merchants into expensive, unconscionable, fraudulent equipment leases, as set forth in paragraphs 131-148, and to create a sham due diligence system, while approving and funding leases known to be solicited by forgery and fraud, as set forth in paragraphs 241-246.

535.    Defendants Cohen and Mezei employed and conspired with Defendants Buono, Sussman, and Joseph I. Sussman, PC to develop and carry out an abusive, harassing debt collections strategy designed to extort money from merchants, as set forth in paragraphs 127-130, 292-317, 367-368, 373-381, and 476-498.

536.    Defendants Healy, Fitzgerald, MBF Leasing, and MBF Merchant Services were instrumental in the Enterprise, brokering the arrangement between Defendants Northern Leasing, Cohen, Mezei, and Krieger, and Defendants Moore and Merchant Services, Inc, that lead to the creation of Defendant MBF Leasing, LLC and enabled all Defendants involved to increase their profits and the profits of their Shell Companies while minimizing the financial risk inherent in defrauding small businesses, as set forth in paragraphs 46-49, 131-148.

537.    Defendant Healy further participated in the Enterprise by conspiring with other Leasing Defendants on the creation of Defendant RBL Capital, LLC, used to funnel money and profits from the fraud to Healy and the Healy Shell Corporations, as set forth in paragraphs 48-49 and 149-152.

538.    Defendant Northern Leasing Systems, Inc. further participated in the Enterprise by

managing, directing, and overseeing the fraud of its directors and officers, agents, and alter-egos. Defendant Northern Leasing Systems, at the direction of Defendant Cohen and Mezei, created alter-egos, such as Defendant MBF Leasing, as set forth in paragraphs and acquired Defendants Golden Eagle Leasing, Lease Finance Group, and Lease Source-LSI, LLC, to act as alter-egos to further the fraud, as set forth in paragraphs 80-93 and 149-152.

539. Defendants' association with the Enterprises enabled Defendants to conduct, direct, and control a pattern of fraudulent, illegal activities over a substantial number of years, which continues to this day.

540. To further their goals, Defendants, working in concert, engaged in various forms of criminal activity, including mail fraud, wire fraud, and money laundering.

541. Defendants' ongoing pattern of racketeering activity has injured and continues to injure Plaintiffs and the Class. Defendants' criminal acts of mail fraud, wire fraud, and money laundering the proximate cause of the injuries suffered by Plaintiffs and the Class.

542. During the ten (10) years preceding March 26, 2006 and to the present, all Defendants did cooperate jointly and severally in the commission of three (3) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d), as described in this Complaint.

543. Beginning at an exact date unknown to Plaintiff, but within ten (10) years preceding the filing of this Complaint, Defendants have knowingly, willfully, and unlawfully participated in a pattern of racketeering activity that continues to this day.

544. The acts set out below ("Racketeering Acts") had the same pattern and purpose to defraud Plaintiffs and the class for the benefit of Defendants. Each Racketeering Act involved the same or similar methods of commission and participants, and affected the Class similarly.

545. Without the repeated predicate acts, the ability to conduct their fraud using the mail and telecommunications wires, and the money laundering, Defendants' business would not have succeeded.

546. The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the Enterprise to operate

Second Amended Class Action Complaint

their businesses to fraudulently induce Plaintiffs and the Class to contract for their services and equipment and to ensure that those trapped into fraudulent contracts could not extricate themselves without paying exorbitant sums of money.

547. Defendants' wrongful conduct has caused injury to Plaintiffs and the Class, remains a part of their ongoing business practices, and remains a continuing threat to Plaintiffs, the Class and the general public.

**Merchant Services Defendants Committed Multiple Acts of Mail Fraud**

**in Violation of 18 U.S.C. § 1341 In Furtherance Of The Enterprise**

548. Merchant Services Defendants devised a scheme to defraud Plaintiffs and the Class by offering deceptive, unconscionable contracts for services. They relied on material misrepresentations of fact and omissions of material facts to entice Plaintiffs and the Class to enter into the contracts.

549. Merchant Services Defendants used the mail for the purpose of executing this fraudulent scheme. Specifically, Merchant Services Defendants relied on the mail to send Plaintiffs and class members altered versions of contracts after such contracts had been executed and to exchange those same contracts with the Leasing Defendants. Merchant Services Defendants knew these documents to be forged and altered at the time they mailed them but mailed them to further the goals of the enterprise. These mailings are described in paragraphs 346, 348 , 367, 369, 370, and 372 with respect to Just Film, 389, 395, and 402-05, with respect to Precision Tune, 414, 417-18, 424-25, 428 with respect to Burlingame Motors, 439 and 461-62 with respect to Dietz Towing, and 468 and 471 with respect to The Rose Dress.

550. Merchant Services Defendants used the mail to send altered versions on thousands of other dates and times with respect to the Class, described in paragraphs 260, 271, and 292 generally.

551. Merchant Services Defendants, under the direction of Defendant Jurczyk, used the mail to send intimidating, threatening letters to former sales representatives to ensure they do not disclose the scope of the fraud, as described in paragraph 205.

552. Merchant Services Defendants could not have furthered their fraud without the use

183621.1

of the mail. For example, Merchant Services Defendants, including Defendants Moore, Parisi, Jurzcyk, Walshe, and Roy instructed their agents and employees to avoid leaving copies of the documents with the Class, knowing that it intended to alter the contracts and that Defendant Madura would use the mail to inform Class members of the new, altered terms and enforce those terms against the Class. In setting up offices in San Jose, Sacramento, Arizona, and Hawaii, use of the mail to exchange documents and checks was inevitable.

553. Merchant Services Defendants further relied on the mail to ship equipment, exchange contracts, financial records, and payments between alter-egos, and to Processors and Leasing Defendants, including Defendants Cohen, Healy, Fitzgerald, and Krieger.

554. Specifically, Merchant Services Defendants mailed copies of the fraudulent contracts to the Processor to effect payment processing. Merchant Services Defendants mailed Just Film's contract to the Processor sometime in June or July 2007. Merchant Services Defendants mailed Precision Tune's contract to the Processor sometime between April and June 2008. Merchant Services Defendants mailed Burlingame Motors' contract to the Processor sometime between May and June 2007. Merchant Services Defendants mailed Dietz Towing's contract to the Processor sometime between October 2007 and November 2007. Merchant Services Defendants mailed The Rose Dress's contract to the Processor sometime between May 2005 and June 2005.

555. Merchant Services Defendants also mailed copies of the fraudulent equipment finance leases to Leasing Defendants. Merchant Services Defendants mailed Just Film's contract to Leasing Defendant sometime in June or July 2007. Merchant Services Defendants mailed Precision Tune's contract to Leasing Defendants sometime in April or May 2008. Merchant Services Defendants mailed Burlingame Motors' contract to Leasing Defendants sometime in May or June 2007. Merchant Services Defendants mailed Dietz Towing's contract to Leasing Defendants sometime in October or November 2007. Merchant Services Defendants mailed The Rose Dress's contract to Leasing Defendants sometime in May or June 2005. Merchant Services Defendants could not have furthered their fraud without the ability to mail fraudulent contracts to Leasing Defendants. Because Merchant Services Defendants needed an equipment lease

Second Amended Class Action Complaint

financing company that permitted it to charge exorbitant rates for the equipment in defiance of industry norms, and that company operated across the country, use of the mail to conduct the fraudulent activity was necessary and inevitable.

556.    Because Merchant Services Defendants employ sales representatives around the country, Defendants communicated with one another and the various offices of each alter-ego via the mail.

557.    Merchant Services Defendants also used the United States mail system for sending collections letters to enforce the fraudulent contracts, settle disputes pertaining to the fraudulent contracts, and intimidate Plaintiffs and the Class into paying to Defendants exorbitant amounts of money as stipulated by the fraudulent contracts.  The dates and contents of some of these mailings and their senders and recipients are more fully set forth in paragraphs 261, 273, 282 291 396, 370, 372, 403, 424, 425, 438, and 431 of this Complaint.

**Leasing Defendants Committed Multiple Acts of Mail Fraud**

**in Violation of 18 U.S.C. § 1341 In Furtherance Of The Enterprise**

558.    Leasing Defendants devised a scheme to defraud Plaintiffs and the Class by offering deceptive, unconscionable contracts for services.  They relied on material misrepresentations of fact and omissions of material facts to entice Plaintiffs and the Class to enter into the contracts.

559.    Leasing Defendants used the mail for the purpose of executing this fraudulent scheme.  Specifically, Leasing Defendants relied on the mail to send Plaintiffs Just Film and Deitz Towing as well as other Class Members notices that money was being withdrawn for the purposes of paying personal property tax, when it had no intention to file tax returns or pay these taxes on behalf of Plaintiff and the Class.  These mailings took place on or about January 10, 2008 and again on or about September 17, 2008 as to Just Film and on or about January 10, 2008, September 17, 2008 and January 14, 2010 as to Dietz Towing, and are described more fully in the paragraphs 274-281, 359-62, 364-65, 447-53,

560.    In March 2011, Leasing Defendants relied on the mail to send thousands of letters from a fraudulent shell company advising class members of audits conducted on their account and

past due property taxes, when no such audit had been conducted and no taxes were due. Leasing Defendants further intentionally used phony dates on the letters to suggest the letters were being prepared and mailed in advance of the withdrawals, and then withheld mailing the letters until it was too late for ensure merchants to instruct their banks to stop payments. An overview of this scam is described in paragraphs 28, 93, 279-281, and more specifically with respect to Plaintiffs Campbell and SVPC in paragraph 507.

561. Leasing Defendants, under the direction of Defendants Sussman and Buono, also used the mail to send harassing letters demanding payment on leases it knew to be forged. Specifically, Leasing Defendants mailed these letters to Just Film and Von Glasenapp on various dates between October 2008 and February 2009, to the Rose Dress and Bae on various dates between July 2005 and March 2010, and to thousands of Class Members on thousands of dates during the last ten years.

562. Leasing Defendants also used the mail to effectuate service of process on individuals it was suing to collect on the fraudulent debt. Specifically, Leasing Defendants, under the direction of Defendants Sussman and Buono, mailed to a process server a summons and complaint in the days following March 22, 2010 as described in paragraphs 491, and to thousands of Class Members on thousands of dates during the last ten years, as described in paragraphs and 292-317.

563. Leasing Defendants also used the mail to send legal collections notices and verified complaints containing false representations about the association of the author and the location of the creditor, as described in paragraphs 97-113.

564. Leasing Defendants could not have furthered their fraud without the use of the mail. Leasing Defendants, including Defendants Cohen, Krieger, Buono, and Sussman relied on the ability to alter contracts in their office and used the mail to deliver the fraudulent contracts to class members so that Leasing Defendants could enforce the new terms against the class members. Leasing Defendants, led by Defendants Sussman, also rely on the mail to serve out of state defendants summons and complaints to collect the fraudulent debt.

565. Leasing Defendants further relied on the mail to ship equipment, exchange

contracts, financial records, and payments between alter-egos, and to Merchant Services

Defendants.  Because Defendants maintain offices around the country, Defendants communicated

with one another and the various offices of each alter-ego via the mail.

566.    Leasing Defendants, including Defendants Buono and Sussman, also used the

United States mail system for sending threatening letters to enforce the fraudulent contracts and

to intimidate Plaintiffs and the Class into paying to Defendants exorbitant amounts of money as

stipulated by the fraudulent contracts. The dates and contents of some of these mailings and their

senders and recipients are more fully set forth in paragraphs 367, 368, and 373 with respect to

Just Film, and 481-82 and 491 with respect to Rose Dress.

**Merchant Services Defendants Committed Multiple Acts of**

**Wire Fraud in Violation of 18 U.S.C. § 1343 In Furtherance Of The Enterprise**

567.    Merchant Services Defendants voluntarily and intentionally devised and

participated in a scheme to defraud Plaintiffs and the Class out of money.  Defendants committed

these acts with the intent to defraud Plaintiffs and the Class.

568.    In engaging in this scheme to defraud, it was reasonably foreseeable that interstate

wire communications would be used.  Merchant Services Defendants in California provided

Plaintiffs and the nationwide Class with telephone and fax numbers that were around the country.

These telephone and fax numbers included the phone numbers of Leasing Defendants in New

York.

569.    Merchant Services Defendants further relied on interstate wires to order

equipment, exchange contracts, financial records, and payments between alter-egos, and to

Leasing Defendants and the Processors.

570.    Specifically, Merchant Services Defendants faxed and emailed copies of the

fraudulent contracts to the Processor to effect payment processing.  Merchant Services

Defendants emailed or faxed Just Film's contract to the Processor sometime in June 2007.

Merchant Services Defendants emailed or faxed Precision Tune's to the Processor sometime

between April 2008 and June 2008.  Merchant Services Defendants emailed or faxed Dietz

Towing's contract to the Processor sometime between October 2007 and November 2007.

571.     Merchant Services Defendants also emailed and faxed copies of the fraudulent equipment finance leases to Leasing Defendants. Merchant Services Defendants emailed and faxed copies of Just Film's contract to Leasing Defendant sometime in June or July 2007. Merchant Services Defendants emailed and faxed Precision Tune's contract to Leasing Defendants sometime between April and June 2008.

572.     Merchant Services Defendants could not have furthered their fraud without the ability to use the telecommunications wires to share information with Leasing Defendants. Because Merchant Services Defendants needed an equipment lease financing company that permitted it to charge exorbitant rates for the equipment in defiance of industry norms, and that company operated across the country, use of interstate telecommunications wires to conduct the fraudulent activity was necessary and inevitable.

573.     Because Merchant Services Defendants maintain offices around the country, Defendants communicated with one another and the various offices of each alter-ego via email, fax, and telephone.

574.     Merchant Services Defendants also placed interstate phone calls to enforce the fraudulent contracts and intimidate Plaintiffs and the Class into paying to Defendants exorbitant amounts of money as stipulated by the fraudulent contracts.

575.     The dates and contents of some of these phone calls and their senders and recipients are more fully set forth in paragraphs 346, 348, 350, 353 with respect to Just Film, 389, 393, and 408 with respect to Precision Tune, 414 with respect to Burlingame Motors, 439, 442, 455-56 with respect to Dietz Towing, and 468 with respect to The Rose Dress.

**Leasing Defendants Committed Multiple Acts of**

**Wire Fraud in Violation of 18 U.S.C. § 1343 In Furtherance Of The Enterprise**

576.     Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiffs and the Class out of money.  Defendants committed these acts with the intent to defraud Plaintiffs and the Class.

577.     In engaging in this scheme to defraud, it was reasonably foreseeable that interstate wire communications would be used.  Leasing Defendants provided Plaintiffs and the Class with

telephone and fax numbers that were outside of the state of California. These telephone and fax numbers included the phone numbers located in New York and Illinois.

578. Leasing Defendants also initiated out of state telephone calls from their New York offices to Plaintiffs and the Class, threatening them with lawsuits and large financial penalties to further their fraudulent scheme.

579. Leasing Defendants used the interstate wires to withdraw money for the purported purposes of paying personal property tax on the leased equipment, when it had no intention to file these taxes on behalf of Plaintiff and the class. With respect to Just Film, these acts of wire fraud occurred on January 10, 2008 and again on September 17, 2008, and are described more fully in the paragraphs 359-62 and 364-65. With respect to Dietz Towing, these acts of wire fraud occurred on January 11, 2008, September 29, 2008, and January 25, 2010, and are described more fully in paragraphs 447-53. Additional allegations about this scheme are alleged in paragraphs 274-81.

580. In March 2011, Leasing Defendants relied on interstate wires to withdraw money from thousands of bank accounts around the country. Specifically, using a fraudulent shell company which purportedly conducted an audit identifying past due property taxes, Leasing Defendants used old ACH withdrawal forms to withdraw amounts from merchants' bank accounts nationwide. An overview of this scam is described in paragraphs 279-81, and specific allegations with respect to Plaintiffs Campbell and SVPC are described in paragraphs 508-10.

581. Leasing Defendants further relied on interstate wires to order equipment, exchange contracts, financial records, and payments between alter-egos, their offices in New York and Illinois, and to Merchant Services Defendants' offices in Illinois and California.

582. Because Leasing Defendants maintain offices around the country, Defendants communicated with one another and the various offices of each alter-ego via email, fax, and telephone.

583. Leasing Defendants also placed and received interstate phone calls to enforce the fraudulent contracts and intimidate Plaintiffs and the Class into paying to Defendants exorbitant amounts of money as stipulated by the fraudulent contracts and to intimidate Plaintiffs and the

Class into paying bogus property taxes.   Specifically, Leasing Defendants placed dozens of calls from New York to Just Film in California between October 2008 and February 2009 to attempt to collect fraudulent debt and further their scheme, as described in paragraphs 367-68

584.   The dates and contents of some of these phone calls and their senders and recipients are more fully set forth in paragraphs 374-78, 476, and 508-09 of this Complaint.

**PLAINTIFFS' SECOND CAUSE OF ACTION**
**Conspiracy to Engage in a Pattern of Racketeering Activity**
**18 U.S.C. § 1962(d)**
**On Behalf Of Themselves and the Class**
**Against All Defendants**

585.   Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

586.   Merchant Services Defendants and Leasing Defendants conspired to conduct and participate in the Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d).

587.   During the ten (10) calendar years preceding March 26, 2006, all Defendants conspired to cooperate jointly and severally in the commission of at least two (2) of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d), and incorporated by reference above.

588.   Leasing Defendants, led by Defendants Mezei, Cohen, Krieger, Healy, Fitzgerald, MBF Merchant Capital, and MBF Leasing conspired with Merchant Services Defendants, led by Defendant Moore, and other ISOs to devise the misleading Equipment Finance Leases, eschew the traditional price cap on leases, and create a sham due diligence system, as set forth in paragraphs and131-48, 168, 171, and 240-46.

589.   Leasing Defendants Mezei, Cohen, and Krieger conspired amongst themselves to develop a complicated system of shell companies and alter-egos to hide the revenues from the Northern Leasing Companies, as set forth in paragraphs 80-124.

590.   Leasing Defendants Cohen, Buono, and Joseph Sussman conspired amongst themselves to create Joseph I. Sussman, P.C., and hold it out as an independent legitimate law firm to mislead class members and the courts, and to further their illegal debt collection efforts, as

set forth in paragraphs 127-130, 292-312, 315-317.

591.    Merchant Services Defendants, led by Defendant Moore, Parisi, Jurczyk, Roy, Walshe, and Madura, conspired with amongst themselves and with Leasing Defendants to engage in a pattern of soliciting merchants through the use of misleading rate quotes, only later to impose a new, more expensive rate structure and new fees, as well as expensive fees for leasing equipment.   Merchant Services Defendants further conspired to withhold key parts of the agreement, contained in the Merchant Card Processing Agreement, from merchants to induce them into entering the contract, as set forth in paragraphs 214-220, and 263-269.

592.    Defendants Moore and Walshe further conspired with each other to expand their fraudulent operations into Northern California, as described in paragraphs 176-77.

593.    Plaintiffs further allege that all Defendants did conspire to commit at least two (2) of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(d), as set forth above.

594.    Defendants' conspiracy is an ongoing element of its business practices and remains a continuing threat to Plaintiffs and the Class.

595.     Defendants' conspiracy has caused injury to Plaintiffs and the Class, remains a part of their ongoing business practices, and remains a continuing threat to Plaintiffs, the Class and the general public.

596.    As a direct and proximate result of this conspiracy, Plaintiff and other members of the Class have suffered and continue to suffer injury in fact and have lost money and/or property in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

## PLAINTIFFS' THIRD CAUSE OF ACTION
### (Fraud, Deceit and/or Misrepresentation)
**On Behalf of Themselves and the Merchant Services Electronic Payment Processing Subclass Against Merchant Services Defendants**

**On Behalf of Themselves and the Northern Leasing Subclass Against Northern Leasing Defendants**

597.     Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

598.     During the previous three years, Defendants represented that Plaintiffs and the Class would save significant amounts of money.

599.     Specifically, agents of Merchant Services Defendants told Plaintiff Just Film in May 2007 that it could reduce its credit card processing cards significantly by contracting with Merchant Services Defendants.  Merchant Services Defendants knew this statement to be false when it was made.  Agents of Merchant Services Defendants told Plaintiff Precision Tune in April 2008 that it could reduce its credit card processing fees significantly by contracting with Merchant Services Defendants.  Merchant Services Defendants knew this statement to be false when it was made.  The details of this fraud is set forth in the discussions of the Plaintiffs, paragraphs 172-298.

600.     Merchant Services Defendants made this same misrepresentation to thousands of small business owners throughout the class period.  In making these representations, Merchant Services Defendants were acting on their own behalf.

601.     Merchant Services Defendants and Leasing Defendants also fraudulently and deceptively failed to inform Plaintiffs and the class that they intended to add undisclosed material terms to the contracts.

602.     Specifically Merchant Services Defendants, acting on their own behalf and as agents of Leasing Defendants fraudulently and deceptively failed to inform class members that they would be charged much higher rates than promised, that they would be bound to the agreement for three or more years, that they would be subject to arbitration provisions and out of state lawsuits, that they would be subject to repeated inquiries into their consumer credit reports,

and that they would be subject to severe penalties for non-compliance or breach.   The details of this fraud are set forth generally for Merchant Services Defendants in paragraphs 185-202, 207-213, 255, 257-73, and 282-83; for Merchant Services Defendants acting on behalf of or in concert with Leasing Defendants in paragraphs 214-17, 221-23, 225-31, 233-36, and 241-45; and for the Leasing Defendants in paragraphs 216-20, 221-22, 224-28, 230-32, 236-38, 246, 247-54, 256, 274-81, and 285-91.  Specific discussions of the fraud directed towards the Plaintiffs is described in paragraphs 339-511.

603.     Specifically, Merchant Services Defendants presented incomplete contracts to Just Film on June 7, 2007 for the Equipment Finance Lease and for the Merchant Card Processing Agreement, representing that they were complete contracts and not disclosing to Just Film the true parties to the contract, specifically the Processors and Leasing Defendants.  Merchant Services Defendants presented incomplete contracts to Precision Tune in April 2008 for the Equipment Finance Lease and for the Merchant Card Processing Agreement, representing that they were complete contracts and not disclosing to Precision Tune the true parties to the contract, specifically the Processors and Leasing Defendants.  Merchant Services Defendants, acting on their own behalf and as agents of Leasing Defendants, presented incomplete contracts to thousand of customers nationwide on various dates throughout the class period.

604.     Defendants Moore, Parisi, and Jurzcyk directed and controlled the fraudulent representations made on behalf of them, the Merchant Services Defendants and the Leasing Defendants.  Defendants Walshe and Roy made fraudulent representations on behalf of themselves and as agents of Merchant Services Defendants and the Leasing Defendants.  Defendants Roy and Walshe and trained other sales representatives to make similar fraudulent representations.  Defendant Madura furthered the fraud by enforcing the contracts, and the fraudulently inserted terms.  Details of how each Merchant Services Control Person carried out the fraud are set forth in 15-17, 23, 185-87, 193, 194-99, 201, 208-13, 215, 229, 243, 257-60, 270, and 272 with respect to Defendant Moore; 23, 184, 185-87, 194-98, 201, 208-13, 215, 229, 243, 257-60, and 270 with respect to Defendant Parisi; 23, 184, 185-87, 193-97, 199, 201, 205 with respect to Defendant Jurzcyk;  23, 193-94, 215, 231, 261, 271, 273, 284, 369, 370, 372, 405,

407, 424, 425, 428, 431, 461 with respect to Defendant Madura; 23, 192, 208-13, 215, 229, 234, 244, 257-60, 270, 434-38 with respect to Defendant Roy; and 18-20, 23, 192, 208-13, 229, 234, 235, 244, 257-60, 270, 340-44, 402-05 with respect to Defendant Walshe.

605. Merchant Services, Inc. employed and/or contracted with Merchant Services Control Persons to carry out the fraud. Defendants Universal Merchant Services, LLC, National Payment Processing, Inc., and Universal Card, Inc. are mere alter-egos of Merchant Services, Inc., as set forth in paragraph 15.

606. These representations and omissions were material at the time they were made. They concerned material facts that were essential to the analysis undertaken by Plaintiff and the Class as to whether to lease the equipment and contract with Merchant Services Defendants, Leasing Defendants, and Processors and their agents for its card processing services.

607. Merchant Services Defendants knew their representations to be false and had no reasonable grounds for believing them to be true when made. Leasing Defendants had knowledge of Merchant Services Defendants misrepresentations when accepting the terms of the contract but entered into the contract to increase their profits.

608. In so informing Plaintiffs and the Class, all Defendants breached their duty to them. All Defendants also gained financially from, and as a result of, their breach.

609. Plaintiff and the Class relied to their detriment on Defendants' fraudulent representations and omissions. Had Plaintiff and the Class been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, purchasing the leasing equipment and/or choosing a different merchant card services provider.

610. Defendants and their agents had a fiduciary duty to inform Class Members at the time of their agreements to utilize Defendants' services of the true nature of the agreement. Defendants and their agents omitted to provide this information to Class Members. Class Members relied to their detriment on Defendants' omissions. These omissions were material to the decisions of Class Members to contract with Defendants for merchant card services or to lease equipment. In making these omissions, Defendants breached their duty to Class Members. Defendants also gained financially from, and as a result of, their breach.

Second Amended Class Action Complaint

183621.1

611.     By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and Class Members to alter their position to their detriment.  Specifically, Defendants fraudulently and deceptively induced Plaintiff and Class Members to, without limitation, to lease credit card processing equipment and to enter into contracts for the processing of credit card payments.

612.     Plaintiffs and Class Members situated justifiably and reasonably relied on Defendants' omissions, and, accordingly, were damaged by the Defendants.

613.     As a direct and proximate result of Defendants' misrepresentations, Plaintiffs and Class Members have suffered damages, including, without limitation, the amount they paid towards their equipment leases and for credit card processing services.

614.     Defendants' conduct as described herein was willful and malicious and was designed to maximize Defendants' profits even though Defendants knew that it would cause loss and harm to Plaintiffs and Class Members.

### PLAINTIFFS' FOURTH CAUSE OF ACTION
**(Negligent Misrepresentation)**
**On Behalf of Themselves and the Merchant Services Electronic Payment Processing Subclass Against Merchant Services Defendants**

**On Behalf of Themselves and the Northern Leasing California Subclass Against Northern Leasing Defendants**

615.     Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

616.     During the previous three years, Merchant Services Defendants represented that Plaintiffs and the Class would save significant amounts of money.  Merchant Services Defendants also fraudulently and deceptively failed to inform Plaintiffs and the class that they and Leasing Defendants intended to add undisclosed material terms to the contracts.  Merchant Services Defendants fraudulently and deceptively failed to inform class members that they would be charged much higher rates than promised, that they would be bound to the agreement for three or more years, and that they would be subject to severe penalties for non-compliance or breach.  In making these representations, Merchant Services Defendants were acting on their own behalf and

as agents for Leasing Defendants.

617. Defendants Moore, Parisi, and Jurzcyk directed and controlled the misrepresentations made on behalf of them, the Merchant Services Defendants and Leasing Defendants. Defendants Walshe and Roy made misrepresentations on behalf of themselves and as agents of Merchant Services Defendants and Leasing Defendants. Defendants Roy and Walshe and trained other sales representatives to make similar misrepresentations. Defendant Madura made misrepresentations by enforcing the contracts, and the fraudulently inserted terms. Details of how each Merchant Services Control Person carried out the fraud are set forth in 15-17, 23, 185-87, 193, 194-99, 201, 208-13, 215, 229, 243, 257-60, 270, and 272 with respect to Defendant Moore; 23, 184, 185-87, 194-98, 201, 208-13, 215, 229, 243, 257-60, and 270 with respect to Defendant Parisi; 23, 184, 185-87, 193-97, 199, 201, 205 with respect to Defendant Jurzcyk; 23, 193-94, 215, 231, 261, 271, 273, 284, 369, 370, 372, 405, 407, 424, 425, 428, 431, 461 with respect to Defendant Madura; 23, 192, 208-13, 215, 229, 234, 244, 257-60, 270, 434-38 with respect to Defendant Roy; and 18-20, 23, 192, 208-13, 229, 234, 235, 244, 257-60, 270, 340-44, 402-05 with respect to Defendant Walshe.

618. Merchant Services, Inc. employed and/or contracted with Merchant Services Control Persons to carry out the fraud. Defendants Universal Merchant Services, LLC, National Payment Processing, Inc., and Universal Card, Inc. are mere alter-egos of Merchant Services, Inc., as set forth in paragraph 15.

619. These representations and omissions, including specific examples described in paragraphs 340-44, 402-05, and 434-48, were material at the time they were made. They concerned material facts that were essential to the analysis undertaken by Plaintiff and the Class as to whether to lease the equipment and contract with Defendants and their agents for its card processing services.

620. Merchant Services Defendants should have known their representations to be false and had no reasonable grounds for believing them to be true when they were made. Leasing Defendants should have known that contracts garnered by Merchant Services Defendants were the result of false representations.

Second Amended Class Action Complaint

621.　Defendants intended that Plaintiffs and the Class rely on these representations.

622.　Plaintiffs and the Class did reasonably rely on these representations when they entered into the contracts.

623.　Plaintiffs and the Class were harmed in that they did not save money but rather paid above and beyond what they were previously paying to other providers and were charged for long-term contracts to which they had not agreed.

624.　Plaintiffs and the Class suffered damages because of these representations and Defendants' false representations were a substantial factor in causing the damage.

### PLAINTIFFS' FIFTH CAUSE OF ACTION

**(False Advertising, Business and Professions Code § 17500, *et seq.***
**On Behalf Of Themselves and the Merchant Services Electronic Payment Processing**
**Subclass Against Merchant Services Defendants**

**On Behalf Of Themselves and the Merchant Services Electronic Payment Processing**
**California Subclass**
**Against Leasing Defendants**

625.　Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

626.　Beginning at an exact date unknown to Plaintiffs, but within three years preceding the filing of the Complaint, Defendants have made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of their merchant card services and equipment leases throughout the United States.

627.　Defendants have made misrepresentations and statements (by omission and commission) that lead reasonable customers to enter into agreements with Defendants and their agents.  Merchant Services Defendants made these statements acting on their own behalf, and as agents of Leasing Defendants.  Specifically, Defendants Moore, Parisi, and Jurzcyk, acting on behalf of themselves, devised a marketing strategy designed to mislead Class Members into believing that the Merchant Services Defendants were agents of reputable banks, would offer them wholesale processing rates, and could save them substantial amounts of money on their card processing costs.  Acting on behalf of themselves, Merchant Services Defendants, and as agents

of Leasing Defendants, Defendants Moore, Parisi, and Jurzcyk devised a strategy to mislead Class Members into believing that Merchant Services Defendants would be directly servicing their equipment lease, that they could cancel the lease at any time, and that that leasing equipment was a good value.  Defendants Walshe and Roy made these representations and trained and directed other sales agents to do the same. Specific examples of these statements are set forth in more detail in paragraphs 340-44, 402-05, and 434-48.

628.    Defendants Universal Card, Inc., Universal Merchant Services LLC, and National Payment Processing Inc., are alter-egos of Merchant Services Inc.

629.    Leasing Defendants authorized and directed Merchant Services Defendants to make these misrepresentations, and the activities described in paragraphs 214-17, 221-23, 225-31, 233-36, and 241-45; were within the scope of authority granted by Leasing Defendants, as detailed in those paragraphs.

630.    These representations, statements, and omissions induced reasonable customers to lease equipment from Defendant and/or their agents.  These representations, statements, and omissions also induced reasonable consumers to agree to a complex and expensive schedule of fees for the services of Defendants and their agents to process credit card payments.

631.    Plaintiffs and those similarly situated relied to their detriment on Defendants' false, misleading and deceptive advertising and marketing practices.   Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, purchasing the equipment outright or contracting with different merchant card services providers.

632.    Defendants' acts and omissions are likely to deceive the general public.

633.    Defendants engaged in these false, misleading and deceptive advertising and marketing practices to increase their profits.  Accordingly, Defendants have engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

634.    The aforementioned practices, which Defendants have used, and continue to use, to their significant financial gain, also constitute unlawful competition and provide an unlawful

1    advantage over Defendants' competitors as well as injury to the general public.

2        635.    Plaintiffs seek, on behalf of those similarly situated, an injunction to prohibit

3    Defendants from continuing to engage in the false, misleading and deceptive advertising and

4    marketing practices complained of herein.  The acts complained of herein occurred, at least in

5    part, within three years preceding the filing of this Complaint.

6        636.    Plaintiffs and those similarly situated are further entitled to and do seek both a

7    declaration that the above-described practices constitute false, misleading and deceptive

8    advertising, and injunctive relief restraining Defendants from engaging in any such advertising

9    and marketing practices in the future.  Such misconduct by Defendants, unless and until enjoined

10   and restrained by order of this Court, will continue to cause injury in fact to the general public

11   and the loss of money and property in that the Defendants will continue to violate the laws of

12   California, unless specifically ordered to comply with the same.  This expectation of future

13   violations will require current and future customers to repeatedly and continuously seek legal

14   redress in order to recover monies paid to Defendants to which Defendants are not entitled.

15   Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate

16   remedy at law to ensure future compliance with the California Business and Professions Code

17   alleged to have been violated herein.

18       637.    As a direct and proximate result of such actions, Plaintiffs and the other members

19   of the Class have suffered, and continue to suffer, injury in fact and have lost money and/or

20   property as a result of such false, deceptive and misleading advertising in an amount which will

21   be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among

22   other things, Plaintiffs and the class lost (1) the portion of the amount they paid for leasing the

23   equipment at rates higher than the cost of purchasing the equipment, (2) the portion of the

24   amounts paid for credit card processing services that was higher than what appeared on the first

25   page of the Equipment Finance Lease and (3) termination fees that they were required to pay in

26   order to get out of the onerous contracts with Defendants.

27       638.    As a direct and proximate result of such actions, Defendants have enjoyed, and

28   continue to enjoy, significant financial gain in an amount which will be proven at trial, but which

is in excess of the jurisdictional minimum of this Court.

## PLAINTIFFS' SIXTH CAUSE OF ACTION
### (Breach of Contract)
**On Behalf of Themselves and the Electronic Payment Processing Subclass
Against Merchant Services Defendants**

**On Behalf of Themselves and the Northern One Page Contract Subclass
Against The Northern Leasing Companies and Northern Leasing Control Persons**

639.    Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

640.    Defendant Merchant Services, Inc. entered into contracts with Plaintiffs and the Electronic Payment Processing Subclass, orally and in writing by way of the Rate Sheet, that provided that Plaintiffs would be charged the "wholesale" rate of an artificially low amount, typically 1.79% for all credit card transactions. Defendant Merchant Services, Inc. then breached those contracts by later imposing on Plaintiffs and the Electronic Payment Processing Subclass a tiered rate schedule, charging higher rates based on the type of card processed.  As alter egos of Defendant Merchant Services, Inc., the Merchant Services Companies and the Merchant Services Control Persons are also liable for these breaches of contract.

641.    In addition, Defendant Merchant Services, Inc entered into oral and implied-in-fact contracts with Plaintiffs and the Electronic Payment Processing Subclass that provided that merchants could cancel electronic payment services at any time without penalty.  In particular: (1) Defendant Merchant Services orally represented that it was the provider of electronic payment services or an authorized sales agent for such a provider, (2) Defendant Merchant Services showed merchants a copy of (parts of) an application for merchant agreement that contained no reference to any length of time for which the merchant was agreeing to the electronic payment processing services and (3) Defendant Merchant Services orally represented that such services could be cancelled at any time.  Defendant Merchant Services breached those contracts by later charging $495 to merchants who cancelled while at the same time asking third-party Processors to waive such fees, so that Merchant Services could keep this money for itself. As alter egos of Defendant Merchant Services, Inc., the Merchant Services Companies and the Merchant Services

Second Amended Class Action Complaint

1 | Control Persons are also liable for these breaches of contract.

2 |       642.    The Northern Leasing Companies entered into one-page "equipment finance lease"

3 | contracts with Plaintiffs and the Northern One Page Contract Subclass, as described in paragraphs

4 | 222-28.  These one-page contracts provided that merchants would have to pay a fixed monthly

5 | fee plus "applicable taxes" and in the event of a legal dispute in which the Northern Leasing

6 | Companies prevailed, "attorneys' fees." They further provided that there was no fixed term

7 | (length) for the contract, in that: (1) the one page contract contained a blank line for the term

8 | length rather than any stated amount, (2) the Northern Leasing Companies authorized ISOs,

9 | including the Merchant Services Defendants, to represent, and such ISOs did represent, that there

10 | was no fixed term for the contract and that it could be cancelled at any time.  The Northern

11 | Leasing Companies breached these contracts by (1) charging and automatically debiting amounts

12 | in excess of the monthly fee, including a $4.95 monthly "loss damage waiver," (2) charging and

13 | automatically debiting amounts, purportedly for taxes and associated tax preparation fees, even

14 | though such amounts were not actually due or remitted to taxing authorities and no tax returns

15 | were filed, (3) charging as an "attorneys' fee" an amount equal to 20% of the purportedly

16 | outstanding debt, even though no such attorneys' fee had been incurred, (4) charging and

17 | automatically debiting amounts, purportedly for the balance due on a lengthy fixed term, to

18 | merchants who cancelled before the end of the term, and (5) charging "first and last" month's

19 | payments in addition to the purported 48-month lease term.  As alter egos of the Northern Leasing

20 | Companies, each of the Northern Leasing Control Persons is also liable for these breaches of

21 | contract.

22 |       643.    With respect to the members of the Northern Leasing California Subclass,

23 | Defendant Merchant Services is also liable for these breaches of contract, as a party to the

24 | contracts. Merchant Services represents to merchants that it, not the Northern Leasing

25 | Companies, is the contracting party on the "equipment finance lease." Defendant Merchant

26 | Services represents that payments indicated on the lease are not payments but rather service fees

27 | for processing the account.  It also put its own logo on the lease.  Thus, although the contract is

28 | sold by Merchant Services to the Leasing Defendants, Merchant Services is a party with whom

1   the class members contracted on the purported equipment finance leases.

2       644.    These representations by Merchant Services Defendants and Leasing Defendants

3   were material and a significant factor in the decisions by Plaintiffs and the Class to enter into

4   agreements for credit card processing and equipment.

5       645.    As a direct and proximate result of Defendants' breaches as described herein,

6   Plaintiffs and the Electronic Payment Processing Subclass and Northern Leasing Contract

7   Subclass have suffered damages in an amount to be proven at trial.

**PLAINTIFFS' SEVENTH CAUSE OF ACTION**
**(Breach of the Duty of Good Faith And Fair Dealing)**

**On Behalf of Themselves and the Electronic Payment Processing Subclass**
**Against the Merchant Services Defendants**

**On Behalf of Themselves and the Northern Leasing California Subclass**
**Against the Leasing Defendants**

14       646.    Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as

15   if set forth herein.

16       647.    Leasing Defendants solicited Plaintiffs and the Class for equipment leases.

17   Merchant Services Defendants (acting on their own behalf and on behalf of Leasing Defendants)

18   solicited Plaintiffs and the Class for equipment leases and for contracts for electronic payment

19   processing services.

20       648.    Plaintiffs and the Class performed their end of the bargain as set forth in the Rate

21   Sheets, the oral and implied-in-fact contract regarding the cancellability of payment processing

22   services, and the Equipment Finance Leases.  Plaintiffs paid for services rendered or objected to

23   charges in the manner set forth by the contract.

24       649.    Merchant Services Defendants unfairly interfered with Plaintiffs' rights to receive

25   the benefits of the Rate Sheet contract by engaging in a variety of actions, including modifying

26   the rates at which credit card transactions would be processed, unilaterally changing the terms and

27   conditions of the contract and equipment lease, refusing to address complaints by Plaintiff and the

28   class about billing and service, failing to provide accurate copies of executed contracts, imposing

"first and last" monthly lease charges that are in addition to contracted amounts, engaging in a

pattern of threats and harassment to enforce the fraudulent terms and conditions of the contracts,

intentionally failing to provide methods for class members to lodge complaint and obtain redress,

and misleading class members, courts, and law enforcement personnel about their identities and

roles.

650.    The Leasing Defendants unfairly interfered with Plaintiffs' rights and the rights of

the Northern Leasing California Subclass to receive the benefits of the Equipment Finance Lease

by, *inter alia,* (1) accepting and attempting to enforce terms of contracts that had been modified

after they had been signed by merchants, (2) refusing to investigate allegations of fraud and

forgery in connection with the execution and modifications of the contracts, (3) refusing to take

reasonable steps to verify that the terms had been accepted by merchants before enforcing them,

(4) refusing to accept notices of cancellation and return tenders of equipment, and continuing to

charge and automatically debit lease payment and other amounts after such tenders have been

made, (5) charging and automatically debiting amounts not actually due under the contracts such

as amounts for taxes and tax preparation fees that were not due, incurred or remitted to taxing

authorities, (6) falsely claiming that amounts are due long after contracts have been terminated,

(7) making false statements in connection with attempts to collect amounts allegedly due under

the contracts, (8) making false and misleading statements in legal proceedings to collect amounts

allegedly due under the contracts, (9) providing inadequate notice of ACH withdrawals,

(10) intentionally failing to provide methods for class members to lodge complaint and obtain

redress, (11) misleading class members, courts, and law enforcement personnel about their

identities and roles.

651.    The Leasing Defendants further unfairly interfered with Plaintiffs' rights and the

rights of the Northern One Page Contract Subclass to receive the benefits of the Equipment

Finance Lease by systematically adding three additional pages to the one page agreement

purportedly entered into by the Subclass.  Leasing Defendants knew the first page of the

agreement was a complete agreement but inserted and enforced terms and conditions on the

remaining pages, thereby interfering with contractual rights. These terms and conditions include,

Second Amended Class Action Complaint

but are not limited to, (1) charging a $4.95 a month insurance charge to protect against losses and damages; (2) charging a $200 deductible to those who invoke the insurance policy; (3) charging personal property taxes and automatically deducting these from the Subclass bank account; (4) charging a $25 filing fee to file the personal property taxes behalf of the Subclass member and automatically deducting these from the Subclass members' bank account; (5) penalizing class members with stiff buy-out charges and continued automatic withdrawals from their bank accounts at the end of the lease term; (6) imposing additional fees, charges, and fines.

652.    As a direct and proximate result of the Defendants' breach of contract, Plaintiffs and the Electronic Payment Processing Subclass, Northern Leasing Contract Subclass, Northern One Page Contract Subclass have suffered damages, including, without limitation, the loss of money paid to Defendants in an attempt to satisfy fraudulent debts.


## PLAINTIFFS' EIGHTH CAUSE OF ACTION
### (Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681)
### On Behalf of Themselves and the Credit Monitoring Subclass Against the Northern Leasing Companies and the Merchant Services Companies

653.    Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

654.    The Merchant Services Companies and Northern Leasing Companies have engaged in a pattern of knowingly and willfully conducting unwarranted, impermissible credit inquiries in violation of 15 U.S.C. § 1681n.

655.    Plaintiffs Volker Von Glasenapp and Lewis Bae are consumers within the meaning of 15 U.S.C. § 1681a(c).

656.    Northern Leasing Companies and Merchant Services Companies are persons within the meaning of 15 U.S.C. § 1681a(b).

657.    The Northern Leasing Companies violated 15 § U.S.C. 1681n(a) and 1681n(b) when they conducted inquiries on Mr. Von Glasenapp's consumer credit report from a consumer reporting agency, within the meaning of 15 U.S.C. §§ 1681a(d) and (f), as described in paragraph 379 and on Mr. Bae's consumer credit report as described in paragraphs 485 and 486.  The

Second Amended Class Action Complaint

Northern Leasing Companies knew they had no permissible purpose to access these reports or the reports of the Subclass, but did so anyway.

658.    The Merchant Services Companies violated 15 U.S.C. §§ 1681n(a) and 1681n(b) when they conducted inquiries on Mr. Von Glasenapp's consumer credit report from a consumer reporting agency, within the meaning of §§ 1681a(d) and (f), as described in paragraphs 370 and 380.  The Merchant Services Companies maintain that they have no contract with class members such as Mr. Von Glasenapp, as described in paragraphs 318-319, and furthermore that at the time of accessing his report, he had already terminated his services with Merchant Services Companies, and accordingly they knowingly conducted these inquiries without a permissible purpose.

659.    As a result of these violations, Mr. Bae, Mr. Von Glasenapp, and the members of the Credit Monitoring Subclasses have been damaged and are entitled to actual or statutory damages of up to $1,000 for every violation and attorneys' fees.

### PLAINTIFFS' NINTH CAUSE OF ACTION
**(Abuse of Process, New York Common Law)**
**On Behalf of The Abuse Of Process Subclass Against the Leasing Defendants**

660.    Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

661.    Leasing Defendants, including Defendants Buono, Sussman, Joseph I. Sussman, P.C., engage in a pattern and practice of regularly filing lawsuits against class members to collect monies purportedly owed on equipment finance leases.

662.    Leasing Defendants employ a variety of abusive and illegal tools to increase their chances of obtaining a default judgment or otherwise compel Class Members to pay large sums of money to satisfy fraudulent leases.   As described in paragraphs 303-308, Leasing Defendants willfully ignore the service requirements and pleading standards of the New York Rules of Civil Procedure.  Leasing Defendants increase the chances that class members will not have an opportunity to defend the allegations against them, and that the New York courts will grant default judgments.

663.    Leasing Defendants intentionally misled the courts and violated New York Rules of Civil Procedure by Leasing Defendants intentionally did not follow New York Rules of Civil Procedure when they used false affidavits by process servers to increase their chances of obtaining a default judgment against Plaintiff Bae and other members of the Abuse of Process subclass.

664.    Leasing Defendants intentionally misled the courts about the basis for jurisdiction and venue, when they falsely claimed that the basis for jurisdiction was the residence of the creditor, even when such creditor actually was an out-of-state entity, to avoid having the Courts give stricter scrutiny to other potential bases of venue and jurisdiction such as a purported forum selection clause.

665.    When class members file answers, Leasing Defendants intentionally keep cases pending for years, with no intent to actually prosecute them to judgment, solely so that the existence of the cases will damage class members' credit ratings, and so that Defendants can extort monies in settlement in exchange for dismissing the claims.

666.    Leasing Defendants intentionally misled the courts and violated New York Rules of Civil Procedure (as well as fundamental due process) by filing a second collections lawsuit against Bae to collect the same purported debt, even though the first action remained pending. Leasing Defendants have engaged in the same tactics against other class members.

667.    Leasing Defendants intentionally misled the courts and violated New York Rules of Civil Procedure by using documents that they know or have reason to believe are forged and fraudulent.  For example, Leasing Defendants do not obtain original copies a four-page signed equipment lease nor do they ensure that purported second through fourth pages of the lease that they file are the actual pages presented to the merchant who is an alleged debtor.  Rather they simply provide the courts with a photocopy (or more likely, a photocopy of a photocopy) of the first page and then attach copies of other pages that they obtain elsewhere and assert, falsely, to have been part of the original signed lease.  Leasing Defendants also represent that the terms shown on the first page of the lease were the same terms approved by the merchant even when they know or have reason to know that such terms were added or modified after the merchant

Second Amended Class Action Complaint

183621.1

signed. Leasing Defendants also represent that the signatures and/or initials shown on the lease documents are the signatures and or initials made by the merchants even when they know or have reason to know that such signatures and/or initials were forged.

668.    Defendants intentionally misled the courts and violated New York Rules of Civil Procedure by filing false and misleading affidavits and declarations as to the roles and responsibilities of the Northern Leasing claiming, in lawsuits again Defendants engage in these practices with the intent to harm class members, by denying them due process, by obtaining default judgments against them with which they use to extort money and damage credit, and other goals that are outside the legitimate purposes of process.

### PLAINTIFFS' TENTH CAUSE OF ACTION
**Conversion**
**On Behalf of Themselves and the Electronic Payment Processing Subclass**
**Against Merchant Services Defendants**

**On Behalf of Themselves and the Northern Leasing Subclass**
**Against the Leasing Defendants**

669.    Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

670.    Defendants have used ACH withdrawal forms to extract sums of money from the bank accounts of Plaintiffs and the Class to which they have no right.

671.    The Merchant Services Defendants unlawfully converted funds from class members bank accounts when they withdrew sums equivalent to the first and last month's payment on the equipment finance leases, when in fact the funds were not credited to class members accounts, but rather, counted towards Merchant Services Defendants own revenues, as described in paragraphs 270-72.

672.    Specifically, the Merchant Services Defendants unlawfully converted funds when they deducted from Just Film's bank account $325.48 on July 3, 2007, as described in paragraph 350. Merchant Services Defendants had no contractual authorization to withdraw that sum and

Second Amended Class Action Complaint

did so for their own financial gain. Merchant Services Defendants claimed that the funds were used as a first and last month's deposit on the terminal, but in reality, the money was never provided to Leasing Defendants, nor was it credited against the purported balance owed on the equipment finance lease.

673.   Merchant Services Defendants have engaged in similar acts of conversion with respect to hundreds or thousands of class members throughout the class period.

674.   The Leasing Defendants unlawfully converted funds from class members' bank accounts when they used ACH forms to withdraw funds, purportedly for payment of property taxes and tax preparation fees, when such taxes were not remitted to taxing authorities and tax returns were not filed, as described generally in paragraphs 274-81.

675.   Specifically, Leasing Defendants unlawfully converted funds when they deducted from Just Film's bank account $81.01 on January 8, 2008 and $79.84 on September 29, 2008. Leasing Defendants unlawfully converted funds when they deducted from Dietz Towing's bank account $62.68 on January 11, 2008, $61.89 on September 29, 2008, and $50.91 on January 25, 2010. Leasing Defendants did not use these funds to pay personal property taxes, but rather converted them into their own revenue stream.

676.   Defendants Dietz Towing and Just Film suffered damages from these acts.

677.   Except for the dates and amounts, class members suffered damages in the same respect.

### PLAINTIFFS' ELEVENTH CAUSE OF ACTION
**(Unfair, Unlawful and Deceptive Trade Practices, Cal. Bus. and Prof. Code § 17200, *et seq*.)**
**On Behalf of Themselves and the Electronic Payment Processing Subclass**
**Against Merchant Services Defendants**

**On Behalf of Themselves and the Northern Leasing California Subclass**
**Against the Leasing Defendants**

678.   Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

679.   Within four years preceding the filing of this Complaint, and at all times

mentioned herein, Defendants have engaged, and continue to engage, in unfair, unlawful and deceptive trade practices in California by engaging in the unfair, deceptive and unlawful business practices outlined in this Complaint. In particular, Defendants have engaged, and continue to engage, in unfair, unlawful and deceptive trade practices by without limitation the following:

    a.   altering contracts after they were signed;

    b.   failing to properly inform class members that (1) they would be leasing the credit card processing equipment at rates much higher than this equipment could be purchased for; (2) they would be charged extremely high, undisclosed rates for the processing of credit card payments; (3) the lease and contract terms were for three or more years; (4) they would be subject to early termination fees; (5) they could be sued in foreign forums, and (6) Defendants would hold them personally liable;

    c.   deceiving class members into believing that (1) the Equipment Finance Lease agreements they entered contained all the terms and conditions; (2) the merchant services application contained all the terms and conditions; (3) class members would be charged low, competitive rates for credit card processing services as set forth on the rate sheets; (4) the agreements could be terminated at any time by all parties; and (5) terminals available for purchase or lease elsewhere were not compatible with Defendants' services;

    d.   marketing, advertising, and selling credit card processing services and equipment leasing without disclosing to customers the true costs of such services;

    e.   engaging in mail fraud in violation of 18 U.S.C. § 1341;

    f.   engaging in wire fraud in violation of 18 U.S.C. § 1343;

    g.   engaging in fraud in connection with an access device in violation of 18 U.S.C. § 1029;

    h.   violating RICO;

    i.   failing to properly inform their customers of the complete contract terms;

    j.   engaging in false advertising in violation of Business & Professions Code § 17500 *et seq.*;

k.   acting in breach of contract;

l.   acting in breach of the duty of good faith and fair dealing;

m.  violating the Fair Credit Reporting Act;

n.   engaging in abuse of process; and.

o.   engaging in conversion

680.    Plaintiffs and those similarly situated relied to their detriment on Defendants' unfair, deceptive and unlawful business practices.   Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, contracting with different merchant card services providers.

681.    Defendants' acts and omissions are likely to deceive the general public.

682.    Defendants engage in these unfair practices to increase their profits.  Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

683.    The aforementioned practices, which Defendants have used, and continue to use, to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

684.    Plaintiffs seek, on behalf of those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiffs, the general public, or those similarly situated by means of the unfair and/or deceptive trade practices complained of herein, plus interest thereon.

685.    Plaintiffs seek, on behalf of those similarly situated, an injunction to prohibit Defendants from continuing to engage in the unfair trade practices complained of herein.  The acts complained of herein occurred, at least in part, within four years preceding the filing of this Complaint.

686.    Plaintiffs and those similarly situated are further entitled to and do seek both a declaration that the above-described trade practices are unfair, unlawful and/or fraudulent and injunctive relief restraining Defendants from engaging in any of such deceptive, unfair and/or unlawful trade practices in the future.  Such misconduct by Defendants, unless and until enjoined

and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that the Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future customers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which Defendants are not entitled. Plaintiff, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

687. As a direct and proximate result of such actions, Plaintiffs and the other members of the Class have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the class lost (1) the portion of the amount they paid for leasing the equipment at rates higher than the cost of purchasing the equipment, (2) the portion of the amounts paid for credit card processing services that was higher than what appeared on the first page of the Equipment Finance Lease and (3) termination fees that they were required to pay in order to get out of the onerous contracts with Defendants.

688. As a direct and proximate result of such actions, Defendants have enjoyed, and continue to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for judgment as follows:

A. On Causes of Action Numbers 1 (Conduct and Participation in a RICO Enterprise) and 2 (Conspiracy To Engage In Racketeering) against Defendants and in favor of Plaintiffs and the other members of the Class:

    1. For treble damages, the amount of which is to be determined at trial;

B. On Causes of Action Numbers 3 (Fraud), 7 (Breach of Duty of Good Faith and

183621.1

Second Amended Class Action Complaint

Fair Dealing), 9 (Abuse of Process) and 10 (Conversion) against Defendants and in favor of Plaintiffs and other members of the named classes:

      1.  An award of compensatory damages, the amount of which is to be determined at trial;

      2.  An award of punitive damages, the amount of which is to be determined at trial;

C.    On Causes of Action Numbers 4 (Negligent Misrepresentation) and 6 (Breach of Contract) against Defendants and in favor of Plaintiffs and other members of the named classes:

      1.  An award of compensatory damages, the amount of which is to be determined at trial;

D.    On Causes of Action Numbers 5 (False Advertising) and 11 (UCL) against Defendants and in favor of Plaintiffs and other members of the named classes:

      1.  An award of restitution;

E.    On Cause of Action Number 8 (Fair Credit Reporting Act) against Defendants and in favor of Plaintiffs and other members of the named classes:

      1.  An award of the greater of actual damages or $1000 for every knowingly impermissible violation;

      2. An award of the actual damages of not less than $100 and not more than $1000 for every willful violation;

      3. an amount of punitive damages; the amount of which is to be determined at trial.

F.    On all causes of action in favor of Plaintiffs and other members of the named classes:

      1.  For declaratory and injunctive relief

      2.  For reasonable attorneys' fees according to proof pursuant to, without limitation, RICO, the FCRA, and California Code of Civil Procedure § 1021.5;

Second Amended Class Action Complaint

3. For costs of suit incurred; and

4. For such further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: March 18, 2011        **GUTRIDE SAFIER LLP**

_____

Adam J. Gutride, Esq.
Seth A. Safier, Esq.
Kristen Simplicio, Esq.
835 Douglass Street
San Francisco, California 94114

**McNUTT LAW GROUP**
Michael A, Sweet, Esq.
Shane Moses, Esq.
188 The Embarcadero, Suite 800
San Francisco, California 94105

Attorneys for Plaintiffs